IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

**FIRST DAY MOTION FOR AN ORDER (I) AUTHORIZING THE
DEBTOR TO PAY AND HONOR CERTAIN PRE-PETITION WAGES,
BENEFITS, AND OTHER COMPENSATION OBLIGATIONS; AND
(II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

USA Gymnastics, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**" or "**USAG**"), hereby moves (the "**Motion**") for the entry of an order, substantially in the form attached hereto as Exhibit A (the "**Order**"), pursuant to sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and Rule B-9013-3 of the Local Rules of the United States Bankruptcy Court for the Southern District of Indiana (the "**Local Rules**"), (a) authorizing the Debtor to pay and honor certain pre-petition wages, benefits, and other compensation obligations; and (b) authorizing financial institutions to honor and process checks and transfers related to such obligations. The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of James Scott Shollenbarger* (the "**First Day Declaration**"). In further support of this Motion, the Debtor respectfully states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference from the United States District Court for the Southern District of Indiana, dated July 11, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 363, 503, 507, 1107, and 1108 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

**I.    General.**

2. On the date hereof (the "**Petition Date**"), USAG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently with this Motion, the Debtor has also filed certain other motions and applications seeking certain "first day" relief.

3. The Debtor remains in possession of its property and continues to operate and maintain its organization as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee has been established in this chapter 11 case.

4. The Debtor is a 501(c)(3) not-for-profit organization incorporated in Texas. Based in Indianapolis, Indiana, the Debtor is governed by a Board of Directors.

5. The Debtor's organization encompasses six disciplines: women's gymnastics, men's gymnastics, trampoline and tumbling, rhythmic gymnastics, acrobatic gymnastics, and group gymnastics. The Debtor provides educational opportunities for coaches and judges, as well as gymnastics club owners and administrators, and sanctions approximately 4,000 competitions

and events throughout the United States annually. More than 200,000 athletes, professionals, and clubs are members of USAG.

6. The Debtor also sets the rules and policies that govern the sport of gymnastics in the United States, including selecting and training the United States gymnastics teams for the Olympics and World Championships. The Debtor is currently designated by the United States Olympic Committee (the "**USOC**") as the national governing body for the sport of gymnastics in the United States. The USOC recently has taken steps toward revoking USAG's designation as the national governing body for gymnastics.

7. As a result of the misconduct of Larry Nassar, a former volunteer physician to USAG, the Debtor has been named as a defendant in approximately 100 lawsuits brought by survivors of Nassar's abuse. The Debtor's first priority is to ensure that these survivors are treated fairly and respectfully. The survivors' claims, in the aggregate, may exceed the available resources of the Debtor. The Debtor submits that this Court is the best forum in which to implement appropriate procedures to equitably determine the rights to and allocate recoveries to survivors who have asserted claims against the Debtor. The Debtor remains committed to its mission of supporting athletes, and will continue to take specific and concrete steps to promote athlete safety and prevent future abuse.

8. Additional information about the Debtor and the events leading up to the Petition Date can be found in the First Day Declaration, which is incorporated herein by reference.

**II. The Employees.**

9. The Debtor has a current workforce of approximately 53 employees (collectively, the "**Employees**"). Approximately 46 of those employees are employed on a full-time, salaried basis, approximately 5 employees are employed on a full-time, hourly basis, and approximately 2

employees are employed on a part-time, hourly basis. The Debtor also engages approximately 28 independent contractors.[2]

10. The Employees possess the institutional knowledge, experience, and skills necessary to support the Debtor's operations during the chapter 11 process and to support the Debtor's reorganization efforts. These Employees rely on their compensation from the Debtor to pay their daily living expenses. The Debtor also incurs a number of obligations related to the Employees, such as paid vacation and other time off, federal and state withholding taxes and other withheld amounts, health, dental, and vision benefits, life and accidental death and dismemberment insurance, short-term and long-term disability coverage, 401(k) contributions, expense reimbursements, and other benefits and programs that the Debtor has historically provided in the ordinary course of operations. The Debtor's compensation and benefit programs are referred to herein as the "**Employee Programs**" and the obligations to the Employees and independent contractors thereunder are referred to herein as the "**Employee Obligations**" and are more fully described below.[3]

11. The Debtor needs the Employees' continued commitment and support; therefore, the Debtor is requesting the relief set forth in this Motion to minimize any hardship to the Employees resulting from the commencement of the Debtor's chapter 11 case. Accordingly, by

---

[2] The Debtor engages other independent contractors for discrete needs. The 28 independent contractors identified in this Motion are necessary to the Debtor's day-to-day operations.

[3] The summary of the Employee Obligations provided herein is qualified entirely by the Debtor's official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtor and its Employees (each, an "**Official Policy**"). In the event of any inconsistency or ambiguity between this summary and an Official Policy, the terms of such Official Policy shall govern, but, for the avoidance of doubt, in no event shall the Debtor make any payments or honor any pre-petition obligations other than what is authorized by the Court after consideration of this Motion.

4

this Motion, the Debtor seeks authority to pay and honor its pre-petition Employee Obligations and to continue its Employee Programs, as further detailed below.

### III. The Employee Obligations And Employee Programs.

#### A. Unpaid Wages And Independent Contractor Obligations.

12. In the ordinary course its operations, the Debtor issues payroll to all Employees in arrears on a bi-weekly basis, with payroll being disbursed every other Friday, for the pay period through and including that Friday. The Debtor last issued payroll on November 30, 2018. The Debtor pays monthly, on average, approximately $305,000[4] in gross wages, salaries, and related taxes. Twice per year, a third payroll cycle occurs during the month and payroll for those two months approximates $455,000. The Debtor also pays approximately $42,000 per month to independent contractors.

13. The Debtor estimates that up to approximately $140,000 in pre-petition wages and salaries to Employees (collectively, the "**Unpaid Wages**") and approximately $4,000 in pre-petition amounts owed to independent contractors (the "**Unpaid Independent Contractor Obligations**") will become due after the Petition Date. Pursuant to this Motion, the Debtor seeks authorization, but not direction, to pay and honor in the ordinary course of operations the Unpaid Wages and Unpaid Independent Contractor Obligations and to continue to pay its Employees and independent contractors after the Petition Date in the ordinary course. If this Motion is granted, absent further order of the Court, the Debtor will not pay any individual Employee or independent contractor on account of pre-petition Unpaid Wages or Unpaid Independent Contractor Obligations amounts that, together with the other Employee Obligations, exceed $12,850.

---

[4] This amount includes the Debtor's employer payroll taxes on the related wages.

### B.  Accrued Vacation And Paid Time Off.

14. The Debtor's full-time Employees are eligible for paid vacation and other paid time off ("**PTO**"). The initial vacation time is two weeks for the first calendar year of employment, prorated for those Employees hired after the beginning of the year. After five years, eligible Employees are entitled to three weeks of paid vacation time. PTO is earned throughout the year on an accrual basis. PTO earned but not used is paid as part of the Employees' final paychecks. Conversely, PTO used in excess of the amount ratably earned is deducted from the Employees' final paychecks. The Debtor estimates the accrued PTO through year-end 2018 to be approximately $120,000.

15. The Debtor requests that, to the extent applicable, it be authorized to honor the accrued pre-petition vacation and PTO obligations of its full-time employees (collectively, the "**Accrued Vacation/PTO Obligations**") and to continue its vacation and PTO programs post-petition in accordance with its pre-petition policies.

### C.  Workers' Compensation Insurance.

16. Under the laws of the states in which the Debtor conducts its operations, the Debtor is required to maintain workers' compensation liability insurance and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor. The Debtor maintain workers' compensation insurance with National Casualty Company for the Employees at the statutorily-required level (the "**Workers' Compensation Policy**" and such program, the "**Workers' Compensation Program**") and will continue to do so as required post-petition. The Workers' Compensation Policy is renewable annually, and the next renewal period is April 1, 2019. The aggregate annual premium for the Workers' Compensation Policy is approximately $36,031, paid in quarterly installments. As of the Petition Date, the Debtor is current on all amounts owed under the Workers' Compensation Policy.

6

17. The Debtor hereby requests authority, but not direction, to continue to maintain the Workers' Compensation Program in the ordinary course of operations, and to pay pre-petition amounts related thereto, including, without limitation, outstanding premiums and potential retroactive premium adjustments under the Workers' Compensation Policy and payments for workers' compensation claims, deductibles and fees for administrative costs and other amounts required in connection with the program, as such amounts become due in the ordinary course of the Debtor's operations.

### D. Employee Benefits.

18. The Debtor has established various plans and policies to provide eligible Employees with various medical, dental, life insurance, and other benefits (collectively, the "**Employee Benefits**," and amounts owed under these plans, the "**Employee Benefit Obligations**"), which it intends to continue after the Petition Date in the ordinary course of its operations, subject to any adjustments or modifications that it determines are necessary, prudent, and in the best interests of its estate.[5] The Debtor seeks the authority, but not the direction, to satisfy all outstanding amounts related to Employee Benefit Obligations that arose prior to the Petition Date including, without limitation, any payments for claims, premiums, and fees owed for administrative costs, and other amounts required in connection with the Employee Benefit Obligations, as such amounts become due in the ordinary course of the Debtor's operations. The Employee Benefits include, but are not limited to, the following:

---

[5] Where required under applicable non-bankruptcy law, including COBRA, the Debtor provides eligible Employees with the opportunity to continue participating in the applicable Employee Benefits programs following their termination by the Debtor. The Debtor intends for the relief requested herein to apply to such former Employees consistent with the Debtor's pre-petition practices and the requirements of applicable law.

7

i. **Medical, Dental, And Vision Benefits.**

19. The Debtor offers a health insurance plan (the "**Health Plan**") and vision insurance plan (the "**Vision Plan**") through Anthem Blue Cross and Blue Shield ("**Anthem**") and a dental plan through Delta Dental (the "**Dental Plan**") for the Employees and their families. There are approximately 50 Employees enrolled in each of the Health Plan, Vision Plan, and Dental Plan. All health, vision, and dental benefits begin on the first day of the first month after a 30-day waiting period. The Employees share a portion of the cost of the Health Plan, Vision Plan, and Dental Plan.

20. The Debtor pays on average approximately $70,000 per month in premiums and claim payments related to the Health Plan, Dental Plan, and Vision Plan. As of the Petition Date, the Debtor is current on all amounts owed under the Health Plan, Dental Plan, and Vision Plan.

ii. **Health Savings Account Program.**

21. The Debtor also all full-time Employees a health savings account program (the "**HSA Program**"). If an Employee elects to participate in the Medical Plan, the Debtor contributes $500 per year for Employees starting coverage in January through June of the current year and $250 per year for Employees starting coverage in July through December of the current year. As of the Petition Date, the Debtor is current on all obligations in connection with the HSA Program. The Debtor respectfully requests authority to continue the HSA Program post-petition in accordance with its pre-petition practices.

iii. **Life And Accidental Death & Dismemberment Insurance, Short-Term Disability Insurance, And Long-Term Disability Insurance.**

22. The Debtor offers to all full-time employees: (i) employer-paid basic group life and accidental death and dismemberment insurance ("**Life Insurance**") and (ii) short-term and long-term disability insurance (the "**Disability Plan**"), in each case through Lincoln Financial

Group. The Disability Plan consists of two plans, one for officers and the other for all other full-time employees.

23. The Debtor pays approximately $3,000 per month to Lincoln Financial Group on account of the Life Insurance and Disability Plan. As of the Petition Date, the Debtor is current on all amounts owed in connection with these programs.

### iv. 401(k) Plan And Retirement Savings.

24. The Debtor maintains a retirement savings plan (the "**401(k) Plan**"), administered by Fidelity Investments that meets the requirements of section 401(k) of the Internal Revenue Code of 1986. Employees become eligible to participate in the 401(k) Plan for the purposes of employer contributions after one year, provided they worked at least 1000 hours in that year. The Debtor makes contributions to the 401(k) Plan on a yearly basis based on the participating Employees' respective salary levels at a contribution percentage determined at the Board of Directors' discretion, which has historically been 6% (the "**Profit Sharing Contributions**"). The 401(k) Plan incorporates a graduated vesting schedule culminating in a 100% vesting after five years of service.

25. Additionally, eligible Employees may take tax-deferred 401(k) or ROTH contributions through payroll. The Debtor collects contributions from eligible, participating Employees each payroll cycle and transfer those contributions into the 401(k) Plan as directed by the Employees, typically on the same day payroll is paid (the "**Employee Contributions**").

26. As of the Petition Date, the Debtor estimates that it owes approximately $236,000 in Profit Sharing Contributions on account of its Employees' services during the 2018 calendar year. The Debtor further estimates that approximately $4,500 in Employee Contributions, attributable to pre-petition services rendered by Employees during the week prior to the Petition Date, will be withheld during the December 14, 2018 payroll cycle.

9

27. By this Motion, the Debtor seeks authority, but not direction, to honor its obligations under the 401(k) Plan and to continue the 401(k) Plan in the ordinary course of its operations.

### E. Employee Payroll Garnishments, Other Payroll Deductions, And Employer-Paid Taxes.

28. The Debtor deducts from its Employees' paychecks certain taxes, such as payroll and social security taxes, required to be withheld by certain federal, state, and local taxing authorities, garnishments and other deductions (the "**Payroll Deductions**"). The Debtor forwards certain of these withheld amounts, as well as the necessary employer contributions, to the appropriate governmental authorities. The Debtor seeks authority to continue to forward any Payroll Deductions not forwarded as of the Petition Date.

29. Occasionally, the Debtor is presented with garnishment or child support orders requiring the withholding of an Employee's wages to satisfy such Employee's obligations. Finally, certain Employees have voluntary deductions for items such as additional life insurance. In these instances, payments of these obligations are made from amounts otherwise payable to the Employees and ultimately are not an incremental cost obligation of the Debtor's estate.

30. The Debtor seeks authority to continue making such Payroll Deductions and to pay over such amounts to third parties as requested or required. The Debtor also seeks to continue to obtain reimbursements for such amounts from the applicable Employees.

31. Finally, the Debtor is subject to certain taxes, fees, and expenses, including federal wage and social security taxes and unemployment taxes and contributions (the "**Employer Taxes**"). The Employer Taxes are determined, for the most part, based on the gross wages and salaries that the Debtor pays to its Employees, and are required to be paid on a periodic basis. The Employer Taxes that were incurred (or relate to compensation earned) prior to the Petition Date

are approximately $5,000. The Debtor hereby seeks authorization, but not direction, to remit these amounts to the applicable authorities consistent with the Debtor's pre-petition practices.

### F. Reimbursable Expenses.

32. As is customary with most large organizations, the Debtor reimburses its employees who incur and pay a variety of approved USAG-related expenses in the ordinary course of performing their duties, including airfare, lodging, meals, ground transportation, and similar expenses. Some Employees initially incur and pay such expenses by using personal credit cards or cash, but are subsequently reimbursed by the Debtor after submission and approval of expense or mileage reimbursement requests. The Debtor estimates that its average monthly payment to reimburse Employees for out-of-pocket expenses is approximately $2,000. As of the Petition Date, the Debtor owes approximately $500 in reimbursable expenses.

33. The Debtor also provides certain Employees with access to company-paid credit cards (the "**Purchase Cards**") and other credit accounts through PNC Bank to pay for reimbursable expenses (the "**Company Expense Program**"), including business travel, hotels, and payment to various vendors for goods and services provided to the Debtor. The Company Expense Program consists of two components: one Purchase Card for USAG, which is primarily used for travel expenses; and one Purchase Card for each state and regional chairman for travel expenses, honorariums, equipment and supplies, postage and freight, purchasing awards, and other operations is his or her state and region. As of the Petition Date, the Debtor estimates that the current aggregate Purchase Card balance is approximately $35,000.

34. The Company Expense Program, together with the reimbursement of out-of- pocket expenses, allows the Debtor to ensure that the Employees are able to fulfill financial obligations that arise in the ordinary course of the Debtor's operations without putting a direct, financial strain on the Employee's own finances. In the ordinary course, obligations arising from the use of the

Company Expense Program are paid directly by the Debtor. However, the Employees who use the Purchase Cards may be personally liable for unpaid pre-petition obligations under the Company Expense Program. As such, authority to pay the pre-petition obligations for use of the Purchase Cards is necessary to avoid financial hardship for the relevant Employees and to maintain Employee dedication and morale. Furthermore, the administrative benefit of continuing to utilize the Company Expense Program and avoiding having to request that Employees finance the costs of the Debtor's operations merits the continuation and maintenance of the Company Expense Program, with such reasonable modifications as the Debtor may agree to post-petition in the exercise of its discretion and sound business judgment.

## RELIEF REQUESTED

35. To minimize the personal hardship the Employees will suffer in connection with the filing of this case, the Debtor requests entry of an order (i) authorizing, but not directing, the Debtor to pay, in its discretion, the Employee Obligations as described in this Motion; (ii) authorizing, but not directing, the Debtor to maintain and continue to honor the Employee Programs as they were in effect as of the Petition Date, as may be modified, amended or supplemented from time to time in the ordinary course of operations, and (iii) authorizing the applicable banks and other financial institutions (the "**Banks**") to receive, honor, process, and pay any and all checks presented for payment and all electronic payment requests made by the Debtor related to the Employee Obligations, whether such checks were presented or electronic payment requests were submitted before or after the Petition Date.

**BASIS FOR RELIEF**

**I.     Authority To Honor The Employee Obligations And Continue The Employee Programs Is Warranted Under The Facts Of This Chapter 11 Case.**

    **A.     Authority To Honor The Employee Obligations Is Authorized Under Sections 363(b) And 1108 Of The Bankruptcy Code.**

36.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners. " *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Consistent with the debtor's fiduciary duties, courts have authorized payment of pre-petition obligations under section 363(b) of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code) (internal citations omitted); *see also Fulton State Bank v. Schipper*, 933 F. 2d 513, 515 (7th Cir. 1991) (noting that a debtor may sell property outside the ordinary course of business if it can provide "articulated business justification") (internal citations omitted); *In re Commercial Mortg. and Fin. Co*., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation."). The business judgment rule is a presumption that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *In re Abbott Labs. Derivative S'holders Litig*., 325 F.3d 795, 807

13

(7th Cir. 2003). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

37. As described above, the Employees are essential to the Debtor's continued operations. The Debtor believes its ability to reorganize will be materially impaired by workforce instability or attrition at this critical juncture. The relief requested in this Motion is, therefore, a necessary and critical element of the Debtor's efforts to preserve value for its stakeholders. Absent approval of the relief requested in this Motion, the Employees may face significant financial hardship and other risks and could be obliged to seek alternative employment opportunities. Additionally, the maximization of value of the Debtor's estate is intrinsically tied to its workforce. The Debtor cannot readily replace its human capital without significant efforts. Paying the Employee Obligations is necessary for the Debtor to avoid unnecessary recruitment and related costs, to avoid certain operating risks, and to minimize the disruption to its operations during the chapter 11 case. The costs of the Employee Obligations are far outweighed by the benefit of preserving the Debtor's operations as a going concern and far outweigh the potential diminishment in value that would occur if the Debtor were unable to operate as usual.

38. Indeed, where debtors have shown that the payment of pre-petition claims is critical to the success of the chapter 11 case, courts in this district and others have authorized debtors to pay pre-petition employee obligations. *See, e.g., In re hhgregg, Inc.*, No. 17-01302-11 (Bankr. S.D. Ind. 2017); *In re Nightingale Home Healthcare, Inc.*, No. 15-10099 (Bankr. S.D. Ind. 2015);

*In re S&S Steel Services, Inc.*, No. 15-07401 (Bankr. S.D. Ind. 2015); *In re Dave's Detailing, Inc.*, No. 13-08077 (Bankr. S.D. Ind. 2013); *In re ITR Concession Co.*, No. 14-34284 (Bankr. N.D. Ill. 2014); *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. 2013); *In re Corus Bankshares, Inc.*, No. 10-26881 (Bankr. N.D. Ill. 2010).

39. Accordingly, as authorized by sections 363(b) and 1108 of the Bankruptcy Code, the Debtor seeks authority to pay the Employee Obligations that become due and owing during the pendency of this case and to continue at this time its practices, programs, and policies with respect to the Employees, as such practices, programs, and policies were in effect as of the Petition Date. The Debtor submits that the relief requested herein is essential and critical to its ability to successfully reorganize.

## II. This Motion Should Only Affect The Timing Of Payment For Certain Employee Obligations.

40. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the Unpaid Wages and a number of other pre-petition Employee-related obligations to priority treatment. Likewise, section 507(a)(8) of the Bankruptcy Code affords statutory priority to many of the Employer Taxes. To confirm a chapter 11 plan, the Debtor must pay priority claims in full. *See* 11 U.S.C. § 1129(a)(9)(B) and (C) (requiring payment in full under a plan of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation or sick leave pay, earned by an individual, (b) contributions to an employee benefit plan, and (c) priority tax obligations). Thus, granting the relief sought herein would only affect the timing of payments of Employee Obligations that are entitled to priority treatment under section 507(a) of the Bankruptcy Code.

## III. Payment Of Certain Employee Obligations Is Required By Law And The U.S. Trustee's Operating Guidelines.

41. Additionally, the failure to pay tax-related Payroll Deductions and the Employer Taxes could result in tax liabilities and penalties for both the Employees and the Debtor, and

15

potentially for the Debtor's directors and officers. Likewise, the failure to transmit garnishments and other similar deductions can cause hardship to certain Employees and an administrative burden for the Debtor. Indeed, if the Debtor were to be prohibited from transmitting such deductions, the Debtor would expect inquiries from garnishors regarding the Debtor's failure to submit, among other things, child support and alimony payments that are not the Debtor's property, but, rather, have been withheld from Employees' paychecks on such parties' behalves. Further, if the Debtor cannot remit these amounts, the Employees may face legal action due to the Debtor's failure to submit such payments.

42. Moreover, maintaining the Workers' Compensation Policy is justified because applicable state law and the Chapter 11 Operating Guidelines (the "**Guidelines**") promulgated by the Office of the United States Trustee ("**U.S. Trustee**") require that the Debtor maintain appropriate insurance, including workers' compensation insurance. If the Debtor fails to maintain the Workers' Compensation Policy, state laws may prohibit the Debtor from operating in those states and the U.S. Trustee may also take action against the Debtor as a result of its failure to adhere to the Guidelines. Payment of all amounts that may be owed under the Workers' Compensation Policy, therefore, is important to the Debtor's continued operations and the successful resolution of the Debtor's chapter 11 case.

**IV.  The Banks Should Be Authorized To Honor And Pay Checks And Electronic Payment Requests In Connection With The Employee Obligations.**

43. In addition, by this Motion, the Debtor requests that the Banks be authorized, when requested by the Debtor, to receive, process, honor, and pay any and all checks presented for payment of, and to honor all fund transfer requests made by the Debtor related to, the pre-petition obligations described herein, whether such checks were presented or fund transfer requests were submitted before or after the Petition Date, provided that sufficient funds are available in the

16

applicable accounts to make the payments. The Debtor represents that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to the authorized payment of obligations described herein. Accordingly, the Debtor believes that checks other than those relating to authorized payments will not be honored inadvertently.

44. For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of its estate and creditors.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

45. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). Authorizing the Debtor to honor the Employee Obligations and granting the other relief requested in this Motion is integral to the Debtor's ability to maintain its operations and to its restructuring. There is a real, immediate risk that, if the Debtor is not authorized to continue to satisfy Employee Obligations in the ordinary course, Employees would no longer support and maintain the operations of the Debtor, thereby impeding the prospects of an effective and efficient reorganization. Consequently, it is critical that the Debtor continues in its ordinary course personnel policies, programs, and procedures that were in effect prior to the Petition Date, except as otherwise set forth herein, for all of its Employees. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested in this Motion.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

46. To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested in this Motion satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**RESERVATION OF RIGHTS**

47. Authorization to pay any amounts under this Motion shall not be deemed to constitute post-petition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code. The Debtor reserves all of its rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts under this Motion shall not affect the Debtor's right to contest the amount or validity of any Employee Obligations, including without limitation the Payroll Deductions or Employer Taxes that may be due to any taxing authority.

**CONSULTATION WITH U.S. TRUSTEE AND CLERK'S OFFICE**

48. The Debtor's counsel discussed this Motion, and the relief requested herein, with the United States Trustee for the Southern District of Indiana on December 4, 2018. Debtor's counsel provided notice of the filing of the chapter 11 case to the Clerk of the Court and the Chief Judge's Courtroom Deputy on December 5, 2018.

**NOTICE**

49. Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the Office of the United States Attorney for the Southern District of Indiana; (iii) the Internal Revenue Service; (iv) the USOC; (v) the Debtor's thirty (30) largest unsecured creditors; and (vi) counsel of record for the individuals who have sued USAG in the Nassar-related litigation. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule B-9013-3(d). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested herein and such further relief as may be just and proper under the circumstances.

| | |
|---|---|
| Dated: December 5, 2018 | Respectfully submitted, |
| | **JENNER & BLOCK LLP** |
| | By: /s/ *Catherine L. Steege* |
| | Catherine L. Steege (*pro hac vice* pending)<br>Dean N. Panos (*pro hac vice* pending)<br>Melissa M. Root (#24230-49)<br>353 N. Clark Street<br>Chicago, Illinois 60654<br>(312) 923-2952<br>csteege@jenner.com<br>dpanos@jenner.com<br>mroot@jenner.com |
| | *Proposed Counsel for the Debtor* |