# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

## DEBTOR'S MOTION FOR FINAL ORDER
## AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING AND
## GRANTING SUPERPRIORITY CLAIMS TO POST-PETITION LENDERS

USA Gymnastics, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**" or "**USAG**"), hereby submits this motion (the "**Motion**") for the entry of a final order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to sections 364(c)(1), 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court of the Southern District of Indiana, authorizing the Debtor to enter into a post-petition financing agreement on the terms and conditions set forth in two Debtor in Possession Term Loan Agreements (substantially in the form attached hereto as <u>Exhibits B and C</u>, the "**DIP Credit Agreements**"), by and among (i) the Debtor, as Borrower, and Virginia Surety Company, Inc., f/k/a Combined Specialty Insurance Company ("**Virginia Surety**"), solely in its capacity as lender, and (ii), the Debtor, as Borrower, and Great American Assurance Company ("**Great American**"), solely in its capacity as lender (collectively, Virginia Surety and Great American, the "**DIP Lenders**" and each individually a "**DIP Lender**"), and

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

granting superpriority administrative expense status pursuant to 11 U.S.C. §364(c)(1) to the claims for repayment of advances and obligations due to the DIP Lenders in accordance with their respective DIP Credit Agreements. In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (D), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a). The statutory and legal predicates for the relief requested herein are 11 U.S.C. §§ 364(c)(1), 503, and 507, Bankruptcy Rule 4001, and Local Rule 4001-2.

## BACKGROUND

2. On December 5, 2018, USAG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. The Debtor remains in possession of its property and continues to operate and maintain its organization as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner in this chapter 11 case.

4. On December 19, 2018, the United States Trustee appointed the Additional Tort Claimants Committee Of Sexual Abuse Survivors (the "**Survivors Committee**").

5. USAG is a non-profit entity. Prior to the Petition Date, USAG did not have any significant secured or unsecured debt, aside from the contingent liabilities arising from the lawsuits and claims asserted against USAG by survivors of sexual abuse. After the filing of its bankruptcy petition, USAG entered into negotiations with the DIP Lenders about the terms of a post-petition loan to assist USAG in covering the expenses of its chapter 11 case.

6. The result of these negotiations are (i) the draft DIP Credit Agreement with Virginia Surety pursuant to which Virginia Surety has agreed, subject to the approval of this Court and satisfaction of the conditions precedent contained in its DIP Credit Agreement, to make a $500,000 debtor-in-possession term loan, and (ii) the draft DIP Credit Agreement with Great American, pursuant to which Great American has agreed, subject to the approval of this Court and satisfaction of the conditions precedent contained in its DIP Credit Agreement, to make a $300,000 loan. Aside from the identity of the DIP Lender and the amount of each loan, the DIP Credit Agreements are identical with respect to their material terms and in total provide USAG up to $800,000 in post-petition financing protected only by a superpriority administrative expense claim under 11 U.S.C. §364(c)(1) and subject to the aggregate Carve Out (as defined in the DIP Credit Agreements). Upon USAG's exit from chapter 11 pursuant to a confirmed plan of reorganization, the DIP Lenders will roll up the outstanding obligations under the DIP Credit Agreements into a post-petition term loan in accordance with the terms of the DIP Credit Agreements. The material terms of the draft DIP Credit Agreements are summarized more fully below:

| SUMMARY OF MATERIAL TERMS OF PROPOSED DIP CREDIT AGREEMENT | | |
|---|---|---|
| **Term** | **Summary** | **Reference** |
| BORROWER: | USA Gymnastics, Inc. | Proposed Final Order ¶ 3; DIP Credit Agreements Introductory Paragraph. |
| DIP LENDER: | DIP Lenders: Virginia Surety Company, Inc. f/k/a Combined Specialty Insurance Company and Great American Assurance Company. | Proposed Final Order ¶ 3; DIP Credit Agreements Introductory Paragraph. |

3

| DIP FACILITIES: | Superpriority Debtor in Possession Term Loan in the aggregate principal amount of up to $500,000 with Virginia Surety; Superpriority Debtor in Possession Term Loan in the aggregate principal amount of up to $300,000 with Great American, both as definitively documented in their respective DIP Credit Agreements. | Proposed Final Order ¶ 2; DIP Credit Agreements § 2.1. |
|---|---|---|
| AVAILABILITY: | Subject to the conditions precedent described in each of the DIP Credit Agreements:<br>Draw A up to $350,000 under the DIP Credit Agreement with Virginia Surety and up to $210,000 under the DIP Credit Agreement with Great American will be available [5] days after of the Final Order, for draw within 30 days.<br>Draw B up to an additional $150,000 under the DIP Credit Agreement with Virginia Surety and up to $90,000 under the DIP Credit Agreement with Great American will be available [30] days after entry of the Final Order, for draw within 30 days. | Proposed Final Order ¶ 3; DIP Credit Agreements Definition of Availability. |
| CLOSING DATE: | Upon satisfaction or waiver of the conditions precedent set forth in the DIP Credit Agreements, including, without limitation, Court approval of the Final Order satisfactory to the DIP Lenders. | Proposed Final Order ¶ 8; DIP Credit Agreements §§ 3.1, 3.2. |
| MATURITY DATE: | Both DIP Credit Agreements provide for a maturity date that is the earliest to occur of (a) March 30, 2020, (b) the effective date of a plan of reorganization for Borrower (c) the final closing date of the sale or transfer of all or substantially all of the assets of the Borrower taken as a whole, (d) the date on which the Court enters an order dismissing the case of Borrower without the consent of DIP Lenders or converting such case to a case under Chapter 7 of the Bankruptcy Code, (e) termination of the agreed stay of litigation by Borrower relating to any prepetition insurance coverage provided by DIP Lender or other general liability insurer to the Borrower (the "Coverage Dispute"), excluding the litigation against Liberty Insurance Underwriters, or (f) the acceleration of the Loan following the occurrence of an uncured Event of Default under the DIP Credit Agreement. | DIP Credit Agreements § 2.2. |
| USE OF PROCEEDS: | Both DIP Credit Agreements provide that the loan proceeds may be used to fund the Debtor's day-to-day operations, pay the costs of the reorganization case, including, professional fees as approved by the Bankruptcy Court, and to maintain and preserve the Debtor's assets. | Proposed Final Order ¶ 3; DIP Credit Agreements § 2.1. |
| AGREED BUDGET: | N/A | |
| INTEREST: | Both DIP Credit Agreements provide for four percent (4.0%) payable at maturity and both provide that during the continuance of an Event of Default, the principal amount of the Loan and, to the extent permitted by applicable law, any interest payments on the Loan or other amounts will bear interest payable on demand at a rate that is seven percent (7.0%) per annum. | Proposed Final Order ¶ 3; DIP Credit Agreements § 2.5. |

4

| | | |
|---|---|---|
| MANDATORY PREPAYMENTS: | Both DIP Credit Agreements provide that prior to maturity, the Borrower shall prepay the outstanding principal amount of the Term Loans with (a) the net proceeds from the settlement of or collection of its claims against Liberty Insurance Underwriters asserted in *USA Gymnastics, Inc. v. Ace American Ins. Co. et al.,* 19 ap 50012 (Bankr. S.D. Ind.), and (b) the net proceeds of any sale of assets by the Borrower.<br>Both DIP Credit Agreements provide that the Debtor will be permitted to repay indebtedness prior to maturity, without penalty. Repayments of principal cannot be re-borrowed. | Proposed Final Order ¶ 3; DIP Credit Agreements § 2.3. |
| CARVE OUT: | Both DIP Credit Agreements provide that the DIP Lenders' respective DIP Superpriority Claim is subordinate only to the following (collectively, the "Carve Out"): | Proposed Final Order ¶¶ 6-7; DIP Credit Agreements Definition of Carve Out, § 4.20. |
| | (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (collectively, the "U.S. Trustee Fees"); and | Proposed Final Order ¶ 7a; DIP Credit Agreements Definition of Carve Out, § 4.20. |
| | (b) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all accrued professional fees (the "Allowed Professional Fees") incurred by (i) persons or firms retained by the Debtor pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor's Professionals"), (ii) persons or firms retained pursuant to section 328 or 1103 the Bankruptcy Code by any Committee(s) appointed pursuant to section 1102 of the Bankruptcy Code (the Committee(s) Professionals"), and (iii) the future claimants' representative appointed by the court and persons or firms retained pursuant to section 328 or 1103 the Bankruptcy Code by the future claims representative; and in each preceding case not yet paid at or prior to the time of an Event of Default that is not otherwise waived (the "Carve Out Trigger Date") and (iv) Allowed Professional Fees incurred after the Carve Out Trigger Date up to the following aggregate limit, allocated 3/8ths to Great American and 5/8ths to Virginia Surety, $150,000 for the Debtor's Professionals, up to $75,000 for any Committee's Professionals, up to $25,000 for any future claims representative appointed by the Court and reasonable and customary out-of-pocket costs and expenses incurred by members of the Committee, in each case as allowed by the Court. | Proposed Final Order ¶ 7b; DIP Credit Agreement: Definition of Carve Out, § 4.20. |

5

| | | |
|---|---|---|
| | All professional fees shall be subject to the requirements of Section 330 of the Bankruptcy Code and Lender reserves the right to review and object to any fee application filed in the Bankruptcy case. | |
| CARVE OUT TRIGGER DATE | The date on which either DIP Lender provides notice of acceleration of a Term Loan resulting from a Default or an Event of Default. | Proposed Final Order ¶ 7; DIP Credit Agreements: Definition of Carve Out Trigger Date; § 4.20. |
| ADEQUATE PROTECTION: | N/A | |
| SUPERPRIORITY STATUS: | Both DIP Credit Agreements provide that except to the extent expressly set forth in the Final Order in respect of the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the obligations (including, without limitation, principal, interest, and indemnification obligations) with respect to the DIP Facility shall constitute allowed senior administrative claims against the Debtor with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (such claims of the DIP Lenders, the "DIP Superpriority Claims"). | Proposed Final Order ¶ 6; DIP Credit Agreements Preamble; §§ 3.2; 4.20. |
| REPORTING AND DISCLOSURES: | Both DIP Credit Agreements provide that the Borrower will provide access to all financial and business records to the Lender upon request, but the DIP Lenders will have no obligation to maintain or dispose of such records (which obligation will remain with Borrower). | Proposed Final Order ¶ 3; DIP Credit Agreements § 5.4. |
| FINANCING MILESTONES: | Both DIP Credit Agreements provide that the Borrower shall: (a) on or before May 30, 2019 (the "Filing Date"), file a motion acceptable to Lender to approve the DIP Facility; (b) no later than July 1, 2019 or as soon as possible thereafter that the Bankruptcy Court's schedule permits obtain entry of a Final DIP Order, approving the DIP Credit Agreements on a final basis, in a form and substance acceptable to the DIP Lenders (the "Final Order"); (c) on or before November 1, 2019, the Debtor shall file a chapter 11 plan of reorganization with the Bankruptcy Court; (d) or before January 31, 2020, the Bankruptcy Court shall have entered an order confirming the plan of reorganization; and (e) on or before July 1, 2019, the | Proposed Final Order ¶ 3; DIP Credit Agreements Definition of Milestones, § 5.8. |

6

| | | |
|---|---|---|
| | Bankruptcy Court shall have entered an order appointing a future claimants representative. | |
| COVENANTS: | Both DIP Credit Agreement contain the following affirmative covenants: Borrower shall (a) file a plan of reorganization on or before November 1, 2019; (b) obtain an order of the Court confirming a plan of reorganization on or before January 31, 2020; and (c) provide Lender with all Reporting and Disclosures required under the DIP Facility.<br>Both DIP Credit Agreement contain the following negative covenants: Borrower may not (a) use loan proceeds to pursue any Coverage Dispute; (b) seek to terminate the stay of litigation relating to the Coverage Dispute as to a DIP Lender, (excluding the litigation against Liberty Insurance Underwriters); (c) enter into, or file a motion seeking authority to enter into, an agreement to sell or transfer substantially all of its assets; and (d) file a plan of liquidation. | Proposed Final Order ¶ 3; DIP Credit Agreements §§ 5.8, 6. |
| EVENTS OF DEFAULT: | Customary for financings of this type (subject to customary grace periods for certain affirmative covenants), including, without limitation, failure to make payments when due; breaches of representations and warranties; and noncompliance with covenants, all to be set forth more fully in the DIP Credit Agreements. | Proposed Final Order ¶ 3; DIP Credit Agreements § 7.1. |
| CONDITIONS TO EACH DRAW | Both DIP Credit Agreements provide for the following conditions: (i) execution and delivery of definitive documentation for the DIP Facility satisfactory to DIP Lender; (ii) entry of an order staying Debtor's litigation against any DIP Lender or other general liability insurer (excluding litigation by or against Liberty Insurance Underwriters) in connection with the Coverage Dispute; (iii) entry of the Final Order by the Court satisfactory to DIP Lender; (iv); (v) no default or event of default under the DIP Credit Agreement, or the Final Order shall have occurred; (vi) accuracy of representations in all material respects (or, with respect to representations qualified by materiality, in all respects); and (vii) the Final Order, shall be in full force and effect. | Proposed Final Order ¶ 8; DIP Credit Agreements § 3.2. |
| INDEMNIFICATION: | Both DIP Credit Agreements provide that the Borrower shall indemnify the DIP Lender and its respective affiliates, and their respective agents, sub-agents, members, officers, partners, directors, trustees, employees, representatives and advisors (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and expenses (including, without limitation, the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted or awarded against any Indemnitee by any third party or by the Debtor arising out of, in connection with, or as a result of (including, without limitation, any investigation, litigation or proceeding commenced or threatened by any person arising out of or related to) the execution or delivery of the DIP Credit Agreement, any other definitive loan document for the DIP Facility or any agreement or | Proposed Final Order ¶ 3; DIP Credit Agreements § 8.8. |

7

| | | |
|---|---|---|
| | instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, the consummation of the transactions contemplated thereby or use of proceeds thereof, the administration of the DIP Credit Agreement, the DIP Lender's conduct undertaken in the capacity of a DIP Lender in the Bankruptcy proceedings of the Debtor or customary environmental matters, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses: (a) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee; or (b) arise out of, or are in connection with or relate to or are as a result of any Indemnitee's obligations under any prepetition insurance contract provided by any Indemnitee or other insurer to the Borrower. For the avoidance of doubt, claims against the Indemnitees in their capacity as insurers of the Debtor are not indemnified. | |
| GOVERNING LAW: | New York. | Proposed Final Order ¶ 3; DIP Credit Agreements § 8.12. |
| EXIT FINANCING | Both DIP Lenders will roll 100% of the then outstanding DIP Loans into a two year [24 month] term loan facility with balloon maturity at the same Interest Rate, provided (a) the plan of reorganization is reasonably acceptable to DIP Lender, and (b) no default under the DIP Credit Agreement shall have occurred prior to the Effective Date of the plan of reorganization. | Proposed Final Order ¶ 3; DIP Credit Agreements § 2.6. |
| GOOD FAITH PROTECTION | Both DIP Credit Agreements provide that the Debtor will seek entry of a Final Order granting the DIP Lender the protection afforded under section 364(e), namely, that no appeal, modification, amendment, or vacatur of the Final Order shall affect the validity and enforceability of any advances made thereunder or any priority authorized or created by the Final Order. | Proposed Final Order ¶ 10; DIP Credit Agreements § 3.2(a). |

7.  Pursuant to Local Rule 4001-2(b), USAG makes the following further disclosures. *First*, there are no provisions in either DIP Credit Agreements that limit, restrict, or otherwise affect specific terms of a plan of reorganization, although the confirmed plan of reorganization must be reasonably acceptable to each DIP Lenders as a condition of the extension of exit financing. *Second*, the DIP Credit Agreements provide disparate treatment for certain fees incurred by professionals of the Debtor and the Survivors Committee. There is a cap to the amount of

8

professional fees incurred after the Carve Out Trigger Date (as defined in the DIP Credit Agreements) that will be paid prior to each DIP Lender's superpriority administrative expense claims. Specifically, up to $75,000 of allowed fees and expenses for the Survivors Committee's professionals incurred after the Carve Out Trigger Date may be granted priority over the DIP Lenders' claims, whereas $150,000 of such allowed fees and expenses for the Debtor's professionals fees may be granted priority over the DIP Lenders' claims. The basis for this higher Carve Out is to reflect the additional work that the Debtor's counsel is likely to be required to perform as opposed to the Survivors Committee's counsel. *Finally*, the DIP Credit Agreements do not provide for the cross-collateralization of any debt, grant or prime any liens in any collateral, impose any budget upon USAG, or require USAG to pay any financing fees or costs.

## RELIEF REQUESTED

8. By this Motion, the Debtor seeks entry of a final order, pursuant to sections 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, authorizing the Debtor to enter into post-petition financing agreements on the terms and conditions set forth in (i) the DIP Credit Agreement, by and among the Debtor, as Borrower, and Virginia Surety, as the DIP Lender, and (ii) the DIP Credit Agreement, by and among the Debtor, as Borrower, and Great American, as DIP Lender, and granting superpriority administrative expense status to the claims of the DIP Lenders in accordance with the DIP Credit Agreements.

## BASIS FOR RELIEF

**I.   The DIP Credit Agreements Are The Best Post-Petition Financing Reasonably Available To The Debtor And Are Necessary To Preserve The Value Of The Debtor's Estate.**

9. The Debtor seeks approval of the DIP Credit Agreements, including their grant of superpriority administrative expense claims to the DIP Lenders, under section 364(c)(1) of the Bankruptcy Code. That section provides that the Court, after notice and a hearing, may authorize

9

a debtor that is unable to obtain unsecured credit allowable as an administrative expense to obtain credit or incur debt "with priority over any or all administrative expenses. . . ." 11 U.S.C. § 364(c)(1); *see also In re 1191 Wood Run, LLC*, 2010 WL 3310353, at *2 (Bankr. N.D. Ill. Mar. 24, 2010) (applying standard and granting superpriority post-petition financing).

10. To satisfy the requirements of section 364(c), a debtor need only demonstrate that it "has reasonably attempted, but failed," to obtain credit on an unsecured or administrative expense basis. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). The statute "imposes no duty upon the [debtor] to seek credit from every possible lender" before concluding that such credit is unavailable. *Id.* (quoting *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)); *accord In re Republic Airways Holdings, Inc.*, 2016 WL 2616717, at *10 (Bankr. S.D.N.Y. May 4, 2016). When few lenders are likely to be able and willing to extend the necessary post-petition credit to a debtor, secured or otherwise, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *cf. Matter of Standard Oil & Exploration of Delaware, Inc.*, 136 B.R. 141, 146 (Bankr. W.D. Mich. 1992) (approving secured post-petition financing and noting that financing pursuant to section 364 need not come from traditional financial lenders).

11. Further, when "determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment." *Republic Airways Holdings*, 2016 WL 2616717, at *11. Courts will consider whether a debtor negotiated and proposed a post-petition financing agreement in "good faith," *1191 Wood Run, LLC*, 2010 WL 3310353, at *2, which is presumed under the business judgment rule unless it is shown that the "purpose" of the financing "is not so much to benefit the estate as it is to benefit a party in interest."

*Ames Dep't Stores*, 115 B.R. at 40. It is an appropriate exercise of a debtor's business judgment to consider certain non-economic factors in drafting the terms of a deal, such as the likelihood of the financing agreement increasing the chances of a "successful reorganization" by avoiding or reducing conflicts among necessary creditor constituencies. *In re ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

12. The Debtor has met these standards here. Given the circumstances, the Debtor could not obtain credit on an unsecured or administrative expense basis. The Debtor's bank, PNC Bank, provides the Debtor with credit in the form of purchase cards which are used to pay for many of the Debtor's ordinary course expenses. PNC Bank has required a cash deposit equal to the amount of the credit limit for the cards and will not extend credit on an unsecured basis alone. The Debtor has also exercised proper business judgment in proposing the DIP Credit Agreements on terms that are fair and reasonable and the best available to it in the current market.

13. When it became apparent that post-petition financing was necessary, the Debtor, together with its advisors, contacted its insurers to determine which could provide post-petition financing on the best terms. The only potential lenders available to the Debtor were its insurers, who have a vested interest in the orderly and equitable resolution of this chapter 11 case. It was therefore reasonable for the Debtor to commence discussions with its insurers and to settle on the deal terms negotiated with the DIP Lenders.

14. The provisions of the DIP Credit Agreements are fair, reasonable, and the best available in the market accessible by the Debtor. The Debtor will be required to pay only accrued interest upon maturity. The covenants in the DIP Credit Agreements are customary for financings of this type and not unnecessarily restrictive. And the milestones set forth in the DIP Credit

11

Agreements are not unduly burdensome, especially since they accord with the Debtor's stated plans for this chapter 11 case—namely, to propose and confirm a plan within the year.

15. The DIP Credit Agreements are also carefully drafted to promote a successful reorganization by not impacting the recoveries of sexual abuse claimants, which would likely lead to disputes and litigation. Because outstanding amounts under the DIP Credit Agreements will, subject to the terms of the DIP Credit Agreements, be rolled up into an exit financing upon the conclusion of this chapter 11 case, the Debtor will not be required to pay the DIP Lenders' superpriority administrative expense claims in cash upon confirmation. Thus, the costs of this financing will be borne by the Debtor *after* this case concludes, not by the Debtor's claimants during this chapter 11 case.

16. The DIP Credit Agreements provide the Debtor with the liquidity it needs, at the lowest cost available and in a manner best suited to support the prospects of a successful reorganization. The terms of the DIP Credit Agreements are the product of extensive and good faith negotiations between the Debtor and the DIP Lenders, each of whom was represented by experienced counsel. Through these arms-length negotiations, the Debtor was able to secure the most favorable terms possible for the DIP Credit Agreements, and the Debtor was not able to obtain financing on better terms without providing each DIP Lenders with superpriority administrative expense claims. The DIP Credit Agreements are the best post-petition financing options that are reasonably available to the Debtor and entering into the DIP Credit Agreements is an appropriate exercise of the Debtor's business judgment.

17. Finally, the Debtor needs immediate authority to enter into the DIP Credit Agreements in order to fulfill its fiduciary duty to protect and maximize estate assets. *See In re*

*Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (the chapter 11 "debtor-in-possession . . . owe[s] a fiduciary duty to his unsecured creditors").

18.  For the foregoing reasons, the Debtor respectfully requests that the Court authorize it to enter into the DIP Credit Agreements and grant each of the DIP Lender a superpriority administrative expense claims in accordance with the terms thereof.

## II.  The Scope Of The Carve Out Is Appropriate And Should Be Approved.

19.  The DIP Lenders' superpriority administrative expense claims are subject to a Carve Out for professional fees incurred by the Debtor, the Survivors Committee, and a future claimants' representative, as well as fees owed to the Clerk of the Court and the Office of the United States Trustee. Without the Carve Out, the interests of the Debtor, individual sexual abuse claimants, and other parties in interest would be adversely affected because the services for which professionals may be paid would be restricted. *See Ames Dep't Stores, Inc.*, 115 B.R. at 40 (observing that courts insist on carve-outs for professionals representing parties in interest "in order to preserve the adversary system" and because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). The Carve Out ensures that professionals in this chapter 11 case will be able to vigorously represent their constituencies, to the benefit of all parties in interest. Additionally, the Carve Out protects against the Debtor's administrative insolvency by requiring that assets remain available for paying fees owed to the Clerk of the Court and the U.S. Trustee. Finally, the Carve Out is acceptable to the DIP Lenders, even though it primes the DIP Lenders' superpriority administrative expense claims.

20.  For the foregoing reasons, the Carve Out is reasonable and appropriate and should be approved.

**III.     The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e).**

21.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, even if the authority of the debtor to obtain such loans is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

22.     Because "good faith" is not defined in section 364(e), courts often look to case law under section 363(m). 7 COLLIER ON BANKRUPTCY ¶ 364.08 (16th ed. 2018) ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction."). As courts within the Seventh Circuit have recognized, the misconduct that invalidates a purchaser's good faith status under the Bankruptcy Code involves "fraud," "collusion," or "an attempt to take grossly unfair advantage of other bidders." *R-Group Investments, Inc. v. Noddah, LLC*, 2015 WL 5731735, at *5 (N.D. Ill. Sept. 30, 2015) (quoting *In re Rock Indus. Machine Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

23.     None of these facts are present here. The DIP Credit Agreements are the result of the Debtor's reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain post-petition financing. The DIP Credit Agreements are "an arms-length transaction between independent entities seeking to further their own commercial interests," and accordingly were entered into in good faith. *In re Olde Prairie Block Owner, LLC*, 460 B.R. 500, 509 (N.D. Ill. 2011) (dismissing appeal of unstayed post-petition order where parties negotiated transaction in good faith); *see also In re General Growth Properties*, 423 B.R. 716, 722

14

(S.D.N.Y. 2010) (finding good faith based on testimony that the terms of the post-petition financing were "vigorously negotiated at arm's length").

24. The DIP Lenders' good faith is manifest. The DIP Credit Agreements feature terms that are highly attractive to the Debtor and its estate, as described above. In addition, the DIP Credit Agreements do not improperly cede control of the Debtor's operations to the DIP Lenders through the use of excessive financial covenants, restrictive approved budgets, or unreasonable case milestones. Finally, Advances under the DIP Credit Agreements will be used only for purposes that are permissible under the Bankruptcy Code and in the DIP Credit Agreements and no consideration is being provided to the DIP Lenders other than as described herein and in the DIP Credit Agreements.

25. Accordingly, the Court should find that the DIP Lenders are good faith lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to the protections afforded by that section.

## IV.  The Court Should Grant The Relief Requested Herein On A Final Basis.

26. Pursuant to Bankruptcy Rule 4001, the "court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion." Fed. R. Bankr. P. 4001(c)(2). The Debtor has contemporaneously filed a motion to shorten notice under the *Order Granting Debtor's Motion For Order Establishing Certain Notice, Case Management, And Administrative Procedures* [Dkt. No. 213] (the "**Case Management Procedures**") to set this Motion to be heard at the next omnibus hearing on May 15, 2019, which is 14 days after the date this Motion has been filed and served. Accordingly, Bankruptcy Rule 4001 permits the Court to grant the Motion on a final basis and the Debtor requests that it do so.

**NOTICE**

27.  The Debtor will provide notice of this Motion in accordance with the Case Management Procedures and Bankruptcy Rule 4001. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that the Court enter the final order substantially in the form annexed hereto as Exhibit A, granting the relief requested herein and such further relief as is just and proper.

Dated: May 1, 2019                                  Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ *Catherine Steege*

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*