> **THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DEBTOR RESERVES THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO THE HEARING TO APPROVE THIS DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

## DISCLOSURE STATEMENT FOR FIRST AMENDED
## CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY USA GYMNASTICS

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

Dated: February 21, 2020

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

## DISCLAIMER

USA GYMNASTICS, AS DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE, BELIEVES THAT THE FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION [DKT. 928], ATTACHED AS <u>EXHIBIT 1</u> TO THIS DISCLOSURE STATEMENT, IS IN THE BEST INTERESTS OF CREDITORS AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN, AND FURTHER URGES ABUSE CLAIMANTS TO MAKE THE SETTLEMENT ELECTION.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS NOT INTENDED TO REPLACE A DETAILED REVIEW AND ANALYSIS OF THE PLAN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE EXHIBITS TO THE PLAN AND THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND THE DEBTOR DOES NOT ASSUME ANY OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT FOR EVENTS OR INFORMATION ARISING AFTER THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THAT REASON, AND BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS INTO THE FUTURE WITH CERTAINTY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION.

HOLDERS OF CLAIMS SHALL NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, FINANCIAL, OR TAX ADVICE. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR OWN ADVISORS AS TO ANY MATTERS CONCERNING THE PLAN, ITS SOLICITATION, AND THE TRANSACTIONS, TREATMENT, AND DISTRIBUTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION AS TO ANY CONTESTED MATTER, ADVERSARY PROCEEDING, CLAIM, OR OTHER ACTION OR THREATENED ACTION BUT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

**TABLE OF CONTENTS**

I. OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN..............................1

    A. Introduction.......................................................................................................................1

    B. Principal Terms Of The Plan. ..........................................................................................2

        1. Treatment Of Abuse Claims. ................................................................................2

        2. Non-Monetary Commitments And Reforms. ......................................................10

        3. Treatment Of Claims Other Than Abuse Claims................................................13

    C. The Plan Is In The Best Interests Of Creditors. ..............................................................13

    D. Voting And Confirmation Procedures. ............................................................................14

II. QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE PLAN .........................................................................................................................15

III. An Overview Of The Chapter 11 Process..........................................................................21

    A. A Chapter 11 Case. ..........................................................................................................21

    B. A Chapter 11 Plan. ..........................................................................................................21

    C. Voting On A Chapter 11 Plan..........................................................................................21

        1. Court Approval Required......................................................................................21

        2. Impaired Classes With Recoveries Entitled To Vote. ........................................21

        3. Acceptance Of A Chapter 11 Plan. .....................................................................22

        4. Disputed Claims May Not Vote...........................................................................22

    D. Confirmation of a Chapter 11 Plan. .................................................................................23

        1. Confirmation With Acceptance By All Classes....................................................23

        2. Confirmation With Rejection By Certain Classes. ..............................................23

IV. THE DEBTOR, ITS OPERATIONS, AND THE CHAPTER 11 CASE...............................24

    A. USAG's Operations. ........................................................................................................24

    B. USAG's Capital Structure................................................................................................24

    C. USAG's Board Of Directors.............................................................................................24

D.  Events Leading To The Chapter 11 Case. .......................................................28

E.  The Chapter 11 Case. .................................................................................29

    1.  First Day Motions. ............................................................................29

    2.  The Debtor's Professionals. ..............................................................30

    3.  The Survivors' Committee. ...............................................................30

    4.  The 105 Stay Order. .........................................................................30

    5.  The Bar Date. ..................................................................................31

    6.  The Claims Against The Debtor And The Debtor's Claims Objections. ...................31

    7.  Mediation. ......................................................................................33

    8.  Future Claimant Representative. ........................................................33

    9.  Debtor In Possession Financing. ........................................................34

    10. Plan Exclusivity. .............................................................................34

    11. Postpetition Litigation. .....................................................................34

    12. Motion To Dismiss. ..........................................................................35

V. SUMMARY OF THE PLAN ..........................................................................35

A.  Treatment of Unclassified Claims. ...............................................................36

    1.  Administrative Claims. .....................................................................36

    2.  Professional Claims. .........................................................................36

    3.  Priority Tax Claims. .........................................................................36

    4.  U.S. Trustee Fees. ............................................................................37

B.  Treatment of Classified Claims. ..................................................................37

    1.  Class 1—Other Priority Claims. ........................................................37

    2.  Class 2—PNC Bank Claim. ..............................................................38

    3.  Class 3—Sharp Claim. .....................................................................38

    4.  Class 4—General Unsecured Convenience Claims. ..............................39

5.  Class 5—General Unsecured Claims. ...................................................39

6.  Class 6—Abuse Claims. ......................................................................40

7.  Class 7—Personal Injury Claim .........................................................41

8.  Class 8—USOPC Claim. .....................................................................41

9.  Class 9—Indemnification Claims. .......................................................42

10. Class 10—Future Claimant Representative Claim (Only In The Event Of A Settlement Election). ..........................................................................43

11. Class 11—Sexual Abuse Claims Filed After The Bar Date (Only In The Event Of A Litigation Election). .........................................................43

VI. MEANS FOR IMPLEMENTATION OF THE PLAN UNDER  THE SETTLEMENT ELECTION ..........................................................................................................44

A.  Trust Funding And Formation. .....................................................................44

1.  Resolution of the Insurance Coverage Adversary Proceeding as to the CGL Settling Insurers ................................................................................44

2.  The CGL Settling Insurers' Payments. ...............................................44

3.  Trust Purpose ......................................................................................45

4.  Funding of Trust ..................................................................................45

5.  Payment of Professional Fees .............................................................45

6.  Approval of Settlement ........................................................................45

7.  Future Claimant Reserve.....................................................................45

B.  Trust. .............................................................................................................46

1.  Establishment Of The Trust. ...............................................................46

2.  Trust Funding. .....................................................................................46

3.  Appointment Of The Trustee. ..............................................................46

4.  Tax Matters. .........................................................................................46

5.  Cooperation By The Debtor And Reorganized Debtor.........................46

6.  Objections To Channeled Claims. .......................................................47

    7.  Trust Indemnification Obligations. ........................................................47

  C.  Liquidation And Payment Of Channeled Claims. ........................................47

    1.  Resolution And Payment Of Channeled Claims. .................................47

    2.  Conditions To Payment Of Abuse Claims And FCR Claims. ................47

    3.  Effect Of No Award On Channeled Claims. ........................................48

    4.  Treatment Of Attorneys' Fees And Costs Of Channeled Claimants. ........48

    5.  Withdrawal Of Channeled Claims. .....................................................48

    6.  Adding Participating Parties. ...............................................................48

    7.  Adding Settling Insurers. .....................................................................48

    8.  Future Claimant Process. .....................................................................49

  D.  CHANNELING INJUNCTION ......................................................................49

    1.  EFFECTIVE DATE INJUNCTIONS ...................................................49

    2.  CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE
        CLAIMS ...............................................................................................49

    3.  SCOPE OF CHANNELING INJUNCTION .........................................51

    4.  ENFORCEMENT TO THE MAXIMUM EXTENT ...............................51

    5.  SETTLING INSURER INJUNCTION .................................................51

    6.  TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF
        SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING
        INSURERS ...........................................................................................52

    7.  RELEASE OF AVOIDANCE CLAIMS AGAINST PARTICIPATING
        PARTIES, NON-DEBTOR CGL SETTLING INSURER PERSONS, AND
        SETTLING INSURERS .......................................................................52

    8.  MUTUAL RELEASE ...........................................................................52

VII. MEANS FOR IMPLEMENTATION OF PLAN  UNDER THE LITIGATION
     ELECTION. ...................................................................................................53

  A.  Lifting Of Automatic Stay And Stay Imposed Under the 105 Order for the Benefit
      of the Holders of Class 6 Claims ................................................................53

iv

B. Post-Effective Date Awards..............................................................................53

C. Cooperation with Insurers in Defense of Claims............................................53

D. Remand of Removed Actions and Relief from Automatic Stay/Discharge ....54

VIII. GENERALLY APPLICABLE PROVISIONS OF THE PLAN..........................................54

A. Conditions Precedent To The Effective Date. ................................................54

    1. Conditions To Effectiveness If Class 6 Makes The Settlement Election. ..................54

    2. Conditions To Effectiveness If Class 6 Makes The Litigation Election.....................54

    3. Waiver of Conditions. ........................................................................................54

    4. Non-Occurrence of Effective Date. .....................................................................55

B. Treatment Of Executory Contracts And Unexpired Leases. ...............................55

    1. Assumed Employee Benefit Plans. .....................................................................55

    2. General; Assumed if Not Rejected. .....................................................................55

    3. Claims for Contract Rejection. ...........................................................................55

C. Litigation..........................................................................................................55

    1. Reorganized Debtor's Retention of Litigation.......................................................55

    2. Additional Actions. ...........................................................................................56

D. Claims And Distributions. ................................................................................56

    1. Lift of Automatic Stay for Personal Injury Claim. .................................................56

    2. Objections to Claims other than Abuse Claims, the Personal Injury Claim, the
       USOPC Claim, Indemnification Claims, and the FCR Claim. ..................................56

    3. Service of Objections. .......................................................................................57

    4. Additional Documentation..................................................................................57

    5. Provisions Governing Distribution To Holders of Allowed Claims...........................57

    6. No Distributions Pending Allowance. ..................................................................58

    7. Setoffs. ............................................................................................................58

    8. No Interest on Claims. ......................................................................................58

E.   Retention Of Jurisdiction. ...........................................................................58

F.   Miscellaneous Provisions...........................................................................59

   1.   Modification Of Plan. ...........................................................................59

   2.   Post-Confirmation Court Approval........................................................59

   3.   Election Pursuant To Section 1129(b) Of The Bankruptcy Code...............60

   4.   Closing Of The Chapter 11 Case. ..........................................................60

   5.   Dissolution Of The Survivors' Committee. .............................................60

   6.   Termination Of The Appointment Of The FCR. .......................................60

   7.   Governing Law. ...................................................................................61

   8.   Reservation Of Rights. .........................................................................61

IX. EFFECTS OF PLAN CONFIRMATION AND DISCHARGE. ................................61

A.   Discharge. ..............................................................................................61

   1.   Source Of Payment In The Event Class 6 Makes The Litigation Election.....61

B.   Vesting of Assets. ....................................................................................62

C.   Continued Existence of Reorganized Debtor................................................62

D.   Exculpation and Limitation of Liability. ......................................................62

X. RISK FACTORS............................................................................................63

A.   Parties In Interest May Object To The Debtor's Classification Of Claims. .......63

B.   The Debtor May Not Be Able To Secure Confirmation Of The Plan. ...............63

C.   Parties In Interest May Object To The Releases And Injunctions Contained In The Plan. ......................................................................................................64

D.   Nonconsensual Confirmation......................................................................64

E.   Non-Occurrence Of The Effective Date. ......................................................64

F.   Medicare Reimbursement. .........................................................................64

XI. BEST INTERESTS TEST. ..............................................................................64

XII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS. ...................................65

A. Tax Consequences To Creditors ......................................................................... 66

B. Tax Consequences To The Debtor ...................................................................... 66

C. Tax Consequences To The Trust. ........................................................................ 67

XIII. VOTING INSTRUCTIONS. ..................................................................................... 67

XIV. CONCLUSION AND RECOMMENDATION ............................................................ 67

USA Gymnastics, as debtor and debtor in possession (the "**Debtor**" or "**USAG**"), respectfully submits this disclosure statement (the "**Disclosure Statement**") in support of the *First Amended Chapter 11 Plan of Reorganization Proposed by USA Gymnastics* (as it may hereafter be amended or modified, the "**Plan**"), a copy of which is attached to this Disclosure Statement as Exhibit 1.[1]

## I. OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN

**A.    Introduction.**

On December 5, 2018, USA Gymnastics filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**"). Following its bankruptcy filing, the Debtor has engaged its insurance carriers, the Survivors' Committee, athletes, creditors, and other parties in interest in good faith and lengthy negotiations over the terms of a plan of reorganization that will compensate all persons holding Allowed Claims against the Debtor, with the Debtor's paramount focus on reaching an equitable resolution of the Abuse Claims. As a result of these efforts, the Debtor submits the Plan, which the Debtor believes is in the best interests of, and provides the highest and most expeditious recoveries to, all parties who hold Claims against the Debtor, including Holders of Abuse Claims. The Debtor recommends that all Classes of Claims entitled to vote accept the Plan, and further recommends that all Holders of Abuse Claims make the Settlement Election (described below).

This Disclosure Statement describes why Claims are placed into certain Classes, the relative allocations of property to the Holders of such Claims, the manner by which the Debtor's Assets are to be distributed, the risks inherent in the Plan, and the applicable bankruptcy and tax consequences of the Plan. You are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The following table briefly summarizes the classification and treatment of Claims under the Plan. For a more detailed description of the Plan's classification and treatment of Claims, see Article V below.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | ESTIMATED RECOVERY |
|-------|-------------|------------|--------|--------------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | PNC Bank Claim | Unimpaired | Deemed to Accept | 100% |
| 3 | Sharp Claim | Unimpaired | Deemed to Accept | 100% |
| 4 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept | 100% |

---

[1] The definitions set forth in Article I of the Plan apply to capitalized terms used, but not defined, in this Disclosure Statement. The rules of construction set forth in Article II of the Plan apply to this Disclosure Statement.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | ESTIMATED RECOVERY |
|-------|-------------|------------|--------|--------------------|
| 5 | General Unsecured Claims | Impaired | Yes | 80% |
| 6 | Abuse Claims | Impaired | Yes | $206,375,000.00 (Settlement Election) To Be Determined (Litigation Election) |
| 7 | Personal Injury Claim | Impaired | Yes | To Be Determined |
| 8 | USOPC Claim | Impaired | Yes | $0.00/Releases (Settlement Election) $0.00/Rights Against CGL Insurers (Litigation Election) |
| 9 | Indemnification Claims | Impaired | Yes | $0.00/Releases (Settlement Election) $0.00/Rights Against certain Insurers (Litigation Election) |
| 10 | FCR Claim *(only if there is a Settlement Election)* | Impaired | Yes | $10,750,000.00 |
| 11 | Sexual Abuse Claims Filed After The Bar Date *(only if there is a Litigation Election)* | Impaired | Deemed to Reject | $0.00 |

As provided by Section 1126 of the Bankruptcy Code, only Classes of Claims that are both impaired under the Plan and entitled to a recovery under the Plan are permitted to vote to accept or reject the Plan. Here, the only Classes of Claims entitled to vote are Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and Class 10 (the FCR Claim, only if there is a Settlement Election) (collectively, the "**Voting Classes**").

**B.    Principal Terms Of The Plan.**

This Section contains a summary of the principal terms of the Plan. You should carefully review the Plan in full before determining whether to vote to accept or reject the Plan. To the extent that any provision of this Disclosure Statement conflicts with any term of the Plan, the terms of the Plan shall control.

**1.    Treatment Of Abuse Claims.**

Excluding duplicative, withdrawn, and disallowed claims, 517 individuals have filed claims against the Debtor asserting that the Debtor has legal liability for Sexual Abuse committed principally by Lawrence Nassar, but in some instances by other gymnastics coaches or trainers. As set forth in the Debtor's liquidation analysis, a liquidation of the Debtor's Assets (exclusive of its Insurance Policies) would be insufficient to make any payments to the Debtor's general unsecured creditors and thus, in a chapter 7 case, the Holders of Abuse Claims would receive no recovery. Accordingly, the Debtor believes that the only source of recovery from the Debtor for Abuse Claimants is the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that provide Insurance Coverage for Abuse Claims). Through the Plan, the Debtor is making its

2

Insurance Policies and the proceeds thereof available to Abuse Claimants in one of two alternative ways.

### a. The Settlement Election.

The first option is the Settlement Election. To date, certain of the Debtor's CGL Insurers have offered $215,000,000.00 to resolve the Abuse Claims and Future Claims. The Debtor understands that this amount includes contributions from certain of USOPC CGL insurance policies. Twistars and the Twistars Insurers have offered $2,125,000.00 for this purpose. The Abuse Claimants may accept this $217,125,000.00 settlement in full satisfaction of their Abuse Claims against the Debtor and subject to the terms of the Plan, including the releases and injunctions in the Plan, by voting for the Plan and selecting the Settlement Election. To be clear, if the Abuse Claimants do not vote for the Plan, or if the Abuse Claimants vote for the Plan but select the Litigation Election, there will be no settlement fund and the Twistars Insurers will not contribute the $2,125,000.00.

If Abuse Claimants vote to accept the Plan and select the Settlement Election, the Plan will create a Trust for their benefit. The Abuse Claims and certain related claims will be channeled to the Trust, which will be funded by the $217,125,000.00 in CGL Settling Insurers' and Twistars Insurers' contributions. The Trust will make distributions to Abuse Claimants and Future Claimants in accordance with the terms of the Plan and the Trust Agreement attached to the Plan as Exhibit D.

In broad overview, the Trust Agreement provides for $10,750,000.00 to be held for the benefit of Future Claimants, subject to the terms of the Plan. The Trust Agreement sets forth an allocation methodology for the distribution of the remaining $206,375,000.00 that classifies Holders of Abuse Claims in four ways: Class 6A (Elite Gymnasts), Class 6B (Non-Elite Gymnasts), Class 6C (Other Claimants), Class 6D (Derivative Claimants). The Abuse Claims are classified in a manner that allocates recoveries to Abuse Claimants based on the geographic location of the abuse. Abuse Claimants who allege abuse occurred at the Olympics, the National Team Training Center, or a National Team event receive the highest recovery, followed by Abuse Claimants who allege abuse at a USAG sanctioned event, followed by Abuse Claimants who allege abuse at a non-USAG location, followed by Abuse Claimants asserting derivative claims. Under this methodology, each member of each subclass shares Pro Rata with the other members of their subclass. The $206,375,000.00 of remaining Trust Assets will be allocated as follows:

| SUBCLASS[2] | SUBCLASS MEMBERS | TOTAL ALLOCATION (%) | TOTAL ALLOCATION ($)[3] | PRO RATA ALLOCATION |
|---|---|---|---|---|
| 6A (Elite Gymnasts) | 66 | 40% | $82,550,000.00 | $1,250,757.58 |
| 6B (Non-Elite Gymnasts) | 142 | 35% | $72,231,250.00 | $508,670.77 |
| 6C (Other Claimants) | 284 | 24% | $49,530,000.00 | $174,401.41 |
| 6D (Derivative Claimants) | 25 | 1% | $2,063,750.00 | $82,550.00 |

Each Claimant in a designated subclass will receive their Pro Rata allocation without the need to present evidence as to the merits of their claim or the amount of damages suffered.

In exchange for payment of their Pro Rata allocation, Abuse Claimants shall agree to a full and complete release of the Debtor, its Estate, the Reorganized Debtor, the Settling Insurers (identified below), the Participating Parties (identified below), and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons (identified below).

The Settling Insurers include the following CGL Settling Insurers, who sold the Debtor's CGL Insurance Policies, all of which also provide coverage to the United States Olympic & Paralympic Committee (the "**USOPC**") as an additional or named insured:

- ACE American Insurance Company;
- Chubb Indemnity Company, also known as Ace American Insurance Company;
- CIGNA Insurance Company, now known as Ace American Insurance Company;
- Great American Assurance Company;
- National Casualty Company Transamerica Insurance Company;
- National Union Fire Insurance Company of Pittsburgh, also known as American International Group, Inc.;
- TIG Insurance Company; and,
- Virginia Surety Company, Inc., formerly known as Combined Specialty Insurance Company.

The Settling Insurers also include the Twistars Settling Insurers:

- Lexington Insurance Company;
- Nationwide Mutual Insurance Company;

---

[2] 553 Abuse Claims were filed. 33 of those Abuse Claims are duplicative, 1 Abuse Claim has been disallowed, 1 Abuse Claim is subject to a pending objection, and 1 Abuse Claim has been withdrawn. The Trust Agreement provides that those 36 claims will receive nothing from the Trust. Seven Abuse Claims are late Claims. The Trust Agreement gives the Trustee the discretion to treat late-filed Abuse Claims as timely filed or as disallowed. This chart assumes that the Trustee will treat late-filed Abuse Claims as timely filed.

[3] The Trust Agreement provides that the Trustee's fees and expenses incurred in the administration of the Trust will be paid from Trust Assets. The amounts set forth for the Total Allocation and Pro Rata Allocation are stated in gross amounts and do not reflect those anticipated fees and expenses.

- New Hampshire Insurance Company;
- Philadelphia Indemnity Insurance Company; and,
- State Farm Fire and Casualty Company.

The Participating Parties include:

- John Geddert;
- Kathryn Geddert;
- Twistars; and,
- USOPC

The Non-Debtor CGL Settling Insurer Covered Persons include:

- All Olympia Gymnastics Center;
- Amy White;
- Bob Colarossi;
- Artur Akopyan;
- Bela Karolyi;
- BMK Partners Ltd.;
- BMK Training Facilities Ltd.;
- Debra Van Horn;
- Donald Peters;
- Galina Marinova;
- John Geddert;
- Karolyi Training Camps;
- Karolyi World Gymnastics;
- Karolyi's Elite;
- Kathryn Geddert;
- Kathy Scanlan, LLC;
- Marta Karolyi;
- Paul Parilla;
- Rhonda Faehn;
- Steve Penny;
- National Gymnastics Foundation;
- Twistars; and,
- USOPC.

The Plan provides that, within ten days after receiving any payment from the Trust, Abuse Claimants shall dismiss with prejudice any lawsuits that such Abuse Claimants previously brought against the Debtor or any Participating Party.

### b.    The Litigation Election.

The second option is the Litigation Election. Abuse Claimants may choose, instead of accepting $217,125,000.00, to continue prosecuting their claims against the Debtor in name only after it emerges from chapter 11 in the courts where such claims were pending before December

5, 2018, or the courts where such claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code, and subject to any applicable statute of limitations or other defenses. Abuse Claimants may only recover judgments or awards from the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that provide coverage for Abuse Claims). No other Assets will be available to satisfy the Abuse Claims.

Under the Litigation Election, if an Abuse Claim was not timely filed in this Case, the person asserting that Abuse Claim will not be permitted to continue to prosecute such Abuse Claim after the effective date of the Plan. In this scenario, unless the Bankruptcy Court holds that an untimely Abuse Claim should be deemed to be timely filed, untimely Abuse Claims are disallowed in full and will receive no property under the Plan.

Finally, if Abuse Claimants vote to reject the Plan, and if the requirements of Section 1129(b) of the Bankruptcy Code are satisfied (which are discussed in more detail in Section III.D.2. below), the Abuse Claims will receive the treatment provided by the Litigation Election.

### c. The Debtor Recommends That Abuse Claimants Select The Settlement Election Over The Litigation Election.

The Debtor strongly recommends that Abuse Claimants vote in favor of the Plan and select the Settlement Election. The Debtor believes that the Settlement Election will offer materially higher recoveries to the collective group of Abuse Claimants in this Case than any other alternative and will provide those recoveries much more quickly and equitably than continued litigation. Under the proposed settlement distribution, survivors will receive between $1,250,757.58 and $174,401.41 depending on the geographic location of the abuse, with those asserting a loss of consortium or other related claims receiving $82,550. If the Abuse Claims, for which the Debtor does not admit liability, were prosecuted, the Debtor believes the vast majority of Abuse Claimants would receive nothing and, even those that might recover would wait many years before a final resolution of their Abuse Claims.

In sum, the Settlement Election provides the best alternative for the following reasons:

**Certainty and Timing of Payment**. The Litigation Election (or dismissal of the Debtor's Case) would re-institute a race to the courthouse and a race to judgment. The first Abuse Claimants to prevail in their suits against the Debtor will not share Pro Rata with their fellow Abuse Claimants. Instead, the winners of the race will be able to collect the entire amount of their judgment from the proceeds of the Debtor's CGL Insurance Policies, which will diminish, and eventually eliminate, the amounts that are available under those insurance policies for those who receive later judgments. As an example, the first Abuse Claimant to obtain a judgment might receive $250,000.00, but the last Abuse Claimant to obtain a judgment might collect nothing, even if the merits of both of their Claims are identical. There may also be a disparity in recoveries on similar Abuse Claims depending on which CGL Insurance Policy was in effect during a particular year, as the applicable policies contain different limits and exclusions, and certain policies may be exhausted.

The Litigation Election or dismissal of the Case would especially prejudice the 75 Abuse Claimants who have not yet filed suit against the Debtor. They would be at a clear disadvantage to those Claimants whose prepetition lawsuits, which were stayed by this Case, are ready to resume litigation after the Plan is confirmed. Survivors without pending lawsuits most likely would not be able to catch up with those who filed suits earlier and thus risk the possibility that the Debtor's CGL Insurance Policies are diminished or exhausted before their Abuse Claims are resolved. These individuals also likely have statute of limitations and other threshold legal issues that would result in the quick dismissal of any such lawsuits.

**Risk of Loss**. The Settlement Election ensures each Abuse Claimant a recovery without requiring that individual to prove their claims in court. If these cases go through the court system, however, the Debtor has defenses to the Abuse Claims that may bar recovery in all or most of the cases.

Most fundamentally, all of the Abuse Claims are subject to dismissal on the basis that the Debtor did not have a legal duty to the Claimants. A recent decision from the United States District Court for the Western District of Michigan, where most lawsuits are pending, is instructive. Applying Michigan law, the court dismissed negligence, gross negligence, and vicarious liability claims brought by a Boy Scout member against the Boy Scouts of America for abuse she suffered by a third-party while participating in a Boy Scouts-sponsored program. *See Doe v. Boy Scouts of America*, No. 18-cv-988-PLM-PJG, Dkt. 33 (W.D. Mich. July 23, 2019) (unpublished). The court dismissed the plaintiff's case because the Boy Scouts did not "owe a duty to protect [the plaintiff] from the specific harm alleged." *Id.* at 7. As a "general rule in Michigan," "there is no legal duty to protect a person from the unforeseeable crimes of a third party." *Id.* at 9. And even if the Boy Scouts had a special duty to ensure the plaintiff's safety was not endangered (because she "entrusted [her] safety" to them), the Boy Scouts still were not liable for the abuser's "unforeseeable criminal activity." *Id.* at 9-10.

This decision is consistent with the Michigan Supreme Court's opinion in *Brown v. Brown*, 739 N.W.2d 313 (Mich. 2007). In *Brown*, the Michigan Supreme Court refused to hold an employer liable under a negligence theory for a sexual assault committed by one of its employees. The Court reasoned that an employer only has a duty to protect third parties from the criminal sexual misconduct of employees or other agents if there is an "unmistakable, particularized threat" of "imminent risk of harm to a specific victim." *Brown*, 739 N.W.2d at 548, 554. While the assailant in *Brown* had made several "crude, sexually explicit comments" before committing the assault, the employer could not have "reasonably anticipate[d]" that those "tasteless comments" were an "inevitable prelude" to sexual assault. *Id.* at 555. Similarly, here, the Debtor did not have notice of any unmistakable, particularized threats of imminent harm from Nassar or others to specific survivors, and therefore owed no duty under Michigan law.

Since the overwhelming majority of Abuse Claims are also governed by Michigan law, courts will likely follow these cases and dismiss the litigation asserted against the Debtor. Courts are unlikely to hold the Debtor legally responsible for the unforeseeable criminal misconduct that gave rise to the Abuse Claims.

In addition, the vast majority of Abuse Claim fall within subclasses 6B (Non-Elite Gymnasts) and 6C (Other Claimants). These two subclasses include 426 of the 517 non-duplicative

Abuse Claims. The ability of these Claimants to hold the Debtor legally responsible for the criminal actions of Nassar and others is even more uncertain. The Abuse Claims that fall within subclass 6C allege abuse at locations, primarily at Michigan State University ("**MSU**"), where USAG had no presence or ability or duty to monitor employees of MSU. In addition, certain of the Claimants that fall within subclass 6C are not gymnasts and do not have any relationship with the sport of gymnastics. Absent the Settlement Election, USAG does not believe that the 284 Claimants falling within Subclass 6C will be able to obtain a judgment against USAG on account of their Abuse Claims.

Similarly, the Debtor's legal responsibility for the 142 Claimants in subclass 6B who allege abuse at a USAG-sanctioned event, is doubtful. The designation that an event is USAG-sanctioned only means that the rules governing scoring and the conduct of the meet are USAG's official rules. It does not mean that the Debtor had any role in the organization or supervision of the meet. The gymnasiums where the overwhelming majority of these meets occur are not owned or operated by USAG, but are private businesses with their own management. Accordingly, USAG does not believe that the 142 Claimants falling within subclass 6C will be able to obtain a judgment against USAG on account of their Abuse Claims.

The lawsuits may also be dismissed on statutes of limitation grounds. The Abuse Claims allege misconduct that occurred between the 1970s and 2016. Under Michigan law, the limitations period for sexual assault is three years, or a plaintiff's nineteenth birthday if the three year period expired while the plaintiff was a minor. A substantial portion of the Abuse Claims were not brought within these periods. Courts will most likely dismiss all such time-barred litigation, whereas the Debtor, under the Settlement Election, is permitting Abuse Claims that would otherwise be barred by the statute of limitations to receive a Pro Rata distribution from the Trust.

While some Abuse Claimants have argued that Nassar's fraudulent concealment of his abuse extends the limitations period as to the Debtor, both the Sixth Circuit and the Michigan Supreme Court have held that the fraudulent statements of an agent/employee do not extend the statute of limitations for claims against the principal/employer. *Chandler v. Wackenhut*, 465 F. App'x 425, 430 (6th Cir. 2012); *Stevenson v. Robinson*, 39 Mich. 160 (1878). Similarly, any attempts to extend the limitations period through a theory of a breach of fiduciary duty will also likely fail because there is no legal support for the notion that an athletic organization owes a fiduciary duty to its members.

**Timing of Distribution**. Abuse Claimants will receive distributions much more quickly under the Settlement Election than any recoveries under the Litigation Election or if the Case were dismissed. The Trust will begin making Pro Rata distributions to Abuse Claimants once the Plan is confirmed, the Trust is funded, and Abuse Claimants tender the required releases to the Trustee. The Debtor anticipates that if the Plan is confirmed in June 2020, Abuse Claimants will receive distributions in 2020. Because Abuse Claimants are entitled to Pro Rata distributions, the Trustee will not have to engage in a lengthy and complicated determination as to the merits of each Abuse Claim and the appropriate amount of damages. By contrast, litigation over the Abuse Claims will be highly contested and subject to complex motion practice and discovery before any trial. Even assuming that Abuse Claims are not dismissed by the courts, it will most likely take years for any judgment to be entered. Successful Abuse Claimants will then most likely have to bring insurance coverage litigation against the Debtor's insurers in order to satisfy any judgments.

**Special Considerations If Your Claim Was Filed After The Bar Date**. For those seven Claimants who filed their Abuse Claims after the Bar Date, the Settlement Election is the only option that allows you to recover. Under the Litigation Election, untimely Abuse Claims receive no recovery and may not commence or continue lawsuits to recover under the Debtor's CGL Insurance Policies. Under the Settlement Election, untimely Abuse Claims will be treated the same as timely Abuse Claims without any requirement that the Claimant seek Bankruptcy Court approval for such treatment.

**Preservation of the Twistars Contribution**. Lawyers for certain of the Holders of the Abuse Claims negotiated a settlement with Twistars and the Twistars Settling Insurers for the limits of Twistars' insurance coverage. That settlement was expressly conditioned upon the settlement being implemented through a plan of reorganization that provides for channeling injunctions and other releases for Twistars and the Twistars Settling Insurers. Implementation of the Twistars settlement is only possible if Abuse Claimants select the Settlement Election. If Abuse Claimants select the Litigation Election or vote no on the Plan and the Court confirms the Plan resulting in the Litigation Election, the Twistars settlement will not be implemented. Twistars will proceed with a motion to dismiss that was set for argument at the time of settlement was reached and Abuse Claimants risk the court granting that motion to dismiss. If the Twistars motion to dismiss is granted, it will likely have a negative impact on the Abuse Claims against the Debtor and other parties.

In sum, if Abuse Claimants want certain compensation without years of litigation, they should vote to accept the Plan and select the Settlement Election.

### d.    The Settlement Election Would Not Be Possible Without The Releases And Injunctions, Including A Release Of The USOPC.

The Settling Insurers conditioned their $217,125,000.00 contribution on certain releases and plan injunctions for the Settling Insurers, Participating Parties, and other individuals. The Debtor and its counsel did not accept the Settling Insurers' demand for releases and injunctions blindly. The Debtor and its counsel evaluated potential reasonably available alternatives and determined that none exist. The only way that the Settlement Election occurs is if the parties contributing to the Trust receive this release. The Debtor believes that Abuse Claimants will be better off receiving a timely distribution from the Trust in exchange for this release, as opposed to rejecting the release and proceeding with highly uncertain litigation.

The USOPC is a beneficiary of the Settlement Election's release and its injunctions. This treatment is required because the USOPC is an additional or named insured under the CGL Insurance Policies. The USOPC has rights to payment under those policies that are independent of any of the Debtor's rights. The CGL Settling Insurers have conditioned the payment of their settlement contributions upon the USOPC giving up its rights under the policies. The only way the USOPC will agree to that result is if it is protected by the releases and injunctions described above.

The Debtor cannot unilaterally strip the USOPC of its rights to proceeds of the CGL Insurance Policies. Courts have consistently held that the rights of additional insureds, like the USOPC, are not a debtor's property that it can sell or otherwise extinguish without that third party's consent. For example, one court within this Circuit determined that an additional insured

had "equal and independent rights to seek indemnification and defense" from a debtor's policies. *In re SoyNut Butter Co.*, No. 17-14970, 2018 WL 3689549, at *3 (Bankr. N.D. Ill. Aug. 1, 2018). It then refused to allow the debtor to sell the policies and extinguish the additional insured's right to payment. *Id.* at *3-4.

Other courts agree and have concluded that bankruptcy courts lack "jurisdiction or authority to impair or extinguish" an additional insured's "independent contractual rights." *In re Sportstuff, Inc.*, 430 B.R. 170, 178 (BAP 8th Cir. 2010); *see also In re Archdiocese of St. Paul & Minn.*, 579 B.R. 188, 197-98, 202-03 (Bankr. D. Minn. 2017); *In re SelectBuild Illinois*, No. 09-12085, 2015 WL 3452542, at *9 (Bankr. D. Del. May 28, 2015); *In re Adelphia Comm'cns Corp.*, 364 B.R. 518, 527-28 (Bankr. S.D.N.Y. 2007); *In re Forty-Eight Insulations*, 149 B.R. 860 (N.D. Ill. 1992).

Given this authority, the Debtor expects that if it attempted to litigate this issue, it is likely that the Bankruptcy Court would hold that the USOPC has equal and independent rights in certain CGL Insurance Policies and that it is entitled to demand a benefit in exchange for releasing those rights. It is for this reason that the USOPC is receiving the protection offered by the Settlement Election's releases and injunctions. Without the benefit of those protections, the USOPC would not agree to give up its rights under the policies and the insurance carriers contributing to the settlement would not be willing to contribute the Plan Payment to the Trust.

The Debtor understands that this amount includes contributions from certain of USOPC CGL insurance policies, which constitutes additional consideration from USOPC.

## 2.    Non-Monetary Commitments And Reforms.

In addition to compensating survivors through the Settlement Election or the Litigation Election, USAG is committed to taking concrete action to address the concerns that survivors and others have raised about the organization and its culture. All USAG members deserve a safe, positive, and encouraging environment where they can thrive, have fun, be successful, and be themselves. They also deserve an organization that does everything it can to prevent the opportunity for abuse to happen in the future. USAG has made substantial progress on these goals during the pendency of this Case, and it will work to further promote athlete safety after this Case concludes.

To accomplish these goals, USAG has undertaken significant changes in its governance. USAG's leadership has completely changed since the disclosure of Nassar's criminal misconduct. In March 2017, USAG's then CEO, Steve Penny, resigned. In January 2018, all non-athlete members of USAG's then board of directors resigned. The current USAG Board and its officers do not include any individuals who served on the former board, excepting one athlete representative. Other employees who faced criticism over their actions in connection with USAG's response to Nassar's conduct are no longer employed by USAG.

One of the most significant changes USAG made during this Case was its decision to hire Li Li Leung as its President and CEO. An accomplished gymnast herself, Ms. Leung possesses a longstanding passion for gymnastics, a sincere commitment to the safety and well-being of USAG's members, including athletes and coaches, and an intimate familiarity with USAG's role

in cultivating and maintaining the sport's infrastructure throughout the United States. Additionally, with nearly two decades of sports business experience at the highest levels, Ms. Leung is well-equipped to restore confidence in USAG and rekindle USAG's relationships with its current and former athletes, sponsors and other key stakeholders. Since joining the organization, Ms. Leung has met with hundreds of stakeholders, including survivors, to hear their perspectives on how to improve athlete safety and the organization overall. She has worked diligently to implement these suggestions where appropriate and feasible.

Consistent with her athlete-centric focus, Ms. Leung created a new position—Vice President of Athlete Health and Wellness—and filled that position in December 2019 with Kim Krantz. In her role, Ms. Krantz is charged with expanding the scope of athlete wellness well beyond traditional sports medicine, to more holistic athlete development. For example, Ms. Krantz is creating programming and training on mental strength and mindfulness, training and recovery (including nutrition and sleep), humanistic coaching, and is identifying and evaluating potential partners to help deliver programming to athletes for longer term career successes. Ms. Krantz brings a wealth of experience to USAG. She earned her Doctor of Science in Physical Therapy from the University of Maryland Baltimore; graduated with a B.S. in Physical Therapy from the University of Wisconsin; is a Board-Certified Clinical Specialist in Sports Physical Therapy and a Fellow of the American College of Healthcare Executives. Ms. Krantz has over 25 years of experience in physical therapy and sports medicine, with a focus on sports nutrition, positive coaching, and sports psychology. She most recently served as the Director of Sports Medicine and Orthopedic Surgery Services and Neurosurgery at Children's Hospital of The King's Daughters, where the program's mission was to promote athlete wellness and injury prevention.

Ms. Leung also spearheaded USAG's move to a new national training team center in Indianapolis, Indiana. The new training center has an emphasis on athlete wellness. It is in an easily accessible location and parents are welcome to attend and observe training sessions. Athletes stay offsite at a nearby hotel. The center has a commercial kitchen for preparation of healthy meals, which are planned with the guidance of a nutritionist. At each meal, a protein, salad bar, fruit, and starches are made available to the athletes. Breakfast is provided by the hotel buffet which includes eggs, bacon/sausage, cereal, oatmeal, bread, juice, etc. In the hotel, athletes have access to a team "hang out" space set up with bean bags and televisions where they can relax and enjoy camaraderie with one another. USAG will implement mindfulness training for all national team coaches at national team training camps.[4] USAG also created periodic surveys for coaches and athletes who attend training camps and some of USAG's larger events so that it can better gather and react to suggestions and comments from its members.

USAG also amended its bylaws to strengthen Safe Sport provisions and complaint processing. These amendments include creating a permanent Safe Sport Committee; increasing the number of independent Board directors to eight (which is a majority of the Board); removing the President from a role in the processing of complaints; easing complaint filing requirements; delineating the responsibilities of the Board and President more clearly; and providing for the publication of the names of members who have been suspended, placed on the permanently

---

[4] Mindfulness is the process of purposely bringing one's attention to the present moment without judgment. Practicing mindfulness can promote psychological and physical wellbeing.

ineligible list, or otherwise had their memberships restricted as part of the disciplinary process, with these lists available on USAG's website:

usagym.org/pages/aboutus/pages/permanently_ineligible_members.html

usagym.org/pages/aboutus/pages/suspended_members.html.

USAG adopted a new Safe Sport Policy, which mandates reporting, defines specific types of misconduct, sets standards to prohibit "grooming" behavior, and establishes greater accountability. The policy provides important requirements and information on mandatory reporting and Proactive Policies that empower athletes and guide athlete-coach interactions. A copy of the Safe Sport Policy is available at usagym.org/pages/education/safesport/policy.html. The website also includes a "Policy Snapshot" summary and educational webinars.

USAG has also rolled out new Safe Sport initiatives. These include regular webinars with topics including prevention policies, healthy boundaries with minors, bullying, protecting against emotional abuse, and educational webinars for parents on understanding the sport better. USAG has implemented new programming at all Regional and National Congresses. These programs include Demystifying Safe Sport, Emotional Abuse and Tough Coaching, and Creating Healthy Boundaries with Athletes. USAG has also signed an agreement with the Positive Coaching Alliance to help create and deliver articles, webinars, and social media posts for parents and coaches.

In addition, USAG implemented programming for its staff and Board. USAG's staff and Board members are required to be trained in Safe Sport, and athlete safety and Safe Sport are now mandatory topics at each staff and Board meeting.

In response to concerns about the need to promote parent engagement, USAG created a parent targeted quarterly e-newsletter that reinforces and increases awareness of new policies and programs. The first e-newsletter was distributed in October 2019 and focused on USAG's Safe Sport policy. The second e-newsletter was distributed in December 2019 and the next one is planned for March 2020. USAG is also using social media as a medium for educating parents on grooming, encouraging parents to attend practices and training sessions, and encouraging parents to attend webinars. In January 2020, USAG implemented "Safe Sport Wednesday" where each Wednesday there will be a targeted post related to athlete safety.

USAG has taken steps to ensure that all abuse complaints are addressed, including the implementation of a new case management system, Maxient, and is planning other system upgrades that will enable it to have best in class systems for addressing and documenting all abuse claims. USAG implemented procedures and guidelines to facilitate the sharing of information regarding abuse reports with the National Center for Safe Sport and with law enforcement.

USAG plans to take additional actions to become more athlete-centric, including hiring a Vice President of Safe Sport (which search is currently underway); auditing member clubs for compliance with the Safe Sport Policy; becoming a more data-driven organization, particularly with regards to athlete safety; providing additional educational programming about athlete safety, including dialogue-based information-share opportunities and more easily-accessed content; continuing to listen to all stakeholders; and engaging with survivors who want to be involved in

order to improve the organization on every level, including with respect to its culture, policies, and governance.

USAG is deeply committed to athlete safety and to addressing the concerns of its members. USAG will continue striving to rebuild the trust and confidence of all of its stakeholders. The proposal of the Plan for confirmation is one step toward that goal.

### 3.    Treatment Of Claims Other Than Abuse Claims.

Claims against the Debtor that are not Abuse Claims are identified and described in full in Article V of this Disclosure Statement. They will be treated as follows under the Plan:

- General Unsecured Claims will be paid from existing and future revenues of the Reorganized Debtor over 3 years at 80 percent. In total, filed and scheduled General Unsecured Claims assert liabilities of approximately $1,841,188.24 (exclusive of the Indemnification Claims, the Personal Injury Claim, a Claim that will be treated as an Abuse Claim, and Claims that have been disallowed). Attached as Exhibit 2 is a *pro forma* cash flow analysis for the Debtor for this three year period.

- The Claimant holding the Personal Injury Claim (General Unsecured Claim No. 251) will be permitted to prosecute the Personal Injury Claim against the Reorganized Debtor in name only in the court in which the Personal Injury Claim could have been brought, but for the automatic stay, and to recover any judgments or settlement awards exclusively from the Debtor's Personal Injury Insurance Policy. The Debtor does not admit liability for the Personal Injury Claim and reserves any defenses.

- The Allowed Other Priority Claims, the PNC Bank Claim, the Sharp Claim, and the General Unsecured Convenience Claims will be unimpaired under the Plan.

- The treatment of Indemnification Claims, the USOPC Claim, the FCR Claim, and Abuse Claims filed after the Bar Date will depend on whether the Abuse Claimants make the Settlement Election or the Litigation Election.

### C.    The Plan Is In The Best Interests Of Creditors.

As discussed in the unaudited Liquidation Analysis attached to this Disclosure Statement as Exhibit 3, the Debtor estimates that recoveries under the Plan for all Holders of Allowed Claims will be greater than their recoveries in a liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, in light of insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies cannot be determined with precision. Because the Debtor has committed to make the value of the Insurance Policies available to Abuse Claimants, Abuse Claimants are receiving at least what they would receive in a chapter 7 liquidation from the Insurance Policies.

Any distributions in chapter 7 will also be reduced by the additional administrative expenses that a chapter 7 trustee (who must be appointed in any chapter 7 case) and the trustee's professionals will incur. Also, because a new deadline will be set for creditors to file claims against

13

the Debtor's estate (including for creditors who did not file their claims in the Case), additional claims may be filed that reduce the amount available for each allowed claims. Distributions in a chapter 7 case will then be delayed due to the time it will take the chapter 7 trustee to assess the Debtor's Assets, review and analyze claims filed against the Debtor, and liquidate the Debtor's property for distribution. Claimants entitled to vote to accept or reject the Plan should review the Liquidation Analysis before casting their votes.

Because the Plan will provide the Debtor with a greater total amount of property to distribute to Holders of Allowed Claims than would be the case in a liquidation under chapter 7, the Debtor submits that the Plan is in the best interest of creditors and urges Claimants to vote in favor of the Plan, and further urges Abuse Claimants to select the Settlement Election.

**D.     Voting And Confirmation Procedures.**

By order dated _____ __, 2020 (the "**Disclosure Statement Order**"), the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to make an informed decision on whether to accept the Plan. A copy of the Disclosure Statement Order is attached hereto as Exhibit 4. The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court to creditors that they should vote to accept or to reject the Plan.

Holders of Allowed Claims in Voting Classes can find voting instructions in the Disclosure Statement Order and in the ballots that accompany this Disclosure Statement. For purposes of voting only, each Abuse Claim in Class 6 will be allocated one dollar ($1.00). To be counted, ballots must be properly completed, executed, and **actually received** by Omni Agent Solutions, Inc., the Debtor's claims agent (the "**Claims Agent**"), by 5:00 p.m. (prevailing Eastern time), on May 8, 2020 (the "**Voting Deadline**").

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan to commence on June 3, 2020 at 10:00 a.m. (prevailing Eastern time) (the "**Confirmation Hearing**"), in Courtroom 329, 46 East Ohio Street, Indianapolis, Indiana 46204. This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code for confirmation. The Bankruptcy Court will also receive and consider a ballot report prepared by the Debtor's Claims Agent tabulating the votes accepting and rejecting the Plan.

## II. QUESTIONS AND ANSWERS REGARDING
## THIS DISCLOSURE STATEMENT AND THE PLAN

**Why is the Debtor sending me this Disclosure Statement?**

The Debtor is seeking Bankruptcy Court approval of the Plan. This Disclosure Statement contains information about the Plan. Section 1125 of the Bankruptcy Code requires the Debtor to provide a Disclosure Statement approved by the Court with the Plan to assist you in making an informed judgment about whether you will accept or reject the Plan.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Debtor believes that recoveries for all claimants, including Abuse Claimants, will be materially reduced. Under the Settlement Election, the Plan incorporates a settlement among the Debtor, certain insurers, and other parties in interest, and allocates the majority portion of the Debtor's insurance proceeds to the Trust for the benefit of the Abuse Claimants and Future Claimants. Confirmation of the Plan is necessary to effectuate that $215,000,000.00 settlement as well as the $2,175,000.00 Twistars Settlement, and Abuse Claimants will lose access to the funds if the Plan is not confirmed.

If the Plan is not confirmed or does not become effective in a timely manner, any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan's Settlement Election on account of, among other things, the cost of negotiating, drafting, and potentially litigating an alternative Plan, as well as the costs of complex litigation arising from the Abuse Claims and remaining coverage disputes between the Debtor and its Insurers.

Abuse Claimants' recoveries under the Litigation Election will also be reduced if the Plan is not confirmed or does not become effective in a timely manner. Under the Litigation Election, Holders of Abuse Claims will have thirty days following the effective date of the Plan to either recommence their prepetition lawsuits or initiate new lawsuits. Once that thirty-day deadline passes, individuals cannot commence any suit asserting a Claim for Sexual Abuse based upon the Debtor's conduct or omissions occurring prior to the filing of this Case. The Litigation Election therefore fixes the universe of claims shortly after the Plan goes into effect. On the other hand, if the Plan is not confirmed and/or does not become effective, there will be nothing to limit the claims that additional parties might bring in the future, even if they failed to submit a timely Abuse Claim in this case. Those new claims would dilute recoveries for individuals who timely filed their Abuse Claims here.

Moreover, failure to confirm the Plan may result in dismissal of the Case in its entirety. Without the discharge contemplated by the Plan, the Debtor will be required to continue to maintain a reserve and allocate insurance proceeds to satisfy claims that are based on the prepetition conduct at issue in this case for which no claims were filed in the Bankruptcy Case. That result would prejudice all claimants who timely filed claims in this case by reducing the amount of available assets the Debtor has to satisfy their claims.

**If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation" and "Effective Date"?**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan will bind the Debtor, any person acquiring property under the Plan, and any creditor, including Abuse Claimants, to the terms of the Plan, in full satisfaction and compromise of any and all obligations that arose prior to this Case.

Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan. After confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective on the "Effective Date."

Under the Settlement Election, the "Effective Date" will occur when the Bankruptcy Court enters an order confirming the plan (and that order is reasonably acceptable to the Reorganized Debtor, the Survivors' Committee, and the parties who contributed to Trust), the Trustee and the Reorganized Debtor sign the Trust Agreement, and all parties contributing to the Trust transfer their funds to the Trust. Under the Litigation Election, the "Effective Date" shall occur when the Bankruptcy Court enters an order confirming the plan and that order is not stayed (*i.e.*, put on hold) by the Bankruptcy Court or any other court.

Distributions will be made on the Effective Date or as soon as practicable thereafter, based on, among other things, the amount of cash available to satisfy the Claims; the amount of Claims outstanding against the Debtor; the time that the Trustee requires to complete his or her analysis of Abuse Claims and their entitlement to a distribution (in the event of the Settlement Election); and the time it takes claimants to litigate their Abuse Claims to judgment, with recoveries solely from the Debtor's comprehensive general liability insurance policies (in the event of a Litigation Election).

**Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes, but only under the Settlement Election. If Class 6 votes for the Plan and selects the Settlement Election, to receive a distribution from the Trust, Abuse Claimants and Future Claimants must execute a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers (identified in Section I.B.1.a above), all Participating Parties (identified in Section I.B.1.a above), and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons (identified in Section I.B.1.a above), of any and all Claims arising from or relating to Abuse Claims or Future Claims. The release must be in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers.

By voting in favor of the Settlement Election, Abuse Claimants and Future Claimants necessarily consent to this release. The release is a necessary component of the Settlement Election, the Plan, and the Debtor's reorganization because, without the release, the Settling

Insurers and Participating Parties will not agree to contribute the settlement amounts and fund the Trust.

In the event of a Litigation Election, the releases just described will not apply. Instead, the Debtor will receive the benefit of a discharge of all liability for all claims that occurred prior to confirmation of the Plan, and Abuse Claimants will only be permitted to recover on their claims from the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that are available for Abuse Claims). Any claims that Abuse Claimants may have against third parties are unimpaired by the Litigation Election.

**Will there be any injunctions entered pursuant to the Plan?**

Yes. In the event of a Settlement Election, the Channeling Injunction and Settling Insurer Injunction described in Article XII of the Plan will both be entered. In addition, regardless of whether Class 6 votes for the Settlement Election or the Litigation Election, the Debtor will receive the benefit of the discharge injunction described in Section 19.1 of the Plan. Certain other parties will also receive the benefit of the exculpation and limitation of liability set forth in Section 19.4 of the Plan.

**Channeling Injunction.** Under the Settlement Election, certain claims will be channeled to the Trust. These Channeled Claims are defined in full in Section 1.2.3 of the Plan, but they include the Abuse Claims, the FCR Claim, the USOPC Claim, the Indemnification Claims, all other claims arising from or related in any way to the Abuse Claims, and any claims for punitive damages, alter ego liability, or piercing the corporate veil against any Participating Party, Settling Insurer, or Non-Debtor CGL Settling Insurer Covered Person.

Individuals holding Channeled Claims will be forever and permanently enjoined, stayed, barred, and restrained from taking any action to recover on Channeled Claims from any asset not held by the Trust. This includes any assets of the Debtor, the Estate, the Reorganized Debtor, any Participating Party, any Settling Insurer, and any Non-Debtor CGL Settling Insurer Covered Person, as well as any of these entities' predecessors, successors, assigns, and present and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such. However, the protection of the Channeling Injunction will not extend to any person who personally committed an act or acts of abuse resulting in a claim against the Debtor, a Participating Party, or a Settling Insurer.

If any claimant violates the Channeling Injunction, they may be subject to sanctions imposed by the Bankruptcy Court, even after the closure of the Debtor's chapter 11 case. The Channeling Injunction will preclude claimants from pursuing Channeled Claims against the entities and assets protected by the Channeling Injunction regardless of whether or not claimants receive a distribution under the Plan. The Channeling Injunction is a necessary component of the Settlement Election, the Plan, and the Debtor's reorganization because, without the Channeling Injunction, the Settling Insurers and Participating Parties will not agree to contribute the settlement amounts and fund the Trust.

**Settling Insurer Injunction.** In addition, under the Settlement Election, the Settling Insurers will receive the benefit of the Settling Insurer Injunction. This injunction prohibits any and all persons from asserting against any Settling Insurer any claim related to any Abuse Claim or Future Claim, any insurance policies issued by the Settling Insurers, or any claim against any Settling Insurer for contribution, indemnity, defense, subrogation, or similar relief. This injunction permits the Settling Insurers to contribute to the Trust in full satisfaction of their respective comprehensive general liability insurance policies, ensuring they will face on claims on account of such policies in the future, and is a necessary component of the Settlement Election, the Plan, and the Debtor's reorganization.

**Discharge Injunction.** Regardless of whether Class 6 votes for the Settlement Election or the Litigation Election, if the Plan is confirmed the Debtor will receive the benefit of the discharge injunction provided by Section 524 of the Bankruptcy Code. That discharge injunction prohibits any act to collect, recover, or offset any claim against or debt of the Debtor that arose before the date the Plan is confirmed. This discharge injunction only applies to the Debtor; it does not apply to any insurer or third party.

**Exculpation and Limitation Of Liability.** Certain Exculpated Parties will be protected from claims arising from or relating to any act or omission in connection with this Case, the pursuit of confirmation of the Plan, or the administration of the Plan, including the exercise of their business judgment and the performance of their fiduciary obligations.

These Exculpated Parties are defined in Section 1.1.39 of the Plan to include the Debtor, the Reorganized Debtor, the Debtor's Professionals, the FCR, the FCR's Professionals, and each of their respective predecessors, successors, assigns, past and present and former shareholders, affiliates, subsidiaries, employees, agents, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such. In the event Class 6 makes the Settlement Election, "Exculpated Parties" will also include the Survivors' Committee, the Survivors' Committee's Professionals, the Settling Insurers, the Participating Parties, and their respective Related Persons. However, the protection of this exculpation and limitation of liability will not extend to any person who personally committed an act or acts of abuse resulting in a claim against the Debtor, a Participating Party, or a Settling Insurer. The exculpation and limitation and liability will also not apply to any claims arising from willful misconduct or fraud, although the Debtor, the Estate, and the Reorganized Debtor will be discharged from liability for any of these acts that occurred prior to confirmation of the Plan.

**Why does the USOPC receive the benefit of the releases and injunctions described above?**

The Settling Insurers conditioned their $217,125,000.00 contribution on certain releases and plan injunctions for the Settling Insurers, Participating Parties, and other individuals. The Debtor and its counsel did not accept the Settling Insurers' demand for releases and injunctions blindly. The Debtor and its counsel evaluated potential reasonably available alternatives and determined that none exist. The only way that the Settlement Election occurs is if the parties contributing to the Trust receive this release. The Debtor believes that Abuse Claimants will be better off receiving a timely distribution from the Trust in exchange for this release, as opposed to rejecting the release and proceeding with highly uncertain litigation.

The USOPC is a beneficiary of the Settlement Election's release and its injunctions. This treatment is required because the USOPC is an additional or named insured under the CGL Insurance Policies. The USOPC has rights to payment under those policies that are independent of any of the Debtor's rights. The CGL Settling Insurers have conditioned the payment of their settlement contributions upon all of their insureds receiving the benefit of the Settlement Election's release and related injunctions and a corollary relinquishment by each insured of its rights under those policies. The only way the USOPC will agree to that result is if it is protected by the releases and injunctions described above.

The Debtor cannot unilaterally strip the USOPC of its rights to proceeds of the CGL Insurance Policies. Courts have consistently held that the rights of additional insureds, like the USOPC, are not a debtor's property that it can sell or otherwise extinguish without that third party's consent. Some courts have gone so far as to say that bankruptcy courts completely lack jurisdiction (*i.e.*, power) to impair or extinguish an additional insured's independent contractual rights.

Given this authority, the Debtor expects that if it attempted to litigate this issue, it is likely that the Bankruptcy Court would hold that the USOPC has equal and independent rights in certain CGL Insurance Policies and that it is entitled to demand a benefit in exchange for releasing those rights. It is for this reason that the USOPC is receiving the protection offered by the Settlement Election's releases and injunctions. Without the benefit of those protections, the USOPC would not agree to give up its rights under the policies and the insurance carriers contributing to the settlement would not be willing to contribute the Plan Payment to the Trust.

The Debtor understands that this amount includes contributions from certain of USOPC CGL insurance policies, which constitutes additional consideration from USOPC.

The Settlement Election therefore would not exist without the protections provided to the USOPC. The Debtor believes that Abuse Claimants will be better off receiving a timely distribution from the Trust in exchange for the releases and injunctions benefitting the USOPC, as opposed to rejecting those protections and proceeding with highly uncertain litigation.

**How do I vote for or against the Plan?**

This Disclosure Statement is being distributed to the Holders of Claims entitled to vote on the Plan, along with ballots to be used for voting on the Plan. If you are a holder of a Claim in Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and Class 10 (the FCR Claim, only if there is a Settlement Election), you may vote for or against the Plan by completing your ballot and by (a) mailing it to USA Gymnastics Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367, or (b) sending a signed, scanned copy of the ballot via email to usagballoting@omnimgt.com. Do not send your ballot to the Debtor or to the Bankruptcy Court.

**What is the deadline to vote on the Plan?**

All ballots must be **actually received** by the Debtor's Claims Agent (Omni Agent Solutions) no later than the Voting Deadline of 5:00 p.m. (prevailing Eastern time) on May 8,

2020, via mail or email, as set forth above. If your ballot is not received by the Debtor's Claims Agent by the Voting Deadline, and such deadline is not extended, your vote on the Plan will not be counted.

**What is the Confirmation Hearing and when is it scheduled to occur?**

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The standards for confirmation are set forth above and in Section 1129 of the Bankruptcy Code.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on June 3, 2020 at 10:00 a.m. (prevailing Eastern time) before the Honorable Robyn Moberly, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court, Courtroom 329, 46 East Ohio Street, Indianapolis, Indiana 46204. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Objections to Confirmation of the Plan must be filed and served on the Debtor no later than May 15, 2020 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to the confirmation of the Plan are timely filed and served, those objections might not be considered by the Bankruptcy Court.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising under, in furtherance of, or in connection with, the Plan. These matters include: (1) the determination of objections to disputed claims and requests for payment on administrative expense claims; (2) the resolution of controversies and disputes regarding interpretation and implementation of the Plan and related documents; (3) the entry of appropriate orders to protect parties from actions prohibited under the Plan; (4) the approval of amendments to and modifications of the Plan; (5) the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Plan's Effective Date; (6) in the event of the Litigation Election, the determination of any motion to determine that a Claimant is a Future Claimant or to determine that an Abuse Claim filed after the Bar Date shall be deemed to have been filed before the Bar Date; and (7) the closure of this chapter 11 case.

**Does the Debtor recommend voting in favor of the Plan?**

Yes. The Debtor recommends voting for the Plan because the Plan provides for a larger distribution to the Debtor's unsecured creditors, including Abuse Claimants, than would otherwise result from liquidation or any other reasonably available alternative. Accordingly, the Debtor recommends that the holders of Claims in the Voting Classes vote to accept the Plan, and recommends that Abuse Claimants select the Settlement Election.

### III. An Overview Of The Chapter 11 Process

**A.      A Chapter 11 Case.**

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize its operations in an orderly fashion for the benefit of its creditors and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a debtor in possession unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's case, there has been no request for the appointment of a trustee and the Debtor remains a debtor in possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by individuals and entities to collect on pre-petition claims against a debtor, continue lawsuits against a debtor, or otherwise exercise control over or interfere with a debtor's property or operations. The automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan, unless otherwise ordered by the Bankruptcy Court.

**B.      A Chapter 11 Plan.**

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying the claims against in a debtor's estate. Once a plan is confirmed by a bankruptcy court, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

**C.      Voting On A Chapter 11 Plan.**

**1.      Court Approval Required.**

Before a debtor solicits votes to accept a proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the plan. This Disclosure Statement is presented to holders of Claims against the Debtor in satisfaction of the requirements of Section 1125 of the Bankruptcy Code.

**2.      Impaired Classes With Recoveries Entitled To Vote.**

After the disclosure statement to a chapter 11 plan has been approved by a bankruptcy court, creditors whose claims against a debtor are impaired under a plan, and who are entitled to receive some recovery under the plan, are permitted to vote to accept or reject the plan. Section 1124 of the Bankruptcy Code provides that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered. As an example, a claim is impaired if the time for the debtor to pay the amount due is extended beyond the time originally contemplated by the parties.

A claim is also impaired if the plan provides that a claimant may only pursue recovery on the claim against certain, rather than all, of the debtor's assets after the conclusion of the chapter 11 case.

Applying these rules in this case, only certain classes of Claims against the Debtor are entitled to vote. Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and Class 10 (the FCR Claim, only if there is a Settlement Election) are each impaired but entitled to receive some property under the Plan. As a result, each of these Voting Classes may vote to accept or reject the Plan.

By contrast, Class 1 (Other Priority Claims), Class 2 (the PNC Bank Claim), Class 3 (the Sharp Claim), and Class 4 (General Unsecured Convenience Claims) are each unimpaired under the Plan and cannot vote because they are deemed to accept the Plan. Relatedly, Class 11 (Sexual Abuse Claims Filed After the Bar Date, only if there is a Litigation Election) is impaired under the plan, is not entitled to receive any property, and is therefore deemed to reject the plan without voting. Any ballots cast by holders of Claims in these Classes will not be counted.

### 3.   Acceptance Of A Chapter 11 Plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan as votes in favor of the plan by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the holders of allowed claims in each voting class who cast ballots. Here, the Claims Agent will collect and tabulate all ballots that are cast by the Voting Classes and report this information to the Bankruptcy Court.

In addition, under Bankruptcy Rule 3018(a), the Bankruptcy Court may temporarily allow any claim in an amount that the Court deems proper for the purpose of voting to accept or reject the Plan. In this case, the Abuse Claims in Class 6 are unliquidated. In other words, the amount of damages to which any Abuse Claimant is entitled, if any at all, has not yet been determined by any court or by any agreement between the Debtor, its insurers, and any Abuse Claimant.

Here, in order to determine if the required dollar amount of the Class 6 Abuse Claims is voted in favor of the Plan, each Abuse Claim will be allocated $1.00 for voting purposes only. If individuals holding more than half of the number of Class 6 Abuse Claims vote in favor of the Plan, Class 6 will have accepted the Plan. If the majority of Class 6 Claims select the Settlement Election, all of Class 6 will receive the Settlement Election. In addition, if Class 6 votes in favor of the Plan and selects the Settlement Election, the FCR will cast a vote for the FCR Claim in Class 10 on behalf of Future Claimants, who are Abuse Claimants who were precluded from filing timely Abuse Claims as set forth in Section 1.1.43 of the Plan. If the majority of Class 6 Claims select the Litigation Election, all of Class 6 will receive the Litigation Election. If Class 6 votes against the Plan, and the requirements under Section 1129(b) are met, the treatment for Holders of Class 6 Claims will be the Litigation Election.

### 4.   Disputed Claims May Not Vote.

If any Claim in any Class entitled to vote is disputed by the Debtor (a "**Disputed Claim**"), the individual holding that Disputed Claim is not entitled to vote on the Plan unless such Disputed Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court in an estimated

amount that the Bankruptcy Court deems proper for the purpose of voting to accept or reject the Plan. A Claim is disputed if it is subject to an objection that has been timely filed and has neither been overruled nor denied by a final order and has not been withdrawn. A Claim is also disputed if it is listed on the Debtor's Schedules as disputed, unliquidated, or contingent, and with respect to which a superseding proof of claim has not been filed. The Bankruptcy Court may also disregard any vote on any Claim if it determines that the acceptance or rejection of the Plan by the claimant was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.      Confirmation of a Chapter 11 Plan.**

**1.      Confirmation With Acceptance By All Classes.**

If all Classes of Claims are deemed to accept the Plan or vote to accept the Plan, the Bankruptcy Court may confirm the Plan if it independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. The Debtor believes that the Plan satisfies all of the applicable requirements of Section 1129(a) of the Bankruptcy Code.

**2.      Confirmation With Rejection By Certain Classes.**

The Bankruptcy Court may also confirm the Plan even though fewer than all of the Classes of Impaired Claims vote to accept the plan. In order for the Plan to be confirmed despite its rejection by a Class of Impaired Claims, the Plan must be accepted by at least one Class of Impaired Claims (determined without counting the votes of "insiders") and the Debtor must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each Impaired Class of Claims that does not vote to accept the Plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides that: (a) each holder of a secured claim will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) each holder of an unsecured claim that is junior to the claims of such class will not receive on account of such junior claim any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtor believes that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any class.

### IV. THE DEBTOR, ITS OPERATIONS, AND THE CHAPTER 11 CASE

**A.    USAG's Operations.**

USAG is a 501(c)(3) not-for-profit organization incorporated in Texas. Based in Indianapolis, Indiana, USAG is led by its President and Chief Executive Officer, Li Li Leung, who was hired in March, 2019, with the approval of the Bankruptcy Court. (Dkt. 367.)

USAG sets the rules and policies that govern the sport of gymnastics in the United States, which encompasses the following disciplines: women's gymnastics, men's gymnastics, trampoline and tumbling, rhythmic gymnastics, acrobatic gymnastics, parkour, and gymnastics for all. USAG is designated by the USOPC and the Fédération Internationale de Gymnastique ("**FIG**") as the national governing body for the sport of gymnastics in the United States. USAG selects and trains the United States gymnastics teams for the Olympic Games and World Championships, among other competitions. USAG also provides educational opportunities for coaches and judges, as well as gymnastics club owners and administrators, and sanctions approximately 4,000 competitions and events throughout the United States annually. More than 200,000 athletes, professionals, and clubs are members of USAG.

**B.    USAG's Capital Structure.**

USAG's primary assets are the proceeds of its various insurance policies. USAG has de minimis secured debt.  USAG's unsecured debt includes debt incurred in its operations and contingent liabilities arising out of the lawsuits and claims asserted against USAG by survivors, which are described in Section IV.D below.  Financial and other information about the Debtor is also found on its website: www.usagym.org.

**C.    USAG's Board Of Directors.**

USAG is governed by a Board of Directors. USAG's Bylaws provide that the Board shall consist of fifteen (15) directors comprised of three (3) National Membership Directors, three (3) Athlete Directors, eight (8) Independent Directors, and one (1) Advisory Council Director. The current Directors and their terms are as follows:

- **Kathryn Carson** serves as Chairperson and Independent Director with a term running from 2019 through 2021. Carson, who is based in Chappaqua, N.Y., most recently served as the chief legal officer for the United States Golf Association. She was previously the senior vice president and general counsel for North American beverages and food service division at PepsiCo, where she held several roles over two decades. Carson currently is a board member for the George Washington University Business and Finance Law. She previously was a board member for We Are Golf, the Executive Women's Golf Association, and USA Field Hockey. Carson graduated from Mount Holyoke College with a Bachelor of Arts in political science and received her JD from George Washington University Law School.

- **David Rudd** serves as Vice Chairperson, Secretary, and Independent director with a term running from 2018 through 2020. Rudd is of counsel to Rudd Resources, a communications, messaging and public relations firm in Chicago. His previous

experience includes communications leadership roles at the University of Chicago Medicine, Weber Shandwick, Motorola, the State of Illinois and Chicago Public Schools. He began his career in journalism at the Chicago Tribune. Rudd serves as a board member for Prevent Child Abuse America and is the treasurer for the Black Public Relations Society. He earned his journalism degree from Northwestern University.

- **Brent Lang** serves as Treasurer and Independent Director with a term running from 2018 through 2020. Based in the San Francisco area, Lang is president and CEO of Vocera Communications (NYSE: VCRA), where he has worked since 2001. Prior to joining Vocera, he was senior director of marketing for 3Com and a strategy consultant for Monitor Company. Lang serves on the Leadership Council for Positive Coaching Alliance. Lang won an Olympic gold medal for swimming in the 4x100 freestyle relay, as part of the U.S. team at the 1988 Olympic Games in Seoul, Korea. He graduated from the University of Michigan with a Bachelor of Science in engineering and a Master of Business Administration from Stanford University Graduate School of Business.

- **Lois Elizabeth Bingham** serves as Independent Director with a term running from 2018 through 2021. Currently based in the metropolitan Washington DC area, Bingham is the National Executive Director for Delta Sigma Theta Sorority, Inc. Prior to serving in her new role, she was a business lawyer in the Detroit area with experience in both law firm and corporate settings, having most recently served as vice president, general counsel, compliance officer and secretary for Yazaki North America. She has served on the American Bar Association's Commission on Women Bias Interrupters Working Group, and as chair of the Board of Directors for the Minerva Education and Development Foundation and Legal Aid and Defender Association in Michigan. Bingham graduated from the University of Pennsylvania with a Bachelor of Arts in political science and from Temple University's James E. Beasley School of Law.

- **Kittia Carpenter** serves as the National Membership Director for the women's program with a term running from 2019 through 2022. Carpenter is the team director and head coach at Buckeye Gymnastics in Westerville, Ohio, where she has guided numerous U.S. National Team members including gold medal winners at the World Championships, American Cup, and Olympic Games. In her thirty years of coaching, Carpenter's gymnasts have won over 1,000 state, regional, and national titles. As a FIG Brevet Level judge, she has judged at the top elite events in the country including the U.S. Championships and World Team Trials. Carpenter is currently the Region 5 Junior Olympic Chair for USA Gymnastics. She was an elite gymnast herself and attended Arizona State University on a full athletic scholarship.

- **Ivana Hong** serves as an Athlete Director for the women's program with a term running from 2018 through 2020. A 2016 Stanford graduate with a degree in human biology and sociology, Hong works as a curator for Laserlike, an engineering tech startup in Mountain View, Calif., and as a Barre3 instructor part time. As an elite

gymnast, Hong claimed the 2009 U.S. balance beam title, 2009 World balance beam bronze medal, 2007 World team gold medal, and served as an alternate for the 2008 U.S. Olympic Team. During her time as the team captain for Stanford University's women's gymnastics team, Hong was a five-time All-American, three-time Regional balance beam champion, 2015 NCAA balance beam runner-up, and 2016 AAI Award semifinalist. Hong, who resides in Menlo Park, Calif., is a member of the USA Gymnastics Hall of Fame.

- **Scott Lineberry** serves as the current Elite Chair of the Trampoline & Tumbling Program for USA Gymnastics with a term running from 2020 through 2024 and also serves as Chair with the Program Council.  He has a Ph D. in Sport Psychology Education and Counseling along with a Masters in Counseling and Masters Certificate in Sport Psychology.  He also holds a Masters in Business Administration and a B.A in Music.  He is an owner and managing partner of Ultimate Kids Gym, and President of The Center for Life and Performance.  Scott has served on numerous local boards. He has served as an Interim National Head Coach for the National Double Mini-Trampoline Team for USA Gymnastics, was a National Coach for the National Trampoline Team for USA Gymnastics, and coached high level divers through USA Diving.  In 2005 he initiated a gymnastics-based competitive diving program which has led to graduating fifteen collegiate scholarship athletes. Scott has served on the USA Gymnastics Interim Board of Directors, USA Diving Grievance Committee, Trampoline and Tumbling Education Committee, a consulting group for NASCAR teams, and the 9/11 Salvation Army Second Response Team at the Pentagon. His professional affiliations include USA Gymnastics, USA Diving, Association for Applied of Sport Psychology, and the National Board of Certified Counselors.

- **Paul Ruggeri** serves as an Athlete Director with a term running from 2020 through 2024. A native of Syracuse, New York, Ruggeri currently operates the Paul Ruggeri Gymnastics, a recreational gymnastics club in New York City, and stages an annual competition in Paramus, New Jersey. In addition, he is a motivational speaker for young professionals and young athletes. He earned his Bachelor of Science in molecular and cellular biology at the University of Illinois. Ruggeri also received his Master of Business Administration in finance from the Keller Graduate School of Management. Ruggeri previously was the chief operating officer for the U.S. Gymnastics Development Center II. Ruggeri won five NCAA titles while at Illinois, was on the 2015 World Championships Team, and won 13 individual U.S. medals.

- **Rebecca Sereda** serves as an Athlete Director with a term running from 2018 through 2021. Sereda, a Staten Island native and graduate of Boston University with a Molecular Biology degree, currently resides in Boston. She currently is employed at Harvard University doing Stem Cell Cardiology Research. In addition, she is a FIG Brevet Judge, Athlete Representative and serves on the Rhythmic Program Committee and Athlete Selection Committee. Sereda was six-time National Champion and was a member of the US Rhythmic National Team for seven years (2008-2014). She was a 2013 World Championships finalist and Pan American

champion. She has won numerous international medals throughout her Junior and Senior competitive years.

- **Staci Slaughter** serves as an Independent Director with a term running from 2018 through 2021. Slaughter is the executive vice president of communications and senior advisor to the CEO for the San Francisco Giants, where she has worked for 22 years. Her previous experience includes press secretary for San Francisco Mayor Frank Jordan and communications advisor to Los Angeles Mayor Richard Riordan. Slaughter currently serves as a Board member for the Baseball Assistance Team and as vice chair of the Board for Golden Gate National Parks Conservancy. Based in the San Francisco area, she graduated from the University of California, Berkeley with a Bachelor of Science in social sciences.

- **Justin Spring** serves as the National Membership Director for the men's program with a term running from 2018 through 2020. Spring, a three-time Big 10 Coach of the Year and the 2012 NCAA Coach of the Year, is currently in his eighth season as head coach at the University of Illinois. Under his direction, the Illini claimed three conference championships and the 2012 NCAA team title. He was a member of the U.S. Men's National Team and a four-time NCAA champion. Spring's athletic accomplishments also include: 2008 Olympic team bronze medalist; 2008 national parallel bars champion; two-time U.S. high bar champion (2005, 2007); 2005 World team member; 2006 Nissen-Emery Award winner; 13-time All-American (2003-06); and Big 10 Gymnast of the Year. He graduated from the University of Illinois in 2006 with a bachelor's degree in speech communication and earned his master's in sports management in 2014.

- **Julie Springwater** serves as an Independent Director with a term running from 2020 through 2024. Springwater, a resident of Andover, Massachusetts, is an adjunct professor at Boston University's School of Social Work and interim chair of Macro Practice (non-clinical social work). She specializes in child welfare, positive youth development, and human service management. Springwater also serves as the director for the New England Association of Child Welfare Commissioners and Directors, located at Boston's Judge Baker Children's Center. She is currently serving as the chair of governance for the Child Welfare League of America. She earned her Bachelor of Arts in sociology at the University of Massachusetts and her Master of Social Work at Boston University.

- **Kimberly Till** serves as an Independent Director with a term running from 2020 through 2024. Till has held senior roles at Disney, Sony, AOL Time Warner, and Microsoft. She was CEO of two consumer insights and data analytics businesses, one of which was a public company traded on NASDAQ. She has served on two public company and two privately held boards. In addition to her corporate roles, Till was selected for the prestigious White House Fellowship, where she served as a special assistant to the former U.S. Trade Representative and Secretary of Agriculture and the director of the FBI. Her academic career includes an MBA from Harvard Business School and a J.D. from Duke University Law School. Till also serves on the boards of the New York Pops and Getting Out and Staying Out.

- **Justin Toman** serves as an Independent Director with a term running from 2019 through 2022. Toman, who is based in White Plains, N.Y., is the head of sports marketing and partnerships for PepsiCo North America Beverages, where he has worked since 2007. He received a Sports Business Journal's 2018 Power Player/Brand Builder Award and in 2017 was named one of the "40 Under 40" in sports business. Toman competed on the men's gymnastics team for the University of Michigan, where he earned his Bachelor of Science in exercise physiology, Master of Arts in sports management and communications, and Master of Business Administration in marketing and strategy. He also worked for Michigan as a National Collegiate Athletic Association rules compliance associate and an assistant sports information director while earning his graduate degrees. Toman was a three-time NCAA national champion and a five-time NCAA All-American, as well as won the 2002 Big 10 Medal of Honor and the 2002 Nissen-Emery Award. Toman was a member of the U.S. National Team from 1998-2002.

- **Kevin White** serves as the Advisory Council Director with a term running from 2018 through 2021. White has owned Courthouse Gymnastics for 26 years. He is currently serving as the Mississippi Men's state chairman and the Region 8 chairman (35 years). In his position as chairman, he has helped develop and institute the Regional Elite Team Program and State Elite Team Programs. He is the current president of the U.S. Men's Gymnastics Coaches Association and a member of the USA Gymnastics Advisory Council. He served as a floor manager for 10 years at USA Gymnastics premier events, including World Championships and several Olympic Trials, American Cup and U.S. National Championships. White has served on several USA Gymnastics eligibility committees. He serves on many Junior Olympic Program Committee sub committees, such as the 2016-2020 Junior Olympic Format Coordinating Committee, and 20-plus years as an NGJA nationally rated judge. In May 2018, White was awarded the Frank Cumiskey Award for outstanding contributions to U.S. junior men's gymnastics.

## D.    Events Leading To The Chapter 11 Case.

Before filing bankruptcy, USAG was named a defendant in approximately 100 lawsuits brought by survivors claiming that they had been abused by Lawrence Nassar. Nassar was employed by MSU and served as a physician volunteer to USAG. As a volunteer, Nassar was to provide medical assistance to gymnasts at various events and camps, including camps held at what was previously USAG's National Team Training Center in Texas.

In June 2015, an initial report came to USAG's attention that Nassar had potentially had inappropriate contact with gymnasts. USAG promptly commenced an investigation into the matter and reported the matter to the FBI. In November 2017, Nassar pleaded guilty to sexual assault and other crimes. As a result of his sentence, Nassar will spend the rest of his life in prison.

Over 400 individuals initiated civil lawsuits against USAG, MSU, and others asserting claims arising from Nassar's abuse, including claims for negligent hiring, negligent retention, negligent supervision, negligent failure to warn or protect, intentional infliction of emotional distress, fraud, and violations of the Racketeering Influenced Corrupt Organizations Act, among

others. These lawsuits remain pending in courts in Michigan, California, and elsewhere. The Michigan and California lawsuits were mediated as a consolidated group, with MSU and the plaintiffs reaching a $500 million settlement in the spring of 2018 with MSU. USAG's own attempts to reach a settlement with survivors through mediation did not succeed at that time.

In late 2016, USAG engaged Deborah Daniels, Managing Partner of Indianapolis based Krieg DeVault LLP and a former federal prosecutor, to conduct an independent review of USAG's bylaws, policies, procedures, and practices related to handling sexual misconduct matters and to issue a report and recommendations (the "**Daniels Report**"). The Daniels Report issued on June 26, 2017, and is publicly available on USAG's website.[5] The Daniels Report contained a number of recommendations, which USAG's then board of directors unanimously agreed to implement. The status of USAG's implementation of the Deborah Daniels recommendations can be found at: usagymprogressreport.com/recommendations/

In connection with the implementation of the Daniels Report's recommendations, USAG's leadership has undergone a complete change since Nassar's misconduct was disclosed. In March 2017, USAG's then CEO, Steve Penny, resigned. In January 2018, all non-athlete members of USAG's then board of directors resigned. The current USAG Board and its officers do not include any individuals who served on the prior Board, excepting one athlete representative. Other employees who faced criticism over their actions in connection with USAG's response to Nassar's conduct are no longer employed by USAG.

On November 5, 2018, the USOPC initiated a proceeding against USAG under Section 8 of the USOC's bylaws, seeking to revoke USAG's designation as the national governing body of gymnastics. Without that designation, USAG would lack authority to engage in numerous of its current functions, including representing the United States before FIG and selecting and training athletes to compete in international and national elite competitions. The USOPC's prosecution of the Section 8 complaint was stayed by the filing of the Case.

## E.        The Chapter 11 Case.

The Debtor commenced this Case on December 5, 2018 (the "**Petition Date**"). The Debtor did so to ensure that its available Assets are equitably allocated to survivors asserting Abuse Claims. As a non-profit entity, USAG does not have substantial assets and instead would have to rely on its CGL Insurance Policies and other applicable Insurance Policies (if any) to pay any judgments obtained by survivors in their prepetition suits. Chapter 11 was USAG's only option to ensure that the proceeds of its applicable Insurance Policies were distributed in a fair, equitable, and logical manner.

### 1.        First Day Motions.

On the Petition Date, USAG as debtor and debtor in possession filed several motions seeking relief from the Bankruptcy Court to ensure a seamless transition into chapter 11 (collectively, the "**First Day Motions**"). The Bankruptcy Court granted the relief requested in the

---

[5] *See* Deborah J. Daniels, *Report To USA Gymnastics On Proposed Policy And Procedural Changes For The Protection Of Young Athletes* (June 26, 2017), available at usagymprogressreport.com.

First Day Motions, authorizing the Debtor to, among other things: (1) continue paying employee wages and benefits (Dkt. 300); (2) continue using the Debtor's existing cash management system, bank accounts, and business forms (Dkt. 299); (3) continue insurance programs, pay insurance premiums, and enter into new insurance policies in the ordinary course (Dkt. 197); (4) pay outstanding taxes, if any (Dkt. 194); (5) provide utility companies with adequate assurances of payment and prohibit utility companies from altering or discontinuing service (Dkt. 195); (6) retain the Claims Agent (Dkt. 63); (7) perform all postpetition obligations under a commercial card agreement with the Debtor's bank (Dkt. 196); and, (8) enter into certain consulting services agreements (Dkts. 124-25).

### 2. The Debtor's Professionals.

After the Petition Date, the Court authorized the Debtor to retain Jenner & Block LLP as lead bankruptcy counsel (Dkt. 188). The Court also authorized the Debtor to retain Miller Johnson P.L.C. and Plews Shadley Racher & Braun LLP as special counsel (Dkts. 189, 191), as well as Barnes & Thornburg LLP, Hilder & Associates, P.C., Pierce Atwood LLP, White & Amundson, P.C., and Zuckerman Spaeder LLP as ordinary course counsel (Dkt. 192-93, 295-96, 298). Finally, the Court approved the retention of APCO World LLC as ordinary course communications advisor (Dkt. 297) and BDO USA LLP as ordinary course auditor and tax professional (Dkt. 785).

### 3. The Survivors' Committee.

Pursuant to Section 1102 of the Bankruptcy Code, on December 19, 2018, the U.S. Trustee appointed the Additional Tort Claimants Committee of Sexual Abuse Survivors to serve in the Debtor's case. The Committee consists of nine members, all of whom filed Abuse Claims against the Debtor: Rachel Denhollander (Co-Chair), Sarah Klein (Co-Chair), Tasha Schwikert-Warren (Co-Chair), Kenzie Gassaway, Alexandra Raisman, Kyla Ross, Marcia Frederick Blanchette, Alyssa Corn, and Jessica Thomashow. (Dkts. 97-98.)

The Survivors' Committee retained the law firms of Pachulski Stang Ziehl & Jones LLP and Rubin & Levin, PC to represent it throughout the case. The Court approved their retention on February 4, 2019. (Dkts. 238, 239.)

### 4. The 105 Stay Order.

Pursuant to Section 362 of the Bankruptcy Code, as of the Petition Date an automatic stay went into effect that paused all of the prepetition litigation asserted by the survivors against the Debtor. However, the automatic stay only protected the Debtor. It did not pause the lawsuits to the extent they asserted claims against defendants in addition to the Debtor.

Even if formally stayed as to the Debtor, continued litigation in the prepetition lawsuits threatened to distract the Debtor's personnel from the chapter 11 case and generate additional obligations for the Debtor, including from certain defendants who asserted they were entitled to indemnities from the Debtor for litigation costs.

As a result, the Debtor entered into an agreed stipulation with all of the plaintiffs and most of the defendants in those lawsuits to stay the lawsuits entirely. The Bankruptcy Court approved the stipulation on April 22, 2019, and entered an injunction prohibiting any signatory to the

stipulation from proceeding with the lawsuits while the stipulation and injunction remained in effect. (Dkt. 426.)

### 5. The Bar Date.

By order dated February 25, 2019 (the "**Bar Date Order**"), the Bankruptcy Court set April 29, 2019 (the "**Bar Date**") as the last day for claimants to file proofs of claim for claims arising before the Petition Date, including Abuse Claims. (Dkt. 301.)

The Debtor and its Claims Agent served notice of the Bar Date on all known creditors. In particular, the Debtor mailed notice of the Bar Date, a copy of the Bar Date Order, and a sexual abuse proof of claim form to all known survivors who had filed or threatened to file lawsuits against USAG alleging sexual abuse, had reported abuse to USAG, had entered into a settlement agreement with USAG stemming from allegations of abuse, or had received payment from USAG as a result of an allegation of abuse, to the extent their mailing address was reasonably available. Although not strictly required by the Bar Date Order, the Debtor also served all potential sexual abuse claimants, even those who never formally or clearly notified USAG of their claims, after a meticulous and comprehensive search of its books and records. As a result, the Debtor sent this notice package to more than 1,300 individuals.

The Debtor also sent this notice package to all known counsel for sexual abuse claimants. The Debtor e-mailed the notice of the Bar Date to its list of more than 360,000 e-mail addresses for current and former USAG members. (Dkt. 341, Ex. E.) The Debtor placed the notice of the Bar Date on its website, Facebook, Twitter, and Instagram pages and published notification in USA Today, Inside Gymnastics, International Gymnast, the Gymcastic podcast, and the Meetscores website. In addition, between February 26 (one day after the Bar Date Order was entered) and April 30 (one day after the Bar Date), the Debtor pinned notice of the Bar Date at the top of its Twitter feed as the "pinned" tweet. The Debtor also sent letters to each of its member gyms asking those facilities to post the notice package and the sexual abuse proof of claim form for their members to see. In addition to this notice, the Debtor's chapter 11 case and the deadline for filing claims received extensive media attention in national publications, local papers, and television and radio broadcasts.

### 6. The Claims Against The Debtor And The Debtor's Claims Objections.

#### a. The Abuse Claims.

The Debtor's broad notice plainly reached the universe of creditors. As to the Abuse Claims, 510 individuals filed their Abuse Claims by the Bar Date (including one claimant whose Abuse Claim was deemed timely filed), and 7 individuals filed late Abuse Claims.[6] Of these Abuse Claims, 60 were filed by individuals alleging abuse by someone other than Nassar. Further, 75 of the claimants had not sued USAG before the bankruptcy filing. USAG had no notice of these 75 claimants and thus, these claimants would have learned of the Bar Date Order as a result of

---

[6] 2 timely Abuse Claims and 1 late-filed Abuse Claim are omitted from these counts. 1 of these timely Abuse Claims is subject to a pending objection and therefore is not currently Allowed. In addition, 1 timely Abuse Claim was withdrawn and 1 late-filed Abuse Claim was disallowed.

USAG's extensive publication notice and/or the extensive media coverage surrounding this chapter 11 case.

Three of the Abuse Claims purported to request relief on behalf of various putative classes of sexual abuse survivors. No class of Abuse Claimants against the Debtor was certified by any court prior to the Petition Date. By agreement with the Debtor, two of these Abuse Claimants agreed to withdraw their class claim or agreed to prosecute their Abuse Claim only in their individual capacity, respectively. (Dkts. 795-96.) As to the remaining Abuse Claim, the Debtor filed an objection on January 17, 2020. (Dkt. 885.) The Debtor argued that a class claim is not appropriate in this chapter 11 case, and that this particular class claim fails on its merits. The objection remains pending.

### b.    The General Claims.

The Debtor also received 336 general, non-Abuse Claims, 7 of which were filed late.[7] The bulk of these general claims assert amounts due for services provided by chaperones, instructors, and coaches at various training camps, competitions, and other gymnastics events. Numerous claims assert indemnities due and owing from the Debtor in connection with Nassar's misconduct. The Debtor objected to numerous of the general claims on the basis that they were duplicative, misclassified as priority claims or administrative expenses, or were legally without merit. (Dkts. 624, 628-29, 635.) The Court entered orders disallowing the claims subject to objection, and one objection requesting the reclassification of additional misclassified claims is currently pending. (Dkts. 720-23, 923.)

The remaining general unsecured claims assert liabilities against the Debtor's estate amounting to $47,160,655.46. The majority of this amount relates to: (a) Indemnification Claims; (b) the Personal Injury Claim; and (c) General Unsecured Claim No. 312. The Indemnification Claims total $41,487,568.17. In the event of a Settlement Election, the Indemnification Claims will be channeled to the Trust and will be satisfied only from the amounts paid to the Trust by the Settling Insurers and Participating Parties, and in the event of a Litigation Election, the Indemnification Claims are deemed disallowed but retain whatever rights those Claimants have against the Debtor's Insurers. The Personal Injury Claim was filed in the amount of $3,000,000.00. It may only be satisfied out of the Debtor's Personal Injury Insurance Policy pursuant to the Plan, regardless of whether the Settlement Election or Litigation Election is selected. General Unsecured Claim No. 312 asserts damages of $1,500,000.00 from alleged emotional abuse. This Claim is treated as an Abuse Claim under the Plan and, therefore, it will be channeled to the Trust under a Settlement Election or permitted to recover solely from the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that provide coverage for Abuse Claims), and no other assets, under a Litigation Election. Thus, the amount of general unsecured claims that must be paid through the Plan is $1,173,087.29 in addition to the $668,100.95 of general unsecured claims that the Debtor scheduled but for which no Claims were filed. The total General Unsecured Claims are therefore $1,841,188.24.

---

[7] Individuals misfiled 23 Abuse Claims on the docket for general Claims. These misfiled Abuse Claims are omitted from these counts of the general Claims against the Debtor.

7.      **Mediation.**

On May 17, 2019, the Bankruptcy Court appointed Judge Gregg Zive to mediate "the resolution of the sexual abuse claims; the resolution of any disputes relating to the applicability of the Debtor's insurance coverage to the sexual abuse claims and the Debtor's insurance carriers' obligations to fund distributions on the sexual abuse claims, and related defense costs; and the resolution of any other matters necessary to equitably determine the rights of, and allocate recoveries to, survivors holding allowed sexual abuse claims." (Dkt. 514, ¶2.)

In preparation for the mediation, the Debtor spent considerable time and resources analyzing the universe of claims, as well as the available insurance coverage for those claims, so that it could determine the extent of its liabilities and negotiate the terms of the Plan. Judge Zive began the mediation process in late May, 2019 and has conducted a series of in-person and telephonic mediation sessions over the last many months. The mediation remains ongoing.

On September 26, 2019, the Bankruptcy Court entered an order authorizing Paul Van Osselaer to participate as a second mediator in the on-going mediations. (Dkt. 798.)

8.      **Future Claimant Representative.**

On May 10, 2019, the Debtor moved for the appointment of Fred Caruso as Future Claimant Representative. (Dkt. 480.) The Court approved the FCR's appointment on May 17, 2019. (Dkt. 516.)

The FCR is the legal representative for Future Claimants holding Future Claims as defined in Sections 1.1.42 and 1.143 of the Plan. The FCR represents the interests of each person who (a) held a Sexual Abuse Claim against the Debtor as of the Bar Date; and (b) meets one of the following criteria: (i) was under the age of majority under applicable state law as of March 1, 2019; (ii) as of March 1, 2019, the statute of limitations for such person was tolled under applicable state law or had not begun to run under applicable state law; (iii) as of March 1, 2019, the Debtor was estopped under applicable state law from asserting the statute of limitations; or (iv) such person's Sexual Abuse Claim was barred by the applicable statute of limitations as of March 1, 2019, but is or becomes no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives such claims. "Future Claimants" exclude any Person who has, at any time before the Bar Date, asserted a claim against, asserted a cause of action against, provided notice to, or made a demand to or against the Debtor, arising out of or relating to Sexual Abuse or whose parent or guardian or other legal representative had done so on behalf of such Person.

Under the Settlement Election, the FCR may vote the Claims of the Future Claimants for or against the Plan. If the Plan is confirmed with the Settlement Election, 5% of the $215,000,000.00 contributed to the Trust by the CGL Settling Insurers will be reserved to satisfy Future Claims, which totals $10,750,000.00 (the "**Future Claimant Reserve**"). Future Claimants will be entitled to distributions from this Future Claimant Reserve if they file their Claims with the FCR within 5 years of the Effective Date of the Plan, money remains in the Future Claimant Reserve, and the FCR and Trustee determine the Claimants seeking compensation qualify as Future Claimants and assert Claims meeting the definition of Sexual Abuse Claims.

33

9.    **Debtor In Possession Financing.**

On May 1, 2019, the Debtor filed a motion seeking authority to obtain debtor-in-possession financing in the aggregate amount of $800,000.00 pursuant to loan agreements with two of the Debtor's CGL Insurers, Great American Assurance Company and Virginia Surety Company, Inc., formerly known as Combined Specialty Insurance Company. (Dkt. 448). As of the date of the Disclosure Statement, the Debtor has not drawn on either debtor-in-possession facility.

10.    **Plan Exclusivity.**

Pursuant to Section 1121 of the Bankruptcy Code, a debtor in possession is granted an exclusive right to file a plan of reorganization for 120 days following the commencement of the case. A debtor also has the exclusive right to solicit votes accepting any plan of reorganization within the 180 days following the commencement of the case. The Bankruptcy Code further provides that a court can increase a debtor's exclusive period to file and solicit acceptances on a plan of reorganization for up to eighteen months and twenty months, respectively, after commencement of the case for cause.

The Bankruptcy Court has extended both periods here. As of February 14, 2020, the Debtor's exclusive right to file its Plan runs through and including April 3, 2020. (Dkt. 899, at ¶2.) The Debtor's exclusive right to solicit acceptances on the Plan runs through and including May 29, 2020. (*Id.* ¶3.)

11.    **Postpetition Litigation.**

a.    **Insurance Coverage Adversary Proceeding.**

On February 1, 2019, the Debtor commenced an adversary proceeding against its insurers to determine the rights it held in its various insurance policies. (*See USA Gymnastics v. Liberty Insurance Underwriters, et al.*, No. 19-50012 (Bankr. S.D. Ind.).) Certain of the Debtor's insurers had consistently and wrongfully refused to pay the Debtor amounts due and owing under those policies. The insurer-defendants included Ace American Insurance Company, Great American Insurance Company, Liberty Insurance Underwriters, Inc., National Casualty Company, RSUI Indemnity Company, TIG Insurance Company, Virginia Surety Company, Inc., Western World Insurance Company, Endurance American Insurance Company, American Home Assurance Company, Doe Insurers.

Since the initiation of this adversary proceeding, the Debtor has prosecuted several partial summary judgment motions against its insurers, in the hopes of facilitating a global settlement of the Abuse Claims with appropriate contributions from the insurers. For instance, the Debtor requested that the Court declare that abuse and molestation exclusions in policies issued by TIG Insurance Company do not bar coverage for the Debtor. (Adv. Dkt. 173.) The Bankruptcy Court agreed with the Debtor's interpretation of the policies. (Adv. Dkt. 274.) The Debtor also requested a declaration that limits in policies issued by Ace American Insurance Company did not apply to lower the amount of the Debtor's coverage on claims arising from Nassar's abuse. (Adv. Dkt. 175.) The Bankruptcy Court rejected the Debtor's readings of those insurance policies, which ruling is currently subject to review by the District Court. (Adv. Dkts. 275, 294.) The Debtor also sought a

declaration that it has access to coverage under certain "lost policies" issued by TIG, and that partial summary judgment motion remains pending. (Adv. Dkt. 204.)

Finally, the Debtor has successfully argued that one insurer wrongfully breached its duty to defend the Debtor with respect to various lawsuits and investigations, as well as the USOPC de-recognition proceeding. (Adv. Dkts. 310.) That insurer has appealed that summary judgment.

### b.    Third Party Injunction Adversary Proceeding.

As noted above, the bulk of the plaintiffs and defendants in all prepetition litigation asserting claims arising from sexual abuse against the Debtor agreed to voluntarily stay that litigation in its entirety. Unfortunately, not every defendant agreed to sign onto the stipulation and injunction, and instead threatened to proceed with the cases in which they were involved. This threatened the Debtor's estate by siphoning its resources and personnel to manage litigation in which it had an interest, even if a judgment could not be obtained against the Debtor while this chapter 11 case remained pending.

With the support of the Survivors' Committee, the Debtor commenced an adversary proceeding on March 29, 2019, requesting the Bankruptcy Court enter an injunction barring these outlier defendants from proceeding with their litigation. (*USA Gymnastics v. Donald Peters, Richard Carlson, et al.*, No. 19-50075 (Bankr. S.D. Ind.) The Bankruptcy Court ultimately overruled the objections and entered the injunction as requested, completely staying the prepetition lawsuits with respect to all third parties and the Debtor. (Adv. Dkt. 71.)

### 12.    Motion To Dismiss.

On January 21, 2020, the Survivors' Committee filed its *Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 349 And 1112(b) Dismissing The Bankruptcy Case And Granting Related Relief* [Dkt. 892] (the "**Motion to Dismiss**"). The Survivors' Committee argued that Abuse Claimants should not have to wait any longer to litigate their Claims in non-bankruptcy forums. It then alleged that cause existed to dismiss the Debtor's Case because, the Debtor could not confirm a plan over the objections of the Abuse Claimants. The Survivors' Committee filed the Motion to Dismiss before the Debtor filed the Plan. The Debtor disputes the allegations in the Motion to Dismiss. After the Debtor filed the Plan, the Survivors' Committee took their Motion off of a hearing schedule and the Motion to Dismiss is not currently set for hearing.

### V. SUMMARY OF THE PLAN

The Debtor proposes the Plan in good faith and believes the Plan is feasible and in the best interest of the creditors of the Debtor. The Debtor therefore recommends acceptance of the Plan by holders of Claims in the Voting Classes, and recommends that the Holders of Abuse Claims select the Settlement Election. This Article V and Articles VI-IX summarize key components of the Plan. To the extent of any inconsistencies between these summaries and the terms of the Plan, the Plan controls. To the extent the summaries omit any provisions of the Plan, such omission has no effect on the enforceability of those provisions in the Plan. All Claimants are encouraged to carefully read the Plan before voting.

**A.     Treatment of Unclassified Claims.**

The following summarizes the treatment of Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees under the Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified under the Plan. Article IV of the Plan sets forth the treatment for each of these types of Claims. The Debtor anticipates that it will pay these unclassified claims in full on the Effective Date.

**1.     Administrative Claims.**

An Administrative Claim is a claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's businesses after the commencement of a chapter 11 case, and compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331, or 503.

The Plan provides that Holders of Administrative Claims must file any requests for allowance and payment within thirty days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Allowed Administrative Claim shall be paid in full in Cash under the Plan unless otherwise agreed between the Reorganized Debtor and the Holder of the Allowed Administrative Claim. Such payment shall be made either (a) on or as soon as practicable following the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant.

**2.     Professional Claims.**

The Plan sets forth the manner and timing in which Professionals must submit Professional Claims to be considered for payment. All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than 45 days after the Effective Date, or such later date as ordered by the Bankruptcy Court. In the event there is a dispute over what amount of a Professional Fee Claim shall be Allowed, if any, the dispute shall be resolved by the Bankruptcy Court.

**3.     Priority Tax Claims.**

A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of Section 507(a)(8) of the Bankruptcy Code. The Debtor received a single Priority Tax Claim (General Unsecured Claim No. 1) asserting a liability of $182.08. With respect to any Allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (a) pay such Claim in Cash as soon as practicable after the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax

Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### 4. U.S. Trustee Fees.

All fees due and payable pursuant to 28 U.S.C. § 1930 (the "**U.S. Trustee Fees**") and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. The Debtor does not believe that it will owe any U.S. Trustee Fees as of the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and the Estate.

### B. Treatment of Classified Claims.

The Plan does not treat each Claim identically; rather, Articles V, VI, and VII of the Plan categorize Claims into Classes, consistent with the requirements in Sections 1122 and 1123(a)(1) of the Bankruptcy Code. That means that, under the Plan, some Holders of Claims will receive full satisfaction of their Claims, some will receive partial satisfaction, and some will receive nothing. In each instance, the Debtor believes that Holders of Claims will receive at least as much value as they would receive if the Debtor's Assets were to be liquidated under chapter 7 of the Bankruptcy Code and that impaired creditors will receive more than they would receive in a chapter 7 liquidation. Regardless, it is important for Holders of Claims to read the Plan and this Disclosure Statement carefully to understand how they will be treated under the Plan.

The categories of Claims set forth in the Plan and summarized below classify Claims for all purposes, including voting, confirmation, and distribution under the Plan and Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class. A Claim is classified within a particular Class for the purpose of receiving distributions only to the extent that such Claim is Allowed and has not already been satisfied before the Effective Date.

The treatment in the Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor. All distributions under the Plan will be tendered to the Person holding the Claim.

### 1. Class 1—Other Priority Claims.

    **a.**    **Classification.** Class 1 consists of Other Priority Claims, which are entitled to priority under Section 507 of the Bankruptcy Code, and which are not Administrative Claims or Priority Tax Claims. All of the Other Priority Claims have or will be reclassified as General Unsecured Claims.

    b.    **Treatment.** Class 1 is unimpaired under the Plan. Any Holders of a Class 1 Claim is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

    c.    **Impairment And Voting.** The Holders of Class 1 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**2.**    **Class 2—PNC Bank Claim.**

    a.    **Classification.** Class 2 consists of the PNC Bank Claim, as scheduled by the Debtor. The Debtor funds its day-to-day operations using a $600,000.00 line of credit issued by PNC Financial Services Group, Inc, d/b/a PNC Bank (the "**PNC Bank**"), which is governed by the VISA Commercial Card Agreement dated as of May 7, 2010, as amended from time to time, between PNC Bank and the Debtor. The Debtor's obligations under these cards are secured by $600,000.00 held in an account maintained at PNC Bank. PNC Bank therefore has a secured Claim against the Debtor for all outstanding amounts on the credit cards.

    b.    **Treatment.** Class 2 is unimpaired under the Plan. PNC Bank is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

    c.    **Impairment And Voting.** The VISA Commercial Card Agreement dated as of May 7, 2010, as amended from time to time, between PNC Bank and the Debtor shall be reinstated and become the obligation of the Reorganized Debtor. PNC Bank shall retain all of its rights and collateral pledged under the VISA Commercial Card Agreement.

**3.**    **Class 3—Sharp Claim.**

    a.    **Classification.** Class 3 consists of the Sharp Claim, which is general Claim No. 63. Wells Fargo Financial Leasing, Inc., asserted the Sharp Claim as assignee for Sharp Business Systems, on account of the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor. The Sharp Claim asserts a Claim for $20,997.82 and is secured by equipment in the possession of the Debtor.

    b.    **Treatment.** Class 3 is unimpaired under the Plan. Sharp is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

    c.      **Impairment And Voting.** The Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor shall be deemed assumed and will become the obligation of the Reorganized Debtor. Sharp Business Systems shall retain all of its rights and its collateral under the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement.

**4.     Class 4—General Unsecured Convenience Claims.**

    a.      **Classification.** Class 4 consists of the Holders of General Unsecured Convenience Claims against the Debtor. These Claims are general unsecured Claims of $500.00 or less, or general unsecured Claims voluntarily reduced to $500.00 or less by their Holder. There are 288 filed and scheduled Claims of $500.00 or less, asserting total liabilities of $47,703.93. In addition, there are 46 Claims asserting amounts between $500.00 and $1,000.00, which the Debtor anticipates will be voluntarily reduced and become General Unsecured Convenience Claims worth $23,000.00 in total. The Debtor therefore anticipates that the total value of General Unsecured Convenience Claims within Class 4 will be approximately $75,000.00.

    b.      **Treatment.** Class 4 is unimpaired under the Plan. The Holders of Class 4 Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

    c.      **Impairment And Voting.** The Holders of Class 4 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed General Unsecured Convenience Claims in Cash, on or as soon as reasonably practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed General Unsecured Convenience Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**5.     Class 5—General Unsecured Claims.**

    a.      **Classification.** Class 5 consists of the Holders of General Unsecured Claims against the Debtor. These Claims are any Claim against the Debtor that is not an Abuse Claim, the Personal Injury Claim, the USOPC Claim, the FCR Claim, an Indemnification Claim, Administrative Claim, a Priority Tax Claim, an Other Priority Claim, or a Claim that is otherwise classified under the Plan. There are 154 General Unsecured Claims asserting total liabilities of $1,173,082.29. In addition, the Debtor listed on its Schedules liabilities worth $668,100.95 for which no Claims were filed. These scheduled amounts will be treated as General Unsecured Claims under the Plan.

b.  **Treatment.** Class 5 is impaired under the Plan. The Holders of Allowed General Unsecured Claims are entitled to vote on the Plan.

c.  **Impairment And Voting.** The Holders of Allowed General Unsecured Claims will receive payment from the Reorganized Debtor of 80% of their Allowed General Unsecured Claims, payable in equal installments on September 1, 2020, September 1, 2021, and September 1, 2022; or, at the Reorganized Debtor's discretion, in less than three installments so long as the Reorganized Debtor accelerates payment to all Holders of Allowed General Unsecured Claims. Attached as <u>Exhibit 2</u> is a *pro forma* cash flow analysis for the Debtor for this three year period.

6.  **Class 6—Abuse Claims.**

a.  **Classification.** Class 6 consists of the Holders of Abuse Claims against the Debtor. Abuse Claims are any Claims arising out of all acts or omissions that the Debtor may be legally responsible for that arise out of, are based upon, or involve sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, or any other sexual misconduct or injury, or contacts or interactions of a sexual nature between an adult or child and a medical professional, coach, trainer, therapist, volunteer, or other authority figure affiliated with the Debtor, or any current or former employee or volunteer of the Debtor, or any other person for whose acts or failures the Debtor is or was allegedly responsible, or the alleged failure by the Debtor or its agents, employees, or volunteers to report the same. An adult or child may have been sexually abused whether or not this activity involved explicit force, whether or not this activity involved genital or other physical contact, and whether or not there was physical, psychological, or emotional harm to the adult or child. Abuse Claims also encompass General Unsecured Claim No. 312 and Sexual Abuse Claim No. 165. There are a total of 517 Abuse Claims that are not duplicative of other Abuse Claims, and have not been disallowed, withdrawn, or subjected to an objection.

b.  **Impairment And Voting.** Class 6 is impaired under the Plan. The Holders of Class 6 Claims are entitled to vote on the Plan.

c.  **Treatment And Election.** The ballot for Holders of Class 6 Claims will provide that Holders of Class 6 Claims voting in favor of the Plan may select the Settlement Election or the Litigation Election. The Settlement Election is described in Section I.B.1.a of this Disclosure Statement, and the Litigation Election is described in Section I.B.1.b of this Disclosure Statement. If Class 6 does not accept the Plan, and the requirements under Section 1129(b) are met, the treatment for Holders of Class 6 Claims will be the Litigation Election.

7.      **Class 7—Personal Injury Claim.**

   a.      **Classification.** The sole member of Class 7 is the Holder of General Unsecured Claim No. 251, which is the Personal Injury Claim. That Claim arises from personal injuries that a minor gymnast allegedly suffered at a gymnastics event, and asserts a liability of $3,000,000.

   b.      **Impairment And Voting.** Class 7 is impaired under the Plan. The Holder of the Class 7 Claim is entitled to vote on the Plan.

   c.      **Treatment.** On the Effective Date, the stay shall be lifted and the Holder of the Class 7 Claim shall have thirty (30) days to file a lawsuit against the Reorganized Debtor, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, in accordance with Section 108(c) of the Bankruptcy Code, or reach a settlement paid by the Personal Injury Insurer. The allowance or disallowance of the Class 7 Claim will be determined in the Post-Effective Date Litigation related to the Class 7 Claim. To the extent the Holder of the Class 7 Claim obtains a Post-Effective Date Award, the sole source of recovery for such Claimant shall be from the Personal Injury Insurance Policy. The Holder of the Class 7 Claim shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Unless otherwise provided in the Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 7 Claim including the liability of the Personal Injury Insurer, which liability shall continue unaffected by the terms of the Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under the Plan and Section 1141(d) of the Bankruptcy Code. Nothing in the Plan is intended to affect, diminish, or impair the Holder of the Class 7 Claim's right against a Non-Participating Co-Defendant, including that Non-Participating Co-Defendant's joint and several liability.

8.      **Class 8—USOPC Claim.**

   a.      **Classification.** The sole member of Class 8 is the Holder of General Unsecured Claim No. 299, which is the USOPC. The USOPC asserted an unliquidated Claim for indemnities the Debtor allegedly owes to the USOPC with respect to attorneys' fees and other costs incurred in connection with the litigation arising from sexual abuse. The USOPC also asserted a General Unsecured Claim against the Debtor in the amount of $88,983.34 on account of certain services agreements entered into between the Debtor and the USOPC and which amount will be treated as a Class 5 Claim.

   b.      **Impairment And Voting.** Class 8 is impaired under the Plan. The USOPC is entitled to vote on the Plan.

    c.    **Treatment.** If Class 6 makes the Settlement Election, all rights that the USOPC has to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's insurance policies, shall be satisfied by granting the USOPC Claim the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC to be a Channeled Claim, and the USOPC shall release all Claims against the Debtor, the Estate, and the Reorganized Debtor. If Class 6 makes the Litigation Election, in accordance with Section 502(e)(1) of the Bankruptcy Code, the sole source of recovery for the USOPC Claim shall be from the Debtor's comprehensive general liability insurance coverage, and the liability of any comprehensive general liability insurer shall not be affected by the Plan or the Debtor's discharge. In this circumstance, the USOPC will receive no Distribution under the Plan.

**9.    Class 9—Indemnification Claims.**

    a.    **Classification.** Class 9 consists of the Holders of Indemnification Claims listed on <u>Exhibit A</u> to the Plan. Claims are classified as Indemnification Claims if they assert liabilities arising out of the Debtor's alleged obligation to compensate third parties for losses or damages they suffered in connection with certain events, such as the commencement of the sexual abuse litigation and related investigations that drove the Debtor to commence the Case. In total, there are 19 Indemnification Claims that assert liabilities of $41,487,568.17 in addition to unliquidated amounts.

    b.    **Impairment And Voting.** Class 9 is impaired under the Plan. The Holders of Class 9 Claims are entitled to vote on the Plan.

    c.    **Treatment And Election.** If Class 6 makes the Settlement Election, all rights that the Holders of Class 9 Claims have to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's insurance policies, shall be satisfied by granting the Class 9 Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the Holders of Class 9 Claims to be a Channeled Claim, and the Holders of Class 9 Claims shall release all Claims against the Debtor, the Estate, and the Reorganized Debtor. If Class 6 makes the Litigation Election, in accordance with Section 502(e)(1) of the Bankruptcy Code, the sole source of recovery for the Class 9 Claims shall be from the Debtor's comprehensive general liability insurance coverage, and the liability of any comprehensive general liability insurer shall not be affected by the Plan or the Debtor's discharge. In this circumstance, the Holders of Class 9 Claims will receive no Distribution under the Plan.

10.  **Class 10—Future Claimant Representative Claim (Only In The Event Of A Settlement Election).**

   a.  **Classification.** Class 10 consists of the Future Claims. The Future Claims are Sexual Abuse Claims held by Future Claimants—*i.e.*, individuals who held Sexual Abuse Claims as of March 1, 2019 and had a valid justification for failing to assert a timely Abuse Claim in the Case, as more fully detailed in Section 1.1.43 of the Plan. The FCR, as the legal representative of the Future Claimants, is deemed to be the Holder of the Class 10 Claims.

   b.  **Impairment And Voting.** Class 10 only exists under the Settlement Election. Class 10 is impaired under the Plan and is entitled to vote on the Plan on behalf of the Future Claimants.

   c.  **Treatment And Election.** If Class 6 makes the Settlement Election, the Trust shall assume on the Effective Date all liability for, and the Trust will pay, all Class 10 Claims pursuant to the provisions of the Plan and the Trust Documents. No Holder of a Class 10 Claim shall have an interest in the Trust Assets other than the Future Claimant Reserve. No Holder of a Class 10 Claim shall be entitled to recover from any assets of the Reorganized Debtor after the Effective Date. The Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 10 Claims, including the liability of any Non-Participating Co-Defendant, which liability shall continue unaffected by the terms of the Plan or the discharge granted under the Plan and Section 1141(d) of the Bankruptcy Code.

11.  **Class 11—Sexual Abuse Claims Filed After The Bar Date (Only In The Event Of A Litigation Election).**

   a.  **Classification.** Class 11 consists of the seven (7) Abuse Claims that were not timely filed by the Bar Date established in the Case. Class 11 only exists under the Litigation Election. In the event of a Settlement Election, the Abuse Claims which were not filed or deemed to be filed by the Bar Date will be classified within Class 6, and the Trustee, in his discretion, may elect to approve distributions on account of such untimely Abuse Claims.

   b.  **Impairment And Voting.** Class 11 is impaired under the Plan. The Holders of Class 11 Claims are deemed to have voted no on the Plan.

   c.  **Treatment And Election.** If Class 6 makes the Litigation Election, Class 11 Claims will receive no distributions under the Plan. No Holder of a Class 11 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date or from the Debtor's insurance policies. The Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 11 Claims, including the liability of any Non-

Participating Co-Defendant, which liability shall continue unaffected by the terms of the Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under the Plan and Section 1141(d) of the Bankruptcy Code.

## VI. MEANS FOR IMPLEMENTATION OF THE PLAN UNDER THE SETTLEMENT ELECTION

A.    **Trust Funding And Formation.**

1.    **Resolution of the Insurance Coverage Adversary Proceeding as to the CGL Settling Insurers.**

The Confirmation Order shall provide that, subject to the occurrence of the Effective Date, and upon receipt of the Insurance Settlement Amount, defined below, the Debtor shall dismiss with prejudice its claims against the Settling Insurers in the Insurance Coverage Adversary Proceeding. This dismissal shall not affect the Personal Injury Insurance Coverage.

2.    **The CGL Settling Insurers' Payments.**

a.    **Insurance Settlement Amount.**

The CGL Settling Insurers will pay the cumulative amount of Two Hundred Nineteen Million Seven Hundred Fifty Thousand ($219,750,000.00) (the "**Insurance Settlement Amount**"). The Insurance Settlement Amount reflects the amount of money that the CGL Settling Insurers have been willing to pay to date: (a) to settle on behalf of the Debtor, the USOPC, and the Non-Debtor CGL Settling Insured Covered Persons, the Abuse Claims (for which $215,000,000.00 of the Insurance Settlement Amount is allocated); and (b) to settle the Debtor's contractual rights to have its Insurance Reimbursement Claims paid (for which $4,750,000.00 of the Insurance Settlement Amount is allocated). The CGL Settling Insurers' obligation to contribute the Insurance Settlement Amount is subject to the Bankruptcy Court issuing the Confirmation Order, pursuant to Sections 1129, 363(f), and 105(a) of the Bankruptcy Code, barring, estopping, and permanently enjoining all Persons from asserting any claims arising from or related to the CGL Settling Insurer Policies. The Insurance Settlement Amount will be paid to the Debtor on or before the Effective Date. Notwithstanding the foregoing, the Personal Injury Insurance Policy will remain in place solely for purposes of defending the Personal Injury Claim and indemnifying the Debtor, the Estate, and the Reorganized Debtor from the Personal Injury Claim. The CGL Settling Insurers will continue to reimburse the Debtor for ongoing Insurance Reimbursement Claims in the ordinary course through the Effective Date. To the extent any such amounts are outstanding on the Effective Date (the "**Outstanding Amount**"), the Outstanding Amount shall be paid by the applicable CGL Settling Insurer in addition to the CGL Settling Insurer's portion of the Insurance Settlement Amount.

b.    **Plan Payment.**

The Plan Payment of $215,000,000 shall be made to the Trust in exchange for the entry of an Order by the Bankruptcy Court imposing a nonconsensual release, remise, and discharge of all Claims relating to the CGL Settling Insurer Policies (excepting the Personal Injury Claim),

including all Channeled Claims, by all Persons who now hold or in the future may hold such Claims against the CGL Settling Insurers pursuant to Section 105 of the Bankruptcy Code.

### 3. Trust Purpose.

The Trust shall be established for the benefit of the Abuse Claimants and Future Claimants and will assume all liability for the Channeled Claims. The Trust will receive, liquidate, and distribute Trust assets in accordance with the Plan and the Trust Documents, including the Trust Agreement attached to the Plan as <u>Exhibit D</u>.

### 4. Funding of Trust.

The Trust shall be funded, on or before the Effective Date, by: (a) the Plan Payment; and (b) the Participating Party Contributions, totaling $217,125,000.

### 5. Payment of Professional Fees.

The Trust shall pay all unpaid Allowed Professional Claims of the Survivors' Committee's Professionals within seven (7) days after the later of the Effective Date or the Bankruptcy Court's order on such Claims and shall pay and reimburse the Debtor, the Estate, or the Reorganized Debtor, as the case may be, for the costs and expenses of publication of the notices of insurance settlement and plan confirmation within seven (7) days after the Effective Date.

### 6. Approval of Settlement.

Pursuant to Section 105(a) of the Bankruptcy Code and in consideration for the classification, distributions, and other benefits provided under the Plan, including, *inter alia*, (a) the Plan Payment; and (b) the Participating Party Contributions, the provisions of the Plan shall constitute a good faith compromise and settlement of all Abuse Claims against the Debtor. The entry of the Confirmation Order will constitute the order approving the compromises and settlements required under the Plan. The Bankruptcy Court's findings in the Confirmation Order shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Claimants holding Abuse Claims, the Holders of other Claims, the Settling Insurers, the Participating Parties, the Non-Debtor CGL Settling Insurer Persons, and other parties in interest, and are fair, equitable, and within the range of reasonableness, and an appropriate exercise of each such Person's business judgment under the applicable laws of corporate governance.

### 7. Future Claimant Reserve.

The Trust shall establish a Future Claimant Reserve which shall be funded with five (5%) percent of the Plan Payment. Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the FCR shall continue until he or his successor resigns or the funds in the Future Claimant Reserve are completely distributed as provided in Section 11.7 of the Plan.

B.    **Trust.**

    1.    **Establishment Of The Trust.**

On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 et seq., as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 et seq. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

    2.    **Trust Funding.**

On or before the Effective Date, each CGL Settling Insurer shall make its portion of the Plan Payment to the Trust by wire transfer. Five (5%) percent of the Plan Payment shall be used to create a Future Claimant Reserve for the benefit of any Future Claimants. On or before the Effective Date, each Twistars Settling Insurer shall make its portion of the Twistars Contribution to the Trust by wire transfer. Each Participating Party shall be deemed to have released any and all Claims such Participating Party may have against the Debtor, the Estates, or the Reorganized Debtor and its Insurance Policies.

    3.    **Appointment Of The Trustee.**

The initial Trustee will be identified in a supplement to the Plan to be filed by the Debtor at least 14 days prior to the Confirmation Hearing. The Trustee shall commence serving as the Trustee on the Confirmation Date. However, the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from an earlier date, as authorized by the Debtor, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

    4.    **Tax Matters.**

The Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain Assets of the Debtor and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code, the regulations promulgated thereunder, and applicable state law, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

    5.    **Cooperation By The Debtor And Reorganized Debtor.**

The Debtor, the Estate, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Trustee as requested in connection with the Trustee's administration of the Trust.

6.      **Objections To Channeled Claims.**

No Person other than the Trustee has the right to object to the Channeled Claims, and any such objection will be prosecuted and resolved in accordance with the terms of the Trust Documents.

7.      **Trust Indemnification Obligations.**

From and after the Effective Date, the Trust shall defend, indemnify, and hold harmless the Protected Parties with respect to any and all Channeled Claims, Medicare Claims, and Claims against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer Policy relating to an Abuse Claim, including: all Claims made by (a) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurer Policy; (b) any Person who has made, will make, or can make (but for the Plan) an Abuse Claim or a Claim against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer; (c) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurer Policy relating to Sexual Abuse or other abuse. The Protected Parties shall have the right to defend any Claims identified in this Section and shall do so in good faith. The Protected Parties may undertake the defense of any Claim on receipt of such Claim. The Protected Parties shall notify the Trust as soon as practicable of any Claims identified in this Section and of their choice of counsel. The Protected Parties' defense of any Claims shall have no effect on the obligations of the Trust, as applicable, to indemnify any such party for such Claims, as set forth in this Section. The Trust shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Protected Parties in defending such Claims. In defense of any such Claims, the Protected Parties may settle or otherwise resolve a Claim consistent with the terms of the Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld.

C.      **Liquidation And Payment Of Channeled Claims.**

1.      **Resolution And Payment Of Channeled Claims.**

The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. The USOPC Claim and the Indemnification Claims shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim.

2.      **Conditions To Payment Of Abuse Claims And FCR Claims.**

As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within

47

ten (10) days after receiving any payment from the Trust, an Abuse Claimant or Future Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant or Future Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person.

### 3.    Effect Of No Award On Channeled Claims.

If a Channeled Claim, including an Abuse Claim filed after the Bar Date, is denied payment from the Trust, the Holder of such Channeled Claim will have no further rights against the Debtor, the Estate, the Reorganized Debtor, the Trust, the Trustee, any Participating Party, or any Settling Insurer, and any of their respective assets or property, including any Revested Assets, relating to such Channeled Claim.

### 4.    Treatment Of Attorneys' Fees And Costs Of Channeled Claimants.

The fees and expenses of attorneys representing Channeled Claimants who receive payment from the Trust will be borne by such Channeled Claimants based on applicable state law and individual arrangements made between such Channeled Claimants and their respective attorneys. The Debtor, the Estate, the Reorganized Debtor, the Released Parties, the Settling Insurers, the Non-Debtor CGL Settling Insurer Covered Persons, the Trust, and the Trustee will not have any liability for any fees and expenses of attorneys representing any of the Channeled Claimants, and all Claims for such fees and expenses, if any, will be disallowed.

### 5.    Withdrawal Of Channeled Claims.

A Channeled Claimant may withdraw a Channeled Claim at any time on written notice to the Trustee. If withdrawn, (a) the Channeled Claim will be withdrawn with prejudice and may not be reasserted, and (b) as a condition to withdrawal of the Channeled Claim, any funds paid to the Channeled Claimant by the Trust shall be returned to the Trust.

### 6.    Adding Participating Parties.

After the Effective Date, upon the consent of the Trustee, any Person may become a Participating Party if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Trustee (a "**Participating Party Agreement**"). After the Effective Date, the Trustee shall have the exclusive authority to seek approval of such a Participating Party Agreement. Upon the Bankruptcy Court's entry of a Final Order approving such an Agreement, Exhibit B to the Plan will be amended by the Trustee to include such Person. Any Person becoming a Participating Party shall have all of the rights, remedies, and obligations of a Participating Party notwithstanding that such Person originally may have been excluded as a Participating Party under any provision of the Plan, including, without limitation, the terms and conditions of the Channeling Injunction.

### 7.    Adding Settling Insurers.

After the Effective Date, upon the consent of the Trustee and the Reorganized Debtor, a Person may become a Settling Insurer if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Trustee. After the Effective Date a Person may become

a Settling Insurer with the consent of the Trustee and the Reorganized Debtor and upon approval of the Bankruptcy Court. If the addition of such Person is approved pursuant to a Final Order, Exhibit C to the Plan will be deemed amended to include such Person. Any Person becoming a Settling Insurer shall have all of the rights, remedies, and duties of a Settling Insurer notwithstanding that such Person originally may have been excluded as a Settling Insurer under any provision of the Plan. Such rights, remedies, and duties shall include, without limitation, the terms and conditions of the Channeling Injunction.

### 8. Future Claimant Process.

A Future Claimant must file a Claim with the Trustee on or before the fifth (5th) anniversary of the Effective Date. The Claim will be entitled to a Distribution from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim. Except as provided in the Plan, Future Claimants will have no right to payment or any other right under the Plan or against the Debtor, the Estate, or the Reorganized Debtor, or any of their respective property including any Revested Assets, or against the Settling Insurers, or the Participating Parties. Following the fifth (5th) anniversary of the Effective Date, any funds held in the Future Claimant Reserve shall be released to the Trustee to, at the Trustee's discretion, (a) administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan; or (b) distribute to a charitable entity mutually agreed upon by the Trustee and the Reorganized Debtor; provided, however, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the USOPC.

## D. CHANNELING INJUNCTION

### 1. EFFECTIVE DATE INJUNCTIONS.

THE INJUNCTIONS PROVIDED FOR IN THE PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID, AND ENFORCEABLE ACCORDING TO THEIR TERMS. THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

### 2. CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS.

IN CONSIDERATION OF THE UNDERTAKINGS OF THE PARTICIPATING PARTIES AND SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE:

    (A)    ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE

AMOUNTS AS ESTABLISHED UNDER THE PLAN AND TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS; AND

(B)   ALL PERSONS THAT HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIM (INCLUDING ALL DEBT HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER) ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIM, INCLUDING:

   i.   COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF THE PROTECTED PARTIES;

   ii.   ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM THE PROTECTED PARTIES, OR FROM THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE PROTECTED PARTIES;

   iii.   CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND AGAINST THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM;

   iv.   ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST: (1) THE PROTECTED PARTIES; (2) ANY DIRECT OR INDIRECT OBLIGATION DUE TO THE PROTECTED PARTIES; OR (3) THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM; AND

   v.   TAKING ANY ACTION, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN.

**ALL CLAIMS DESCRIBED IN SECTION 12.2 OF THE PLAN SHALL BE CHANNELED TO THE TRUST. THIS INJUNCTION SHALL NOT APPLY TO ANY REINSURANCE CLAIM.**

**3.      SCOPE OF CHANNELING INJUNCTION**.

NOTWITHSTANDING ANY PROVISION OF THE PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS" PROVIDES ABSOLUTELY NO PROTECTION TO (A) A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY, OR A SETTLING INSURER; (B) ANY PERSON ON ACCOUNT OF CLAIMS EXCEPTED FROM THE EXCULPATION UNDER SECTION 19.4 OF THE PLAN; AND (C) TO THE EXTENT THE TWISTARS SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, THIS INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR THE USOPC AGAINST ANY OF THE TWISTARS SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO THE DEBTOR OR THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, AS THE CASE MAY BE.

**4.      ENFORCEMENT TO THE MAXIMUM EXTENT.**

TO THE EXTENT NOT OTHERWISE ENJOINED IN SECTION 12.2 OF THE PLAN, THE ASSERTION OR ENFORCEMENT OF CHANNELED CLAIMS, AND ANY ATTEMPT TO ASSERT OR ENFORCE SUCH CLAIMS, BY ANY PERSON, AGAINST A PARTICIPATING PARTY OR SETTLING INSURER IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.

**5.      SETTLING INSURER INJUNCTION.**

IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE SETTLING INSURERS, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS (INCLUDING, WITHOUT LIMITATION, ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER) ARE PERMANENTLY ENJOINED AND BARRED FROM ASSERTING AGAINST A SETTLING INSURER ANY CLAIM (INCLUDING ANY INSURANCE COVERAGE CLAIM, EXTRA-CONTRACTUAL CLAIM, CONTRIBUTION CLAIM, OR SUBROGATION CLAIM) OR INTEREST OF ANY KIND OR NATURE WHATSOEVER ARISING FROM OR RELATING IN ANY WAY TO (A) ANY ABUSE CLAIM OR FUTURE CLAIM OR (B) ANY OF THE SETTLING INSURER POLICIES OR (C) ANY CLAIM

AGAINST ANY SETTLING INSURER FOR CONTRIBUTION, INDEMNITY, DEFENSE, SUBROGATION, OR SIMILAR RELIEF THAT ARISES DIRECTLY OR INDIRECTLY FROM ANY CLAIM AGAINST THE DEBTOR OR THE TWISTARS SETTLEMENT PARTIES; *PROVIDED, HOWEVER*, THAT SUCH INJUNCTION SHALL NOT APPLY TO THE HOLDER OF THE PERSONAL INJURY CLAIM AND HER ABILITY TO PURSUE RECOVERY FROM THE PERSONAL INJURY INSURANCE POLICY. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE TWISTARS SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, THIS SETTLING INSURER INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR THE USOPC AGAINST ANY OF THE TWISTARS SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO THE DEBTOR OR THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, AS THE CASE MAY BE.

6. **TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING INSURERS.**

ALL INJUNCTIONS AND STAYS PROVIDED FOR IN THE PLAN AND UNDER THE INJUNCTIVE PROVISIONS OF SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE ARE PERMANENT AND WILL REMAIN IN FULL FORCE AND EFFECT FOLLOWING THE EFFECTIVE DATE AND ARE NOT SUBJECT TO BEING VACATED OR MODIFIED.

7. **RELEASE OF AVOIDANCE CLAIMS AGAINST PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER PERSONS, AND SETTLING INSURERS.**

ON THE EFFECTIVE DATE, ALL AVOIDANCE RIGHTS OF THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, INCLUDING THOSE ARISING UNDER SECTIONS 544, 547, 548, 549, 550, AND 553 OF THE BANKRUPTCY CODE, AGAINST EACH OF THE PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER PERSONS, AND SETTLING INSURERS SHALL BE DEEMED SETTLED, COMPROMISED, AND RELEASED BY THE PLAN.

8. **MUTUAL RELEASE.**

EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE REORGANIZED DEBTOR PURSUANT TO ARTICLE XX OF THE PLAN, OBLIGATIONS UNDER THE PLAN, AND CLAIMS EXCEPTED FROM EXCULPATION AND DISCHARGE UNDER SECTIONS 19.1 AND 19.4, ON THE EFFECTIVE DATE, THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, ON THE ONE HAND, AND THE PARTICIPATING PARTIES, THE NON-DEBTOR CGL SETTLING INSURER COVERED PERSONS, AND SETTLING INSURERS, ON THE OTHER HAND, WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR RESPECTIVE RELATED PERSONS. NO SUCH CLAIM WILL

SURVIVE THE EFFECTIVE DATE. NO SUCH CLAIM WILL BE DEEMED TO BE ASSIGNED TO THE TRUST. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE TWISTARS SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, THIS MUTUAL RELEASE SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR THE USOPC AGAINST ANY OF THE TWISTARS SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO THE DEBTOR OR THE USOPC UNDER POLICIES ISSUES TO THE DEBTOR OR THE USOPC, AS THE CASE MAY BE.

## VII. MEANS FOR IMPLEMENTATION OF PLAN
## UNDER THE LITIGATION ELECTION

**A.     Lifting Of Automatic Stay And Stay Imposed Under the 105 Order for the Benefit of the Holders of Class 6 Claims**

Under the 105 Order for the Benefit of the Holders of Class 6 Claims. On the Effective Date, the automatic stay shall be lifted only for the Holders of Class 6 Claims and the injunction imposed by the 105 Order will be dissolved. Holders of Class 6 Claims who had not filed a Pre-Petition Lawsuit against the Debtor shall have, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, thirty (30) days pursuant to Section 108(c) of the Bankruptcy Code, to file such lawsuit in a court of appropriate jurisdiction against the Debtor; *provided, however*, that the sole source of recovery for such Claims shall be any proceeds of the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that provide coverage for such Class 6 Claims). Holders of a Class 6 Claim who filed a Pre-Petition Lawsuit against the Debtor or any Co-Defendants shall have thirty (30) days to file a notice in such Pre-Petition Lawsuit stating that the Claimant is electing to recommence litigation against the Reorganized Debtor in name only pursuant to the terms of the Plan; *provided, however*, that the sole source of recovery for such Claims shall be any proceeds of the Debtor's CGL Insurance Policies (and Other Insurance Policies (if any) that provide coverage for such Class 6 Claims). A Holder of a Class 6 Claim that does not file a suit or file a notice to recommence litigation of a Pre-Petition Lawsuit within such thirty (30) day period shall be forever barred from asserting the Holder's Claim.

**B.     Post-Effective Date Awards.**

In the event that any Holder of a Class 6 Claim obtains a Post-Effective Date Award against the Reorganized Debtor, the Reorganized Debtor will not object to the Claimant pursuing payment from any CGL Insurer that the Claimant contends provides CGL Insurance Coverage for such Post-Effective Date Award. To the extent the Holder of a Class 6 Claim pursues payment from an Insurer other than a CGL Insurer, the Debtor and Reorganized Debtor reserves its right to object.

**C.     Cooperation with Insurers in Defense of Claims.**

In the event that any Holder of a Class 6 Claim prosecutes an action against the Reorganized Debtor, the Reorganized Debtor shall reasonably cooperate, in accordance with the terms of any applicable Insurance Policy, governing law, and consistent with the terms of the Plan, with an Insurer that is providing a defense to such a Claim, but the Reorganized Debtor shall not

be required to pay for the costs of any such defense or cooperation, which will be paid solely by the Insurer(s) providing the defense. The Debtor does not admit liability for any such Claims.

**D.    Remand of Removed Actions and Relief from Automatic Stay/Discharge.**

On the thirtieth (30th) day after the Effective Date and without further order of the Bankruptcy Court or the District Court, (a) all actions removed by the Debtor or any other Co-Defendant during the Chapter 11 Case are remanded to the Court from which they were removed; and (b) such actions are not subject to the automatic stay or the injunction in Bankruptcy Code Section 524(a)(2). Nothing contained herein is intended to affect, diminish, or impair those provisions of the Plan which prohibit execution of any judgment against the Reorganized Debtor, the Reorganized Debtor's Revested Assets or property the Reorganized Debtor acquires after the Effective Date. Notwithstanding the foregoing, any plaintiff in a removed action may object to remand of such action by filing an objection with the Bankruptcy Court within fifteen (15) days after the Effective Date. Any removed action subject to an objection to remand shall not be remanded except upon order of the Bankruptcy Court. The Reorganized Debtor shall file a notice of remand on the docket for each remanded action.

## VIII. GENERALLY APPLICABLE PROVISIONS OF THE PLAN.

**A.    Conditions Precedent To The Effective Date.**

Section 18.1 of the Plan sets forth the conditions precedent to the effectiveness of the Plan. The Plan's Effective Date will occur when each those conditions have been satisfied or waived in accordance with Section 18.2 of the Plan.

### 1.    Conditions To Effectiveness If Class 6 Makes The Settlement Election.

Under the Settlement Election, the Effective Date will occur when: (a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor, the Survivors' Committee, the Participating Parties, and the CGL Settling Insurers; (b) the Trustee and Reorganized Debtor have signed the Trust Agreement; (c) the CGL Settling Insurers have paid the Insurance Settlement Amount; and (d) the Participating Parties and the CGL Settling Insurers have made the transfers required to fund the Trust as described in Section 9.2 of the Plan.

### 2.    Conditions To Effectiveness If Class 6 Makes The Litigation Election.

Under the Litigation Election, the Effective Date will occur when the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor and no stay of such Confirmation Order shall be in effect.

### 3.    Waiver of Conditions.

Any conditions described above, and as set forth in Section 18.1 of the Plan, may be waived by the mutual written consent of the Debtor, the Survivors' Committee, the Participating Parties, and the Settling Insurers.

4.      **Non-Occurrence of Effective Date.**

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within one hundred twenty (120) days after entry of a Final Order confirming the Plan, the Plan shall become null and void. A statement shall be filed with the Court within three (3) Business Days after the Effective Date, advising all parties of the Effective Date, or within three (3) Business Days after the occurrence of any event that renders the Plan null and void, advising all parties that the Plan is null and void.

**B.      Treatment Of Executory Contracts And Unexpired Leases.**

1.      **Assumed Employee Benefit Plans.**

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor is a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

2.      **General; Assumed if Not Rejected.**

Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date.

3.      **Claims for Contract Rejection.**

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for the filing of Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

**C.      Litigation**

1.      **Reorganized Debtor's Retention of Litigation.**

The Reorganized Debtor shall retain and exclusively enforce the Debtor's Causes of Action, including Insurance Reimbursement Claims, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, an adversary proceeding filed in the Chapter 11 Case. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Causes of Action, without obtaining Bankruptcy Court approval. Notwithstanding the foregoing, in the event Class 6 makes the Settlement Election, the Debtor's Insurance Reimbursement Claims and any other Claims against CGL Settling Insurers and Participating Parties will be released.

### 2.    Additional Actions.

Any Person to whom the Debtor has incurred an obligation (whether on account of the provision of goods, services, or otherwise), or who has received goods or services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (a) such Person has filed a proof of Claim against the Debtor in this Chapter 11 Case; (b) such Person's proof of Claim has been objected to; (c) such Person's Claim was included in the Schedules; or (d) such Person's scheduled Claim has been objected to or has been identified as disputed, contingent, or unliquidated. Notwithstanding the foregoing, this Section shall not be applicable to Abuse Claimants if Class 6 makes the Settlement Election.

### D.    Claims And Distributions.

### 1.    Lift of Automatic Stay for Personal Injury Claim.

On the Effective Date, the automatic stay of litigation against the Debtor will be modified solely to permit the Holder of the Personal Injury Claim to file a lawsuit against the Debtor in a court of appropriate jurisdiction within thirty (30) days, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, and pursuant to Section 108(c) of the Bankruptcy Code; provided, however, that the sole source of recovery for the Personal Injury Claimant shall be any proceeds of the Personal Injury Insurance Policy. In the event the Personal Injury Claimant prosecutes an action against the Reorganized Debtor, the Reorganized Debtor shall reasonably cooperate, in accordance with the terms of the Personal Injury Insurance Policy, governing law, and consistent with the terms of the Plan, with the Insurer that is providing a defense to such a Claim, but the Reorganized Debtor shall not be required to pay for the costs of any such defense or cooperation. The Debtor admits no liability for the Personal Injury Claim. If the Holder of the Personal Injury Claim does not file suit within such thirty (30) day period, the Holder of the Personal Injury Claim shall be forever barred from asserting the Holder's Claim.

### 2.    Objections to Claims other than Abuse Claims, the Personal Injury Claim, the USOPC Claim, Indemnification Claims, and the FCR Claim.

Unless a Claim is (a) expressly described as an Allowed Claim pursuant to or under the Plan; or (b) otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any and all rights, interests, and objections of the Debtor, or the Estate, to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured, or unsecured, and whether under the Bankruptcy Code, other applicable law, or contract. The Debtor's failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Reorganized Debtor's rights to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the Holder of such Claim. Objections to a Claim (except for Abuse Claims, the Indemnification Claim, and the Personal Injury Claim) as to which no objection is pending as of the Effective Date, must be filed and served not later than  sixty (60) days after the later of (a) the Effective Date or (b) the date

such Claim is filed, provided that the Reorganized Debtor may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

### 3. Service of Objections.

An objection to a Claim shall be deemed properly served on the Holder of such Claim if the objector effects service by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Case.

### 4. Additional Documentation.

From and after the Effective Date, the Reorganized Debtor shall be authorized to enter into, execute, adopt, deliver, and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan without further Order of the Bankruptcy Court.

### 5. Provisions Governing Distribution To Holders of Allowed Claims.

#### a. Distribution Only to Holders of Allowed Claims.

Distributions under the Plan and the Plan Documents will be made only to the Holders of Allowed Claims. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any Distribution otherwise provided to the Claimants under the Plan. If necessary in determining the amount of a Pro Rata distribution due to the Holders of Allowed Claims in any Class, the Reorganized Debtor will make the Pro Rata calculation as if all unresolved Claims were Allowed Claims in the full amount claimed or in the Estimated Amount. When an unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

#### b. Timing of Distributions.

Unless otherwise agreed by the Reorganized Debtor and the recipient of a distribution under the Plan on account of an Allowed Claim, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by the Plan or any applicable agreement or instrument. Any Claimant that is otherwise entitled to an Undeliverable Distribution and who does not provide the Reorganized Debtor, within thirty (30) days after a Distribution is deemed to be an Undeliverable Distribution, a written notice asserting its claim to that Undeliverable Distribution

and setting forth a current, deliverable address, will be deemed to waive any claim to such Undeliverable Distribution and will be forever barred from receiving such Undeliverable Distribution or asserting any Claim against the Reorganized Debtor or its property. Any Undeliverable Distributions that are not claimed under this Section will be retained by the Reorganized Debtor in accordance with the Plan. Nothing in the Plan requires the Reorganized Debtor to attempt to locate any Claimant who is otherwise entitled to an Undeliverable Distribution.

### 6.      No Distributions Pending Allowance.

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Disputed Claim is an Allowed Claim, the Reorganized Debtor may, in its discretion, make a distribution on account of the portion of such Claim that is an Allowed Claim.

### 7.      Setoffs.

The Reorganized Debtor may, to the extent permitted under applicable law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, the Claims, rights, and Causes of Action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor possesses against such Holder.

### 8.      No Interest on Claims.

Post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan or the Confirmation Order, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### E.      Retention Of Jurisdiction.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including the following:

(i)      The determination of objections to Disputed Claims, and the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(ii)   The resolution of controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents;

(iii)  The granting of relief in aid of the Plan and the Plan Documents, including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, as well as contempt or other sanctions) to protect the Reorganized Debtor and the Released Parties from actions prohibited under the Plan or the Plan Documents;

(iv)   Amendments to and modifications of the Plan;

(v)    Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

(vi)   In the event Class 6 makes the Litigation Election, the determination of any motion to determine that a Claimant is a Future Claimant or to determine that an Abuse Claim filed after the Bar Date shall be deemed to have been filed before the Bar Date; and

(vi)   The closing of this case.

**F.      Miscellaneous Provisions.**

**1.      Modification Of Plan.**

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend, modify, or withdraw the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtor may, upon order, amend, or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**2.      Post-Confirmation Court Approval.**

Any action requiring Bankruptcy Court, District Court, or state court approval after the Effective Date will require the Person seeking such approval to file an application, motion, or other request with the Bankruptcy Court, District Court, or state court, as applicable, and obtain a Final Order approving such action before the requested action may be taken. The Person filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the Bankruptcy Court, on the Reorganized Debtor by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

3.      **Election Pursuant To Section 1129(b) Of The Bankruptcy Code.**

If necessary, the Debtor requests confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except Section 1129(a)(8) thereof, are met with regard to the Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of the Plan will be deemed deleted from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class.

4.      **Closing Of The Chapter 11 Case.**

As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Chapter 11 Case shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, or any other party in interest, to reopen the Chapter 11 Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under the Plan. Any order closing this Chapter 11 Case will provide that the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Chapter 11 Case, and the obligations created by the Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents.

5.      **Dissolution Of The Survivors' Committee.**

On the Effective Date, the Survivors' Committee shall dissolve automatically, whereupon its members and the Survivors' Committee's Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, and further provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

6.      **Termination Of The Appointment Of The FCR.**

The Bankruptcy Court's appointment of the FCR shall be terminated, if Class 6 makes the Litigation Election, on the Effective Date, whereupon the FCR and the FCR's Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, and further provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims. The Bankruptcy Court's appointment of the FCR shall be terminated, if Class 6 makes the Settlement

Election, when the funds in the Future Claimant Reserve are completely distributed as provided in Sections 9.5 and 11.7 of the Plan, whereupon the FCR and the FCR's Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, and further provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

### 7. Governing Law.

Except to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan and under the Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of laws.

### 8. Reservation Of Rights.

If the Plan is not confirmed, the rights of all parties in interest in the Chapter 11 Case are and will be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concessions or settlements.

## IX. EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

### A. Discharge.

On the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Related Persons, before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of the Chapter 11 Case, and including all Claims and Debts based upon or arising out of Abuse Claims, the Personal Injury Claim, the USOPC Claim, or the Indemnification Claims and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Plan; or (c) the Holder of such Claim has accepted the Plan.

### 1. Source Of Payment In The Event Class 6 Makes The Litigation Election.

IN THE EVENT CLASS 6 MAKES THE LITIGATION ELECTION, EXCEPT AS REQUIRED BY THE DEBTOR'S INSURANCE POLICIES, AND UPON NOTICE TO THE APPLICABLE INSURER, THE DEBTOR MAY ELECT NOT TO DEFEND ANY POST EFFECTIVE DATE LITIGATION WHICH IS AUTHORIZED TO BE PROSECUTED AGAINST THE DEBTOR PURSUANT TO THE PLAN AND NO JUDGMENT OBTAINED

AGAINST THE DEBTOR IN SUCH LITIGATION CAN BE EXECUTED AGAINST THE REVESTED ASSETS, AGAINST ANY PROPERTY ACQUIRED BY THE REORGANIZED DEBTOR SUBSEQUENT TO THE EFFECTIVE DATE, OR AGAINST THE REORGANIZED DEBTOR. THE REORGANIZED DEBTOR REMAINS LIABLE TO PAY AMOUNTS TO THE EXTENT THERE IS ALSO INSURANCE COVERAGE FOR THOSE AMOUNTS. THE ONLY SOURCE OF ANY PAYMENT FOR ANY JUDGMENT ENTERED IN ANY LITIGATION AUTHORIZED TO PROCEED AFTER THE EFFECTIVE DATE SHALL BE THE DEBTOR'S CGL INSURANCE POLICIES AND OTHER INSURANCE POLICIES, IF ANY, THAT PROVIDE COVERAGE TO CLASS 6 CLAIMS.

**B.**      **Vesting of Assets.**

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, the Revested Assets shall vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court, and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

**C.**      **Continued Existence of Reorganized Debtor.**

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date in accordance with the applicable laws of the State of Texas, with all the powers of a not-for-profit having tax-exempt status under 26 U.S.C. § 501(c)(3) and all other applicable laws, and without prejudice to any right to alter or terminate such existence under applicable state law.

**D.**      **Exculpation and Limitation of Liability.**

NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS, OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THIS CHAPTER 11 CASE, INCLUDING THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR FRAUD (PROVIDED, HOWEVER, THE DEBTOR, THE ESTATE, AND REORGANIZED DEBTOR WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) OR ANY CAUSES OF ACTION ARISING FROM OR RELATED TO DENIALS OF COVERAGE OR COVERAGE DEFENSES, AND, IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. WITHOUT LIMITING THE

GENERALITY OF THE FOREGOING, THE DEBTOR AND ITS RELATED PARTIES, ITS EMPLOYEES, AND THE DEBTOR'S PROFESSIONALS, SHALL BE ENTITLED TO AND GRANTED THE BENEFITS OF SECTION 1125(E) OF THE BANKRUPTCY CODE. FOR THE AVOIDANCE OF DOUBT, THIS SECTION AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF SEXUAL ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR. THE EXCULPATED PARTIES, NOR, IN THE EVENT CLASS 6 MAKES THE SETTLEMENT ELECTION, THE TRUST OR THE TRUSTEE, AND PROFESSIONALS EMPLOYED BY THE FOREGOING, SHALL NOT HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO A SEXUAL ABUSE CLAIMANT, INCLUDING LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT.

## X. RISK FACTORS

In evaluating whether to vote to accept or to reject the Plan, all Claimants holding Allowed Claims and all Abuse Claimants in the Voting Classes should carefully read and consider the risk factors set forth below, which describe how the anticipated distributions and treatments under the Plan rely on uncertain assumptions and are not guaranteed. The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the exhibits attached hereto. You should consult with your legal, financial, and tax advisors regarding the risks associated with the plan and distributions you may receive.

**A.      Parties In Interest May Object To The Debtor's Classification Of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim is substantially similar to the other claims in such class. The Debtor believes that the classification of claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created classes of claims that only encompass claims that are substantially similar to the other claims in such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.      The Debtor May Not Be Able To Secure Confirmation Of The Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any rejecting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to rejecting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to rejecting Classes. If the Plan is not confirmed, it is unclear what distributions that claimants holding Allowed Claims will receive with respect to their Allowed Claims, or the timing of receipt of such distributions, as it is unclear whether a confirmable alternative plan can be proposed by any other party in this chapter 11 case. If the Plan is not confirmed and an alternate reorganization plan is not confirmed, it is possible that the Debtor would have to liquidate, in which case it is possible that the claimants holding Allowed Claims could receive substantially less favorable treatment than they would receive under the Plan.

**C.      Parties In Interest May Object To The Releases And Injunctions Contained In The Plan.**

Confirmation is also subject to the Bankruptcy Court's approval of the releases, injunction, and discharge and related provisions described in the Plan. Certain parties in interest may assert that the Debtor cannot demonstrate that the Plan meets the standards for approval of releases, injunctions, and exculpations under applicable law.

**D.      Nonconsensual Confirmation.**

The Debtor believes that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code to seek a nonconsensual confirmation of the Plan if necessary. However, there is no assurance that the Bankruptcy Court will reach this conclusion, in which case the Plan may not be confirmed.

**E.      Non-Occurrence Of The Effective Date.**

The occurrence of the Effective Date is subject to the conditions precedent listed in the Plan. There can be no assurance that all of the conditions necessary for the Plan to become effective will be met, in which case distributions will be delayed and the Debtor's comprehensive general liability insurers may refuse to contribute to the Trust in favor of the Abuse Claimants.

**F.      Medicare Reimbursement.**

Abuse Claimants who (a) are Medicare beneficiaries and (b) receive a payment from the Trust may be required to reimburse Medicare for medical expenses already paid on behalf of such Abuse Claimant. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect the amount of an Abuse Claimant's reimbursement obligations.

## XI. BEST INTERESTS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," holders of impaired allowed claims must either (i) accept the plan of reorganization, or (ii) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such rejecting claimants would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtor believes that the Plan provides the same or a greater recovery for claimants holding Allowed Claims as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (i) the additional administrative claims generated by conversion to a chapter 7 case; (ii) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; and (iii) the loss of an agreement by the Debtor's CGL Settling Insurers and the Twistars Settling Insurers to contribute to a settlement fund if Settlement Election under the Plan is not selected and the Plan is not confirmed, each of which likely would diminish the value of the Debtor's assets available for distribution.

The Debtor has prepared an unaudited Liquidation Analysis, attached hereto as <u>Exhibit 3</u>, to assist claimants holding Allowed Claims in evaluating the Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to claimants holding Allowed Claims under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. The actual liquidation value of the Debtor could vary materially from the estimate provided in the liquidation analysis. Finally, the Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, in light of insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies is highly uncertain.

## XII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

The following summary is a general discussion of certain potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The federal income tax consequences to any particular creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

## A.    Tax Consequences To Creditors

A creditor that receives a distribution in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss.  Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the distribution in income when received.

The Debtor anticipates that distributions in satisfaction of Abuse Claims will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and/or physical sickness, within the meaning of Section 104(a)(2) of Tax Code. The Debtor has not, however, fully analyzed such tax issues and cannot (and does not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

## B.    Tax Consequences To The Debtor

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to the Debtor.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in this chapter 11 case.

C.      **Tax Consequences To The Trust.**

The Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund ("**QSF**"). The Debtor expresses no opinion regarding whether the Internal Revenue Service would conclude that the Trust is a designated settlement fund or a QSF. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel regarding whether the Trust is a designated settlement fund or a qualified settlement fund. Accordingly, each creditor is urged to consult its own tax advisor regarding the characterization of the Trust and the tax consequences of such characterization.

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state, and local tax purposes, based on its particular tax situations.

## XIII. VOTING INSTRUCTIONS

The Debtor's Claims Agent will send to all Claimants entitled to vote on the Plan: (i) the Disclosure Statement Order, (ii) a notice of the Confirmation Hearing, (iii) the Disclosure Statement, as approved by the Bankruptcy Court and together with the Plan attached as an exhibit, and (iv) a ballot (collectively, the "**Solicitation Packages**"). The Solicitation Packages will also describe the procedures and deadline for submitting ballots to the Debtor's Claims Agent.

## XIV. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Debtor urges all claimants entitled to vote to accept the Plan, and urges Abuse Claimants to select the Settlement Election, by so indicating on their ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: February 21, 2020

Respectfully submitted,

**JENNER & BLOCK LLP**

By: /s/ *Catherine Steege*

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*