## **Exhibit 1**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LIBERTY INSURANCE UNDERWRITERS INC., | : | |
| | : | |
| Plaintiff, | : | Civ. A. No. 1:20-cv-10025 |
| | : | |
| vs. | : | |
| | : | |
| EPIQ eDISCOVERY SOLUTIONS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION OF LIBERTY INSURANCE UNDERWRITERS INC.
## FOR PRELIMINARY INJUNCTION

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Ronald P. Schiller
Matthew A. Hamermesh (*pro hac vice* forthcoming)
Bonnie M. Hoffman (*pro hac vice* forthcoming)
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200 (telephone)
(215) 568-0300 (facsimile)
rschiller@hangley.com;
mhamermesh@hangley.com;
bhoffman@hangley.com

# TABLE OF CONTENTS

I.     Introduction ..............................................................................................................1

II.    Relevant Background ............................................................................................. 3

    A.    USAG's Bankruptcy Action and Adversary Proceeding in the Southern District of Indiana against LIU ........................................ 3

    B.    LIU's Motions for Stay and Compliance with the January 13 Order ...........5

    C.    Epiq's Contract and Services ........................................................... 6

    D.    Epiq's Threat to Terminate Its Services Now.................................. 8

    E.    The Epiq Agreement Contains a Controlling Arbitration Clause for the Resolution of Disputes...........................................................10

III.   This Court Should Enjoin Epiq from Changing the Status Quo by Terminating Its Services to USAG ..................................................................... 11

    A.    The Legal Standard ....................................................................... 11

    B.    LIU Is Likely to Suffer Irreparable Harm in the Absence of an Injunction ...................................................................................12

    C.    LIU Is Likely to Succeed on the Merits of Its Claims ...................15

    D.    There are Sufficiently Serious Questions Going to the Merits of LIU's Claims and the Balance of Hardships Weighs Decidedly in LIU's Favor ....................................................................................17

    E.    An Injunction Preventing Epiq from Ceasing Its Services Is in the Public Interest....................................................................................18

    F.    LIU Pledges to Post an Injunction Bond .......................................19

IV.   LIU Has Provided Epiq Notice of this Action......................................... 20

V.    Conclusion................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*,
2 A.3d 526 (Pa. 2010)................................................................13

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)............................................................15, 19

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)...................................................................19

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
934 F.2d 30 (2d Cir. 1991)........................................................13

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999).......................................................14

*Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ*,
9 F. Supp. 2d 331 (S.D.N.Y 1998)..............................................13

*Cincinnati Ins. Co. v. Grand Pointe, LLC*,
501 F. Supp. 2d 1145 (E.D. Tenn. 2007)...................................14

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)........................................................17

*Colony Ins. Co. v. G & E Tires & Serv., Inc.*,
777 So. 2d 1034 (Fla. Dist. Ct. App. 2000)...............................14

*Cotter Corp. v. American Empire Surplus Lines Ins. Co.*,
90 P.3d 814 (Colo. 2004).........................................................14

*Deckert v. Indep. Shares Corp.*,
311 U.S. 282 (1940).................................................................14

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)................................................................20

*John Hancock Life Ins. Co. v. Wilson*,
254 F.3d 48 (2d Cir. 2001).......................................................16

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019).............................................................18

*Lopez v. Nights of Cabiria, LLC,*
   96 F. Supp. 3d 170 (S.D.N.Y. 2015)................................................................18

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
   883 F.3d 32 (2d Cir. 2018)..........................................................................11, 12

*Nat'l Sur. Corp. v. Immunex Corp.,*
   297 P.3d 688 (Wash. 2013) ..........................................................................13

*Nokia Corp. v. Interdigital, Inc.,*
   645 F.3d 553 (2d Cir. 2011)..........................................................................19

*Register.com, Inc. v. Verio, Inc.,*
   356 F.3d 393 (2d Cir. 2004) ..........................................................................15

*Robert Lawrence Co. v. Devonshire Fabrics, Inc.,*
   271 F.2d 402 (2d Cir. 1959) ..........................................................................18

*Rodriguez ex rel. Rodriguez v. DeBuono,*
   175 F.3d 227 (2d Cir. 1999) ..........................................................................12

*New York ex rel. Schneiderman v. Actavis PLC,*
   787 F.3d 638 (2d Cir. 2015)..........................................................................12

*Selective Ins. Co. of Am. v. Smiley Body Shop, Inc.,*
   260 F. Supp. 3d 1023 (S.D. Ind. 2017)..........................................................13

*Ticor Title Ins. Co. v. Cohen,*
   173 F.3d 63 (2d Cir. 1999)..........................................................................15

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995) ..........................................................................11

*United Nat'l Ins. Co. v. SST Fitness Corp.,*
   309 F.3d 914 (6th Cir. 2002)..........................................................................14

**Rule**

Federal Rule of Civil Procedure 65(c)..........................................................................19

**Other Authority**

U.S. Court of Appeals for the Seventh Circuit, *Oral Argument Audio Recordings: USA Gymnastics v. Liberty Insurance Underwriters* (Nov. 9, 2020), http://media.ca7.uscourts.gov/sound/external/ds.20-1245.20-1245_11_09_2020.mp3..........................................................................5

Plaintiff Liberty Insurance Underwriters Inc. ("LIU") submits this Memorandum of Law in support of its motion for a preliminary injunction to prevent Defendant Epiq eDiscovery Solutions, Inc. ("Epiq") from ceasing its services to LIU's insured, USA Gymnastics ("USAG"), on November 30, 2020.

## I.  Introduction

Epiq, a provider of e-discovery services to USAG for more than two years, has threatened to terminate those services unless it is paid a claimed outstanding fee balance of $1.8 million by November 30, 2020. Although multiple insurers, including LIU, are parties to the relevant contract, Epiq and USAG have decided that LIU, and not any other insurer, must pay the entire balance immediately, notwithstanding that:

1.  The contract contains a controlling dispute resolution clause;
2.  An insurer other than LIU is responsible for the vast majority of the unpaid balance;
3.  USAG is not even a party to the contract;
4.  An appeal challenging LIU's responsibility for any part of the Epiq charges is pending in the United States Court of Appeals for the Seventh Circuit, was argued on November 9, 2020, and submitted for decision; and
5.  The November 30 deadline is arbitrary and in breach of contract, but holds potentially severe consequences for the non-party USAG (which, ironically, may have helped orchestrate this "emergency").

The arbitrary deadline also puts LIU in the impossible situation of facing seriatim accusations of bad faith from USAG while a meritorious appeal is pending as to amounts completely the responsibility of others.

LIU is one of multiple insurers of USAG in connection with claims arising from the abuse of several hundred female gymnasts by Dr. Larry Nassar, a former volunteer for USAG. On January 13, 2020, the United States District Court for the Southern District of Indiana ("Indiana District Court") entered an order (Dist. Ct. ECF 146) ("January 13 Order") directing LIU to provide a "complete defense" to USAG for the

Nassar-Related Matters (defined more fully below).[1] The January 13 Order is currently on appeal to the United States Court of Appeals for the Seventh Circuit and was argued on November 9, 2020.

As to Epiq, LIU has complied with this obligation by paying its agreed 4% share of Epiq's fees, with the other insurers responsible for the balance. Epiq now claims it has accrued a balance of $1.8 million in unpaid fees. This balance has accrued not because of any action or inaction of LIU, but because USAG's other insurers have challenged Epiq's services and the volume of its fees. Indeed, Epiq's own records show that another insurer – K&K Insurance, the adjuster for National Casualty Company (collectively, "National Casualty Company") – owes almost all of the balance Epiq claims: $1.78 million.

Nevertheless, Epiq is now threatening – with the support of, and perhaps in concert with, USAG – that if *LIU* does not pay the entire claimed balance of $1.8 million by November 30, Epiq "will be disabling access and ceasing all additional work" for USAG.

LIU respectfully asks this Court to issue an order preliminarily enjoining Epiq from terminating its services on behalf USAG as long as LIU pays its 4% share or unless and until it is determined that LIU owes some other share, and granting any other and further relief that this Court may deem just and proper.

---

[1] Documents filed in the Indiana District Court action are hereinafter identified as "D. Ct. ECF ##."

## II.     Relevant Background

### A.     USAG's Bankruptcy Action and Adversary Proceeding in the Southern District of Indiana against LIU

This action arises out of numerous personal injury claims, investigations, and other proceedings brought against or related to USAG arising from Larry Nassar's abuse of female gymnasts ("Nassar-Related Matters"). *USA Gymnastics v. ACE Am. Ins. Co., et al.*, Adv. Proc. 19-50012 (Bankr. S.D. Ind.), ECF 1, Complaint ¶¶ 2, 20-22.[2]

On April 6, 2018, USAG filed an action in Indiana state court seeking coverage for these Nassar-Related Matters under various insurance policies. (*Id.* ¶¶ 4-6.) It named LIU as one of the defendants. LIU had issued a Nonprofit Executive Advantage Policy to USAG for the policy period from May 16, 2016, through May 16, 2017. (Adv. Proc. ECF 2-14, Tab 5, at MP-003181 *et seq.*)[3] The action was removed to the Indiana District Court. (Ind. S.D. Civ. A. No. 1:18-cv-1306-RLY-MPB.)

In December 2018, USAG filed a voluntary petition in the U.S. Bankruptcy Court for the Southern District of Indiana ("Bankruptcy Court") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, docketed as *In re USA Gymnastics,* Case No. 18-09108-RLM-11 (Bankr. S.D. Ind.). (Bankr. Ct. ECF 1.) On January 25, 2019, the Indiana District Court administratively closed USAG's coverage action, citing USAG's bankruptcy filing and the operation of the automatic stay under 11 U.S.C. § 362. (D. Ct. ECF 72.)

---

[2] Documents filed in the Adversary Proceeding in the United States Bankruptcy Court for the Southern District of Indiana are hereinafter identified as "Adv. Proc. ECF ##."

[3] LIU issued a single claims-made directors-and-officers ("D&O") policy with a limit of liability of $5 million (or $250,000 depending upon the underlying claim). The LIU policy differs from the other insurers' policies that are otherwise at issue in the USAG coverage litigation, which provide general liability coverage over multiple years.

Less than a week later, USAG commenced an adversary proceeding against its insurers in the Bankruptcy Court, seeking to litigate the same insurance coverage claims raised in USAG's initial complaint. (Adv. Proc. ECF 1.) Before LIU had even entered an appearance in the adversary proceeding, USAG moved for partial summary judgment to declare that LIU owes a duty to defend all of the Nassar-Related Matters. (Adv. Proc. ECF 26.) LIU opposed USAG's motion and cross-moved for summary judgment. (Adv. Proc. ECF 131.)

The Bankruptcy Court issued Proposed Findings and Conclusions with Respect to USAG's Motion for Partial Summary Judgment and LIU's Cross-Motion for Summary Judgment. (Adv. Proc. ECF 260.) The Bankruptcy Court proposed granting USAG's motion over LIU's opposition with regard to LIU's duty to defend nearly all of the Nassar-Related Matters. (Adv. Proc. ECF 260.) LIU timely objected to the Proposed Findings and Conclusions. (Adv. Proc. ECF 270.)

On January 13, 2020, the Indiana District Court entered an Order on USAG's motion essentially adopting the Bankruptcy Court's Proposed Findings and Conclusions with a single paragraph of rulings (after reciting the procedural history). The Court granted partial summary judgment in favor of USAG, requiring LIU to "provide a complete defense to USAG" for all of the specified Nassar-Related Matters. (D. Ct. ECF 146, at 5.) The January 13 Order also requires LIU to reimburse USAG for legal fees relating to the Nassar-Related Matters that it paid or accrued prior to the entry of the order. (Dist. Ct. ECF 146, at 5.)

LIU's appeal of the January 13 Order to the Seventh Circuit Court of Appeals remains pending. Oral argument was held on November 9, 2020. LIU anticipates that the Court of Appeals will issue its decision shortly.[4]

**B.      LIU's Motions for Stay and Compliance with the January 13 Order**

Earlier this year, LIU sought a complete stay of the January 13 Order from the Indiana District Court. That motion was denied, and the Seventh Circuit Court of Appeals also denied a stay. (D. Ct. ECF 200, 202; 7th Cir. No. 20-1245 ECF 47.) In addition to the present action for injunctive relief, LIU has simultaneously filed a new motion in the Indiana District Court for a stay limited to the obligation to pay more than LIU's agreed share of Epiq's fees. That motion was filed on November 25, 2020.

Since the initial denial of its stay motion, LIU has complied with its obligation to provide a "complete defense to USAG." As to payment of defense costs for defending the more than 100 lawsuits brought by female athletes against USAG ("Nassar Athlete Lawsuits"), USAG and its insurers – including LIU – agreed to an interim allocation long before this action was filed. (Ex. A, Levitin Decl. ¶¶ 4-6;[5] Adv. Proc. ECF 27, at 8 (acknowledging that LIU has "agreed to continue funding a small percentage of the defense in the sexual abuse lawsuits").) In particular, USAG's insurance carriers agreed

---

[4] During oral argument, Chief Judge Sykes picked up on a key distinction not considered by the Bankruptcy Court and Indiana District Court: that because LIU's policy with USAG is a D&O policy, the cases concerning general liability policies – upon which the Bankruptcy Court and District Court relied – are inapplicable. *See* U.S. Court of Appeals for the Seventh Circuit, *Oral Argument Audio Recordings: USA Gymnastics v. Liberty Insurance Underwriters*, at 10:00 *et seq.* (Nov. 9, 2020), http://media.ca7.uscourts.gov/sound/external/ds.20-1245.20-1245_11_09_2020.mp3.

[5]      "Levitin Decl." refers to the Declaration of Arlene Levitin in Support of this Motion, submitted herewith as Exhibit A. "Schiller Decl." refers to the Declaration of Ronald P. Schiller in Support of this Motion, submitted herewith as Exhibit B.

that their payment would be based on their respective shares of the total number of
policies of insurance that might apply to the Nassar Athlete Lawsuits. (Ex. A, Levitin
Decl. exs. 1, 3.) Based on this allocation, LIU agreed to pay – and has been consistently
paying – 4% of USAG's defense costs for the Nassar Athlete Lawsuits. (*Id*.)

During 2020, LIU has paid $282,290.46 in legal fees to law firms representing
USAG. (Ex. A, Levitin Decl. ¶ 7.) LIU has also paid all of the invoices it has so far
received from Epiq with regard to the USAG legal defense. (Ex. A, Levitin Decl. ¶ 12.)

### C.   Epiq's Contract and Services

In addition to engaging defense counsel, USAG also selected a global e-discovery
services provider – Epiq – to assist USAG in connection with the Nassar-Related
Matters. (Adv. Proc. ECF 379, at 2.) Epiq has provided USAG document collection,
preservation, review, hosting, and production services, referred to as "ESI." (*Id*.) Epiq
has also provided contracted staff to conduct document reviews for USAG, referred to as
"DRS." (*Id*.)

Although USAG and its national coordinating counsel at the law firm of Miller
Johnson chose to use Epiq, USAG does not have a contract with Epiq. (Ex. B, Schiller
Decl. ex. 1 (7/29 Tr. at 30:2-17, 60:14-16).) Instead, certain insurers, including LIU,
entered into a contract with Epiq at USAG's request to provide services for the benefit of
USAG. (Ex. B, Schiller Decl. ex. 1 (7/29 Tr. at 60:17-19).)

Specifically, the services Epiq provides on behalf of USAG are governed by a
written contract, the Legal Solutions Services Agreement ("Epiq Agreement"; Levitin
Decl. ex. 5 (filed under seal)). The Epiq Agreement was signed by Epiq and six of
USAG's insurers: TIG Insurance, Chubb/CIGNA Insurance, Combined Specialty
Insurance/Virginia Surety, Great American Insurance Company, National Casualty

Company, and LIU. (*Id.*) The Epiq Agreement does not state that USAG's insurers are jointly liable for Epiq's fees, nor does it specify at all how Epiq's fees are to be allocated among USAG's insurers. (*Id.*)

Initially, Epiq billed each of the insurers an equal share of its fees. (Ex. A, Levitin Decl. ¶ 9.) After some of the insurers pointed out that this was not what they agreed to among themselves, Epiq reran all of its invoices with new percentages nearly matching the insurers' agreed allocation of fees. (Ex. A, Levitin Decl. ¶ 10.) However, Epiq mistakenly billed LIU for 5% of its fees, rather than the 4% to which LIU had agreed, as discussed above. (Ex. A, Levitin Decl. ¶ 11, ex. 7.) LIU has paid its 4% share of the invoices it has so far received from Epiq, which cover the period up through October 2020. (Ex. A, Levitin Decl. ¶ 12.)

Just over a year ago, on November 18, 2019, a representative of one of the other insurers sent an e-mail to USAG's counsel and Epiq seeking information about Epiq's fees and the services Epiq was providing to USAG. (Ex. B, Schiller Decl. ex. 2.) In particular, the insurers asked:

- How does Epiq receive assignments?

- When Epiq receives an assignment, is a work order or some sort of proposal prepared?

- Is there any backup for the work identified in the invoices, such as timesheets?

- Can you walk us through the October [2019] invoices, as an example, and help us understand the difference between the two, what was done, and why?

- Contact information for the project manager to the extent additional questions arise.

(*Id.*) The November 18 e-mail also requested that USAG and Epiq schedule a call with the insurers to discuss those questions. (*Id.*)

Remarkably, almost seven months went by before Epiq and USAG finally scheduled a meeting to address these requests – and only then after LIU informed the Bankruptcy Court that Epiq and USAG had failed to respond, and demanded (and was finally given some abbreviated) discovery. (Ex. B, Schiller Decl. ex. 1 (7/29 Tr. at 67:19-22); Adv. Proc. ECF 357, at 19.) During a conference call on June 10, Epiq and USAG addressed some of the questions raised in the November 18 e-mail. (Ex. B, Schiller Decl. ¶¶ 8-9.) Epiq's responses did not satisfy the other insurers' challenges and objections to Epiq's work. (*Id.*)

Moreover, other insurers have refused to pay their agreed share of Epiq's fees. (Ex. A, Levitin Decl. ex. 8.) As a result, Epiq claims its unpaid fee balance has risen to $1.8 million. (Ex. A, Levitin Decl. exs. 8, 9 (attachment).) One insurer in particular – National Casualty Company – has apparently refused to pay nearly $1.78 million. (Ex. A, Levitin Decl. ex. 9 (attachment).)

Although Epiq has previously provided both ESI and DRS services to USAG, in the last few months its work has been limited to ESI document hosting services. The August, September, and October 2020 invoices reflect that the only work USAG is currently doing for USAG is hosting data that previously was the subject of document searches and production. (Ex. A, Levitin Decl. exs. 10-12.) Epiq currently appears not to be conducting any document reviews for USAG.

### D.      Epiq's Threat to Terminate Its Services Now

On March 13, 2020, USAG filed with the Bankruptcy Court a Motion to Enter Money Judgment and to Enforce Order. (Adv. Proc. ECF 339, the "Money Judgment

Motion.") USAG's Money Judgment Motion seeks to liquidate the amount of unreimbursed defense costs USAG allegedly incurred through the time of filing of the Money Judgment Motion and to obtain a money judgment for that amount from LIU. (Money Judgment Motion, Adv. Proc. ECF 339, at 2.) Among other things, the Money Judgment Motion seeks to compel LIU to pay $1,391,204.58 in fees claimed by Epiq. (Adv. Proc. ECF 337, at 4.)

The Bankruptcy Court held an evidentiary hearing on the Money Judgment Motion in late July and early August. It heard oral argument on September 17. The Bankruptcy Court issued its Proposed Findings and Conclusions on September 29, 2020. (Adv. Proc. ECF 496.) The Bankruptcy Court proposed that the Indiana District Court enter a judgment for more than $3.5 million against LIU for purportedly "reasonable and necessary" defense costs. Included in that amount is essentially all of Epiq's fees that USAG sought in the Money Judgment Motion.

Two days after the Bankruptcy Court entered its Proposed Findings and Conclusions, Epiq sent an e-mail to LIU's counsel demanding immediate payment of the $1,391,204.58, and payment of other balances of about $600,000 within thirty days. (Ex. B, Schiller Decl. ex. 3.) Epiq's demand was based on the erroneous assumption that the Bankruptcy Court's decision was a final judgment. It was not, as LIU pointed out to Epiq in an e-mail response on October 8, 2020. (Ex. B, Schiller Decl. ex. 4.) Epiq never responded to LIU's October 8 e-mail. (Ex. B, Schiller Decl. ¶ 13.)

Instead, on November 4, 2020, Epiq sent an e-mail to LIU and the other insurers demanding that its entire claimed balance of $1.8 million be paid by November 30. (Ex. B, Schiller Decl. ex. 5.) Epiq threatened that, if the balance is not paid on that date, Epiq

"will be disabling access and ceasing all additional work" for USAG. (Ex. A, Levitin Decl. ex. 8.)

On November 23, 2020, Epiq sent a follow-up e-mail reiterating its threat to cut off USAG, and further indicating that it will delete all of USAG's data if its hosting fees are not paid. (Ex. A, Levitin Decl. ex. 9.) Epiq attached to its e-mail a spreadsheet purporting to identify the amounts outstanding. (*Id.*) According to Epiq's own spreadsheet, the lion's share of the $1.8 million Epiq claims it is owed – $1.78 million of the total amount – is owed by National Casualty Company, not LIU. (*Id.*)

On that same day, USAG itself sent LIU a demand letter concerning Epiq. In it, USAG demands that LIU pay the full amount claimed by Epiq. (Ex. B, Schiller Decl. ¶ 15.) It has threatened not only to seek damages if LIU does not pay the full amount, but also accused LIU of engaging in bad faith. (*Id.*)

The timing of Epiq's and USAG's threats is notable and directly relevant to this motion. Epiq sent its demand just two weeks after LIU filed Objections to the Bankruptcy Court's Proposed Findings and Conclusions with Respect to USAG's Money Judgment Motion. In the Objections, LIU argued that USAG did not have standing as a third-party beneficiary to seek a judgment for the amount of Epiq's unpaid fees because Epiq continues to provide USAG the only benefit it receives in connection with the Epiq Agreement – Epiq's services. (D. Ct. ECF 204, at 52-55.) Epiq's threat is an obvious attempt to work around that argument and help USAG.

### E.    The Epiq Agreement Contains a Controlling Arbitration Clause for the Resolution of Disputes

Epiq has a remedy if it is not being paid by some of the insurers, or if some insurers disagree with their allocated share of Epiq's fees. The Epiq Agreement, which

was signed by all six insurers, provides in Section 22 that arbitration is the exclusive

remedy for any disputes arising out of or relating to the Agreement. It states: "Any

dispute, controversy, proceeding or claim arising out of or relating to this Agreement, or

the Services, including but not limited to any alleged breach shall be settled by

mandatory, final and binding arbitration in Kansas City, Missouri[.]" (Ex. A, Levitin

Decl. ex. 5.)

Thus, if some of the insurers have not been paying their share, or Epiq desires a

determination of the extent to which each of the insurers is liable for its fees, Epiq's

remedy is clear: arbitration.

Epiq has nevertheless ignored that solution to which it expressly agreed. On

November 25, 2020, LIU contacted Epiq by e-mail to demand that it confirm that it will

continue providing services to USAG and, if Epiq desires to seek relief from the insurers,

it would commence an arbitration proceeding. (Ex. B, Schiller Decl. ex. 5.) Epiq refused

to do either. (*Id.*)

## III.    This Court Should Enjoin Epiq from Changing the Status Quo by Terminating Its Services to USAG

### A.    The Legal Standard

"The purpose of a preliminary injunction is to preserve the relative positions of

the parties." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d

Cir. 2018) (alteration omitted) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

(1981)). While "[a] mandatory injunction" aims "to alter the status quo by commanding

some positive act," a "prohibitory" one "seeks only to maintain the status quo." *Tom

Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). The United

States Court of Appeals for the Second Circuit has defined "status quo" in this context to

mean "status quo ante" – "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 & n.5 (citations omitted).

The injunction sought in the present case is prohibitory, not mandatory. The status quo ante is Epiq's provision of services to USAG in exchange for compensation supplied by the insurers. That is the arrangement LIU seeks to preserve through this action, with any dispute over each insurer's share of Epiq's compensation proceeding through arbitration, as required by the contract Epiq signed with LIU and the other insurers.

A party seeking a prohibitory injunction must establish three elements:

(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of [the moving party's] claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted). Each of these factors favors granting LIU its requested relief.

**B.    LIU Is Likely to Suffer Irreparable Harm in the Absence of an Injunction**

Irreparable harm is "an injury that is neither remote nor speculative, but actual and imminent[,] and that cannot be remedied by an award of monetary damages." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation omitted). The possible injury to LIU satisfies both of these criteria.

First, Epiq's ultimatum that it will cease its services to USAG on November 30 unless it is paid the full balance of outstanding fees evidently poses both actual and imminent harm. Despite LIU's efforts, and despite the Epiq Agreement's clear

arbitration clause, Epiq and USAG have persisted in their all-or-nothing stance. There has been no indication that Epiq's ultimatum is puffery or a negotiating tactic. The act is also imminent: LIU is bringing this action on the very same day that Epiq has said it will follow through on its threat.

Second, in the absence of injunctive relief, LIU is likely to suffer harm incapable of remedy by a damages award. Although "[m]onetary loss alone will generally not amount to irreparable harm," the Second Circuit Court of Appeals has suggested that irreparable harm may occur when the moving party cannot "be fully compensated for financial loss by a money judgment." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991); *see also Brenntag Int'l Chems., Inc. v. Norddeutsche Landesbank GZ*, 9 F. Supp. 2d 331, 345 (S.D.N.Y 1998) ("Where a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury." (alteration and citation omitted)). Here, if Epiq is able to follow through on its threat, LIU likely will have to pay the entire balance of $1.8 million outstanding to Epiq. And to the extent LIU pays those fees, it is likely that LIU will not be able to recover them if the January 13 Order is reversed – either because LIU may have no legal right to reimbursement of defense costs paid erroneously,[6] or because USAG is insolvent and unable to repay

---

[6]     Indiana law governs the insurance contracts, and a federal court has predicted that in Indiana, an insurer has no right to reimbursement of defense costs paid under an erroneous order, absent reservation of that right in the policy. *See Selective Ins. Co. of Am. v. Smiley Body Shop, Inc.,* 260 F. Supp. 3d 1023, 1033 (S.D. Ind. 2017). The states more generally are split on this question. *Compare Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.,* 2 A.3d 526, 529 (Pa. 2010) (holding that, despite a subsequent declaration of no duty to defend, "an insurer is not entitled to be reimbursed for defense costs absent an express provision in the written contract"); *Nat'l Sur. Corp. v. Immunex*

them. LIU would never be able to receive full compensation for its loss. *See, e.g.*, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (holding that an injunction "to preserve the status quo" was appropriate because the insolvency of the party to be collected from would render a legal remedy unavailable); *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents.").

Those fees are only the calculable ones. According to USAG, the abrupt cessation of Epiq's services could have a significant negative impact upon USAG's legal defense of and ability to settle the Nassar-Related Matters.[7] (Ex. B, Schiller Decl. ¶ 15.) Epiq stores and handles over 2.9 million documents. (*Id.*) That information, USAG has said, is used in assessing the claims asserted against it, responding to investigations, and satisfying USAG's legal obligation to preserve evidence for the various litigation matters. (*Id.*) Epiq has not only threatened to disable access to the documents and cease all further work, but also suggested it may delete all of USAG's data. (Ex. A, Levitin Decl. ex. 9.)

Given USAG's own evaluation of the costs of these actions to itself, the actions are likely to cause LIU incalculable financial losses. LIU has consistently paid USAG's current defense costs for the Nassar-Related Matters. If, however, Epiq is permitted to

---

*Corp.*, 297 P.3d 688, 693 (Wash. 2013) (holding to a similar effect and citing cases), *with United Nat'l Ins. Co. v. SST Fitness Corp.,* 309 F.3d 914, 916 (6th Cir. 2002) (under Ohio law, permitting an insurer to seek reimbursement for defense costs when it is determined the insurer has no duty to defend, even if the policy does not contain an express provision regarding reimbursement); *Cincinnati Ins. Co. v. Grand Pointe, LLC,* 501 F. Supp. 2d 1145, 1151 (E.D. Tenn. 2007) (Tennessee law); *Cotter Corp. v. American Empire Surplus Lines Ins. Co.,* 90 P.3d 814 (Colo. 2004) (Colorado law); *Colony Ins. Co. v. G & E Tires & Serv., Inc.,* 777 So. 2d 1034 (Fla. Dist. Ct. App. 2000) (Florida law).

[7] LIU reserves the right to contest any claims of such harm, should USAG raise them in a proceeding against LIU.

carry through its threat to cease all further work, disable access, and possibly delete all of USAG's data, the costs of effective defense may rise significantly and in unpredictable ways across an indefinite period of time. For example, another vendor will need to be hired and any undeleted data will need to be transferred – an expensive and difficult feat. Moreover, inability to settle could unnecessarily prolong the litigation. Irreparable harm, the Second Circuit Court of Appeals has held, may exist where "it would be very difficult to calculate monetary damages" to redress losses arising from an event of "indeterminate" ramifications. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 406 (2d Cir. 2004) ("[I]rreparable harm may be found where damages are difficult to establish and measure."). That principle applies here.

### C.  LIU Is Likely to Succeed on the Merits of Its Claims

The grant of an injunction in this case, simply preserving the status quo ante, would permit the resolution of two substantive issues: whether the dispute over Epiq's compensation should be resolved through arbitration, and the share of that compensation LIU is obliged to pay. On both, LIU's position is likely to prevail.

First, any dispute over LIU's share of the Epiq fees should be resolved through arbitration. The Epiq Agreement has a compulsory arbitration provision. (Ex. A, Levitin Decl. ex. 5, at USAG-LIU002152.) It provides: "Any dispute, controversy, proceeding or claim arising out of or relating to this Agreement, or the Services, including but not limited to any alleged breach shall be settled by mandatory, final and binding arbitration in Kansas City, Missouri[.]" (*Id.* ¶ 22, at USAG-LIU002152.) Under the Federal Arbitration Act ("FAA"), "courts must rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233

(2013) (internal quotation marks omitted). The language of the Epiq Agreement's arbitration clause is unambiguous: *any* dispute, controversy, or claim related to the Agreement – such as the amount each of the insurers is obliged to pay – *shall* be settled by binding arbitration. And even if a reasonable mind could discern some ambiguity in this language, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Just because Epiq provided the contract does not mean it has merely an option to abide by its terms; it is just as bound as the insurers are. To the extent, therefore, that Epiq and the insurers dispute the insurers' relative shares of Epiq's fees, that dispute must be resolved through arbitration.

Second, LIU is also likely to succeed on whether it is liable to pay more than 4% of Epiq's fees. The Epiq Agreement does not specify that the insurers are jointly and severally liable for Epiq's fees. (Ex. A, Levitin Decl. ex. 5.) Nor does it specify at all how Epiq's fees are to be allocated among USAG's insurers. (*Id.*) Indeed, in its response to LIU's Objections to the Bankruptcy Court's Proposed Findings and Conclusions on USAG's Money Judgment Motion, USAG did not offer any argument why LIU should be jointly and severally liable for the entire amount of Epiq's fees. (Dist. Ct. ECF 207, at 25-26.) There is good reason for that: LIU is not jointly and severally liable. Moreover, LIU and the other insurers agreed that LIU would pay 4% of USAG's defense costs, and LIU has duly paid its 4% share. (Ex. A, Levitin Decl. ¶¶ 4-7, 12 & exs. 1-3.) Even Epiq's own records show that almost all of the amount Epiq claims, $1.78 million of the claimed $1.8 million, is owed by National Casualty Company, not LIU. (Ex. A, Levitin Decl. ex. 9 (attachment).) There is no basis for a tribunal to require LIU to pay more, let alone the

entire remainder of Epiq's balance, simply because other insurers unilaterally stopped

paying their shares.

      Thus, an injunction preserving the status quo ante, where Epiq provides its

services to USAG in return for compensation supplied by the insurers, would enable the

contractually mandated arbitration to move forward and provide the opportunity for the

parties to appropriately resolve the nature and scope of the insurers' obligations under

the Epiq Agreement.

      **D.**    **There are Sufficiently Serious Questions Going to the Merits of
LIU's Claims and the Balance of Hardships Weighs Decidedly in
LIU's Favor**

      Even apart from the likelihood of success, the above at the very least shows that

LIU has raised serious questions regarding both the nature and scope of its obligations

and the means of finally determining them. And the balance of hardships tips decidedly

in LIU's favor. *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master*

*Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (commenting that the "serious questions"

standard as an alternative to the likelihood-of-success prong provides "flexibility in the

face of varying factual scenarios and the greater uncertainties inherent" in "particularly

complex litigation").

      As noted above, LIU faces significant harm if Epiq is permitted to carry out its

threat. Without an injunction, LIU will likely have to provide funds that it is not legally

obliged to expend and that it likely will not be able to recoup, and the alleged harm to

USAG's legal defense would likely result in incalculable additional litigation costs that

would not otherwise have been incurred. Meanwhile, for its part, Epiq faces only a

continuation of its current status: provision of services to USAG with an ongoing dispute

over the relative sources of its compensation. This state of things was not unforeseen.

The Epiq Agreement provides a reasonable and well-established mechanism for the resolution of such disputes even while the services are ongoing: arbitration. Epiq has given no indication of irreparable or even substantial harm in the absence of immediate payment of its outstanding balance. As noted, it appears that Epiq's ultimatum may well be the result of an arrangement with USAG to weaken LIU's legal position opposing the Money Judgment Motion.[8] LIU's request for an injunction seeks only to ensure that the parties can reach an orderly resolution of the Epiq compensation dispute according to the terms of the contract that Epiq proposed and signed.

### E. An Injunction Preventing Epiq from Ceasing Its Services Is in the Public Interest

Finally, the public interest weighs in favor of granting an injunction here. It is of course true that the public has an interest in Epiq receiving appropriate compensation for the services it has provided. *See, e.g.*, *Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 178 (S.D.N.Y. 2015) (observing that it is in "the public's interest [to] ensur[e] that workers receive a fair day's pay for a fair day's work" (alteration and internal quotation marks omitted)). But it is equally true that the FAA has long been understood as a supreme statement of the public's interest in the enforcement of arbitration agreements. *See Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 406-07 (2d Cir. 1959). And that interest stems ultimately from a concern to enforce contracts entered into by the consent of the parties. *See, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S.

---

[8] Contemporaneously with this Motion, LIU is filing a motion seeking expedited discovery concerning communications between Epiq and USAG after the Bankruptcy Court issued its Proposed Findings and Conclusions on USAG's Money Judgment Motion. LIU seeks to determine if there were any communications between USAG and Epiq that resulted in their recent demands through an explicit or implicit agreement between them or otherwise.

Ct. 1407, 1415 (2019) (noting that the "foundational FAA principle" is that "arbitration is strictly a matter of consent" (alteration and citations omitted)); *Italian Colors*, 570 U.S. at 233 (observing that the text of the FAA "reflects the overarching principle that arbitration is a matter of contract"). Regardless, then, of the ongoing dispute over the extent of LIU's individual obligations to provide the costs of USAG's defense, there is a well-established public interest in the enforcement of contracts and the facilitation of "efficient, streamlined procedures" for the resolution of such disputes. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). By its threatened actions, Epiq would undermine these interests, disregard the terms of its own contract, and bring substantial harm upon multiple parties.

***

Thus, all of the factors relevant to whether this Court should prevent Epiq from carrying through on its threat substantially favor granting the injunction LIU requests.

### F.    LIU Pledges to Post an Injunction Bond

Under Federal Rule of Civil Procedure 65(c), a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). As the Second Circuit Court of Appeals has explained, "the underlying purpose" of Rule 65(c) is to ensure that "the moving party . . . demonstrate[s] confidence in [its] legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring in part and concurring the judgment)).

LIU here demonstrates confidence in its legal position by pledging to post a bond, obtained from the Ohio Casualty Insurance Company, in the amount of $1.8 million. (Ex. A, Levitin Decl. ¶ 17.)

## IV.   LIU Has Provided Epiq Notice of this Action

Simultaneously with the filing of this Motion, LIU is sending to Mark Euler, Vice President, Legal Services of Epiq, by e-mail copies of this Memorandum of Law, LIU's Notice of Motion for Preliminary Injunction, and the Declarations of Arlene Levitin (Exhibit A) and Ronald P. Schiller (Exhibit B) in Support of the Motion, with accompanying exhibits.

## V.   Conclusion

For the foregoing reasons, LIU respectfully requests that this Court issue an order preliminarily enjoining Epiq from terminating its services on behalf USAG as long as LIU pays its 4% share or unless and until it is determined that LIU owes some other share, and granting any other and further relief that this Court may deem just and proper.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

  _/s/ Ronald P. Schiller_
Ronald P. Schiller (S.D.N.Y. ID No. RS2953)
Matthew A. Hamermesh (_pro hac vice_ forthcoming)
Bonnie M. Hoffman (_pro hac vice_ forthcoming)
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200 (telephone)
(215) 568-0300 (facsimile)
rschiller@hangley.com; mhamermesh@hangley.com;
bhoffman@hangley.com

Dated: November 30, 2020         _Counsel for Liberty Insurance Underwriters Inc._