**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>    Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

## REPLY IN SUPPORT OF DEBTOR'S STAY ENFORCEMENT MOTION

Dated: April 26, 2021

**JENNER & BLOCK LLP**

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
353 N. Clark Street
Chicago, Illinois 60654
Tel: (312) 923-2952
Fax: (312) 840-7352
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com

*Counsel for the Debtor*

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 130 E. Washington Street, Suite 700, Indianapolis, Indiana 46204.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

REPLY ......................................................................................................................2

I.      The Alter Ego Claims Are Estate Property Subject To The Automatic Stay. ....................3

        A.      The Alter Ego Claims Are General Claims, Shared By All Creditors And
                USAG, And Do Not Allege Injuries Unique To Any Single Creditor. ..................3

        B.      Texas Law Governs The Alter Ego Claims And Permits USAG To Assert
                The Alter Ego Claims. ..............................................................................7

II.     The Alter Ego Claims Threaten USAG's Insurance Policies And The Proceeds To Be
        Distributed To Creditors, Violating The Automatic Stay. .................................................11

III.    The Four Plaintiffs' Discovery Directed Against USAG Violates The Automatic Stay...13

IV.     To The Extent The Stay Does Not Automatically Apply, USAG Is Entitled To An
        Injunction Staying The Pre-Petition Lawsuits. ..................................................................18

CONCLUSION...........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re A.G. Fin. Serv. Ctr., Inc.*,
    395 F.3d 410 (7th Cir. 2005) ....................................................................6

*A.H. Robins Co., Inc. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) ..................................................................21

*In re Barlas*,
    05-06861M, 2006 WL 1452806 (Bankr. N.D. Iowa May 19, 2006) .......................13

*Caesar's Ent. Operating Corp. v. BOKF, N.A.*,
    808 F.3d 1186 (7th Cir. 2015) ............................................................3, 19

*In re Capriati Constr. Corp., Inc.*,
    BAP NV-17-1200-BHTA, 2018 WL 1404439 (BAP 9th Cir. Mar. 20, 2018)
    (unpub.) ...................................................................................10

*In re Caesars Ent. Operating Co., Inc.*,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ..........................................19, 21, 22

*Capital Parks, Inc. v. S.E. Advert. & Sales System, Inc.*,
    30 F.3d 627 (5th Cir. 1994) ....................................................................8

*Castleberry v. Branscum*,
    721 S.W.2d 270 (Tex. 1986).............................................................7, 8, 9

*Matter of Chicago, Milwaukee, St. Paul & P. R. Co.*,
    738 F.2d 209 (7th Cir. 1984) .................................................................19

*In re Eagle-Picher Industries, Inc.*,
    963 F.2d 855 (6th Cir. 1992) .................................................................21

*In re Ellis*,
    10-16998-AJM-7A, 2011 WL 5147551 (Bankr. S.D. Ind. Oct. 27, 2011)..............10

*Fisher v. Apostolou*,
    155 F.3d 876 (7th Cir. 1998) .................................................................19

*Home Ins. Co. v. Cooper & Cooper, Ltd.*,
    889 F.2d 746 (7th Cir. 1989) .................................................................12

*Hubbard Mfg. Co., Inc. v. Greeson*,
    515 N.E.2d 1071 (Ind. 1987) ................................................................10

*Hughes v. Cuna Mutual Group*,
    257 F.R.D. 176 (S.D. Ind. 2009) .................................................16

*In re Jefferson County, Ala.*,
    491 B.R. 277 (Bankr. N.D. Ala. 2013) ...................................14, 17

*Johns-Manville Corp. v. The Abestos Lit. Grp. (In re Johns-Manville Corp.)*,
    40 B.R. 219 (S.D.N.Y. 1984) ....................................................14

*In re Klarchek*,
    508 B.R. 386 (Bankr. N.D. Ill. 2014) ........................................12

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ....................................................................19

*In re Lee*,
    524 B.R. 798 (Bankr. S.D. Ind. 2014) .......................................10

*In re Lyondell Chem. Co.*,
    402 B.R. 571 (Bankr. S.D.N.Y. 2009) .......................................21

*In re Manley Toys Ltd.*,
    16-15374 (JNP), 2018 WL 1071167 (Bankr. D.N.J. Feb. 23, 2018) .................13

*In re Marrs-Winn Co., Inc.*,
    103 F.3d 584 (7th Cir. 1996) .....................................................10

*In re Moore*,
    608 F.3d 253 (5th Cir. 2010) .......................................................8

*Nat'l Tax Credit Partners, L.P. v. Havlik*,
    20 F.3d 705 (7th Cir. 1994) .........................................................6

*Norton Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    39 B.R. 659 (S.D.N.Y. 1984) ....................................................14

*Occidental Chem. Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    41 B.R. 926 (S.D.N.Y. 1984) ....................................................14

*In re OGA Charters, L.L.C.*,
    901 F.3d 599 (5th Cir. 2018) .....................................................12

*In re Packer*,
    816 F.3d 87 (5th Cir. 2016) .........................................................8

*Matter of Perkins*,
    902 F.2d 1254 (7th Cir. 1990) .....................................................6

*In re Philadelphia Newspapers, LLC,*
    407 B.R. 606 (E.D. Pa. 2009) ...........................................................................14

*In re Purdue Pharm. L.P.,*
    619 B.R. 38 (S.D.N.Y. 2020) .....................................................................19, 21

*In re Schimmelpenninck,*
    183 F.3d 347 (5th Cir. 1999) ....................................................................4, 8, 9

*Matter of S.I. Acquisition, Inc.,*
    817 F.2d 1142 (5th Cir. 1987) ............................................................................8

*In re Stinnett,*
    465 F.3d 309 (7th Cir. 2006) ...........................................................................12

*Winter v. Nat. Resources Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................................19

## STATUTES & REGULATIONS

11 U.S.C. §105(a) .................................................................................................19, 20

11 U.S.C. §362(a)(1) ....................................................................................................13

11 U.S.C. §362(a)(3) .................................................................................................6, 13

11 U.S.C. §541(a) .......................................................................................................9, 12

45 C.F.R. §164.502(a) ..................................................................................................15

Cal. Civ. Code Ann. §56.10 .........................................................................................15

Cal. Penal Code Ann. §11167.5 ...................................................................................15

Ind. Code Ann. §31-33-18-1 ........................................................................................15

Mich. Comp. Laws Ann. §722.627 ..............................................................................15

USA Gymnastics, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Debtor**" or "**USAG**"), files this omnibus reply in response to *The Additional Tort Claimants Committee Of Sexual Abuse Survivors' (A) Objection To Debtor's Motion To Enforce The Stay And (B) Support Of Certain Survivors' Motion For (I) Determination Of Scope Of Automatic Stay, (II) Stay Relief, Or (III) Injunction Against Interference With Plaintiffs' Legitimate Discovery* [Dkt. 1473] (the "**Comm. Obj.**") and the *Certain Survivors' Objection To USAG's Motion To Enforce The Automatic Stay* [Dkt. 1476] (the "**Pl. Obj.**" and together with the Comm. Obj, the "**Objections**").[1] In support of this Reply, USAG submits the Declaration of Christopher J. Schneider (the "**Schneider Decl**."), attached as <u>Exhibit A</u>, and respectfully states as follows:

## INTRODUCTION

1.      Of the 510 sexual abuse claimants who asserted timely claims in this case, 506 claimants have chosen to remain parties to the §105 Injunction and to await the outcome of the ongoing mediated negotiations between USAG, the USOPC, their respective insurers, and the Survivors' Committee. The Four Plaintiffs are outliers. They alone have decided to remove themselves from that process—concluding that settlement discussions should end now, not in a few more months, but *now*. And it is only the Four Plaintiffs that have returned to non-bankruptcy courts even though the allegations in their Pre-Petition Lawsuits, if true, would give every other USAG creditor and USAG itself reason to sue the USOPC for its alleged misconduct as USAG's alter ego.

---

[1]      Capitalized terms used herein but not defined shall have the meaning given to them in the *Debtor's Motion To Enforce The Automatic Stay* [Dkt. 1459] (the "**Stay Enforcement Motion**" or "**USAG Mot.**") and the *Debtor's Objection To Four Plaintiffs' Stay Relief Motion* [Dkt. 1474] (the "**Stay Relief Objection**" or "**USAG Obj.**").

2.     The Objections filed by the Four Plaintiffs and the Survivors' Committee offer no reason why the Four Plaintiffs alone should have the right to re-commence litigation against the USOPC, and to seek USAG documents, while settlement negotiations continue in earnest. On the other hand, the Objectors also ignore the harm that will come to USAG if it does not control the estate's claims against the USOPC as it works towards a mediated resolution of all survivors' claims or if other claimants follow the Four Plaintiffs' example and re-commence their own suits. Inevitably, if the Four Plaintiffs are permitted to proceed, other survivors may feel compelled to follow. That will embroil USAG in costly litigation in multiple fora—re-creating the litigation burden that caused USAG to file this chapter 11 case in the first place. It will also make a comprehensive settlement even more difficult to reach by forcing key stakeholders back into adversarial, litigation postures, and by generating even more indemnification and insurance-based claims against USAG's estate that will increase the amount the insurers will have to contribute to resolve all claims.

3.     The Court should not countenance this disruption in the path to a global settlement and resolution of this case. It should enforce the stay and prohibit the Four Plaintiffs from continuing to prosecute their Pre-Petition Lawsuits, including any discovery served in those lawsuits.

**REPLY**

4.     The Four Plaintiffs and the Survivors' Committee make four principal arguments in their Objections. ***First***, they argue that the Alter Ego Claims are not estate claims because they are not general claims that applicable state law permits USAG to assert for the benefit of its estate and entire creditor body, rather than just for the benefit of the Four Plaintiffs. ***Second***, they assert that continued prosecution of the Alter Ego Claims does not threaten USAG's insurance assets. ***Third***, they claim, on their own say-so, that their requested discovery will not actually burden

USAG or impair its restructuring. **Fourth**, they misconstrue clearly applicable Seventh Circuit law governing §105(a) injunctions to contend that USAG is not entitled to an injunction staying their Pre-Petition Lawsuits, and the discovery served therein. *See Caesar's Ent. Operating Corp. v. BOKF, N.A.*, 808 F.3d 1186 (7th Cir. 2015). None of these arguments has merit. And to the extent any argument raises disputed issues of fact, USAG will submit testimony at the hearing on this matter, including testimony showing the harm that continued prosecution of the Alter Ego Claims will cause to USAG and its restructuring.

## I.     The Alter Ego Claims Are Estate Property Subject To The Automatic Stay.

### A.     The Alter Ego Claims Are General Claims, Shared By All Creditors And USAG, And Do Not Allege Injuries Unique To Any Single Creditor.

5.     The Objectors assert in conclusory fashion that the Alter Ego Claims are not estate property because they are not general claims. As USAG argued previously, this argument is contradicted by the actual allegations the Four Plaintiffs pled in their complaints. (*See* USAG Mot. ¶¶38-39; USAG Obj., at 5-10.) The Four Plaintiffs' objection makes USAG's point even clearer. Their objection highlights that the Alter Ego Claims arise because the USOPC "controlled child-safety policymaking of USAG," "prevented USAG from adopting more child protective athlete safety policies," "caused USAG to conceal reports of sex abuse," and "had a direct hand in causing sex abuse to go undetected at USAG for decades." (Pl. Obj. ¶41.)

6.     The Four Plaintiffs do not explain how these allegations, if true, caused harm only to the Four Plaintiffs and not to anybody else. They cannot do so since every other sexual abuse claimant would be able to assert that her abuse might not have happened but for the USOPC's alleged acts that interfered in USAG's operations, impaired USAG's ability to guard against abuse, and forced USAG to conceal, rather than report, any abuse that occurred—increasing the risk of harm to each and every sexual abuse claimant in addition to the Four Plaintiffs, and ultimately

causing their injuries. The Four Plaintiffs' repeated assertion that the Alter Ego Claims are specific claims rather than general claims does not make them so; instead, the Four Plaintiffs' actual allegations control, and those allegations could be asserted in common by all other creditors in addition to the Four Plaintiffs. *See In re Schimmelpenninck*, 183 F.3d 347, 359 (5th Cir. 1999) (a debtor has the exclusive right to control a cause of action that asserts a "generalized grievance" by all creditors).

7.        For its part, the Survivors' Committee asserts that the Alter Ego Claims are not estate property because they are "unique to survivors of sexual abuse." (Comm. Obj. ¶9.) But that is a non-sequitur. If the Alter Ego Claims could be asserted by all 500 plus "survivors of sexual abuse," as the Survivors' Committee concedes (*id.*), then they are not "unique" to any single creditor, do not "accrue[] *individually* to a claimant," and therefore vest in the Debtor's control as estate property. *Koch*, 831 F.2d at 1349 (emphasis added); *see also Schimmelpenninck*, 183 F.3d at 360 (personal claims are limited to those "[a]ctions by individual creditors that *affect only that creditor* personally") (emphasis added).

8.        The Survivors' Committee tries to salvage the argument by asserting that the Alter Ego Claims could not be asserted by trade creditors or USAG itself, which purportedly means they are not general claims. (Comm. Obj. ¶¶8-9.) As USAG has explained previously (USAG Obj., at 6-7), this argument is inaccurate. For starters, this case is not about the trade creditors. This is a mass tort chapter 11 case where the only liabilities material to USAG's restructuring are the sexual abuse liabilities and where continued prosecution of the Alter Ego Claims would directly impede the Debtor's efforts to reach a global settlement with all stakeholders, including the USOPC, to resolve the sexual abuse claims for the benefit of the estate on the whole. Moreover, if the Four Plaintiffs' allegations are true, trade creditors and USAG also suffered injuries as a result of the

USOPC's alleged alter ego misconduct because it increased the risk of sexual abuse and led to the mass tort litigation and this chapter 11 case, the costs of which USAG's insurers have not agreed to reimburse.

9.     Similarly, both the Four Plaintiffs and the Survivors' Committee wrongly argue that the Alter Ego Claims are not general claims because some of the alter ego allegations pertain specifically to USAG's elite program, which purportedly involved only a "small number" of survivors other than the Four Plaintiffs. (Pl. Obj. ¶41; Comm. Obj. ¶9.) To the contrary, there are at least 70 sexual abuse claimants alleging abuse at the Olympics, the Olympic Trials, the Karolyi Ranch, or some other location connected to USAG's elite program. (USAG Obj., at 8-9.) If, as the Four Plaintiffs and the Survivors' Committee suggest, all of these 70 elite sexual abuse claimants could assert the Alter Ego Claims, then the alleged alter ego misconduct inflicted harm on at least that many creditors in a common manner—not on a single creditor who would be the "*only* injured person" holding the claim. (Pl. Obj. ¶39 (emphasis added).) Put differently, as the Four Plaintiffs quote from *Koch*, a claim is held personally by a claimant only when the "'claimant [herself] is harmed and *no other* claimant or creditor has an interest in the cause.'" (*Id.* (quoting *Koch*, 831 F.2d at 1349) (emphasis added).) The fact that 70 elite sexual abuse claimants at a minimum hold the Alter Ego Claims destroys the Objectors' argument that the Alter Ego Claims are personal claims, not general claims.

10.     Even then, the focus on the elite program is a red herring. The Four Plaintiffs' other alter ego allegations go far beyond the USOPC's alleged misconduct with respect to the elite program. As noted, those allegations generally assert that the USOPC increased the risk that all athletes and other individuals would suffer harm after coming into contact with the abusers, including Nassar, who volunteered for USAG. The USOPC purportedly did so by "co-opt[ing]

USAG's entire organization" and "affirmatively interfer[ing] with USAG's efforts" to limit the risk of sexual abuse. (USAG Mot., Ex. H, ¶122(n); Pl. Obj. ¶41.) Importantly, the Four Plaintiffs concede that an alter ego claim is held in common by all creditors and is a general claim if it arises from injuries inflicted upon "all creditors of the corporation without regard to the personal dealings between [the alter ego entity] and such creditors." (Pl. Obj. ¶39; *see also* Comm. Obj. ¶10.) The Four Plaintiffs' alter ego allegations assert these common injuries by pleading first that the USOPC interfered with USAG's ability to protect individuals from abuse, which then indirectly, eventually, and allegedly caused harm to every sexual abuse claimant (by increasing the likelihood of sexual abuse), to every trade creditor (by causing this chapter 11 case and the impairment of trade creditors' general unsecured claims), and to USAG itself (by generating the mass tort litigation leading to this chapter 11 case, the costs of which USAG's insurers have not reimbursed).

11. Because the Alter Ego Claims arise from allegations of harm that could be asserted by all sexual abuse claimants, by all of USAG's trade creditors, and by USAG itself, the Alter Ego Claims are estate property. The Four Plaintiffs' continued prosecution of the Pre-Petition Lawsuits therefore is an act to exercise control over estate property in violation of 11 U.S.C. §362(a)(3). The Four Plaintiffs feign ignorance as to "what property interest . . . USAG claims is at issue." (Pl. Obj. ¶6 n.3.) But it is beyond dispute that a "debtor's choses in action" are "assets of the estate" under controlling Seventh Circuit law, meaning the Four Plaintiffs' attempts to control the Alter Ego Claims violates the stay. *In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 415 (7th Cir. 2005); *accord Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994).

12. Finally, it is telling that the Survivors' Committee suggests that the Court grant the Four Plaintiffs derivative standing to assert the Alter Ego Claims. (Comm. Obj. ¶11.) That presumes estate causes of action are at issue, which are "vested exclusively" in USAG's control

as debtor in possession. *Matter of Perkins*, 902 F.2d 1254, 1257 (7th Cir. 1990). The Court may "divest" USAG of that "exclusive authority only in narrow circumstances," namely upon proof by the Four Plaintiffs that USAG "unjustifiably refuse[d] a demand to pursue" the cause of action and the cause of action is "colorable." *Id.* at 1258. Granting derivative standing here would be entirely inappropriate given the Four Plaintiffs' failure to demand that USAG prosecute the Alter Ego Claims, to bring a standing motion, and to submit proof on the derivative standing factors, and USAG reserves all rights to respond in full to any standing motion eventually filed by the Four Plaintiffs.

**B.    Texas Law Governs The Alter Ego Claims And Permits USAG To Assert The Alter Ego Claims.**

13.    The Four Plaintiffs' next argument is that applicable state law does not permit USAG to assert the Alter Ego Claims. Tellingly, the Survivors' Committee does not join this argument. (*See generally* Comm. Obj.) As USAG has already explained, the law of the state of USAG's incorporation (Texas) determines whether USAG can assert the Alter Ego Claims. (USAG Mot. ¶¶40-43; USAG Obj., at 11-13.) Texas law authorizes USAG to do so, as do the laws of Indiana, California, and Illinois, which the Four Plaintiffs incorrectly offer as alternatives to Texas law. (USAG Mot. ¶¶41-46; USAG Obj., at 13-15.)

14.    The Four Plaintiffs make two points in response, neither of which has merit. First, they contend that Texas law would not permit USAG to assert the Alter Ego Claims because Texas purportedly only allows corporations to pierce their own corporate veils on a "general alter ego theory," as opposed to a "sham-to-perpetrate-a-fraud theory," and the Four Plaintiffs' allegations purportedly only qualify as the latter. (Pl. Obj. ¶¶37-38.) The Four Plaintiffs describe a general alter ego claim as one arising from allegations that "a corporation is organized and operated as a mere tool or business conduit of another corporation," whereas the "sham" theory alleges that a

corporation's control person used the corporation to perpetrate a fraud on a victim. *Castleberry v. Branscum*, 721 S.W.2d 270, 272-73 (Tex. 1986). Critically, *Castleberry* never discussed whether corporations have standing to pierce their own corporate veils or assert alter ego claims, much less held that they lack standing on one theory or another; instead, the case merely explained the various different instances in which Texas courts will pierce the veils of Texas corporations. In addition, the case has been overruled, *see Capital Parks, Inc. v. S.E. Advert. & Sales System, Inc.*, 30 F.3d 627, 630 n.2 (5th Cir. 1994), making it a weak reed upon which to contest the numerous Fifth Circuit decisions interpreting Texas law to permit debtors to assert alter ego claims for the benefit of creditors, *see, e.g., Schimmelpenninck*, 183 F.3d at 355; *In re Packer*, 816 F.3d 87, 92 (5th Cir. 2016); *In re Moore*, 608 F.3d 253, 258-59 (5th Cir. 2010); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152-53 (5th Cir. 1987). The Four Plaintiffs ignore these controlling cases that address the issue head on and all of which stand for the proposition that USAG can bring the Alter Ego Claims.

15.    In any event, the distinction the Four Plaintiffs draw does not help them. Once again, the Four Plaintiffs' factual allegations contradict their arguments. The Four Plaintiffs' Alter Ego Claims, as pled, sound just like the "general alter ego theory" that the Four Plaintiffs admit a Texas corporation has standing to assert. (Pl. Obj. ¶38.) Again, the Four Plaintiffs characterize this theory as seeking recovery when a "'corporation is organized and operated as a mere tool or business conduit of another corporation.'" (Pl. Obj. ¶37 (quoting *Castleberry*, 721 S.W.2d at 272).) Here, the Four Plaintiffs have alleged, among other things:

- "USOPC used USAG as a *mere conduit* for fulfilling USOPC's statutory responsibility of organizing and controlling the women's gymnastics team for the Olympic and Pan American Games." (Schwikert-Warren Second Am. Compl., Dkt. 1459, Ex. H, ¶122(n) (emphasis added).)

- "USOPC used USAG as a *conduit* for its own affairs at the elite level and became the primary source of funding for such program." (*Id.* ¶122(b) (emphasis added).)

- USOPC "*co-opted USAG's entire organization* to enable USOPC to fulfill its statutory responsibilities, without adequately capitalizing USAG's programs to protect the athletes and detect, prosecute, discipline, and investigate child abusers." (*Id.* ¶122(n) (emphasis added).)

- "USOPC used USAG to procure labor, services, and merchandise for its own use." (*Id.* ¶122(o).)

- "USOPC and USAG used the same employees, volunteers, and agents," including "Marta and Bela Karolyi, Dr. Nassar, Debbie Van Horn, and John Geddert." (*Id.* ¶122(a).)

- "USOPC and USAG commingled funds….The primary source of funding for USAG's elite program, in which [the Four Plaintiffs participated], came from USOPC because the elite program served the interests of USOPC in fulfilling USOPC's statutory responsibility and exclusive jurisdiction of organizing, financing, and controlling representation for Team USA and obtaining such representation." (*Id.* ¶122(b), (h).)

- "USOPC manipulated USAG in order to concentrate all the assets in its own form—including sponsorships and broadcast rights from USAG's athletes and activities—without voluntarily accepting the liabilities associated with USAG's activities performed at USOPC's direction. (*Id.* ¶122(p).)

- USOPC's "overall control and supervision of national governing bodies like USAG, and the steps USOPC took to frustrate any effort by USAG to protect the minors in its care from sex abuse, together make it responsible by law, as alter ego or otherwise, for the actions of USAG." (*Id.* ¶120.)

These allegations show that the Four Plaintiffs are asserting a "general alter-ego claim," as they characterize *Castleberry*. Thus, under the Four Plaintiffs' own reading of Texas law, then, USAG has standing to assert the Alter Ego Claims because they seek redress for injuries allegedly caused by the USOPC's misuse of USAG as the USOPC's mere "conduit." *See also Schimmelpennick*, 183 F.3d at 359 (Texas law permits debtors to assert any creditor claims that seek recovery for "generalized grievance[s]" suffered by the creditor class).

16.    Next, the Four Plaintiffs argue that Indiana's choice of law rules require the application of California law to the Alter Ego Claims because the Four Plaintiffs allege abuse in California. (Pl. Obj. ¶36.) Not so. The issue is not what law governs the merits of the Four

Plaintiffs' direct liability and vicarious liability tort claims, but whether the Alter Ego Claims are property of USAG's estate under 11 U.S.C. §541(a). That inquiry is a question of federal law, preempting anything to the contrary in the state choice of law rules cited by the Four Plaintiffs. *In re Marrs-Winn Co., Inc.*, 103 F.3d 584, 591 (7th Cir. 1996); *In re Ellis*, 10-16998-AJM-7A, 2011 WL 5147551, at *2 (Bankr. S.D. Ind. Oct. 27, 2011); *In re Lee*, 524 B.R. 798, 802 (Bankr. S.D. Ind. 2014). And federal bankruptcy law is clear that the law of a debtor's state of incorporation controls whether a debtor has standing to assert an alter ego claim arising from the misuse of its corporate form. *See, e.g., In re Capriati Constr. Corp., Inc.*, BAP NV-17-1200-BHTA, 2018 WL 1404439, at *6 (BAP 9th Cir. Mar. 20, 2018) (unpub.) (collecting cases).

17.     The Four Plaintiffs respond that the Alter Ego Claims are really only "an additional remedy for a tort victim" and not "a separate cause of action," which purportedly permits them to disregard the law of Texas as USAG's state of incorporation, smuggle in Indiana's choice of law rules, and conclude that California law governs the Alter Ego Claims. (Pl. Obj. ¶36.) In the next breath, though, the Four Plaintiffs admit that the Alter Ego Claims are "an alternative theory of *liability*" on their tort claims. (*Id.* ¶41 (emphasis added).) The Four Plaintiffs' supposed (and illusory) distinction between theories of liability and remedies therefore has no bearing here. And, regardless, even if Indiana choice of law rules somehow applied, California law still would not govern. That is because the Alter Ego Claims allege harm to USAG as a Texas organization and "USAG's operations" at USAG's headquarters in Indiana (USAG Mot., Ex. H, ¶123(b)), which alter ego misconduct only then indirectly caused harm to all of USAG's sexual abuse claimants and other creditors "around the world" (Pl. Obj. ¶36), not simply in California. *See Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1074 (Ind. 1987) (in choice of law analysis, looking to "the

place where the conduct" occurred that gave rise to the specific claim and to where defendant was incorporated).

18.    Accordingly, the Court should reject the Four Plaintiffs' arguments contesting the state law applicable to the Alter Ego Claims and should hold that USAG has standing to assert the Alter Ego Claims under the law of Texas, its state of incorporation.

## II.    The Alter Ego Claims Threaten USAG's Insurance Policies And The Proceeds To Be Distributed To Creditors, Violating The Automatic Stay.

19.    The Objectors next contend that the continued prosecution of the Alter Ego Claims and Pre-Petition Lawsuits cannot threaten to control property of the estate or constitute an action against the Debtor because the Pre-Petition Lawsuits do not risk diminishing estate assets. (Pl. Obj. ¶¶28-32; Comm. Obj. ¶¶15-18.) But they ignore the proof of claim that the USOPC has filed in this case. That claim clearly asserts that "the USOPC is insured as an additional insured under USAG's insurance policies." (USAG Mot., Ex. M, at 4 n.14.) The claim further states that the USOPC "assert[s] contingent and unliquidated unsecured claims for contribution and indemnification, to the extent that the USOPC Parties suffer losses" in the Four Plaintiffs' Pre-Petition Lawsuits, which are specifically identified on the exhibits to the claim. (*Id.* at 4; *see also id.* Litigations Sch., Ex. D, at 3.) Accordingly, regardless of whether the Four Plaintiffs will directly assert a claim against USAG's insurance policies, the USOPC has already done so. And the amount of that claim will only increase as the Four Plaintiffs cause the USOPC to incur costs in connection with the Pre-Petition Lawsuits and if the Four Plaintiffs prevail in those suits.

20.    The Objectors then argue that USAG's insurance policies are not threatened because the "policies are no aggregate policies and do not cap defense costs." (Comm. Obj. ¶17; Pl. Obj. ¶27.) This purportedly means that the Pre-Petition Lawsuits "will have no impact on the final pool of insurance proceeds to be distributed to the creditors." (*Id.* ¶27.) Wrong. Nobody

disputes that, to date, the insurers have not offered a settlement amount acceptable to all parties in interest to resolve the various claims against USAG, including the claims asserted by the sexual abuse claimants and by the USOPC. Continuing to prosecute the Pre-Petition Lawsuits, as noted, will only increase the size of the claims the USOPC asserts against USAG and its insurers. That means the insurers will have to offer an even larger amount to the USOPC in order to settle its own claims in this case, even while the insurers' global settlement offers to date have been insufficient. So, even assuming as a policy matter that the Pre-Petition Lawsuits would not exhaust USAG's insurance coverage, their continued prosecution would control property of the estate by increasing the claims against the limited pool of funds that the insurers are practically and realistically willing to offer as a global settlement, impeding USAG's efforts to resolve this case for the benefit of all creditors.

21.    For this reason as well, the rationale of *In re OGA Charters, L.L.C.*, 901 F.3d 599 (5th Cir. 2018) applies here, despite the Four Plaintiffs' argument to the contrary (Pl. Obj. ¶32.) A debtor has "an equitable interest . . . in having [insurance] proceeds applied to satisfy as much of [the debtor's] claims as possible," which equitable interest qualifies as estate property under §541(a). *Id.* at 604. As a result, the bankruptcy court has the authority to "marshal[] the insurance proceeds, and, along with the other assets, arrang[e] for their distribution so as to maximize their ability both to satisfy legitimate creditor claims and to preserve the debtor's estate." *Id.* at 604-05; *accord In re Stinnett*, 465 F.3d 309, 312 (7th Cir. 2006); *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 748 (7th Cir. 1989); *In re Klarchek*, 508 B.R. 386, 395 (Bankr. N.D. Ill. 2014). Here, the Four Plaintiffs threaten the Court's ability to oversee an equitable distribution of insurance proceeds by prosecuting the Pre-Petition Lawsuits that will increase the USOPC's claims against the limited pool of insurance proceeds and diluting recoveries for all other creditors.

22.     Finally, the Objectors ignore that USAG's insurers have collectively resisted USAG's attempts to demand reimbursement of defense costs. By way of example, the District Court adopted this Court's recommended order that LIU reimburse USAG for defense costs in *January 2020*, and LIU has still failed to pay USAG the amounts due. (Dist. Ct. No. 18-CV-1306, Dkt. 146.) USAG is likewise in litigation with its other insurers before the District Court over defense fees incurred in this Bankruptcy Case. The notion that USAG's insurers will simply rubber stamp costs of defense defies the reality of this case.

23.     For these reasons, the Four Plaintiffs' Pre-Petition Lawsuits directly threaten USAG's property interests in its insurance policies, which are the only material asset available to satisfy sexual abuse claims and resolve this chapter 11 case. The Pre-Petition Lawsuits are therefore stayed. *See* 11 U.S.C. §§362(a)(1), (a)(3).

## III.    The Four Plaintiffs' Discovery Directed Against USAG Violates The Automatic Stay.

24.     The Objectors offer no meritorious argument for why the discovery served in the Pre-Petition Lawsuits is not subject to the automatic stay.

25.     They first contend that the automatic stay categorically does not apply to discovery served in litigation involving third parties in addition to a debtor. (Pl. Obj. ¶¶15-20; Comm. Obj. ¶13.) But none of their cases cited in support of this position held as much. As with the cases the Four Plaintiffs originally cited in their stay relief motion (*see* USAG Obj., at 23-24), the cases cited in the Objections rejected a debtor's automatic stay arguments when there was *no record* establishing, as is the case here, that forcing the debtor to comply with the discovery would unduly burden the debtor, dilute estate assets, and impair progress towards resolving the bankruptcy case. *See, e.g., In re Manley Toys Ltd.*, 16-15374 (JNP), 2018 WL 1071167, at *5 (Bankr. D.N.J. Feb. 23, 2018) (no discussion of whether discovery would burden chapter 15 debtor, including because discovery had not yet been served); *In re Barlas*, 05-06861M, 2006 WL 1452806, at *2-3 (Bankr.

N.D. Iowa May 19, 2006) (permitting single deposition of individual chapter 7 debtor on claims asserted solely against third party, without discussion of any burden on debtor, and where debtor had already received discharge and was not reorganizing).

26.     Similarly, in other cases cited by the Four Plaintiffs, the courts granted litigants relief from the stay to prosecute their discovery—which necessarily assumes that the stay applied in the first instance—because the debtors made "no showing" that the discovery would unduly burden their estates. *Norton Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 39 B.R. 659, 662 (S.D.N.Y. 1984) ("no showing has been made that [discovery] expenditures would imperil the reorganization or the interests of Manville's creditors" because "Manville is a giant corporation of vast resources"); *see also Occidental Chem. Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 41 B.R. 926, 932 (S.D.N.Y. 1984).[2]

27.     Here, that evidentiary record exists. In a sworn affidavit, USAG's Chief Legal Officer testified that, if the Four Plaintiffs' discovery is not stayed, USAG's professionals will have to review over 1.3 million documents for privileged and individuals' private information at a cost estimated to exceed $3.5 million. (USAG Mot., Ex. B, ¶¶5-7.) USAG's insurers either have refused to reimburse such costs, or have not expressly agreed to reimburse them. (*Id.* ¶7.) Further,

---

[2]     The Four Plaintiffs incorrectly assert that these two cases arising out of the Johns-Manville bankruptcy overruled an earlier decision in the case (*Johns-Manville Corp. v. The Abestos Lit. Grp. (In re Johns-Manville Corp.)*, 40 B.R. 219 (S.D.N.Y. 1984) ("**Manville I**")), which USAG cited in its Stay Enforcement Motion. Because the Four Plaintiffs' cases granted *relief* from the stay, they in no way contradict *Manville I*'s holding that the stay applies, in the first instance, to discovery that would "have a serious adverse impact upon [a debtor's] reorganization proceedings." *Manville I*, 40 B.R. at 223; *see also id.* at 225 ("the court below was fully justified in protecting the debtor for a reasonable time from the attempts to remove the stay"). The Four Plaintiffs also conspicuously ignore other cases cited by USAG that held that §362 stays discovery that impairs a debtor's restructuring efforts. *See, e.g., In re Jefferson County, Ala.*, 491 B.R. 277, 290 (Bankr. N.D. Ala. 2013) (collecting cases); *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 615-16 (E.D. Pa. 2009).

the Court can take note that the insurers have not paid Epiq all that it is owed to date and currently are embroiled in a dispute between themselves about Epiq's bills.

28.     Most importantly, USAG did not conjure these estimated expenses out of thin air. Its e-discovery vendor Epiq—which this Court has already determined charges "reasonable" fees (Adv. No. 19-50012, Dkt. 496, at 40)—drafted a cost estimate after USAG learned that the Four Plaintiffs were prosecuting their discovery demands involving Ropes & Gray. (*See* Epiq Costs Estimates, attached as <u>Exhibit B</u> and <u>Exhibit C</u>.) The Four Plaintiffs dispute this estimate on the basis that it is too high for a privilege review, but they ignore that the most significant expense in producing documents from the Ropes & Gray production will be the necessary review and redaction of each of the 1.3 million documents for confidential personal and medical information. USAG will submit evidence at the hearing on this matter substantiating Epiq's cost estimate, including through further testimony by USAG's CLO. As a result, the record does (and will) rebut the Objectors' assertions in their briefing that USAG's estimates are inaccurate. (Pl. Obj. ¶26; Comm. Obj. ¶14.)

29.     This Court previously denied the Survivors' Committee's Rule 2004 request for the Ropes & Gray documents (Dkt. 591), and the Four Plaintiffs are also wrong to assert that the Court should reverse course now. (Pl. Obj. ¶¶21-26.) As USAG argued in its opposition to the 2019 Rule 2004 motion (*see* Dkt. 562 at 18-19) and again here, the burden of producing the Ropes & Gray documents is excessive. The Four Plaintiffs suggest that this Court should ignore this costly burden because USAG purportedly has no right to review the documents for private and privileged information. But this argument not only ignores the rights of individuals named in those documents to privacy, it also ignores the context in which USAG produced the documents to Ropes & Gray in the first place.

30.    *First*, applicable law makes clear that individuals have a right to confidentiality in many of these documents, including with respect to reports of sexual abuse and their private health information. *See, e.g.,* Ind. Code Ann. §31-33-18-1 (reports of sexual abuse under Indiana law are "confidential"); Cal. Penal Code Ann. §11167.5 (reports of sexual abuse and emotional abuse under California law "shall be confidential"); Mich. Comp. Laws Ann. §722.627 (reports of sexual abuse under Michigan law are "confidential record[s]"); 45 C.F.R. §164.502(a) (entities subject to HIPAA "may not use or disclose protected health information"); Cal. Civ. Code Ann. §56.10 (generally prohibiting the disclosure of "medical information" without individual's consent). Because of these confidentiality requirements, and because the Ropes & Gray documents include "highly personal information about other individuals" that is "not reasonably likely to lead to the discovery of admissible information" in the Four Plaintiffs' Pre-Petition Lawsuits, USAG is obligated to redact all such information before Ropes & Gray produces documents to the Four Plaintiffs. *Hughes v. Cuna Mutual Group*, 257 F.R.D. 176, 180-81 (S.D. Ind. 2009). The Four Plaintiffs are therefore wrong to assert that USAG would not need to incur the $3.5 million in costs if the discovery in the Pre-Petition Lawsuits is not stayed.

31.    *Second*, USAG did not voluntarily produce these files to Ropes & Gray in unredacted form. The USOPC, not USAG, commissioned Ropes & Gray to complete its report concerning Nassar's criminal conduct. The USOPC then compelled USAG to immediately produce documents requested by Ropes & Gray in unredacted form, threatening USAG with de-certification as the national governing body for gymnastics if USAG did not comply. USAG complied with the USOPC's order only after first objecting to the USOPC's demands and only after obtaining Ropes & Gray's agreement to hold all documents in strict confidentiality and only

for the purpose of an investigation—not a litigation in federal court. USAG has the right to conduct

a privilege review before Ropes & Gray produces any documents to the Four Plaintiffs.

32.     Further, these anticipated costs are not the universe of costs USAG will incur if the

Four Plaintiffs are permitted to continue prosecuting their Pre-Petition Lawsuits. The USOPC has

made clear it will serve discovery on USAG if the Pre-Petition Lawsuits are not stayed. The

USOPC asserts that USAG's conduct is "necessarily at the center" of all the Four Plaintiffs' claims

in the Pre-Petition Lawsuits. (USOPC Resp., Dkt. 1475, ¶2.) If the Pre-Petition Lawsuits proceed,

then, the USOPC will demand "substantive discovery from USAG concerning *all* facets of its

involvement in, and potential culpability for, the alleged [alter ego and sexual abuse] misconduct."

(*Id.* ¶4 (emphasis added).) This includes discovery pertaining to "USAG's role in controlling and

managing Nassar [and other abusers], as well as USAG's relationship with the Plaintiffs, and its

involvement in the circumstances under which Plaintiffs were abused." (*Id.* ¶¶5-6.)

33.     The USOPC therefore threatens USAG with additional, and even more substantial,

discovery burdens if the Four Plaintiffs are permitted to continue prosecuting the Pre-Petition

Lawsuits. The USOPC discovery will extend far beyond a privilege and privacy review of

documents to be produced by a third party. It will demand that USAG collect and review

documents pertaining to all substantive issues in the Pre-Petition Lawsuits, conduct an additional

privilege and privacy review of any documents that do not overlap with any documents held by

Ropes & Gray, and then respond to inevitable discovery disputes with the USOPC and the Four

Plaintiffs. The costs of compliance with this discovery will extend far and beyond the $3.5 million

USAG currently estimates with respect to the Ropes & Gray discovery. That burden on USAG

and its estate cannot be countenanced. *See In re Jefferson County, Ala.*, 491 B.R. 277, 292 (Bankr.

N.D. Ala. 2013) (holding that plaintiff's discovery was subject to automatic stay because, if

plaintiff was allowed to proceed, another party "anticipate[d] undertaking much broader discovery," ratcheting up the burden on the debtor and its estate).

34.      The discovery served in the Pre-Petition Lawsuits therefore independently violates the stay. Indeed, as the USOPC recognizes, if the discovery is permitted to proceed, it will be "simply impossible" for USAG to avoid "becoming directly and extensively involved" in the Pre-Petition Lawsuits." (*Id.* ¶9.) The lawsuits therefore implicate USAG as the real party in interest, and they threaten to seize estate assets—*i.e.*, any cash required to be used to pay for this broad, burdensome discovery, which USAG's insurers have not yet agreed to reimburse—all in violation of the stay.

## IV.    To The Extent The Stay Does Not Automatically Apply, USAG Is Entitled To An Injunction Staying The Pre-Petition Lawsuits.

35.      The Four Plaintiffs' arguments against entry of a §105(a) injunction are also baseless. ***First***, the Four Plaintiffs contend that this Court lacks jurisdiction to enjoin the continued prosecution of the Pre-Petition Lawsuits (Pl. Obj. ¶¶44-49), even though that litigation will increase the amount of indemnification and insurance claims against USAG's estate and impair USAG's ability to settle this case. This position is obviously inconsistent with this Court's prior orders enjoining other third party litigation that threatened to dilute estate assets (*see* Adv. No. 19-50075, Dkt. 71) and ordering a USAG insurer to dismiss litigation against a third party in another forum that threatened to impair USAG's insurance rights (*see* Dkt. 1374). In addition, the potential dilution of USAG assets is not "speculative" here, as the Four Plaintiffs assert. (Pl. Obj. ¶46.) They ignore that the USOPC has filed its claim for insurance coverage and indemnification from USAG in connection with all of its losses incurred in connection with the Four Plaintiffs' Lawsuits, and the amount of that claim will increase with every moment the USOPC's professionals spend defending the Pre-Petition Lawsuits. Next, the Four Plaintiffs clearly submitted themselves to the

jurisdiction of this Court when they filed their proofs of claim, which permits the Court to enjoin the Four Plaintiffs' continued prosecution of the Pre-Petition Lawsuits that are directly related to those claims. *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). Finally, the Seventh Circuit in *Caesars* expressly held that bankruptcy courts have constitutional authority and jurisdiction to enjoin litigation when its continued prosecution could "endanger the success of the bankruptcy proceedings," as here. 808 F.3d at 1188; *see also In re Purdue Pharm. L.P.*, 619 B.R. 38, 50-51 (S.D.N.Y. 2020); *In re Gander Partners LLC*, 432 B.R. 781, 784 (Bankr. N.D. Ill. 2010).

36.     **Second**, the Four Plaintiffs contend that USAG cannot satisfy the traditional factors for injunctive relief under *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7 (2008). (Pl. Obj. ¶¶50-52.) But *Winter* does not apply when a debtor requests an injunction under §105(a). *Winter* addressed the general authority of federal courts to enter injunctive relief as a matter of federal common law. *Id*. at 20-21. The case did not address injunctive relief where a statute both authorizes an injunctive remedy and provides a standard for granting that remedy.

37.     Here, instead, §105(a) provides that a bankruptcy "court may issue any order," including an injunction, "that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). And binding Seventh Circuit law holds that the specific language of §105 displaces the traditional injunctive relief factors and simply requires a showing that the third party litigation, if not enjoined, would "impair" the bankruptcy court's jurisdiction; the debtor has a "likelihood of a success" in reorganizing; and the injunction promotes the public interest. *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *Matter of Chicago, Milwaukee, St. Paul & P. R. Co.*, 738 F.2d 209, 213 (7th Cir. 1984); *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 441, 450

(Bankr. N.D. Ill. 2016). With those showings, and only those showings, granting injunction relief under §105(a) is appropriate, regardless of *Winter*.[3]

38.    ***Third***, even if the traditional *Winter* factors applied (and they do not), USAG would clearly be entitled to an injunction staying the Four Plaintiffs' Pre-Petition Lawsuits. To begin, USAG has a likelihood of a successful reorganization because, among other reasons, the settlement conference is still pending, and as this Court noted at the March 31, 2021 hearing, the Judge presiding over the settlement conference has expressed "optimism" about the settlement process. Further, 506 out of 510 sexual abuse claimants have remained committed to settlement negotiations and have not opted out of the §105(a) Injunction. Permitting the settlement talks to continue without the distraction and expense of burdensome third party litigation will increase the likelihood that the parties will come to a global settlement and successfully resolve this case.

39.    The Four Plaintiffs respond only by complaining about the length of time this chapter 11 case has been pending, which purportedly shows that a global settlement and successful reorganization is out of reach. (Pl. Obj. ¶55.) But USAG was moving towards confirmation last spring and then its confirmation schedule got delayed (and ultimately indefinitely continued) for additional negotiations which have necessarily been complicated due to COVID-19. USAG and key stakeholders then agreed to attempt mediated settlement discussions one more time. It is those settlement discussions that are still pending. The fact that all parties except for the Four Plaintiffs

---

[3]    There is no inconsistency between USAG's argument here and its argument in its Stay Relief Objection that the Four Plaintiffs failed to satisfy the *Winter* factors in their own request for an injunction against USAG to prevent USAG from "interfering" with their discovery requests. (*See* USAG Obj., at 22-25.) The Four Plaintiffs' requested injunction would burden USAG's estate and impair its restructuring efforts by requiring USAG to comply with the Four Plaintiffs' (and then the USOPC's) costly discovery requests. An injunction that interferes with USAG's successful restructuring is not one that is "necessary or appropriate to carry out the provisions of [Title 11]." 11 U.S.C. §105(a). And so the *Winter* factors apply to the Four Plaintiffs' request for injunctive relief, not the standard under §105(a).

remain at the negotiating table makes clear that the consensus is that a successful reorganization is possible and likely here.

40.     For the next factor, USAG would suffer irreparable harm if the Pre-Petition Lawsuits are not stayed. The Pre-Petition Lawsuits will augment the amount of indemnification and insurance-based claims against USAG's estate, directly diminishing the likelihood that the insurers will offer a global settlement amount that is high enough and agreeable to all stakeholders. USAG will suffer irreparable harm if a global settlement is not reached and its crippling mass tort liabilities are not completely addressed in this chapter 11 case. *See Purdue Pharm.*, 619 B.R. at 59-60 (debtors would suffer irreparable harm if third-party litigation continued because it "threaten[ed]" to "impede the debtor's estate and reorganization prospects"); *accord In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 860-61 (6th Cir. 1992); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir. 1986); *Caesars*, 561 B.R. at 454-55; *In re Lyondell Chem. Co.*, 402 B.R. 571, 590-91 (Bankr. S.D.N.Y. 2009).

41.     The Four Plaintiffs respond that USAG's claims of irreparable harm are hollow because USAG inexcusably delayed in seeking a §105(a) injunction. (*Id.* ¶¶57-58.) But that is simply false. USAG learned no earlier than March 11, 2021 that the Four Plaintiffs were actually prosecuting their Pre-Petition Lawsuits and that they were seeking a substantial document production from Ropes & Gray that would impose undue burdens and costs on USAG's estate. Then, within a month, USAG filed its Stay Enforcement Motion. As a result, USAG did not delay in enforcing its claim for a §105 injunction against the Four Plaintiffs.[4]

---

[4]     For the same reason, the Four Plaintiffs' *laches* argument fails. (Pl. Obj. ¶61-62.) USAG sprung into action immediately after it became clear that the prosecution of the Pre-Petition Lawsuits would harm USAG. USAG did not "inexcusably delay" in bringing its Stay Enforcement Motion. (*Id.*)

42.     Finally, the balance of the harms and the public interest favor USAG, not the Four Plaintiffs. (*See* Pl. Obj. ¶¶59-60.) If the §105(a) injunction is entered, the Four Plaintiffs will only be temporarily delayed from prosecuting their claims, which is not irreparable harm. By contrast, USAG's efforts to globally resolve this case will be impaired by costly, burdensome litigation, which will only multiply as more and more claimants follow the Four Plaintiffs back into non-bankruptcy courts to attempt to become the first to judgment against the USOPC. That is inevitable since, despite the Objectors' claims that the USOPC is well-capitalized with hundreds of millions of current assets, claimants will rush to ensure they are the first (or one of the first) to collect on those assets. And the public interest does not favor an outcome where over five hundred sexual abuse claimants recover disparately on similar claims; instead, the public interest favors a successful resolution of this case that pays all sexual abuse claimants in an equitable and comparable manner. *See Caesars*, 561 B.R. at 453-54 (determining that the public interest both in "successful reorganizations" and in negotiating an "overall settlement" of the chapter 11 case overrode specific creditors' interests in continuing to prosecute their claims).

43.     Accordingly, to the extent the automatic stay does not apply, USAG is entitled to a §105 injunction staying the Pre-Petition Lawsuits and the discovery served therein.

**CONCLUSION**

For the reasons given above and in USAG's Stay Enforcement Motion and Stay Relief Objection, the Court should hold that the Alter Ego Claims are estate property and stay the continued prosecution of the Alter Ego Claims and the Pre-Petition Lawsuits, including any discovery served in those suits.

Dated: April 26, 2021                                          Respectfully submitted,

                                                              **JENNER & BLOCK LLP**

                                                              By: /s/ *Catherine Steege*

                                                              Catherine L. Steege (admitted *pro hac vice*)
                                                              Dean N. Panos (admitted *pro hac vice*)
                                                              Melissa M. Root (#24230-49)
                                                              353 N. Clark Street
                                                              Chicago, Illinois 60654
                                                              Tel: (312) 923-2952
                                                              Fax: (312) 840-7352
                                                              csteege@jenner.com
                                                              dpanos@jenner.com
                                                              mroot@jenner.com

                                                              *Counsel for the Debtor*