> **THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES OF THE PLAN MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THE DEBTOR RESERVES THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO THE HEARING TO APPROVE THIS DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>          Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

## USA GYMNASTICS' DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY USA GYMNASTICS AND THE ADDITIONAL TORT CLAIMANTS COMMITTEE OF SEXUAL ABUSE SURVIVORS

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root
Adam T. Swingle (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com
aswingle@jenner.com

*Counsel for the Debtor*

Dated: August 31, 2021

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 1099 N. Meridian St., Suite 800, Indianapolis, Indiana 46204.

**DISCLAIMER**

USA GYMNASTICS, AS DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE BELIEVES THAT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION [DKT. 1551], ATTACHED AS <u>EXHIBIT 1</u> TO THIS DISCLOSURE STATEMENT, IS IN THE BEST INTERESTS OF CREDITORS AND URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR OR AGAINST THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN AND IS NOT INTENDED TO REPLACE A DETAILED REVIEW AND ANALYSIS OF THE PLAN. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE EXHIBITS TO THE PLAN AND THIS ENTIRE DISCLOSURE STATEMENT CAREFULLY BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND THE DEBTOR DOES NOT ASSUME ANY OBLIGATION TO UPDATE THIS DISCLOSURE STATEMENT FOR EVENTS OR INFORMATION ARISING AFTER THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THAT REASON, AND BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS INTO THE FUTURE WITH CERTAINTY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION.

HOLDERS OF CLAIMS SHALL NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, FINANCIAL, OR TAX ADVICE. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR OWN ADVISORS AS TO ANY MATTERS CONCERNING THE PLAN, ITS SOLICITATION, AND THE TRANSACTIONS, TREATMENT, AND DISTRIBUTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION AS TO ANY CONTESTED MATTER, ADVERSARY PROCEEDING, CLAIM, OR OTHER ACTION OR THREATENED ACTION BUT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

**TABLE OF CONTENTS**

I. OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN...............................1

   A.  Introduction...............................................................................................................1

   B.  Principal Terms Of The Plan. .................................................................................5

      1.  Treatment Of Abuse Claims. ..........................................................................5

         a.  The Full or Partial Settlement Alternative. ............................................5

         b.  The Litigation Only Alternative..............................................................9

         c.  The Releases And Injunctions, Including A Release Of The USOPC, Are Necessary To The Full or Partial Settlement Alternative. .....................................10

      2.  USAG's Non-Monetary Commitments And Reforms..................................12

      3.  Treatment Of Claims Other Than Abuse Claims.........................................17

   C.  The Plan Is In The Best Interests Of Creditors. ...................................................18

   D.  Voting And Confirmation Procedures. ..................................................................19

II. QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE PLAN ......................................................................................................20

III. AN OVERVIEW OF THE CHAPTER 11 PROCESS ...............................................27

   A.  A Chapter 11 Case. ...............................................................................................27

   B.  A Chapter 11 Plan. ...............................................................................................27

   C.  Voting On A Chapter 11 Plan. ..............................................................................28

      1.  Court Approval Required............................................................................28

      2.  Impaired Classes With Recoveries Entitled To Vote. ................................28

      3.  Acceptance Of A Chapter 11 Plan. ............................................................28

      4.  Disputed Claims May Not Vote..................................................................29

   D.  Confirmation of a Chapter 11 Plan. ......................................................................29

      1.  Confirmation With Acceptance By All Classes...........................................29

      2.  Confirmation With Rejection By Certain Classes. ......................................29

IV. THE DEBTOR, ITS OPERATIONS, AND THE CHAPTER 11 CASE..............................30

    A.  USAG's Operations. ..................................................................................30

    B.  USAG's Capital Structure ..........................................................................30

    C.  USAG's Board Of Directors. ......................................................................30

    D.  Events Leading To The Chapter 11 Case. ....................................................34

    E.  The Chapter 11 Case. ...............................................................................35

        1.  First Day Motions. ...........................................................................35

        2.  The Debtor's Professionals. ...............................................................36

        3.  The Survivors' Committee.................................................................36

        4.  Future Claimant Representative. .........................................................36

        5.  The Bar Date. .................................................................................37

        6.  The Claims Against The Debtor And The Debtor's Claims Objections. ...................38

            a.  The Abuse Claims.....................................................................38

            b.  The General Claims. .................................................................38

        7.  Postpetition Financing. .....................................................................39

            a.  Debtor In Possession Financing....................................................39

            b.  Paycheck Protection Program Funding............................................39

        8.  Plan Exclusivity and Deadlines. .........................................................39

        9.  Litigation.......................................................................................40

            a.  Insurance Coverage Adversary Proceeding. ....................................40

            b.  Prepetition Abuse Litigation and the 105 Order.................................41

            c.  Third Party Injunction Adversary Proceeding. ..................................41

            d.  California Plaintiffs' Litigation....................................................42

        10. Mediation and Settlement Conference.................................................42

        11. Motion To Dismiss. ........................................................................43

12. Plan Support Agreement. ...........................................................................43

V. SUMMARY OF THE PLAN ...........................................................................43

   A.  Treatment of Unclassified Claims. .............................................................43

      1.  Administrative Claims. .........................................................................44

      2.  Professional Claims. ............................................................................44

      3.  Priority Tax Claims. .............................................................................44

      4.  U.S. Trustee Fees. ................................................................................45

   B.  Treatment of Classified Claims. ................................................................45

      1.  Class 1—Other Priority Claims. ..........................................................45

      2.  Class 2—PNC Bank Claim. .................................................................46

      3.  Class 3—Sharp Claim. ........................................................................46

      4.  Class 4—General Unsecured Convenience Claims. ..............................46

      5.  Class 5—General Unsecured Claims. ..................................................47

      6.  Class 6—Abuse Claims. ......................................................................48

      7.  Class 7—Personal Injury Claim. .........................................................48

      8.  Class 8—USOPC Claim. .....................................................................49

      9.  Class 9—Indemnification Claims. .......................................................50

      10. Class 10—Future Claimant Representative Claim. ..............................51

      11. Class 11—Sexual Abuse Claims Filed After The Bar Date. .................51

VI. MEANS FOR IMPLEMENTATION OF THE  PLAN UNDER THE FULL OR
PARTIAL SETTLEMENT ALTERNATIVE .........................................................52

   A.  Trust Formation and Funding. ...................................................................52

      1.  Establishment Of The Trust. ................................................................52

      2.  Trust Purpose .....................................................................................52

      3.  Funding of Trust .................................................................................52

      4.  Approval of Settlement .......................................................................52

5.  Future Claimant Reserve.................................................................................52

6.  The Settlement Trustee. ...............................................................................53

7.  Tax Matters. ...............................................................................................53

8.  Cooperation By The Debtor And Reorganized Debtor....................................53

9.  Objections To Channeled Claims. .................................................................53

10. Trust Indemnification Obligations. ...............................................................53

B.  Implementation of the Partial Settlement Option. ..............................................54

1.  Partial Settlement Option Election.................................................................54

2.  Selection of CGL Insurer(s) in the Partial Settlement Option. ......................54

3.  Treatment Under Partial Settlement Option. .................................................54

4.  Transfer of Insurance Claims Upon Failure of CGL Insurer to Accept Its CGL Insurer Settlement Offer. ..............................................................................55

5.  Treatment of CGL Insurers That Are Not A Partial Settlement Option Accepted Party............................................................................................55

6.  No Claims Of Non-Settling Insurers Against Settling Insurers Or Non-Debtor CGL Settling Insurer Covered Persons............................................................55

7.  Abuse Claimant's Right to Litigate Abuse Claim Upon Failure of CGL Insurer to Accept Its CGL Insurer Settlement Offer......................................55

8.  Litigation Claimant's Right to Commence or Continue Actions.................................56

9.  Effect of Trust Insurance Settlements. ..........................................................56

10. Application of Claim Enhancement................................................................56

11. Withdrawal of Litigation Claimant Election..................................................57

12. Litigation Claimant's Allocated Settlement Payment.....................................57

13. Abuse Claimants' Rights Reserved. ..............................................................57

14. No Compromise of Insurance Policies for Claims that are not Abuse Claims...........57

C.  Liquidation And Payment Of Channeled Claims. ...............................................58

1.  Resolution And Payment Of Channeled Claims.............................................58

2.   Conditions To Payment Of Abuse Claims And FCR Claims. ....................................58

3.   Effect Of No Award On Channeled Claims. .................................................................58

4.   Treatment Of Attorneys' Fees And Costs Of Channeled Claimants. ..........................59

5.   Withdrawal Of Channeled Claims. ................................................................................59

6.   Adding Participating Parties. .........................................................................................59

7.   Adding Settling Insurers. ...............................................................................................59

8.   Future Claimant Process. ...............................................................................................60

D.   CHANNELING INJUNCTION..............................................................................................60

1.   EFFECTIVE DATE INJUNCTIONS .............................................................................60

2.   CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE
CLAIMS ..........................................................................................................................60

3.   SCOPE OF CHANNELING INJUNCTION ...................................................................62

4.   ENFORCEMENT TO THE MAXIMUM EXTENT........................................................62

5.   SETTLING INSURER INJUNCTION............................................................................62

6.   CONTRIBUTION BAR AGAINST NON-SETTLING INSURERS. .........................63

7.   PERMANENT TERM OF INJUNCTIONS OR STAYS AND
CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES
AND SETTLING INSURERS ........................................................................................63

8.   RELEASE OF AVOIDANCE CLAIMS AND OTHER CLAIMS AGAINST
PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER
PERSONS, AND SETTLING INSURERS .....................................................................64

9.   MUTUAL RELEASE ......................................................................................................64

10.  PROTECTED PARTY RELEASE...................................................................................65

11.  USOPC RELEASE. .........................................................................................................65

12.  KAROLYI RELEASE. ....................................................................................................66

13.  EXCLUDED PARTIES LIMITATION OF RELEASES AND
CHANNELING INJUNCTION........................................................................................66

VII. MEANS FOR IMPLEMENTATION OF THE PLAN UNDER THE LITIGATION ONLY ALTERNATIVE ...................................................................................................67

   A. Lifting Of Automatic Stay And Stay Imposed Under the 105 Order for the Benefit of the Holders of Class 6 Claims ................................................................................67

   B. Post-Effective Date Awards.........................................................................................67

   C. Cooperation with Insurers in Defense of Claims.........................................................67

   D. Remand of Removed Actions and Relief from Automatic Stay/Discharge ...................68

VIII. GENERALLY APPLICABLE PROVISIONS OF THE PLAN...........................................68

   A. Conditions Precedent To The Effective Date. ..............................................................68

      1. Conditions To Effectiveness. ..................................................................................68

      2. Waiver of Conditions..............................................................................................68

      3. Non-Occurrence of Effective Date. ........................................................................69

   B. Insurance Neutrality......................................................................................................69

      1. No Modification of Debtor's Insurance Policies of Non-Settling Insurers, Other Insurers, or Personal Injury Insurer. ...........................................................69

      2. Non-Settling Insurers', Other Insurers', and Personal Injury Insurer's Duties Not Impaired. ..........................................................................................................69

      3. Trust Has No Impact. ..............................................................................................69

      4. Obligations for Claims............................................................................................69

      5. Non-Settling Insurers', Other Insurers', and Personal Injury Insurer's Defenses..................................................................................................................70

      6. Reinsurance.............................................................................................................70

      7. Defenses of the Debtor, the Estate, and the Reorganized Debtor.............................70

      8. Governing Law. ......................................................................................................70

   C. Treatment Of Executory Contracts And Unexpired Leases. .........................................70

      1. Assumed Employee Benefit Plans...........................................................................70

      2. General; Assumed if Not Rejected. .........................................................................70

3.  Claims for Contract Rejection. ................................................................70

4.  Indemnification Claims..........................................................................71

D.  Litigation. .......................................................................................................71

1.  Reorganized Debtor's Retention of Causes of Action and Litigation. ........71

2.  Additional Actions. ...............................................................................71

E.  Claims And Distributions. ...............................................................................71

1.  Lift of Automatic Stay for Personal Injury Claim. ...................................71

2.  Objections to Claims other than Abuse Claims, the Personal Injury Claim, the USOPC Class 8 Claim, Indemnification Claims, and the FCR Claim. ........72

3.  Service of Objections. ...........................................................................72

4.  Additional Documentation. ....................................................................72

5.  Provisions Governing Distribution To Holders of Allowed Claims............73

a.  Distribution Only to Holders of Allowed Claims. ...............................73

b.  Timing of Distributions.....................................................................73

6.  No Distributions Pending Allowance. .....................................................73

7.  Setoffs. ................................................................................................73

8.  No Interest on Claims. ...........................................................................74

F.  Retention Of Jurisdiction. ................................................................................74

G.  Miscellaneous Provisions.................................................................................74

1.  Modification Of Plan. ............................................................................74

2.  Post-Confirmation Court Approval..........................................................74

3.  Election Pursuant To Section 1129(b) Of The Bankruptcy Code................75

4.  Closing Of The Chapter 11 Case. ...........................................................75

5.  Dissolution Of The Survivors' Committee. ..............................................75

6.  Termination Of The Appointment Of The FCR. .......................................76

7.  Governing Law. .....................................................................................76

8.   Reservation Of Rights...................................................................................76

IX. EFFECTS OF PLAN CONFIRMATION AND DISCHARGE..............................................76

A.  Discharge. ...............................................................................................76

B.  Vesting of Assets. ......................................................................................77

C.  Continued Existence of Reorganized Debtor...............................................77

D.  Exculpation and Limitation of Liability. ....................................................77

X. RISK FACTORS..................................................................................................78

A.  Parties In Interest May Object To The Debtor's Classification Of Claims. ....................78

B.  The Debtor and the Survivors' Committee May Not Be Able To Secure
     Confirmation Of The Plan. ........................................................................78

C.  Parties In Interest May Object To The Releases And Injunctions Contained In The
     Plan. ......................................................................................................79

D.  Nonconsensual Confirmation......................................................................79

E.  Non-Occurrence Of The Effective Date. .....................................................79

F.  Medicare Reimbursement. ..........................................................................79

XI. BEST INTERESTS TEST.....................................................................................79

XII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ..............................................80

A.  Tax Consequences To Creditors .................................................................80

B.  Tax Consequences To The Debtor................................................................81

C.  Tax Consequences To The Trust. ................................................................81

XIII. VOTING INSTRUCTIONS ..................................................................................82

XIV. CONCLUSION AND RECOMMENDATION..............................................................82

USA Gymnastics, as debtor and debtor in possession (the "**Debtor**" or "**USAG**") respectfully submits this disclosure statement (the "**Disclosure Statement**") in support of the *Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants' Committee Of Sexual Abuse Survivors* (as it may hereafter be amended or modified, the "**Plan**"), a copy of which is attached to this Disclosure Statement as <u>Exhibit 1</u>.[1]

## I. OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE PLAN

**A.    Introduction.**

On December 5, 2018, USA Gymnastics filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**"). Following its bankruptcy filing, the Debtor has engaged the Survivors' Committee, the Debtor's insurance carriers, athletes, the United States Olympic & Paralympic Committee (the "**USOPC**"), creditors, and other parties in interest in good faith and lengthy negotiations over the terms of a plan of reorganization that will compensate all Persons holding Allowed Claims against the Debtor. The Debtor's paramount focus has been on reaching an equitable resolution of the Abuse Claims.

As a result of these efforts, the Debtor, the Survivors' Committee, certain survivors, and certain of the Settling Insurers executed a Plan Support Agreement, which sets forth the key terms of the Plan. The Debtor and the Survivors' Committee believe the Plan is in the best interests of, and provides the highest and most expeditious recoveries, to all parties who hold Claims against the Debtor, including Holders of Abuse Claims. **The Debtor and the Survivors' Committee recommend that all Classes of Claims entitled to vote accept the Plan.**

This Disclosure Statement describes why Claims are placed into certain Classes, the relative allocations of property to the Holders of such Claims, the manner by which the Debtor's Assets are to be distributed, the Allocation Protocol for distributions by the Trust to Abuse Claimants, the risks inherent in the Plan, and the applicable bankruptcy and tax consequences of the Plan. You are advised and encouraged to read both this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

> **Note, this paragraph will be deleted from the solicitation version of this Disclosure Statement.** As discussed in greater detail below, the Plan provides two possible alternatives: (i) the Full or Partial Settlement Alternative, or (ii) the Litigation Only Alternative. The Litigation Only Alternative will not occur if the CGL Insurers accept the CGL Insurer Settlement Offers *or* if the Debtor and the Survivors' Committee jointly elect the Partial Settlement Option. The deadline by which the Debtor and the Survivors' Committee must make the Partial Settlement Option election is the date set for the hearing on approval of this Disclosure Statement. The <mark>yellow highlighted</mark> sections of this Disclosure Statement are applicable only if the Debtor and the Survivors' Committee jointly elect the Partial Settlement Option, and will be deleted from the Disclosure Statement if the Debtor and the Survivors' Committee do not make such an election. The <mark>blue</mark>

---

[1] The definitions set forth in Article I of the Plan apply to capitalized terms used, but not defined, in this Disclosure Statement. The rules of construction set forth in Article II of the Plan apply to this Disclosure Statement.

highlighted sections of this Disclosure Statement are applicable only if the Debtor and the Survivors' Committee do *not* jointly elect the Partial Settlement Option, and will be deleted from the Disclosure Statement if the Debtor and the Survivors' Committee make such an election. If the deadline by which the Debtor and the Survivors' Committee must make the Partial Settlement Option is extended, both the yellow and blue highlighted sections will remain in this Disclosure Statement, and the Disclosure Statement will contain a section stating the new deadline by which the Debtor and the Survivors' Committee must make the Partial Settlement Option.

The Plan provides two alternatives for Abuse Claims (and the USOPC Claim and Indemnification Claims): (a) the Full or Partial Settlement Alternative; or (b) the Litigation Only Alternative. In broad overview, under the Full or Partial Settlement Alternative: (a) if the CGL Insurers each accept the Survivors' Committee's CGL Insurer Settlement Offer (which, in the aggregate, is $425,000,000.00, the "**Total Settlement Demand Amount**") the Trust will be created for the benefit of Abuse Claimants and Future Claimants and will be funded by the Total Settlement Demand Amount (less the Professional Fee Hold-Back) and the Twistars Payment; or (b) if less than all CGL Insurers accept the Survivors' Committee's CGL Insurer Settlement Offer, then the Survivors' Committee and the Debtor may jointly elect the Partial Settlement Option and the Trust will be created for the benefit of Abuse Claimants and Future Claimants and will be funded by the payments by the Partial Settlement Option Accepted Parties (less the Professional Fee Hold-Back), the Twisters Payment, and the assignment of Insurance Claims, and Abuse Claimants whose Claims are covered by a Non-Settling Insurer's policy may elect to pursue litigation against the Debtor and any other defendant subject to the terms of the Plan.

Under the Litigation Only Alternative—which will occur if the CGL Insurers do not commit to fund the Total Settlement Demand Amount and the Debtor and the Survivors' Committee do not jointly elect to proceed with the Partial Settlement Option—the Plan permits all Holders of Abuse Claims filed or deemed to be filed by the Bar Date to prosecute their Claims against the Reorganized Debtor in name only in the courts where such Claims were pending before the Petition Date or the courts in which such Claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code. To be clear, **a vote for the Plan is to accept the Plan, and is not a vote for a particular alternative**.

On [•], 2021, the Debtor and the Survivors' Committee jointly elected the Partial Settlement Option, which, as set forth below, had the effect of eliminating the Litigation Only Alternative. Accordingly, this Disclosure Statement does not provide an overview of the treatment of Claims under the Litigation Only Alternative. As of the date of this Disclosure Statement, the Debtor and the Survivors' Committee have not elected to make the Partial Settlement Option election, and the deadline for doing so has not been extended. Accordingly, the means for implementation of the Partial Settlement Option are not described below.

The following table briefly summarizes the classification and treatment of Claims under the Plan. For a more detailed description of the Plan's classification and treatment of Claims, see Article V below.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | TREATMENT |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | PNC Bank Claim | Unimpaired | Deemed to Accept | 100% |
| 3 | Sharp Claim | Unimpaired | Deemed to Accept | 100% |
| 4 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept | 100% |
| 5 | General Unsecured Claims | Impaired | Yes | 80% over three years in equal installments on August 15, 2022, August 15, 2023, and August 15, 2024. |
| 6 | Abuse Claims | Impaired | Yes | *Full or Partial Settlement Alternative*: 99% of the Net Settlement Payment, and, if applicable, the assignment of Insurance Claims<br><br>-or-<br><br>*Litigation Only Alternative*: Holders of Class 6 Abuse Claims filed or deemed to be filed by the Bar Date to prosecute their Claims against the Reorganized Debtor in name only in the courts where such Claims were pending before the Petition Date or the courts in which such Claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code and may recover any judgments or awards against the Debtor only from the proceeds of the CGL Insurance Policies issued by the Debtor CGL Insurers. |
| 7 | Personal Injury Claim | Impaired | Yes | To be determined. |
| 8 | USOPC Claim | Impaired | Yes | *Full or Partial Settlement Alternative*: $0.00, release, and channeling injunction. In the case of the Partial Settlement Option, (a) all rights that the USOPC has, if any, to receive indemnification or reimbursement from the Debtor under any of the Debtor's Settling Insurance Policies, with respect to Abuse Claims falling under the insurance policies of any Settling Insurer, shall be satisfied by granting the USOPC the benefit of the Channeling Injunction; and (b) the USOPC will retain any rights that it has to receive indemnification or reimbursement from the Debtor for Abuse Claims falling under the Debtor's Non-Settling Insurer policies, but only to the extent that there is coverage under the Debtor's Non-Settling Insurer policies for the USOPC Claim.<br><br>-or- |

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | TREATMENT |
|---|---|---|---|---|
| | | | | *Litigation Only Alternative*: Any rights to reimbursement or indemnification from the Debtor are preserved but the sole source of recovery for such Claim shall be from the Debtor CGL Insurance Policies—no recovery from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. The portion of the Claim seeking $88,983.34 will be treated as a Class 5 General Unsecured Claim and the Debtor preserves its right to object to such Claim. |
| 9 | Indemnification Claims | Impaired | Yes | *Full or Partial Settlement Alternative*: $0.00, release, and channeling injunction. In the case of the Partial Settlement Option, (a) all rights that the Holders of Class 9 Claims have, if any, to receive indemnification or reimbursement from the Debtor under any of the Debtor's Settling Insurance Policies, with respect to Abuse Claims falling under the insurance policies of any Settling Insurer, shall be satisfied by granting the Holders of Class 9 Claims the benefit of the Channeling Injunction; and (b) the Holders of Class 9 Claims will retain any rights that such Holders have to receive indemnification or reimbursement from the Debtor for Abuse Claims falling under the Debtor's Non-Settling Insurer policies, but only to the extent that there is coverage under the Debtor's Non-Settling Insurer policies for the Indemnification Claim.<br><br>-or-<br><br>*Litigation Only Alternative*: Any rights to reimbursement or indemnification from the Debtor are preserved but the sole source of recovery for such Claim shall be from the Debtor CGL Insurance Policies—no recovery from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. |
| 10 | FCR Claim *(only under the Full or Partial Settlement Alternative)* | Impaired | Yes *(only under the Full or Partial Settlement Alternative)* | *Full or Partial Settlement Alternative*: 1% of the Net Settlement Payment.<br><br>*Litigation Only Alternative*: $0.00. |

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING | TREATMENT |
|---|---|---|---|---|
| 11 | Sexual Abuse Claims Filed After The Bar Date | Impaired | Deemed to Reject | *Full or Partial Settlement Alternative*: $0.00.<br><br>*Litigation Only Alternative*: Class 11 Claims shall not receive a Distribution; *provided, however*, that to the extent that the Holder of a Class 11 Claim has a right to recovery under any of the Debtor CGL Insurance Policies, such rights are preserved and will not be impaired under the Plan. |

As provided by Section 1126 of the Bankruptcy Code, only Classes of Claims that are both impaired under the Plan and entitled to a recovery under the Plan are permitted to vote to accept or reject the Plan. Here, the only Classes of Claims entitled to vote are Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and, only under the Full or Partial Settlement Alternative, Class 10 (the FCR Claim) (collectively, the "**Voting Classes**").

## B.    Principal Terms Of The Plan.

This Section contains a summary of the principal terms of the Plan. You should carefully review the Plan in full before determining whether to vote to accept or reject the Plan. To the extent that any provision of this Disclosure Statement conflicts with any term of the Plan, the terms of the Plan shall control.

### 1.    Treatment Of Abuse Claims.

Excluding duplicative, withdrawn, untimely, and disallowed claims, 510 individuals have filed Abuse Claims against the Debtor.[2] As set forth in the Debtor's liquidation analysis, a liquidation of the Debtor's Assets (exclusive of the Debtor's Insurance Policies) would be insufficient to make any payments to the Debtor's general unsecured creditors and thus, in a chapter 7 case, the Holders of Abuse Claims would receive no recovery (exclusive of recoveries under the Debtor's Insurance Policies). Accordingly, the Debtor believes that the only source of potential recovery from the Debtor for Abuse Claimants is the Debtor CGL Insurance Policies (and Other Insurance Policies (if any) that provide Insurance Coverage for Abuse Claims). The Plan provides two alternatives for Abuse Claims (and the USOPC Claim and Indemnification Claims): (a) the Full or Partial Settlement Alternative; and (b) the Litigation Only Alternative.

#### a.    The Full or Partial Settlement Alternative.

The first alternative is the Full or Partial Settlement Alternative. The Survivors' Committee made the CGL Insurer Settlement Offer to each of the below CGL Insurers in the aggregate amount

---

[2] 561 Abuse Claims were filed. 33 of those Abuse Claims are duplicative, 2 Abuse Claims have been disallowed, 1 Abuse Claim has been withdrawn, and 15 Abuse Claims were filed late. The Trust Agreement provides that these 51 duplicative, disallowed, withdrawn, and late Abuse Claims will receive nothing from the Trust (unless, with respect to a late-filed Abuse Claim, the Court deems such Abuse Claim to be timely filed).

of $425,000,000.00. The table below provides additional detail regarding the CGL Insurer Settlement Offers:

| CGL Insurers | CGL Insurer Settlement Offer |
|---|---|
| **Virginia Surety Company (f/k/a/ Combined Specialty Insurance Company)**<br>    Debtor Policies<br>    USOPC Policies | $27,899,577<br>$4,230,199<br><br>**Total: $32,129,776** |
| **National Casualty Company**<br>    Debtor Policies<br>    USOPC Policies | $XXXX<br>$XXXX<br><br>**Total:  $XXXX**[3] |
| **TIG Insurance Company**<br>    Debtor Policies<br>    USOPC Policies | $67,157,545<br>$39,044,273<br><br>**Total: $106,201,818** |
| **CIGNA Insurance Company (n/k/a ACE American Insurance Company)**<br>(Debtor Policies Only) | **Total: $XXXX** |
| **National Union Fire Insurance Company of Pittsburgh, P.A. (n/k/a AIG)**<br>(Debtor Policies Only) | **Total: $XXXX** |
| **Gemini Insurance Company**<br>(USOPC Policies Only) | **Total: $XXXX** |
| **Great American Assurance Company**<br>    Debtor/Karolyi Policies<br>    USOPC Policies | $28,121,305<br>$13,166,680<br><br>**Total: $41,287,985** |
| **Philadelphia Indemnity Insurance Company**<br>(USOPC Policies Only) | **Total: $1,903,311** |
| **Total:** | **$425,000,000** |

---

[3] CGL Insurers who have reached agreement on a number are shown as XXXX. The figures designated for National Casualty Company with XXXX are not to be shared publicly until the Committee and Debtor jointly elect to pursue the Full or Partial Settlement Alternative and will not be shared publicly in the event the Committee and Debtor do not jointly elect to pursue the Full or Partial Settlement Alternative.

As of the date of this Disclosure Statement, CIGNA Insurance Company (n/k/a ACE American Insurance Company, National Union Fire Insurance Company of Pittsburgh, P.A. (n/k/a AIG), National Casualty Company, and Gemini Insurance Company, have committed to fund their respective CGL Insurer Settlement Offers.

If the remaining CGL Insurers commit to fund the Total Settlement Demand Amount, or the Debtor and the Survivors' Committee jointly elect to proceed with the Partial Settlement Option, the Plan provides for the creation of a Trust for the exclusive benefit of Abuse Claimants and Future Claimants. The Plan provides that, on the Effective Date, each Settling Insurer shall make its Agreed CGL Insurer Payment by wire transfer to the Debtor pursuant to such Debtor's Settling Insurer's Buy-Back Agreement or other agreement with the USOPC Settling Insurers. Upon receipt of the Agreed CGL Insurer Payments from the Settling Insurers, the Debtor will wire the Net Settlement Payment to the Trust. In addition, the Trust will also be funded with the Twistars Settlement and, in the event that the Debtor and the Survivors' Committee elect to proceed with the Partial Settlement Option, a transfer of the Insurance Claims against the Non-Settling Insurers, as set forth in Section 10.5 of the Plan.

The Trust Assets will be used to fund Distributions to Holders of Abuse Claims and Holders of Future Claims. Under the Partial Settlement Option, Abuse Claimants whose Claims are covered only by a Non-Settling Insurer's policy may elect to pursue litigation against the Debtor and any other defendant; *provided, however*, that any such Claims are subject to the terms of the Plan and that Claims against the Debtor or a Protected Party may recover only from a CGL Insurance Policy issued by a Non-Settling Insurer of the Debtor or a CGL Insurance Policy issued by a Non-Settling Insurer of a Protected Party. Exhibit E to the Plan identifies which Abuse Claims are covered by each CGL Insurance Policy. In exchange for payment from the Trust, Abuse Claimants shall agree to a full and complete general release of the Debtor, its Estate, the Reorganized Debtor, the Settling Insurers (identified below), the Participating Parties (identified below), and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons (identified below). A copy of the release will be attached to the Plan as Exhibit J.

A Future Claimant Reserve will be established for the payment of any Future Claims and any amounts remaining in the Future Claimant Reserve will revert to the Trust's general funds for use and Distribution as set forth in the Trust Agreement after five years. The Future Claimant Reserve will be funded with one percent (1.0%) of the Net Settlement Payment. Distributions and reserves from the Trust to Abuse Claimants and Future Claimants will be determined by application of the Allocation Protocol for Abuse Claims and the Future Claimant Allocation Protocol, as the case may be. Abuse Claims filed after the Bar Date or not deemed to be filed by the Bar Date will not receive any Distribution from the Trust, but will be channeled to the Trust and subject to the Channeling Injunction.

Protected Parties and Settling Insurers will receive the benefit of the injunctions and releases provided under the Plan, including under Article XII of the Plan.

The Settling Insurers include the Debtor CGL Insurers listed immediately below, which issued the Debtor CGL Insurance Policies, and which, with the exception of National Union Fire Insurance Company of Pittsburgh, P.A. (now known as AIG), also provide coverage to the USOPC

as an additional or named insured. With the exception of ACE American Insurance Company and National Union Insurance Company of Pittsburgh, P.A. (now known as AIG), the CGL Insurers also issued separate insurance policies to the USOPC.

- ACE American Insurance Company, formerly known as Cigna Insurance Company;
- National Casualty Company;
- National Union Fire Insurance Company of Pittsburgh, P.A.;

The Settling Insurers also include the Twistars Settling Insurers:

- Lexington Insurance Company;
- Nationwide Mutual Insurance Company;
- New Hampshire Insurance Company;
- Philadelphia Indemnity Insurance Company; and,
- State Farm Fire and Casualty Company.

The USOPC Settling Insurers include:

- National Casualty Company; and
- Gemini Insurance Company.

The Participating Parties include:

- Karolyis
- Twistars; and,
- USOPC

The Non-Debtor CGL Settling Insurer Covered Persons include:

- All Olympia Gymnastics Center;
- AOGC All Olympia Gymnastics Center;
- Amy White;
- Artur Akopyan;
- Bob Colarossi;
- Bela Karolyi;
- BMK Partners Ltd.;
- BMK Training Facilities Ltd.;
- Debra Van Horn;
- Galina Marinova;
- Karolyi Training Camps, LLC;
- Karolyi World Gymnastics;
- Karolyi's Elite;
- Kathy Scanlan;
- Kathy Scanlan, LLC;
- Marta Karolyi (aka Martha Karolyi);

8

- Paul Parilla;
- Rhonda Faehn;
- Steve Penny;
- National Gymnastics Foundation;
- Twistars; and,
- USOPC.

In addition to the USOPC and the National Gymnastics Foundation, the Non-Debtor CGL Settling Insurer Covered Persons are former Debtor employees, coaches, gyms, members, or volunteers and they have each made claims against the Debtor's Insurance Policies related to Abuse Claims. The Settling Insurers have demanded that all Non-Debtor CGL Settling Insurer Covered Persons be released as a condition to paying the amount of the Settling Insurers' respective CGL Insurer Settlement Offers. The contribution of the Non-Debtor CGL Settling Insurer Covered Persons is their release of any rights under the Debtor CGL Insurance Policies and in addition, in the case of the USOPC, the contribution of substantial proceeds from the USOPC Settling Insurance Policies and the waiver of its claims against the estate. The Non-Debtor CGL Settling Insurer Covered Persons do <u>not</u> include the Excluded Parties. The Excluded Parties are listed on <u>Exhibit D</u> to the Plan and include: Don Peters; SCATS Gymnastics, including without limitation any predecessor in interest thereto; Steve Rybacki; Beth Rybacki; and Charter Oak Gymnastics, including without limitation any predecessor in interest thereto.

The Plan provides that, within ten days after receiving any payment from the Trust, Abuse Claimants shall dismiss with prejudice any and all lawsuits that such Abuse Claimants previously brought against the Debtor or any Participating Party and evidence of such dismissal with prejudice shall be promptly delivered to the Trust.

b.        **The Litigation Only Alternative.**

The second alternative is the Litigation Only Alternative. If the CGL Insurers do not commit to fund the Total Settlement Demand Amount and the Debtor and the Survivors' Committee do not jointly elect to proceed with the Partial Settlement Option, the Plan does not provide for the creation of a Trust or for a Future Claimant Reserve. Instead, Article XIII of the Plan permits all Holders of Abuse Claims filed or deemed to be filed by the Bar Date to prosecute their Claims against the Reorganized Debtor in name only in the courts where such Claims were pending before the Petition Date or the courts in which such Claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code. Holders of Abuse Claims may recover any judgments or awards against the Debtor only from the proceeds of the CGL Insurance Policies issued by the Debtor's CGL Insurers. The 105 Order will be vacated. Under the Litigation Only Alternative, the Plan will not include injunctions and releases for the benefit of Settling Insurers or Protected Parties. The Debtor will not enter into Buy-Back Agreements with any of the Debtor CGL Insurers, and all of the Debtor's Insurance Policies shall remain in full force and effect. The Debtor will receive a discharge.

c. **The Releases And Injunctions, Including A Release Of The USOPC, Are Necessary** To The Full or Partial Settlement Alternative.

The Plan provides for certain releases and plan injunctions for the Protected Parties under the Full or Partial Settlement Alternative. The Debtor and its counsel did not accept these releases and injunctions blindly. The Debtor and its counsel evaluated potential reasonably available alternatives and determined that none exist. The only way to fund the Trust is if the parties contributing to the Trust receive a full and complete release and the benefit of an injunction from all present and future claims.

Under the Full or Partial Settlement Alternative, the USOPC is a beneficiary of the Plan's releases and its injunctions. This treatment is required because of the contributions made by both the USOPC Settling Insurers and Debtor Settling Insurers[4] on USOPC's behalf, which in the latter case reflects that the USOPC is an additional or named insured under most of the Debtor CGL Insurance Policies and a contractual indemnitee of USAG.

*First*, National Casualty Company is both a Debtor CGL Insurer and a USOPC Settling Insurer, and thus its CGL Insurer Settlement Offer includes a payment on account of the USOPC. While ACE is only a Debtor Settling Insurer, and not a USOPC Settling Insurer, it has accepted its CGL Insurer Settlement Offer under Debtor CGL Policies that cover both USAG and USOPC. Gemini Insurance Company, which is a USOPC Settling Insurer but not a Debtor CGL Insurer, has accepted its CGL Insurer Settlement Offer, and thus its payment is made on behalf of USOPC. The Debtor submits that these contributions constitute additional and substantial consideration from the USOPC and therefore that the Plan's release and injunction provisions are fair, appropriate, and necessary to confirmation and implementation of the Plan.

*Second*, the USOPC qualifies as an insured under the following primary Debtor CGL Insurance Policies covering the following years:

| Insurer | Policy Number | How USOPC is Referenced: | Policy Dates |
|---------|---------------|--------------------------|--------------|
| Transamerica Commercial Insurance | SSP35038808 | USOPC with specific premise listed as Olympic Training Center | 8/1/1992-8/1/1993 |
| Transamerica Commercial Insurance | SSP36099770 | USOPC with specific premise listed as Olympic Training Center | 8/1/1993-8/1/1994 |

---

[4] National Union Fire Insurance Company of Pittsburgh, PA is the only Debtor Settling Insurer that denied coverage for the USOPC and is not making any contribution on behalf of the USOPC.

| Insurer | Policy Number | How USOPC is Referenced: | Policy Dates |
|---|---|---|---|
| TIG Insurance Company[5] | SSP3739355001 | USOPC | 8/1/1997-8/1/1998 |
| Cigna | G19421752 | USOPC | 8/1/1998-8/1/1999 |
| Cigna | G19421752 | USOPC | 8/1/1999-8/1/2000 |
| Ace American | G19421752 | USOPC | 8/1/2000-8/1/2001 |
| TIG Specialty | T7 0003921762800 | USOPC | 8/1/2001-8/1/2002 |
| Combined Specialty | T7 0000000734000 | USOPC | 8/1/2002-8/1/2000 |
| Combined Specialty | T7 0000000734001 | USOPC | 8/1/2003-8/1/2004 |
| Great American | PAC0000568846300 | USOPC | 8/1/2004-8/1/2005 |
| Great American | PAC0000568846301 | USOPC | 8/1/2005-8/1/2006 |
| Great American | PAC0000568846302 | USOPC | 8/1/2006-8/1/2007 |
| National Casualty | KRO0000000103500 | USOPC | 8/1/2007-8/1/2008 |
| National Casualty | KRO0000000103501 | Co-Promoters | 8/1/2008-8/1/2009 |
| National Casualty | KRO0000000103502 | Co-Promoters | 8/1/2009-8/1/2010 |
| National Casualty | KRO0000001198500 | Co-Promoters | 8/1/2010-8/1/2011 |
| National Casualty | KRO0000002032600 | Sponsors and Co-Promoters | 8/1/2011-8/1/2012 |
| National Casualty | KRO0000002905000 | Sponsors and Co-Promoters | 8/1/2012-8/1/2013 |
| National Casualty | KRO0000003809900 | Sponsors and Co-Promoters | 8/1/2013-8/1/2014 |
| National Casualty | KRO0000004695000 | Sponsors and Co-Promoters | 8/1/2014-8/1/2015 |
| National Casualty | KRO0000005683700 | "Sponsors" and Co-Promoters | 8/1/2015-8/1/2016 |
| National Casualty | KRO0000006492900 | USOPC | 8/1/2016-8/1/2017 |
| National Casualty | KRO0000007069300 | USOPC | 8/1/2017-8/1/2018 |

*Third*, the Debtor CGL Insurance Policies could afford coverage for USOPC's indemnification claims against USAG under the "Insured Contract" or comparable provisions of the Debtor CGL Insurance Policies.

As noted in the above chart, the National Casualty Company Debtor CGL Insurance Policies for the policy periods running from August 2011 through August 2016 did not specifically identify USOPC as an additional insured, but instead referred more generally to "Sponsors" and "Co-Promoters." USOPC has made a demand under these policies for coverage and National Casualty Company has demanded that USOPC release NCC and that USOPC be released as part of any payments under those policies. Under the Debtor CGL Insurance Policies that include USOPC, the USOPC has rights under those policies that are independent of any of the Debtor's rights. The Debtor CGL Settling Insurers have conditioned the payment of their respective CGL Insurer Settlement Offers upon the USOPC giving up any rights it may have under the policies.

---

[5] Additional TIG Insurance Company policies may list the USOPC as an additional insured, however, the Debtor does not have complete copies of all policies at this time.

The only way the USOPC will agree to that result is if it is protected by the releases and injunctions under the Plan.

The Debtor does not believe that it can successfully strip the USOPC of its rights to proceeds under the applicable Debtor CGL Insurance Policies without its consent. The majority of courts have held that the rights of additional insureds, like the USOPC, are not a debtor's property that it can sell or otherwise extinguish without that third party's consent. For example, one court within this Circuit determined that an additional insured had "equal and independent rights to seek indemnification and defense" from a debtor's policies. *In re SoyNut Butter Co.*, No. 17-14970, 2018 WL 3689549, at *3 (Bankr. N.D. Ill. Aug. 1, 2018). It then refused to allow the debtor to sell the policies and extinguish the additional insured's right to payment. *Id.* at *3-4.

Other courts agree and have concluded that bankruptcy courts lack "jurisdiction or authority to impair or extinguish" an additional insured's "independent contractual rights." *In re Sportstuff, Inc.*, 430 B.R. 170, 178 (BAP 8th Cir. 2010); *see also In re Archdiocese of St. Paul & Minn.*, 579 B.R. 188, 197-98, 202-03 (Bankr. D. Minn. 2017); *In re SelectBuild Illinois*, No. 09-12085, 2015 WL 3452542, at *9 (Bankr. D. Del. May 28, 2015); *In re Adelphia Comm'cns Corp.*, 364 B.R. 518, 527-28 (Bankr. S.D.N.Y. 2007); *In re Forty-Eight Insulations*, 149 B.R. 860 (N.D. Ill. 1992).

Given this authority, the Debtor expects that if it attempted to litigate this issue, it is likely that the Bankruptcy Court would hold that the USOPC has equal and independent rights in certain Debtor CGL Insurance Policies and that it is entitled to demand a benefit in exchange for releasing those rights. Because such litigation would be costly and time-consuming and USOPC has made an independent contribution through the payments made by its own carriers towards the funding of the Plan the Debtor has proposed that, under the Full or Partial Settlement Alternative, the USOPC will receive the protection offered by the Plan's releases and injunctions, and, subject to such being approved by the Bankruptcy Court, the USOPC will consent to release any rights it may have under the Debtor CGL Insurance Policies.

## 2. USAG's Non-Monetary Commitments And Reforms.

Athletes are the heart and soul of gymnastics, and the Debtor and the Survivors' Committee are both focused on making the organization more athlete-centric. As part of this commitment, the Survivors' Committee and the Debtor are working towards an agreement on certain non-monetary commitments to be included in the Plan when it is sent to survivors for their vote.

As those discussions continue, and subject to their completion, the parties have discussed and agreed upon a number of steps to strengthen athlete safety and are in discussion about other steps to be taken. The Debtor has committed thus far to the following:

- Before the Petition Date, the Debtor implemented a streamlined Board structure, reducing the number of directors from 21 to 15 and requiring a majority of the Board to be independent directors. In November 2020, the Debtor adopted Amended and Restated Bylaws, which further changed the Board structure. The Board continues to have 15 members, now comprised of 8 independent directors, 5 athlete representatives, 1 national membership director, and 1 affiliated organizations Director. At least 1 of

USAG's directors will be a survivor. At least 1 member of USAG's Safe Sport Committee and at least 1 member of USAG's Athlete Health and Wellness Council will be a survivor. The Survivors' Committee is working on a proposed process to nominate and/or select the survivors to fill these positions.

- Any complaints about individuals holding positions on the USAG board or standing committee member over whom the USAG board has oversight or removal capabilities will be addressed by the USAG board at the next board meeting following the complaint, or within 30 days, whichever is earlier.

- The Debtor hired a new President and CEO, who has met nearly one thousand stakeholders, including survivors, to hear their perspectives on how to improve athlete safety and the organization overall.

- The Debtor updated its bylaws and policies to strengthen Safe Sport provisions and complaint processing. These updates include: creating a permanent Safe Sport Committee; increasing the number of independent directors to eight; removing the President from a role in the processing of complaints; easing complaint filing requirements; delineating responsibilities of the Board and president more clearly; and providing for the publication of the names of members who have been suspended or placed on the permanently ineligible list as part of the disciplinary process.

- The Debtor adopted a new Safe Sport Policy, which mandates reporting, defines specific types of misconduct, sets standards to prohibit "grooming" behavior, and establishes greater accountability. The policy further provides important requirements and information on mandatory reporting and Proactive Policies that empower athletes and guide athlete-coach interactions. A copy of the Safe Sport Policy is available at: https://usagym.org/pages/education/safesport/policy.html. The Debtor will not permit a gym club to be a member of USAG unless it commits, as part of its membership agreement with USAG, to adopt and share these policies with its coaches, employees and gymnasts. The website also includes a "Policy Snapshot" summary, Safe Sport FAQs, including an FAQ page specific to parents and guardians, and educational webinars.

- The Debtor has expanded its Safe Sport Department to better support, train, educate, and serve members. The department now includes a Director of Safe Sport Education and Policy, a Safe Sport Legal Counsel, four Safe Sport Investigators, a Safe Sport Administrative Manager, and paralegal with dedicated Safe Sport responsibilities.

- The Debtor has hired a Chief of Athlete Wellness, which is a new role. This person is responsible for overseeing the Safe Sport Department as well as the organization's strategy and execution of holistic athlete health and wellness initiatives, including sports medicine, sports psychology, and nutrition services. Medical care at USAG-hosted camps and events is provided in accessible areas where multiple athletes may be present and multiple medical staff are present and able to view all medical encounters.

- The Debtor will ensure that posters with information setting forth how to report abuse or assault ("**reporting posters**") shall be affixed in prominent places throughout the venue during a USAG-hosted camp or event. The reporting poster will have QRC codes for easy accessibility to USAG's and the Center for SafeSport's (the "**Center**") online reporting portals. The reporting poster will be written so that it is easily understood by its intended audience, including children. USAG member clubs must also hang such posters in prominent places throughout their facilities as a condition of membership in USAG. USAG will supply the posters to member clubs at USAG's expense.

- The Debtor will not permit a gymnastics club to be a member of USAG unless it commits, as a condition of the membership agreement (which will include this Non-Monetary Commitments section of the Plan as an attachment to the agreement), to at the least:

  o affix the reporting posters in prominent places throughout the member club's facility;

  o provide gymnasts (or the gymnast's parent/guardian, if the gymnast is a minor) with information and pamphlets about sexual assault and how to report it and USAG will supply the pamphlets to member clubs at USAG's expense;

  o adopt and utilize USAG's Safe Sport Policy;

  o provide educational programs and training to volunteers, gymnasts (including minor gymnasts, with parent/guardian consent) and coaches related to appropriate boundaries, sexual assault, abuse and how to report it;

  o require individual members, including member club owners and coaches, to agree as a condition of membership that they understand their abuse reporting obligations and that they will report any suspicion of abuse to law enforcement;

  o prohibit one-on-one contact between a minor and an unrelated adult, in accordance with the Center's Minor Athlete Abuse Prevention Policy;

  o utilize the member club's website to provide educational information regarding assault and abuse and how to report it; and

  o require all persons, including but not limited to volunteers, coaches, and owners, who have regular contact with or authority over with minor athletes to complete Safe Sport training.

- Each member club will have a Safety Champion, who is responsible for communicating with USAG and facilitating compliance with the above mentioned requirements. The Safety Champion will work with USAG so that the member club has access to materials and information, provided at USAG's expense, needed to fulfill its obligations set forth above. The process of selecting and training the Safety Champion is under discussion with the Survivors' Committee.

14

- The Debtor has charged all of its employees with supporting and encouraging athlete wellness. For example, the Debtor's Chief Communications and Marketing Officer is responsible for incorporating the message of safety in all communications, and the Debtor's Chief of Staff and human Resources is responsible for ensuring that there is an internal, organizational culture of prioritizing safety. As part of this initiative, all new staff members receive SafeSport training within their first week with the organization.

- The Debtor has streamlined the reporting process by creating a dedicated, toll-free number, 833-844-SAFE; the safe sport email address of safesport@usagym.org; and online reporting at usagym.org/safesport. In addition to reporting violations of the Safe Sport code to USA Gymnastics, members are required to immediately report suspected child abuse, including sexual abuse, to law enforcement and to the U.S. Center for Safe Sport. The Debtor will set up a reporting portal that is accessible through use of a QRC code and a hotline for ease of reporting by a person or child. The reporting portal and/or hotline will be user friendly and make it easy for even a child to report abuse. The Debtor will promptly provide all reporting information that it receives to the U.S. Center for Safe Sport. The Survivors' Committee may make additional suggestions to aid in ease of use of the portal.

- USAG will work with the Survivors' Committee to address issues that currently exist with the Center's performance and USAG will help facilitate that communication with the Center, including, but not limited to, using its best efforts to arrange for a video conference with the Debtor, the Survivor's Committee and the Center's decision-makers and those with the ability to assist in implementing changes to the reporting process and procedures thereafter, including expediting timing of the investigation and its conclusion.

- The Debtor publishes on its website the names of permanently ineligible members and suspended members. The website for permanently ineligible members is: https://usagym.org/pages/aboutus/pages/permanently_ineligible_members.html And the website for suspended members is: https://usagym.org/pages/aboutus/pages/suspended_members.html

- The Debtor has strengthened its educational initiatives about athlete safety. The Debtor rolled out its new Safe Sport educational and training materials, which include industry best practices and ideas from experts in the prevention of child sexual abuse. The educational outreach encompasses presentations at Regional and National Congresses, social media posts, along with live additional educational and informational opportunities for clubs and all professional members; informational videos and articles about Safe Sport issues at usagym.org/safesport; and additional resources for parents at usagymparents.com. Professional members, Board members, and USA Gymnastics staff are required to take Safe Sport training. Safe Sport is also included as part of the safety and risk management course.

- The Debtor has instituted a Protest Policy for National Team Athletes. The below statement is memorialized in the National Team Handbook.

  *As a National Team athlete, you have an opportunity to use your voice to help improve the sport and the National Team experience by providing critical feedback, responding to surveys, and speaking candidly about what is and is not working well. Our role at USA Gymnastics is to listen to your feedback, and ensure that your input is an important component in the planning and decision-making process.*

  *In a number of forums (e.g., on social media, at press conferences, etc.), you also have a platform to use your voice in other ways – whether that is to inspire the next generation of gymnasts, provide feedback on your experiences, share personal anecdotes, or advocate for causes you believe in. Your choice to do so – including through peaceful protest at a USA Gymnastics' event – will not impact selections, team participation, or results, to the extent it is under USA Gymnastics' control (i.e., the Olympic Games are not under USAG control), so long as you are complying with the USA Gymnastics' policies, including the Code of Ethical Conduct.*

- The Debtor adopted an Athlete Bill of Rights, which is posted on the Debtor's website here: https://usagym.org/PDFs/About%20USA%20Gymnastics/athlete_bor.pdf.

- The Debtor has partnered with the Positive Coaching Alliance and has instituted training for clubs, gyms, gymnasts (or their parent/guardian, if the gymnast is a minor), organization staff, national team staff, and coaches of national team members.

- The Debtor issued a Culture Survey to athlete parents and our membership to track its progress, and the Debtor is committed to doing this survey on an annual basis.

- The Debtor retained Deborah Daniels to audit the Debtor's progress on the Daniels' recommendations.

In addition, the Debtor and the Reorganized Debtor commit to the following steps to continue strengthening athlete safety:

- Ensure that all sponsorship and partnership dals incorporate some aspect of athlete wellness.

- Become a more data-driven organization, particularly with regards to athlete safety;

- Implement additional educational programming about athlete safety, including dialogue-based information-share opportunities and more easily-accessed content, such programming will be shared with gyms and clubs through conferences and Safety Champions;

- Become more transparent in the Safe Sport process to build trust within the community and encourage reporting;

- Audit member clubs for compliance with the Safe Sport Policy;

- Continue to engage with, and listen to, all stakeholders; and

- Engage with survivors who want to be involved in order to improve the organization on every level—culture, policies, governance, etc.

**Accountability.** The Debtor and the Survivors' Committee are discussing a process to provide for historical accountability, healing for all stakeholders, with focus on the survivors, and future supervision, monitoring, auditing and implementation of the Plans' Non-Monetary Commitments. The Survivor's Committee and the Debtor commit to continued discussions regarding the hiring of an independent, trauma-informed Expert, with experience in childhood sexual abuse involving betrayal trauma/institutional betrayal. The Survivors' Committee and the Debtor commit to continued discussions about the work and make-up of a Restorative Justice Task Force.

### 3. Treatment Of Claims Other Than Abuse Claims.

Claims against the Debtor that are not Abuse Claims are identified and described in full in Article V.B. of this Disclosure Statement. They will be treated as follows under the Plan:

- **Classes 1-4:** The Other Priority Claims (Class 1), the PNC Bank Claim (Class 2), the Sharp Claim (Class 3), and the General Unsecured Convenience Claims (Class 4) will be unimpaired under the Plan.

- **Class 5 General Unsecured Claims:** General Unsecured Claims will be paid from existing and future revenues of the Reorganized Debtor over 3 years at 80 percent in equal annual installments, beginning on August 15, 2022. In total, filed and scheduled General Unsecured Claims assert liabilities of approximately $1,841,188.24 (exclusive of the Indemnification Claims, the Personal Injury Claim, a Claim that will be treated as an Abuse Claim, and Claims that have been disallowed). Attached as Exhibit 2 is a *pro forma* cash flow analysis for the Debtor for this three year period.

- **Class 7 Personal Injury Claim:** The Claimant holding the Personal Injury Claim (General Unsecured Claim No. 251) will be permitted to prosecute the Personal Injury Claim against the Reorganized Debtor in name only in the court in which the Personal Injury Claim could have been brought, but for the automatic stay, and to recover any judgments or settlement awards exclusively from the Debtor's Personal Injury Insurance Policy. The Debtor does not admit liability for the Personal Injury Claim and reserves any and all defenses.

- **Class 8 USOPC Claim and Class 9 Indemnification Claims:** Holders of Class 8 and 9 Claims shall not receive a distribution under the Plan. If the entire amount of the Total Settlement Demand Amount is funded on the Effective Date of the Plan, all rights that

the Holders of Class 8 and 9 Claims have to receive indemnification or reimbursement from the Debtor shall be satisfied by granting the Holders of Class 8 and 9 Claims the benefit of the Channeling Injunction. In the case of the Partial Settlement Option, (a) all rights that the Holders of Class 8 and 9 Claims have to receive indemnification or reimbursement from the Debtor under any of the Debtor's Settling Insurance Policies, with respect to Abuse Claims falling under the insurance policies of any Settling Insurer, shall be satisfied by granting the Holders of Class 8 and 9 Claims the benefit of the Channeling Injunction; and (b) the Holders of Class 8 and 9 Claims will retain any rights that the Holders of such Claims have to receive indemnification or reimbursement from the Debtor for Abuse Claims falling under the Debtor CGL Insurance Policies issued by a Non-Settling Insurer, but only to the extent that there is coverage under such policies for such Class 8 Claim or Class 9 Claim. Under the Litigation Only Alternative, all rights that the Holders of Class 8 and 9 Claims have to reimbursement or indemnification from the Debtor are preserved but the sole source of recovery for such Claims shall be from the Debtor CGL Insurance Policies. With respect to the USOPC Claim, the portion of that Claim that seeks payment of $88,983.24 will be treated as a Class 5 General Unsecured Claim and the Debtor preserves its rights to object to the Allowance of such Claim.

- **Class 10 FCR Claim:** Under the Full or Partial Settlement Alternative, on the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 10 Claims pursuant to the provisions of the Plan and the Trust Documents; *provided, however*, that no Holder of a Class 10 Claim shall have an interest in the Trust Assets other than the Future Claimant Reserve. Under the Litigation Only Alternative, the FCR Claim receives nothing; provided, however, that to the extent that the Holder of an FCR Claim has a right to recovery under any of the Debtor CGL Insurance Policies, such rights are preserved and will not be impaired under the Plan.

- **Class 11 Sexual Abuse Claims Filed After the Bar Date:** Under the Full or Partial Settlement Alternative Class 11 Claims will receive no Distributions under the Plan. Under the Litigation Only Alternative, Class 11 Claims shall not receive a Distribution; *provided, however*, that to the extent that the Holder of a Class 11 Claim has a right to recovery under any of the Debtor CGL Insurance Policies, such rights are preserved and will not be impaired under the Plan.

## C.    The Plan Is In The Best Interests Of Creditors.

As discussed in the unaudited Liquidation Analysis attached to this Disclosure Statement as Exhibit 3, the Debtor estimates that recoveries under the Plan for all Holders of Allowed Claims will be greater than their recoveries in a liquidation under chapter 7 of the Bankruptcy Code. The Liquidation Analysis does not include a liquidation analysis of the Debtor CGL Insurance Policies. This is so because, in light of insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies cannot be determined with precision. The Debtor submits, however, that in a liquidation scenario, it is unlikely that the value of the Debtor CGL Insurance Policies would exceed the amount the Debtor is receiving on account of its entry into the Buy-Back Agreements for the Debtor CGL Insurance Policies of the Debtor CGL Insurers who are Settling Insurers. This is due both because of the uncertainty of recovery in light of insurer

coverage defenses, and also the delay in any recovery during a period of litigation. With regard to any Debtor CGL Insurers who are *not* Settling Insurers, the Debtor submits that in light of the assignment of Insurance Claims to the Trust, Abuse Claimants are receiving at least what they would receive in a chapter 7 liquidation from the Debtor CGL Insurance Policies of the non-settling Debtor CGL Insurers.

Under the Litigation Only Alternative, the Debtor submits that Abuse Claimants are receiving at least what they would receive in a chapter 7 liquidation from the Debtor CGL Insurance Policies. This is so because, under the Litigation Only Alternative, the Plan permits Holders of Abuse Claims filed or deemed to be filed by the Bar Date to prosecute their Claims against the Reorganized Debtor in name only in the courts where such Claims were pending before the Petition Date or the courts in which such Claims could have been brought, but for the automatic stay imposed by Section 362 of the Bankruptcy Code, and to recover any judgments or awards against the Debtor only from the proceeds of the CGL Insurance Policies issued by the Debtor's CGL Insurers.

Any distributions in chapter 7 will also be reduced by the additional administrative expenses that a chapter 7 trustee (who must be appointed in any chapter 7 case) and the trustee's professionals will incur. Also, because a new deadline will be set for creditors to file claims against the Debtor's estate (including for creditors who did not file their claims in the Debtor's case), additional claims may be filed that reduce the amount available for each allowed claim. Distributions in a chapter 7 case will then be delayed due to the time it will take the chapter 7 trustee to assess the Debtor's Assets, review and analyze claims filed against the Debtor, and liquidate the Debtor's property for distribution. Claimants entitled to vote to accept or reject the Plan should review the Liquidation Analysis before casting their votes.

Because the Plan will provide the Debtor with a greater total amount of property to distribute to Holders of Allowed Claims than would be the case in a liquidation under chapter 7, the Debtor submits that the Plan is in the best interest of creditors and urges Claimants to vote in favor of the Plan.

**D.    Voting And Confirmation Procedures.**

By order dated [•], 2021 (the "**Disclosure Statement Order**") the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable creditors of the Debtor to make an informed decision on whether to accept the Plan. A copy of the Disclosure Statement Order is attached hereto as Exhibit 4. The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court to creditors that they should vote to accept or to reject the Plan.

Holders of Allowed Claims in Voting Classes can find voting instructions in the Disclosure Statement Order and in the ballots that accompany this Disclosure Statement. For purposes of voting only, each Abuse Claim (Class 6), Personal Injury Claim (Class 7), USOPC Claim (Class 8), Indemnification Claim (Class 9), and FCR Claim (Class 10) (only in the case of the Full or Partial Settlement Alternative) will be allocated one dollar ($1.00). To be counted, ballots must be properly completed, executed, and **actually received** by Omni Agent Solutions, Inc., the

Debtor's claims agent (the "**Claims Agent**"), on or before November 8, 2021 (the "**Voting Deadline**").

Objections to Confirmation of the Plan must be filed and served on the Debtor, the Survivors' Committee, and the U.S. Trustee no later than November 19, 2021 at 11:59 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to the confirmation of the Plan are timely filed and served, those objections might not be considered by the Bankruptcy Court.

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan on December 8-9, 2021 at 10:00 a.m. (prevailing Eastern time) (the "**Confirmation Hearing**"), in person in Courtroom 329, 116 U.S. Courthouse, 46 East Ohio Street, Indianapolis, Indiana 46204. This hearing may be adjourned from time to time, including without further notice other than by announcement in the Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code for confirmation. The Bankruptcy Court will also receive and consider a ballot report prepared by the Debtor's Claims Agent tabulating the votes accepting and rejecting the Plan.

## II. QUESTIONS AND ANSWERS REGARDING
## THIS DISCLOSURE STATEMENT AND THE PLAN

**Why is the Debtor sending me this Disclosure Statement?**

The Debtor is seeking Bankruptcy Court approval of the Plan. This Disclosure Statement contains information about the Plan. Section 1125 of the Bankruptcy Code requires the Debtor to provide a Disclosure Statement approved by the Court with the Plan to assist you in making an informed judgment about whether you will accept or reject the Plan.

**The Plan provides that the Debtor and the Survivors' Committee may jointly elect the Partial Settlement Option. Which is the deadline by which they must make that election?**

The deadline for the Debtor and the Survivors' Committee to jointly elect the Partial Settlement Option was the date of the hearing to approve this Disclosure Statement. At that hearing the Debtor and the Survivors' Committee jointly elected the Partial Settlement Option. Thus, the portions of the Plan pertaining to the Litigation Only Alternative are no longer relevant. At that hearing the Debtor and the Survivors' Committee did not jointly elect the Partial Settlement Option. Thus, the portions of the Plan pertaining to the Partial Settlement Option are no longer relevant.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

If the Plan is not confirmed, the Debtor believes that recoveries for all claimants, including Abuse Claimants, will be materially reduced.

Under the Full or Partial Settlement Alternative, a Trust will be established for the benefit of Holders of Class 6 Abuse Claims and the Class 10 FCR Claim that—as of the date of this Disclosure Statement—would include $[•] from the Settling Insurers (less the Professional Fee

Hold-Back), the $2,125,000.00 Twistars Payment, and, under the Partial Settlement Option, an assignment of any Insurance Claims. Confirmation of the Plan is necessary to effectuate these settlements, and Abuse Claimants will lose access to the $[•] and the assignment of any Insurance Claims if the Plan is not confirmed.

Abuse Claimants' recoveries under the Litigation Only Alternative will be determined in the state or federal courts where these claims were pending before the Chapter 11 Case. Under the Litigation Only Alternative, Holders of Abuse Claims will have thirty days following the Effective Date of the Plan to either recommence their prepetition lawsuits or initiate new lawsuits. Once that thirty-day deadline passes, individuals cannot commence any suit asserting a Claim for Sexual Abuse based upon the Debtor's conduct or omissions occurring prior to the filing of this case. The Litigation Only Alternative therefore fixes the universe of claims shortly after the Plan goes into effect. On the other hand, if the Plan is not confirmed and/or does not become effective, there will be nothing to limit the claims that additional parties might bring in the future, even if they failed to submit a timely Abuse Claim in this case. Those new claims would dilute recoveries for individuals who timely filed their Abuse Claims here.

Moreover, if the Plan is not confirmed or does not become effective in a timely manner, any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan on account of, among other things, the cost of negotiating, drafting, and potentially litigating an alternative Plan. Further, failure to confirm the Plan may result in dismissal of the case in its entirety. Without the discharge contemplated by the Plan, the Debtor will be subject to claims of claimants who did not file claims in the case.  That result could, depending on the applicable insurance policy, prejudice those claimants who timely filed claims in this case by potentially reducing the amount of available assets the Debtor has to satisfy their claims.

**What do you mean when you refer to "Confirmation" and "Effective Date"?**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court. Confirmation of the Plan will bind the Debtor, any Person acquiring property under the Plan, and any creditor, including Abuse Claimants, to the terms of the Plan, in full satisfaction and compromise of any and all obligations that arose prior to this case.

Confirmation of the Plan does not guarantee that you will receive the distribution contemplated under the Plan. After confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and become effective on the "Effective Date."

The "Effective Date" will occur when the Bankruptcy Court enters an order confirming the Plan (and that order is reasonably acceptable to the Reorganized Debtor, the Survivors' Committee, and, if the Full or Partial Settlement Alternative is selected, the Participating Parties and the Settling Insurers), the Confirmation Order becomes a final order on or before December 31, 2021, and, if the Full or Partial Settlement Alternative is selected, the Settlement Trustee, the FCR, and the Reorganized Debtor sign the Trust Agreement, the Settling Insurers have made their Agreed CGL Insurer Payments to the Debtor and the Trust has been funded, the Bankruptcy Court has approved the Settling Insurers' Buy-Back Agreements, and the Settling Insurers have been dismissed from the Insurance Coverage Adversary Proceeding with prejudice.

**Under the Full or Partial Settlement Alternative, how will the Trust pay Abuse Claims?**

The Plan provides that the Trust will be funded with the $2,125,000.00 Twistars Payment and the Net Settlement Payment, which is (a) in the event that the Total Settlement Demand is funded as of the Effective Date, $425,000,000.00 less the Professional Fee Hold-Back; and (b) in the event that the Partial Settlement Option is jointly elected by the Debtor and the Survivors' Committee, all payments received from a Partial Settlement Option Accepted Party less the Professional Fee Hold-Back plus Insurance Claims.

The Trust shall pay Abuse Claims and Future Claims in accordance with the Allocation Protocol and the Future Claimant Allocation Protocol, which protocols are attached to the Plan as Exhibits H and I. The initial Settlement Trustee will be William L. Bettinelli. Mr. Bettinelli is a retired judge, and has extensive experience in mass tort cases, including serving as a trustee. The Future Claimant Reserve will be funded with 1% of the Net Settlement Payment.

**Under the Partial Settlement Option, How Can an Abuse Claimant Litigate Her Abuse Claim?**

If the Debtor and the Survivors' Committee, each in their sole discretion, jointly elect to proceed with the Partial Settlement Option, an Abuse Claimant whose Abuse Claim is covered only by a Non-Settling CGL Insurer, as set forth on Exhibit E to the Plan, may make a one-time election to be treated as a "**Litigation Claimant**" within 60 days of the Effective Date of the Plan. A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time. Once withdrawn, the election may not be reinstated.

The Plan permits a Litigation Claimant, at his or her own expense, to commence or continue any action against the Debtor or a Participating Party that is covered by a Non-Settling Insurer; *provided, however*, that such Litigation Claimant may only collect a judgment or award from the proceeds of an insurance policy issued by a Non-Settling Insurer.

To the extent the Settlement Trustee enters into a settlement agreement (such settlement, a "**Trust Settlement Agreement**") with any Non-Settling Insurer that covers a Litigation Claimant's Abuse Claim, such Litigation Claimant shall be entitled to an enhancement (the "**Claim Enhancement**") as set forth in Section 10.8.3 of the Plan to his or her allocation pursuant to the Allocation Protocol, which enhanced amount shall be deducted from the proceeds of the settlement agreement with the applicable Non-Settling Insurer. A Litigation Claimant's allocated settlement payment shall be held in reserve until one of the conditions in Section 10.8.5 of the Plan is met.

**Will there be any releases granted to parties other than the Debtor as part of the Plan?**

Yes, but only under the Full or Partial Settlement Alternative. Under the Full or Partial Settlement Alternative, to receive a distribution from the Trust, Abuse Claimants and Future Claimants must execute a full and complete general release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may or could claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons (each as identified in Section I.B.1.a above), of any and all Claims arising from, in connection with, or relating to Abuse Claims, Future Claims, USAG and the Settling Insurance Policies listed on Exhibit A to the Plan. The

release must be in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers and will be attached to the Plan as Exhibit J. Note, however, that under the Partial Settlement Option, there will not be releases for any Non-Settling Insurers.

By voting in favor of the Plan, Abuse Claimants and Future Claimants necessarily consent to this release. The release is a necessary component of the Full or Partial Settlement Alternative, the Plan, and the Debtor's reorganization because, without the release, the Settling Insurers and Participating Parties will not agree to contribute the settlement amounts and fund the Trust.

In the event of a Litigation Only Alternative, the releases just described will not apply. Instead, the Debtor will receive the benefit of a discharge of all liability for all claims that occurred prior to confirmation of the Plan, and Abuse Claimants will only be permitted to recover on their claims from the Debtor CGL Insurance Policies (and Other Insurance Policies (if any) that are available for Abuse Claims). Any claims that Abuse Claimants may have against third parties are unimpaired by the Litigation Only Alternative.

**Will there be any injunctions entered pursuant to the Plan?**

Yes. In the event of a Full or Partial Settlement Alternative, the Channeling Injunction and Settling Insurer Injunction described in Article XII of the Plan will both be entered with respect to certain Claims. In addition, under both the Full or Partial Settlement Alternative and the Litigation Only Alternative, the Debtor will receive the benefit of the discharge injunction described in Section 18.1 of the Plan. Certain other parties will also receive the benefit of the exculpation and limitation of liability set forth in Section 18.4 of the Plan.

**Channeling Injunction.** Under the Full or Partial Settlement Alternative, certain Claims will be channeled to the Trust. These Channeled Claims are defined in full in Section 1.1.25 of the Plan, and include the Abuse Claims, FCR Claim, Participating Party Claims, Indemnification Claims, and any Claims against a Participating Party, a Non-Debtor CGL Settling Insurer Covered Person, or a Settling Insurer arising from, in connection with, or related in any way to USAG, an Abuse Claim, or any of the Settling Insurance Policies listed on Exhibit A to the Plan, excepting solely the Personal Injury Claim. In addition, a Channeled Claim includes any Claim against the Debtor, a Participating Party, a Non-Debtor CGL Settling Insurer Covered Person, or a Settling Insurer based on allegations that it is an alter ego of a Person that is not a Participating Party, Non-Debtor CGL Settling Insurer Covered Person, or Settling Insurer or that the Debtor's, Participating Party's, Non-Debtor CGL Settling Insurer Covered Person's or Settling Insurer's corporate veil should be pierced on account of Claims against a Person that is not a Participating Party, Non-Debtor CGL Settling Insurer Covered Person, or Settling Insurer or based on any other theory under which the legal separateness of any Person and any other Person may be disregarded to impose liability for a Claim on either such Person. For the avoidance of doubt and notwithstanding anything to the contrary herein, no Claim by any Person, including an Abuse Claimant or Future Claimant, against an Excluded Party may be a Channeled Claim. The Personal Injury Claim is not a Channeled Claim.

Individuals holding Channeled Claims will be forever and permanently enjoined, stayed, barred, and restrained from taking any action to recover on Channeled Claims from any asset not

held by the Trust. The Channeling Injunction will preclude recovery from any assets of the Debtor, the Estate, the Reorganized Debtor, any Participating Party, any Settling Insurer, and any Non-Debtor CGL Settling Insurer Covered Person, as well as any of these entities' predecessors, successors, assigns, and present and former shareholders, affiliates, subsidiaries, employees, agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such. However, the protection of the Channeling Injunction will not extend to any Person who personally committed an act or acts of abuse resulting in a claim against the Debtor, a Participating Party, or a Settling Insurer.

If any claimant violates the Channeling Injunction, they may be subject to sanctions imposed by the Bankruptcy Court, even after the closure of the Debtor's Chapter 11 Case. The Channeling Injunction will preclude claimants from pursuing Channeled Claims against the entities and assets protected by the Channeling Injunction regardless of whether or not claimants receive a distribution under the Plan. The Channeling Injunction is a necessary component of the Full or Partial Settlement Alternative, the Plan, and the Debtor's reorganization because, without the Channeling Injunction, the Settling Insurers and Participating Parties will not agree to contribute the settlement amounts and fund the Trust.

**Settling Insurer Injunction.** In addition, under the Full or Partial Settlement Alternative, and consistent with the holdings in *Eli Lilly and Co. v. The Aetna Casualty and Surety Co., et al.*, Cause No. 49D12 0102 CP 000243 (Marion Cty. Sup. Ct. 2002) and *Southern Indiana Gas & Electric Company v. Admiral Ins. Co*., Cause No. 49D05 0411 PL 2265 (Marion Cty. Sup. Ct. 2011), the Settling Insurers will receive the benefit of the Settling Insurer Injunction. This injunction prohibits any and all Persons from asserting against any Settling Insurer any claim related to any Abuse Claim or Future Claim, any insurance policies issued by the Settling Insurers, or any claim against any Settling Insurer for contribution, indemnity, defense, subrogation, or similar relief. This injunction permits the Settling Insurers to contribute to the Trust in full satisfaction of their respective comprehensive general liability insurance policies with respect to the Abuse Claims, ensuring they will face no claims on account of such policies in the future, and is a necessary component of the Full or Partial Settlement Alternative, the Plan, and the Debtor's reorganization.

**Discharge Injunction.** If the Plan is confirmed the Debtor will receive the benefit of the discharge injunction provided by Section 524 of the Bankruptcy Code. That discharge injunction prohibits any act to collect, recover, or offset any claim against or debt of the Debtor that arose before the date the Plan is confirmed. This discharge injunction only applies to the Debtor; it does not apply to any other Person.

**Exculpation and Limitation Of Liability.** Certain Exculpated Parties will be protected from claims arising from or relating to any act or omission in connection with this case, the pursuit of confirmation of the Plan, or the administration of the Plan, including the exercise of their business judgment and the performance of their fiduciary obligations.

These Exculpated Parties are defined in Section 1.1.56 of the Plan to include the Debtor, the Reorganized Debtor, the Debtor's Professionals, the FCR, the FCR's Professionals, the Survivors' Committee, the Survivors' Committee's members in their capacities as members of the

24

Survivors' Committee, the Survivors' Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and each of their respective Related Persons. However, the protection of this exculpation and limitation of liability will not extend to any Person who personally committed an act or acts of abuse resulting in a claim against the Debtor, a Participating Party, or a Settling Insurer. The exculpation and limitation and liability will also not apply to any claims arising from willful misconduct or fraud, although the Debtor, the Estate, and the Reorganized Debtor will be discharged from liability for any of these acts that occurred prior to confirmation of the Plan.

**Why does the USOPC receive the benefit of the releases and injunctions described above under the Full or Partial Settlement Alternative?**

Under the Full or Partial Settlement Alternative, the USOPC is a beneficiary of the Plan's release and injunctions. Importantly, the USOPC will not receive the benefit of the releases and injunctions under the Litigation Only Alternative. The Debtor and the Survivors' Committee support the Plan's releases under the Full or Partial Settlement Alternative for two primary reasons.

*First*, National Casualty Company is both a Debtor CGL Insurer and a USOPC Settling Insurer, and thus its CGL Insurer Settlement Offer includes a payment on behalf of the USOPC pursuant to USOPC's rights under both the Debtor CGL Policies and the USOPC CGL Insurance Policies issued by National Casualty Company. While ACE is only a Debtor Settling Insurer, and not a USOPC Settling Insurer, it has accepted its CGL Insurer Settlement Offer under Debtor CGL Policies that cover both USAG and USOPC, and thus its payment is made on behalf of the USOPC pursuant to its rights under those policies. Gemini Insurance Company, which is a USOPC Settling Insurer but not a Debtor CGL Insurer, has accepted its CGL Insurer Settlement Offer, and thus its payment is made on behalf of the USOPC. The Debtor submits that these contributions constitute additional and substantial consideration from the USOPC and therefore that the Plan's release and injunction provisions are appropriate.

*Second*, the USOPC qualifies as an insured under the Debtor CGL Insurance Policies identified in Section I.B.1.c. of this Disclosure Statement and has asserted rights as an insured under other Debtor CGL Policies. The Debtor cannot unilaterally strip the USOPC of its rights under the applicable Debtor CGL Insurance Policies. Courts have consistently held that the rights of additional insureds, like the USOPC, are not a debtor's property that it can sell or otherwise extinguish without that third party's consent. Some courts have gone so far as to say that bankruptcy courts completely lack jurisdiction (*i.e.*, power) to impair or extinguish an additional insured's independent contractual rights. Given this authority, the Debtor expects that if it attempted to litigate this issue, it is likely that the Bankruptcy Court would hold that the USOPC has equal and independent rights in certain Debtor CGL Insurance Policies and that it is entitled to demand a benefit in exchange for releasing those rights. It is for this additional reason that the USOPC is receiving the protection under the Full or Partial Settlement Alternative offered by the Plan's releases and injunctions

**How do I vote for or against the Plan?**

This Disclosure Statement is being distributed to the Holders of Claims entitled to vote on the Plan, along with ballots to be used for voting on the Plan. If you are a holder of a Claim in

Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and Class 10 (the FCR Claim, only under the Full or Partial Settlement Alternative), you may vote for or against the Plan by completing your ballot and submitting it using one of two methods: (1) by electronic submission via the Balloting Agent's E-Ballot Platform at https://omniagentsolutions.com/USAG-Ballots, or (2) by mail, overnight, or personal delivery to the Balloting Agent at USA Gymnastics Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367. You are highly encouraged to submit your Ballot via the E-Ballot Platform. Do not send your ballot to the Debtor or to the Bankruptcy Court.

**What is the deadline to vote on the Plan?**

All ballots must be **actually received** by the Debtor's Claims Agent (Omni Agent Solutions) on or before the Voting Deadline of November 8, 2021, via the E-Ballot Platform or mail, overnight, or personal delivery, as set forth above and on your ballot. If your ballot is not received by the Debtor's Claims Agent by the Voting Deadline, and such deadline is not extended, your vote on the Plan will not be counted.

**What is the Confirmation Hearing and when is it scheduled to occur?**

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The standards for confirmation are set forth above and in Section 1129 of the Bankruptcy Code.

The Bankruptcy Court has scheduled the Confirmation Hearing for December 8-9, 2021 at 10:00 a.m. (prevailing Eastern time) before the Honorable Robyn Moberly, Chief United States Bankruptcy Judge, in person in Courtroom 329, 116 U.S. Courthouse, 46 East Ohio Street, Indianapolis, Indiana 46204. The Confirmation Hearing may be adjourned from time to time, including without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Objections to Confirmation of the Plan must be filed and served on the Debtor, the Survivors' Committee, and the United States Trustee no later than November 19, 2021 at 11:59 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless objections to the confirmation of the Plan are timely filed and served, those objections might not be considered by the Bankruptcy Court.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising under, in furtherance of, or in connection with, the Plan. These matters include: (1) the determination of objections to Disputed Claims and requests for payment on administrative expense of Claims entitled to priority under Section 507 of the Bankruptcy Code; (2) the resolution of disputes regarding interpretation and implementation of the Plan and related documents; (3) the entry of appropriate orders to protect parties from actions prohibited under the Plan; (4) the approval of amendments to and modifications of the Plan; (5) the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Plan's

Effective Date, including but not limited to the Insurance Coverage Adversary Proceeding; (6) the determination of any motion to determine that a Claimant is a Future Claimant or to determine that an Abuse Claim filed after the Bar Date shall be deemed to have been filed before the Bar Date; and (7) the closure of this Chapter 11 Case.

**Does the Debtor recommend voting in favor of the Plan?**

Yes. The Debtor recommends voting for the Plan because the Plan provides for a larger and more certain distribution to the Debtor's unsecured creditors, including Abuse Claimants, than would otherwise result from liquidation or any other reasonably available alternative. Accordingly, the Debtor recommends that the holders of Claims in the Voting Classes vote to accept the Plan.

**Does the Survivors' Committee recommend voting in favor of the Plan?**

Yes.  The Survivors' Committee has enclosed with this Disclosure Statement a letter stating its recommendation in favor of the Plan.

## III. AN OVERVIEW OF THE CHAPTER 11 PROCESS

**A.      A Chapter 11 Case.**

Chapter 11 of the Bankruptcy Code allows a debtor to reorganize its operations in an orderly fashion for the benefit of its creditors and other parties in interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate and remain in possession of its property as a debtor in possession unless the Bankruptcy Court orders the appointment of a trustee. In the Debtor's case, there has been no request for the appointment of a trustee and the Debtor remains a debtor in possession.

The filing of a petition under the Bankruptcy Code triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by individuals and entities to collect on prepetition claims against a debtor, continue lawsuits against a debtor, or otherwise exercise control over or interfere with a debtor's property or operations. The automatic stay remains in full force and effect until the effective date of a confirmed chapter 11 plan, unless otherwise ordered by the Bankruptcy Court.

**B.      A Chapter 11 Plan.**

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying the claims against in a debtor's estate. Once a plan is confirmed by a bankruptcy court, it becomes binding on a debtor and all of its creditors, and the prior obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

C. **Voting On A Chapter 11 Plan.**

1. **Court Approval Required.**

Before a debtor solicits votes to accept a proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the plan. This Disclosure Statement is presented to holders of Claims against the Debtor in satisfaction of the requirements of Section 1125 of the Bankruptcy Code.

2. **Impaired Classes With Recoveries Entitled To Vote.**

After the disclosure statement to a chapter 11 plan has been approved by a bankruptcy court, creditors whose claims against a debtor are impaired under a plan, and who are entitled to receive some recovery under the plan, are permitted to vote to accept or reject the plan. Section 1124 of the Bankruptcy Code provides that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered. As an example, a claim is impaired if the time for the debtor to pay the amount due is extended beyond the time originally contemplated by the parties. A claim is also impaired if the plan provides that a claimant may only pursue recovery on the claim against certain, rather than all, of the debtor's assets after the conclusion of the chapter 11 case.

Applying these rules in this case, only certain classes of Claims against the Debtor are entitled to vote. Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the Personal Injury Claim), Class 8 (the USOPC Claim), Class 9 (Indemnification Claims), and Class 10 (the FCR Claim, only under the Full or Partial Settlement Alternative) are each impaired but entitled to receive some property under the Plan. As a result, each of these Voting Classes may vote to accept or reject the Plan.

By contrast, Class 1 (Other Priority Claims), Class 2 (the PNC Bank Claim), Class 3 (the Sharp Claim), and Class 4 (General Unsecured Convenience Claims) are each unimpaired under the Plan and cannot vote because they are deemed to accept the Plan. Relatedly, Class 11 (Sexual Abuse Claims Filed After the Bar Date) is impaired under the plan, is not entitled to receive any property, and is therefore deemed to reject the plan without voting. Any ballots cast by holders of Claims in these Classes will not be counted.

3. **Acceptance Of A Chapter 11 Plan.**

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan as votes in favor of the plan by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in each voting class held by creditors who cast ballots. Here, the Claims Agent will collect and tabulate all ballots that are cast by the Voting Classes and report this information to the Bankruptcy Court.

In addition, under Bankruptcy Rule 3018(a), the Bankruptcy Court may temporarily allow any claim in an amount that the Court deems proper for the purpose of voting to accept or reject the Plan. In this case, the Abuse Claims in Class 6, the Personal Injury Claim in Class 7, the USOPC Claim in Class 8, the Indemnification Claim in Class 9, and the FCR Claim in Class 10

28

(only under the Full or Partial Settlement Alternative) are unliquidated. In other words, the amount of damages to which any such Claimant is entitled, if any at all, has not yet been determined by any court or by any agreement between the Debtor, any such Claimant, and the Debtor's insurers.

Here, in order to determine if the required dollar amount of the Claims in these classes has voted in favor of the Plan, each such Claim will be allocated $1.00 for voting purposes only. If more than one-half in number and more than two-thirds in dollar amount of such Claims in their respective Classes vote and vote in favor of the Plan, such Classes will have accepted the Plan.

### 4. Disputed Claims May Not Vote.

If any Claim in any Class entitled to vote is disputed by the Debtor (a "**Disputed Claim**"), the individual holding that Disputed Claim is not entitled to vote on the Plan unless such Disputed Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court in an estimated amount that the Bankruptcy Court deems proper for the purpose of voting to accept or reject the Plan. A Claim is disputed if it is subject to an objection that has been timely filed and has neither been overruled nor denied by a final order and has not been withdrawn. A Claim is also disputed if it is listed on the Debtor's Schedules as disputed, unliquidated, or contingent, and with respect to which a superseding proof of claim has not been filed. The Bankruptcy Court may also disregard any vote on any Claim if it determines that the acceptance or rejection of the Plan by the claimant was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## D. Confirmation of a Chapter 11 Plan.

### 1. Confirmation With Acceptance By All Classes.

If all Classes of Claims are deemed to accept the Plan or vote to accept the Plan, the Bankruptcy Court may confirm the Plan if it independently determines that the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. The Debtor believes that the Plan satisfies all of the applicable requirements of Section 1129(a) of the Bankruptcy Code.

### 2. Confirmation With Rejection By Certain Classes.

The Bankruptcy Court may also confirm the Plan even though fewer than all of the Classes of Impaired Claims vote to accept the plan. In order for the Plan to be confirmed despite its rejection by a Class of Impaired Claims, the Plan must be accepted by at least one Class of Impaired Claims and the Debtor must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each Impaired Class of Claims that does not vote to accept the Plan.

Under Section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides that: (a) each holder of a secured claim will receive or retain on account of its claim property that has a value, as of the effective date of the plan, in an amount equal to the allowed amount of such claim or such other treatment as accepted by the holder of such claim; and (b) each holder of an unsecured claim that is junior to the claims of such class will not receive on account of such junior claim any property at all unless the senior class is paid in full.

29

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

The Debtor believes that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.

## IV. THE DEBTOR, ITS OPERATIONS, AND THE CHAPTER 11 CASE

### A.   USAG's Operations.

USAG is a 501(c)(3) not-for-profit organization incorporated in Texas. Based in Indianapolis, Indiana, USAG is led by its President and Chief Executive Officer, Li Li Leung, who was hired in March, 2019, with the approval of the Bankruptcy Court. (Dkt. 367.)

USAG sets the rules and policies that govern the sport of gymnastics in the United States, which encompasses the following disciplines: women's gymnastics, men's gymnastics, trampoline and tumbling, rhythmic gymnastics, acrobatic gymnastics, parkour, and gymnastics for all. USAG is designated by the USOPC and the Fédération Internationale de Gymnastique ("**FIG**") as the national governing body for the sport of gymnastics in the United States. USAG selects and trains the United States gymnastics teams for the Olympic Games and World Championships, among other competitions. USAG also provides educational opportunities for coaches and judges, as well as gymnastics club owners and administrators, and sanctions approximately 4,000 competitions and events throughout the United States annually. More than 200,000 athletes, professionals, and clubs are members of USAG.

### B.   USAG's Capital Structure.

USAG's primary assets are its Insurance Policies and the proceeds of the Debtor's Insurance Policies. USAG has de minimis secured debt. USAG's unsecured debt includes debt incurred in its operations and contingent liabilities arising out of the lawsuits and claims asserted against USAG by survivors, which are described in Section IV.D below. Financial and other information about the Debtor is also found on its website: www.usagym.org.

### C.   USAG's Board Of Directors.

USAG is governed by a Board of Directors. USAG's Bylaws provide that the Board shall consist of fifteen (15) directors comprised of three (3) National Membership Directors, three (3) Athlete Directors, eight (8) Independent Directors, and one (1) Advisory Council Director. The current Directors and their terms are as follows:

- **Kathryn Carson** serves as Chairperson and Independent Director with a term running from 2019 through 2021. Carson most recently served as the chief legal officer for the United States Golf Association. She was previously the senior vice president and general counsel for North American beverages and food service division at PepsiCo, where she held several roles over two decades. Carson currently is a board member for the George Washington University Business and

Finance Law program. She previously was a board member for We Are Golf, the Executive Women's Golf Association, and USA Field Hockey. Carson graduated from Mount Holyoke College with a Bachelor of Arts in political science and received her JD from George Washington University Law School.

- **Justin Toman** serves as the Vice Chairman/Secretary and Independent Director with a term running from 2019 through 2022. Toman, who is based in White Plains, N.Y., is the head of sports marketing and partnerships for PepsiCo North America Beverages, where he has worked since 2007. He received a Sports Business Journal's 2018 Power Player/Brand Builder Award and in 2017 was named one of the "40 Under 40" in sports business. Toman competed on the men's gymnastics team for the University of Michigan, where he earned his Bachelor of Science in exercise physiology, Master of Arts in sports management and communications, and Master of Business Administration in marketing and strategy. He also worked for Michigan as a National Collegiate Athletic Association rules compliance associate and an assistant sports information director while earning his graduate degrees. Toman was a three-time NCAA national champion and a five-time NCAA All-American. He also won the 2002 Big 10 Medal of Honor and the 2002 Nissen-Emery Award. Toman was a member of the U.S. National Team from 1998-2002.

- **Brent Lang** serves as Treasurer and Independent Director with a term running from 2021 through 2024. Based in the San Francisco area, Lang is president and CEO of Vocera Communications, where he has worked since 2001. Prior to joining Vocera, he was senior director of marketing for 3Com and a strategy consultant for Monitor Company. Lang serves on the Leadership Council for Positive Coaching Alliance. Lang won an Olympic gold medal for swimming in the 4x100 freestyle relay as part of the U.S. team at the 1988 Olympic Games in Seoul, South Korea. He graduated from the University of Michigan with a Bachelor of Science in engineering. He received a Master of Business Administration from Stanford University Graduate School of Business.

- **Lois Elizabeth Bingham** serves as Independent Director with a term running from 2018 through 2021. Currently based in the metropolitan Washington DC area, Bingham is the National Executive Director for Delta Sigma Theta Sorority, Inc. Prior to serving in her new role, she was a business lawyer in the Detroit area with experience in both law firm and corporate settings, having most recently served as vice president, general counsel, compliance officer, and secretary for Yazaki North America. She has served on the American Bar Association's Commission on Women Bias Interrupters Working Group, and as chair of the Board of Directors for the Minerva Education and Development Foundation and Legal Aid and Defender Association in Michigan. Bingham graduated from the University of Pennsylvania with a Bachelor of Arts in political science and from Temple University's James E. Beasley School of Law.

- **Dylan Carney** serves as an Independent Director with a term running from 2021 through 2024. Dylan currently serves as an Emergency Physician and Assistant Medical Director at MarinHealth Medical Center in Greenbrae, Calif, and was the

Director of Medication Assisted Treatment programs for Vituity. Carney was a member of the Stanford Men's Gymnastics team, where he earned five NCAA All-American honors – three on horizontal bar (2006-08) and two on vault (2006-07). In 2006, he was also the NCAA horizontal bar co-national champion. Carney holds Bachelor's and Master's degrees in Biological Sciences from Stanford University and a second Master's in Public Health and Medical Doctorate from Harvard University.

- **Kittia Carpenter** serves as the National Membership Director for the women's program with a term running from 2019 through 2022. Carpenter is the team director and head coach at Buckeye Gymnastics in Westerville, Ohio, where she has guided numerous U.S. National Team members including gold medal winners at the World Championships, American Cup, and Olympic Games. In her thirty years of coaching, Carpenter's gymnasts have won over 1,000 state, regional, and national titles. As a FIG Brevet Level judge, she has judged at the top elite events in the country including the U.S. Championships and World Team Trials. Carpenter is currently the Region 5 Junior Olympic Chair for USA Gymnastics. She was an elite gymnast herself and attended Arizona State University on a full athletic scholarship.

- **Logan Dooley** serves as an Athlete Director for the men's program with a term running from 2021 through 2024. Logan serves as a coach and club manager for World Elite Gymnastics in Rancho Santa Margarita, Calif. He was a member of the U.S. Trampoline and Tumbling Sr. National Team from 2007 through 2018, earning seven synchronized trampoline national championships, eight World Championships appearances, and an Olympic berth. After being named an alternate in 2008 and 2012, Dooley competed at the 2016 Rio Olympics. In 2009, he became the first U.S. athlete to win a World Cup; he and partner Steven Gluckstein also won the synchronized title. The pair later went on to win the 2010 synchronized World Cup series title. Logan attended Saddleback College with an emphasis in early childhood education.

- **Sarah Finnegan** serves as an Athlete Director for the women's program with a term running from 2021 through 2024. A 2019 Louisiana State University (LSU) graduate with a degree in kinesiology and psychology, Finnegan is currently pursuing a Master's in Occupational Therapy at Rockhurst University. As an elite gymnast, Finnegan was a member of the U.S. National Team, where she won both national and international medals in both Junior and Senior divisions. She was a member of the gold medal winning 2010 Pan American Championships U.S. Team, where she was the individual balance beam bronze medalist. Finnegan also served as an alternate for the 2012 U.S. Olympic Team. During her time at LSU, Finnegan was a 23-time All-American, five-time SEC champion, two-time SEC Gymnast of the Year, two-time Central Region Gymnast of the Year, two-time NCAA uneven bars champion, Honda Sports Women of the Year Nominee, and 2019 AAI Award Winner.

- **Serena Lu** serves as an Athlete Director for the women's program with a term running from 2021 through 2024. Serena was a member of the rhythmic gymnastics National Team from 2010 through 2018 and is a five-time all-around bronze medalist at the USA National Championships. She was a member of the 2014 and 2015 World Championships teams and competed at the 2017 University Games in Taipei as an undergraduate student at Princeton University. Serena completed her degree in 2020, graduating as a pre-law student with a major in Psychology and minors in Dance and Cognitive Science. Currently, Serena is on the USA Gymnastics Athlete's Council as a representative for rhythmic gymnastics and the USOPC Athlete' Advisory Council as the representative for Gymnastics. She is now working with the Manhattan District Attorney's Office and dancing with Movement Headquarters, a NYC-based contemporary ballet company.

- **Rebecca Sereda** serves as an Athlete Director for the women's program with a term running from 2018 through 2021. Sereda, a Staten Island native and graduate of Boston University with a Molecular Biology degree, currently resides in Boston. She currently is employed at Harvard University doing Stem Cell Cardiology Research. In addition, she is a FIG Brevet Judge and Athlete Representative and serves on the Rhythmic Program Committee and Athlete Selection Committee. Sereda was a six-time National Champion and was a member of the US Rhythmic National Team for seven years (2008-2014). She was a 2013 World Championships finalist and Pan American champion. She has won numerous international medals throughout her Junior and Senior competitive years.

- **Staci Slaughter** serves as an Independent Director with a term running from 2018 through 2021. Slaughter is the executive vice president of communications and senior advisor to the CEO for the San Francisco Giants, where she has worked for 22 years. Her previous experience includes press secretary for San Francisco Mayor Frank Jordan and communications advisor to Los Angeles Mayor Richard Riordan. Slaughter currently serves as a Board member for the Baseball Assistance Team and as vice chair of the Board for Golden Gate National Parks Conservancy. Based in the San Francisco area, she graduated from the University of California, Berkeley with a Bachelor of Science in social sciences.

- **Julie Springwater** serves as an Independent Director with a term running from 2020 through 2024. Springwater, a resident of Andover, Massachusetts, is an adjunct professor at Boston University's School of Social Work and interim chair of Macro Practice (non-clinical social work). She specializes in child welfare, positive youth development, and human service management. Springwater also serves as the director for the New England Association of Child Welfare Commissioners and Directors, located at Boston's Judge Baker Children's Center. She is currently serving as the chair of governance for the Child Welfare League of America. She earned her Bachelor of Arts in sociology at the University of Massachusetts and her Master of Social Work at Boston University.

- **Kimberly Till** serves as an Independent Director with a term running from 2020 through 2024. Till has held senior roles at Disney, Sony, AOL Time Warner, and

Microsoft. She was CEO of two consumer insights and data analytics businesses, one of which was a public company traded on NASDAQ. She has served on two public company and two privately held boards. In addition to her corporate roles, Till was selected for the prestigious White House Fellowship, where she served as a special assistant to the former U.S. Trade Representative and Secretary of Agriculture and the director of the FBI. Her academic career includes an MBA from Harvard Business School and a J.D. from Duke University Law School. Till also serves on the boards of the New York Pops and Getting Out and Staying Out.

- **Brandon Wynn** serves as an Athlete Director for the men's program with a term running from 2020 through 2024. Wynn is currently the CEO at Business Elevator, a fitness, nutrition, and wellness company for professionals, as well as CEO with 10th Avenue Holdings, a real estate holding company. He is a veteran of three World Championships Teams (2010, 2013, 2015) and the 2013 World still rings bronze medalist. In 2015, he helped the U.S. men place fifth at the World Championships and finished fifth on still rings. Originally from Voorhees, N.J., he is a four-time U.S. still rings champion (2010-11, 2013-14). He competed for the Ohio State University men's gymnastics team and clinched two NCAA still rings titles. Wynn has a master's degree in business administration, accounting, and finance from Keller Graduate School of Management, graduating in 2015.

### D.    Events Leading To The Chapter 11 Case.

Before filing bankruptcy, USAG was named a defendant in approximately 100 lawsuits brought by survivors asserting abuse by Lawrence Nassar. Nassar was employed by MSU and served as a physician volunteer to USAG. As a volunteer, Nassar was to provide medical assistance to gymnasts at various events and camps, including camps held at what was previously USAG's National Team Training Center in Texas.

In June 2015, an initial report came to USAG's attention that Nassar had potentially had inappropriate contact with gymnasts. USAG promptly commenced an investigation into the matter and reported the matter to the FBI. In November 2017, Nassar pleaded guilty to sexual assault and other crimes. As a result of his sentence, Nassar will spend the rest of his life in prison.

Over 400 individuals initiated civil lawsuits against USAG, MSU, and others asserting claims arising from Nassar's abuse, including claims for negligent hiring, negligent retention, negligent supervision, negligent failure to warn or protect, intentional infliction of emotional distress, fraud, and violations of the Racketeering Influenced Corrupt Organizations Act, among others. These lawsuits remain pending in courts in Michigan, California, and elsewhere. The Michigan and California lawsuits were mediated as a consolidated group, with the plaintiffs reaching a $500 million settlement in the spring of 2018 with MSU. USAG's own attempts to reach a settlement with survivors through mediation did not succeed at that time.

In late 2016, USAG engaged Deborah Daniels, Managing Partner of Indianapolis based Krieg DeVault LLP and a former federal prosecutor, to conduct an independent review of USAG's bylaws, policies, procedures, and practices related to handling sexual misconduct matters and to issue a report and recommendations (the "**Daniels Report**"). The Daniels Report was issued on

June 26, 2017, and contained a number of recommendations, which USAG's then board of directors unanimously agreed to implement. A copy of the Daniels Report is publicly available on USAG's website, here: usagym.org/PDFs/About%20USA%20Gymnastics/ddreport_062617.pdf.

In connection with the implementation of the Daniels Report's recommendations, USAG's leadership has undergone a complete change since Nassar's misconduct was disclosed. In March 2017, USAG's then CEO, Steve Penny, resigned. In January 2018, all non-athlete members of USAG's then board of directors resigned. The current USAG Board and its officers do not include any individuals who served on the prior Board. Other employees who faced criticism over their actions in connection with USAG's response to Nassar's conduct are no longer employed by USAG.

On November 5, 2018, the USOPC initiated a proceeding against USAG under Section 8 of the USOPC's bylaws, seeking to revoke USAG's designation as the national governing body of gymnastics. Without that designation, USAG would lack authority to engage in numerous of its current functions, including representing the United States before FIG and selecting and training athletes to compete in international and national elite competitions. The USOPC's prosecution of the Section 8 complaint was stayed by the filing of the Chapter 11 Case.

In 2020, USAG engaged Ms. Daniels to conduct an audit of USAG's implementation of the Daniels Report's recommendations to date. Ms. Daniels released the audit on March 10, 2021. In the audit findings, Ms. Daniels concludes that "Overall, it appears that USA Gymnastics, particularly in the time period since the current CEO was installed in the Spring of 2019, has made significant forward progress toward not only improving its written policies but also improving its performance in terms of athlete abuse reporting and response to reports of abuse; training of various constituencies to enhance their understanding of what constitutes abuse and what action is expected if misconduct is detected; outreach to, protection and support of athletes; and communication from the top down of a culture that values and protects its athletes first and foremost." A copy of the 2021 audit report is publicly available on USAG's website, here: usagym.org/PDFs/About%20USA%20Gymnastics/ddaudit_0221.pdf.

## E.    The Chapter 11 Case.

The Debtor commenced this Chapter 11 Case on December 5, 2018. The Debtor did so to ensure that its available Assets are equitably allocated to survivors asserting Abuse Claims. As a non-profit entity, USAG does not have substantial assets and instead would have to rely on its Debtor CGL Insurance Policies and other applicable Insurance Policies (if any) to pay any judgments obtained by survivors in their prepetition suits. Chapter 11 was USAG's only option to ensure that the proceeds of its applicable Insurance Policies were distributed in a fair, equitable, and logical manner.

### 1.    First Day Motions.

On the Petition Date, USAG as debtor and debtor in possession filed several motions seeking relief from the Bankruptcy Court to ensure a seamless transition into chapter 11 (collectively, the "**First Day Motions**"). The Bankruptcy Court granted the relief requested in the First Day Motions, authorizing the Debtor to, among other things: (1) continue paying employee

35

wages and benefits (Dkt. 300); (2) continue using the Debtor's existing cash management system, bank accounts, and business forms (Dkt. 299); (3) continue insurance programs, pay insurance premiums, and enter into new insurance policies in the ordinary course (Dkt. 197); (4) pay outstanding taxes, if any (Dkt. 194); (5) provide utility companies with adequate assurances of payment and prohibit utility companies from altering or discontinuing service (Dkt. 195); (6) retain the Claims Agent (Dkt. 63); (7) perform all postpetition obligations under a commercial card agreement with the Debtor's bank (Dkt. 196); and, (8) enter into certain consulting services agreements (Dkts. 124-25).

### 2.    The Debtor's Professionals.

After the Petition Date, the Court authorized the Debtor to retain Jenner & Block LLP as lead bankruptcy counsel (Dkt. 188). The Court also authorized the Debtor to retain Miller Johnson P.L.C. and Plews Shadley Racher & Braun LLP as special counsel (Dkts. 189, 191), as well as Barnes & Thornburg LLP, Hilder & Associates, Krieg DeVault LLP, P.C., Pierce Atwood LLP, White & Amundson, P.C., and Zuckerman Spaeder LLP as ordinary course counsel (Dkt. 192-93, 295-96, 298, 1345). Finally, the Court approved the retention of APCO World LLC as ordinary course communications advisor (Dkt. 297) and BDO USA LLP as ordinary course auditor and tax professional (Dkt. 785).

### 3.    The Survivors' Committee.

Pursuant to Section 1102 of the Bankruptcy Code, on December 19, 2018, the U.S. Trustee appointed the Additional Tort Claimants Committee of Sexual Abuse Survivors to serve in the Debtor's case. The Committee consists of nine members, all of whom filed Abuse Claims against the Debtor: Rachel Denhollander (Co-Chair), Sarah Klein (Co-Chair), Tasha Schwikert-Warren (Co-Chair), Kenzie Gassaway, Alexandra Raisman, Kyla Ross, Marcia Frederick Blanchette, Alyssa Corn, and Jessica Thomashow. (Dkts. 97-98.)

The Survivors' Committee retained the law firms of Pachulski Stang Ziehl & Jones LLP and Rubin & Levin, PC to represent it throughout the Chapter 11 Case. The Court approved their retention on February 4, 2019. (Dkts. 238, 239.)

### 4.    Future Claimant Representative.

On May 10, 2019, the Debtor moved for the appointment of Fred Caruso as Future Claimant Representative. (Dkt. 480.) The Court approved the FCR's appointment on May 17, 2019. (Dkt. 516.)

The FCR is the legal representative for individuals holding Abuse Claims who qualify as Future Claimants, as that term is defined in Section 1.1.63 of the Plan. The FCR represents the interests of each Person who (a) held a Sexual Abuse Claim as of the Bar Date; and (b) meets one of the following criteria: (i) was under the age of majority under applicable state law as of March 1, 2019; (ii) as of March 1, 2019, the statute of limitations for such Person was tolled under applicable state law or had not begun to run under applicable state law, including because of a Sexual Abuse Claim based on repressed memory or similar theory; (iii) as of March 1, 2019, the Debtor was estopped under applicable state law from asserting the statute of limitations; or (iv) such Person's Sexual Abuse Claim was barred by the applicable statute of limitations as of March

1, 2019, but is or becomes no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives such Claims; *provided, however*, that the following persons are not Future Claimants: any Person who has, at any time before the Bar Date, asserted a Sexual Abuse Claim, asserted a cause of action based on a Sexual Abuse Claim, provided notice of a Sexual Abuse Claim, or made a demand based on a Sexual Abuse Claim, or whose parent or guardian or other legal representative had done so on behalf of such Person, at any time before the Bar Date.

The FCR retained the law firm of FrankGecker LLP to represent it throughout the Chapter 11 Case. The FCR also retained Development Specialists, Inc. to provide consulting services with respect to the FCR's analysis of potential Future Claims. The Court approved each firm's retention on June 11, 2019. (Dkts. 592, 593.)

### 5.    The Bar Date.

By order dated February 25, 2019 (the "**Bar Date Order**"), the Bankruptcy Court set April 29, 2019 (the "**Bar Date**") as the last day for claimants to file proofs of claim for claims arising before the Petition Date, including Abuse Claims. (Dkt. 301.)

The Debtor and its Claims Agent served notice of the Bar Date on all known creditors. In particular, the Debtor mailed notice of the Bar Date, a copy of the Bar Date Order, and a sexual abuse proof of claim form to all known survivors who had filed or threatened to file lawsuits against USAG alleging sexual abuse, had reported abuse to USAG, had entered into a settlement agreement with USAG stemming from allegations of abuse, or had received payment from USAG as a result of an allegation of abuse, to the extent their mailing address was reasonably available. Although not strictly required by the Bar Date Order, the Debtor also served all potential sexual abuse claimants, even those who never formally or clearly notified USAG of their claims, after a meticulous and comprehensive search of its books and records. As a result, the Debtor sent this notice package to more than 1,300 individuals.

The Debtor also sent this notice package to all known counsel for sexual abuse claimants. The Debtor e-mailed the notice of the Bar Date to its list of more than 360,000 e-mail addresses for current and former USAG members. (Dkt. 341, Ex. E.) The Debtor placed the notice of the Bar Date on its website, Facebook, Twitter, and Instagram pages and published notification in USA Today, Inside Gymnastics, International Gymnast, the Gymcastic podcast, and the Meetscores website. In addition, between February 26 (one day after the Bar Date Order was entered) and April 30 (one day after the Bar Date), the Debtor pinned notice of the Bar Date at the top of its Twitter feed as the "pinned" tweet. The Debtor also sent letters to each of its member gyms asking those facilities to post the notice package and the sexual abuse proof of claim form for their members to see. In addition to this notice, the Debtor's Chapter 11 Case and the deadline for filing claims received extensive media attention in national publications, local papers, and television and radio broadcasts.

6.      **The Claims Against The Debtor And The Debtor's Claims Objections.**

a.      **The Abuse Claims.**

The Debtor's broad notice plainly reached the universe of creditors. As to the Abuse Claims, 510 individuals filed their Abuse Claims by the Bar Date (including one claimant whose Abuse Claim was deemed timely filed), and 15 individuals filed late Abuse Claims.[6] Of these Abuse Claims, 59 were filed by individuals alleging abuse by someone other than Nassar. Further, 78 of the claimants had not sued USAG before the bankruptcy filing. USAG had no notice of these 78 claimants and thus, these claimants would have learned of the Bar Date Order as a result of USAG's extensive publication notice and/or the extensive media coverage surrounding this Chapter 11 Case.

Three of the Abuse Claims purported to request relief on behalf of various putative classes of sexual abuse survivors. No class of Abuse Claimants against the Debtor was certified by any court prior to the Petition Date. By agreement with the Debtor, two of these Abuse Claimants agreed to withdraw their class claim or agreed to prosecute their Abuse Claim only in their individual capacity, respectively. (Dkts. 795-96.) As to the remaining Abuse Claim, the Debtor filed an objection on January 17, 2020. (Dkt. 885.) The Debtor argued that a class claim is not appropriate in this Chapter 11 Case, and that this particular class claim fails on its merits. On April 20, 2020, the Bankruptcy Court entered an order sustaining the Debtor's objection to that claim. (Dkt. 1021.)

b.      **The General Claims.**

The Debtor also received 336 general, non-Abuse Claims, 7 of which were filed late.[7] The bulk of these general claims assert amounts due for services provided by chaperones, instructors, and coaches at various training camps, competitions, and other gymnastics events. Numerous claims assert indemnities due and owing from the Debtor in connection with Nassar's misconduct. The Debtor objected to numerous of the general claims on the basis that they were duplicative, misclassified as priority claims or administrative expenses, or were otherwise legally without merit. (Dkts. 624, 628-29, 635, 923.) The Court entered orders disallowing or reclassifying the claims subject to objection. (Dkts. 720-23, 1001.)

The remaining general unsecured claims assert liabilities against the Debtor's estate amounting to $47,160,655.46. The majority of this amount relates to: (a) Indemnification Claims; (b) the Personal Injury Claim; and (c) General Unsecured Claim No. 312. The Indemnification Claims total $41,487,568.17. In the event of the Full or Partial Settlement Alternative, the Indemnification Claims will be channeled to the Trust and will be satisfied only from the amounts paid to the Trust by the Settling Insurers and Participating Parties, and in the event of a Litigation Only Alternative, the Indemnification Claims are deemed disallowed but retain whatever rights those Claimants have against the Debtor's Insurers. The Personal Injury Claim was filed in the

---

[6] These counts omit 33 duplicative Abuse Claims, 1 withdrawn Abuse Claim, and 2 disallowed Abuse Claims.

[7] Individuals misfiled 23 Abuse Claims on the docket for general Claims. These misfiled Abuse Claims are omitted from these counts of the general Claims against the Debtor.

amount of $3,000,000.00. It may only be satisfied out of the Debtor's Personal Injury Insurance Policy pursuant to the Plan, regardless of whether the Full or Partial Settlement Alternative or Litigation Only Alternative is selected; *provided, however*, that nothing herein or in the Plan prevents, or shall be deemed to prevent a buyback of the Personal Injury Policy and all other coverages thereunder other than for the Personal Injury Claim. General Unsecured Claim No. 312 asserts damages of $1,500,000.00 from alleged emotional abuse. This Claim is treated as an Abuse Claim under the Plan and, therefore, it will be channeled to the Trust under the Full or Partial Settlement Alternative or permitted to recover solely from the Debtor CGL Insurance Policies (and Other Insurance Policies (if any) that provide coverage for Abuse Claims), and no other assets, under a Litigation Only Alternative. Thus, the amount of general unsecured claims that must be paid through the Plan is $1,173,087.29 in addition to the $668,100.95 of general unsecured claims that the Debtor scheduled but for which no Claims were filed. The total General Unsecured Claims are therefore $1,841,188.24.

### 7. Postpetition Financing.

#### a. Debtor In Possession Financing.

On May 1, 2019, the Debtor filed a motion seeking authority to obtain debtor-in-possession financing in the aggregate amount of $800,000.00 pursuant to loan agreements with two of the Debtor's CGL Insurers, Great American Assurance Company and Virginia Surety Company, Inc., formerly known as Combined Specialty Insurance Company. (Dkt. 448). As of the date of the Disclosure Statement, the Debtor has not drawn on either debtor-in-possession facility.

#### b. Paycheck Protection Program Funding.

On May 28, 2020, the Debtor moved for authority to obtain funding under the Paycheck Protection Program (the "**PPP**"), as authorized by the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (the "**CARES Act**"). (Dkt. 1079.) Concurrently, the Debtor initiated litigation challenging a rule promulgated by the U.S. Small Business Administration (the "**SBA**") that categorically barred chapter 11 debtors from receiving PPP funding. (*See USA Gymnastics v. Carranza*, No. 20-50055 (Bankr. S.D. Ind.).) Among other things, the Debtor argued that the rule violated the Administrative Procedure Act because it was arbitrary and capricious and contrary to law. The District Court agreed with the Debtor and enjoined the SBA from denying the Debtor access to PPP funding solely on account of its status as a chapter 11 debtor. (Adv. Dkt. 26.)

Following the District Court's ruling, on June 11, 2020, the Bankruptcy Court entered an order authorizing the Debtor to apply for and obtain up to $804,500.00 in unsecured, forgivable PPP funding. (Dkt. 1125.) The SBA thereafter disbursed $804,500.00 to the Debtor. The SBA holds an administrative expense claim against the Debtor in this amount, subject to the forgiveness provisions contained in the CARES Act. The Debtor believes that the PPP funding qualifies for forgiveness and it intends to file a forgiveness application which it expects will be granted.

### 8. Plan Exclusivity and Deadlines.

Pursuant to Section 1121 of the Bankruptcy Code, a debtor in possession is granted an exclusive right to file a plan of reorganization for 120 days following the commencement of the case. A debtor also has the exclusive right to solicit votes accepting any plan of reorganization

within the 180 days following the commencement of the case. The Bankruptcy Code further provides that a court can increase a debtor's exclusive period to file and solicit acceptances on a plan of reorganization for up to eighteen months and twenty months, respectively, after commencement of the case for cause. The Bankruptcy Court has extended both periods here to their statutory maximum. (Dkt. 981.) On September 2, 2021, the Bankruptcy Court ordered that the Debtor's deadline to file its Plan and this Disclosure Statement is 21 days after the conclusion of the Settlement Conference (as defined below). (Dkt. 1282, ¶ 2.)

### 9.    Litigation.

#### a.    Insurance Coverage Adversary Proceeding.

On February 1, 2019, the Debtor commenced an adversary proceeding against its insurers to determine the rights it held in its various insurance policies. (*See USA Gymnastics v. Liberty Insurance Underwriters, et al.*, No. 19-50012 (Bankr. S.D. Ind.).) Certain of the Debtor's insurers had consistently and wrongfully refused to pay the Debtor amounts due and owing under those policies. The insurer-defendants included Ace American Insurance Company, Great American Insurance Company, Liberty Insurance Underwriters, Inc., National Casualty Company, RSUI Indemnity Company, TIG Insurance Company, Virginia Surety Company, Inc., Western World Insurance Company, Endurance American Insurance Company, American Home Assurance Company, and certain other Doe Insurers. The insurer-defendants dispute the Debtor's allegations.

Since the initiation of this adversary proceeding, the Debtor has prosecuted several partial summary judgment motions against certain of its insurers, in the hopes of facilitating a global settlement of the Abuse Claims with appropriate contributions from the insurers. For instance, the Debtor requested that the Court declare that abuse and molestation exclusions in policies issued by TIG do not bar coverage for the Debtor. (Adv. Dkt. 173.) The Bankruptcy Court agreed with the Debtor's interpretation of the policies (Adv. Dkt. 274), which ruling the District Court accepted and entered on November 23, 2020 (*USA Gymnastics v. ACE American Ins. Co.*, No. 18-CV-1306, Dkt. 223 (November 23, 2020).) The Debtor also requested a declaration that limits in policies issued by ACE did not apply to lower the amount of the Debtor's coverage on claims arising from Nassar's abuse. (Adv. Dkt. 175.) The Bankruptcy Court rejected the Debtor's readings of those insurance policies (Adv. Dkt. 275), which ruling the District Court accepted and entered on December 7, 2020. (Dist. Dkt. 234.) The Debtor also sought a declaration that it has access to coverage under certain "lost policies" issued by TIG. (Adv. Dkt. 204.) The Debtor and TIG consensually resolved this motion and stipulated to the existence of various TIG policies providing coverage to the Debtor during policy years 1986 through 1991. (Adv. Dkt. 617.)

In addition, the Debtor has successfully argued that Liberty Insurance Underwriters, Inc. ("**LIU**") wrongfully breached its duty to defend the Debtor with respect to various lawsuits, investigations, and proceedings, including prepetition litigation asserting sexual abuse, investigations by Congressional committees and the Indiana Attorney General, and the USOPC de-recognition proceeding. On October 24, 2019, the Bankruptcy Court issued proposed findings of fact and conclusions of law providing that LIU has a duty to defend USAG in these matters. (Adv. Dkt. 260.) On January 13, 2020, the District Court accepted and entered the Bankruptcy Court's recommended ruling. (Adv. Dkt. 310.) LIU has appealed the District Court's summary judgment order. Although LIU has not obtained a stay of this order, LIU has not paid the amounts

due to USAG to date. USAG initiated additional motion practice in the District Court to enforce the summary judgment against LIU, and has sought to hold LIU in contempt for its failure to comply with numerous orders of the District Court and Bankruptcy Court setting forth its coverage obligations to the Debtor. On August 2, 2021, the District Court ruled that it would enter judgment against LIU for a sum certain representing its coverage obligations to the Debtor to date (which, including pre-judgment interest will be in the amount of $2,171,951.18 as of August 17, 2021, with an additional $279.56 in interest for every day between August 17, 2021 and the date of payment (Dist. Dkts. 322, 324.)

Finally, the Debtor has filed a motion for summary judgment seeking a declaration requiring certain of the insurer-defendants to pay for the cost of USAG's bankruptcy defense and for a judgment in the amount of those defense costs to date. (Adv. Dkts. 406-07.) The Bankruptcy Court issued proposed findings of fact and conclusions of law that recommend that the District Court deny this motion (Adv. Dkt. 571), which recommendation the District Court accepted and entered on August 13, 2021 (Dist. Dkt. 323). USAG is considering its options with respect to this Order.

### b.    Prepetition Abuse Litigation and the 105 Order.

Pursuant to Section 362 of the Bankruptcy Code, as of the Petition Date an automatic stay went into effect that paused all of the prepetition litigation asserted by the survivors against the Debtor. However, the automatic stay only protected the Debtor. It did not pause the lawsuits to the extent they asserted claims against defendants in addition to the Debtor.

Even if formally stayed as to the Debtor, continued litigation in the prepetition lawsuits threatened to distract the Debtor's personnel from the Chapter 11 Case and generate additional obligations for the Debtor, including from certain defendants who asserted they were entitled to indemnities from the Debtor for litigation costs.

As a result, the Debtor entered into an agreed stipulation with all of the plaintiffs and most of the defendants in those lawsuits to stay the lawsuits entirely. The Bankruptcy Court approved the stipulation on April 22, 2019, and entered an injunction prohibiting any signatory to the stipulation from proceeding with the lawsuits while the stipulation and injunction remained in effect (the "**105 Order**"). (Dkt. 426.)

### c.    Third Party Injunction Adversary Proceeding.

Although the bulk of the plaintiffs and defendants in all prepetition litigation asserting claims arising from sexual abuse against the Debtor agreed to voluntarily stay that litigation in its entirety, not every defendant agreed to sign onto the 105 Order. Instead, these defendants threatened to proceed with the cases in which they were involved. This threatened the Debtor's estate by siphoning its resources and personnel to manage litigation in which it had an interest, even if a judgment could not be obtained against the Debtor while this Chapter 11 Case remained pending.

With the support of the Survivors' Committee, the Debtor commenced an adversary proceeding on March 29, 2019, requesting the Bankruptcy Court enter an injunction barring these outlier defendants from proceeding with their litigation. (*USA Gymnastics v. Donald Peters,*

*Richard Carlson, et al.*, No. 19-50075 (Bankr. S.D. Ind.).) While certain of those parties objected, the Bankruptcy Court ultimately overruled the objections and entered the injunction as requested, completely staying the prepetition lawsuits with respect to all third parties and the Debtor pending further order of the Court. (Adv. Dkt. 71.)

### d.    California Plaintiffs' Litigation.

In late 2020, four Abuse Claimants withdrew from the 105 Order and re-commenced their prepetition litigation pending in California courts, nominally only against non-Debtor parties, including the USOPC. However, the plaintiffs served discovery in that litigation that threatened to distract the Debtor's personnel and professionals, impose significant litigation costs on the Debtor's estate (including costs to review documents for privileged material and personally identifying information, deposition preparation and attendance, and attending court hearings), and potentially deplete the Debtor's insurance coverage and/or generate additional indemnification claims against the Debtor's estate. Accordingly, the Debtor moved to enforce the automatic stay against the continued prosecution of the California litigation and any discovery served therein. (Dkt. 1459.) The plaintiffs filed a cross-motion for relief from the automatic stay. (Dkt. 1460.)

The Court held an evidentiary hearing on April 28, 2021 and took the cross-motions under submission. On May 11, 2021, the Debtor and the plaintiffs agreed to hold the cross-motions in abeyance pending further settlement negotiations over the terms of a consensual Plan in this case. (Dkt. 1498.)

### 10.    Mediation and Settlement Conference.

On May 17, 2019, the Bankruptcy Court appointed Judge Gregg Zive to mediate "the resolution of the sexual abuse claims; the resolution of any disputes relating to the applicability of the Debtor's insurance coverage to the sexual abuse claims and the Debtor's insurance carriers' obligations to fund distributions on the sexual abuse claims, and related defense costs; and the resolution of any other matters necessary to equitably determine the rights of, and allocate recoveries to, survivors holding allowed sexual abuse claims." (Dkt. 514, ¶2.) The Bankruptcy Court subsequently entered an order authorizing Paul Van Osselaer to participate as a second mediator. (Dkt. 798.)

In preparation for the mediation, the Debtor spent considerable time and resources analyzing the universe of claims, as well as the available insurance coverage for those claims, so that it could determine the extent of its liabilities and negotiate the terms of the Plan. The mediation process began in late May, 2019 and a series of in-person and telephonic mediation sessions occurred throughout 2019 and 2020. These mediation sessions did not produce an agreement among parties in interest on the terms of a global settlement and consensual plan.

On August 20, 2020, the Debtor and the Survivors' Committee jointly moved for the Bankruptcy Court to hold a settlement conference (the "**Settlement Conference**") with the Debtor, the Survivors' Committee, the USOPC, the respective insurers for the Debtor and the USOPC, and the individual(s) with settlement authority for each party. (Dkt. 1230.) On September 2, 2020, the Court granted the motion and appointed the Honorable James M. Carr, Bankruptcy Judge for the Southern District of Indiana, to preside over the Settlement Conference. (Dkt. 1262.)

Shortly thereafter, Judge Carr commenced a series of telephonic settlement conferences and mediation sessions with the various parties in interest. The Plan, as jointly proposed by the Debtor and the Survivors' Committee, is the product of the Settlement Conference.

### 11.    Motion To Dismiss.

On January 21, 2020, the Survivors' Committee filed its *Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 349 And 1112(b) Dismissing The Bankruptcy Case And Granting Related Relief* [Dkt. 892] (the "**Motion to Dismiss**"). The Survivors' Committee asserted that the mediation had not yet produced a global settlement and argued that Abuse Claimants should not have to wait any longer to litigate their Claims in non-bankruptcy forums. It then alleged that cause existed to dismiss the Debtor's case because the Debtor could not confirm a plan over the objections of the Abuse Claimants. After the Debtor filed the initial version of its Plan and as settlement negotiations continued, the Survivors' Committee took the Motion to Dismiss off of the hearing schedule. The Motion to Dismiss is not currently set for hearing.

### 12.    Plan Support Agreement.

On May 6, 2021, the Debtor and the Survivors' Committee entered into the Plan Support Agreement, subject to approval by the Court. The Plan Support Agreement memorializes the Debtor and Survivors' Committee's agreement to seek confirmation of the Plan, which provides for the global settlement and resolution of all Abuse Claims through either the Full or Partial Settlement Alternative or the Litigation Only Alternative. The Plan Support Agreement further provides that CGL Insurers may become signatories to the Plan Support Agreement upon their acceptance of the settlement offers made with respect to CGL Insurance Policies they issued and their agreement to the terms of the Plan. As of the date of this Disclosure Statement, National Casualty Company, CIGNA Insurance Company (n/k/a ACE American Insurance Company), National Union Fire Insurance Company of Pittsburgh, P.A. (n/k/a AIG), and Gemini Insurance Company have accepted their settlement offers and agreed to become Settling Insurers. [•] are currently Non-Settling Insurers.

## V. SUMMARY OF THE PLAN

The Debtor and the Survivors' Committee propose the Plan in good faith and believe the Plan is feasible and in the best interest of the creditors of the Debtor. The Debtor and the Survivors' Committee therefore recommend acceptance of the Plan by holders of Claims in the Voting Classes. This Article V and Articles VI through IX summarize key components of the Plan. To the extent of any inconsistencies between these summaries and the terms of the Plan, the Plan controls. To the extent the summaries omit any provisions of the Plan, such omission has no effect on the enforceability of those provisions in the Plan. All Claimants are encouraged to carefully read the Plan before voting.

### A.    Treatment of Unclassified Claims.

The following summarizes the treatment of Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees under the Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified under the Plan. Article IV of the Plan sets forth the

treatment for each of these types of Claims. The Debtor anticipates that it will pay these unclassified claims in full on the Effective Date.

### 1. Administrative Claims.

An Administrative Claim is a claim for payment of an administrative expense of a kind specified in Bankruptcy Code Section 503(b) and referred to in Bankruptcy Code Section 507(a)(2), including the actual and necessary costs and expenses of preserving the estate or operating the Debtor's businesses after the commencement of a chapter 11 case, and compensation for legal and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code Sections 330(a), 331, or 503.

The Plan provides that Holders of Administrative Claims must file any requests for allowance and payment within thirty days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Allowed Administrative Claim shall be paid in full in Cash under the Plan unless otherwise agreed between the Reorganized Debtor and the Holder of the Allowed Administrative Claim. Such payment shall be made either (a) on or as soon as practicable following the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant. However, any Administrative Claim incurred postpetition by the Debtor in the ordinary course of its operations or arising pursuant to any postpetition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, including the PPP Loan Claim, will be paid or performed in accordance with the terms and conditions of the particular agreements or transactions giving rise to the claim, or as otherwise agreed by the Debtor and the Administrative Claimant.

### 2. Professional Claims.

The Plan sets forth the manner and timing in which Professionals must submit Professional Claims to be considered for payment. All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than 45 days after the Effective Date, or such later date as ordered by the Bankruptcy Court. In the event there is a dispute over what amount of a Professional Fee Claim shall be Allowed, if any, the dispute shall be resolved by the Bankruptcy Court.

### 3. Priority Tax Claims.

A Priority Tax Claim is an unsecured Claim of a governmental unit entitled to priority in payment pursuant to any provision of Section 507(a)(8) of the Bankruptcy Code. The Debtor received a single Priority Tax Claim (General Unsecured Claim No. 1) asserting a liability of $182.08. With respect to any Allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (a) pay such Claim in Cash as soon as practicable after the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax

Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### 4.    U.S. Trustee Fees.

All fees due and payable pursuant to 28 U.S.C. § 1930 (the "**U.S. Trustee Fees**") and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. The Debtor does not believe that it will owe any U.S. Trustee Fees as of the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a Final Decree is entered.

### B.    Treatment of Classified Claims.

The Plan does not treat each Claim identically; rather, Articles V, VI, and VII of the Plan categorize Claims into Classes, consistent with the requirements in Sections 1122 and 1123(a)(1) of the Bankruptcy Code. That means that, under the Plan, some Holders of Claims will receive full satisfaction of their Claims, some will receive partial satisfaction, and some will receive nothing. In each instance, the Debtor believes that Holders of Claims will receive at least as much value as they would receive if the Debtor's Assets were to be liquidated under chapter 7 of the Bankruptcy Code and that impaired creditors will receive more than they would receive in a chapter 7 liquidation. Regardless, it is important for Holders of Claims to read the Plan and this Disclosure Statement carefully to understand how they will be treated under the Plan.

The categories of Claims set forth in the Plan and summarized below classify Claims for all purposes, including voting, confirmation, and distribution under the Plan and Sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class. A Claim is classified within a particular Class for the purpose of receiving distributions only to the extent that such Claim is Allowed and has not already been satisfied before the Effective Date.

The treatment in the Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor. All distributions under the Plan will be tendered to the Person holding the Claim.

### 1.    Class 1—Other Priority Claims.

      **a.**    **Classification.** Class 1 consists of Other Priority Claims, which are entitled to priority under Section 507 of the Bankruptcy Code, and which are not Administrative Claims or Priority Tax Claims. All of the Other Priority Claims have or will be reclassified as General Unsecured Claims.

      **b.**    **Treatment.** Class 1 is unimpaired under the Plan. Holders of Class 1 Claims are deemed to have accepted the Plan and are not entitled to vote on the Plan.

c.   **Impairment And Voting.** The Holders of Class 1 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**2.   Class 2—PNC Bank Claim.**

a.   **Classification.** Class 2 consists of the PNC Bank Claim, as scheduled by the Debtor. The Debtor funds its day-to-day operations using a line of credit issued by PNC Financial Services Group, Inc, d/b/a PNC Bank (the "**PNC Bank**"). The Debtor's obligations under these cards are secured by a collateral account maintained at PNC Bank.

b.   **Treatment.** Class 2 is unimpaired under the Plan. PNC Bank is deemed to have accepted the Plan and is not entitled to vote on the Plan.

c.   **Impairment And Voting.** The VISA Commercial Card Agreement between PNC Bank and the Debtor shall be reinstated and become the obligation of the Reorganized Debtor. PNC Bank shall retain all of its rights and collateral pledged under the VISA Commercial Card Agreement.

**3.   Class 3—Sharp Claim.**

a.   **Classification.** Class 3 consists of the Sharp Claim, which is general Claim No. 63. Wells Fargo Financial Leasing, Inc., asserted the Sharp Claim as assignee for Sharp Business Systems, on account of the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor. The Sharp Claim asserts a Claim for $20,997.82 and is secured by equipment in the possession of the Debtor.

b.   **Treatment.** Class 3 is unimpaired under the Plan. Sharp is deemed to have accepted the Plan and is not entitled to vote on the Plan.

c.   **Impairment And Voting.** The Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor shall be deemed assumed and will become the obligation of the Reorganized Debtor. Sharp Business Systems shall retain all of its rights and its collateral under the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement.

**4.   Class 4—General Unsecured Convenience Claims.**

a.   **Classification.** Class 4 consists of the Holders of General Unsecured Convenience Claims against the Debtor. These Claims are general

unsecured Claims of $500.00 or less, or general unsecured Claims voluntarily reduced to $500.00 or less by their Holder. There are 288 filed and scheduled Claims of $500.00 or less, asserting total liabilities of $47,703.93. In addition, there are 46 Claims asserting amounts between $500.00 and $1,000.00, which the Debtor anticipates will be voluntarily reduced and become General Unsecured Convenience Claims worth $23,000.00 in total. The Debtor therefore anticipates that the total value of General Unsecured Convenience Claims within Class 4 will be approximately $75,000.00.

b.   **Treatment.** Class 4 is unimpaired under the Plan. The Holders of Class 4 Claims are deemed to have accepted the Plan and are not entitled to vote on the Plan.

c.   **Impairment And Voting.** The Holders of Class 4 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed General Unsecured Convenience Claims in Cash, on or as soon as reasonably practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed General Unsecured Convenience Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**5.   Class 5—General Unsecured Claims.**

a.   **Classification.** Class 5 consists of the Holders of General Unsecured Claims against the Debtor. These Claims are any Claim against the Debtor that is not an Abuse Claim, the Personal Injury Claim, the USOPC Claim, the FCR Claim, an Indemnification Claim, Administrative Claim, a Priority Tax Claim, an Other Priority Claim, or a Claim that is otherwise classified under the Plan. There are 154 General Unsecured Claims asserting total liabilities of $1,173,082.29. In addition, the Debtor listed on its Schedules liabilities worth $668,100.95 for which no Claims were filed. These scheduled amounts will be treated as General Unsecured Claims under the Plan under the Litigation Only Alternative.

b.   **Treatment.** Class 5 is impaired under the Plan. The Holders of Allowed General Unsecured Claims are entitled to vote on the Plan.

c.   **Impairment And Voting.** The Holders of Allowed General Unsecured Claims will receive payment from the Reorganized Debtor of 80% of their Allowed General Unsecured Claims, payable in equal installments on August 15, 2022, August 15, 2023, and August 15, 2024; or, at the Reorganized Debtor's discretion, in less than three installments so long as the Reorganized Debtor accelerates payment to all Holders of Allowed General Unsecured Claims. Attached as Exhibit 2 is a *pro forma* cash flow analysis for the Debtor for this three year period.

6.       **Class 6—Abuse Claims.**

    a.       **Classification.** Class 6 consists of the Holders of Abuse Claims against the Debtor. Abuse Claims also encompass General Unsecured Claim No. 312 and Sexual Abuse Claim No. 165. There are a total of 510 timely Abuse Claims that are not duplicative of other Abuse Claims, and have not been disallowed, withdrawn, or subjected to an objection.

    b.       **Impairment And Voting.** Class 6 is impaired under the Plan. The Holders of Class 6 Claims are entitled to vote on the Plan.

    c.       **Treatment.** The treatment of Class 6 Claims depends on whether the CGL Insurers accept their respective CGL Insurer Settlement Offers and whether the Debtor and the Survivors' Committee elect to proceed with the Full or Partial Settlement Alternative or the Litigation Only Alternative.

        The Full or Partial Settlement Alternative is described in Section I.B.1.a of this Disclosure Statement. Under the Full or Partial Settlement Alternative, the Trust shall assume all liability for and the Trust will pay all Class 6 Claims pursuant to the provisions of the Plan. Under the Partial Settlement Option, Abuse Claimants whose Claims are covered solely by a Non-Settling Insurers' policy may elect to pursue litigation against the Debtor and any other defendant but may only recover from a CGL Insurance Policy issued by a Non-Settling Insurer of the Debtor or a CGL Insurance Policy issued by a Non-Settling Insurer of a Protected Party, and not from the Debtor or any of its property.

        The Litigation Only Alternative is described in Section I.B.1.b of this Disclosure Statement. Under the Litigation Only Alternative, Holders of Class 6 Claims will be permitted to pursue litigation against the Debtor and any other defendant. Abuse Claimants may recover any judgments or awards only from the proceeds of the CGL Insurance Policies issued by the Debtor's CGL Insurers, and not from the Debtor or any of its property.

        Under either the Full or Partial Settlement Alternative or the Litigation Only Alternative, Class 6 Claims not timely filed by the Bar Date will be disallowed and will receive no recovery.

7.       **Class 7—Personal Injury Claim.**

    a.       **Classification.** The sole member of Class 7 is the Holder of General Unsecured Claim No. 251, which is the Personal Injury Claim. That Claim arises from personal injuries that a minor gymnast allegedly suffered at a gymnastics event, and asserts a liability of $3,000,000.00.

    b.       **Impairment And Voting.** Class 7 is impaired under the Plan. The Holder of the Class 7 Claim is entitled to vote on the Plan.

c.      **Treatment.** On the Effective Date, the stay shall be lifted and the Holder of the Class 7 Claim shall have thirty (30) days to file a lawsuit against the Reorganized Debtor, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, in accordance with Section 108(c) of the Bankruptcy Code, or reach a settlement paid by the Personal Injury Insurer. The allowance or disallowance of the Class 7 Claim will be determined in the post-Effective Date Litigation related to the Class 7 Claim. To the extent the Holder of the Class 7 Claim obtains a Post-Effective Date Award, the sole source of recovery for such Claimant shall be from the Personal Injury Insurance Policy; however, nothing in the Plan shall prevent the buyback of the Personal Injury Insurance Policy and all other coverages under such policy other than for the Personal Injury Claim. The Holder of the Class 7 Claim shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Unless otherwise provided in the Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 7 Claim including the liability of the Personal Injury Insurer, which liability shall continue unaffected by the terms of the Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under the Plan and Section 1141(d) of the Bankruptcy Code. Nothing in the Plan is intended to affect, diminish, or impair the Holder of the Class 7 Claim's right against any other parties (except the Released Parties), including such parties' joint and several liability. The Debtor does not admit any liability for the Class 7 Claim and reserves all defenses.

8.      **Class 8—USOPC Claim.**

a.      **Classification.** The sole member of Class 8 is the Holder of General Unsecured Claim No. 299, which is the USOPC. The USOPC asserted an unliquidated Claim for indemnities the Debtor allegedly owes to the USOPC with respect to attorneys' fees and other costs incurred in connection with the litigation arising from sexual abuse. The USOPC also asserted a General Unsecured Claim against the Debtor in the amount of $88,983.34 on account of certain services agreements entered into between the Debtor and the USOPC, which amount will be treated as a Class 5 Claim.

b.      **Impairment And Voting.** Class 8 is impaired under the Plan. The USOPC is entitled to vote on the Plan.

c.      **Treatment.** Under the Full or Partial Settlement Alternative, the Holder of the Class 8 Claim shall not receive a distribution. If the entire amount of the Total Settlement Demand Amount is funded on the Effective Date of the Plan, all rights that the Holder of the Class 8 Claim has to receive indemnification or reimbursement from the Debtor shall be satisfied by granting the Holder of the Class 8 Claim the benefit of the Channeling

Injunction. In the case of the Partial Settlement Option, the Holder of the Class 8 Claim will retain any independent rights that such Holder has to receive indemnification or reimbursement from the Debtor, including all of its rights (if any) to reimbursement, indemnification, or a defense under any of the Debtor's Non-Settling Insurer insurance policies, but only for Abuse Claims falling under the Debtor's Non-Settling Insurer insurance policies and only to the extent that there is coverage under the Debtor's Non-Settling Insurer insurance policies for the USOPC Claim and then only to the extent of any payment made by such Debtor Non-Settling Insurer, which shall be the sole source of recovery on account the USOPC Claim under the Partial Settlement Option.

Under the Litigation Only Alternative, the Class 8 Claim shall be treated as a Class 5 General Unsecured Claim in the maximum amount of $88,983.34. However, nothing in the Plan shall be deemed to be a determination that the Class 8 Claim is Allowed in the amount of $88,983.34, and the Debtor shall retain the right to object to the Class 8 Claim as a Class 5 General Unsecured Claim. Further, under the Litigation Only Alternative, in addition to the independent rights that the Holder of the Class 8 Claim has under the Debtor CGL Insurance Policies as an additional insured, all rights that the Holder of the Class 8 Claim has to reimbursement or indemnification from the Debtor shall be preserved, but the sole source of recovery for any such reimbursement or indemnification Claim shall be from the Debtor CGL Insurance Policies.  Except to the extent that some or all of the $88,983.34 portion of the Class 8 Claim is Allowed as a Class 5 General Unsecured Claim, the Holder of the Class 8 Claim shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date

9.    **Class 9—Indemnification Claims.**

a.    **Classification.** Class 9 consists of the Holders of Indemnification Claims listed on Exhibit A to the Plan. Claims are classified as Indemnification Claims if they assert liabilities arising out of the Debtor's alleged obligation to compensate third parties for losses or damages they suffered in connection with certain events, such as the commencement of the sexual abuse litigation and related investigations that drove the Debtor to commence the Chapter 11 Case. In total, there are 19 Indemnification Claims that assert liabilities of $41,487,568.17 in addition to unliquidated amounts.

b.    **Impairment And Voting.** Class 9 is impaired under the Plan. The Holders of Class 9 Claims are entitled to vote on the Plan.

c.    **Treatment.** Holders of Class 9 Claims shall not receive a distribution under the Plan. If the entire amount of the Total Settlement Demand Amount is funded on the Effective Date of the Plan, all rights that the Holders of Class

9 Claims have to receive indemnification or reimbursement from the Debtor shall be satisfied by granting the Holders of Class 9 Claims the benefit of the Channeling Injunction. In the case of the Partial Settlement Option, the Holders of Class 9 Claims will retain any rights that such Holder has to receive indemnification or reimbursement from the Debtor, including all of its rights (if any) to reimbursement, indemnification, or a defense under any of the Debtor's Non-Settling Insurer insurance policies, but only for Abuse Claims falling under the Debtor's Non-Settling Insurer insurance policies and only to the extent that there is coverage under the Debtor's Non-Settling Insurer insurance policies for such Indemnification Claim and then only to the extent of any payment made by such Debtor Non-Settling Insurer, which shall be the sole source of recovery on account of any Class 9 Claim under the Partial Settlement Option. Under the Litigation Only Alternative, all rights that the Holders of Class 9 Claims have to reimbursement or indemnification from the Debtor are preserved but the sole source of recovery for such Claims shall be from the Debtor CGL Insurance Policies.

10.    **Class 10—Future Claimant Representative Claim.**

   a.    **Classification.** Class 10 consists of the Future Claims. The Future Claims are Sexual Abuse Claims held by Future Claimants—*i.e.*, individuals who held Sexual Abuse Claims as of March 1, 2019 and had a valid justification for failing to assert a timely Abuse Claim in the case, as more fully detailed in Section 1.1.63 of the Plan. The FCR, as the legal representative of the Future Claimants, is deemed to be the Holder of the Class 10 Claims.

   b.    **Impairment And Voting.** Class 10 is impaired under the Plan. The FCR as Holder of the FCR Claim is entitled to vote on the Plan on behalf of the Future Claimants.

   c.    **Treatment.** Under the Full or Partial Settlement Alternative, on the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 10 Claims pursuant to the provisions of the Plan and the Trust Documents; *provided, however*, that no Holder of a Class 10 Claim shall have an interest in the Trust Assets other than the Future Claimant Reserve. Under the Litigation Only Alternative, the FCR Claim will not receive a Distribution; *provided, however*, that to the extent that the Holder of an FCR Claim has a right to recovery under any of the Debtor CGL Insurance Policies, such rights are preserved and will not be impaired under the Plan.

11.    **Class 11—Sexual Abuse Claims Filed After The Bar Date.**

   a.    **Classification.** Class 11 consists of the fifteen (15) Abuse Claims that were not timely filed by the Bar Date established in the case.

   b.    **Impairment And Voting.** Class 11 is impaired under the Plan. The Holders of Class 11 Claims are deemed to have voted no on the Plan.

      **c.**    **Treatment.** Under the Full or Partial Settlement Alternative, Class 11 Claims will receive no Distributions under the Plan. Under the Litigation Only Alternative, Class 11 Claims will receive no Distributions under the Plan; *provided, however*, that to the extent that the Holder of a Class 11 Claim has a right to recovery under any of the Debtor CGL Insurance Policies, such rights are preserved and will not be impaired under the Plan.

## VI. MEANS FOR IMPLEMENTATION OF THE PLAN UNDER THE FULL OR PARTIAL SETTLEMENT ALTERNATIVE

**A.**    **Trust Formation and Funding.**

    **1.**    **Establishment Of The Trust.**

On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986.

    **2.**    **Trust Purpose.**

The Trust shall be established for the benefit of the Abuse Claimants and Future Claimants and will assume all liability for the Channeled Claims. The Trust will receive, liquidate, and distribute Trust assets in accordance with the Plan and the Trust Documents, including the Trust Agreement attached to the Plan as <u>Exhibit F</u>, the Allocation Protocol attached to the Plan as <u>Exhibit H</u>, and the Future Claimant Allocation Protocol attached to the Plan as <u>Exhibit I</u>.

    **3.**    **Funding of Trust.**

The Trust shall be funded, on or before the Effective Date, by: (a) the Net Settlement Payment; (b) the Twistars Payment; and/or (c) the assignment of any Insurance Claims. Upon the funding of the Trust, each Buy-Back Agreement shall be binding on the Trust and the Settlement Trustee and FCR.

    **4.**    **Approval of Settlement and Buy-Back Agreements.**

The entry of the Confirmation Order will constitute the order approving the compromises and settlements required under the Plan and approving the sales contemplated by the Buy-Back Agreements pursuant to 11 U.S.C. §363. The Bankruptcy Court's findings of fact in the Confirmation Order shall constitute its determination that such compromises and settlements and sales are in the best interests of the Debtor, the Claimants holding Abuse Claims, the Holders of other Claims, the Protected Parties and all other parties in interest, and are fair, equitable, and within the range of reasonableness, and an appropriate exercise of each such Person's business judgment under the applicable laws of corporate governance.

    **5.**    **Future Claimant Reserve.**

The Trust shall establish a Future Claimant Reserve which shall be funded with one (1%) percent of the Net Settlement Payment. Notwithstanding the entry of the Confirmation Order or

the occurrence of the Effective Date, the FCR shall continue until he or his successor resigns or the funds in the Future Claimant Reserve are completely distributed as provided in Section 11.8 of the Plan.

### 6.    The Settlement Trustee.

The initial Settlement Trustee shall be William L. Bettinelli. In the event Mr. Bettinelli elects not to serve, the Survivors' Committee shall identify the Settlement Trustee in a supplement to be filed within fourteen (14) days prior to the Confirmation Hearing. The Settlement Trustee shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

### 7.    Tax Matters.

The Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain Assets of the Debtor and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Settlement Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code, the regulations promulgated thereunder, and applicable state law, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

### 8.    Cooperation By The Debtor And Reorganized Debtor.

The Debtor, the Estate, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Settlement Trustee as requested in connection with the Settlement Trustee's administration of the Trust.

### 9.    Objections To Channeled Claims.

No Person other than the Settlement Trustee has the right to object to the Channeled Claims, and any such objection will be prosecuted and resolved in accordance with the terms of the Trust Documents.

### 10.    Trust Indemnification Obligations.

From and after the Effective Date, the Trust shall be bound by the terms of the Plan and shall defend, indemnify, and hold harmless the Protected Parties with respect to any and all Channeled Claims, Medicare Claims, and Claims against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer relating to an Abuse Claim, including: all Claims made by (a) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurance Policy; (b) any Person who has made, will make, or can make (but for the Plan) an Abuse Claim or a Claim against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer; (c) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurance Policy relating to Sexual Abuse or other abuse. The Protected Parties shall have the right to defend any Claims identified in this Section and shall do so in good faith. The Protected Parties may undertake the defense of any Claim on receipt of such Claim. The Protected Parties shall notify the Trust as soon

as practicable of any Claims identified in this Section and of their choice of counsel. The Protected Parties may seek to enjoin such Claim and introduce a copy of the Confirmation Order in support thereof, and the Trust shall take all reasonable steps to join in and support such injunctive relief. The Protected Parties' defense of any Claims shall have no effect on the obligations of the Trust, as applicable, to indemnify any such party for such Claims. The Trust shall promptly reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Protected Parties in defending such Claims upon presentation of statements for such fees, expenses, costs and amounts to the Trust. In defense of any such Claims, the Protected Parties may settle or otherwise resolve a Claim consistent with the terms of the Plan and with the prior consent of the indemnifying party, which consent shall not be unreasonably withheld. The Settlement Trustee shall be obligated to ensure that the Trust complies in all respects with the obligations set forth herein.

**B. Implementation of the Partial Settlement Option.**

**1. Partial Settlement Option Election.**

The Plan provides that if fewer than all of the CGL Insurers accept the CGL Insurer Settlement Offers by the date set for the hearing to approve this Disclosure Statement, the Debtor and the Survivors' Committee may jointly elect to include the Partial Settlement Option in the Plan if the Survivors' Committee and the Debtor each determine that there is sufficient liquidity available to fund the Trust due to sufficient funding through settlement with one or more CGL Insurer or other Participating Party. At the hearing on this Disclosure Statement, the Debtor and the Survivors' Committee gave notice that they jointly elected to include the Partial Settlement Option in the Plan.

**2. Selection of CGL Insurer(s) in the Partial Settlement Option.**

The Debtor and the Survivors' Committee can select which CGL Insurer(s) may participate in the Partial Settlement Option and obtain the benefit of the Channeling Injunction and become a Released Party. If the Debtor and the Survivors' Committee jointly elect to proceed with the Partial Settlement Option, any CGL Insurer that has agreed to fund its full CGL Insurer Settlement Offer will be included in the Partial Settlement Option.

**3. Treatment Under Partial Settlement Option.**

Under the Partial Settlement Option: (a) each Partial Settlement Option Accepted Party shall receive the benefit of the Plan's Channeling Injunction and releases and shall become a Participating Party or Settling Insurer, as the case may be; (b) the Debtor shall assign all Insurance Claims against a Non-Settling Insurer to the Trust, to the extent that such assignment may be effectuated without impairing the defense and indemnity obligations under the applicable Non-Settling Insurer insurance policies, as set forth in Section 10.5 of the Plan; (c) each Participating Party and Settling Insurer shall assign all Insurance Claims against a Non-Settling Insurer to the Trust that may be asserted against such Non-Settling Insurer with respect to Abuse Claims, to the extent such assignment may be effectuated without impairing the defense and indemnity obligations under the applicable Non-Settling Insurer insurance policies, as set forth in Section 10.5 of the Plan; (d) any Abuse Claimant holding an Abuse Claim insured solely by one or more

54

Non-Settling Insurers that provided insurance coverage to the Debtor and/or any other Participating Party shall be authorized to pursue his or her Abuse Claim against the Debtor and any Participating Party, although such Abuse Claimant shall be authorized to seek payment solely from any Non-Settling Insurer on account of Claims against the Debtor and any Participating Party; and (e) the Trust shall have sole and exclusive authority to settle Insurance Claims and Abuse Claims with such Non-Settling Insurer or other party after the Effective Date of the Plan.

4.      **Transfer of Insurance Claims Upon Failure of CGL Insurer to Accept Its CGL Insurer Settlement Offer.**

Upon selection of the Partial Settlement Option, Insurance Claims against any Non-Settling CGL Insurer shall be transferred to the Trust via (1) an assignment of any such Claims against the Non-Settling Insurers held by the Debtor, Reorganized Debtor, and Participating Parties to the Trust, or (2) the appointment of the Trust as representative for the Debtor, Reorganized Debtor, and Participating Parties to pursue any such Claims against the Non-Settling Insurers. If the Bankruptcy Court does not enter an order approving the assignment of Insurance Claims against any Non-Settling Insurers to the Trust, or the appointment of the Trust as representative of the Debtor, Reorganized Debtor, and Participating Parties to pursue such Claims on their behalf, the Debtor, Reorganized Debtor, and Participating Parties shall retain such Claims but will prosecute such Claims upon the request of the Trust. In any event, no Insurance Claims will be transferred to the Trust without a Bankruptcy Court order determining that such transfer does not defeat or impair the Insurance Coverage.

5.      **Treatment of CGL Insurers That Are Not A Partial Settlement Option Accepted Party.**

Any CGL Insurer or other Person that is not a Partial Settlement Option Accepted Party shall not receive the benefit of a Channeling Injunction or any release or exculpation under the Plan.

6.      **No Claims Of Non-Settling Insurers Against Settling Insurers Or Non-Debtor CGL Settling Insurer Covered Persons.**

Consistent with the holdings in *Eli Lilly and Co. v. The Aetna Casualty and Surety Co., et al.*, Cause No. 49D12 0102 CP 000243 (Marion Cty. Sup. Ct. 2002) and *Southern Indiana Gas & Electric Company v. Admiral Ins. Co.*, Cause No. 49D05 0411 PL 2265 (Marion Cty. Sup. Ct. 2011), the Confirmation Order shall order that any Non-Settling Insurer shall have no Claims, causes of action, or any other remedies of any kind, in law or equity, against any Settling Insurer or Non-Debtor CGL Settling Insurer Covered Persons and any and all such Claims, causes of action, and other remedies shall be deemed released and enjoined.

7.      **Abuse Claimant's Right to Litigate Abuse Claim Upon Failure of CGL Insurer to Accept Its CGL Insurer Settlement Offer.**

If the Debtor and the Survivors' Committee, each in their sole discretion, jointly elect to proceed with the Partial Settlement Option, an Abuse Claimant whose Abuse Claim is covered by a Non-Settling CGL Insurer, as set forth on Exhibit E to the Plan,  may make a one-time election to be treated as a "**Litigation Claimant**" within 60 days of the Effective Date of the Plan, but

solely to the extent that such Abuse Claim may be covered only by CGL Insurance Policies issued by a Non-Settling Insurer(s). A Future Claimant may not elect to become a Litigation Claimant. An Abuse Claimant whose Abuse Claim is covered by a Settling Insurer may not elect to become a Litigation Claimant.

**8.      Litigation Claimant's Right to Commence or Continue Actions.**

A Litigation Claimant may, at his or her own expense, commence or continue any action against the Debtor or a Participating Party that is covered by a Non-Settling Insurer, but such Litigation Claimant may only collect a judgment or award from the proceeds of an insurance policy issued by a Non-Settling Insurer.

**9.      Effect of Trust Insurance Settlements.**

To the extent the Settlement Trustee enters into a settlement agreement (a "**Trust Insurance Settlement**") with any Non-Settling Insurer that covers a Litigation Claimant's Abuse Claim (the policy or policies that respond to such Claim(s) are a "**Target Policy**"), such Litigation Claimant shall be entitled to an enhancement (the "**Claim Enhancement**") to his or her allocation pursuant to the Allocation Protocol, which enhanced amount shall be deducted from the proceeds of the settlement agreement with the applicable Non-Settling Insurer. The Claim Enhancements are independent of one another, and are not intended to be cumulative.  The Trustee shall reserve sufficient amounts to fund such enhanced payments prior to Distribution of settlement proceeds to Abuse Claimants who are not Litigation Claimants.

**10.      Application of Claim Enhancement.**

The Claim Enhancement shall be applied as follows:

(a)   A Litigation Claimant shall be entitled to an enhancement of five percent (5%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into prior to such time that discovery is propounded in such Litigation Claimant's case.

(b)   A Litigation Claimant shall be entitled to an enhancement of ten percent (10%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into after discovery is propounded but before a motion for summary judgment is filed in such Litigation Claimant's case.

(c)   A Litigation Claimant shall be entitled to an enhancement of fifteen percent (15%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into after a motion for summary judgment is filed but before trial in such Litigation Claimant's case.

(d)   A Litigation Claimant shall be entitled to an enhancement of twenty percent (20%) if the Trust negotiates a Trust Insurance Settlement for a Target Policy of such Litigation Claimant if the Trust Insurance Settlement is entered into

after trial commences but before a verdict is returned or a judgment is entered in favor of the Litigation Claimant.

**11.      Withdrawal of Litigation Claimant Election.**

A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time. Once withdrawn, the election may not be reinstated.

**12.      Litigation Claimant's Allocated Settlement Payment.**

A Litigation Claimant's allocated settlement payment shall be held in reserve by the Settlement Trustee until either:

(a)   There is a Final Order determining that the Debtor does not have any liability on account of such Claimant's Abuse Claim. In that case, the Claimant's Claim shall be disallowed and the Claimant shall not be entitled to any Distribution from the Settlement Fund.

(b)   There is a Final Order determining that the Debtor is liable to the Claimant on account of the Abuse Claim. In that case, the Settlement Trustee shall release the Claimant's Distribution from the Settlement Fund.

(c)   The Trust enters into a Trust Settlement Agreement with the applicable Target Policy. In that case, the Litigation Claimant's Abuse Claim shall become a Channeled Claim and the Settlement Trustee shall release such Claimant's Distribution (including the claim enhancement) from the Settlement Fund.

(d)   If and to the extent a Litigation Claimant obtains a verdict or judgment on account of his or her Abuse Claim, then, at the election of the Litigation Claimant, the Settlement Trustee shall not be authorized to include such Abuse Claim in any settlement agreement with the Non-Settling Insurer. The Abuse Claimant may receive the full amount of his or her share under the Allocation Protocol, except for proceeds of any settlement with any Non-Settling Insurer responsible to pay such judgment. The Abuse Claimant shall have all rights available under the law to pursue direct Claims against and payment from the applicable Non-Settling Insurer.

**13.      Abuse Claimants' Rights Reserved.**

All Abuse Claimants' (and any other parties') rights with respect to Claims against any Person other than a Protected Party—*i.e.*, the Debtor, the Estate, the Reorganized Debtor, any Participating Party, any Settling Insurer, any Non-Debtor CGL Settling Insurer Covered Person, and their respective Related Persons—shall be preserved and remain unaffected by the Plan.

**14.      No Compromise of Insurance Policies for Claims that are not Abuse Claims.**

The Trust shall not be authorized to compromise any Insurance Policy of a Participating Party with respect to any Claim that is not an Abuse Claim without the express written consent of

the Participating Party. Any settlement between the Trust and a Non-Settling Insurer or other party shall entitle such Non-Settling Insurer and any Participating Party or Non-Debtor CGL Settling Insurer Covered Person with a Claim to Insurance Coverage under such Non-Settling Insurer's insurance policies to the benefits afforded Settling Insurers, Participating Parties, or Non-Debtor CGL Settling Insurer Covered Persons as the case may be, under the Plan.

**C.      Liquidation And Payment Of Channeled Claims.**

**1.      Resolution And Payment Of Channeled Claims.**

The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. Except as set forth in Sections 9.10 and 9.11 of the Plan, the USOPC Claim and the Indemnification Claims shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim. Because Abuse Claims and Future Claims are being paid by the Trust without regard to whether those Claims are covered by the insurance policies issued by Settling Insurers: (a) the Trust shall be deemed subrogated to the Claims of Abuse Claimants paid by the Trust to the extent of those payments; and (b) the Trust may pursue such subrogation Claim or any contribution Claim; provided however, that no such action may be brought against a Protected Party.

**2.      Conditions To Payment Of Abuse Claims And FCR Claims.**

As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete general release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from, in connection with, or relating to USAG, Abuse Claims, Future Claims or Settling Insurance Policies issued by a Settling Insurer.  In addition, within ten (10) days after receiving any payment from the Trust, an Abuse Claimant or Future Claimant shall dismiss with prejudice any and all lawsuit that such Abuse Claimant or Future Claimant had brought against the Debtor, any Participating Party, any Settling Insurer, and any Non-Debtor CGL Settling Insurer Covered Person, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall provide copies of such dismissal orders to the Debtor any Protected Party that requests a copy.

**3.      Effect Of No Award On Channeled Claims.**

If a Channeled Claim, including an Abuse Claim filed after the Bar Date, is denied payment from the Trust, the Holder of such Channeled Claim will have no further rights against any Protected Party, the Settlement Trustee and any of his Related Persons, the FCR and any of his Related Persons, and any of their respective assets or property, including any Revested Assets, relating to such Channeled Claim.

4.      **Treatment Of Attorneys' Fees And Costs Of Channeled Claimants.**

The fees and expenses of attorneys representing Channeled Claimants who receive payment from the Trust will be borne by such Channeled Claimants based on applicable state law and individual arrangements made between such Channeled Claimants and their respective attorneys. The Debtor, the Estate, the Reorganized Debtor, the Released Parties, the Trust, and the Settlement Trustee will not have any liability for any fees and expenses of attorneys representing any of the Channeled Claimants, and all Claims for such fees and expenses, if any, will be disallowed.

5.      **Withdrawal Of Channeled Claims.**

A Channeled Claimant may withdraw a Channeled Claim at any time on written notice to the Settlement Trustee. If withdrawn, (a) the Channeled Claim will be withdrawn with prejudice and may not be reasserted, (b) as a condition to withdrawal of the Channeled Claim, any funds paid to the Channeled Claimant by the Trust shall be returned to the Trust, and (c) any releases granted by the Channeled Claimant pursuant to Section 11.2.1 of the Plan and the Channeling Injunction granted Protected Parties in Section 12.3 of the Plan shall remain valid and enforceable against the Channeled Claimant who withdraws a Channeled Claim.

6.      **Adding Participating Parties.**

After the Effective Date, upon the consent of the Settlement Trustee, any Person may become a Participating Party if the Bankruptcy Court, after notice and hearing, approves an agreement between such Person and the Settlement Trustee (a "**Participating Party Agreement**"). After the Effective Date, the Settlement Trustee shall have the exclusive authority to seek approval of such a Participating Party Agreement. Upon the Bankruptcy Court's entry of a Final Order approving such an Agreement, Exhibit C to the Plan will be amended by the Settlement Trustee to include such Person. Any Person becoming a Participating Party shall have all of the rights, remedies, and obligations of a Participating Party notwithstanding that such Person originally may have been excluded as a  Participating Party under any provision of the Plan, including, without limitation, the terms  and conditions of the Channeling Injunction.

7.      **Adding Settling Insurers.**

After the Effective  Date a Person may become a Settling Insurer with the consent of the Settlement Trustee and the Reorganized Debtor, and in the case of the USOPC Insurers with the consent of the USOPC, upon approval of the Bankruptcy Court, and upon payment of an amount that is acceptable to the Settlement Trustee and the Reorganized Debtor, which amount may or may not be the same as that Person's CGL Insurer Settlement Offer. If the addition of such Person is approved pursuant to a Final Order, the defined term "Settling Insurer" will be deemed amended to include such Person. Any Person becoming a Settling Insurer shall have all of the rights, remedies, and duties of a Settling Insurer  notwithstanding that such Person originally may have been excluded as a Settling Insurer under any provision of the Plan.  Such rights, remedies, and duties shall include, without limitation, the terms and conditions of the Channeling Injunction.

8.      **Future Claimant Process.**

A Future Claimant must file a Claim with the Settlement Trustee on or before the fifth (5th) anniversary of the Effective Date. The Claim will be entitled to a Distribution from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Settlement Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim. Future Claimants will have no right to payment or any other right under the Plan or against the Debtor, the Estate, or the Reorganized Debtor, or any of their respective property including any Revested Assets, or against the Settling Insurers, or the Participating Parties, or any Persons that are Related Persons to any of the foregoing Persons. Following the fifth (5th) anniversary of the Effective Date, any funds held in the Future Claimant Reserve shall be released to the Settlement Trustee to administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan. In the event that the remaining funds held, when combined with other Trust assets, total $50,000 or less, the Settlement Trustee shall have the discretion to either (a) administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan; or (b) distribute to a charitable entity mutually agreed upon by the Settlement Trustee and the Reorganized Debtor, but any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the USOPC.

D.      **CHANNELING INJUNCTION**

1.      **EFFECTIVE DATE INJUNCTIONS.**

THE INJUNCTIONS PROVIDED FOR IN THE PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID, AND ENFORCEABLE ACCORDING TO THEIR TERMS. THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

2.      **CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS.**

IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE DEBTOR, THE PARTICIPATING PARTIES, AND SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE:

(A)     ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS AS ESTABLISHED UNDER THE PLAN AND TRUST

AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL
HOLDERS OF CHANNELED CLAIMS; AND

(B)    ALL PERSONS THAT HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR
MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIM
(INCLUDING ALL DEBT HOLDERS, GOVERNMENTAL, TAX, AND
REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER
CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, OTHER
INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF
ANY KIND OR NATURE WHATSOEVER AGAINST OR RELATED TO THE
PROTECTED PARTIES) ARE HEREBY PERMANENTLY STAYED,
ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION,
DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING,
ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY
CHANNELED CLAIM AGAINST A PROTECTED PARTY, INCLUDING:

  i.   COMMENCING OR CONTINUING IN ANY MANNER ANY
       ACTION OR OTHER PROCEEDING OF ANY KIND WITH
       RESPECT TO ANY CHANNELED CLAIM AGAINST THE
       PROTECTED PARTIES OR AGAINST THE PROPERTY OF THE
       PROTECTED PARTIES;

  ii.  ENFORCING, ATTACHING, COLLECTING OR RECOVERING,
       BY ANY MANNER OR MEANS, FROM THE PROTECTED
       PARTIES, OR FROM THE PROPERTY OF THE PROTECTED
       PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM,
       ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE
       PROTECTED PARTIES;

  iii. CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY
       KIND AGAINST THE PROTECTED PARTIES, OR THE
       PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO
       ANY SUCH CHANNELED CLAIM;

  iv.  ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY
       CHANNELED CLAIM OF ANY KIND AGAINST: (1) THE
       PROTECTED PARTIES; (2) ANY DIRECT OR INDIRECT
       OBLIGATION DUE TO THE PROTECTED PARTIES; OR (3) THE
       PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO
       ANY SUCH CHANNELED CLAIM; AND

  v.   TAKING ANY ACTION, IN ANY MANNER, IN ANY PLACE
       WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY
       WITH, THE PROVISIONS OF THE PLAN.

**ALL CLAIMS DESCRIBED IN SECTION 12.3 OF THE PLAN SHALL BE CHANNELED
TO THE TRUST. THIS INJUNCTION SHALL NOT APPLY TO ANY REINSURANCE**

**CLAIM OR THE PERSONAL INJURY CLAIM. FOR THE AVOIDANCE OF DOUBT, CLAIMS BY OR AGAINST ANY NON-SETTLING INSURER SHALL NOT BE CHANNELED CLAIMS BUT CLAIMS BY ANY NON-SETTLING INSURER SHALL BE SUBJECT TO THE INJUNCTIONS AND RELEASES SET FORTH IN THE PLAN.**

3.      **SCOPE OF CHANNELING INJUNCTION**.

NOTWITHSTANDING ANY PROVISION OF THE PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS" PROVIDES ABSOLUTELY NO PROTECTION TO: (A) AN EXCLUDED PARTY; (B) ANY CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4 OF THE PLAN; (C) TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN, THE CHANNELING INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN; AND (D) ANY NON-SETTLING INSURER.

4.      **ENFORCEMENT TO THE MAXIMUM EXTENT.**

TO THE EXTENT NOT OTHERWISE ENJOINED IN SECTION 12.3 OF THE PLAN, THE ASSERTION OR ENFORCEMENT OF CHANNELED CLAIMS, AND ANY ATTEMPT TO ASSERT OR ENFORCE A CHANNELED CLAIM, DIRECTLY OR INDIRECTLY, BY ANY PERSON, AGAINST A PROTECTED PARTY IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.

5.      **SETTLING INSURER INJUNCTION.**

IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS (INCLUDING, WITHOUT LIMITATION, ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, SETTLING INSURERS, NON-SETTLING INSURERS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER AGAINST OR RELATED TO THE PROTECTED PARTIES) ARE PERMANENTLY ENJOINED AND BARRED FROM ASSERTING AGAINST A SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR SETTLING INSURER COVERED PERSON ANY CLAIM (INCLUDING ANY INSURANCE COVERAGE CLAIM, EXTRA-CONTRACTUAL CLAIM, CONTRIBUTION CLAIM, OR SUBROGATION CLAIM)

OR INTEREST OF ANY KIND OR NATURE WHATSOEVER ARISING FROM OR RELATING IN ANY WAY TO (A) ANY ABUSE CLAIM OR FUTURE CLAIM OR (B) ANY OF THE SETTLING INSURER POLICIES OR (C) ANY CLAIM AGAINST ANY SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR SETTLING INSURER COVERED PERSON FOR CONTRIBUTION, INDEMNITY, DEFENSE, SUBROGATION, OR SIMILAR RELIEF THAT ARISES DIRECTLY OR INDIRECTLY FROM ANY CLAIM AGAINST THE DEBTOR OR ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON, OR ANY SETTLING INSURER POLICY; *PROVIDED, HOWEVER*, THAT SUCH INJUNCTION SHALL NOT APPLY TO THE HOLDER OF THE PERSONAL INJURY CLAIM AND HER ABILITY TO PURSUE RECOVERY FROM THE PERSONAL INJURY INSURANCE POLICY. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN, THE CHANNELING INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN;  AND (D) ANY NON-SETTLING INSURER.

6. **Contribution Bar against Non-Settling Insurers.**

IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE SETTLING INSURERS PURSUANT TO THE TERMS OF THE PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THE PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105(a), 363, AND 1129 OF THE BANKRUPTCY CODE, ANY NON-SETTLING INSURER IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, INCLUDING FILING ANY SUIT OR CAUSE OF ACTION AGAINST ANY SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR SETTLING INSURER COVERED PERSON, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CLAIM, INCLUDING ANY CONTRIBUTION CLAIM, SUBROGATION CLAIM, CLAIM FOR RECOVERY OF DEFENSE COSTS OR INDEMNITY PAYMENTS, OR ANY SIMILAR CLAIM, CAUSE OF ACTION, OR REMEDY, AGAINST ANY SETTLING INSURER AND ANY NON-DEBTOR SETTLING INSURER COVERED PERSON.

7. **PERMANENT TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING INSURERS.**

ALL INJUNCTIONS AND STAYS PROVIDED FOR IN THE PLAN AND UNDER AND PURSUANT TO THE INJUNCTIVE PROVISIONS OF SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE ARE PERMANENT  AND WILL REMAIN IN FULL FORCE

AND EFFECT FOLLOWING THE EFFECTIVE DATE AND ARE NOT SUBJECT TO BEING VACATED OR MODIFIED.

     **8.**     **RELEASE OF AVOIDANCE CLAIMS AND OTHER CLAIMS AGAINST PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER PERSONS, AND SETTLING INSURERS.**

ON THE EFFECTIVE DATE, ALL AVOIDANCE RIGHTS OF THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, INCLUDING THOSE ARISING UNDER SECTIONS 544, 547, 548, 549, 550, AND 553 OF THE BANKRUPTCY CODE, AGAINST EACH OF THE PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER PERSONS, AND SETTLING INSURERS SHALL BE DEEMED SETTLED, COMPROMISED, AND RELEASED BY THE PLAN. AS TO EACH SETTLING INSURER, ON THE EFFECTIVE DATE, THE INSURANCE COVERAGE ADVERSARY PROCEEDING AND ALL RELATED PROCEEDINGS IN ANY COURT SHALL IMMEDIATELY CEASE, AND THE INSURANCE COVERAGE ADVERSARY PROCEEDING AND ANY RELATED PROCEEDINGS SHALL BE DISMISSED, WITH PREJUDICE, AGAINST EACH SETTLING INSURER.

     **9.**     **MUTUAL RELEASE.**

EXCEPT FOR (i) OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE REORGANIZED DEBTOR PURSUANT TO ARTICLE XIX OF THE PLAN, (ii) OBLIGATIONS UNDER THE PLAN INCLUDING THE OBLIGATIONS OF THE PERSONAL INJURY INSURER SOLELY WITH RESPECT TO THE PERSONAL INJURY CLAIM AND THE OBLIGATIONS OF SETTLING INSURERS TO PAY DEFENSE COSTS (EXCLUDING ALL DEFENSE COSTS OF THE TYPE SOUGHT IN THE COSTS MOTION) THROUGH THE EFFECTIVE DATE OF THE PLAN, AND (iii) CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4 OF THE PLAN, ON THE EFFECTIVE DATE, THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, ON THE ONE HAND, AND THE PARTICIPATING PARTIES, THE NON-DEBTOR CGL SETTLING INSURER COVERED PERSONS, AND SETTLING INSURERS, ON THE OTHER HAND, WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR RESPECTIVE RELATED PERSONS, INCLUDING CLAIMS ARISING UNDER OR AGAINST THEIR RESPECTIVE INSURANCE POLICIES. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE. NO SUCH CLAIM WILL BE DEEMED TO BE ASSIGNED TO THE TRUST. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES ISSUED TO THE DEBTOR OR ANY PARTICIPATING PARTY NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN, THIS MUTUAL RELEASE SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u> TO THE PLAN.

10.    **PROTECTED PARTY RELEASE.**

EXCEPT FOR (i) OBLIGATIONS UNDER THE PLAN INCLUDING THE OBLIGATIONS OF THE PERSONAL INJURY INSURER WITH RESPECT TO THE PERSONAL INJURY CLAIM AND THE OBLIGATIONS OF SETTLING INSURERS TO PAY DEFENSE COSTS (EXCLUDING ALL DEFENSE COSTS OF THE TYPE SOUGHT IN THE COSTS MOTION) THROUGH THE EFFECTIVE DATE OF THE PLAN, AND (ii) CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4 OF THE PLAN, ON THE EFFECTIVE DATE OF THE PLAN, EACH AND EVERY PROTECTED PARTY SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO EACH DEBTOR CGL SETTLING INSURER AND ITS RELATED PERSONS A FULL AND COMPLETE GENERAL RELEASE OF ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, THAT THEY MAY HAVE AGAINST EACH DEBTOR CGL SETTLING INSURER AND ITS RELATED PERSONS RELATED IN ANY WAY TO THE DEBTOR CGL INSURANCE POLICIES ISSUED BY SUCH DEBTOR CGL SETTLING INSURERS. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE AND SUCH RELEASES WILL BE DEEMED GRANTED REGARDLESS OF WHETHER THE PROTECTED PARTY EXECUTES AND DELIVERS A SEPARATE RELEASE TO A DEBTOR CGL SETTLING INSURER.  IN ADDITION, EACH PROTECTED PARTY WILL BE DEEMED TO HAVE CONSENTED TO THE SALE BY THE DEBTOR OF EACH DEBTOR CGL INSURANCE POLICIES ISSUED BY A DEBTOR CGL SETTLING INSURER BACK TO THE DEBTOR CGL SETTLING INSURER. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE DEBTOR CGL SETTLING INSURERS ARE ALSO INSURERS TO THE USOPC UNDER POLICIES ISSUED TO THE USOPC OR TO THE KAROLYIS UNDER INSURANCE POLICIES ISSUED TO THE KAROLYIS, THIS RELEASE SHALL BE LIMITED BY THE USOPC RELEASE AND THE KAROLYI RELEASE.

11.    **USOPC RELEASE.**

ON THE EFFECTIVE DATE OF THE PLAN, THE USOPC SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO EACH USOPC SETTLING INSURER AND ITS RELATED PERSONS A FULL AND COMPLETE GENERAL RELEASE OF ANY RIGHTS AND INTERESTS IN INDEMNITY COVERAGE FOR ABUSE CLAIMS UNDER ANY INSURANCE POLICY ISSUED BY A USOPC SETTLING INSURER FOR WHICH THE ABUSE CLAIMANT HAS PROVIDED A FULL AND COMPLETE GENERAL RELEASE TO THE USOPC PURSUANT TO SECTION 11.2.1 OF THE PLAN. THE USOPC SHALL ALSO GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, ONLY TO NATIONAL CASUALTY COMPANY AND ITS RELATED PERSONS, AND ONLY IF NATIONAL CASUALTY COMPANY IS A SETTLING INSURER, AND THEN ONLY UPON THE EFFECTIVE DATE, A FULL AND COMPLETE RELEASE OF ANY AND ALL RIGHTS AND INTERESTS TO DEFENSE COSTS INCURRED AFTER THE EFFECTIVE DATE OF THE PLAN FOR ABUSE CLAIMS UNDER ANY INSURANCE POLICY ISSUED BY NATIONAL CASUALTY COMPANY THAT IS SPECIFICALLY IDENTIFIED ON <u>EXHIBIT A</u> TO THE PLAN, WHETHER OR NOT SUCH ABUSE CLAIMS ARE THOSE FOR WHICH AN ABUSE CLAIMANT HAS PROVIDED A RELEASE TO THE USOPC PURSUANT TO SECTION 11.2.1 OF THE PLAN. NOTWITHSTANDING THE FOREGOING, THE USOPC RETAINS THE RIGHT TO REIMBURSEMENT OF, AND TO PURSUE COLLECTION OF, ANY

DEFENSE COSTS INCURRED BEFORE THE EFFECTIVE DATE OF THE PLAN UNDER ANY INSURANCE POLICY ISSUED BY NATIONAL CASUALTY COMPANY. THE USOPC ALSO RETAINS THE RIGHT TO REIMBURSEMENT OF, AND TO PURSUE COLLECTION OF, ANY DEFENSE COSTS INCURRED BEFORE OR AFTER THE EFFECTIVE DATE OF THE PLAN UNDER ANY INSURANCE POLICY ISSUED BY A USOPC INSURER OTHER THAN NATIONAL CASUALTY COMPANY. NOTHING IN THIS PROVISION SHALL BE DEEMED TO LIMIT THE PROTECTED PARTY RELEASE (DESCRIBED ABOVE) GRANTED BY THE USOPC TO ANY DEBTOR CGL SETTLING INSURER OF CLAIMS AGAINST A DEBTOR CGL INSURANCE POLICY. *PROVIDED, HOWEVER*, NOTHING IN THIS PROVISION SHALL BE CONSTRUED TO EFFECTUATE A RELEASE OF ANY CLAIM BY THE USOPC AGAINST ANY DEBTOR CGL SETTLING INSURER OR USOPC SETTLING INSURER UNDER OR IN CONNECTION WITH ANY INSURANCE POLICY THAT IS NOT SUBJECT TO A  CGL SETTLEMENT OFFER THAT IS ACCEPTED BY A SETTLING INSURER AND THAT IS NOT LISTED ON <u>EXHIBIT A</u> TO THE PLAN.

### 12.   KAROLYI RELEASE.

ON THE EFFECTIVE DATE OF THE PLAN, THE KAROLYIS SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO THE KAROLYI SETTLING INSURER AND ITS RELATED PERSONS A RELEASE OF ANY RIGHTS AND INTERESTS IN INDEMNITY COVERAGE FOR ABUSE CLAIMS UNDER ANY INSURANCE POLICY ISSUED BY THE KAROLYI INSURER FOR WHICH THE ABUSE CLAIMANT HAS PROVIDED A RELEASE TO THE KAROLYIS PURSUANT TO SECTION 11.2.1 OF THE PLAN. NOTWITHSTANDING THE FOREGOING, NOTHING SHALL BE CONSTRUED TO EFFECT A RELEASE OF ANY CLAIMS BY THE KAROLYIS FOR REIMBURSEMENT OF DEFENSE COSTS UNDER ANY INSURANCE POLICY ISSUED BY THE KAROLYI SETTLING INSURER. THE KAROLYIS RETAIN THE RIGHT TO REIMBURSEMENT OF, AND TO PURSUE COLLECTION OF, ANY DEFENSE COSTS INCURRED TO DATE OR WHICH MAY BE INCURRED AFTER THE EFFECTIVE DATE OF THE PLAN. NOTHING IN THIS PROVISION SHALL BE DEEMED TO LIMIT THE PROTECTED PARTY RELEASE (DESCRIBED ABOVE) GRANTED BY THE KAROLYIS TO ANY DEBTOR CGL SETTLING INSURER OF CLAIMS AGAINST A DEBTOR CGL INSURANCE POLICY.

### 13.   EXCLUDED PARTIES LIMITATION OF RELEASES AND CHANNELING INJUNCTION.

Notwithstanding anything to the contrary herein, nothing herein shall be deemed to release or affect any Claims by any Person (including Abuse Claimants, Future Claimants, and any other Person) against any Excluded Parties.  The Excluded Parties shall not be Released Parties or receive the benefits or protections of the Channeling Injunction. The fact that an Excluded Party shall not be a Released Party or receive the benefits or protections of the Channeling Injunction shall not prevent a release of Insurance Coverage under the Debtor CGL Insurance Policies issued by Debtor CGL Settling Insurers.

## VII. MEANS FOR IMPLEMENTATION OF THE PLAN UNDER THE LITIGATION ONLY ALTERNATIVE

**A.      Lifting Of Automatic Stay And Stay Imposed Under the 105 Order for the Benefit of the Holders of Class 6 Claims**

On the Effective Date, the automatic stay shall be lifted only for the Holders of Class 6 Claims and the injunction imposed by the 105 Order will be dissolved.

Holders of Class 6 Claims who had not filed a Lawsuit before the Petition Date against the Debtor shall have, subject to any and all defenses, including any applicable statute of limitations or repose, or the equitable doctrine of laches, thirty (30) days pursuant to Section 108(c) of the Bankruptcy Code, to file such lawsuit in a court of appropriate jurisdiction against the Debtor. However, the sole source of recovery for such Claims against the Debtor shall be limited to available proceeds of the Debtor CGL Insurance Policies (and Other Insurance Policies, if any, that provide coverage for Class 6 Claims).

Holders of a Class 6 Claim who filed a prepetition lawsuit against the Debtor or any Co-Defendants shall have thirty (30) days to file a notice in such prepetition lawsuit stating that the Claimant is electing to recommence litigation against the Reorganized Debtor in name only pursuant to the terms of the Plan. However, the sole source of recovery for such Claims against the Debtor shall be shall be limited to available proceeds of the Debtor CGL Insurance Policies (and Other Insurance Policies, if any, that provide coverage for Class 6 Claims).

A Holder of a Class 6 Claim that does not file a suit or file a notice to recommence litigation of a prepetition lawsuit within such thirty (30) day period shall be forever barred from asserting the Holder's Claim.

**B.      Post-Effective Date Awards.**

In the event that any Holder of a Class 6 Claim obtains a Post-Effective Date Award against the Reorganized Debtor, the Reorganized Debtor will not object to the Claimant pursuing payment from any Debtor CGL Insurer that the Claimant contends provides Debtor CGL Insurance Coverage for such Post-Effective Date Award. To the extent the Holder of a Class 6 Claim pursues payment from an Insurer other than a Debtor CGL Insurer, the Debtor and Reorganized Debtor reserve their rights to object to the pursuit of such payment.

**C.      Cooperation with Insurers in Defense of Claims.**

In the event that any Holder of a Class 6 Claim prosecutes an action against the Reorganized Debtor, the Reorganized Debtor shall reasonably cooperate, in accordance with the terms of any applicable Insurance Policy, governing law, and consistent with the terms of the Plan, with any Insurer that is providing a defense to such a Claim, but the Reorganized Debtor shall not be required to pay for the costs of any such defense or cooperation, which will be paid solely by the Insurer(s) providing the defense. The Debtor does not admit liability for any Class 6 Claims.

**D.      Remand of Removed Actions and Relief from Automatic Stay/Discharge.**

On the thirtieth (30th) day after the Effective Date and without further order of the Bankruptcy Court or the District Court, (a) all actions removed by the Debtor or any other Co-Defendant during the Chapter 11 Case are remanded to the Court from which they were removed; and (b) such actions are not subject to the automatic stay or the injunction in Bankruptcy Code Section 524(a)(2). Nothing contained herein is intended to affect, diminish, or impair those provisions of the Plan which prohibit execution of any judgment against the Reorganized Debtor, the Reorganized Debtor's Revested Assets or property the Reorganized Debtor acquires after the Effective Date. Notwithstanding the foregoing, any plaintiff in a removed action may object to remand of such action by filing an objection with the Bankruptcy Court within fifteen (15) days after the Effective Date. Any removed action subject to an objection to remand shall not be remanded except upon order of the Bankruptcy Court. The Reorganized Debtor shall file a notice of remand on the docket for each remanded action.

## VIII. GENERALLY APPLICABLE PROVISIONS OF THE PLAN.

**A.      Conditions Precedent To The Effective Date.**

Section 17.1 of the Plan sets forth the conditions precedent to the effectiveness of the Plan. The Plan's Effective Date will occur when each those conditions have been satisfied or waived in accordance with Section 17.2 of the Plan.

**1.      Conditions To Effectiveness.**

The Effective Date will occur when each of the following conditions is met: (a) the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably acceptable to the Reorganized Debtor and the Survivors' Committee, and in addition, if the Full or Partial Settlement Alternative is selected, to the Participating Parties and the Settling Insurers; (b) the Confirmation Order has become a Final Order on or before December 31, 2021; (c) if the Full or Partial Settlement Alternative is selected, the Settlement Trustee, the FCR, and the Reorganized Debtor have signed the Trust Agreement; (d) if the Full or Partial Settlement Alternative is selected, the Settling Insurers have made their Agreed CGL Insurer Payments to the Debtor and the transfers to the Trust contemplated in Section 9.3.2 of the Plan have been made to the Trust; (e) if the Full or Partial Settlement Alternative is selected, the Bankruptcy Court has approved, by Final Order, the Buy-Back Agreement of each Settling Insurer in form and substance reasonably acceptable to each Settling Insurer, the Reorganized Debtor, and the Survivors' Committee; and (f) if the Full or Partial Settlement Alternative is selected, the Settling Insurers have been dismissed from the Insurance Coverage Adversary Proceeding with prejudice.

**2.      Waiver of Conditions.**

Any conditions described above, and as set forth in Section 17.1 of the Plan, may be waived only by the mutual written consent of the Debtor, the Survivors' Committee, and, under the Full or Partial Settlement Alternative is selected, the Participating Parties and Settling Insurers.

### 3. Non-Occurrence of Effective Date.

Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within one hundred twenty (120) days after entry of a Final Order confirming the Plan, the Plan shall become null and void. A statement shall be filed with the Court within three (3) Business Days after the Effective Date, advising all parties of the Effective Date, or within three (3) Business Days after the occurrence of any event that renders the Plan null and void, advising all parties that the Plan is null and void.

## B. Insurance Neutrality.

### 1. No Modification of Debtor's Insurance Policies of Non-Settling Insurers, Other Insurers, or Personal Injury Insurer.

Nothing in the Plan, the Confirmation Order, or in any Plan Document modifies any of the terms of any Debtor's Insurance Policies.

### 2. Non-Settling Insurers', Other Insurers', and Personal Injury Insurer's Duties Not Impaired.

The duties and obligations, if any, of the Non-Settling Insurers, the Personal Injury Insurer and Other Insurer under their respective insurance policies shall not be impaired, altered, reduced, or diminished by: (a) the discharge granted to the Debtor under the Plan pursuant to Section 1141(d) of the Bankruptcy Code; (b) the injunctions, exculpations, and releases contained in the Plan; or (c) any other provision of the Plan, the Confirmation Order, or the Plan Documents. Nothing in the Plan, the Confirmation Order, or the Plan Documents shall provide any Non-Settling Insurer, the Personal Injury Insurer, or any Other Insurer with a defense to their rights, obligations, or duties to provide Insurance Coverage under any insurance policy.

### 3. Trust Has No Impact.

The fact that under the Full or Partial Settlement Alternative the Trust is liquidating and paying or reserving monies on account of the Abuse Claims and Future Claims shall not be construed in any way to diminish any obligation of any Non-Settling Insurer, the Personal Injury Insurer, or an Other Insurer under any insurance policy to provide Insurance Coverage to the Debtor, the Reorganized Debtor or a Participating Party for Abuse Claims. The assignment of Insurance Claims or the appointment of the Trust as the representative of the Debtor, the Reorganized Debtor or a Participating Party to pursue Insurance Claims, shall not be asserted as a defense to coverage under any Non-Settling Insurer's Insurance Policy or as a defense to the Insurance Claims.

### 4. Obligations for Claims.

The Non-Settling Insurers', Other Insurers', and Personal Injury Insurer's obligations, if any, with respect to any Claim or Cause of Action, shall be determined by and in accordance with the terms of their respective insurance policies and applicable non-bankruptcy law, subject in all respects to the provisions of the Plan.

**5.      Non-Settling Insurers', Other Insurers', and Personal Injury Insurer's Defenses.**

Nothing in the Plan, the Confirmation Order, or any Plan Document shall constitute a finding or determination that the Debtor and/or any third party is or is not a named insured, additional insured, or insured in any other way under any insurance policy; or that any Non-Settling Insurer or Personal Injury Insurer or Other Insurer has or does not have any defense or indemnity obligation with respect to any Claim. Such rights shall be determined by and in accordance with the terms of the insurance policies and applicable non-bankruptcy law and the Plan. Nothing in the Plan, any Plan Document, or Confirmation Order creates a right of direct action not in accordance with applicable non-bankruptcy law or insurance policy or eliminates a right of direct action in accordance with applicable non-bankruptcy law or insurance policy.

**6.      Reinsurance.**

Nothing in the Plan affects the rights of a Settling Insurer under any agreement or contract providing reinsurance to the Settling Insurer. All such rights are retained by the Settling Insurer.

**7.      Defenses of the Debtor, the Estate, and the Reorganized Debtor.**

Nothing in the Plan, the Confirmation Order, or any Plan Document shall diminish or impair the Debtor's, the Estate's, or the Reorganized Debtor's defenses to liability or damages in connection with any insured Claim and the right of any Non-Settling Insurer or Other Insurer or Personal Injury Insurer that is defending the Reorganized Debtor to assert any such underlying defenses to liability.

**8.      Governing Law.**

Nothing in the Plan is intended to affect the governing law of the any insurance policy.

**C.      Treatment Of Executory Contracts And Unexpired Leases.**

**1.      Assumed Employee Benefit Plans.**

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor is a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

**2.      General; Assumed if Not Rejected.**

Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date.

**3.      Claims for Contract Rejection.**

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective

Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for the filing of Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

### 4. Indemnification Claims.

Any agreement to provide indemnification to any Person contained in the Debtor's By-laws or any executory contract shall be satisfied by the treatment set forth in the Plan for Claims in Classes 8 and 9.

## D. Litigation.

### 1. Reorganized Debtor's Retention of Causes of Action and Litigation.

The Reorganized Debtor shall retain and exclusively enforce the Debtor's Claims and Causes of Action, including against any Non-Settling CGL Insurer or Other Insurer in the Insurance Coverage Adversary Proceeding, whether arising before or after the Petition Date, in any court or other tribunal, including without limitation any adversary proceeding filed in the Chapter 11 Case. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims and Causes of Action, without obtaining Bankruptcy Court approval. Confirmation of the Plan shall not release any of the Debtor's Claims or Causes of Action except as expressly provided in the Plan.

### 2. Additional Actions.

Any Person to whom the Debtor has incurred an obligation (whether on account of the provision of goods, services, or otherwise), or who has received goods or services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (a) such Person has filed a proof of Claim against the Debtor in this Chapter 11 Case; (b) such Person's proof of Claim has been objected to; (c) such Person's Claim was included in the Schedules; or (d) such Person's scheduled Claim has been objected to or has been identified as disputed, contingent, or unliquidated. Notwithstanding the foregoing, this provision shall not be applicable to Abuse Claimants.

## E. Claims And Distributions.

### 1. Lift of Automatic Stay for Personal Injury Claim.

On the Effective Date, the automatic stay of litigation against the Debtor will be modified solely to permit the Holder of the Personal Injury Claim to file a lawsuit against the Debtor in a court of appropriate jurisdiction within thirty (30) days, subject to any applicable statute of limitations or repose, or the equitable doctrine of laches, and pursuant to Section 108(c) of the Bankruptcy Code; provided, however, that the sole source of recovery for the Personal Injury

Claimant shall be any available proceeds of the Personal Injury Insurance Policy. In the event the Personal Injury Claimant prosecutes an action against the Reorganized Debtor, the Reorganized Debtor shall reasonably cooperate, in accordance with the terms of the Personal Injury Insurance Policy, governing law, and consistent with the terms of the Plan, with the Insurer that is providing a defense to such a Claim, but the Reorganized Debtor shall not be required to pay for the costs of any such defense or cooperation. The Debtor admits no liability for the Personal Injury Claim. If the Holder of the Personal Injury Claim does not file suit within such thirty (30) day period, the Holder of the Personal Injury Claim shall be forever barred from asserting the Holder's Claim.

2. **Objections to Claims other than Abuse Claims, the Personal Injury Claim, the USOPC Class 8 Claim, Indemnification Claims, and the FCR Claim.**

Unless a Claim is (a) expressly described as an Allowed Claim pursuant to or under the Plan; or (b) otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any and all rights, interests, and objections of the Debtor, or the Estate, to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured, or unsecured, and whether under the Bankruptcy Code, other applicable law, or contract. The Debtor's failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Reorganized Debtor's rights to object to, to contest, or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the Holder of such Claim. Objections to a Claim (except for Abuse Claims, the USOPC Class 8 Claim (but not the USOPC Class 5 General Unsecured Claim under the Litigation Only Alternative)), the Indemnification Claims, and the Personal Injury Claim) as to which no objection is pending as of the Effective Date, must be filed and served not later than sixty (60) days after the later of (a) the Effective Date or (b) the date such Claim is filed, provided that the Reorganized Debtor may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

3. **Service of Objections.**

An objection to a Claim shall be deemed properly served on the Holder of such Claim if the objector effects service by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Case.

4. **Additional Documentation.**

From and after the Effective Date, the Reorganized Debtor shall be authorized to enter into, execute, adopt, deliver, and/or implement all contracts, leases, instruments, releases, and other

agreements or documents necessary to effectuate or memorialize the settlements contained in the Plan without further Order of the Bankruptcy Court.

**5.    Provisions Governing Distribution To Holders of Allowed Claims.**

**a.    Distribution Only to Holders of Allowed Claims.**

Distributions under the Plan and the Plan Documents will be made only to the Holders of Allowed Claims. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any Distribution otherwise provided to the Claimants under the Plan. If necessary in determining the amount of a Pro Rata distribution due to the Holders of Allowed Claims in any Class, the Reorganized Debtor will make the Pro Rata calculation as if all unresolved Claims were Allowed Claims in the full amount claimed or in the Estimated Amount. When an unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor will make full or partial distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

**b.    Timing of Distributions.**

Unless otherwise agreed by the Reorganized Debtor and the recipient of a distribution under the Plan on account of an Allowed Claim, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by the Plan or any applicable agreement or instrument. Any Claimant that is otherwise entitled to an Undeliverable Distribution and who does not provide the Reorganized Debtor, within thirty (30) days after a Distribution is deemed to be an Undeliverable Distribution, a written notice asserting its claim to that Undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to such Undeliverable Distribution and will be forever barred from receiving such Undeliverable Distribution or asserting any Claim against the Reorganized Debtor or its property. Any Undeliverable Distributions that are not claimed under this Section will be retained by the Reorganized Debtor in accordance with the Plan. Nothing in the Plan requires the Reorganized Debtor to attempt to locate any Claimant who is otherwise entitled to an Undeliverable Distribution.

**6.    No Distributions Pending Allowance.**

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Disputed Claim is an Allowed Claim, the Reorganized Debtor may, in its discretion, make a distribution on account of the portion of such Claim that is an Allowed Claim.

**7.    Setoffs.**

The Reorganized Debtor may, to the extent permitted under applicable law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such

Allowed Claim, the Claims, rights, and Causes of Action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor possesses against such Holder.

### 8.    No Interest on Claims.

Postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan or the Confirmation Order, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### F.    Retention Of Jurisdiction.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including: (1) the determination of objections to Disputed Claims and requests for payment on administrative expense of Claims entitled to priority under Section 507 of the Bankruptcy Code; (2) the resolution of disputes regarding interpretation and implementation of the Plan and related documents; (3) the entry of appropriate orders to protect parties from actions prohibited under the Plan; (4) the approval of amendments to and modifications of the Plan; (5) the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Plan's Effective Date, including but not limited to the Insurance Coverage Adversary Proceeding; (6) the determination of any motion to determine that a Claimant is a Future Claimant or to determine that an Abuse Claim filed after the Bar Date shall be deemed to have been filed before the Bar Date; and (7) the closure of this Chapter 11 Case.

### G.    Miscellaneous Provisions.

### 1.    Modification Of Plan.

The Debtor and the Survivors' Committee (together, the "**Plan Proponents**") each reserve the right, in accordance with the Bankruptcy Code, to amend, modify, or withdraw the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Plan Proponents may, upon order, amend, or modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.    Post-Confirmation Court Approval.

Any action requiring Bankruptcy Court, District Court, or state court approval after the Effective Date will require the Person seeking such approval to file an application, motion, or other request with the Bankruptcy Court, District Court, or state court, as applicable, and obtain a Final Order approving such action before the requested action may be taken. The Person filing such

application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the Bankruptcy Court, on the Reorganized Debtor by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

### 3.      Election Pursuant To Section 1129(b) Of The Bankruptcy Code.

If necessary, the Plan Proponents request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except Section 1129(a)(8) thereof, are met with regard to the Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of the Plan will be deemed deleted from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class.

### 4.      Closing Of The Chapter 11 Case.

As soon as practicable after the Confirmation Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Chapter 11 Case shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, or any other party in interest, to reopen the Chapter 11 Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under the Plan. Any order closing this Chapter 11 Case will provide that the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Chapter 11 Case, and the obligations created by the Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under the Plan and the Plan Documents.

### 5.      Dissolution Of The Survivors' Committee.

On the Effective Date, the Survivors' Committee shall dissolve automatically, whereupon its members and the Survivors' Committee's Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, and further provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims.

6.      **Termination Of The Appointment Of The FCR.**

The Bankruptcy Court's appointment of the FCR shall be terminated when the funds in the Future Claimant Reserve are completely distributed as provided in Sections 9.5 and 11.8 of the Plan, whereupon the FCR and the FCR's Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during the Chapter 11 Case, which shall remain in full force and effect according to their terms, and further provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Claims. The fees and expenses of the FCR from and after the Effective Date shall be paid from the Future Claimant Reserve.

7.      **Governing Law.**

Except as provided in Section 14.8 of the Plan or to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan and under the Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of laws.

8.      **Reservation Of Rights.**

If the Plan is not confirmed, or, if confirmed, or, if confirmed, the Effective Date does not occur by December 31, 2021 (unless such deadline is waived or modified as provided in Section 17.2 of the Plan), the rights of all parties in interest in the Chapter 11 Case are and will be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan is not confirmed, or, if confirmed, the Effective Date does not occur, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concessions or settlements.

## IX. EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

**A.      Discharge.**

On the Effective Date, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Related Persons, before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of the Chapter 11 Case, and including all Claims and Debts based upon or arising out of Abuse Claims, the Personal Injury Claim, the USOPC Claim, or the Indemnification Claims and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Plan; or (c) the Holder of such Claim has accepted the Plan.

**B.     Vesting of Assets.**

In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, the Revested Assets shall vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court, and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

**C.     Continued Existence of Reorganized Debtor.**

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date in accordance with the applicable laws of the State of Texas, with all the powers of a not-for-profit having tax-exempt status under 26 U.S.C. § 501(c)(3) and all other applicable laws, and without prejudice to any right to alter or terminate such existence under applicable state law.

**D.     Exculpation and Limitation of Liability.**

NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE RELATED PERSONS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THIS CHAPTER 11 CASE, INCLUDING (1) THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, (2) THE PURSUIT OF CONFIRMATION OF THE PLAN, OR (3) THE ADMINISTRATION OF THE PLAN, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR FRAUD (PROVIDED, HOWEVER, THE DEBTOR, THE ESTATE, AND REORGANIZED DEBTOR WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) AND, IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTOR AND ITS RELATED PARTIES, ITS EMPLOYEES, AND THE DEBTOR'S PROFESSIONALS, AND THE SURVIVORS' COMMITTEE, ITS MEMBERS SOLELY IN THEIR CAPACITIES AS MEMBERS OF THE SURVIVORS' COMMITTEE, AND THE SURVIVORS' COMMITTEE'S PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED THE BENEFITS OF SECTION 1125(E) OF THE BANKRUPTCY CODE. FOR THE AVOIDANCE OF DOUBT, THIS SECTION AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF SEXUAL ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR. NEITHER THE EXCULPATED PARTIES, NOR THE TRUST OR THE SETTLEMENT TRUSTEE, AND PROFESSIONALS EMPLOYED BY THE FOREGOING, SHALL HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO

A SEXUAL ABUSE CLAIMANT, INCLUDING LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT, EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN.

## X. RISK FACTORS

In evaluating whether to vote to accept or to reject the Plan, all Claimants holding Allowed Claims and all Claimants in the Voting Classes should carefully read and consider the risk factors set forth below, which describe how the anticipated distributions and treatments under the Plan rely on uncertain assumptions and are not guaranteed. The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the exhibits attached hereto. You should consult with your legal, financial, and tax advisors regarding the risks associated with the plan and distributions you may receive.

**A.      Parties In Interest May Object To The Debtor's Classification Of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim is substantially similar to the other claims in such class. The Debtor and the Survivors' Committee believe that the classification of claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan creates classes of claims that only encompass claims that are substantially similar to the other claims in such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.      The Debtor and the Survivors' Committee May Not Be Able To Secure Confirmation Of The Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any rejecting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to rejecting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to rejecting Classes. If the Plan is not confirmed, it is unclear what distributions that claimants holding Allowed Claims will receive with respect to their Allowed Claims, or the timing of receipt of such distributions, as it is unclear whether a confirmable alternative plan can be proposed by any other party in this Chapter 11 Case. If the Plan is not confirmed and an alternate reorganization plan is not confirmed, it is possible that the Debtor would have to liquidate, in which case it is possible that the claimants holding Allowed Claims could receive substantially less favorable treatment than they would receive under the Plan.

**C.     Parties In Interest May Object To The Releases And Injunctions Contained In The Plan.**

Confirmation is also subject to the Bankruptcy Court's approval of the releases, injunction, discharge, exculpation, and related provisions described in the Plan. Certain parties in interest may assert that the Debtor and the Survivors' Committee cannot demonstrate that the Plan meets the standards for approval of releases, injunctions, discharges, and exculpations under applicable law.

**D.     Nonconsensual Confirmation.**

The Debtor and the Survivors' Committee believe that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code to seek a nonconsensual confirmation of the Plan if necessary. However, there is no assurance that the Bankruptcy Court will reach this conclusion, in which case the Plan may not be confirmed.

**E.     Non-Occurrence Of The Effective Date.**

The occurrence of the Effective Date is subject to the conditions precedent listed in the Plan. There can be no assurance that all of the conditions necessary for the Plan to become effective will be met, in which case under the Full or Partial Settlement Alternative the Settling Insurers will have no obligation to make their Agreed CGL Insurer Payments to fund the Trust.

**F.     Medicare Reimbursement.**

Abuse Claimants who (a) are Medicare beneficiaries and (b) receive a payment from the Trust may be required to reimburse Medicare for medical expenses already paid on behalf of such Abuse Claimant. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect the amount of an Abuse Claimant's reimbursement obligations.

## XI. BEST INTERESTS TEST

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," holders of impaired allowed claims must either (i) accept the plan of reorganization, or (ii) receive or retain under the plan property of a value, as of the plan's assumed effective date, that is not less than the value such rejecting claimants would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Debtor and the Survivors' Committee believe that the Plan provides the same or a greater recovery for claimants holding Allowed Claims as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (i) the additional administrative claims generated by conversion to a chapter 7 case; (ii) the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation; and (iii) the loss of an agreement by the Settling Insurers to contribute to a settlement fund if the Plan is not confirmed, each of which likely would diminish the value of the Debtor's assets available for distribution. As set forth above, in the event of a liquidation under chapter 7, Abuse Claimants could pursue their right to recover from the Debtor CGL Insurance Policies, but such recovery is uncertain, will take substantial time and cost, and may not result in a greater recovery

on average for Abuse Claimants and for many Abuse Claimants would result in no recovery at all. Under the Litigation Only Alternative, the recovery for Abuse Claimants would be the same as that in a chapter 7 liquidation in that the only source of recovery would be uncertain litigation recoveries against the Debtor CGL Insurance Policies and Other Insurance Policies, if any, that provide coverage for Abuse Claims.

The Debtor has prepared an unaudited Liquidation Analysis, attached hereto as <u>Exhibit 3</u>, to assist claimants holding Allowed Claims in evaluating the Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtor in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to claimants holding Allowed Claims under the Plan. The Liquidation Analysis is based on the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. The actual liquidation value of the Debtor could vary materially from the estimate provided in the liquidation analysis. Finally, the Liquidation Analysis does not include a liquidation analysis of the Debtor's Insurance Policies. This is so because, in light of insurer coverage defenses and defenses to Abuse Claims, the liquidation value of those policies is highly uncertain.

## XII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

The following summary is a general discussion of certain potential Federal income tax consequences of the Plan. The summary is based upon relevant provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the applicable Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authority, published rulings, and such other authorities considered relevant now in effect, all of which are subject to change.

The federal income tax consequences to any particular creditor may be affected by matters not discussed below. Furthermore, the summary does not address all categories of Creditors, some of which may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each Creditor or the Debtor.

## A.   Tax Consequences To Creditors

A creditor that receives a distribution in satisfaction of its Claim will generally recognize a gain or loss in an amount equal to the difference between (i) the amount of cash received by such creditor in respect of its Claim (excluding any cash received in respect of a Claim for accrued

interest) and (ii) the creditor's tax basis in its Claim. The character of any gain or loss recognized as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among other things, the tax status of the creditor, whether the Claim constitutes a capital asset in the hands of the creditor, whether the Claim has been held for more than one year, and whether and to what extent the creditor has previously claimed a bad debt deduction (or charged a reserve for bad debts) with respect to the Claim.

For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the Claimant's trade or business, and the Claimant had previously included the amount of such receivable Distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the Claimant but may, as discussed below, result in a loss. Conversely, if the Claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the Claimant generally would be required to include the amount of the distribution in income when received.

The Debtor anticipates that distributions in satisfaction of Abuse Claims will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and/or physical sickness, within the meaning of Section 104(a)(2) of Tax Code. The Debtor has not, however, fully analyzed such tax issues and cannot (and does not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN UNSECURED CLAIM OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN UNSECURED CLAIM AS A RESULT OF THE PLAN.

**B.      Tax Consequences To The Debtor**

The Debtor is a non-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3). Due to the Debtor's status as a non-profit corporation, the Debtor does not expect that the Plan will result in any significant federal income tax consequences to the Debtor.

Under the Internal Revenue Code of 1986, as amended (the "**Code**"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect creditors in this Chapter 11 Case.

**C.      Tax Consequences To The Trust.**

The Trust may satisfy the requirements of a designated settlement fund under § 468B of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury Regulations. There are certain tax consequences associated with the characterization of the Trust as a designated settlement fund or a qualified settlement fund ("**QSF**"). The Debtor expresses no opinion regarding whether the Internal Revenue Service would conclude that the Trust is a designated settlement fund or a QSF. The Debtor has not requested a ruling from the Internal

Revenue Service or an opinion of counsel regarding whether the Trust is a designated settlement fund or a qualified settlement fund. Accordingly, each creditor is urged to consult its own tax advisor regarding the characterization of the Trust and the tax consequences of such characterization.

The federal income tax consequences to a Holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the Claimants' method of accounting, and their own particular tax situation. Because each Claimant's tax situation differs, Claimants should consult their own tax advisors to determine how the Plan affects them for federal, state, and local tax purposes, based on its particular tax situations.

## XIII. VOTING INSTRUCTIONS

The Debtor's Claims Agent will send to all Claimants entitled to vote on the Plan: (i) the Disclosure Statement Order, (ii) a notice of the Confirmation Hearing, (iii) the Disclosure Statement, as approved by the Bankruptcy Court and together with the Plan attached as an exhibit, and (iv) a ballot (collectively, the "**Solicitation Packages**"). The Solicitation Packages will also describe the procedures and deadline for submitting ballots to the Debtor's Claims Agent.

## XIV. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative. Accordingly, the Debtor urges all claimants entitled to vote to accept the Plan by so indicating on their ballots and returning them as specified in the instructions set forth in the Solicitation Packages.

Dated: August 31, 2021                    Respectfully submitted,


**JENNER & BLOCK LLP**

By: /s/ *Catherine Steege*

Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root (#24230-49)
Adam T. Swingle (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com
aswingle@jenner.com

*Counsel for the Debtor*

# EXHIBIT 1

**Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants' Committee Of Sexual Abuse Survivors**

## EXHIBIT 2

***Pro Forma*** **Cash Flow Analysis**

**USA Gymnastics**
**Cash Flow Projections—Full or Partial Settlement Alternative**

| | August - December 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **Beginning Unrestricted Cash** | $  8,410,000 | $  8,340,000 | $  7,990,000 | $  7,910,000 |
| **Cash Receipts** | | | | |
| Membership | 6,500,000 | 11,500,000 | 12,500,000 | 13,500,000 |
| Event Revenue | 1,500,000 | 12,500,000 | 13,000,000 | 13,500,000 |
| USOPC Grants | 1,055,000 | 2,500,000 | 2,500,000 | 2,500,000 |
| Partner Sponsorships & Media | 300,000 | 1,900,000 | 2,500,000 | 2,700,000 |
| Merchandise Sales | 50,000 | 400,000 | 420,000 | 500,000 |
| Total Cash Receipts | 9,405,000 | 28,800,000 | 30,920,000 | 32,700,000 |
| **Cash Disbursements** | | | | |
| Program Event Expenses | 1,000,000 | 11,000,000 | 12,000,000 | 13,000,000 |
| Salaries, Contract Labor, Benefits | 2,650,000 | 7,500,000 | 7,800,000 | 8,100,000 |
| Insurance | 2,500,000 | 4,000,000 | 4,400,000 | 4,800,000 |
| Administrative Overhead | 2,500,000 | 5,400,000 | 5,600,000 | 5,800,000 |
| Legal | 750,000 | 650,000 | 600,000 | 600,000 |
| Administrative Class Distribution | | | | |
| Convenience Class Distribution | 75,000 | | | |
| Unsecured Creditor Distributions | | 600,000 | 600,000 | 600,000 |
| Total Cash Disbursements | 9,475,000 | 29,150,000 | 31,000,000 | 32,900,000 |
| **Net Cashflow** | (70,000) | (350,000) | (80,000) | (200,000) |
| **Ending Cash** | $  8,340,000 | $  7,990,000 | $  7,910,000 | $  7,710,000 |

**USA Gymnastics**
**Cash Flow Projections—Litigation Only Alternative**

|  | August - December 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **Beginning Unrestricted Cash** | $ 8,410,000 | $ 40,000 | $ 460,000 | $ 350,000 |
| **Cash Receipts** |  |  |  |  |
| Membership | 6,500,000 | 11,500,000 | 12,500,000 | 13,500,000 |
| Event Revenue | 1,500,000 | 12,500,000 | 13,000,000 | 13,500,000 |
| USOPC Grants | 1,055,000 | 2,500,000 | 2,500,000 | 2,500,000 |
| Partner Sponsorships & Media | 300,000 | 1,900,000 | 2,500,000 | 2,700,000 |
| Merchandise Sales | 50,000 | 400,000 | 420,000 | 500,000 |
| Total Cash Receipts | 9,405,000 | 28,800,000 | 30,920,000 | 32,700,000 |
| **Cash Disbursements** |  |  |  |  |
| Program Event Expenses | 1,000,000 | 11,000,000 | 12,000,000 | 13,000,000 |
| Salaries, Contract Labor, Benefits | 2,650,000 | 7,500,000 | 7,800,000 | 8,100,000 |
| Insurance | 2,500,000 | 4,000,000 | 4,400,000 | 4,800,000 |
| Administrative Overhead | 2,500,000 | 5,400,000 | 5,600,000 | 5,800,000 |
| Legal | 750,000 | 650,000 | 600,000 | 600,000 |
| Administrative Class Distribution | 7,500,000 |  |  |  |
| Convenience Class Distribution | 75,000 |  |  |  |
| Unsecured Creditor Distributions |  | 630,000 | 630,000 | 630,000 |
| Total Cash Disbursements | 16,975,000 | 29,180,000 | 31,030,000 | 32,930,000 |
| **Net Cashflow** | (7,570,000) | (380,000) | (110,000) | (230,000) |
| **Ending Cash** | $ 840,000 | $ 460,000 | $ 350,000 | $ 20,000 |

# EXHIBIT 3

**Liquidation Analysis**

**USA Gymnastics**
**Liquidation Analysis**
**As of July 31, 2021**

| Assets Available for Distribution | Book/Market Value | Recovery % | Liquidated Value |
|---|---|---|---|
| Unrestricted cash | $            8,410,000 | 100% | $            8,410,000 |
| Inventory | 86,000 | 20% | 17,200 |
| Furniture and Equipment | 120,000 | 20% | 24,000 |
| Educational and Training Materials | 450,000 | 20% | 90,000 |
| Subtotal - Asset Value | 9,066,000 | 94% | 8,541,200 |
| Less: | | | |
| Chapter 7 Trustee Fees & Related Costs | | | (275,000) |
| Winddown Costs | | | (425,000) |
| Auction Costs | | | (19,700) |
| **Net Assets Available for Distribution** | | | **7,821,500** |

| Administrative Costs | | | |
|---|---|---|---|
| Post Petition - Accounts Payable | 5,385,000 | | |
| Accrued Expenses | 2,115,000 | | |
| Total Administrative Costs | 7,500,000 | | 7,500,000 |
| **Net Assets Available after Administrative Costs** | | | **321,500** |

| Bankruptcy Claims | | | |
|---|---|---|---|
| Abuse Claims* | - | | |
| Future Claims* | - | | |
| Indemnification Claims* | - | | |
| Personal Injury Claim* | - | | |
| Unsecured Creditors | 1,841,188 | | |
| **Total Bankruptcy Claims** | **1,841,188** | | **1,841,188** |

| | | |
|---|---|---|
| **Shortfall in Assets After Claims and Costs** | **$    (1,519,688)** |

*Unliquidated, covered by insurance.

**USA GYMNASTICS**
**Notes To Liquidation Analysis**

1. These projections were prepared based on assets held by USAG and estimated obligations owed on July 31, 2021. The Debtor reserves its right to modify these projections.

2. The organization has $600,000 in restricted funds to pay credit cards balances in the event of a default. To the extent the full $600,000 is not needed to pay corporate credit cards, the excess will be available to the organization as unrestricted cash.

3. The available cash will fluctuate as revenue is collected and expenses paid. Membership fee income, representing the majority of annual cash receipts, primarily occurs between July and October of each year.

4. Assets are shown as market value where known and book value for the remaining assets.

5. Educational and training materials include proprietary materials developed in-house. It is expected an organization similar to or wanting to replace USAG would pay for these materials at a discounted rate.

6. Winddown costs include final payroll and administrative expenses to close down administrative office.

7. Inventory, furniture, equipment and training materials would be liquidated through an auction process.

8. Equipment would be returned to secured equipment creditors. To the extent the secured debt exceeded market values, the excess owed would be treated the same as unsecured creditors.

9. Accrued expenses primarily include estimated unbilled legal fees through July 31, 2021.

10. Abuse Claims, Future Claims, Indemnification Claims, and the Personal Injury Claim are unliquidated and covered by insurance. In the event of a chapter 7 liquidation, the Abuse Claims, Future Claims, Indemnification Claims, and the Personal Injury Claim would be allowed to proceed against certain USAG insurance policies.

## **EXHIBIT 4**

**Disclosure Statement Order**