**SO ORDERED: December 16, 2021.**



**Robyn L. Moberly**
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**CONFIRMING THE MODIFIED THIRD AMENDED JOINT CHAPTER 11**
**PLAN OF REORGANIZATION PROPOSED BY USA GYMNASTICS AND THE**
**ADDITIONAL TORT CLAIMANTS COMMITTEE OF SEXUAL ABUSE SURVIVORS**

This matter came before the Court for confirmation of the *Modified Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors* [Dkt. 1764] (the "**Plan**")[2] filed by USA Gymnastics, as debtor and debtor in possession (the "**Debtor**"), and the Additional Tort Claimants

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of USAG's principal office is 1099 N. Meridian St., Suite 800, Indianapolis, Indiana 46204.

[2] Capitalized terms used herein but not defined shall have the meaning given to them in the Plan.

Committee of Sexual Abuse Survivors (the "**Survivors' Committee**" and, together with the Debtor, the "**Plan Proponents**"), pursuant to Sections 105(a) and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 3016, 3017, 3018, 3019, and 3020 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3018-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Indiana (the "**Local Rules**"); and this Court having considered the record in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), including: (i) the Plan and all exhibits thereto, (ii) *USA Gymnastics' Disclosure Statement For Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors* [Dkt. 1656] (the "**Disclosure Statement**") and all exhibits thereto, (iii) the *Debtor's Memorandum Of Law In Support Of Confirmation Of The Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors And Omnibus Reply To Confirmation Objections* [Dkt. 1751], (iv) the *Declaration Of Christopher J. Schneider In Support Of Confirmation* [Dkt. 1752] (the "**Schneider Declaration**"), (v) the *Declaration Of Bernadette M. Barron In Support Of Confirmation* [Dkt. 1753] (the "**Barron Declaration**"), (vi) the *Declaration Of Lauryn Turner In Support Of Confirmation* [Dkt. 1754] (the "**Turner Declaration**"), (vii) the *Declaration Of Li Li Leung In Support Of Confirmation* [Dkt. 1755] (the "**Leung Declaration**" and, together with the Schneider Declaration, Barron Declaration, and Turner Declaration, the "**Confirmation Declarations**"), (viii) the *Declaration Of Catherine Nownes-Whitaker Regarding The Solicitation Of Votes And Tabulation Of Ballots Cast On The Third Amended Joint Chapter 11 Plan* [Dkt. 1732] (the "**Voting Report**"), (ix) the *Certificates Of Service* of Catherine Nownes-Whitaker and Randy Lowry, dated October 27, 2021, December 1, 2021, and December 2, 2021, regarding

the Plan, Disclosure Statement, Disclosure Statement Order, Solicitation Packages, Confirmation Hearing Notice, and Notice of Non-Voting Status [Dkts. 1670, 1722, 1723, 1724, 1725, 1726, 1727, 1730, and 1731] (collectively, the "**Solicitation Certificates**"), (x) the *Certificate Of Service Of Publication* of Darleen Sahagun regarding publication of the Confirmation Hearing Notice in the National Edition of USA Today [Dkt. 1679] (the "**Publication Certificate**"), (xi) the confirmation objections filed by the United States Trustee [Dkt. 1734] (the "**UST Objection**"), the Indiana Attorney General [Dkt. 1739] (the "**IAG Objection**"), TIG Insurance Company [Dkt. 1736] (the "**TIG Objection**"), and Liberty Insurance Underwriters, Inc. [Dkt. 1735] (the "**LIU Objection**" and, together with the UST Objection, the IAG Objection, and the TIG Objection, the "**Confirmation Objections**"), (xii) the *Omnibus Reply Of The Additional Tort Claimants Committee Of Sexual Abuse Survivors In Support Of The Third Amended Joint Chapter 11 Plan Of Reorganization* [Dkt 1756], (xiii) the *Response Of The United States Olympic And Paralympic Committee To The United States Trustee's Objection To Third Amended Joint Chapter 11 Plan Of Reorganization* [Dkt. 1757], (xiv) the *Limited Response And Reservation Of Rights To The Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors* [Dkt. 1728] (the "**Twistars Response**") filed by Gedderts' Twistars USA Gymnastics Club, Inc., Twistars USA, Inc., John Geddert, and Kathryn Geddert; (xv) the filing of the Plan, and (xvi) the hearing this Court held on December 13, 2021 to consider confirmation of the Plan (the "**Confirmation Hearing**"); and this Court having admitted the Confirmation Declarations and the Voting Report and having considered the evidence in support of confirmation, the arguments of counsel at the Confirmation Hearing, and the entire record in the Chapter 11 Case; and after due deliberation and

good and sufficient cause appearing therefor, the Court hereby FINDS, CONCLUDES, AND ORDERS as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     **Findings of Fact and Conclusions of Law**. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     **Jurisdiction and Constitutional Authority**. The Court has jurisdiction over the Debtor's Chapter 11 Case, including this matter, pursuant to 28 U.S.C. § 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) and this Court has constitutional authority to enter a final order consistent with Article III of the United States Constitution. *See Stern v. Marshall*, 564 U.S. 462 (2011); *In re Millennium Lab Holdings II, LLC,* 945 F.3d 126 (3d Cir. 2019).

C.     **Venue**. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Judicial Notice**. The Court takes judicial notice of the docket of the Chapter 11 Case and related proceedings maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, and the transcripts of, and all evidence and arguments made, proffered, or adduced at, the hearings held before the Court during the pendency of this Chapter 11 Case.

E.     **Solicitation and Notice**. On October 26, 2021, the Court entered its *Order Approving The Disclosure Statement And Plan Confirmation Procedures* [Dkt. 1659] (the "**Disclosure Statement Order**"). The Disclosure Statement Order approved the Disclosure

Statement as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors to make an informed judgment whether to accept or reject the Plan.

       F.     Pursuant to the Disclosure Statement Order, the Court required the Plan Proponents, through Omni Agent Solutions Inc. (the "**Balloting Agent**"), to distribute Solicitation Packages (as defined in the Disclosure Statement Order) to: (i) all Holders of Claims entitled to vote on the Plan; (ii) counsel for Class 6 Abuse Claimants; (iii) the United States Trustee; (iv) the Indiana Attorney General; and (v) all parties who have filed requests for notices under Bankruptcy Rule 2002 as of the date the Disclosure Statement Order was entered. The Solicitation Packages contained a creditor's Ballot for its respective Voting Class, the Plan, the Disclosure Statement, the Disclosure Statement Order, a cover letter from the Debtor recommending voting to accept the Plan, a cover letter from the Survivors' Committee recommending voting to accept the Plan (only distributed to Class 6 Abuse Claimants), a notice of the Confirmation Hearing, and a pre-addressed return envelope. As set forth in the Solicitation Certificates and Publication Certificate, the Balloting Agent completed service of the Solicitation Packages to creditors on October 29, 2021 and supplemented its service thereafter based upon specific requests from individual creditors or their counsel.

       G.     In addition to soliciting votes from all Holders of impaired Claims entitled to vote, the Balloting Agent and the Debtor gave broad notice of the Confirmation Hearing and the deadlines to vote on and object to the Plan beyond the requirements of the Bankruptcy Code and Bankruptcy Rules. The Balloting Agent published notice of the Confirmation Hearing and deadlines in the National Edition of USA Today on November 1, 2021 (*see* Dkt. 1679), and it emailed notice of the Confirmation Hearing and deadlines to over 733,000 former and current

USAG members (*see* Dkt. 1722, Ex. J). It also mailed a notice of the Confirmation Hearing and related deadlines to over 6,000 other interested parties, including parties not entitled to vote because their Claims are unimpaired under the Plan. (*Id.*, Exs. H-I.) Finally, the Debtor posted notice of the Confirmation Hearing and deadlines on its website, its social media, and the Safe Sport website, and placed ads containing such information in the GymCastic podcast, the Inside Gymnastics magazine, and the MeetScoresOnline website.

H.      Accordingly, the Plan Proponents solicited votes on the Plan and provided notice of the Confirmation Hearing in accordance with the Disclosure Statement Order and in satisfaction of all requirements under the Bankruptcy Code and Bankruptcy Rule 2002. The solicitation of votes and notice of the Confirmation Hearing, including notice of the Buy-Back Agreements, was fair, good, appropriate, and sufficient under the circumstances of this Chapter 11 Case. The publication notice of the Confirmation Hearing, including the notice of the Buy-Back Agreements, provided due process to all unknown holders of Abuse Claims.

I.      **No Material Modification.** The Plan, as filed on December 13, 2021, does not materially and adversely modify the terms of the *Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors And Omnibus Reply To Confirmation Objections* [Dkt. 1655], and no additional disclosure of the Plan's terms or resolicitation of votes is required under Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

J.      **Voting**. The Plan Proponents, through the Balloting Agent, followed the procedures set forth in the Disclosure Statement Order for soliciting acceptances of the Plan, as evidenced by the Voting Report, the Solicitation Certificates, and the Publication Certificate. The Plan Proponents did not solicit acceptances or rejection of the Plan from any Holder of a Claim

before the approval and transmission of the Disclosure Statement. Therefore, the Plan Proponents have complied with Section 1125 of the Bankruptcy Code.

K.      As set forth in the Voting Report, the Plan has been accepted, in accordance with the requirements of Section 1126(c) of the Bankruptcy Code, Bankruptcy Rule 3018, and Local Rule 3018-1, by each Class of Claims entitled to vote on the Plan and that submitted valid and timely ballots to vote on the Plan. Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 8 (Indemnification Claims), Class 9 (the FCR Claim), and Class 10 (Abuse Claims Filed After The Bar Date) all voted to accept the Plan. No Ballot was received on account of the single Claim in Class 7 (the USOPC Claim).

L.      **Burden of Proof**. The Plan Proponents have met their burden of proving by a preponderance of the evidence that the Plan satisfies the elements of Section 1129 of the Bankruptcy Code.

M.      **Section 1129(a)(1): Plan Compliance**. The Plan complies with all applicable provisions of the Bankruptcy Code, including Sections 1122 and 1123 of the Bankruptcy Code.

1.  **Designation of Classes—Sections 1122 and 1123(a)(1)**. In accordance with Sections 1122 and 1123(a)(1) of the Bankruptcy Code, the Plan designates ten Classes of Claims. The Plan Proponents' rationales for separate classification of Claims meet the requirements of applicable law because, among other things, "disparities exist between the legal rights" of the Holders of Claims separately classified under the Plan. *In re Wabash Valley Power Assoc.*, 72 F.3d 1305, 1321 (7th Cir. 1995). The Plan adequately and properly classifies all Claims required to be classified and thus satisfies the requirements of Sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2.  **Impairment of Classes—Section 1123(a)(2)**. Pursuant to Section 1123(a)(2) of the Bankruptcy Code, the Plan designates Class 1 (Other Priority Claims), Class 2 (the PNC Bank Claim), Class 3 (the Sharp Claim), and Class 4 (General Unsecured Convenience Claims) as unimpaired because they will receive payment in full under the Plan. The Plan further designates Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 7 (the USOPC Claim), Class 8 (Indemnification Claims), Class 9 (the FCR Claim), and Class 10 (Abuse Claims Filed After The Bar Date) as impaired because the Plan does not

"leave[] unaltered" the respective "legal, equitable, and contractual rights" of the Claims in such Classes. 11 U.S.C. § 1124(1).

3. **Treatment of Classes—Section 1123(a)(3)**. The Plan sets forth in detail how each Class of Claims will be treated upon the Effective Date. The Plan therefore satisfies Section 1123(a)(3) of the Bankruptcy Code.

4. **Equal Treatment of Classes—Section 1123(a)(4)**. The Plan satisfies the equal treatment requirement of Section 1123(a)(4) of the Bankruptcy Code because the Plan provides Holders of Allowed Claims the same rights and treatment as other Holders of Allowed Claims within their respective Class.

5. **Adequate Means for Implementation—Section 1123(a)(5)**. The Plan provides adequate means for its implementation, including by: (i) establishing the Trust to administer Abuse Claims, Future Claims, and Abuse Claims Filed After The Bar Date, in accordance with the Plan and Trust Documents; (ii) funding the Trust with the contributions of the Debtor, Settling Insurers, Participating Parties, and Protected Parties, including pursuant to the Buy-Back Agreements by and among the Debtor and each Debtor CGL Settling Insurer; (iii) implementing the Channeling Injunction, Settling Insurer Injunction, and related releases by Abuse Claimants, Future Claimants, the Debtor, the Reorganized Debtor, the Estate, Settling Insurers, Participating Parties, and Non-Debtor CGL Settling Insurer Covered Persons, all of which were necessary to obtain the settlements that underly the Plan; (iv) authorizing the Debtor to retain the Professional Fee Hold-Back to satisfy Professional Claims through the Effective Date; (v) vesting in the Reorganized Debtor all property of the Debtor that is not assigned to the Trust or otherwise treated under the Plan; (vi) deeming all executory contracts of the Debtor not rejected as of the Effective Date to be assumed; (vii) providing for the resolution of Disputed Claims (other than Abuse Claims, the USOPC Claim, Indemnification Claims, the FCR Claim, and Abuse Claims Filed After The Bar Date) by the Debtor; (viii) implementing non-monetary commitments and reforms agreed to between the Debtor and Survivors' Committee; and (ix) deeming any action contemplated by the Plan that requires the approval of the Debtor's officers to be so approved before, on, or after the Effective Date, as required under the circumstances.

6. **No Voting Equity Securities—Section 1123(a)(6)**. Section 1123(a)(6) of the Bankruptcy Code is not applicable because the Debtor is a not-for-profit corporation that does not issue securities and there are no Holders of voting or nonvoting securities of the Debtors.

7. **Directors, Officers, and Trustees—Section 1123(a)(7)**. Based upon the Confirmation Declarations and the record at the Confirmation Hearing, the Plan is consistent with the interests of creditors and with public policy with respect to the manner of selection of any directors and officers of the Reorganized Debtor and the Settlement Trustee of the Trust.

8. **No Individual Earnings—Section 1123(a)(8)**. The Debtor is not an individual with earnings from personal services. Accordingly, Section 1123(a)(8) of the Bankruptcy Code does not apply to the Plan.

N.    **Section 1129(a)(2)—Proponent Compliance**. The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The Plan Proponents, through the Balloting Agent, solicited acceptances of the Plan in accordance with the requirements of the Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules. The ballots of Holders of Claims entitled to vote on the Plan were properly solicited and tabulated, as described in the Voting Report. The Plan Proponents have also complied with all provisions of the Bankruptcy Code and the Bankruptcy Rules governing notice of the Confirmation Hearing, approval of the Disclosure Statement, and all other matters considered by the Court in this Chapter 11 Case.

O.    **Section 1129(a)(3)—Good Faith**. The entire record of this Chapter 11 Case, including the Confirmation Declarations and the evidence and argument submitted at the Confirmation Hearing, establishes that the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law. The Plan is the outcome of over two years of Court-ordered mediations overseen by the Honorable James Carr, the Honorable Gregg Zive, and Paul Van Osselaer, which mediations were, at various times, attended by the Debtor, the Survivors' Committee, individual Abuse Claimants, the USOPC, the insurers for the Debtor and the USOPC, other key stakeholders of the Debtor, and/or each of their respective professionals. Through the mediations, the parties engaged in extensive, arms-length, and hard-fought negotiations. Each party made numerous, material concessions to avoid uncertain and complex litigation, which would have delayed distributions to creditors (including Abuse Claimants) and increased costs for all parties if such litigation continued. The parties' diligent and constructive participation in the

mediations, which produced the Plan, is independent and sufficient evidence that the Plan has been proposed in good faith.

P.     In addition, the Court finds that the Plan treats all creditors fairly and equitably and provides appropriate releases, injunctions, exculpations, and other protections to the Debtor, the Survivors' Committee, the Settling Insurers, the Participating Parties, the Protected Parties, and their respective professionals, as applicable, in exchange for their contributions to and under the Plan, all of which contributions are meaningful and substantial. These reasonable terms of the Plan further establish that it has been proposed in good faith and with the legitimate purpose of maximizing the value of the Debtor's Estate and providing fair and equitable distributions to creditors.

Q.     Finally, as further evidence of the Plan's good faith, the Plan has been accepted by Holders of Claims in all Classes that submitted votes, including the Holders of Class 6 Abuse Claims who voted unanimously to accept the Plan. No creditor filed any objection to the Plan, and no creditor has argued that the Plan is proposed in bad faith, that the Plan's treatment of any Claims is unfair and inequitable, or that the Plan's releases, injunctions, exculpations, and other protections for the Debtor, Survivors' Committee, Settling Insurers, Participating Parties, Protected Parties, and their respective professionals, as applicable, is unjustified on the particular facts and circumstances of this Chapter 11 Case. This overwhelming support by voting creditors evidences their informed judgment that the Plan treats them appropriately and that the Plan is proposed consistently with the purposes of the Bankruptcy Code. *Matter of Andreuccetti*, 975 F.2d 413, 420 (7th Cir. 1992); *accord Matter of Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984). Accordingly, the Plan is proposed in good faith and not by any means forbidden by law and therefore satisfies Section 1129(a)(3) of the Bankruptcy Code.

R.     **Plan Payments—Section 1129(a)(4)**. All amounts to be paid by the Debtor or its Estate for services or expenses in this Chapter 11 Case have either been fully disclosed and approved as reasonable or, pursuant to the terms of the Plan, will be disclosed and subject to the approval of the Bankruptcy Court following confirmation of the Plan. Expenses that the Trust incurs after the Effective Date (including the fees and expenses of professionals retained by the Trust after the Effective Date) may be paid by the Trust from the Trust Assets pursuant to the terms of the Plan and the Trust Documents.

S.     **Reorganized Debtor's Management—Section 1129(a)(5)**. On the Effective Date, the Debtor's current directors and officers will continue to serve in accordance with the Debtor's bylaws and Section 21.23 of the Plan. Subject to the non-monetary provisions of Article XX of the Plan, the identity of the Debtor's directors and officers and their compensation was disclosed in the Schneider Declaration. The Court finds that the Debtor's directors and officers are well positioned to continue to lead the organization after confirmation, and that their continued service is in the best interests of the Debtor, its creditors, and its other stakeholders.

T.     **Rates—Section 1129(a)(6)**. There are no rates applicable to the Debtor over which any governmental regulatory commission will have jurisdiction after confirmation of the Plan.

U.     **Best Interests—Section 1129(a)(7)**. As set forth in the Liquidation Analysis appended to the Disclosure Statement and Barron Declaration, each Holder of an Allowed Claim will receive under the Plan property of a value not less than the amount such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. A conversion of this Chapter 11 Case would likely be accompanied by a decrease in the recovery that creditors would receive on account of their Claims because: (1) the Debtor's operating cash would be nearly depleted after satisfying Administrative Claims and would be insufficient to fund distributions on

non-Administrative Claims in amounts equal to the amounts proposed under the Plan; (2) in the absence of the settlements proposed under the Plan, there is no assurance that the Estate will recover as much under the Debtor's Insurance Policies as the Settling Insurers will contribute to the Trust under the Plan; and (3) a chapter 7 trustee and professionals will further dilute the Estate's assets that may be used to fund distributions to creditors. The Plan therefore provides a superior recovery to creditors than conversion of this Chapter 11 Case, and, accordingly, the Plan is in the best interests of creditors under Section 1129(a)(7) of the Bankruptcy Code.

V.    **Acceptance and Cramdown—Sections 1129(a)(8) and 1129(b)**. All Holders of Claims impaired under the Plan have been given adequate opportunity to vote to accept or reject the Plan. Class 1 (Other Priority Claims), Class 2 (the PNC Bank Claim), Class 3 (the Sharp Claim), and Class 4 (General Unsecured Convenience Claims) are unimpaired and deemed to accept the Plan under Section 1126(f) of the Bankruptcy Code. Class 5 (General Unsecured Claims), Class 6 (Abuse Claims), Class 8 (Indemnification Claims), Class 9 (the FCR Claim), and Class 10 (Abuse Claims Filed After The Bar Date) all affirmatively voted to accept the Plan in the number and amount required by Section 1126(c) of the Bankruptcy Code. While the Holder of the Class 7 USOPC Claim did not vote on the Plan, that Class is deemed to have accepted the Plan. *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1267-68 (10th Cir. 1988); *Matter of Dues*, 98 B.R. 434, 440 (Bankr. N.D. Ind. 1989). Accordingly, the Plan Proponents have satisfied the requirements of Section 1129(a)(8) of the Bankruptcy Code requiring acceptance by all impaired classes.

W.    Alternatively, the Plan satisfies Section 1129(b)'s cramdown requirements with respect to Class 7 (the USOPC Claim). The Plan does not unfairly discriminate against the Class 7 USOPC Claim because the Plan's treatment of the Class 7 USOPC Claim is not materially different from its treatment of similarly situated Class 8 Indemnification Claims. The Plan is also fair and

equitable as to the Class 7 USOPC Claim because there are no junior creditors or interest Holders who are receiving any distributions under the Plan.

      X.     **Administrative Expenses and Priority Claims—Section 1129(a)(9)**. The Plan satisfies Section 1129(a)(9)(A) of the Bankruptcy Code because it provides that, with the exception of Allowed Administrative Claims that arise in the ordinary course of business (which will be paid in the ordinary course of business), each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim either (a) on or as soon as practicable following the Effective Date, or, if later, the date such Administrative Claim is Allowed; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant. The Plan satisfies Section 1129(a)(9)(B) of the Bankruptcy Code because any Holders of the types of Claims specified in Section 1129(a)(9)(B) are unimpaired under the Plan. The Plan satisfies Section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be paid in full in cash as soon as practicable after the Effective Date, or on such other terms agreed to by the Holder of an Allowed Priority Tax Claim.

      Y.     **Impaired Class Acceptances—Section 1129(a)(10)**. Six Classes of Claims are impaired under the Plan, and, as reflected in the Voting Report, the Plan has been accepted by at least one impaired Class without including the vote of any insider.

      Z.     **Feasibility—Section 1129(a)(11)**. Based upon the Barron Declaration, the Turner Declaration, and the Leung Declaration, and the record at the Confirmation Hearing, the Plan complies with Section 1129(a)(11) of the Bankruptcy Code because it is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor. Because the Plan discharges the Debtor's liability for Abuse Claims, the Debtor will have sufficient cash flows to

fund all operating expenses and distributions to creditors other than Abuse Claimants on and after the Effective Date.

AA.    **Fees Under 28 U.S.C. § 1930—Section 1129(a)(12)**. Pursuant to Section 1129(a)(12) of the Bankruptcy Code, the Plan provides for the payment of statutory fees due under 28 U.S.C. § 1930(a)(6) until the entry of a final decree or an order converting or dismissing this Chapter 11 Case.

BB.    **No Retiree Benefits—Section 1129(a)(13)**. The Debtor owes no "retiree benefits" within the meaning of Section 1114(a) of the Bankruptcy Code. Accordingly, Section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

CC.    **No Domestic Support Obligations—Section 1129(a)(14)**. The Debtor owes no "domestic support obligations" within the meaning of Section 101(14A) of the Bankruptcy Code. Accordingly, Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan.

DD.    **No Individual Debtor Distributions—Section 1129(a)(15)**. The Debtor is not an individual. Accordingly, Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Plan.

EE.    **No Applicable Non-Bankruptcy Law Regarding Transfers—Section 1129(a)(16)**. There is no provision of non-bankruptcy law concerning the transfer of property by a not-for-profit organization like the Debtor that is applicable to any of the transfers contemplated by the Plan. Accordingly, the Plan complies with Section 1129(a)(16) of the Bankruptcy Code.

FF.    **Only One Plan—Section 1129(c)**. The Plan is the only plan in this Chapter 11 Case that has been solicited and for which any proponent seeks confirmation. Accordingly, Section 1129(c) of the Bankruptcy Code is inapplicable to the Plan.

GG. **Principal Purpose of the Plan—Section 1129(d)**. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933. Accordingly, the Plan complies with Section 1129(d) of the Bankruptcy Code.

HH. **Good Faith Solicitation—Section 1125(e)**. Based on the record before the Court in this Chapter 11 Case, (1) the Plan Proponents are determined to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, Sections 1125(c) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (2) the Plan Proponents, and all of their respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, affiliates, and representatives are determined to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the solicitation of the Plan and are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation set forth in Section 18.4 of the Plan.

II. **Third-Party Releases and Injunctions**. The third-party releases and injunctions under Articles XI and XII of the plan are appropriate and permissible under applicable law. Based on the Confirmation Declarations and the record at the Confirmation Hearing, resolution of this Chapter 11 Case would not have been possible without the Plan's releases and injunctions, including the Channeling Injunction. The Settling Insurers would not have agreed to make their critical and substantial settlement contributions and payments, including those to buy-back the Debtor CGL Settling Insurance Policies without the protections of the Plan's releases and injunctions, which would have precluded the Debtor from funding the Trust to a level sufficient for settlement with the Survivors' Committee. The USOPC would not have agreed to make its

critical and substantial settlement contributions and payments, including the USOPC Out-of-Pocket Contribution, without the protections of the Plan's releases and injunctions, which would have precluded the Debtor from funding the Trust to a level sufficient for settlement with the Survivors' Committee. Third-parties with independent rights under or interests in the Debtor CGL Settling Insurance Policies also would not have consented to the elimination of their rights or interests in such policies without the protections of the Plan's releases and injunctions, which also constitute adequate protection as to these third-parties required by Sections 363(e) and (f) of the Bankruptcy Code. Further, the releases and injunctions proposed under the Plan are narrowly tailored to the specific facts and circumstances of this Chapter 11 Case because they only protect the Protected Parties from Claims arising from, connected with, or related to the Debtor, Abuse Claims, Future Claims, and the Settling Insurance Policies, and they do not offer any protection to Excluded Parties who personally committed an act of Sexual Abuse that resulted or would result in a Claim against the Debtor or a Participating Party. Accordingly, based upon the entire record of this Chapter 11 Case, including the Confirmation Declarations and the record at the Confirmation Hearing, the Court finds and concludes that the Plan's releases and injunctions are "narrow" and "essential to the reorganization," and therefore are confirmable. *In re Airadigm Comm'cns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008); *In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009). In addition, the Plan's releases and injunctions are confirmable pursuant to 11 U.S.C. §§ 363(b), (e), and (f) and 105(a).

JJ.     **Buy-Back of Debtor CGL Settling Insurance Policies**. The sale of property of the Estate under the Plan and the Buy-Back Agreements was negotiated in good faith and at arm's length. The consideration to be paid under the Buy-Back Agreements is fair and reasonable and is the result of extended negotiations pursuant to the mediations in this Chapter 11 Case. The sale

proceeds to be received pursuant to the Buy-Back Agreements are necessary components of the Plan and essential to funding the Plan. The Settling Insurers are good faith purchasers for value within the meaning of Section 363(m) of the Bankruptcy Code and are entitled to the protection thereof, and the Debtor and the Settling Insurers have not engaged in any conduct that would prevent the application of Section 363(m) of the Bankruptcy Code. Neither the Buy-Back Agreements nor the transactions contemplated thereby are subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and the Debtor and the Debtor CGL Settling Insurers have not engaged in any conduct that would cause or permit the Buy-Back Agreements to be avoided under the Bankruptcy Code or applicable non-bankruptcy law.

KK.    **Approval of Debtor Release**. The Debtor has exercised appropriate business judgment in the resolution of Claims against the Settling Insurers, Participating Parties, and Protected Parties, as provided under the Buy-Back Agreements and the Debtor releases contained in Sections 12.7, 12.8, and 12.9 of the Plan (collectively, the "**Debtor Releases**"). The proceeds of such Buy-Back Agreements and the Debtor Releases are necessary and essential components of the Plan and are the result of extensive negotiation pursuant to the mediations in this Chapter 11 Case. The settlement and compromise with the Settling Insurers, Participating Parties, and Protected Parties is within the reasonable range of litigation outcomes if the Debtor was to litigate instead and represents fair and reasonable consideration for the sale of the Debtor CGL Settling Insurance Policies and the Debtor Releases. The transactions contemplated by the Buy-Back Agreements and the Debtor Releases are in compliance with, and satisfy the requirements for, approval of a settlement or compromise pursuant to Bankruptcy Rule 9019 and all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a) and 363 of the Bankruptcy Code and applicable non-bankruptcy laws. It is in the interests of the Estate, creditors,

and other parties in interest to approve the Buy-Back Agreements and the Debtor Releases instead of incurring the delay, risk, and cost of continued litigation.

## ORDER CONFIRMING PLAN

Based upon the record of the Confirmation Hearing, all the proceedings held before this Court in the Chapter 11 Case, and the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED THAT:

1.     **Confirmation**. The Plan is hereby confirmed. Each and every provision of the Plan is approved and confirmed in full without any modification. A copy of the confirmed Plan, including exhibits thereto, is attached hereto as Exhibit 1 and is incorporated in full into this Confirmation Order.

2.     **Omission of Reference to Particular Plan Provisions**. The failure to specifically describe or include any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety. Each provision of the Plan shall be deemed authorized and approved by this Confirmation Order and shall have the same binding effect as every other provision of the Plan, whether or not mentioned in this Confirmation Order. In the event of any inconsistencies between the Plan and this Confirmation Order, this Confirmation Order shall govern.

3.     **Objections Overruled or Withdrawn**. All objections to confirmation of the Plan that have not been withdrawn, including the UST Objection, the IAG Objection, and the LIU Objection, are hereby overruled for the reasons stated on the record. As stated on the record, the TIG Objection has been withdrawn based on the settlement embodied in the Plan, and it is hereby determined that the TIG Objection is withdrawn with prejudice. The Twistars Response is resolved based on the terms of the Plan. All parties have had a full and fair opportunity to litigate all issues

raised by the Confirmation Objections, or which might have been raised through any objection to confirmation, and the Confirmation Objections have been fully and fairly litigated.

4.      **Binding Effect**. On the Effective Date, pursuant to Section 1141(a) of the Bankruptcy Code, all terms of the Plan, all exhibits thereto, and all other relevant and necessary documents, including but not limited to the Trust Documents and the Buy-Back Agreements, shall be, and hereby are, effective and binding upon the Plan Proponents, the Settling Insurers, the Participating Parties, the Protected Parties, the Trust, the Settlement Trustee, any entity acquiring property under the Plan, and any Creditor, whether or not such Creditor has filed a proof of Claim in this Chapter 11 Case, whether or not the Claim of such Creditor is impaired under the Plan, and whether or not such Creditor has accepted, rejected, or voted on the Plan. The binding effect of the Plan shall extend to all heirs, executors, administrators, successors, or assigns, if any, of the foregoing parties.

5.      **Approval of Buy-Back Agreements.** The sale of the Debtor CGL Insurance Policies back to the applicable Debtor CGL Insurer is hereby approved pursuant to Sections 363(b) and (f), 1123(a)(5), 1123(b)(6), and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019. Such sale shall be free and clear of any and all liens, Claims, encumbrances and Interests of any and all Persons, including any person who could claim coverage under a Debtor CGL Insurance Policy, and the Debtor may enter into a buy-back agreement with each Debtor CGL Settling Insurer in the form substantially attached to the Plan. Each Debtor CGL Settling Insurer shall be entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to such sale. Upon payment of the Settlement Amount and any Outstanding Amount by the Debtor CGL Settling Insurers, the Debtor CGL Settling Insurance Policies subject to the Buy-Back Agreements shall be terminated and of no further force and effect. The Debtor CGL Settling Insurers' payment of

their respective Settlement Amounts and any Outstanding Amounts constitutes each Debtor CGL Settling Insurer's full and complete performance of any and all obligations and exhausts all limits of liability under the Debtor CGL Settling Insurance Policies subject to the Buy-Back Agreements.

6. **Discharge**. On the Effective Date of the Plan, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Related Persons, before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of the Chapter 11 Case, and including all Claims and Debts based upon or arising out of Abuse Claims, the USOPC Claim, or the Indemnification Claims and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under the Plan; or (c) the Holder of such Claim has accepted the Plan.

7. **Revested Assets**. In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, the Revested Assets shall vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court, and free of any restrictions imposed by the Bankruptcy Code,

Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or this Confirmation Order.

8.      **Reorganized Debtor's Retention of Causes of Action and Litigation**. Except as provided otherwise in the Plan, the Reorganized Debtor shall retain and exclusively enforce the Debtor's Claims and Causes of Action, including against any Other Insurer in the Insurance Coverage Adversary Proceeding, whether arising before or after the Petition Date, in any court or other tribunal, including without limitation any adversary proceeding filed in the Chapter 11 Case. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims and Causes of Action, without obtaining Bankruptcy Court approval. Confirmation of the Plan shall not release any of the Debtor's Claims or Causes of Action except as expressly provided herein or in the Plan.

9.      **Approval of the USOPC Loan**. The Debtor and the Reorganized Debtor are each authorized and approved, including to the extent that approval is required under Sections 363 and 364 of the Bankruptcy Code, without need for further corporate action or further order or authorization of the Bankruptcy Court, to enter into the USOPC Loan and to execute and deliver all documents, agreements, and instruments contemplated thereby.

10.     **Distributions Under the Plan**. All distributions under the Plan shall be made in accordance with Articles IV, VI, VII, IX, XI, and XV of the Plan and all other relevant provisions of the Plan.

11.     **Trust Creation**. On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*

The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). On the Effective Date, the Trust will assume liability for all Channeled Claims, which shall include Abuse Claims, the USOPC Claim, Indemnification Claims, the FCR Claim, and any Claim against a Protected Party arising from, in connection with, or related in any way to a Channeled Claim. The Trust will control the allocation of Trust Assets to Abuse Claimants and Future Claimants pursuant to the terms of the Allocation Protocol, the Future Claims Allocation Protocol, the Trust Agreement, the Plan, the Plan Documents, and this Confirmation Order. The Settlement Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement. The Trust shall be the applicable entity from which any Abuse Claimant and Future Claimant who might also be a Medicare Beneficiary receives payment on account of a Tort Claim. The Trust to be established pursuant to the Plan, in accordance with Section 11.7.1 of the Plan, shall be the Responsible Reporting Entity as that term is defined in the MMSEA. In addition, all provisions of Article XI of the Plan with respect to the Trust's obligations are expressly approved.

12.     **Trust Funding**. The Trust shall be funded, on or before the Effective Date, by: (a) the Net Settlement Payment; and the (b) the Twistars Payment. Upon the funding of the Trust according to the respective amounts specified in Section 3.2.4 of the Plan, each Buy-Back Agreement shall be binding on the Trust and the Settlement Trustee and FCR.

13.     **Appointment of the Settlement Trustee**. The initial Settlement Trustee shall be William L. Bettinelli. The Settlement Trustee shall commence serving as the Settlement Trustee on the Effective Date. However, the Settlement Trustee is permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Debtor. The Settlement

Trustee shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

14.     **Liquidation and Resolution of Channeled Claims**. The Trust shall pay Abuse Claims in accordance with the Plan, this Confirmation Order, and the Trust Documents and the Allocation Protocol. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. The USOPC Claim and the Indemnification Claims shall not be entitled to payment from Trust Assets but rather shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim. Because Abuse Claims and Future Claims are being paid by the Trust without regard to whether those Claims are covered by the Settling Insurance Policies issued by Settling Insurers: (a) the Trust is deemed subrogated to the Claims of Abuse Claimants paid by the Trust to the extent of those payments; and (b) the Trust may pursue such subrogation Claim or any contribution Claim, but no such action may be brought against a Protected Party.

15.     **INJUNCTION AGAINST INTERFERENCE WITH THE PLAN. Upon the Effective Date of the Plan, all Holders of Claims against the Debtor (whether or not such Holders accepted the Plan), all Settling Insurers, all Other Insurers, and all other parties in interest, along with their respective Related Persons, are hereby PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED from taking any actions to interfere with the implementation or consummation of the Plan. Nothing in the Plan or in this Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, this Confirmation Order, or any other Plan Document.**

16.     **CHANNELING INJUNCTION**. **In consideration of the critical undertakings and substantial contributions of the Debtor, the Participating Parties, and Settling Insurers pursuant to the terms of the Plan, including the funding of the Trust, and to further preserve and promote the settlements embedded in the Plan between and among the Participating Parties, the Settling Insurers, Holders of Sexual Abuse Claims, the Survivors' Committee, the FCR, and the Debtor, and pursuant to Sections 105, 363, and 1129 of the Bankruptcy Code:**

> a.   **Any and all Channeled Claims are CHANNELED into the Trust and shall be treated, administered, determined, and resolved under the procedures and Protocols and in the amounts as established under the Plan and Trust Agreement as the sole and exclusive remedy for all Holders of Channeled Claims; and**

> b.   **All Persons that have held or asserted, hold or assert, or may in the future hold or assert, any Channeled Claim (including all debt holders, governmental, tax, and regulatory authorities, lenders, trade and other Creditors, Abuse Claimants, Future Claimants, Other Insurers, and all others holding Claims or interests of any kind or nature whatsoever against or related to the Protected Parties) are hereby PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED from taking any action, directly or indirectly, for the**

purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against a Protected Party, including:

    i.   commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against the Protected Parties or against the property of the Protected Parties;

    ii.  enforcing, attaching, collecting or recovering, by any manner or means, from the Protected Parties, or from the property of the Protected Parties, with respect to any such Channeled Claim, any judgment, award, decree, or order against the Protected Parties;

    iii. creating, perfecting or enforcing any lien of any kind against the Protected Parties, or the property of the Protected Parties, with respect to any such Channeled Claim;

    iv. asserting, implementing, or effectuating any Channeled Claim of any kind against: (1) the Protected Parties; (2) any direct or indirect obligation due to the Protected Parties; or (3) the property of the Protected Parties, with respect to any such Channeled Claim; and

    v.  taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

All Claims described in Section 12.2 of the Plan shall be channeled to the Trust. The Channeling Injunction under Section 12.2 of the Plan shall not apply to any Reinsurance Claim.

17.    **LIMITATIONS ON THE SCOPE OF CHANNELING INJUNCTION**. Notwithstanding any provision of the Plan, the Channeling Injunction under Section 12.2 of the Plan provides absolutely no protection to: (a) an Excluded Party; (b) any Claims excepted from exculpation under Section 18.4 of the Plan; and (c) to the extent the Settling Insurers are also insurers to the Debtor or to any Participating Party under insurance policies not specifically identified in <u>Exhibit A</u> to the Plan, the Channeling Injunction shall not apply to Claims by the Debtor or any Participating Party against any Settling Insurers in their capacity as an insurer to such parties under insurance policies not specifically identified in <u>Exhibit A</u> to the Plan.

18.    **ENFORCEMENT OF CHANNELING INJUNCTION TO THE MAXIMUM EXTENT**. To the extent not otherwise enjoined in Section 12.2 of the Plan, the assertion or enforcement of Channeled Claims, and any attempt to assert or enforce a Channeled Claim, directly or indirectly, by any Person, against a Protected Party is HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.

19.    **SETTLING INSURER INJUNCTION**. In consideration of the critical undertakings and substantial contributions of the Settling Insurers pursuant to the terms of the Plan, including the funding of the Trust, and to further preserve and promote the settlements embedded in the Plan between and among the Participating Parties, the Settling Insurers, Holders of Sexual Abuse Claims, the Survivors' Committee, the FCR, and the Debtor, and pursuant to Sections 105, 363, and 1129 of the Bankruptcy Code, and except as

otherwise provided in the Plan, any and all Persons (including, without limitation, all debt holders, all equity holders, governmental, tax, and regulatory authorities, lenders, trade and other Creditors, Abuse Claimants, Future Claimants, Settling Insurers, Other Insurers, and all others holding Claims or interests of any kind or nature whatsoever against or related to the Protected Parties) are **PERMANENTLY ENJOINED AND BARRED** from asserting against a Settling Insurer, or any of its Related Persons, or any Non-Debtor CGL Settling Insurer Covered Person any Claim (including any Insurance Coverage Claim, Extra-Contractual Claim, Contribution Claim, or Subrogation Claim) or interest of any kind or nature whatsoever arising from or relating in any way to (a) any Abuse Claim or Future Claim or (b) any of the Settling Insurance Policies or (c) any Claim against any Settling Insurer, or any of its Related Persons, or any Non-Debtor CGL Settling Insurer Covered Person for contribution, indemnity, defense, subrogation, or similar relief that arises directly or indirectly from any Claim against the Debtor or any Non-Debtor CGL Settling Insurer Covered Person, or any Settling Insurance Policies. Notwithstanding the foregoing, to the extent the Settling Insurers are also insurers to the Debtor or to any Participating Party under insurance policies not specifically identified in <u>Exhibit A</u> to the Plan, the Channeling Injunction shall not apply to Claims by the Debtor or any Participating Party against any Settling Insurers in their capacity as an insurer to such parties under insurance policies not specifically identified in <u>Exhibit A</u> to the Plan.

20.     **CONTRIBUTION BAR AGAINST OTHER INSURERS**. In consideration of the critical undertakings and substantial contributions of the Settling Insurers pursuant to the terms of the Plan, including the funding of the Trust, and to further preserve and promote the settlements embedded in the Plan between and among the Participating Parties,

the Settling Insurers, Holders of Sexual Abuse Claims, the Survivors' Committee, the FCR, and the Debtor, and pursuant to Sections 105(a), 363, and 1129 of the Bankruptcy Code, any Other Insurer is hereby **PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED** from taking any action, directly or indirectly, including filing any suit or Cause of Action against any Settling Insurer, or any of its Related Persons, or any Non-Debtor CGL Settling Insurer Covered Person, for the purposes of asserting, enforcing, or attempting to assert or enforce any Claim, including any Contribution Claim, Subrogation Claim, Claim for recovery of defense costs or indemnity payments, or any similar Claim, Cause of Action, or remedy, against any Settling Insurer and any Non-Debtor CGL Settling Insurer Covered Person.

21.     **PERMANENT TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING INSURERS**. All injunctions and stays provided for in the Plan and under and pursuant to the injunctive provisions of Sections 524 and 1141 of the Bankruptcy Code are permanent and will remain in full force and effect following the Effective Date and are not subject to being vacated or modified. For the avoidance of doubt, absence of objection to the settlements, releases, injunctions, and sales provided in the Plan constitutes consent to such settlements, releases, injunctions, and sales.

22.     **DEBTOR RELEASE**. On the Effective Date, all Avoidance Rights of the Debtor, the Estate, and the Reorganized Debtor, including those arising under Sections 544, 547, 548, 549, 550, and 553 of the Bankruptcy Code, against each of the Participating Parties, Non-Debtor CGL Settling Insurer Covered Persons, and Settling Insurers shall be deemed settled, compromised, and released by the Plan. As to each Settling Insurer, on the Effective

Date, the Insurance Coverage Adversary Proceeding and all related proceedings in any Court shall immediately cease, and the Insurance Coverage Adversary Proceeding and any related proceedings shall be dismissed, with prejudice, against each Settling Insurer.

23. **MUTUAL RELEASE. Except for (i) obligations arising under any executory contract assumed by the Reorganized Debtor pursuant to Article XIX of the Plan, (ii) obligations under the Plan of Settling Insurers to pay defense costs (excluding all defense costs of the type sought in the Costs Motion) through the Effective Date of the Plan, and (iii) Claims excepted from exculpation under Section 18.4 of the Plan, on the Effective Date, the Debtor, the Estate, and the Reorganized Debtor, on the one hand, and the Participating Parties, the Non-Debtor CGL Settling Insurer Covered Persons, and Settling Insurers, on the other hand, shall be deemed to have waived, released, and discharged any and all Claims or Causes of Action of every kind and nature, known or unknown, that they may have against each other, and their respective Related Persons, including Claims arising under or against their respective insurance policies. No such Claim will survive the Effective Date. No such Claim will be deemed to be assigned to the Trust. Notwithstanding the foregoing, to the extent the Settling Insurers are also insurers to the Debtor or to any Participating Party under policies issued to the Debtor or any Participating Party not specifically identified in Exhibit A to the Plan, this mutual release shall not apply to Claims by the Debtor or any Participating Party against any Settling Insurers in their capacity as an insurer to such parties under insurance policies not specifically identified in Exhibit A to the Plan.**

24. **PROTECTED PARTY RELEASE. Except for (i) obligations under the Plan of Settling Insurers to pay defense costs (excluding all defense costs of the type sought in the Costs Motion) through the Effective Date of the Plan, and (ii) Claims excepted from**

exculpation under Section 18.4 of the Plan, on the Effective Date of the Plan, each and every Protected Party shall grant, and shall be deemed to have granted, to each Debtor CGL Settling Insurer and its Related Persons a full and complete general release of all Claims or Causes of Action of every kind and nature, known or unknown, that they may have against each Debtor CGL Settling Insurer and its Related Persons related in any way to the Debtor CGL Insurance Policies issued by such Debtor CGL Settling Insurers. No such Claim will survive the Effective Date and such releases are deemed granted regardless of whether the Protected Party executes and delivers a separate release to a Debtor CGL Settling Insurer. In addition, each Protected Party is deemed to have consented to the sale by the Debtor of each Debtor CGL Insurance Policy issued by a Debtor CGL Settling Insurer back to the respective Debtor CGL Settling Insurer. Notwithstanding the foregoing, to the extent the Debtor CGL Settling Insurers are also insurers to the USOPC under insurance policies issued to the USOPC or to the Karolyis under insurance policies issued to the Karolyis, this release shall be limited by the USOPC Release and the Karolyi Release.

25.    **USOPC RELEASE**. On the Effective Date of the Plan, and subject to any separate agreement between the USOPC and a USOPC Settling Insurer, which shall control in the event of any conflict with Section 12.10 of the Plan, and, as set forth in Section 12.10 of the Plan, the USOPC shall grant, and shall be deemed to have granted, to each USOPC Settling Insurer and its Related Persons a full and complete general release of any rights and interests in defense costs incurred after the Effective Date of the Plan and indemnity coverage for Abuse Claims under any CGL Insurance Policy issued by a USOPC Settling Insurer for which the Abuse Claimant has provided a full and complete general release to the USOPC pursuant to Section 11.1.1 of the Plan. Notwithstanding the foregoing, the

**USOPC retains the right to reimbursement of, and to pursue collection of, any defense costs incurred before the Effective Date of the Plan under any CGL Insurance Policy issued by a USOPC Insurer. Nothing in this provision shall be deemed to limit the Protected Party Release under Section 12.09 of the Plan and granted by the USOPC to any Debtor CGL Settling Insurer of Claims against a Debtor CGL Insurance Policy. However, nothing in this provision shall be construed to effectuate a release of any Claim by the USOPC against any Debtor CGL Settling Insurer or USOPC Settling Insurer under or in connection with any insurance policy that is not listed on Exhibit A to the Plan.**

26.    **KAROLYI RELEASE. On the Effective Date of the Plan, the Karolyis shall grant, and shall be deemed to have granted, to the Karolyi Settling Insurer and its Related Persons a release of any rights and interests in indemnity coverage for Abuse Claims under any insurance policy issued by the Karolyi Insurer for which the Abuse Claimant has provided a release to the Karolyis pursuant to Section 11.1.1 of the Plan. Notwithstanding the foregoing, nothing shall be construed to effect a release of any Claims by the Karolyis for reimbursement of defense costs under any insurance policy issued by the Karolyi Settling Insurer. The Karolyis retain the right to reimbursement of, and to pursue collection of, any defense costs incurred to date or which may be incurred after the Effective Date of the Plan. Nothing in Section 12.11 of the Plan shall be deemed to limit the Protected Party Release (described in Section 12.9 of the Plan) granted by the Karolyis to any Debtor CGL Settling Insurer of Claims against a Debtor CGL Insurance Policy.**

27.    **ABUSE CLAIMANT RELEASE. As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete general release of the Debtor, the Estate, the Reorganized Debtor,**

the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any insurance policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, and for each of the foregoing, their Related Persons, but solely acting in their capacity as such, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to USAG, Abuse Claims, Future Claims or Settling Insurance Policies. The form of such release is appended as **Exhibit J** to the Plan, incorporated herein, and approved, and shall be enforced to the fullest extent permitted by law and the terms of this Confirmation Order once executed by any Abuse Claimant or Future Claimant in exchange for a distribution from the Trust.

28.      **EXCLUDED PARTIES LIMITATION OF RELEASES AND CHANNELING INJUNCTION**. Notwithstanding anything to the contrary herein or in the Plan, nothing herein or in the Plan shall be deemed to release or affect any Claims by any Person (including Abuse Claimants, Future Claimants, and any other Person) against any Excluded Parties. The Excluded Parties shall not be Released Parties or receive the benefits or protections of the Channeling Injunction. The fact that an Excluded Party shall not be a Released Party or receive the benefits or protections of the Channeling Injunction shall not prevent a release of Insurance Coverage under the Debtor CGL Insurance Policies issued by Debtor CGL Settling Insurers.

29.      **EXCULPATION**. None of the Exculpated Parties will have or incur any liability to, or be subject to any right of action by, any Holder of a Claim, any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, relating to, or arising out of this Chapter 11 Case, including (1) the exercise of their

respective business judgment and the performance of their respective fiduciary obligations, (2) the pursuit of confirmation of the Plan, or (3) the administration of the Plan, except liability for their willful misconduct or fraud (*provided, however*, the Debtor, the Estate, and Reorganized Debtor will be discharged from any such liability for such acts or omissions occurring prior to the Confirmation Date) and, in all respects, such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Chapter 11 Case. Without limiting the generality of the foregoing, the Debtor and its Related Persons, its employees, and the Debtor's Professionals, and the Survivors' Committee, its members solely in their capacities as members of the Survivors' Committee, and the Survivors' Committee's Professionals shall be entitled to and granted the benefits of Section 1125(e) of the Bankruptcy Code. For the avoidance of doubt, Section 18.4 of the Plan and the Plan's definition of "Exculpated Parties" shall not, directly or indirectly, inure to or for the benefit of a Person or Persons having personally committed an act or acts of Sexual Abuse resulting in a Claim against the Debtor. None of the Exculpated Parties, the Trust, the Settlement Trustee, or Professionals employed by any of the foregoing, shall have any liability to any governmental entity or insurer on account of payments made to a Sexual Abuse Claimant, including liability under the Medicare Secondary Payer Act, except as expressly provided in the Plan.

30.    **Existing Injunctions and Stays**. Unless otherwise provided, all injunctions or stays provided for in this Chapter 11 Case pursuant to Sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of this Confirmation Order, including but not limited to the 105 Order, shall remain in full force and effect until the Effective Date. This Confirmation Order PERMANENTLY ENJOINS the commencement or prosecution

by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released or channeled to the Trust pursuant to the Plan.

31. **Dismissal of Insurance Coverage Adversary Proceeding as to Settling Insurers.** Subject to the occurrence of the Effective Date, the Debtor and any other plaintiffs shall dismiss with prejudice any and all Claims against the Settling Insurers in the Insurance Coverage Adversary Proceeding, with each party to bear its own costs; *provided, however*, that such dismissal shall not affect the Claims of the Debtor against Liberty Insurance Underwriters, Inc. or any other defendant in the Insurance Coverage Adversary Proceeding that is not a Settling Insurer.

32. **Chubb Claims.** (a) Notwithstanding anything in the Plan, this Confirmation Order, or any Plan Document to the contrary, the policies listed in the Chubb Claims (as defined herein) shall vest unaltered in the Reorganized Debtor except that on and after the Effective Date, to the extent the Reorganized Debtor seeks coverage or payment under any of the policies listed in the Chubb Claims, the Chubb Companies (as defined herein) shall be entitled to payment or reimbursement in full from the Reorganized Debtor, to the extent required under the applicable policy, in the ordinary course and without the need for the Chubb Companies to file a Claim, proof of Claim or Administrative Claim; *provided, however*, that any and all rights of the Reorganized Debtor to dispute such payments or reimbursements are expressly reserved, and therefore, Claim Numbers 292, 293, and 295 (collectively, the "**Chubb Claims**") filed by Federal Insurance Company, Executive Risk Indemnity, Inc., and ACE Property & Casualty Insurance Company, respectively, (collectively, the "**Chubb Companies**") shall be, on the Effective Date, deemed (i) withdrawn and (ii) removed from Exhibit B to the Plan, and not treated as Indemnification Claims; and (b) Claim Number 294 filed by ACE American Insurance Company shall be deemed

withdrawn on the Effective Date, and this withdrawal shall have no effect on the treatment of ACE American Insurance Company as a Settling Insurer under the Plan.

33.      **No Admission**. This Confirmation Order's compliance with the requirements of Bankruptcy Rule 3020(c), and the Plan Proponents' compliance with the requirements of Bankruptcy Rule 3016, shall not constitute an admission by the Plan Proponents or any other Person that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

34.      **Restorative Justice Task Force**. A Restorative Justice Task Force will be established pursuant to Section 20.1 of the Plan.

35.      **Effective Date**. The Effective Date will occur when each of the following conditions is met: (a) this Confirmation Order is entered on or before December 31, 2021, in form and substance reasonably acceptable to the Reorganized Debtor, the Survivors' Committee, the Participating Parties, and the Settling Insurers; (b) the Confirmation Order shall have become a Final Order, unless the Debtor, the Survivors' Committee, and the Settling Insurers agree to waive such requirement; (c) the Settlement Trustee, the FCR, and the Reorganized Debtor have signed the Trust Agreement; (d) the Settling Insurers have made their Agreed CGL Insurer Payments to the Debtor and the transfers to the Trust contemplated in Section 9.2.2 of the Plan have been made to the Trust; (e) the Bankruptcy Court has approved the USOPC Loan, and the Debtor has delivered the promissory note evidencing the USOPC Loan to the USOPC; (f) USOPC has made the USOPC Out-of-Pocket Contribution; (g) USAG has made the USAG Contribution; (h) the Bankruptcy Court has approved, by Final Order (unless the Debtor, the Survivors' Committee, and the Settling Insurers, agree to waive such requirement for a Final Order), the Buy-Back Agreement of each Settling Insurer in form and substance reasonably acceptable to each Settling Insurer, the

Reorganized Debtor, and the Survivors' Committee; and (i) the Settling Insurers have been dismissed from the Insurance Coverage Adversary Proceeding with prejudice, with each party to bear its own costs.

36.     **Post Confirmation Reporting Obligations and Payment of Statutory Fees**. Any statutory fees pursuant to 28 U.S.C. § 1930(a)(6), accruing after the Confirmation Date shall be paid by the Reorganized Debtor. The Reorganized Debtor shall be responsible for preparing and filing post-confirmation reports and shall make payment of the post-confirmation statutory fees. All post-confirmation reports are due quarterly, once the Effective Date of the Plan has occurred, until such time as this Court enters a final decree, or the Chapter 11 Case dismisses or converts. The Trust will provide a final report to the United States Trustee upon final disbursement and closure of the Trust.

37.     **Retention of Jurisdiction**. Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with the Plan, including the following:

     a.   The determination of objections to Disputed Claims, and the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

     b.   The resolution of controversies and disputes regarding interpretation and implementation of the Plan and the Plan Documents;

     c.   The granting of relief in aid of the Plan and the Plan Documents, including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, as well as contempt or other sanctions) to protect the Reorganized Debtor and the Released Parties from actions prohibited under the Plan or the Plan Documents;

     d.   Amendments to and modifications of the Plan;

     e.   The determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date, including but not limited to the Insurance Coverage Adversary Proceeding;

f.  The determination of any motion to determine that a Claimant is a Future Claimant or to determine that an Abuse Claim Filed After The Bar Date shall be deemed to have been filed before the Bar Date;

g.  To enforce the terms of the non-monetary provisions of Article XX of the Plan; and

h.  The closing of this Chapter 11 Case and the entry of a final decree.

38.    **Necessary Action**. The Plan Proponents are authorized to (a) take such actions as may be necessary or appropriate to carry out the Plan and (b) execute such documents and instruments as may be required to implement the Plan.

<div align="center">###</div>

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| USA GYMNASTICS,[1] | Case No. 18-09108-RLM-11 |
| Debtor. | |

**MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**PROPOSED BY USA GYMNASTICS AND THE ADDITIONAL**
**TORT CLAIMANTS COMMITTEE OF SEXUAL ABUSE SURVIVORS**

JENNER & BLOCK LLP
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root
Adam T. Swingle (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com
aswingle@jenner.com

*Counsel for the Debtor*

PACHULSKI STANG ZIEHL & JONES
James I. Stang (admitted *pro hac vice*)
Ilan D. Scharf (admitted *pro hac vice*)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067
(310) 277-6910
jstang@pszjlaw.com
ischarf@pszjlaw.com

-and-

RUBIN & LEVIN
Deborah J. Caruso
Meredith R. Theisen
135 N. Pennsylvania Street, Suite 1400
Indianapolis, Indiana 46204
(317) 634-0300
dcaruso@rubin-levin.net
mtheisen@rubin-levin.net

*Counsel for the Survivors' Committee*

Dated: December 13, 2021

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 1099 N. Meridian St., Suite 800, Indianapolis, Indiana 46204.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS ......................................................................................1

    1.1      General Definitions ...............................................................................1

        1.1.1.    "105 Order" ...................................................................................1

        1.1.2.    "Abuse Claimant" .......................................................................1

        1.1.3.    "Abuse Claims" ...........................................................................1

        1.1.4.    "Abuse Claims Settlement Fund" ...............................................1

        1.1.5.    "Accepting Parties" .....................................................................1

        1.1.6.    "Administrative Claim" ...............................................................1

        1.1.7.    "Administrative Claimant" ..........................................................1

        1.1.8.    "Agreed CGL Insurer Payment" .................................................2

        1.1.9.    "Allocation Protocol" .................................................................2

        1.1.10.   "Allowance Date" .......................................................................2

        1.1.11.   "Allowed" ...................................................................................2

        1.1.12.   "Assets" ......................................................................................2

        1.1.13.   "Avoidance Rights" .....................................................................2

        1.1.14.   "Bankruptcy Code" .....................................................................2

        1.1.15.   "Bankruptcy Court" .....................................................................2

        1.1.16.   "Bankruptcy Rules" .....................................................................2

        1.1.17.   "Bar Date" ...................................................................................2

        1.1.18.   "Business Day" ............................................................................3

        1.1.19.   "Buy-Back Agreement" ...............................................................3

        1.1.20.   "Cash" .........................................................................................3

        1.1.21.   "Causes of Action" ......................................................................3

        1.1.22.   "CGL Insurance Policies" ...........................................................3

1.1.23.    "CGL Insurer" ................................................................................3

1.1.24.    "CGL Insurer Settlement Offer" ............................................................3

1.1.25.    "Channeled Claim" ...........................................................................3

1.1.26.    "Channeled Claimant" ......................................................................4

1.1.27.    "Channeling Injunction" ...................................................................4

1.1.28.    "Chapter 11 Case" ..........................................................................4

1.1.29.    "Claim" .......................................................................................4

1.1.30.    "Claims Agent" ..............................................................................4

1.1.31.    "Claimant" ...................................................................................4

1.1.32.    "Class" ........................................................................................4

1.1.33.    "Conditional Payment" ....................................................................4

1.1.34.    "Confirmation Date" .......................................................................4

1.1.35.    "Confirmation Hearing" ...................................................................4

1.1.36.    "Confirmation Order" ......................................................................4

1.1.37.    "Costs Motion" ..............................................................................4

1.1.38.    "Creditor" ....................................................................................5

1.1.39.    "Debtor" ......................................................................................5

1.1.40.    "Debtor CGL Insurance Coverage" .....................................................5

1.1.41.    "Debtor CGL Insurance Policies" .......................................................5

1.1.42.    "Debtor CGL Insurer" ......................................................................5

1.1.43.    "Debtor CGL Settling Insurance Policy" ..............................................5

1.1.44.    "Debtor CGL Settling Insurer" ..........................................................5

1.1.45.    "Debtor's Insurance Policies" ...........................................................5

1.1.46.    "Debtor's Professionals" ..................................................................5

1.1.47.    "Disclosure Statement" ....................................................................5

1.1.48.  "Disputed Claim" ................................................................................5

1.1.49.  "Distribution" .....................................................................................6

1.1.50.  "District Court" ..................................................................................6

1.1.51.  "Effective Date" .................................................................................6

1.1.52.  "Estate" ...............................................................................................6

1.1.53.  "Estimated Amount" ..........................................................................6

1.1.54.  "Excluded Party" ...............................................................................6

1.1.55.  "Exculpated Parties" ..........................................................................6

1.1.56.  "FCR" .................................................................................................6

1.1.57.  "FCR Claim" .....................................................................................6

1.1.58.  "FCR's Professionals" .......................................................................6

1.1.59.  "Final Order" .....................................................................................6

1.1.60.  "Future Claim" ..................................................................................6

1.1.61.  "Future Claimant" .............................................................................7

1.1.62.  "Future Claimant Allocation Protocol" ............................................7

1.1.63.  "Future Claimant Reserve" ...............................................................7

1.1.64.  "General Unsecured Claim" ..............................................................7

1.1.65.  "General Unsecured Convenience Claim" .........................................7

1.1.66.  "Holder" .............................................................................................7

1.1.67.  "Impaired" ..........................................................................................7

1.1.68.  "Indemnification Claim" ...................................................................7

1.1.69.  "Insurance Coverage" ........................................................................7

1.1.70.  "Insurance Coverage Adversary Proceeding" ..................................8

1.1.71.  "Insurance Reimbursement Claims" .................................................8

1.1.72.  "Karolyi Insurer" ..............................................................................8

1.1.73.  "Karolyi Release" ...................................................................................8

1.1.74.  "Karolyi Settling Insurer" .........................................................................8

1.1.75.  "Karolyis" ..................................................................................................8

1.1.76.  "MAO" .......................................................................................................8

1.1.77.  "Mediators" ................................................................................................8

1.1.78.  "Medicare Beneficiary" .............................................................................8

1.1.79.  "Medicare Claims" .....................................................................................8

1.1.80.  "Medicare Reporting Information" .............................................................8

1.1.81.  "Medicare Trust Fund" ...............................................................................9

1.1.82.  "MMSEA" ..................................................................................................9

1.1.83.  "MSP" .........................................................................................................9

1.1.84.  "Net Settlement Payment" .........................................................................9

1.1.85.  "Non-Debtor CGL Settling Insurer Covered Persons" .............................9

1.1.86.  "Other Insurance Policy" ...........................................................................9

1.1.87.  "Other Insurers" .........................................................................................9

1.1.88.  "Other Priority Claim" ...............................................................................9

1.1.89.  "Outstanding Amount" ...............................................................................9

1.1.90.  "Participating Party" ..................................................................................9

1.1.91.  "Participating Party Claim" ......................................................................10

1.1.92.  "Person" ....................................................................................................10

1.1.93.  "Petition Date" ..........................................................................................10

1.1.94.  "Plan" ........................................................................................................10

1.1.95.  "Plan Documents" .....................................................................................10

1.1.96.  "Plan Support Agreement" .......................................................................10

1.1.97.  "PNC Bank" ..............................................................................................10

1.1.98.    "PNC Bank Claim" ................................................................10

1.1.99.    "PPP Loan Claim" ..............................................................10

1.1.100.   "Priority Claim" ...............................................................10

1.1.101.   "Priority Claimant" .........................................................10

1.1.102.   "Priority Tax Claim" ........................................................11

1.1.103.   "Professional" ..................................................................11

1.1.104.   "Professional Claim" .......................................................11

1.1.105.   "Professional Claims Bar Date" ......................................11

1.1.106.   "Professional Fee Hold-Back" .........................................11

1.1.107.   "Pro Rata" ........................................................................11

1.1.108.   "Protected Parties" ..........................................................11

1.1.109.   "Related Person" ..............................................................11

1.1.110.   "Released Parties" ............................................................11

1.1.111.   "Reorganized Debtor" ......................................................12

1.1.112.   "Revested Assets" .............................................................12

1.1.113.   "RRE" or Responsible Reporting Entity" .......................12

1.1.114.   "Schedules" .......................................................................12

1.1.115.   "Settlement Trustee" ........................................................12

1.1.116.   "Settling Insurance Policies" ..........................................12

1.1.117.   "Settling Insurer" .............................................................12

1.1.118.   "Settling Insurer Injunction" ..........................................12

1.1.119.   "Sexual Abuse" .................................................................12

1.1.120.   "Sexual Abuse Claim" ......................................................13

1.1.121.   "Sharp Claim" ...................................................................13

1.1.122.   "Survivors' Committee" ...................................................13

1.1.123. "Survivors' Committee's Professionals" ....................................................13

1.1.124. "Total Settlement Demand Amount" ..........................................................13

1.1.125. "Trust" .........................................................................................................13

1.1.126. "Trust Agreement" ........................................................................................13

1.1.127. "Trust Assets" ...............................................................................................13

1.1.128. "Trust Documents" ........................................................................................13

1.1.129. "Trust Expenses" ...........................................................................................13

1.1.130. "Trust Reserve" .............................................................................................13

1.1.131. "Twistars" .....................................................................................................13

1.1.132. "Twistars Payment" ......................................................................................14

1.1.133. "Twistars Settlement" ...................................................................................14

1.1.134. "Twistars Settling Insurers" .........................................................................14

1.1.135. "Undeliverable Distribution" .......................................................................14

1.1.136. "USAG Contribution" ...................................................................................14

1.1.137. "U.S. Trustee" ...............................................................................................14

1.1.138. "USOPC" ......................................................................................................14

1.1.139. "USOPC Out-of-Pocket Contribution" means $34,392,689. ......................14

1.1.140. "USOPC Claim" ...........................................................................................14

1.1.141. "USOPC Insurers" ........................................................................................14

1.1.142. "USOPC Loan" .............................................................................................14

1.1.143. "USOPC Release" .........................................................................................14

1.1.144. "USOPC Settling Insurers" ..........................................................................14

ARTICLE II. INTERPRETATION .................................................................................15

2.1    Bankruptcy Code Section 102 .............................................................................15

2.2    Undefined Terms ................................................................................................15

2.3    Plan Definitions Control ...................................................................15

2.4    Include and Including ........................................................................15

2.5    Plural and Singular Terms ..................................................................15

2.6    References to Court Filings ................................................................15

2.7    Inclusion of Amended Agreements .....................................................15

2.8    Exhibits ...........................................................................................15

2.9    Herein/Hereof/Hereto .......................................................................15

2.10   Headings ..........................................................................................15

2.11   No Admissions ..................................................................................15

2.12   Computation of Time .........................................................................16

2.13   Merger .............................................................................................16

ARTICLE III. MEANS OF FUNDING THE PLAN .........................................16

3.1    Plan's Objective ...............................................................................16

       3.1.1.   Settlement With the Debtor CGL Insurers, USOPC Insurers, and
                USOPC .................................................................................16

3.2    Survivors' Committee's Offer to Resolve Abuse Claims.........................17

       3.2.1.   Survivors' Committee's Offer to the CGL Insurance Carriers.........17

       3.2.2.   The CGL Insurer Settlement Offer. ..........................................17

       3.2.3.   Survivors' Committee's Agreement with Twistars. ......................17

       3.2.4.   CGL Insurer Settlement Offers and Twistars Payment. ................18

3.3    Debtor's Representations. ..................................................................19

3.4    Funding of USOPC and USAG Contributions. .......................................19

3.5    Funding of Agreed CGL Insurer Payments. ..........................................19

3.6    Resolution of the Insurance Coverage Adversary Proceeding as to the Settling
       Insurers. .........................................................................................20

3.7    Debtor CGL Settling Insurers' Obligation to Reimburse the Debtor for
       Insurance Reimbursement Claims ........................................................................20

3.8    Class 8 Indemnification Claims and USOPC Claim......................................................21

3.9    Sexual Abuse Claims Filed After the Bar Date or Not Deemed to Be Timely
       Filed. ..............................................................................................................21

3.10   Claims Other Than Abuse Claims, the Class 7 USOPC Claim, the Class 8
       Indemnification Claims, the Class 9 FCR Claim, and the Class 10 Claims...............21

3.11   Discharge .......................................................................................................21

ARTICLE IV. TREATMENT OF UNCLASSIFIED CLAIMS...................................................21

4.1    Administrative Claims ......................................................................................21

4.2    Professional Claims .........................................................................................22

       4.2.1.    Bar Dates for Professional Claims....................................................22

       4.2.2.    Objections to Professional Claims....................................................22

4.3    U.S. Trustee Fees ............................................................................................22

4.4    Priority Tax Claims .........................................................................................22

ARTICLE V. CLASSIFICATION OF CLAIMS ...................................................................22

5.1    Classification of Claims ...................................................................................22

5.2    Treatment in Complete Satisfaction..................................................................23

ARTICLE VI. TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS..............................23

6.1    Class 1: Other Priority Claims ..........................................................................23

       6.1.1.    Impairment and Voting ...................................................................23

       6.1.2.    Treatment .....................................................................................23

6.2    Class 2: PNC Bank Claim.................................................................................24

       6.2.1.    Impairment and Voting ...................................................................24

       6.2.2.    Treatment .....................................................................................24

6.3    Class 3: Sharp Claim.......................................................................................24

6.3.1.    Impairment and Voting ..................................................................24

6.3.2.    Treatment ......................................................................................24

6.4    Class 4: General Unsecured Convenience Claims ...........................24

6.4.1.    Impairment and Voting ..................................................................24

6.4.2.    Treatment ......................................................................................24

ARTICLE VII. TREATMENT OF IMPAIRED CLASSES OF CLAIMS ....................24

7.1    Class 5: General Unsecured Claims .................................................24

7.1.1.    Impairment and Voting ..................................................................24

7.1.2.    Treatment ......................................................................................24

7.2    Class 6: Abuse Claims .....................................................................25

7.2.1.    Impairment and Voting ..................................................................25

7.2.2.    Treatment of Class 6 Claims ..........................................................25

7.3    Class 7: USOPC Claim .....................................................................25

7.3.1.    Impairment and Voting ..................................................................25

7.3.2.    Treatment of Class 7 Claim ...........................................................25

7.4    Class 8: Indemnification Claims .......................................................26

7.4.1.    Impairment and Voting ..................................................................26

7.4.2.    Treatment of Class 8 Claims ..........................................................26

7.4.3.    Stephen Penny's Class 8 Claim .....................................................26

7.5    Class 9: Future Claimants Representative Claim ..............................26

7.5.1.    Impairment and Voting ..................................................................26

7.5.2.    Treatment ......................................................................................26

7.6    Class 10: Sexual Abuse Claims Filed After The Bar Date ................27

7.6.1.    Impairment and Voting ..................................................................27

7.6.2.    Treatment of Class 10 Claims ........................................................27

ARTICLE VIII. ACCEPTANCE OR REJECTION OF PLAN .................................................27

8.1     Impaired Classes to Vote ...........................................................................................27

8.2     Acceptance by Class of Creditors ..............................................................................27

ARTICLE IX. TRUST FUNDING AND FORMATION ......................................................27

9.1     Establishment of Trust ...............................................................................................27

9.2     Trust Formation and Funding .....................................................................................28

    9.2.1.    Trust Purpose ...................................................................................................28

    9.2.2.    Funding of Trust ..............................................................................................28

9.3     Approval of Settlement ...............................................................................................28

9.4     Future Claimant Reserve ............................................................................................28

9.5     Closing ........................................................................................................................28

9.6     Appointment of the Settlement Trustee .....................................................................28

9.7     Tax Matters .................................................................................................................29

9.8     Cooperation by the Debtor and Reorganized Debtor ..................................................29

9.9     Objections to Channeled Claims ................................................................................29

9.10    Trust Indemnification Obligations .............................................................................29

ARTICLE X. No CLaims Against Settling Insurers And Abuse Claimants' Rights Reserved ....30

10.1    [Intentionally Omitted]. .............................................................................................30

10.2    [Intentionally Omitted]. .............................................................................................30

10.3    [Intentionally Omitted]. .............................................................................................30

10.4    [Intentionally Omitted]. .............................................................................................30

10.5    [Intentionally Omitted]. .............................................................................................30

10.6    [Intentionally Omitted]. .............................................................................................30

10.7    No Claims Of Other Insurers Against Settling Insurers or Non-Debtor CGL
        Settling Insurer Covered Persons................................................................................30

10.8    [Intentionally Omitted]. .............................................................................................30

10.9    Abuse Claimants' Rights Reserved. ...............................................................30

10.10  [Intentionally Omitted]. ...............................................................................30

ARTICLE XI. LIQUIDATION AND PAYMENT OF CHANNELED CLAIMS......................30

11.1    Liquidation and Resolution of Channeled Claims. ......................................30

11.1.1.  Conditions to Payment of Abuse Claims and FCR Claims ...............................31

11.1.2.  Trust Documents May Not Modify The Plan ...................................................31

11.2    Effect of No Award on Channeled Claims .....................................................31

11.3    Treatment of Attorneys' Fees and Costs of Channeled Claimants .............................31

11.4    Withdrawal of Channeled Claims ..................................................................31

11.5    Supplementing Exhibit C to Add Participating Parties..................................32

11.5.1.  Participating Party Agreement......................................................................32

11.5.2.  Rights of Additional Participating Parties .....................................................32

11.5.3.  Retention of Jurisdiction...............................................................................32

11.5.4.  Retention of Jurisdiction...............................................................................32

11.6    Future Claimant Process ................................................................................32

11.7    Special Distribution Conditions ....................................................................33

11.7.1.  Medicare Secondary Payer ...........................................................................33

11.7.2.  Medicare-Related Obligations ......................................................................33

11.7.3.  Certification of Reports ................................................................................34

11.7.4.  Rejected or Non-Compliant Reports.............................................................35

11.7.5.  Medicare-Related Obligations for Unreported Settlements.............................35

11.7.6.  Duration of Medicare-Related Obligations....................................................35

11.7.7.  Prophylactic Measures .................................................................................36

11.7.8.  Corrections of Reports .................................................................................36

11.7.9.  Medicare Reporting Information Required.....................................................36

11.7.10.  Payment from the Trust ......................................................37

11.7.11.  Indemnification ...............................................................37

11.7.12.  Medicare Hold-back ........................................................37

ARTICLE XII. CHANNELING INJUNCTION ...........................................38

12.1   Effective Date Injunctions ...........................................................38

12.2   CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE
       CLAIMS ..................................................................................38

12.2.1.   LIMITATIONS ON THE SCOPE OF CHANNELING INJUNCTION............39

12.3   ENFORCEMENT TO THE MAXIMUM EXTENT.................................40

12.4   SETTLING INSURER INJUNCTION...............................................40

12.5   CONTRIBUTION BAR AGAINST OTHER INSURERS. .......................40

12.6   PERMANENT TERM OF INJUNCTIONS OR STAYS AND
       CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING
       PARTIES AND SETTLING INSURERS .............................................41

12.7   RELEASE OF AVOIDANCE CLAIMS AND OTHER CLAIMS AGAINST
       PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER
       COVERED PERSONS, AND SETTLING INSURERS ...........................41

12.8   MUTUAL RELEASE ....................................................................41

12.9   PROTECTED PARTY RELEASE .....................................................42

12.10  USOPC RELEASE .......................................................................42

12.11  KAROLYI RELEASE. ..................................................................43

12.12  EXCLUDED PARTIES LIMITATION OF RELEASES AND
       CHANNELING INJUNCTION. .....................................................43

ARTICLE XIII. [INTENTIONALLY OMITTED]..........................................44

ARTICLE XIV. INSURANCE NEUTRALITY ..............................................44

14.1   No Modification of Debtor's Insurance Policies of Other Insurers............44

14.2   Other Insurers' Duties Not Impaired ..............................................44

14.3   Trust Has No Impact......................................................................44

14.4    Obligations for Claims ..................................................................................44

14.5    Other Insurers' Defenses ............................................................................44

14.6    Reinsurance...................................................................................................44

14.7    Defenses of the Debtor, the Estate, and the Reorganized Debtor ...............44

14.8    Governing Law .............................................................................................45

ARTICLE XV. CLAIMS AND DISTRIBUTIONS....................................................................45

15.1    Objections to Claims other than Abuse Claims, the USOPC Claim,
        Indemnification Claims, and the FCR Claim ..............................................45

15.2    Service of Objections ...................................................................................45

15.3    Additional Documentation ...........................................................................45

15.4    Provisions Governing Distribution To Holders of Allowed Claims............45

       15.4.1.    Distribution Only to Holders of Allowed Claims ..............................45

       15.4.2.    Timing of Distributions .....................................................................46

       15.4.3.    Waiver of Distribution .......................................................................46

       15.4.4.    Form of Distributions.........................................................................46

       15.4.5.    No Professional Fees or Expenses .....................................................46

15.5    No Distributions Pending Allowance ..........................................................46

15.6    Claim Estimation ..........................................................................................46

15.7    Setoffs ...........................................................................................................47

15.8    No Interest on Claims ...................................................................................47

15.9    Withholding Taxes ........................................................................................47

15.10  No De Minimis Distributions........................................................................47

15.11  Manner of Cash Payments ............................................................................47

ARTICLE XVI. LITIGATION.................................................................................................48

16.1    Reorganized Debtor's Retention of Causes of Action and Litigation .........48

16.2    Additional Actions ........................................................................................48

ARTICLE XVII. CONDITIONS PRECEDENT ................................................................48

    17.1   Conditions to Effectiveness ................................................................48

    17.2   Waiver of Conditions ................................................................49

    17.3   Statement................................................................49

    17.4   Non-Occurrence of Effective Date ................................................................49

ARTICLE XVIII. EFFECTS OF PLAN CONFIRMATION AND DISCHARGE ....................49

    18.1   Discharge ................................................................49

    18.2   Vesting of Assets ................................................................49

    18.3   Continued Existence of Reorganized Debtor................................................49

    18.4   Exculpation and Limitation of Liability ................................................................50

ARTICLE XIX. TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED
             LEASES ................................................................50

    19.1   Assumed Employee Benefit Plans ................................................................50

    19.2   General; Assumed if Not Rejected ................................................................50

    19.3   Claims for Contract Rejection ................................................................51

    19.4   Indemnification Claims................................................................51

ARTICLE XX. NON-MONETARY COMMITMENTS ................................................................51

    20.1   Commitment to Athlete Safety ................................................................51

ARTICLE XXI. MISCELLANEOUS PROVISIONS ................................................................56

    21.1   Obligations of the Reorganized Debtor ................................................................56

    21.2   Retention of Jurisdiction ................................................................56

    21.3   Modification of Plan ................................................................57

    21.4   Post-Confirmation Court Approval................................................................57

    21.5   Election Pursuant to Section 1129(b) of the Bankruptcy Code ................................57

    21.6   Closing of the Chapter 11 Case ................................................................57

    21.7   Dissolution of the Survivors' Committee ................................................................58

21.8   Termination of the Appointment of the FCR ............................................................58

21.9   Notices ...................................................................................................................58

21.10  Notices to Claimants ..............................................................................................59

21.11  Consummation of the Plan ......................................................................................59

21.12  Severability ............................................................................................................59

21.13  Headings .................................................................................................................59

21.14  Exemption from Transfer Taxes .............................................................................59

21.15  Waivers ..................................................................................................................59

21.16  Setoffs, Recoupments, and Defenses ......................................................................59

21.17  Withdrawal or Revocation of the Plan ....................................................................60

21.18  Default ....................................................................................................................60

21.19  Governing Law .......................................................................................................60

21.20  Reservation of Rights .............................................................................................60

21.21  Successors and Assigns ...........................................................................................60

21.22  Direction to a Party .................................................................................................60

21.23  Certain Actions .......................................................................................................60

21.24  Rounding of Fractional Numbers ............................................................................61

21.25  Saturday, Sunday, or Legal Holiday .......................................................................61

21.26  Exhibits ..................................................................................................................61

ARTICLE XXII. CONFIRMATION REQUEST ...............................................................62

22.1   Request for Confirmation ......................................................................................62

## TABLE OF EXHIBITS

**EXHIBIT A**:  Schedule of CGL Insurers and CGL Insurance Policies

**EXHIBIT B**:  Schedule of Indemnification Claims

**EXHIBIT C**:  Schedule of Participating Parties

**EXHIBIT D:**  Schedule of Excluded Parties

**EXHIBIT E:**  [Intentionally Omitted]

**EXHIBIT F**:  Form of Trust Agreement

**EXHIBIT G**:  Form of Buy-Back Agreement (Exhibits G-1 through G-4)

**EXHIBIT H**:  Allocation Protocol

**EXHIBIT I**:  Future Claimant Allocation Protocol

**EXHIBIT J**:  Form of General Release

USA Gymnastics ("**USAG**" or the "**Debtor**") and the Additional Tort Claimants Committee Of Sexual Abuse Survivors (the "**Survivors' Committee**" and together with the Debtor, the "**Plan Proponents**") propose the following Plan pursuant to the provisions of chapter 11 of title 11 of the United States Code. The Debtor previously filed the *Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization by USA Gymnastics and the Additional Tort Claimants Committee Of Sexual Abuse Survivors* (the "**Disclosure Statement**").

Subject to the provisions of Section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to amend, alter, or modify the Plan one or more times before confirmation and/or substantial consummation.

## ARTICLE I.  DEFINITIONS

For the purposes of the Plan, all capitalized terms not otherwise defined in the Plan shall have the meanings ascribed to them below or in the Bankruptcy Code or Bankruptcy Rules, as applicable:

**1.1    General Definitions**.

**1.1.1.  "105 Order"** means the *Agreed Stipulation And Order Pursuant To 11 U.S.C. § 105 Enjoining The Continued Prosecution Of Certain Pre-Petition Lawsuits* [Dkt. 426], entered by the Bankruptcy Court on April 22, 2019.

**1.1.2.  "Abuse Claimant"** means a Holder of an Abuse Claim filed on or before the Bar Date or otherwise deemed timely pursuant to an order of the Bankruptcy Court.

**1.1.3.  "Abuse Claims"** means Sexual Abuse Claims and General Unsecured Claim No. 312 alleging emotional abuse.

**1.1.4.   "Abuse Claims Settlement Fund"** means the Net Settlement Payment, plus the Twistars Payment less the Future Claimant Reserve and Trust Reserve.

**1.1.5.  "Accepting Parties"** means, collectively, those (a) CGL Insurers that have entered into the Plan Support Agreement, (b) any other Person that enters into the Plan Support Agreement with the consent of the Debtor and the Survivors' Committee, and/or (c) any CGL Insurer that accepts its Agreed CGL Insurer Settlement Offer by the date set for approval of the Disclosure Statement or on such later date as agreed to by the Survivors' Committee and the Debtor.

**1.1.6.  "Administrative Claim"** means a Claim for costs and expenses of administration that is allowable and entitled to priority under Sections 503, 507(a)(2), or 507(b) of the Bankruptcy Code, including any post-petition tax Claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

**1.1.7.  "Administrative Claimant"** means the Holder of an Administrative Claim.

**1.1.8.  "Agreed CGL Insurer Payment"** means the payment by a CGL Insurer of the amount set forth in Section 3.2.4 as such insurer's CGL Insurer Settlement Offer.

**1.1.9.  "Allocation Protocol"** means the protocol for allocation of the Abuse Claims Settlement Fund, which is attached hereto as <u>Exhibit H</u>.

**1.1.10. "Allowance Date"** means, with respect to a Claim, the date such Claim becomes Allowed.

**1.1.11. "Allowed"** means, (a) any Claim against the Debtor that has been listed by the Debtor in the Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and which is not disputed or contingent, and for which no contrary proof of claim has been filed; (b) any timely filed Claim as to which no objection to allowance has been interposed in accordance with Section 15.1 hereof or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder; or (c) any Claim expressly allowed by a Final Order or hereunder.

**1.1.12. "Assets"** means, collectively, any and all property of the Debtor or the Estate, respectively, of every kind and character, wherever located, whether real or personal, tangible or intangible, and specifically including Cash and Causes of Action.

**1.1.13. "Avoidance Rights"** means those rights that may be asserted by the Debtor, as debtor in possession, to avoid and recover transfers, liens, or obligations, described in Sections 544, 545, 546, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code, and any other actions provided for under applicable law that allow a debtor in possession or trustee to avoid certain transfers.

**1.1.14. "Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code.

**1.1.15. "Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Indiana.

**1.1.16. "Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075, as amended, and the local rules and general orders of the Bankruptcy Court, as applicable to the Chapter 11 Case, together with all amendments and modifications thereto.

**1.1.17. "Bar Date"** means April 29, 2019 at 4:00 p.m. (prevailing Eastern time), the date and time set by for the filing of Abuse Claims and General Unsecured Claims by the *Order Approving Debtor's Motion For Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof* [Dkt. 301], entered by the Bankruptcy Court on February 25, 2019, as modified by the *Order Granting Debtor's Motion For Clarification Of Bar Date Order* [Dkt. 417], entered by the Bankruptcy Court on April 16, 2019.

2

**1.1.18. "Business Day"** means any day other than Saturday, Sunday, or a "legal holiday", as that term is defined in Bankruptcy Rule 9006(a).

**1.1.19. "Buy-Back Agreement"** means a separate settlement and sale agreement between the Debtor and each Debtor CGL Settling Insurer, the forms of which are attached hereto as Exhibits G-1, G-2, G-3, and G-4.

**1.1.20. "Cash"** means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

**1.1.21. "Causes of Action"** means any and all Claims, demands, rights, actions, causes of action, and suits of the Debtor or the Estate, of any kind or character whatsoever, known or unknown, suspected or unsuspected, matured or unmatured, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, including (a) rights of setoff, counterclaim, or recoupment, and Claims on contracts or for breaches of duties imposed by law; (b) the right to object to Claims; (c) Claims pursuant to Section 362 of the Bankruptcy Code; (d) such Claims and defenses as fraud, negligence, breach of fiduciary duty, corporate waste, unlawful dividends, mistake, duress, and usury; (e) all Avoidance Rights; (f) all Claims in or related to the Insurance Coverage Adversary Proceeding; (g) Insurance Reimbursement Claims; (h) Claims for tax refunds; and (i) any other Claims which may be asserted against third parties or insiders.

**1.1.22. "CGL Insurance Policies"** means, collectively, the policies of primary, excess or umbrella comprehensive general liability insurance purchased by the Debtor from the Debtor CGL Insurers, the USOPC from the USOPC Insurers, and the Karolyis from the Karolyi Insurer, each of which is identified in the schedule attached as Exhibit A hereto.

**1.1.23. "CGL Insurer"** means the Debtor CGL Insurers, the USOPC Insurers, and the Karolyi Insurer, each of which is identified in the schedule attached as Exhibit A hereto.

**1.1.24. "CGL Insurer Settlement Offer"** means the offers made by the Survivors' Committee to each CGL Insurer, the amounts of which are set forth in Section 3.2.4.

**1.1.25. "Channeled Claim"** means Abuse Claims, the FCR Claim, the Participating Party Claims, Indemnification Claims, and/or any Claims against a Participating Party, a Non-Debtor CGL Settling Insurer Covered Person, or a Settling Insurer arising from, in connection with, or related in any way to an Abuse Claim, USAG, or any of the Settling Insurer Policies listed on Exhibit A, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, extra-contractual or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy, and whether filed or not and whether filed before or after the Bar Date. In addition, a Channeled Claim includes any Claim against the Debtor, a Participating Party, a Non-Debtor CGL Settling Insurer Covered Person, or a Settling Insurer based on allegations that it is an alter ego of a Person that is not a Participating Party, Non-Debtor CGL Settling Insurer Covered Person, or Settling Insurer or that the Debtor's, Participating Party's, Non-Debtor CGL Settling Insurer Covered Person's or Settling Insurer's

corporate veil should be pierced on account of Claims against a Person that is not a Participating Party, Non-Debtor CGL Settling Insurer Covered Person, or Settling Insurer or based on any other theory under which the legal separateness of any Person and any other Person may be disregarded to impose liability for a Claim on either such Person. For the avoidance of doubt and notwithstanding anything to the contrary herein, no Claim by any Person, including an Abuse Claimant or Future Claimant, against an Excluded Party may be a Channeled Claim.

**1.1.26. "Channeled Claimant"** means a Holder of a Channeled Claim.

**1.1.27. "Channeling Injunction"** means the injunction provided for under Article XII of the Plan.

**1.1.28. "Chapter 11 Case"** means the case under Chapter 11 of the Bankruptcy Code commenced by USA Gymnastics on December 5, 2018 in the Bankruptcy Court, Case No. 18-09108-RLM-11.

**1.1.29. "Claim"** means any past, present, or future claim, demand, action, request, formal or informal subpoena, cause of action, suit, proceeding, or liability of any kind or nature whatsoever, whether at law or equity, known or unknown, actual or alleged, asserted or not asserted, suspected or not suspected, anticipated or unanticipated, accrued or not accrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive, or exemplary damages) or equitable, mandatory, injunctive, or any other type of relief, including cross-claims, counterclaims, third-party claims, suits, lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights, causes of action or orders, and any claim within the definition of "Claim" in Section 101(5) of the Bankruptcy Code.

**1.1.30. "Claims Agent"** means Omni Agent Solutions, Inc., the Court appointed Claims and Noticing Agent.

**1.1.31. "Claimant"** means a Holder of a Claim.

**1.1.32. "Class"** means a class of Claims as classified under the Plan.

**1.1.33. "Conditional Payment"** means any payment made pursuant to Section 1395y(b)(2)(B) of the MSP.

**1.1.34. "Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order.

**1.1.35. "Confirmation Hearing"** means the hearing held by the Bankruptcy Court regarding confirmation of the Plan, as such may be continued from time to time.

**1.1.36. "Confirmation Order"** means an order issued by the Bankruptcy Court confirming the Plan.

**1.1.37. "Costs Motion"** means USA Gymnastics' Motion For Partial Summary Judgment On Bankruptcy Defense Costs (Dkt. 406 in the Insurance Coverage Adversary

Proceeding), and the related proceedings in the United States District Court and any appeals or remand proceedings.

      **1.1.38. "Creditor"** shall have the meaning given to the term in Section 101(10) of the Bankruptcy Code.

      **1.1.39. "Debtor"** means USA Gymnastics, a 501(c)(3) not-for-profit organization incorporated in Texas.

      **1.1.40. "Debtor CGL Insurance Coverage"** means any insurance that is available under any Debtor CGL Insurance Policy, whether known or unknown to the Debtor, that provides indemnification to: (a) the Debtor or any Person that is a Related Person to the Debtor for any reason or that provides reimbursement for any costs and expenses incurred by the Debtor or any Related Person; or (b) a Participating Party or any Person that is a Related Person to a Participating Party; *provided, however,* Debtor CGL Insurance Coverage excludes any agreement or contract providing reinsurance to a Debtor CGL Settling Insurer.

      **1.1.41. "Debtor CGL Insurance Policies"** means a CGL Insurance Policy purchased by the Debtor from a Debtor CGL Insurer.

      **1.1.42. "Debtor CGL Insurer"** means Virginia Surety Company f/k/a Combined Specialty Insurance Company, National Casualty Company, Great American Assurance Company, TIG Insurance Company, ACE American Insurance Company f/k/a Cigna Insurance Company, and National Union Fire Insurance Company of Pittsburgh, Pa.

      **1.1.43. "Debtor CGL Settling Insurance Policy"** means an Insurance Policy of a Debtor CGL Settling Insurer listed on <u>Exhibit A</u> hereto.

      **1.1.44. "Debtor CGL Settling Insurer"** means a Debtor CGL Insurer that has accepted such Debtor CGL Insurer's CGL Insurer Settlement Offer.

      **1.1.45. "Debtor's Insurance Policies"** means any Debtor CGL Insurance Policy or Other Insurance Policy.

      **1.1.46. "Debtor's Professionals"** means Jenner & Block LLP, Miller Johnson P.L.C., Plews Shadley Racher & Braun LLP, APCO Worldwide LLC, Barnes & Thornburg LLP, BDO USA, LLP, Hilder & Associates, P.C., Pierce Atwood LLP, White & Amundson, P.C., Zuckerman Spaeder LLP, Krieg DeVault LLP, and all other professionals, if any, which the Debtor has retained or may retain to provide professional services in accordance with Sections 327(a), 327(b), and 327(e) of the Bankruptcy Code.

      **1.1.47. "Disclosure Statement"** means the Disclosure Statement relating to this Plan, as it may be amended from time to time.

      **1.1.48. "Disputed Claim"** means a Claim as to which a proof of Claim is filed or is deemed filed under Bankruptcy Rule 3003(b)(1), and as to which an objection: (a) has been timely filed; and (b) has neither been overruled nor denied by a Final Order and has not been withdrawn.

**1.1.49. "Distribution"** means any transfer of Cash or other property or instruments to a Claimant pursuant to the Plan.

**1.1.50. "District Court"** means the United States District Court for the Southern District of Indiana**.**

**1.1.51. "Effective Date"** means the first Business Day after the Confirmation Date upon which: (a) the conditions in Section 17.1 have been satisfied or waived; and (b) no stay of the Confirmation Order is in effect.

**1.1.52. "Estate"** means the estate created in this Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code.

**1.1.53. "Estimated Amount"** means the amount at which the Bankruptcy Court, pursuant to Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018(a), estimates any Claim.

**1.1.54. "Excluded Party"** means any Person who personally committed an act of Sexual Abuse that resulted or would result in a Claim against the Debtor or a Participating Party and the Persons or Entities listed on Exhibit D hereto.

**1.1.55. "Exculpated Parties"** means the Debtor, the Reorganized Debtor, the Debtor's Professionals, the FCR, the FCR's Professionals, the Survivors' Committee, the Survivors' Committee's members in their capacities as members of the Survivors' Committee, the Survivors' Committee's Professionals, the Mediators, Participating Parties, the Settling Insurers, and each of their respective Related Persons.  For the avoidance of doubt and notwithstanding anything to the contrary herein, no Excluded Party may be an Exculpated Party.

**1.1.56. "FCR"** means Fred Caruso, appointed pursuant to the *Order Authorizing Appointment of Future Claimants' Representative and Appointing Fred C. Caruso as Future Claimants' Representative* [Dkt. 516], entered by the Bankruptcy Court on May 17, 2019, and any successor or such other Person appointed by the Bankruptcy Court or otherwise.

**1.1.57. "FCR Claim"** means the Claim of the FCR on behalf of Future Claimants.

**1.1.58. "FCR's Professionals"** means Development Specialists, Inc., FrankGecker LLP, and all other professionals, if any, which the FCR has retained or may retain to provide professional services in accordance with the Bankruptcy Code and as approved by the Bankruptcy Court.

**1.1.59.  "Final Order"** means an order, judgment, or other decree (including any modification or amendment thereof) of the Bankruptcy Court, the District Court, or any other court having jurisdiction that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such appeal or review has been taken, it has been resolved and no longer remains pending.

**1.1.60. "Future Claim"** means a Claim by a Future Claimant.

**1.1.61. "Future Claimant"** means a Person who (a) held a Sexual Abuse Claim as of the Bar Date; and (b) meets one of the following criteria: (i) was under the age of majority under applicable state law as of March 1, 2019; (ii) as of March 1, 2019, the statute of limitations for such Person was tolled under applicable state law or had not begun to run under applicable state law, including because of a Sexual Abuse Claim based on repressed memory or similar theory; (iii) as of March 1, 2019, the Debtor was estopped under applicable state law from asserting the statute of limitations; or (iv) such Person's Sexual Abuse Claim was barred by the applicable statute of limitations as of March 1, 2019, but is or becomes no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revives such Claims; *provided, however*, that the following persons are not Future Claimants: any Person who has, at any time before the Bar Date, asserted a Sexual Abuse Claim, asserted a cause of action based on a Sexual Abuse Claim, provided notice of a Sexual Abuse Claim, or made a demand based on a Sexual Abuse Claim, or whose parent or guardian or other legal representative had done so on behalf of such Person, at any time before the Bar Date.

**1.1.62. "Future Claimant Allocation Protocol"** means the protocol for allocation of the Future Claimant Reserve, which is attached hereto as Exhibit I.

**1.1.63. "Future Claimant Reserve"** means a reserve of one percent (1.0%) of the Net Settlement Payment, which reserve is established to fund payments to Future Claimants pursuant to the terms of the Future Claimant Allocation Protocol.

**1.1.64. "General Unsecured Claim"** means any Claim against the Debtor that is not an Abuse Claim, USOPC Claim, the FCR Claim, a Class 8 Indemnification Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, or a Claim that is otherwise classified under the Plan.

**1.1.65. "General Unsecured Convenience Claim"** means any General Unsecured Claim in an amount of $500.00 or less, or voluntarily reduced to $500.00 by the Holder of such Claim. To the extent a Creditor filed multiple General Unsecured Claims, if those Claims in the aggregate exceed $500.00, none of those Claims will be treated as General Unsecured Convenience Claims, unless the Holder of those Claims voluntarily reduces their aggregate value to $500.00.

**1.1.66. "Holder"** means the legal or beneficial holder of any Claim or Interest.

**1.1.67. "Impaired"** shall have the meaning given to the term in Section 1124 of the Bankruptcy Code.

**1.1.68. "Indemnification Claim"** means any Person's Claim against the Debtor for contribution, indemnity, or reimbursement arising as a result of such Person having paid or defended against any Claim and any Claim for future amounts to be paid defending against or paying a Claim. The Claims listed on Exhibit B are Indemnification Claims.

**1.1.69. "Insurance Coverage"** means any insurance that is available under any CGL Insurance Policy or Other Insurance Policy, whether known or unknown to the Debtor, that provides indemnification to: (a) the Debtor or any Person that is a Related Person to the Debtor for any reason or that provides reimbursement for any costs and expenses incurred by the Debtor

or any Related Person; or (b) a Participating Party or any Person that is a Related Person to a Participating Party; *provided, however,* Insurance Coverage excludes any agreement or contract providing reinsurance to a Debtor CGL Settling Insurer or a USOPC Settling Insurer.

**1.1.70. "Insurance Coverage Adversary Proceeding"** means the adversary proceeding docketed as Adversary Proceeding No. 19-50012 pending in the Bankruptcy Court and any related proceedings in the District Court, the Court of Appeals for the Seventh Circuit, or the United States Supreme Court.

**1.1.71. "Insurance Reimbursement Claims"** means any Claims of the Debtor, the Estate, or the Reorganized Debtor against a Debtor CGL Insurer for reimbursement of fees and costs incurred in defense of any Claim or all Claims insured under the Debtor CGL Insurance Policies, including the Claim for recovery of the Debtor's fees and costs incurred in the Chapter 11 Case as set forth in the Costs Motion or any other motion seeking such reimbursement.

**1.1.72. "Karolyi Insurer"** means American Empire Surplus Lines Insurance Company.

**1.1.73. "Karolyi Release"** means the release provided for in Section 12.11.

**1.1.74. "Karolyi Settling Insurer"** means the Karolyi Insurer if it has accepted such Karolyi Settling Insurer's CGL Insurer Settlement Offer.

**1.1.75. "Karolyis"** means Marta Karolyi (aka Martha Karolyi), Bela Karolyi, Karolyi Training Camps, LLC, Karolyi's Elite, Karolyi World Gymnastics, BMK Partners, Ltd., and BMK Training Facilities, Ltd.

**1.1.76. "MAO"** means Medicare Advantage Organization under parts C and D of the MSMEA.

**1.1.77. "Mediators"** means the (a) Honorable Gregg W. Zive, United States Bankruptcy Judge for the District of Nevada; (b) Honorable James M. Carr, United States Bankruptcy Judge for the Southern District of Indiana; and (c) Paul Van Osselaer.

**1.1.78. "Medicare Beneficiary"** means any Abuse Claimant or Future Claimant who is a citizen or resident of the United States and whose Claim indicates that he or she was abused, in whole or in part, after December 5, 1980, and who has applied for, received, or is eligible to receive benefits under the MMSEA or the MSP.

**1.1.79. "Medicare Claims"** means Claims for benefits paid, received or accrued to an Abuse Claimant or Future Claimant pursuant to the MMSEA or the MSP.

**1.1.80. "Medicare Reporting Information"** means information that may be required to make a query or report a settlement to CMS or an MAO and may include the Person's full name, address, telephone number, date of birth, gender, last five digits of the Person's Social Security number, and Medicare Claim Number, if one exists.

**1.1.81. "Medicare Trust Fund"** means a U.S. Treasury-held trust fund account from which Medicare is funded or from which Medicare disbursements are paid, including the Hospital Insurance Trust Fund and the Supplementary Medical Insurance (SMI) Trust Fund.

**1.1.82. "MMSEA"** means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L. 110-173).

**1.1.83. "MSP"** means the Medicare Secondary Payer Act, codified at 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or amendments thereto.

**1.1.84. "Net Settlement Payment"** means the Total Settlement Demand Amount less the Twistars Payment and the Professional Fee Hold-Back.

**1.1.85. "Non-Debtor CGL Settling Insurer Covered Persons"** means any Person that has or may have a Claim to Insurance Coverage under a Debtor CGL Settling Insurer Policy, including the USOPC, the National Gymnastics Foundation, Twistars, the Karolyis, Rhonda Fahan, Stephen Penny, Paul Parilla, Amy White, Debra Van Horn, Kathy Scanlan, Kathy Scanlan LLC, Bob Colarossi, All Olympia Gymnastics Center, AOGC All Olympia Gymnastics Center, Artur Akopyan, and Galina Marinova. For the avoidance of doubt and notwithstanding anything to the contrary herein, no Excluded Party may be a Non-Debtor CGL Settling Insurer Covered Person.

**1.1.86. "Other Insurance Policy"** means any policy of insurance other than the Debtor CGL Insurance Policies, including directors' and officers' insurance, purchased by the Debtor that during any period of time provided Insurance Coverage to the Debtor, its predecessors, successors, or assigns, or any Persons that are Related Persons to the Debtor.

**1.1.87. "Other Insurers"** means (a) any Person, other than a CGL Insurer, that during any period of time either (i) provided Insurance Coverage (other than under a CGL Insurance Policy) to the Debtor and/or a Participating Party, or their predecessors, successors, or assigns, or (ii) issued an Other Insurance Policy to the Debtor, its predecessors, successors, or assigns; and (b) any Person owing a duty to defend and/or indemnify the Debtor under any Other Insurance Policy.

**1.1.88. "Other Priority Claim"** means a Priority Claim that is not a Priority Tax Claim.

**1.1.89. "Outstanding Amount"** shall have the meaning given to it in Section 3.7.

**1.1.90. "Participating Party"** means the USOPC, the Karolyis, Twistars, and any Person that becomes a Participating Party pursuant to the terms set forth in Section 11.5, and for each includes their respective employees, officers, agents, attorneys, and directors, but only to the extent acting in their capacities as such, all of which are providing or will provide consideration or a portion of the funding for the Plan in exchange for: (a) the release of any indemnification or contribution Claim by the Debtor against such Participating Party; (b) the benefit of the Channeling Injunction; and/or (c) any other benefits in favor of Participating Parties under the Plan. A Settling Insurer is not a Participating Party. A Participating Party shall release all of its Claims against the

Debtor, the Estate, and the Reorganized Debtor, and each of their respective Related Persons. The list of current Participating Parties is attached hereto as <u>Exhibit C</u>.

**1.1.91. "Participating Party Claim"** means any Claims asserted by a Participating Party against the Debtor, including Class 8 Indemnification Claims and the USOPC Claim if the party asserting the Class 8 Indemnification Claim or the USOPC are a Participating Party.

**1.1.92. "Person"** means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof and any other individual or entity within the definition of (a) "person" in Section 101(41) of the Bankruptcy Code; or (b) "entity" in Section 101(15) of the Bankruptcy Code.

**1.1.93. "Petition Date"** means December 5, 2018, the date on which the Debtor commenced the Chapter 11 Case.

**1.1.94. "Plan"** means the Chapter 11 plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, and including any and all exhibits to the Plan and Plan Documents.

**1.1.95. "Plan Documents"** means all agreements, documents, and exhibits, as the same may be amended, modified, supplemented, or restated from time to time, that are necessary or appropriate to implement the Plan.

**1.1.96. "Plan Support Agreement"** means that certain USA Gymnastics Plan Support Agreement first dated as of May 6, 2021 between and among the Debtor, the Survivors' Committee, and the Accepting Parties who sign it, and any amendments to the Plan Support Agreement.

**1.1.97. "PNC Bank"** means PNC Financial Services Group d/b/a PNC Bank, N.A.

**1.1.98. "PNC Bank Claim"** means the Claim of PNC Bank listed by the Debtor on the Schedules.

**1.1.99. "PPP Loan Claim"** means the Claim of PNC Bank under the Paycheck Protection Program Term Note dated June 26, 2020.

**1.1.100. "Priority Claim"** means any Claim which, if Allowed, would be entitled to priority under Section 507 of the Bankruptcy Code.

**1.1.101. "Priority Claimant"** means the Holder of a Priority Claim.

**1.1.102.** **"Priority Tax Claim"** means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

**1.1.103.** **"Professional"** means any professional employed or to be compensated pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

**1.1.104.** **"Professional Claim"** means a Claim for compensation for services and/or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Chapter 11 case.

**1.1.105.** **"Professional Claims Bar Date"** means (a) forty-five (45) days after a notice of the Effective Date is filed with the Bankruptcy Court and served on such Professional or other Persons; or (b) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 45-day period.

**1.1.106.** **"Professional Fee Hold-Back"** means the amount retained by the Debtor or the Reorganized Debtor from the Total Settlement Demand Amount to pay Professional Claims through the Effective Date.

**1.1.107.** **"Pro Rata"** means, with respect to any Distribution on account of any Allowed Claim in any Class, the ratio of (a) the amount of such Allowed Claim to (b) the sum of (i) all Allowed Claims in such Class and (ii) the aggregate maximum of all Allowed Claims in such Class.

**1.1.108.** **"Protected Parties"** or "**Protected Party**" means the Debtor, the Estate, the Reorganized Debtor, any Participating Party, any Settling Insurer, any Non-Debtor CGL Settling Insurer Covered Person, and their respective Related Persons.  For the avoidance of doubt and notwithstanding anything to the contrary herein, no Excluded Party may be a Protected Party.

**1.1.109.** **"Related Person"** means, with respect to any Person, such Person's predecessors, successors, assigns, and present and former shareholders, affiliates, parents, subsidiaries, employees, agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such; *provided, however*, that no Person shall be a Related Person if such Person is an Excluded Party.

**1.1.110.** **"Released Parties"** means (a) a Participating Party; (b) the Participating Party's Related Persons; (c) a Settling Insurer, but only to the extent that such Settling Insurer's liability arises out of, or relates to, the Settling Insurance Policies; (d) a Settling Insurer's Related Persons, but only to the extent such Person's liability arises out of, or relates to, the Settling Insurance Policies; and (e) the Non-Debtor CGL Settling Insurer Covered Persons; *provided, however*, that the scope of any release for a Non-Debtor CGL Settling Insurer Covered Person under this Plan shall apply only to the extent of the liability for such Person that is covered by Insurance Policies issued by the Settling Insurer or that is covered by a Claim of indemnity against the Debtor. The term "Released Parties" does not include any Excluded Party.

11

1.1.111.    **"Reorganized Debtor"** means USA Gymnastics, on and after the Effective Date.

1.1.112.    **"Revested Assets"** means all assets and property, real or personal, owned by the Debtor that shall be revested in the Reorganized Debtor, pursuant to Sections 1141(b) and 1123(a)(5) of the Bankruptcy Code, on the Effective Date.

1.1.113.    **"RRE" or Responsible Reporting Entity"** means an entity with responsibility to ensure fulfillment of the reporting and reimbursement requirements, if any under the MSP and the MMSEA.

1.1.114.    **"Schedules"** means the *Schedules of Assets and Liabilities* and *Statement of Financial Affairs* of the Debtor, as amended, filed pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, including any supplements or amendments thereto through the Confirmation Date [Dkts. 205, 206, 218, 219, 220, 242, 337, 474].

1.1.115.    **"Settlement Trustee"** means the trustee of the Trust, who initially will be William L. Bettinelli, or such other Person the Survivors' Committee selects and any successor trustee appointed pursuant to the terms of this Plan and the Trust Documents.

1.1.116.    **"Settling Insurance Policies"** means the CGL Insurance Policies listed on Exhibit A hereto.

1.1.117.    **"Settling Insurer"** means the Debtor CGL Insurers, the Twistars Settling Insurers, the Karolyi Insurer, and the USOPC Settling Insurers. A Settling Insurer's predecessors, successors, and assigns shall receive the benefits and protections afforded to a Settling Insurer under the Plan, but only to the extent that: (i) such predecessor's liability was assumed by the Settling Insurer, and not independent of the liability of such Settling Insurer; and (ii) such successor's or assign's liability is derivative of the liability of the Settling Insurer and not independent of the liability of the Settling Insurer.

1.1.118.    **"Settling Insurer Injunction"** means the injunctions provided in Section 12.4.

1.1.119.    **"Sexual Abuse"** means any and all acts or omissions that the Debtor or a Protected Party may be or is alleged to be legally responsible for that arise out of, are based upon, or involve sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, or any other sexual misconduct or injury, or contacts or interactions of a sexual nature between an adult or child and a medical professional, coach, trainer, therapist, volunteer, or other authority figure allegedly affiliated with the Debtor, as a member or otherwise, or any current or former employee or volunteer of the Debtor, or any other Person for whose acts or failures the Debtor is or was allegedly responsible, or the alleged failure by the Debtor or a Protected Party or their respective alleged agents, employees, or volunteers to report the same. An adult or child may have been sexually abused whether or not this activity involved explicit force, whether or not this activity involved genital or other physical contact, and whether or not there was physical,

12

psychological, or emotional harm to the adult or child. With regard to USOPC, the term "Sexual Abuse" does not include any actual or alleged acts or omissions of the nature contemplated by this provision involving athletes, medical professionals, coaches, trainers, therapists, volunteers, authority figures, or other individuals unless such Abuse Claim relates to the Debtor.

      1.1.120.      **"Sexual Abuse Claim"** means a Claim arising from or relating to Sexual Abuse.

      1.1.121.      **"Sharp Claim"** means the secured Claim of Sharp Business Systems, as assigned to Wells Fargo Financial Leasing, Inc.

      1.1.122.      **"Survivors' Committee"** means the Additional Tort Claimants Committee Of Sexual Abuse Survivors, appointed by the U.S. Trustee on December 19, 2018.

      1.1.123.      **"Survivors' Committee's Professionals"** means Pachulski Stang Ziehl & Jones LLP, Rubin & Levin, P.C., and all other professionals, if any, which the Survivors' Committee has retained or may retain to provide professional services in accordance with Section 1103(a) of the Bankruptcy Code and as approved by the Bankruptcy Court.

      1.1.124.      **"Total Settlement Demand Amount"** means $380,000,000, which represents the aggregate amount of the CGL Insurer Settlement Offers, the Twistars Payment, the USOPC Out-of-Pocket Contribution and the USAG Contribution.

      1.1.125.      **"Trust"** means the trust to be established pursuant to the Plan and the Trust Agreement.

      1.1.126.      **"Trust Agreement"** means the agreement between and among the Debtor, the Survivors' Committee and the Settlement Trustee governing the Trust.

      1.1.127.      **"Trust Assets"** means all property funded to the Trust pursuant to Section 9.2.2.

      1.1.128.      **"Trust Documents"** means the Trust Agreement and all other instruments and other documents that are reasonably necessary or desirable in order to implement the provisions of the Plan that relate to the creation, funding, and administration of the Trust.

      1.1.129.      **"Trust Expenses"** means the costs of administering the Trust, including payments to the Settlement Trustee and payments to or on behalf of professionals retained to represent the Trust.

      1.1.130.      **"Trust Reserve"** means a reserve sufficient to fund Trust Expenses to be established by the Trustee.

      1.1.131.      **"Twistars"** means Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA, Geddert's Twistars USA Gymnastics Club, Inc., Twistars USA, Inc., John Geddert, and Kathryn Geddert.

1.1.132.       **"Twistars Payment"** means the $2,125,000.00 to be paid pursuant to the Twistars Settlement.

1.1.133.       **"Twistars Settlement"** means that certain settlement agreement between Twistars, the Twistars Settling Insurers, and certain Holders of Class 6 Claims.

1.1.134.       **"Twistars Settling Insurers"** means Philadelphia Indemnity Insurance Company, Lexington Insurance Company, New Hampshire Insurance Company, Nationwide Mutual Insurance Company, and State Farm Fire and Casualty Company.

1.1.135.       **"Undeliverable Distribution"** means a Distribution that was returned to the Reorganized Debtor as undeliverable, and which shall be deemed an Undeliverable Distribution on the date that such Distribution was returned.

1.1.136.       **"USAG Contribution"** means $6,150,000, which amount shall be funded with the proceeds of the USOPC Loan.

1.1.137.       **"U.S. Trustee"** means the Office of the United States Trustee for Region 10, which includes the Southern District of Indiana.

1.1.138.       **"USOPC"** means the United States Olympic and Paralympic Committee.

1.1.139.       **"USOPC Out-of-Pocket Contribution"** means $34,392,689.

1.1.140.       **"USOPC Claim"** means General Unsecured Claim No. 299.

1.1.141.       **"USOPC Insurers"** means Virginia Surety Company f/k/a/ Combined Specialty Insurance Company, National Casualty Company, Great American Assurance Company, TIG Insurance Company, Gemini Insurance Company, and Philadelphia Indemnity Insurance Company.

1.1.142.       **"USOPC Loan"** means a loan in the amount of $6,150,000 made to USAG on the Effective Date to be used to fund the USAG Contribution. The loan shall be evidenced by a note, shall not bear interest, shall be repayable over ten years on an amortization schedule to be agreed upon by USAG and the USOPC, shall be subject to such other terms that are acceptable to the USOPC, and shall not constitute a liability for purposes of the USOPC's auditing of USAG.

1.1.143.       **"USOPC Release"** means the release provided for in Section 12.10.

1.1.144.       **"USOPC Settling Insurers"** means any USOPC Insurer that accepts such USOPC Insurer's CGL Insurer Settlement Offer.

## ARTICLE II.  INTERPRETATION

**2.1     Bankruptcy Code Section 102.** The rules of construction in Bankruptcy Code Section 102 apply to this Plan to the extent not inconsistent with any other provision of this Article II.

**2.2     Undefined Terms.** Any term that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**2.3     Plan Definitions Control.** The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, or the Disclosure Statement.

**2.4     Include and Including.** The terms "including" or "include(s)" are intended to be illustrative and not exhaustive, and shall be construed as "including, but not limited to" or "include(s), but is not limited to."

**2.5     Plural and Singular Terms.** Whenever the context requires, terms shall include the plural as well as the singular number, and the masculine gender shall include the feminine and the feminine gender shall include the masculine.

**2.6     References to Court Filings.** Unless the context should otherwise require, all references to documents to be filed shall refer to filing with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.

**2.7     Inclusion of Amended Agreements.** Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified, or supplemented.

**2.8     Exhibits.** Unless otherwise specified, all references in the Plan to "Articles," "Sections," "Exhibits" and "Schedules" are references to Articles, Sections, Exhibits and "Schedules" of or to the Plan.

**2.9     Herein/Hereof/Hereto.** The words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan.

**2.10     Headings.** Captions and headings to Articles and Sections are inserted for ease of reference only and shall not be considered a part of the Plan or otherwise affect the interpretation of the Plan.

**2.11     No Admissions.** The Plan makes no judgments about the validity of, or insurance coverage for, any particular Claims. Nothing contained in this Plan constitutes an admission by any Person of liability or insurance coverage for, or the validity, priority, amount, or extent of, any Claim, lien, or security interest asserted against the Debtor or against any third party. The fact that a CGL Insurer agreed to make an Agreed CGL Insurer Payment is not an admission of liability.

**2.12    Computation of Time.** In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply. If any act under the Plan is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Enlargement of any period of time prescribed or allowed by the Plan shall be governed by the provisions of Bankruptcy Rule 9006(b).

**2.13    Merger.** The Plan supersedes all prior plans, drafts of the Plan, and all prior negotiations, agreements, and understandings with respect to the Plan, evidence of which shall not affect the interpretation of any provision of the Plan.

## ARTICLE III.  MEANS OF FUNDING THE PLAN

**3.1    Plan's Objective**. The Plan provides the means for settling and paying all Claims asserted against the Debtor. With respect to holders of General Unsecured Claims that do not elect treatment as General Unsecured Convenience Claims, such Claims will receive payments over three years in an amount equal to eighty (80%) percent of such Holder's Allowed Claim. With respect to Abuse Claims, the USOPC Claim, the Class 8 Indemnification Claims, the Class 9 FCR Claim, and the Class 10 Claims, the Plan provides for a Trust funded with the Total Settlement Demand Amount.

**3.1.1.  Settlement With the Debtor CGL Insurers, USOPC Insurers, and USOPC.** The Total Settlement Demand Amount has been committed. Each of the Debtor CGL Insurers, the Karolyi Insurer, and the USOPC Insurers has accepted its CGL Insurer Settlement Offer. The USOPC has agreed to make the USOPC Out-of-Pocket Contribution and to make the USOPC Loan to the Debtor so that the Debtor can make the USAG Contribution. The Plan provides for the creation of a Trust for the exclusive benefit of Abuse Claimants and Future Claimants. The Trust Assets will consist of the Net Settlement Payment and the Twistars Payment. Trust Assets will be used to fund Distributions to holders of Abuse Claims and holders of Future Claims.

A Future Claims Reserve will be established for the payment of any Future Claims and any amounts remaining in the Future Claims Reserve will revert to the Trust's general funds for use and Distribution as set forth in the Trust Agreement after five years. Distributions and reserves from the Trust to Abuse Claimants and Future Claimants will be determined by application of the Allocation Protocol and the Future Claimant Allocation Protocol, as the case may be. Subject to Section 11.6 of the Plan, Sexual Abuse Claims filed after the Bar Date or not deemed to be filed by the Bar Date will not receive any Distribution from the Trust, but will be channeled to the Trust and subject to the Channeling Injunction.

Each Protected Party will receive the benefit of injunctions and releases provided under this Plan, including under Article XII of the Plan. Nothing in this Plan is intended to replace and does not affect, diminish or impair the liabilities of any Person that is not a Protected Party under applicable non-bankruptcy law, including the law governing joint and several liabilities.

### 3.2    Survivors' Committee's Offer to Resolve Abuse Claims.

**3.2.1.    Survivors' Committee's Offer to the CGL Insurance Carriers.** Through the Plan, the Survivors' Committee offers to fully and finally resolve all Abuse Claims and the FCR Claim against the Debtor and its Related Persons, the USOPC and its Related Persons, the Karolyis and their Related Persons, the Settling Insurers, and the Non-Debtor CGL Settling Insurer Covered Persons.  This is a compromise resolution of the contested Abuse Claims based upon a reasonable assessment of the risks and potential costs of continued litigation.

**3.2.2.    The CGL Insurer Settlement Offer.** The CGL Insurer Settlement Offer made to each CGL Insurer set forth in Section 3.2.4 below is an independent offer to compromise with that CGL Insurer for Claims potentially triggering such CGL Insurer's applicable CGL Insurance Policies and is contingent only upon: (i) the Holders of Class 6 Claims voting to accept the Plan; (ii) the acceptance of all CGL Insurer Settlement Offers by each and every CGL Insurer (for the avoidance of doubt, acceptance of the CGL Insurer Settlement Offers means, with respect to a CGL Insurer that also issued policies to the USOPC and/or the Karolyis, the acceptance of the total CGL Insurer Settlement Offer for each of those policies, as set forth below); and (iii) certain judicial determinations described below.

**3.2.3.    Survivors' Committee's Agreement with Twistars.** The Plan provides for the implementation of the Twistars Settlement and the contribution of the Twistars Payment to the Trust. Twistars, the Twistars Settling Insurers, and certain Holders of Class 6 Claims agreed to the Twistars Settlement conditioned upon the Twistars Settlement being implemented through a plan of reorganization for the Debtor that provided for a channeling injunction that protected Twistars and the Twistars Settling Insurers. The Debtor was not a party to the Twistars Settlement; however, the Debtor has agreed to implement the Twistars Settlement through the Plan. On the Effective Date, the Twistars Settling Insurers shall make the Twistars Payment to the Trust by wire transfer or check.

### 3.2.4.   CGL Insurer Settlement Offers and Twistars Payment.

| CGL Insurers and Twistars Settling Insurers | CGL Insurer Settlement Offer |
|---|---|
| **Virginia Surety Company (f/k/a Combined Specialty Insurance Company)**<br>    Debtor policies<br>    USOPC policies | <br><br><br>$23,500,000<br>$3,500,000<br><br>**Total: $27,000,000** |
| **National Casualty Company**<br>    Debtor policies<br>    USOPC policies | <br>$158,000,000<br>$42,000,000<br><br>**Total: $200,000,000** |
| **TIG Insurance Company**<br>    Debtor policies<br>    USOPC policies | <br>$32,081,108.85<br>$12,918,891.15<br><br>**Total: $45,000,000** |
| **CIGNA Insurance Company (n/k/a ACE American Insurance Company)**<br>(Debtor policies Only) | **Total: $17,500,000** |
| **National Union Fire Insurance Company of Pittsburgh, P.A. (n/k/a AIG)**<br>(Debtor policies Only) | **Total: $8,500,000** |
| **Gemini Insurance Company**<br>(USOPC policies Only) | **Total: $2,429,000** |
| **Great American Assurance Company**<br>    Debtor policies<br>    USOPC policies<br><br>**American Empire Surplus Lines Insurance Company**<br>    Karolyi policies | <br>$23,679,453<br>$11,002,454<br><br><br><br>$318,093<br><br>**Total: $35,000,000** |

18

| CGL Insurers and Twistars Settling Insurers | CGL Insurer Settlement Offer |
|---|---|
| **Philadelphia Indemnity Insurance Company** (USOPC policies Only) | **Total: $1,903,311** |
| **Philadelphia Indemnity Insurance Company, Lexington Insurance Company, New Hampshire Insurance Company, Nationwide Mutual Insurance Company, and State Farm Fire and Casualty Company** (Twistars Settling Insurers) | **Total: $2,125,000** |
| **Total CGL Settlement Offers and Twistars Payment:** | **$339,457,311** |

As of the date of this Plan, all of the Debtor CGL Insurers, USOPC Insurers, and the Karoyli Insurer have accepted their CGL Insurer Settlement Offer.

**3.3     Debtor's Representations.** The Debtor supports the CGL Insurer Settlement Offers and has demanded that the Debtor CGL Insurers accept the CGL Insurer Settlement Offers. In support of the CGL Insurer Settlement Offers, the Debtor has agreed that on the Effective Date, each Debtor CGL Settling Insurer may buy-back its Debtor CGL Insurance Policies pursuant to the Buy-Back Agreement. The Debtor has agreed that it will obtain approval of such Buy-Back Agreements pursuant to Bankruptcy Code §363(b), (f), §1123(a)(5), (b)(6) and §1129. The USOPC has agreed that on the Effective Date, it will provide the USOPC Release to each of the USOPC Settling Insurers (other than with respect to an Abuse Claim for which USOPC has not received a release from the Sexual Abuse Claimant) and the Karolyis have agreed that on the Effective Date they will provide the Karolyi Release to the Karolyi Settling Insurer (other than with respect to an Abuse Claim for which the Karolyis have not received a release from the Sexual Abuse Claimant). In addition to the other Persons receiving the benefit of the Plan's Channeling Injunction and other injunctions and releases, each Settling Insurer will receive the benefit of the Plan's Channeling Injunction and other injunctions and releases set forth in this Plan. The support of the Debtor, the USOPC, or the Karolyis for the CGL Insurer Settlement Offers, shall not be deemed to be an admission of liability of any sort by any Person, and may not be proffered as such in any forum.

**3.4     Funding of USOPC and USAG Contributions.** On the Effective Date, USOPC will make the USOPC Out-of-Pocket Contribution by wire transfer to the Trust. On the Effective Date the Debtor will make the USAG Contribution by making a wire transfer of the USOPC Loan proceeds to the Trust or, in the discretion of the Debtor and the USOPC, the USOPC may wire the USOPC Loan proceeds directly to the Trust.

**3.5     Funding of Agreed CGL Insurer Payments.** On the Effective Date, (i) each Debtor CGL Settling Insurer shall make its Agreed CGL Insurer Settlement Payment by wire transfer or check to the Debtor pursuant to such Settling Insurer's Buy-Back Agreement; (ii)

19

Twistars shall make the Twistars Payment to the Trust; (iii) each USOPC Insurer and the Karolyi Insurer shall make its Agreed CGL Insurer Payment to the Trust; and (iv) the Trust will be established pursuant to the Trust Agreement for the exclusive benefit of the Holders of Abuse Claims and the FCR Claim. Upon receipt of the Agreed CGL Insurer Payments from the Settling Insurers and any contributions from the Participating Parties, the Debtor will wire the Net Settlement Payment to the Trust.

3.6     **Resolution of the Insurance Coverage Adversary Proceeding as to the Settling Insurers.** The Confirmation Order shall provide that, subject to the occurrence of the Effective Date, the Debtor and any other plaintiffs shall dismiss with prejudice any and all Claims against the Settling Insurers in the Insurance Coverage Adversary Proceeding, with each party to bear its own costs, *provided, however*, that such dismissal shall not affect the Claims of the Debtor against Liberty Insurance Underwriters, Inc. or any other defendant in the Insurance Coverage Adversary Proceeding that is not a Settling Insurer.

3.7     **Debtor CGL Settling Insurers' Obligation to Reimburse the Debtor for Insurance Reimbursement Claims**. The Debtor CGL Settling Insurers will continue to pay any reasonable and necessary attorneys' fees, costs, and/or expenses incurred by the Debtor of the same nature and type that such Settling Insurer has historically been paying on behalf of the Debtor, in the ordinary course of business since the Petition Date and prior to the Effective Date, pursuant to the Debtor CGL Settling Insurance Policies, including but not limited to the policies listed on Exhibit A, but such obligation shall not include any fees or costs of the nature and/or type sought in the Costs Motion, and/or any fees or costs for a claim for which that Settling Insurer previously denied coverage. To the extent any such amounts are outstanding on the Effective Date (the "**Outstanding Amount**"), the Debtor CGL Settling Insurer which owes such Outstanding Amount shall pay such Outstanding Amount to the Debtor or its applicable vendor on the Effective Date and the Debtor shall retain such Outstanding Amount (if applicable) and shall not be obligated to transfer such Outstanding Amount to the Trust. The payment of an Outstanding Amount shall be in addition to the payment of the Debtor CGL Settling Insurers' Agreed CGL Insurer Payment. All invoices for Outstanding Amounts must be submitted to the Debtor CGL Settling Insurers ten days before the Confirmation Hearing. If a Debtor CGL Settling Insurer disputes the Outstanding Amount, it shall notify the Debtor of such dispute within five days of the Confirmation Hearing and the Bankruptcy Court will resolve any such dispute as part of approving the buy-back of the Debtor CGL Settling Insurer's Policies. The Debtor retains the right to continue to pursue collection of the Outstanding Amounts and any additional amounts that may come due after the Effective Date from any of the Debtor's Other Insurers. Consistent with the foregoing, the Outstanding Amount owed by a Debtor CGL Settling Insurer on the Effective Date shall not include any attorneys' fees, costs, or expenses for which the Debtor is seeking reimbursement in the Costs Motion. If the Outstanding Amounts owed to EPIQ are still the subject of an on-going arbitration or otherwise in dispute as of the Effective Date, the existence of any Outstanding Amounts owed by any Debtor CGL Settling Insurer to EPIQ shall in no way prevent any Debtor CGL Settling Insurer from having all of the protections afforded a Debtor CGL Settling Insurer under this Plan. If such arbitration or other dispute is resolved against a Debtor CGL Settling Insurer after the Effective Date, the Debtor CGL Settling Insurer shall pay or otherwise settle the

amounts determined to be due to EPIQ by such Debtor CGL Settling Insurer notwithstanding the Buy-Back Agreement with such Debtor CGL Settling Insurer.

 **3.8 Class 8 Indemnification Claims and USOPC Claim.** The Holders of the Class 8 Indemnification Claims and the USOPC Claim and their related Released Parties will receive the benefits of the Channeling Injunction and the other releases, covenants not to execute, injunctions and related provisions under this Plan, including the Trust's obligation to indemnify and defend a Protected Party with respect to Channeled Claims (as set forth in Section 9.10), in full and complete satisfaction of such Claims and will not receive any payment from the Trust (other than any payment required under Section 9.10), or the Debtor, or the Estate. The Holders of Class 8 Indemnification Claims and the USOPC Claim shall not be entitled to recover on account of their Class 8 Indemnification Claims and the USOPC Claim from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. For the avoidance of doubt, to the extent of any conflict between the terms of this Plan, on the one hand, and the Debtor's bylaws or any agreement between the Debtor and the Holders of the USOPC Claim or a Class 8 Indemnification Claim, on the other, this Plan controls.

 **3.9 Sexual Abuse Claims Filed After the Bar Date or Not Deemed to Be Timely Filed.** Pursuant to Section 11.6, Holders of Class 10 Claims may file a Claim with the Settlement Trustee to be deemed a Future Claimant and may recover from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Settlement Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim.

 **3.10 Claims Other Than Abuse Claims, the Class 7 USOPC Claim, the Class 8 Indemnification Claims, the Class 9 FCR Claim, and the Class 10 Claims**. General Unsecured Claims will be paid from existing and future revenues of the Reorganized Debtor over time in accordance with the Plan. The Allowed Other Priority Claims, the PNC Bank Claim, the Sharp Claim, the PPP Loan Claim, and General Unsecured Convenience Claims are unimpaired under the Plan.

 **3.11 Discharge.** The Debtor will receive the benefit of a Section 1141(d) discharge.

## ARTICLE IV.  TREATMENT OF UNCLASSIFIED CLAIMS

 **4.1 Administrative Claims.** Requests for allowance and payment of Administrative Claims must be filed and served no later than thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court. Each Holder of an Allowed Administrative Claim against the Debtor shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash equal to the Allowed amount of such Allowed Administrative Claim, either (a) on or as soon as practicable following the Effective Date, or, if later, the Allowance Date; or (b) upon such terms as may be agreed to in writing by the Administrative Claimant. *Provided, however*, that any Administrative Claim incurred post-petition by the Debtor in the ordinary course of its operations or arising pursuant to one or more post-petition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, including the PPP Loan Claim, shall be paid or performed in accordance with the terms and conditions of the particular transaction(s) and any agreement(s)

relating thereto by the Debtor before the Effective Date or by the Reorganized Debtor after the Effective Date, or as otherwise agreed by the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), on the one hand, and the Holder of such Administrative Claim, on the other. The PPP Loan Claim has been forgiven.

**4.2    Professional Claims**.

**4.2.1.  Bar Dates for Professional Claims.** All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b), and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Chapter 11 Case) shall file and serve in accordance with the Bankruptcy Court's case management order an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than the Professional Claims Bar Date.

**4.2.2.  Objections to Professional Claims.** Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtor and the Professionals or other Persons to whose application the objections are addressed on or before (a) twenty-one (21) days after the Professional Claims Bar Date; or (b) such later date as (i) the Bankruptcy Court shall order upon application made prior to the end of such 21-day period or (ii) is agreed between the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), as applicable, and the affected Professional or other Person.

**4.3    U.S. Trustee Fees.** All fees due and payable pursuant to 28 U.S.C. § 1930 and not paid prior to the Effective Date shall be paid in Cash as soon as practicable after the Effective Date. After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Chapter 11 Case is closed and a final decree is entered under Rule 3022 of the Bankruptcy Rules. In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Debtor and the Estate.

**4.4    Priority Tax Claims.** With respect to each Allowed Priority Tax Claim not paid prior to the Effective Date, the Reorganized Debtor shall (a) pay such Claim in Cash as soon as practicable after the Effective Date; or (b) provide such other treatment agreed to by the Holder of such Allowed Priority Tax Claim and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

## ARTICLE V.  CLASSIFICATION OF CLAIMS

**5.1    Classification of Claims.** All Claims except Administrative Claims and Priority Tax Claims are placed in the following Classes for all purposes including voting, confirmation of the Plan, and Distributions pursuant to the Plan. A Claim is classified in a particular Class only to the extent the Claim qualifies within the description of that Class and is classified in a different Class to the extent the Claim qualifies within the description of that different Class. Except as

22

otherwise provided under the Bankruptcy Code or applicable law, if a Claim (other than a Claim entitled to priority status under Section 507 of the Bankruptcy Code) is acquired or transferred, the Claim will be placed in the Class where it would have been placed if it were owned by the original Holder of such Claim. If a Claimant has more than one Claim in the same Class, such Claims will be aggregated and treated as a single Claim. If a Claimant has Claims in different Classes, such Claims will be aggregated only within the same Class and not between Classes.

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|-------|-------------|------------|--------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | PNC Bank Claim | Unimpaired | Deemed to Accept |
| 3 | Sharp Claim | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Convenience Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Abuse Claims | Impaired | Yes |
| 7 | USOPC Claim | Impaired | Yes |
| 8 | Indemnification Claims (other than the USOPC Claim which is separately classified in Class 7) | Impaired | Yes |
| 9 | FCR Claim | Impaired | Yes |
| 10 | Sexual Abuse Claims filed after the Bar Date | Impaired | Yes |

**5.2    Treatment in Complete Satisfaction.** The treatment in this Plan is in full and complete satisfaction of all of the legal, contractual, and equitable rights that each Holder of a Claim may have against the Debtor, the Estate, or its Assets. This treatment supersedes and replaces any agreements or rights those Holders have in or against the Debtor, the Estate, or its Assets. All Distributions under the Plan will be tendered to the Person holding the Claim.

## ARTICLE VI.  TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS

**6.1    Class 1: Other Priority Claims**.

**6.1.1.    Impairment and Voting.** Class 1 is unimpaired under the Plan. Holders of Class 1 Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**6.1.2.    Treatment.** The Holders of Class 1 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

**6.2    Class 2: PNC Bank Claim.**

      **6.2.1.    Impairment and Voting.** Class 2 is unimpaired under the Plan. PNC Bank is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

      **6.2.2.    Treatment.** The VISA Commercial Card Agreement dated as of May 7, 2010, as amended from time to time, between PNC Bank and the Debtor shall be reinstated and become the obligation of the Reorganized Debtor.  PNC Bank shall retain all of its rights and collateral pledged under the VISA Commercial Card Agreement.

**6.3    Class 3: Sharp Claim.**

      **6.3.1.    Impairment and Voting.** Class 3 is unimpaired under the Plan. Sharp is deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and is not entitled to vote on the Plan.

      **6.3.2.    Treatment.** The Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement between Sharp Business Systems and the Debtor shall be deemed assumed and will become the obligation of the Reorganized Debtor. Sharp Business Systems shall retain all of its rights and collateral under the Value Lease Agreement, Equipment Sales Agreement, and Customer Care Maintenance Agreement.

**6.4    Class 4: General Unsecured Convenience Claims.**

      **6.4.1.    Impairment and Voting.** Class 4 is unimpaired under the Plan. The Holders of Class 4 Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

      **6.4.2.    Treatment.** The Holders of Class 4 Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed General Unsecured Convenience Claims in Cash, on or as soon as reasonably practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed General Unsecured Convenience Claims upon such terms as may be agreed in writing by the Claimant and the Debtor and the Estate (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date).

### ARTICLE VII.  TREATMENT OF IMPAIRED CLASSES OF CLAIMS

**7.1    Class 5: General Unsecured Claims**.

      **7.1.1.    Impairment and Voting.** Class 5 is impaired under the Plan. The Holders of Allowed General Unsecured Claims are entitled to vote on the Plan.

      **7.1.2.    Treatment.** The Holders of Allowed General Unsecured Claims will receive payment from the Reorganized Debtor of 80% of their Allowed General Unsecured Claims, payable in equal installments on August 15, 2022, August 15, 2023, and August 15, 2024; or, at the Reorganized Debtor's discretion, in less than three installments so long as the Reorganized Debtor accelerates payment to all Holders of Allowed General Unsecured Claims.

Holders of Allowed General Unsecured Claims may elect to reduce their Claim to $500, in which case their Claim will be treated as a Class 4 General Unsecured Convenience Claim for purposes of this Plan.

**7.2    Class 6: Abuse Claims**.

**7.2.1.    Impairment and Voting.** Class 6 is impaired under the Plan. The Holders of Allowed Abuse Claims are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 6 is deemed to be Allowed in the amount of $1.00.

**7.2.2.    Treatment of Class 6 Claims.** On the Effective Date of the Plan, the Trust shall assume all liability for and the Trust will pay all Class 6 Claims pursuant to the provisions of the Plan and the Trust Documents. No Holder of a Class 6 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date of the Plan. Except as otherwise provided in the Plan (including the Settling Insurer Injunction, the Channeling Injunction, the covenants not to execute against property and assets of a Protected Party, the exculpations, and the releases in this Plan), the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 6 Claims, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Bankruptcy Code Section 1141(d). Class 6 Claims will exclude Sexual Abuse Claims that are not filed by the Bar Date; *provided, however*, that pursuant to Section 21.2(f) of the Plan, the Bankruptcy Court may determine on a motion that an Abuse Claim is deemed to be filed before the Bar Date. The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents and the Allocation Protocol.

**7.3    Class 7: USOPC Claim**.

**7.3.1.    Impairment and Voting.** Class 7 is impaired under the Plan. The Holder of the USOPC Claim is entitled to vote on the Plan. Only for purposes of voting, the Claim in Class 7 is deemed to be $1.00.

**7.3.2.    Treatment of Class 7 Claim.** The Holder of the Class 7 Claim shall not receive a distribution under the Plan. All rights that the USOPC has to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's Insurance Policies, shall be satisfied by granting USOPC on account of the USOPC Claim the benefit of the Channeling Injunction and releases and exculpation provisions under this Plan and by deeming any Abuse Claim against the USOPC to be a Channeled Claim and USOPC to be a Participating Party and Protected Party. The USOPC shall not be entitled to recover from the Reorganized Debtor's Revested Assets, or property acquired by the Reorganized Debtor after the Effective Date of the Plan and shall be deemed to have released all Claims against the Debtor, the Estate, the Reorganized Debtor, and all rights and Claims arising under, relating to, or in connection with any of the Debtor's Insurance Policies issued by a Debtor CGL Settling Insurer.

7.4    **Class 8: Indemnification Claims**.

7.4.1.    **Impairment and Voting.** Class 8 is impaired under the Plan. The Holders of Class 8 Indemnification Claims are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 8 is deemed to be $1.00.

7.4.2.    **Treatment of Class 8 Claims.** Holders of Class 8 Claims shall not receive a distribution under the Plan. All rights that the Holder of a Class 8 Claim has to receive indemnification or reimbursement from the Debtor, including any right to receive reimbursement, indemnification, or a defense under any of the Debtor's Insurance Policies, shall be satisfied by granting the Holder of a Class 8 Claim the benefit of the Channeling Injunction, and the releases and exculpation provisions (to the extent applicable) under this Plan and by deeming any Abuse Claim against the Holder of a Class 8 Claim to be a Channeled Claim and the Holder of a Class 8 Claim a Protected Party. The Holders of Class 8 Claims shall not be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the effective date of the Plan and shall be deemed to have released all Claims against the Debtor, the Estate, the Reorganized Debtor, and all rights and Claims arising under, relating to, or in connection with any of the Debtor's Insurance Policies issued by a Debtor CGL Settling Insurer.

7.4.3.    **Stephen Penny's Class 8 Claim.** Stephen Penny's Class 8 Claim includes a statement that he is owed certain amounts for unpaid severance. The Debtor disputes this Claim. Mr. Penny's entire Claim including the amounts he alleges for unpaid severance will be treated as a Class 8 Indemnification Claim and will receive no Distribution on account of the portion of his Claim seeking recovery for his unpaid severance. If Mr. Penny objects to such treatment, the Debtor's Plan shall be treated as a request to equitably subordinate his Claim and to pay such Claim nothing under the Plan.

7.5    **Class 9: Future Claimants Representative Claim.**

7.5.1.    **Impairment and Voting.** Class 9 is impaired under the Plan. The FCR is deemed to be the Holder of the Class 9 Claim and is entitled to vote on the Plan on behalf of the Future Claimants. Only for purposes of voting, the Claim in Class 9 is deemed to be $1.00.

7.5.2.    **Treatment of Class 9 Claim.** On the Effective Date, the Trust shall assume all liability for and the Trust will pay all Class 9 Claims pursuant to the provisions of the Plan and the Trust Documents; *provided, however*, that no Holder of a Class 9 Claim shall have an interest in the Trust Assets other than the Future Claimant Reserve. No Holder of a Class 9 Claim shall be entitled to recover from the Reorganized Debtor's Revested Assets or property acquired by the Reorganized Debtor after the Effective Date. Except as otherwise provided in the Plan (including the Settling Insurer Injunction, the Channeling Injunction, and the exculpations and releases in this Plan), the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 9 Claims, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor, the Estate, or the Reorganized Debtor under this Plan and Section 1141(d) of the Bankruptcy Code.

7.6    **Class 10: Sexual Abuse Claims Filed After The Bar Date.**

      7.6.1.    **Impairment and Voting.** Holders of Allowed Sexual Abuse Claims Filed After the Bar Date are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 10 is deemed to be Allowed in the amount of $1.00.

      7.6.2.    **Treatment of Class 10 Claims.** Pursuant to Section 11.6 of the Plan, Holders of Class 10 Claims may file a Claim with the Settlement Trustee to be deemed a Future Claimant and may recover from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Settlement Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim.

## ARTICLE VIII.  ACCEPTANCE OR REJECTION OF PLAN

8.1    **Impaired Classes to Vote.** Each Holder of a Claim in an impaired Class shall be entitled to vote separately to accept or reject the Plan unless such Holder is deemed to accept or reject the Plan.

8.2    **Acceptance by Class of Creditors.** An impaired Class of Holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

## ARTICLE IX.  TRUST FUNDING AND FORMATION

9.1    **Establishment of Trust.** On the Effective Date, the Trust shall be established in accordance with the Trust Documents. The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq*. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference. On the Effective Date, the Trust will assume liability for all Channeled Claims, which shall include Abuse Claims, the USOPC Claim, Indemnification Claims, the FCR Claim, and any Claim against a Protected Party arising from, in connection with, or related in any way to a Channeled Claim. The Trust will control the allocation of Trust Assets to Abuse Claimants and Future Claimants pursuant to the terms of the Allocation Protocol, the Future Claims Allocation Protocol, the Trust Agreement, the Plan, the Plan Documents and the Confirmation Order.  The Settlement Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement. The

Trust shall be the applicable plan from which any Abuse Claimant and Future Claimant who might also be a Medicare Beneficiary receives payment on account of a Tort Claim.

**9.2** **Trust Formation and Funding**.

**9.2.1. Trust Purpose.** The Trust shall be established for the benefit of the Abuse Claimants and Future Claimants and will assume all liability for the Channeled Claims. The Trust will receive, liquidate, and distribute Trust Assets in accordance with this Plan and the Trust Documents. The proposed Trust Agreement is attached hereto as Exhibit F.

**9.2.2. Funding of Trust.** The Trust shall be funded, on or before the Effective Date, by: (a) the Net Settlement Payment; and (b) the Twistars Payment. Upon the funding of the Trust according to the respective amounts specified in Section 3.2.4, each Buy-Back Agreement shall be binding on the Trust and the Settlement Trustee and FCR.

**9.3** **Approval of Settlement and Buy-Back Agreements.** The entry of the Confirmation Order will constitute the order approving the compromises and settlements required under this Plan and approving the sales contemplated by the Buy-Back Agreements pursuant to 11 U.S.C. §363. The Bankruptcy Court's findings of fact in the Confirmation Order shall constitute its determination that such compromises and settlements and sales are in the best interests of the Debtor, the Claimants holding Abuse Claims, the Holders of other Claims, the Protected Parties and all other parties in interest, and are fair, equitable, and within the range of reasonableness, and an appropriate exercise of each such Person's business judgment under the applicable laws of corporate governance and that the Debtor CGL Settling Insurers are good faith purchasers within the meaning of Section 363(m) of the Bankruptcy Code.

**9.4** **Future Claimant Reserve.** The Trust shall establish a Future Claimant Reserve which shall be funded with one (1%) percent of the Net Settlement Payment. Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the FCR shall continue until he or his successor resigns or the funds in the Future Claimant Reserve are completely distributed as provided in Section 11.6 of the Plan.

**9.5** **Closing.** Closing under this Plan will be conducted in the offices of Jenner & Block, 353 North Clark Street, Chicago, Illinois, 60654, or at such other location designated by the Reorganized Debtor, as soon as reasonably practicable following the Confirmation Date for the purpose of the Reorganized Debtor, and the Participating Parties executing and delivering the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and fund the Trust and make other Distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after the conditions set forth in Section 17.1 have been satisfied or waived in accordance with Section 17.2, the Reorganized Debtor shall file a notice of the Closing and the occurrence of the Effective Date.

**9.6** **Appointment of the Settlement Trustee.** The initial Trustee shall be William L. Bettinelli. In the event Mr. Bettinelli elects not to serve, the Survivors' Committee shall identify the Settlement Trustee in a supplement to be filed within fourteen (14) days prior to the Confirmation Hearing. The Settlement Trustee shall commence serving as the Settlement Trustee on the Effective Date; *provided, however*, that the Settlement Trustee shall be permitted to act in

accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Debtor.  The Settlement Trustee shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

**9.7     Tax Matters.** The Trust shall not be deemed to be the same legal entity as the Debtor, but only the assignee of certain Assets of the Debtor and a representative of the Estate for delineated purposes within the meaning of Section 1123(b)(3) of the Bankruptcy Code. The Trust is expected to be tax exempt. The Settlement Trustee shall file such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code, the regulations promulgated thereunder, and applicable state law, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.

**9.8     Cooperation by the Debtor and Reorganized Debtor.** The Debtor, the Estate, the Reorganized Debtor, and their counsel shall reasonably cooperate with the Settlement Trustee as requested in connection with the Settlement Trustee's administration of the Trust.

**9.9     Objections to Channeled Claims.** No Person other than the Settlement Trustee has the right to object to the Channeled Claims, and any such objection will be prosecuted and resolved in accordance with the terms of the Trust Documents.

**9.10    Trust Indemnification Obligations.** From and after the Effective Date, the Trust shall be bound by the terms of the Plan and shall defend, indemnify, and hold harmless the Protected Parties with respect to any and all Channeled Claims, Medicare Claims, and Claims against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer relating to an Abuse Claim, including: all Claims made by (a) any Person claiming to be insured (as a named insured, additional insured, or otherwise) under any Settling Insurer Policy; (b) any Person who has made, will make, or can make (but for this Plan) an Abuse Claim or a Claim against the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling Insurer; (c) any Person who has actually or allegedly acquired or been assigned the right to make a Claim under any Settling Insurer Policy relating to Sexual Abuse or other abuse. The Protected Parties shall have the right to defend any Claims identified in this Section and shall do so in good faith. The Protected Parties may undertake the defense of any Claim on receipt of such Claim. The Protected Parties shall notify the Trust as soon as practicable of any Claims identified in this Section and of their choice of counsel. The Protected Parties may seek to enjoin such Claim and introduce a copy of the Confirmation Order in support thereof, and the Trust shall take all reasonable steps to join in and support such injunctive relief. The Protected Parties' defense of any Claims shall have no effect on the obligations of the Trust, as applicable, to indemnify any such party for such Claims, as set forth in this Section. The Trust shall promptly reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the Protected Parties in defending such Claims upon presentation of statements for such fees, expenses, costs, and amounts to the Trust. In defense of any such Claims, the Protected Parties may settle or otherwise resolve a Claim consistent with the terms of this Plan and with the prior consent of the indemnifying party,

which consent shall not be unreasonably withheld. The Settlement Trustee shall be obligated to ensure that the Trust complies in all respects with the obligations set forth herein.

## ARTICLE X.  NO CLAIMS AGAINST SETTLING INSURERS AND ABUSE CLAIMANTS' RIGHTS RESERVED

**10.1**  **[Intentionally Omitted].**

**10.2**  **[Intentionally Omitted].**

**10.3**  **[Intentionally Omitted].**

**10.4**  **[Intentionally Omitted].**

**10.5**  **[Intentionally Omitted].**

**10.6**  **[Intentionally Omitted].**

**10.7**  **No Claims Of Other Insurers Against Settling Insurers or Non-Debtor CGL Settling Insurer Covered Persons.** Consistent with the holdings in *Eli Lilly and Co. v. The Aetna Casualty and Surety Co., et al.*, Cause No. 49D12 0102 CP 000243 (Marion Cty. Sup. Ct. 2002) and *Southern Indiana Gas & Electric Company v. Admiral Ins. Co*., Cause No. 49D05 0411 PL 2265 (Marion Cty. Sup. Ct. 2011), the Confirmation Order shall order that any Other Insurer shall have no Claims, causes of action, or any other remedies of any kind, in law or equity, against any Settling Insurer or Non-Debtor CGL Settling Insurer Covered Persons and any and all such Claims, causes of action, and other remedies shall be deemed released and enjoined.

**10.8**  **[Intentionally Omitted].**

**10.9**  **Abuse Claimants' Rights Reserved.** All Abuse Claimants' (and any other parties') rights with respect to Claims against any Person other than a Protected Party shall be preserved and remain unaffected by the Plan.

**10.10**  **[Intentionally Omitted].**

## ARTICLE XI. LIQUIDATION AND PAYMENT OF CHANNELED CLAIMS

**11.1**  **Liquidation and Resolution of Channeled Claims.** The Trust shall pay Abuse Claims in accordance with the Plan, the Confirmation Order, and the Trust Documents and the Allocation Protocol. The FCR Claim shall be paid from the Future Claimant Reserve and not from any other Trust Assets. The USOPC Claim and the Indemnification Claims shall not be entitled to payment from Trust Assets but rather shall be satisfied by granting the USOPC Claim and the Indemnification Claims the benefit of the Channeling Injunction and by deeming any Abuse Claim against the USOPC or a Holder of an Indemnification Claim to be a Channeled Claim. Because Abuse Claims and Future Claims are being paid by the Trust without regard to whether those Claims are covered by the insurance policies issued by Settling Insurers: (a) the Trust shall be deemed subrogated to the Claims of Abuse Claimants paid by the Trust to the extent of those

30

payments; and (b) the Trust may pursue such subrogation Claim or any contribution Claim; provided however, that no such action may be brought against a Protected Party.

**11.1.1. Conditions to Payment of Abuse Claims and FCR Claims.** As a pre-condition to receiving any payment from the Trust, each Abuse Claimant or Future Claimant shall execute and deliver to the Trust a full and complete general release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, and for each of the foregoing, their Related Persons, but solely acting in their capacity as such, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to USAG, Abuse Claims, Future Claims or Settling Insurance Policies.  In addition, within ten (10) days after receiving any payment from the Trust, an Abuse Claimant or Future Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant or Future Claimant had brought against the Debtor, any Participating Party, any Settling Insurer and any Non-Debtor CGL Settling Insurer Covered Person, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall provide copies of such general releases and dismissal orders to the Debtor or any Protected Party that requests a copy.

**11.1.2. Trust Documents May Not Modify The Plan.** Nothing in the Trust Documents shall (a) impose any costs, directly or indirectly, upon the Debtor, the Estate, the Reorganized Debtor, any Participating Party, or any Settling Insurer relating to the treatment of Channeled Claims, or (b) otherwise modify the rights or obligations of the Debtor, the Estate, the Reorganized Debtor, any Participating Party, or any Settling Insurer as otherwise set forth in the Plan.

**11.2    Effect of No Award on Channeled Claims.** If a Channeled Claim, including an Abuse Claim filed after the Bar Date, is denied payment from the Trust, the Holder of such Channeled Claim will have no further rights against any Protected Party, the Settlement Trustee and any of his Related Persons, the FCR and any of his Related Persons, and any of their respective assets or property, including any Revested Assets, relating to such Channeled Claim.

**11.3    Treatment of Attorneys' Fees and Costs of Channeled Claimants.** The fees and expenses of attorneys representing Channeled Claimants who receive payment from the Trust will be borne by such Channeled Claimants based on applicable state law and individual arrangements made between such Channeled Claimants and their respective attorneys. The Debtor, the Estate, the Reorganized Debtor, the Released Parties, the Trust, and the Settlement Trustee will not have any liability for any fees and expenses of attorneys representing any of the Channeled Claimants, and all Claims for such fees and expenses, if any, will be disallowed.

**11.4    Withdrawal of Channeled Claims.** A Channeled Claimant may withdraw a Channeled Claim at any time on written notice to the Settlement Trustee. If withdrawn, (a) the Channeled Claim will be withdrawn with prejudice and may not be reasserted, (b) as a condition to withdrawal of the Channeled Claim, any funds paid to the Channeled Claimant by the Trust shall be returned to the Trust, and (c) any releases granted by a Channeled Claimant pursuant to Section 11.1.1 of this Plan and the Channeling Injunction granted Protected Parties in Section 12.2

of this Plan shall remain valid and enforceable against any Channeled Claimant who withdraws a Channeled Claim.

**11.5    Supplementing <u>Exhibit C</u> to Add Participating Parties**.

**11.5.1. Participating Party Agreement.** After the Effective Date and notwithstanding any present exclusionary language contained in this Plan, upon the consent of the Settlement Trustee, any Person may become a Participating Party if the Bankruptcy Court, after notice and hearing,  approves an agreement between such Person and the Settlement Trustee (a "**Participating Party Agreement**").  After the Effective Date, the Settlement Trustee shall have the exclusive authority to seek  approval of such a Participating Party Agreement.  Upon the Bankruptcy Court's entry of a  Final Order approving such an agreement, <u>Exhibit C</u> will be amended by the Settlement Trustee to include such Person.

**11.5.2. Rights of Additional Participating Parties.** Any Person becoming a Participating Party shall have all of the rights, remedies, and obligations of a Participating Party notwithstanding that such Person originally may have been excluded as a  Participating Party under any provision of the Plan, including, without limitation, the terms  and conditions of the Channeling Injunction.

**11.5.3. Retention of Jurisdiction.** The Bankruptcy Court's retained jurisdiction to approve a Participating Party Agreement under this Section shall include jurisdiction to determine the adequacy of the notice of a motion to approve such a Participating Party Agreement.

**11.5.4. Retention of Jurisdiction.** The Bankruptcy Court's retained jurisdiction to approve an agreement under this Section shall include jurisdiction to determine the adequacy of notice of a motion to approve such an agreement.

**11.6    Future Claimant Process.** A Future Claimant must file a Claim with the Settlement Trustee on or before the fifth (5th) anniversary of the Effective Date. The Claim will be entitled to a Distribution from the Future Claimant Reserve, provided funds remain in such Future Claimant Reserve, only if the Settlement Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim. Except as provided in the Plan, Future Claimants will have no right to payment or any other right under the Plan or against the Debtor, the Estate, or the Reorganized Debtor, or any of their respective property including any Revested Assets, or against the Settling Insurers, or the Participating Parties, or any Persons that are Related Persons to any of the foregoing Persons. Following the fifth (5th) anniversary of the Effective Date, any funds held in the Future Claimant Reserve shall be released to the Settlement Trustee to administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of this Plan. In the event that the remaining funds held, when combined with other Trust assets, total $50,000 or less, the Settlement Trustee shall have the discretion to either (a) administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan; or (b) distribute to a charitable entity mutually agreed upon by the Settlement Trustee and the Reorganized Debtor; *provided, however*, that any such

funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the USOPC.

**11.7     Special Distribution Conditions**.

**11.7.1. Medicare Secondary Payer**. Pursuant to the MMSEA, the Trust shall be the applicable plan from which any Abuse Claimant and Future Claimant who might also be a Medicare Beneficiary receives payment on account of a Tort Claim. All payment obligations to any Abuse Claimant or Future Claimant will be funded from the assets of the Trust, and the Trust and Settlement Trustee, in his capacity as trustee, shall be the Responsible Reporting Entity as that term is defined in the MMSEA and the Confirmation Order shall so provide. The Trust shall register as an RRE, and shall report under the Trust's RRE number. The Trust shall timely submit all reports that would be required to be made by any of the Debtor, the Reorganized Debtor, the Participating Parties, or any of the Settling Insurers if any, some or all of them would have had such obligations but for the terms of the settlements with the Settling Insurers, the terms of the Plan and creation of the Trust, on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust for purposes of MMSEA. The Trust and Trustee shall follow all applicable guidance published by the Centers for Medicare and Medicaid Services ("CMS") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

**11.7.2. Medicare-Related Obligations**. The Settlement Trustee as the RRE will be responsible for fulfilling, at the sole expense of the Trust, the reporting and reimbursement requirements, if any, pursuant to the MSP and the MMSEA and any other similar statute or regulation, and any related rules, regulations, user guides, or any other guidance issued in connection therewith. The Settlement Trustee shall obtain information needed to query beneficiary status, to complete Section 111 reporting, and to reimburse conditional payments. The Settlement Trustee as the RRE shall follow all applicable guidance published by the Centers for Medicare and Medicaid Services ("CMS") to determine whether or not and, if so, how, to report to CMS pursuant to the MMSEA and to protect the Medicare Trust Fund as required by the MSP. All Medicare-Related Obligations apply equally to any MAO as to CMS.

(a)     On or after the date that the Confirmation Order becomes a Final Order, the Settlement Trustee shall determine, for any Abuse Claimant or Future Claimant whose Claim, including a proof of Claim, complaint (if one has been served or filed), or other documentation offered in support of that Claim, if the Person potentially alleges or indicates that he or she was or may have suffered Abuse after December 5, 1980 (a "Post- 1980 Claimant"), by query to CMS: (i) whether that Post-1980 Claimant is Medicare Eligible (as defined in the Plan) and, if so, (ii) whether he or she has received, or if any medical provider has received for items and services rendered to the Claimant, any Conditional Payment arising from or relating to treatment for Abuse. The Settlement Trustee shall initiate such queries as soon as practicable, including prior to the Effective Date. The Settlement Trustee shall also, reasonably contemporaneously with initiating such queries, provide to any of the Reorganized Debtor, or Settling Insurer who may request all information necessary to perform the same queries,

33

although none of the Reorganized Debtor, or any Settling Insurer is under an obligation to conduct such queries.

(b)     If the Settlement Trustee does not receive a response from CMS (including a response from a query that the Reorganized Debtor, or a Settling Insurer or Tort Claimant's counsel has initiated, so long as the Reorganized Debtor, and Settling Insurer receives a copy of any such query initiated by Tort Claimant's counsel) within seventy-five days as to whether a Post-1980 Claimant is Medicare Eligible and/or has received one or more Conditional Payments, then that Claimant may, in lieu of the query response, certify in writing to the Settlement Trustee that he or she (i) is not Medicare Eligible and (ii) that he or she will provide for payment and/or resolution of any future obligations owing or potentially owing under the MSP and will indemnify the Trust and the Reorganized Debtor, and any Settling Insurer for any liability to CMS and/or an MAO that may arise under the MSP.

(c)     Prior to issuing a payment to any Post-1980 Tort Claimant who is Medicare Eligible, the Trust and Settlement Trustee shall require that the Abuse Claimant or Future Claimant, or his or her counsel, obtain a Final Payment Letter or the equivalent from CMS and any MAO holding a lien. The Abuse Claimant or Future Claimant's payment shall be held by the Settlement Trustee until that Abuse Claimant, Future Claimant or his or her counsel has provided written documentation from CMS, Medicare or an MAO, such as a Final Payment Letter, demonstrating that all Conditional Payments have been satisfied, waived or otherwise released.

(d)     If any portion of the Settlement Amount is paid to any Post-1980 Tort Claimant who is identified as Medicare Eligible, the Settlement Trustee will report such payments to Medicare in accordance with the MMSEA. The Settlement Trustee will also provide to the Reorganized Debtor, and Settling Insurers all information necessary for any of the Reorganized Debtor, or Settling Insurer to report such payments to CMS or Medicare although none of the Reorganized Debtor, or Settling Insurer is under an obligation to make such reports.

(e)     The Trust shall defend, indemnify and hold harmless the Debtor, Reorganized Debtor and the Protected Parties from any Claims related to Medicare Claims reporting and payment obligations, whether relating to past Conditional Payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Trust shall not be required to create a reserve for this potential obligation.

**11.7.3. Certification of Reports.** The Settlement Trustee shall provide a written certification to each of the Debtor, the Reorganized Debtor, the Participating Parties, and the

Settling Insurers within ten (10) business days following the end of each calendar quarter, confirming that all reports to CMS required by the previous Section have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

> **11.7.4. Rejected or Non-Compliant Reports.** With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Settlement Trustee shall, upon request by the Debtor, the Reorganized Debtor, any Participating Party, or any of the Settling Insurers, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however*, that the Trust may redact from such copies the names, Social Security numbers other than the last five digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of Abuse Claimants, Future Claimants, guardians, conservators, and/or other personal representatives, as applicable. With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by the Debtor, the Reorganized Debtor, the Participating Parties, or the Settling Insurers, provide the Debtor, the Reorganized Debtor, the Participating Parties, or the Settling Insurers copies of such resubmissions; *provided, however*, that the Trust may redact from such copies the names, Social Security numbers other than the last five digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of Abuse Claimants, Future Claimants, guardians, conservators, and/or other personal representatives, as applicable. In the event the Trust is unable to remedy any issue of noncompliance, the provisions of Section 11.7.8 shall apply.

> **11.7.5. Medicare-Related Obligations for Unreported Settlements.** With respect to each Claim of a Medicare Beneficiary that was paid by the Trust and not disclosed to CMS, the Settlement Trustee shall, upon request by the Debtor, the Reorganized Debtor, any of the Participating Parties, or any of the Settling Insurers, promptly provide the last five digits of the Abuse Claimant's or Future Claimant's Social Security number, the year of the Abuse Claimant's or Future Claimant's birth, and any other information that may be necessary in the reasonable judgment of any of the Debtor, the Reorganized Debtor, the Participating Parties, or Settling Insurers to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event that any of the Participating Parties or Settling Insurers inform the Settlement Trustee that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Settlement Trustee shall promptly report the payment to CMS. All documentation relied upon by the Settlement Trustee in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

> **11.7.6. Duration of Medicare-Related Obligations.** The Settlement Trustee shall make the reports and provide the certifications and perform the obligations required by Sections 11.7.1, 11.7.2, 11.7.3, 11.7.4, or 11.7.5 until such time as the Debtor, the Reorganized Debtor, the Participating Parties, and each of the Settling Insurers determine, in their reasonable judgment, that no further legal obligation exists under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore, following any permitted cessation of reporting, and if the

Debtor, the Reorganized Debtor, the Participating Parties, or any of the Settling Insurers reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that continued reporting is required, then the Trust shall promptly perform its obligations under Sections 11.7.1, 11.7.2, 11.7.3, 11.7.4, or 11.7.5.

11.7.7. **Prophylactic Measures.** Section 11.7 is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the Debtor, the Reorganized Debtor, the Participating Parties, and/or the Settling Insurers are in fact Responsible Reporting Entities or within the meaning of MMSEA, or that they have any legal obligation to report any actions undertaken by the Settlement Trustee or contributions to the Trust under MMSEA or any other statute or regulation.

11.7.8. **Corrections of Reports.** In the event that CMS concludes that reporting done by the Settlement Trustee in accordance with Section 11.7 is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, the Debtor, the Reorganized Debtor, any of the Participating Parties, or any of the Settling Insurers a concern with respect to the sufficiency or timeliness of such reporting, or there appears to the Debtor, the Reorganized Debtor, the Participating Parties, or any of the Settling Insurers a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Sections 11.7.1, 11.7.2, 11.7.3, 11.7.4, or 11.7.5, or other credible information, then each of the Debtor, the Reorganized Debtor, the Participating Parties, and the Settling Insurers shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any party that elects to file its own reports such information as the electing party may require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 11.7.1 or 11.7.2 without any redactions. The Debtor, the Reorganized Debtor, the Participating Parties and the Settling Insurers shall keep any information they receive from the Trust pursuant to this Section confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

11.7.9. **Medicare Reporting Information Required**. The Debtor, the Reorganized Debtor, the Participating Parties, and the Settling Insurers intend to protect, and not to impair, the Medicare Trust Fund. Notwithstanding any other provisions hereof, for each Abuse Claimant and Future Claimant, the Settlement Trustee shall be required to report under this Section and must rely on each Person on whose behalf the Settlement Trustee is required to report to have provided all Medicare Reporting Information that may be required, including the Person's full name, address, telephone number, date of birth, gender, last five digits of the Person's Social Security number, Medicare Number, and Medicare Claim Number, if one exists. The Settlement Trustee shall make at least three requests of each Person for Medicare Reporting Information. The Trust shall have no indemnification obligation under Section 11.7.11 to any Person who refuses to provide any Medicare Reporting Information, following at least three requests, for any penalty, interest, or sanction with respect to a Claim that may arise solely on account of such Person's failure timely to provide all required Medicare Reporting Information to the Settlement Trustee in response to requests by the Trust for such Medicare Reporting Information. However, nothing herein relieves the Settlement Trustee from its reporting obligations with respect to each Person who provides the Settlement Trustee with its Medicare Reporting Information. The Trust shall indemnify the Debtor, the Estate, the Reorganized Debtor, a Participating Party, or a Settling

36

Insurer for any failure to report payments to Medicare-eligible Abuse Claimants or Future Claimants who have supplied Medicare Reporting Information.

          **11.7.10.**     **Payment from the Trust.** In connection with the implementation of the Plan, the Settlement Trustee of the Trust shall obtain, prior to remitting funds to an Abuse Claimant's or Future Claimant's counsel, or to an Abuse Claimant or Future Claimant, if *pro se*, in respect of any Claim, a certification from the Abuse Claimant or Future Claimant to be paid that said Abuse Claimant or Future Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under the MSP relating to such Claim; otherwise the Trust shall withhold from any payment to the Abuse Claimant or Future Claimant funds sufficient to assure that any obligations owing or potentially owing under the MSP relating to such Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section to each of the Debtor, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, and permit reasonable audits by such Persons, no more often than quarterly, to confirm the Trust's compliance with this Section. For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section regardless of whether any of the Participating Parties or the Settling Insurers elects to file its own reports under MMSEA pursuant to Section 11.7.8.

          **11.7.11.**     **Indemnification.** The Trust shall defend, indemnify, and hold harmless the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers from any Claims related to MSP compliance, including Medicare Claims reporting and payment obligations, whether relating to past Conditional Payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Tort Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Trust shall not create a reserve for this potential obligation.

          **11.7.12.**     **Medicare Hold-back.** The Trust shall establish a "**Medicare Hold-back**" and such Medicare Hold-back shall consist of the proceeds of the Net Settlement Payment. The Trust shall not distribute any portion of the Medicare Hold-back until such time as the Medicare Procedures (defined below) are completed by the Trust. The "**Medicare Procedures**" to be completed by the Trust are to register as an RRE, and: (i) immediately upon the Effective Date, the Settlement Trustee shall conduct a Beneficiary Lookup using the Coordination of Benefits Secure Website ("**COBSW**") or by submitting a Section 111 Query File to the Benefits Coordination and Recovery Center ("**BCRC**") (the "**Medicare Beneficiary Status Query**"), with respect to each Abuse Claimant or Future Claimant, to determine whether each Abuse Claimant or Future Claimant is eligible to receive, is receiving, or has received Medicare benefits ("**Medicare Eligible**"); (ii) within ten (10) calendar days after the Effective Date, the Settlement Trustee shall provide to the Settling Insurers and Participating Parties, and, if requested, the Reorganized Debtor, information sufficient to allow them to perform their own SSA queries to the extent they wish to do so; (iii) in the event that one or more Abuse Claimants or Future Claimants is identified through the Medicare Beneficiary Status Query as Medicare Eligible, the Settlement Trustee shall complete a query to CMS for each such Abuse Claimant or Future Claimant to determine whether any Conditional Payment has been made to or on behalf of that Abuse Claimant or Future Claimant arising from or relating to treatment for abuse; (iv) obtain a Consent to Release from each Abuse Claimant or Future Claimant identified as Medicare Eligible; (v) determine whether any Medicare

Advantage Plan ("**MAP**") or Medicare Advantage Organization ("**MAO**") has made any Conditional Payment for services provided to an Abuse Claimant or Future Claimant; (vi) if any Conditional Payment has been made to or on behalf of an Abuse Claimant or Future Claimant, the Settlement Trustee shall timely reimburse the appropriate Medicare Trust Fund, MAP, and/or MAO for the claimed amount after procurement costs; (vii) upon resolution of all CMS inquiries, reimbursements, and matters relating to the foregoing provisions of this Section 11.7.12, the Medicare Hold-back shall be immediately available for Distribution by the Trust. The Settlement Trustee's obligation to make the reimbursements required by Section 11.7.12 and to indemnify the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers with respect to Medicare Claims, Claims of an Abuse Claimant or Future Claimant, and Claims against a Settling Insurer related to the Abuse Claims is not limited to the amount of the Medicare Hold-back.

## ARTICLE XII.  CHANNELING INJUNCTION

**12.1    Effective Date Injunctions.**  THE INJUNCTIONS PROVIDED FOR IN THIS PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID, AND ENFORCEABLE ACCORDING TO THEIR TERMS.  THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

**12.2    CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS.**  IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE DEBTOR, THE PARTICIPATING PARTIES, AND SETTLING INSURERS PURSUANT TO THE TERMS OF THIS PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THIS PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE:

(A) ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS AS ESTABLISHED UNDER THE PLAN AND TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS; AND

(B) ALL PERSONS THAT HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIM (INCLUDING ALL DEBT HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER AGAINST OR RELATED TO THE PROTECTED PARTIES) ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR

ENFORCE ANY CHANNELED CLAIM AGAINST A PROTECTED PARTY, INCLUDING:

> i. COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF THE PROTECTED PARTIES;

> ii. ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM THE PROTECTED PARTIES, OR FROM THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE PROTECTED PARTIES;

> iii. CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND AGAINST THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM;

> iv. ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST: (1) THE PROTECTED PARTIES; (2) ANY DIRECT OR INDIRECT OBLIGATION DUE TO THE PROTECTED PARTIES; OR (3) THE PROPERTY OF THE PROTECTED PARTIES, WITH RESPECT TO ANY SUCH CHANNELED CLAIM; AND

> v. TAKING ANY ACTION, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN.

**ALL CLAIMS DESCRIBED IN THIS SECTION 12.2 SHALL BE CHANNELED TO THE TRUST. THIS INJUNCTION SHALL NOT APPLY TO ANY REINSURANCE CLAIM.**

**12.2.1. LIMITATIONS ON THE SCOPE OF CHANNELING INJUNCTION.** NOTWITHSTANDING ANY PROVISION OF THIS PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS" PROVIDES ABSOLUTELY NO PROTECTION TO: (A) AN EXCLUDED PARTY; (B) ANY CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4 OF THE PLAN; AND (C) TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u>, THE CHANNELING INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A.</u>

39

**12.3   ENFORCEMENT TO THE MAXIMUM EXTENT.** TO THE EXTENT NOT OTHERWISE ENJOINED IN SECTION 12.2, THE ASSERTION OR ENFORCEMENT OF CHANNELED CLAIMS, AND ANY ATTEMPT TO ASSERT OR ENFORCE A CHANNELED CLAIM, DIRECTLY OR INDIRECTLY, BY ANY PERSON, AGAINST A PROTECTED PARTY IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.

**12.4   SETTLING INSURER INJUNCTION.** IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE SETTLING INSURERS PURSUANT TO THE TERMS OF THIS PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THIS PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105, 363, AND 1129 OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS (INCLUDING, WITHOUT LIMITATION, ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, FUTURE CLAIMANTS, SETTLING INSURERS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER AGAINST OR RELATED TO THE PROTECTED PARTIES) ARE PERMANENTLY ENJOINED AND BARRED FROM ASSERTING AGAINST A SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON ANY CLAIM (INCLUDING ANY INSURANCE COVERAGE CLAIM, EXTRA-CONTRACTUAL CLAIM, CONTRIBUTION CLAIM, OR SUBROGATION CLAIM) OR INTEREST OF ANY KIND OR NATURE WHATSOEVER ARISING FROM OR RELATING IN ANY WAY TO (A) ANY ABUSE CLAIM OR FUTURE CLAIM OR (B) ANY OF THE SETTLING INSURER POLICIES OR (C) ANY CLAIM AGAINST ANY SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON FOR CONTRIBUTION, INDEMNITY, DEFENSE, SUBROGATION, OR SIMILAR RELIEF THAT ARISES DIRECTLY OR INDIRECTLY FROM ANY CLAIM AGAINST THE DEBTOR OR ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON, OR ANY SETTLING INSURER POLICY. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A</u>, THE CHANNELING INJUNCTION SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN <u>EXHIBIT A.</u>

**12.5   CONTRIBUTION BAR AGAINST OTHER INSURERS.** IN CONSIDERATION OF THE CRITICAL UNDERTAKINGS AND SUBSTANTIAL CONTRIBUTIONS OF THE SETTLING INSURERS PURSUANT TO THE TERMS OF THIS PLAN, INCLUDING THE FUNDING OF THE TRUST, AND TO FURTHER PRESERVE AND PROMOTE THE SETTLEMENTS EMBEDDED IN THIS PLAN BETWEEN AND AMONG THE PARTICIPATING PARTIES, THE SETTLING INSURERS, HOLDERS OF SEXUAL ABUSE CLAIMS, THE SURVIVORS' COMMITTEE, THE FCR, AND THE DEBTOR, AND PURSUANT TO SECTIONS 105(a), 363, AND 1129 OF THE BANKRUPTCY CODE, ANY

OTHER INSURER IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, INCLUDING FILING ANY SUIT OR CAUSE OF ACTION AGAINST ANY SETTLING INSURER, OR ANY OF ITS RELATED PERSONS, OR ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CLAIM, INCLUDING ANY CONTRIBUTION CLAIM, SUBROGATION CLAIM, CLAIM FOR RECOVERY OF DEFENSE COSTS OR INDEMNITY PAYMENTS, OR ANY SIMILAR CLAIM, CAUSE OF ACTION, OR REMEDY, AGAINST ANY SETTLING INSURER AND ANY NON-DEBTOR CGL SETTLING INSURER COVERED PERSON.

**12.6    PERMANENT TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING INSURERS.** ALL INJUNCTIONS AND STAYS PROVIDED FOR IN THIS PLAN AND UNDER AND PURSUANT TO THE INJUNCTIVE PROVISIONS OF SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE ARE PERMANENT AND WILL REMAIN IN FULL FORCE AND EFFECT FOLLOWING THE EFFECTIVE DATE AND ARE NOT SUBJECT TO BEING VACATED OR MODIFIED. FOR THE AVOIDANCE OF DOUBT, ABSENCE OF OBJECTION TO THE SETTLEMENTS, RELEASES AND SALES PROVIDED IN THE PLAN CONSTITUTES CONSENT TO SUCH RELEASES AND SALES.

**12.7    RELEASE OF AVOIDANCE CLAIMS AND OTHER CLAIMS AGAINST PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER COVERED PERSONS, AND SETTLING INSURERS.** ON THE EFFECTIVE DATE, ALL AVOIDANCE RIGHTS OF THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, INCLUDING THOSE ARISING UNDER SECTIONS 544, 547, 548, 549, 550, AND 553 OF THE BANKRUPTCY CODE, AGAINST EACH OF THE PARTICIPATING PARTIES, NON-DEBTOR CGL SETTLING INSURER COVERED PERSONS, AND SETTLING INSURERS SHALL BE DEEMED SETTLED, COMPROMISED, AND RELEASED BY THIS PLAN. AS TO EACH SETTLING INSURER, ON THE EFFECTIVE DATE, THE INSURANCE COVERAGE ADVERSARY PROCEEDING AND ALL RELATED PROCEEDINGS IN ANY COURT SHALL IMMEDIATELY CEASE, AND THE INSURANCE COVERAGE ADVERSARY PROCEEDING AND ANY RELATED PROCEEDINGS SHALL BE DISMISSED, WITH PREJUDICE, AGAINST EACH SETTLING INSURER.

**12.8    MUTUAL RELEASE**. EXCEPT FOR (i) OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE REORGANIZED DEBTOR PURSUANT TO ARTICLE XIX OF THIS PLAN, (ii) OBLIGATIONS UNDER THE PLAN OF SETTLING INSURERS TO PAY DEFENSE COSTS (EXCLUDING ALL DEFENSE COSTS OF THE TYPE SOUGHT IN THE COSTS MOTION) THROUGH THE EFFECTIVE DATE OF THE PLAN, AND (iii) CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4, ON THE EFFECTIVE DATE, THE DEBTOR, THE ESTATE, AND THE REORGANIZED DEBTOR, ON THE ONE HAND, AND THE PARTICIPATING PARTIES, THE NON-DEBTOR CGL SETTLING INSURER COVERED PERSONS, AND SETTLING INSURERS, ON THE OTHER HAND, SHALL BE DEEMED TO HAVE WAIVED, RELEASED, AND DISCHARGED ANY AND ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR

RESPECTIVE RELATED PERSONS, INCLUDING CLAIMS ARISING UNDER OR AGAINST THEIR RESPECTIVE INSURANCE POLICIES. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE. NO SUCH CLAIM WILL BE DEEMED TO BE ASSIGNED TO THE TRUST.  NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE SETTLING INSURERS ARE ALSO INSURERS TO THE DEBTOR OR TO ANY PARTICIPATING PARTY UNDER POLICIES ISSUED TO THE DEBTOR OR ANY PARTICIPATING PARTY NOT SPECIFICALLY IDENTIFIED IN EXHIBIT A, THIS MUTUAL RELEASE SHALL NOT APPLY TO CLAIMS BY THE DEBTOR OR ANY PARTICIPATING PARTY AGAINST ANY SETTLING INSURERS IN THEIR CAPACITY AS AN INSURER TO SUCH PARTIES UNDER POLICIES NOT SPECIFICALLY IDENTIFIED IN EXHIBIT A.

**12.9    PROTECTED PARTY RELEASE**. EXCEPT FOR (i) OBLIGATIONS UNDER THE PLAN OF SETTLING INSURERS TO PAY DEFENSE COSTS (EXCLUDING ALL DEFENSE COSTS OF THE TYPE SOUGHT IN THE COSTS MOTION) THROUGH THE EFFECTIVE DATE OF THE PLAN, AND (ii) CLAIMS EXCEPTED FROM EXCULPATION UNDER SECTION 18.4, ON THE EFFECTIVE DATE OF THE PLAN, EACH AND EVERY PROTECTED PARTY SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO EACH DEBTOR CGL SETTLING INSURER AND ITS RELATED PERSONS A FULL AND COMPLETE GENERAL RELEASE OF ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE, KNOWN OR UNKNOWN, THAT THEY MAY HAVE AGAINST EACH DEBTOR CGL SETTLING INSURER AND ITS RELATED PERSONS RELATED IN ANY WAY TO THE DEBTOR CGL INSURANCE POLICIES ISSUED BY SUCH DEBTOR CGL SETTLING INSURERS. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE AND SUCH RELEASES WILL BE DEEMED GRANTED REGARDLESS OF WHETHER THE PROTECTED PARTY EXECUTES AND DELIVERS A SEPARATE RELEASE TO A DEBTOR CGL SETTLING INSURER.  IN ADDITION, EACH PROTECTED PARTY WILL BE DEEMED TO HAVE CONSENTED TO THE SALE BY THE DEBTOR OF EACH DEBTOR CGL INSURANCE POLICIES ISSUED BY A DEBTOR CGL SETTLING INSURER BACK TO THE DEBTOR CGL SETTLING INSURER. NOTWITHSTANDING THE FOREGOING, TO THE EXTENT THE DEBTOR CGL SETTLING INSURERS ARE ALSO INSURERS TO THE USOPC UNDER POLICIES ISSUED TO THE USOPC OR TO THE KAROLYIS UNDER INSURANCE POLICIES ISSUED TO THE KAROLYIS, THIS RELEASE SHALL BE LIMITED BY THE USOPC RELEASE AND THE KAROLYI RELEASE.

**12.10   USOPC RELEASE**. ON THE EFFECTIVE DATE OF THE PLAN, AND SUBJECT TO ANY SEPARATE AGREEMENT BETWEEN THE USOPC AND A USOPC SETTLING INSURER, WHICH SHALL CONTROL IN THE EVENT OF ANY CONFLICT WITH THIS SECTION 12.10,  THE USOPC SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO EACH USOPC SETTLING INSURER AND ITS RELATED PERSONS A FULL AND COMPLETE GENERAL RELEASE OF ANY RIGHTS AND INTERESTS IN DEFENSE COSTS INCURRED AFTER THE EFFECTIVE DATE OF THE PLAN AND INDEMNITY COVERAGE FOR ABUSE CLAIMS UNDER ANY INSURANCE POLICY ISSUED BY A USOPC SETTLING INSURER FOR WHICH THE ABUSE CLAIMANT HAS PROVIDED A FULL AND COMPLETE GENERAL RELEASE TO THE USOPC PURSUANT TO SECTION 11.1.1 OF THE PLAN.  NOTWITHSTANDING THE FOREGOING, THE USOPC RETAINS THE RIGHT TO REIMBURSEMENT OF, AND TO PURSUE COLLECTION OF, ANY DEFENSE COSTS INCURRED BEFORE THE EFFECTIVE DATE

OF THE PLAN UNDER ANY INSURANCE POLICY ISSUED BY A USOPC INSURER. NOTHING IN THIS PROVISION SHALL BE DEEMED TO LIMIT THE PROTECTED PARTY RELEASE (DESCRIBED ABOVE) GRANTED BY THE USOPC TO ANY DEBTOR CGL SETTLING INSURER OF CLAIMS AGAINST A DEBTOR CGL INSURANCE POLICY. PROVIDED, HOWEVER, NOTHING IN THIS PROVISION SHALL BE CONSTRUED TO EFFECTUATE A RELEASE OF ANY CLAIM BY THE USOPC AGAINST ANY DEBTOR CGL SETTLING INSURER OR USOPC SETTLING INSURER UNDER OR IN CONNECTION WITH ANY INSURANCE POLICY THAT IS NOT SUBJECT TO A  CGL SETTLEMENT OFFER THAT IS ACCEPTED BY A SETTLING INSURER AND THAT IS NOT LISTED ON EXHIBIT A.

**12.11   KAROLYI RELEASE.** ON THE EFFECTIVE DATE OF THE PLAN, THE KAROLYIS SHALL GRANT, AND SHALL BE DEEMED TO HAVE GRANTED, TO THE KAROLYI SETTLING INSURER AND ITS RELATED PERSONS A RELEASE OF ANY RIGHTS AND INTERESTS IN INDEMNITY COVERAGE FOR ABUSE CLAIMS UNDER ANY INSURANCE POLICY ISSUED BY THE KAROLYI INSURER FOR WHICH THE ABUSE CLAIMANT HAS PROVIDED A RELEASE TO THE KAROLYIS PURSUANT TO SECTION 11.1.1 OF THE PLAN. NOTWITHSTANDING THE FOREGOING, NOTHING SHALL BE CONSTRUED TO EFFECT A RELEASE OF ANY CLAIMS BY THE KAROLYIS FOR REIMBURSEMENT OF DEFENSE COSTS UNDER ANY INSURANCE POLICY ISSUED BY THE KAROLYIS SETTLING INSURER. THE KAROLYIS RETAIN THE RIGHT TO REIMBURSEMENT OF, AND TO PURSUE COLLECTION OF, ANY DEFENSE COSTS INCURRED TO DATE OR WHICH MAY BE INCURRED AFTER THE EFFECTIVE DATE OF THE PLAN. NOTHING IN THIS PROVISION SHALL BE DEEMED TO LIMIT THE PROTECTED PARTY RELEASE (DESCRIBED ABOVE) GRANTED BY THE KAROLYIS TO ANY DEBTOR CGL SETTLING INSURER OF CLAIMS AGAINST A DEBTOR CGL INSURANCE POLICY.

**12.12   EXCLUDED PARTIES LIMITATION OF RELEASES AND CHANNELING INJUNCTION.** NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NOTHING HEREIN SHALL BE DEEMED TO RELEASE OR AFFECT ANY CLAIMS BY ANY PERSON (INCLUDING ABUSE CLAIMANTS, FUTURE CLAIMANTS, AND ANY OTHER PERSON) AGAINST ANY EXCLUDED PARTIES.  THE EXCLUDED PARTIES SHALL NOT BE RELEASED PARTIES OR RECEIVE THE BENEFITS OR PROTECTIONS OF THE CHANNELING INJUNCTION. THE FACT THAT AN EXCLUDED PARTY SHALL NOT BE A RELEASED PARTY OR RECEIVE THE BENEFITS OR PROTECTIONS OF THE CHANNELING INJUNCTION SHALL NOT PREVENT A RELEASE OF INSURANCE

COVERAGE UNDER THE DEBTOR CGL INSURANCE POLICIES ISSUED BY DEBTOR CGL SETTLING INSURERS.

## ARTICLE XIII. [INTENTIONALLY OMITTED]

## ARTICLE XIV.  INSURANCE NEUTRALITY

**14.1    No Modification of Debtor's Insurance Policies of Other Insurers.** Nothing in this Plan, the Confirmation Order, or in any Plan Document modifies any of the terms of any of the Debtor's Insurance Policies.

**14.2    Other Insurers' Duties Not Impaired.** The duties and obligations, if any, of the Other Insurers under their respective insurance policies shall not be impaired, altered, reduced, or diminished by: (a) the discharge granted to the Debtor under the Plan pursuant to Section 1141(d) of the Bankruptcy Code; (b) the injunctions, exculpations, and releases contained in the Plan; or (c) any other provision of the Plan, the Confirmation Order, or the Plan Documents. Nothing in the Plan, the Confirmation Order, or the Plan Documents shall provide any Other Insurer with a defense to their rights, obligations, or duties to provide Insurance Coverage under any insurance policy.

**14.3    Trust Has No Impact.** The fact that the Trust is liquidating and paying or reserving monies on account of the Abuse Claims and Future Claims shall not be construed in any way to diminish any obligation of any Other Insurer under any insurance policy to provide Insurance Coverage to the Debtor, the Reorganized Debtor or a Participating Party for Abuse Claims.

**14.4    Obligations for Claims.** The Other Insurers' obligations, if any, with respect to any Claim or Cause of Action, shall be determined by and in accordance with the terms of their respective insurance policies and applicable non-bankruptcy law, subject in all respects to the provisions of this Plan.

**14.5    Other Insurers' Defenses.** Nothing in this Plan, the Confirmation Order, or any Plan Document shall constitute a finding or determination that the Debtor and/or any third party is or is not a named insured, additional insured, or insured in any other way under any insurance policy; or that any Other Insurer has or does not have any defense or indemnity obligation with respect to any Claim. Such rights shall be determined by and in accordance with the terms of the insurance policies and applicable non-bankruptcy law and this Plan. Nothing in the Plan, any Plan Document, or Confirmation Order creates a right of direct action not in accordance with applicable non-bankruptcy law or insurance policy or eliminates a right of direct action in accordance with applicable non-bankruptcy law or insurance policy.

**14.6    Reinsurance.** Nothing in this Plan affects the rights of a Settling Insurer under any agreement or contract providing reinsurance to the Settling Insurer. All such rights are retained by the Settling Insurer.

**14.7    Defenses of the Debtor, the Estate, and the Reorganized Debtor.** Nothing in the Plan, the Confirmation Order, or any Plan Document shall diminish or impair the Debtor's, the Estate's, or the Reorganized Debtor's defenses to liability or damages in connection with any

insured Claim and the right of any Other Insurer that is defending the Reorganized Debtor to assert any such underlying defenses to liability.

**14.8    Governing Law.** Nothing in this Plan is intended to affect the governing law of the any insurance policy.

## ARTICLE XV. CLAIMS AND DISTRIBUTIONS

**15.1    Objections to Claims other than Abuse Claims, the USOPC Claim, Indemnification Claims, and the FCR Claim.** Unless a Claim is (a) expressly described as an Allowed Claim pursuant to or under the Plan; or (b) otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Reorganized Debtor shall be deemed to have a reservation of any and all rights, interests, and objections of the Debtor, or the Estate, to any and all Claims and motions or requests for the payment of or on account of Claims, whether administrative expense, priority, secured, or unsecured, and whether under the Bankruptcy Code, other applicable law, or contract. The Debtor's failure to object to any Claim in the Chapter 11 Case shall be without prejudice to the Reorganized Debtor's rights to object to, to contest or otherwise defend against such Claim in the Bankruptcy Court as set forth in this Section when and if such Claim is sought to be enforced by the Holder of such Claim. Objections to a Claim (except for Abuse Claims, the USOPC Claim, and Indemnification Claims) as to which no objection is pending as of the Effective Date, must be filed and served not later than  sixty (60) days after the later of (a) the Effective Date or (b) the date such Claim is filed, provided that the Reorganized Debtor may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Debtor's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

**15.2    Service of Objections.** An objection to a Claim shall be deemed properly served on the Holder of such Claim if the objector effects service by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Case.

**15.3    Additional Documentation.** From and after the Effective Date, the Reorganized Debtor shall be authorized to enter into, execute, adopt, deliver, and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements contained in this Plan without further Order of the Bankruptcy Court.

**15.4    Provisions Governing Distribution To Holders of Allowed Claims**.

**15.4.1. Distribution Only to Holders of Allowed Claims.** Distributions under this Plan and the Plan Documents will be made only to the Holders of Allowed Claims. Until a Disputed Claim becomes an Allowed Claim, the Holder of that Disputed Claim will not receive any Distribution otherwise provided to the Claimants under this Plan. If necessary in determining

the amount of a Pro Rata Distribution due to the Holders of Allowed Claims in any Class, the Reorganized Debtor will make the Pro Rata calculation as if all unresolved Claims were Allowed Claims in the full amount claimed or in the Estimated Amount. When an unresolved Claim in any Class becomes an Allowed Claim, the Reorganized Debtor will make full or partial Distributions, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and/or any required withholding of applicable federal and state taxes.

**15.4.2. Timing of Distributions.** Unless otherwise agreed by the Reorganized Debtor and the recipient of a Distribution under this Plan on account of an Allowed Claim, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by this Plan or any applicable agreement or instrument. Any Claimant that is otherwise entitled to an Undeliverable Distribution and who does not provide the Reorganized Debtor, within thirty (30) days after a Distribution is deemed to be an Undeliverable Distribution, a written notice asserting its Claim to that Undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any Claim to such Undeliverable Distribution and will be forever barred from receiving such Undeliverable Distribution or asserting any Claim against the Reorganized Debtor or its property. Any Undeliverable Distributions that are not claimed under this Section will be retained by the Reorganized Debtor in accordance with the Plan. Nothing in the Plan requires the Reorganized Debtor to attempt to locate any Claimant who is otherwise entitled to an Undeliverable Distribution.

**15.4.3. Waiver of Distribution.** If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such instrument is sent to the Claimant, that instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and such Distribution shall become Cash available to the Reorganized Debtor.

**15.4.4. Form of Distributions.** Unless otherwise agreed by the Reorganized Debtor and the recipient of a Distribution under this Plan, all Distributions will be made, at the option of the Reorganized Debtor, by a check by first class mail, postage prepaid, or by wire or ACH transfer.

**15.4.5. No Professional Fees or Expenses.** No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Estate, or the Reorganized Debtor, except as specified in this Plan.

**15.5   No Distributions Pending Allowance.** No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; *provided, however*, that in the event that only a portion of such Disputed Claim is an Allowed Claim, the Reorganized Debtor may, in its discretion, make a Distribution on account of the portion of such Claim that is an Allowed Claim.

**15.6   Claim Estimation.** In order to effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, the Debtor and the Estate (if prior to the Effective Date) and the Reorganized Debtor (on and after the Effective Date), after notice

and a hearing (which notice may be limited to the Holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court, pursuant to Section 502(c) of the Bankruptcy Code, estimating or limiting, on account of a Disputed Claim, the amount of (a) property that must be withheld from or reserved for distribution purposes on account of such Disputed Claim, (b) such Claim for allowance or disallowance purposes, or (c) such Claim for any other purpose permitted under the Bankruptcy Code; *provided, however*, that the Bankruptcy Court or the District Court, as applicable, shall determine (a) whether such Claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code and (b) the timing and procedures for such estimation proceedings, if any, with such matters being beyond the scope of the Plan.

**15.7   Setoffs.** The Reorganized Debtor may, to the extent permitted under applicable law, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim, the Claims, rights, and Causes of Action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor possesses against such Holder.

**15.8   No Interest on Claims.** Post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan or the Confirmation Order, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

**15.9   Withholding Taxes.** The Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Debtor may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

**15.10   No De Minimis Distributions.** Notwithstanding anything to the contrary in this Plan, no cash payment of less than $10 will be made by the Reorganized Debtor to any Holder of an Allowed Claim. No consideration will be provided in lieu of the de minimis Distributions that are not made under this Section. Allowed Claims that are entitled to a Pro Rata Distribution of less than $10 shall continue to accrue until such time as the Pro Rata Distribution on account of such Claim will be $10 or more.

**15.11   Manner of Cash Payments.** Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Reorganized Debtor, or at the Reorganized Debtor's option, by wire transfer from a domestic bank. Cash payments to foreign Claimants may be paid, at the Reorganized Debtor's option, either in the

same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## ARTICLE XVI.  LITIGATION

**16.1    Reorganized Debtor's Retention of Causes of Action and Litigation.** Except as provided otherwise in this Plan, the Reorganized Debtor shall retain and exclusively enforce the Debtor's Claims and Causes of Action, including against any Other Insurer in the Insurance Coverage Adversary Proceeding, whether arising before or after the Petition Date, in any court or other tribunal, including without limitation any adversary proceeding filed in the Chapter 11 Case. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims and Causes of Action, without obtaining Bankruptcy Court approval.  Confirmation of this Plan shall not release any of the Debtor's Claims or Causes of Action except as expressly provided in this Plan.

**16.2    Additional Actions.** Any Person to whom the Debtor has incurred an obligation (whether on account of the provision of goods, services, or otherwise), or who has received goods or services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, regardless of whether (a) such Person has filed a proof of Claim against the Debtor in this Chapter 11 Case; (b) such Person's proof of Claim has been objected to; (c) such Person's Claim was included in the Schedules; or (d) such Person's scheduled Claim has been objected to or has been identified as disputed, contingent, or unliquidated. Notwithstanding the foregoing, this Section shall not be applicable to Abuse Claimants.

## ARTICLE XVII.  CONDITIONS PRECEDENT

**17.1    Conditions to Effectiveness.** The Effective Date will occur when each of the following conditions is met: (a) the Bankruptcy Court shall have entered the Confirmation Order on or before December 31, 2021, in form and substance reasonably acceptable to the Reorganized Debtor, the Survivors' Committee, the Participating Parties, and the Settling Insurers; (b) the Confirmation Order shall have become a Final Order, unless the Debtor, the Survivors' Committee, and the Settling Insurers, agree to waive such requirement; (c) the Settlement Trustee, the FCR, and the Reorganized Debtor have signed the Trust Agreement; (d) the Settling Insurers have made their Agreed CGL Insurer Payments to the Debtor and the transfers to the Trust contemplated in Section 9.2.2 of the Plan have been made to the Trust; (e) the Bankruptcy Court has approved the USOPC Loan, and the Debtor has delivered the promissory note evidencing the USOPC Loan to the USOPC; (f) USOPC has made the USOPC Out-of-Pocket Contribution; (g) USAG has made the USAG Contribution; (h) the Bankruptcy Court has approved, by Final Order (unless the Debtor, the Survivors' Committee, and the Settling Insurers, agree to waive such requirement for a Final Order), the Buy-Back Agreement of each Settling Insurer in form and substance reasonably acceptable to each Settling Insurer, the Reorganized Debtor, and the Survivors' Committee; and

(i) the Settling Insurers have been dismissed from the Insurance Coverage Adversary Proceeding with prejudice, with each party to bear its own costs.

**17.2   Waiver of Conditions.** Any conditions set forth in Section 17.1 of this Plan may be waived only by the mutual written consent of the Debtor, the Survivors' Committee, the Participating Parties, and Settling Insurers.

**17.3   Statement.** A statement shall be filed with the Court within three (3) Business Days after the Effective Date, advising the Court and all parties in interest of the occurrence of the Effective Date.

**17.4   Non-Occurrence of Effective Date.** Subject to further order of the Bankruptcy Court, in the event that the Effective Date does not occur within one hundred twenty (120) days after entry of a Final Order confirming the Plan, the Plan shall become null and void. A statement shall be filed with the Court within three (3) Business Days after the Effective Date, advising all parties of the Effective Date, or within three (3) Business Days after the occurrence of any event that renders the Plan null and void, advising all parties that the Plan is null and void.

### ARTICLE XVIII.  EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

**18.1   Discharge.** On the Effective Date of the Plan, pursuant to Section 1141(d) of the Bankruptcy Code, the Debtor, the Estate, and the Reorganized Debtor will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Related Persons, before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of the Chapter 11 Case, and including all Claims and Debts based upon or arising out of Abuse Claims, the USOPC Claim, or the Indemnification Claims and from any liability of the kind specified in Sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under Section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the Holder of such Claim has accepted this Plan.

**18.2   Vesting of Assets.** In accordance with Sections 1141 and 1123(a)(5) of the Bankruptcy Code, the Revested Assets shall vest in the Reorganized Debtor on the Effective Date free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire, and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court, and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

**18.3   Continued Existence of Reorganized Debtor.** The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date in accordance with the applicable laws of the State of Texas, with all the powers of a not-for-profit having tax-exempt status under

26 U.S.C. § 501(c)(3) and all other applicable laws, and without prejudice to any right to alter or terminate such existence under applicable state law.

**18.4    Exculpation and Limitation of Liability.** NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE RELATED PERSONS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THIS CHAPTER 11 CASE, INCLUDING (1) THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, (2) THE PURSUIT OF CONFIRMATION OF THE PLAN, OR (3) THE ADMINISTRATION OF THE PLAN, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR FRAUD (*PROVIDED, HOWEVER*, THE DEBTOR, THE ESTATE, AND REORGANIZED DEBTOR WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) AND, IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTOR AND ITS RELATED PARTIES, ITS EMPLOYEES, AND THE DEBTOR'S PROFESSIONALS, AND THE SURVIVORS' COMMITTEE, ITS MEMBERS SOLELY IN THEIR CAPACITIES AS MEMBERS OF THE SURVIVORS' COMMITTEE, AND THE SURVIVORS' COMMITTEE'S PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED THE BENEFITS OF SECTION 1125(E) OF THE BANKRUPTCY CODE. FOR THE AVOIDANCE OF DOUBT, THIS SECTION AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF SEXUAL ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR. NEITHER THE EXCULPATED PARTIES, NOR THE TRUST OR THE SETTLEMENT TRUSTEE, AND PROFESSIONALS EMPLOYED BY THE FOREGOING, SHALL HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO A SEXUAL ABUSE CLAIMANT, INCLUDING LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT, EXCEPT AS EXPRESSLY PROVIDED HEREIN.

## ARTICLE XIX.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**19.1    Assumed Employee Benefit Plans.** To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor is a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

**19.2    General; Assumed if Not Rejected.** Subject to the requirements of Section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtor that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure

defaults that may be required under Section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute.

**19.3    Claims for Contract Rejection.** All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for the filing of Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

**19.4    Indemnification Claims.** Notwithstanding the foregoing, any agreement to provide indemnification to any Person contained in the Debtor's By-laws or any executory contract shall be satisfied by the treatment set forth in this Plan for Claims in Classes 7 and 8.

## ARTICLE XX.  NON-MONETARY COMMITMENTS

**20.1    Commitment to Athlete Safety.** Athletes are the heart and soul of gymnastics, and the Debtor and the Survivors' Committee are both focused on making the organization more athlete-centric. As part of this commitment, the Survivors' Committee and the Debtor are working towards an agreement on certain non-monetary commitments to be included in the Plan when it is sent to survivors for their vote.

As those discussions continue, and subject to their completion, the parties have discussed and agreed upon a number of steps to strengthen athlete safety and are in discussion about other steps to be taken. The Debtor has committed thus far to the following:

- Before the Petition Date, the Debtor implemented a streamlined Board structure, reducing the number of directors from 21 to 15 and requiring a majority of the Board to be independent directors. In November 2020, the Debtor adopted Amended and Restated Bylaws, which further changed the Board structure. The Board continues to have 15 members, now comprised of 8 independent directors, 5 athlete representatives, 1 national membership director, and 1 affiliated organizations Director.  At least 1 of USAG's directors will be a survivor.  At least 1 member of USAG's Safe Sport Committee and at least 1 member of USAG's Athlete Health and Wellness Council will be a survivor. The Survivors' Committee is working on a proposed process to nominate and/or select the survivors to fill these positions.

- Any complaints about individuals holding positions on the USAG board or standing committee member over whom the USAG board has oversight or removal capabilities will be addressed by the USAG board at the next board meeting following the complaint, or within 30 days, whichever is earlier.

- The Debtor hired a new President and CEO, who has met nearly one thousand stakeholders, including survivors, to hear their perspectives on how to improve athlete safety and the organization overall.

- The Debtor updated its bylaws and policies to strengthen Safe Sport provisions and complaint processing. These updates include: creating a permanent Safe Sport Committee; increasing the number of independent directors to eight; removing the President from a role in the processing of complaints; easing complaint filing requirements; delineating responsibilities of the Board and president more clearly; and providing for the publication of the names of members who have been suspended or placed on the permanently ineligible list as part of the disciplinary process.

- The Debtor adopted a new Safe Sport Policy, which mandates reporting, defines specific types of misconduct, sets standards to prohibit "grooming" behavior, and establishes greater accountability. The policy further provides important requirements and information on mandatory reporting and Proactive Policies that empower athletes and guide athlete-coach interactions. A copy of the Safe Sport Policy is available at: https://usagym.org/pages/education/safesport/policy.html. The Debtor will not permit a gym club to be a member of USAG unless it commits, as part of its membership agreement with USAG, to adopt and share these policies with its coaches, employees and gymnasts. The website also includes a "Policy Snapshot" summary, Safe Sport FAQs, including an FAQ page specific to parents and guardians, and educational webinars.

- The Debtor has expanded its Safe Sport Department to better support, train, educate, and serve members. The department now includes a Director of Safe Sport Education and Policy, a Safe Sport Legal Counsel, four Safe Sport Investigators, a Safe Sport Administrative Manager, and paralegal with dedicated Safe Sport responsibilities.

- The Debtor has hired a Chief of Athlete Wellness, which is a new role. This person is responsible for overseeing the Safe Sport Department as well as the organization's strategy and execution of holistic athlete health and wellness initiatives, including sports medicine, sports psychology, and nutrition services. Medical care at USAG-hosted camps and events is provided in accessible areas where multiple athletes may be present and multiple medical staff are present and able to view all medical encounters.

- The Debtor will ensure that posters with information setting forth how to report abuse or assault ("**reporting posters**") shall be affixed in prominent places throughout the venue during a USAG-hosted camp or event. The reporting poster will have QRC codes for easy accessibility to USAG's and the Center for SafeSport's (the "**Center**") online reporting portals.  The reporting poster will be written so that it is easily understood by its intended audience, including children. USAG member clubs must also hang such posters in prominent places throughout their facilities as a condition of membership in USAG. USAG will supply the posters to member clubs at USAG's expense.

- The Debtor will not permit a gymnastics club to be a member of USAG unless it commits, as a condition of the membership agreement (which will include this Non-Monetary Commitments Section of the Plan as an attachment to the agreement), to at the least:

  o affix the reporting posters in prominent places throughout the member club's facility;

  o provide gymnasts (or the gymnast's parent/guardian, if the gymnast is a minor) with information and pamphlets about sexual assault and how to report it and USAG will supply the pamphlets to member clubs at USAG's expense;

  o adopt and utilize USAG's Safe Sport Policy;

  o provide educational programs and training to volunteers, gymnasts (including minor gymnasts, with parent/guardian consent) and coaches related to appropriate boundaries, sexual assault, abuse and how to report it;

  o require individual members, including member club owners and coaches, to agree as a condition of membership that they understand their abuse reporting obligations and that they will report any suspicion of abuse to law enforcement;

  o prohibit one-on-one contact between a minor and an unrelated adult, in accordance with the Center's Minor Athlete Abuse Prevention Policy;

  o utilize the member club's website to provide educational information regarding assault and abuse and how to report it; and

  o require all persons, including but not limited to volunteers, coaches, and owners, who have regular contact with or authority over minor athletes to complete Safe Sport training.

- Each member club will have a Safety Champion, who is responsible for communicating with USAG and facilitating compliance with the above mentioned requirements. The Safety Champion will work with USAG so that the member club has access to materials and information, provided at USAG's expense, needed to fulfill its obligations set forth above. The process of selecting and training the Safety Champion is under discussion with the Survivors' Committee.

- The Debtor has charged all of its employees with supporting and encouraging athlete wellness. For example, the Debtor's Chief Communications and Marketing Officer is responsible for incorporating the message of safety in all communications, and the Debtor's Chief of Staff and Human Resources is responsible for ensuring that there is an internal, organizational culture of prioritizing safety. As part of this initiative, all new staff members receive SafeSport training within their first week with the organization.

- The Debtor has streamlined the reporting process by creating a dedicated, toll-free number, 833-844-SAFE; the safe sport email address of safesport@usagym.org; and online reporting at usagym.org/safesport. In addition to reporting violations of the Safe Sport code

to USA Gymnastics, members are required to immediately report suspected child abuse, including sexual abuse, to law enforcement and to the Center. The Debtor will set up a reporting portal that is accessible through use of a QRC code and a hotline for ease of reporting by a person or child. The reporting portal and/or hotline will be user friendly and make it easy for even a child to report abuse. The Debtor will promptly provide all reporting information that it receives to the Center. The Survivors' Committee may make additional suggestions to aid in ease of use of the portal.

- USAG will work with the Survivors' Committee to address issues that currently exist with the Center's performance and USAG will help facilitate that communication with the Center, including, but not limited to, using its best efforts to arrange for a video conference with the Debtor, the Survivor's Committee and the Center's decision-makers and those with the ability to assist in implementing changes to the reporting process and procedures thereafter, including expediting timing of the investigation and its conclusion.

- The Debtor publishes on its website the names of permanently ineligible members and suspended members.    The website for permanently ineligible members is: https://usagym.org/pages/aboutus/pages/permanently_ineligible_members.html. And the website        for        suspended        members        is: https://usagym.org/pages/aboutus/pages/suspended_members.html.

- The Debtor has strengthened its educational initiatives about athlete safety. The Debtor rolled out its new Safe Sport educational and training materials, which include industry best practices and ideas from experts in the prevention of child sexual abuse. The educational outreach encompasses presentations at Regional and National Congresses, social media posts, along with live additional educational and informational opportunities for clubs and all professional members; informational videos and articles about Safe Sport issues at    usagym.org/safesport;    and    additional    resources    for    parents    at usagymparents.com. Professional members, Board members, and USA Gymnastics staff are required to take Safe Sport training. Safe Sport is also included as part of the safety and risk management course.

- The Debtor has instituted a Protest Policy for National Team Athletes. The below statement is memorialized in the National Team Handbook.

> *As a National Team athlete, you have an opportunity to use your voice to help improve the sport and the National Team experience by providing critical feedback, responding to surveys, and speaking candidly about what is and is not working well. Our role at USA Gymnastics is to listen to your feedback, and ensure that your input is an important component in the planning and decision-making process.*
>
> *In a number of forums (e.g., on social media, at press conferences, etc.), you also have a platform to use your voice in other ways – whether that is to inspire the next generation of gymnasts, provide feedback on your experiences, share personal anecdotes, or advocate for causes you believe*

> *in. Your choice to do so – including through peaceful protest at a USA Gymnastics' event – will not impact selections, team participation, or results, to the extent it is under USA Gymnastics' control (i.e., the Olympic Games are not under USAG control), so long as you are complying with the USA Gymnastics' policies, including the Code of Ethical Conduct.*

- The Debtor adopted an Athlete Bill of Rights, which is posted on the Debtor's website here: https://usagym.org/PDFs/About%20USA%20Gymnastics/athlete_bor.pdf.

- The Debtor has partnered with the Positive Coaching Alliance and has instituted training for clubs, gyms, gymnasts (or their parent/guardian, if the gymnast is a minor), organization staff, national team staff, and coaches of national team members.

- The Debtor issued a Culture Survey to athlete parents and our membership to track its progress, and the Debtor is committed to doing this survey on an annual basis.

- The Debtor retained Deborah Daniels to audit the Debtor's progress on the Daniels recommendations.

In addition, the Debtor and the Reorganized Debtor commit to the following steps to continue strengthening athlete safety:

- Ensure that all sponsorship and partnership deals incorporate some aspect of athlete wellness.

- Become a more data-driven organization, particularly with regards to athlete safety;

- Implement additional educational programming about athlete safety, including dialogue-based information-share opportunities and more easily-accessed content, such programming will be shared with gyms and clubs through conferences and Safety Champions;

- Become more transparent in the Safe Sport process to build trust within the community and encourage reporting;

- Audit member clubs for compliance with the Safe Sport Policy;

- Continue to engage with, and listen to, all stakeholders; and

- Engage with survivors who want to be involved in order to improve the organization on every level—culture, policies, governance, etc.

**Accountability.** The Debtor and the Survivors' Committee are discussing a process to provide for historical accountability, healing for all stakeholders, with focus on the survivors, and future supervision, monitoring, auditing and implementation of the Plan's Non-Monetary Commitments. The Survivor's Committee and the Debtor commit to continued discussions regarding the hiring of an independent, trauma-informed expert, with experience in childhood sexual abuse involving

betrayal trauma/institutional betrayal. The Survivors' Committee and the Debtor commit to continued discussions about the work and make-up of a Restorative Justice Task Force.

## ARTICLE XXI.  MISCELLANEOUS PROVISIONS

**21.1     Obligations of the Reorganized Debtor.** The Reorganized Debtor will:

(a)     In the exercise of its business judgment, review all Claims filed against the Estate except for Channeled Claims, and, if advisable, object to such Claims;

(b)     In the exercise of its business judgment, investigate, prosecute, settle, dismiss, or otherwise resolve all Causes of Action that are not resolved under this Plan. Unless otherwise provided in this Plan, the Reorganized Debtor will be entitled to receive recoveries from Causes of Action, including Insurance Reimbursement Claims, and from the Debtor's Insurance Policies;

(c)     Perform all of its obligations under this Plan and Plan Documents, in each case, as and when the same become due or are to be performed; and

(d)     Notwithstanding anything to the contrary in this Plan, honor all of the Debtor's obligations under the Debtor's Insurance Policies and under applicable non-bankruptcy law, with the Reorganized Debtor's attorneys' fees, costs, and expenses incurred in doing so, if any, to be paid by the Insurers, as provided under the Debtor's Insurance Policies.

**21.2     Retention of Jurisdiction.** Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising under, in furtherance of, or in connection with this Plan, including the following:

(a)     The determination of objections to Disputed Claims, and the determination of requests for payment of Claims entitled to priority under Section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

(b)     The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

(c)     The granting of relief in aid of this Plan and the Plan Documents, including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, as well as contempt or other sanctions) to protect the Reorganized Debtor and the Released Parties from actions prohibited under this Plan or the Plan Documents;

(d)     Amendments to and modifications of this Plan;

(e)     The determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date, including but not limited to the Insurance Coverage Adversary Proceeding;

(f)     The determination of any motion to determine that a Claimant is a Future Claimant or to determine that a Sexual Abuse Claim filed after the Bar Date shall be deemed to have been filed before the Bar Date; and

(g)     The closing of this Chapter 11 Case.

**21.3    Modification of Plan.** The Plan Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify, or withdraw this Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Plan Proponents may, upon order, amend, or modify this Plan in accordance with Section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**21.4    Post-Confirmation Court Approval.** Any action requiring Bankruptcy Court, District Court, or state court approval after the Effective Date will require the Person seeking such approval to file an application, motion, or other request with the Bankruptcy Court, District Court, or state court, as applicable, and obtain a Final Order approving such action before the requested action may be taken. The Person filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the Bankruptcy Court, on the Reorganized Debtor by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery. Unless the court orders otherwise, all notices shall provide at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing. If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

**21.5    Election Pursuant to Section 1129(b) of the Bankruptcy Code.** If necessary, the Plan Proponents hereby request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the requirements of all provisions of Section 1129(a) of the Bankruptcy Code, except Section 1129(a)(8) thereof, are met with regard to the Plan. In determining whether the requirements of Section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not contain as an element thereof an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this Plan shall be deemed deleted from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class.

**21.6    Closing of the Chapter 11 Case.** As soon as practicable after the Effective Date, when the Reorganized Debtor deems appropriate, the Reorganized Debtor will seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules; *provided, however*, that entry of a final decree closing the Chapter 11 Case shall, whether or not specified therein, be without prejudice to the right of the Reorganized Debtor, or any other party in interest, to reopen the Chapter 11 Case for any matter over which the Bankruptcy Court or the District Court has retained jurisdiction under this Plan. Any order closing this Chapter 11 Case will provide that the Bankruptcy Court or the District Court, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Chapter 11 Case, and the obligations created by this Plan and the

Plan Documents; and (b) all other jurisdiction and authority granted to it under this Plan and the
Plan Documents.

21.7    **Dissolution of the Survivors' Committee.** On the Effective Date, the Survivors'
Committee shall dissolve automatically, whereupon its members and the Survivors' Committee's
Professionals shall be released from any further duties and responsibilities in the Chapter 11 Case
and under the Bankruptcy Code, except that such parties shall continue to be bound by any
obligations arising under confidentiality agreements, joint defense/common interest agreements
(whether formal or informal), and protective orders entered during the Chapter 11 Case, which
shall remain in full force and effect according to their terms, and further provided that such parties
shall continue to have a right to be heard with respect to any and all applications for Professional
Claims.

21.8    **Termination of the Appointment of the FCR.** The Bankruptcy Court's
appointment of the FCR shall be terminated when the funds in the Future Claimant Reserve are
completely distributed as provided in Sections 9.4 and 11.6 of the Plan, whereupon the FCR and
the FCR's Professionals shall be released from any further duties and responsibilities in the
Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be
bound by any obligations arising under confidentiality agreements, joint defense/common interest
agreements (whether formal or informal), and protective orders entered during the Chapter 11
Case, which shall remain in full force and effect according to their terms, and further provided that
such parties shall continue to have a right to be heard with respect to any and all applications for
Professional Claims. The fees and expenses of the FCR from and after the Effective Date shall be
paid from the Future Claimant Reserve.

21.9    **Notices.** All notices or requests to the Debtor, the Estate, or the Reorganized Debtor
in connection with this Plan shall be in writing and served either by (i) United States mail, postage
prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and
shall be deemed given when received by the following parties:

**If to the Debtor, the Estate, or Reorganized Debtor:**

USA Gymnastics
1099 N. Meridian St.,
Suite 800
Indianapolis, Indiana 46204

*With a copy to:*

Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
Attn: Catherine Steege and Melissa Root

**If to the Survivors' Committee:**

Pachulski Stang Ziehl & Jones
10100 Santa Monica Blvd., 11th Floor

Los Angeles, California 90067
Attn: James Stang and Ilan Scharf

**21.10   Notices to Claimants.** All notices and requests to a Person holding any Claim will be sent to them at the last known address listed for such Person with the Bankruptcy Court or with the Claims Agent, or to the last known address of their attorney of record. The Holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor. Any Person entitled to receive notice under this Plan will have the obligation to provide the Reorganized Debtor with such Person's current address for notice purposes. The Reorganized Debtor will have no obligation to attempt to locate a more current address in the event any notice proves to be undeliverable to the most recent address which has been provided to the Reorganized Debtor.

**21.11   Consummation of the Plan.** The Debtor reserves the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

**21.12   Severability.** If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted, except if such term or provision is inconsistent with the intent of the Plan Proponents, in which case the Plan may be unilaterally withdrawn by the Plan Proponents. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**21.13   Headings.** The headings of the Sections of this Plan are inserted for convenience only and will not affect the interpretation hereof.

**21.14   Exemption from Transfer Taxes.** Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, whether occurring prior or subsequent to the Confirmation Date, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Plan, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or other similar tax. The Plan may be modified after the Effective Date to incorporate the terms of such sale.

**21.15   Waivers.** Any term of the Plan may be waived by the party benefited by the term to be waived.

**21.16   Setoffs, Recoupments, and Defenses.** Nothing contained in the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any rights of setoff or recoupment or of any defense they may have with respect to any Claim (including rights under Section 502(d) of the Bankruptcy Code). The Debtor, the Estate, and the Reorganized Debtor

may, but will not be required to, set off against any Claim or any Distributions with respect to such Claim, any and all of the Claims, rights, and causes of action of any nature that the Debtor, the Estate, or the Reorganized Debtor may hold against the Holder of such Claim; *provided, however*, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any Distribution hereunder or any other action or omission of the Debtor, the Estate, or the Reorganized Debtor, nor any provision of the Plan, shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any such Claims, rights, and causes of action that the Debtor, the Estate, or the Reorganized Debtor may possess against such Holder.

**21.17   Withdrawal or Revocation of the Plan.** The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.

**21.18   Default.** In the event that the Reorganized Debtor defaults in the performance of any of its respective obligations under the Plan or under any of the Plan Documents, and shall not have cured such default within any applicable cure period (or, if no cure period is specified in the Plan, Plan Documents, or any instrument issued to or retained by a Claimant under the Plan, then within 30 days after receipt of written notice of default), then the entity to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default with respect to any other Claim.

**21.19   Governing Law.** Except as provided in Section 14.8 or to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan and under the Plan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of laws.

**21.20   Reservation of Rights.** If the Plan is not confirmed, or, if confirmed, the Effective Date does not occur by December 31, 2021 (unless such deadline is waived or modified as provided in Section 17.1), the rights of all parties in interest in the Chapter 11 Case are and will be reserved in full. Any concessions or settlements reflected herein, if any, are made for purposes of the Plan only, and if the Plan is not confirmed, or, if confirmed, the Effective Date does not occur, no party in interest in the Chapter 11 Case shall be bound or deemed prejudiced by any such concessions or settlements.

**21.21   Successors and Assigns.** The Plan shall be binding upon and inure to the benefit of the Debtor, the Estate, the Reorganized Debtor, all Claimants, and all other parties in interest affected thereby, and their respective successors, heirs, legal representatives, and assigns.

**21.22   Direction to a Party.** On and after the Effective Date, the Reorganized Debtor may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**21.23   Certain Actions.** By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would

otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or the organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers of the Debtor.

**21.24   Rounding of Fractional Numbers.** All fractional numbers, including payments or Distributions under the Plan, shall be rounded (up or down) to the nearest whole number.

**21.25   Saturday, Sunday, or Legal Holiday.** If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**21.26   Exhibits.** All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

## ARTICLE XXII.  CONFIRMATION REQUEST

**22.1    Request for Confirmation.** The Plan Proponents request confirmation of the Plan under Section 1129 of the Bankruptcy Code with respect to any impaired class that does not accept the Plan or is deemed to reject the Plan. In addition, the Plan Proponents seek approval of the Debtor's entry into the Buy-Back Agreements with each of the Settling Insurers in the amounts set forth in Section 3.2.4. The standard form of the Buy-Back Agreement is set forth on Exhibit G-1, and the forms of the Buy-Back Agreements specific to certain Settling Insurers are set forth on Exhibits G-2 through G-4. The Debtor requests that the Court approve the Buy-Back Agreements pursuant to Bankruptcy Code §§ 363(b), (f), 1123(a)(5), (b)(6), and 1129, with specific findings in the Confirmation Order that (i) each Settling Insurer is a good faith purchaser within the meaning of Bankruptcy Code §363(m), (ii) the Debtor's sale of the applicable policies to each Settling Insurer is free and clear of all liens, Claims, encumbrances, and other interests, and (iii) the consideration exchanged constitutes a fair and reasonable settlement of the respective disputes and rights and obligations under the policies that are being sold and that it constitutes reasonably equivalent value of such policies.

Dated: December 13, 2021

JENNER & BLOCK LLP

/s/ Catherine Steege
Catherine L. Steege (admitted *pro hac vice*)
Dean N. Panos (admitted *pro hac vice*)
Melissa M. Root
Adam T. Swingle (admitted *pro hac vice*)
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350
csteege@jenner.com
dpanos@jenner.com
mroot@jenner.com
aswingle@jenner.com
*Counsel for the Debtor*

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES

/s/ Ilan D. Scharf
James I. Stang (admitted *pro hac vice*)
Ilan D. Scharf (admitted *pro hac vice*)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067
(310) 277-6910
jstang@pszjlaw.com
ischarf@pszjlaw.com

-and-

RUBIN & LEVIN
Deborah J. Caruso
Meredith R. Theisen
135 N. Pennsylvania Street, Suite 1400
Indianapolis, Indiana 46204
(317) 634-0300
dcaruso@rubin-levin.net
mtheisen@rubin-levin.net
*Counsel for the Survivors' Committee*

# EXHIBIT A

**Schedule of CGL Insurers and CGL Insurance Policies**

**USA Gymnastics Plan of Reorganization**
**Exhibit A, Schedule of CGL Insurers and CGL Insurance Policies**

## Debtor CGL Insurers

| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA | |
|---|---|
| Policy Number | Coverage Dates |
| S 138-60-74 | 6-1-79 to 1-1-86 |
| | |
| **TIG INSURANCE COMPANY** | |
| Policy Number | Coverage Dates |
| SSL0001820 or SSL0001820SA or SSL000183-0 | 6-1-86 to 8-1-87 |
| SSP1229882 | 8-1-87 to 8-1-88 |
| SSP1228108 or SSP1228111 or SSP1229705 or SSP1229704 | 1-1-88 to 8-1-88 |
| SSP1229705 or SSP1230368 or SSP1230529 | 8-1-88 to 8-1-89 |
| SSP1230368 or SSP1230529 or SSP1340151 | 8-1-89 to 8-1-90 |
| SSP1340151 or SSP1340354 | 8-1-89 to 1-1-90 |
| SSP2718914 | 8-1-90 to 8-1-91 |
| SSP02719412 | 8-1-91 to 8-1-92 |
| SSP35038808 | 8-1-92 to 8-1-93 |
| SSP35036185 | 6-1-92 to 6-1-93 |
| SSP35036205 | 6-1-92 to 6-1-93 |
| SSP36099770 | 8-1-93 to 8-1-94 |
| SSP36099761 | 6-1-93 to 6-1-94 |
| SSP36099764 | 6-1-93 to 6-1-94 |
| SPX36099765 | 6-1-93 to 6-1-94 |
| SSP3621154000 | 6-1-94 to 6-1-95 |
| SSP36212187 | 8-1-94 to 8-1-95 |
| SSP3621153700 | 6-1-94 to 6-1-95 |
| SSP36245082 | 6-1-95 to 6-1-96 |
| SSP36245080 | 6-1-95 to 6-1-96 |
| SSP36245084 | 8-1-95 to 8-1-96 |
| KLB37391537 | 6-25-96 to 7-2-96 |
| SSP37393550-01 | 8-1-96 to 8-1-97 |
| KLB37498134 | 9-16-96 to 8-1-97 |
| SSP3739355001 | 8-1-97 to 8-1-98 |
| KLB-00037498134-01 | 8-1-97 to 8-1-98 |
| T7 0003921762800 | 8-1-01 to 8-1-04 |
| KLB003921763000 | 8-1-01 to 8-1-02 |
| | |
| **ACE AMERICAN INSURANCE COMPANY F/K/A CIGNA INSURANCE COMPANY** | |
| Policy Number | Coverage Date |
| G19421752 | 8-1-98 to 8-1-99 |
| XCP G19493805 | 8-1-98 to 8-1-99 |
| G19421752 (Renewal) | 8-1-99 to 8-1-00 |

**USA Gymnastics Plan of Reorganization**
**Exhibit A, Schedule of CGL Insurers and CGL Insurance Policies**

| | |
|---|---|
| XCP G20086427 | 8-1-99 to 8-1-00 |
| G19421752 (Renewal) | 8-1-00 to 8-1-01 |
| XCP G20125858 | 8-1-00 to 8-1-01 |
| | |
| **VIRGINIA SURETY COMPANY F/K/A COMBINED SPECIALTY INSURANCE COMPANY** | |
| Policy Number | Coverage Date |
| T7 0000000734000 | 8-1-02 to 8-1-03 |
| T7 0000000734001 | 8-1-03 to 8-1-04 |
| | |
| **GREAT AMERICAN ASSURANCE COMPANY** | |
| Policy Number | Coverage Date |
| EXC000591017800 | 8-1-02 to 8-1-03 |
| EXC000591017801 | 8-1-03 to 8-1-04 |
| PAC0000568846300 | 8-1-04 to 8-1-05 |
| EXC00005688847900 | 8-1-04 to 8-1-05 |
| PAC0000568846301 | 8-1-05 to 8-1-06 |
| EXC00005688847901 | 8-1-05 to 8-1-06 |
| PAC0000568846302 | 8-1-06 to 8-1-07 |
| EXC00005688847902 | 8-1-06 to 8-1-07 |
| | |
| **NATIONAL CASUALTY COMPANY** | |
| Policy Number | Coverage Date |
| KRO0000000103500 | 8-1-07 to 8-1-08 |
| XKO000000000103600 | 8-1-07 to 8-1-08 |
| KRO000000103501 | 8-1-08 to 8-1-09 |
| XKO0000000103601 | 8-1-08 to 8-1-09 |
| KRO0000000103502 | 8-1-09 to 8-1-10 |
| XKO0000000103602 | 8-1-09 to 8-1-10 |
| KRO0000001198500 | 8-1-10 to 8-1-11 |
| XKO0000001198600 | 8-1-10 to 8-1-11 |
| KRO0000002032600 | 8-1-11 to 8-1-12 |
| XKO0000002032700 | 8-1-11 to 8-1-12 |
| KRO0000002905000 | 8-1-12 to 8-1-13 |
| XKO0000002905100 | 8-1-12 to 8-1-13 |
| KRO0000003809900 | 8-1-13 to 8-1-14 |
| XKO0000003810100 | 8-1-13 to 8-1-14 |
| KRO0000004695000 | 8-1-14 to 8-1-15 |
| XKO0000004695400 | 8-1-14 to 8-1-15 |
| KRO0000005683700 | 8-1-15 to 8-1-16 |
| XKO0000005690800 | 8-1-15 to 8-1-16 |
| KRO0000006492900 | 8-1-16 to 8-1-17 |
| XKO0000006519400 | 8-1-16 to 8-1-17 |
| KRO0000007069300 | 8-1-17 to 8-1-18 |
| XKO0000007069600 | 8-1-17 to 8-1-18 |

USA Gymnastics Plan of Reorganization
Exhibit A, Schedule of CGL Insurers and CGL Insurance Policies

|  |
|---|

### USOPC Insurers

| TRANSAMERICA INSURANCE COMPANY | |
|---|---|
| Policy Number | Coverage Dates |
| SSP-02719143 | 1-1-91 to 1-1-92 |
| KLB2723643 | 1-1-91 to 1-1-92 |
| SSP-02767733 | 1-1-92 to 1-1-93 |
| KLB2777292 | 1-1-92 to 1-1-93 |
| SSP-35042049 | 1-1-93 to 1-1-94 |
| KLB-35042101 | 1-1-93 to 1-1-94 |
| SSP-36105725 | 1-1-94 to 1-1-95 |
| KLB-36207747 | 1-1-94 to 1-1-95 |
| TIG INSURANCE COMPANY | |
| Policy Number | Coverage Dates |
| SSP-36239586 | 1-1-95 to 1-1-96 |
| KLB-36239589 | 1-1-95 to 1-1-96 |
| SSP-37274344 | 1-1-96 to 1-1-97 |
| KLB-37274346 | 1-1-96 to 1-1-97 |
| SSP-00037501755-00 | 1-1-97 to 1-1-00 |
| KLB-0037501757-00 | 1-1-97 to 1-1-98 |
| KLB-0037501757-01 | 1-1-98 to 1-1-99 |
| KLB00037501757-02 | 1-1-99 to 5-1-99 |
| KLB00037501757-03 | 5-1-99 to 1-1-00 |
| SSP0003750175503 | 1-1-00 to 1-1-03 |
| KLB00037501757-04 | 1-1-00 to 1-1-01 |
| KLB00037501757-05 | 1-1-01 to 1-1-02 |
| KLB00037501757-05 | 1-1-02 to 1-31-02 |
|  | |
| VIRGINIA SURETY COMPANY F/K/A COMBINED SPECIALTY INSURANCE COMPANY | |
| Policy Number | Coverage Date |
| SSP0000001020600 | 2-8-03 to 2-8-04 |
|  | |
| GREAT AMERICAN ASSURANCE COMPANY | |
| Policy Number | Coverage Date |
| EXC0000565946200 | 2-8-03 to 2-8-04 |
| GLO0000558255700 | 2-8-04 to 2-8-05 |
| EXC0000558255800 | 2-8-04 to 2-8-05 |
| GLO0000558255701 | 2-8-05 to 2-8-06 |
| EXC0000558255801 | 2-8-05 to 2-8-06 |
| GLO0000558255702 | 2-8-06 to 2-8-07 |
| EXC0000558255802 | 2-8-06 to 2-8-07 |
| GLO0000558255703 | 2-8-07 to 2-8-08 |
| EXC0000558255803 | 2-8-07 to 2-8-08 |

**USA Gymnastics Plan of Reorganization**
**Exhibit A, Schedule of CGL Insurers and CGL Insurance Policies**

| | |
|---|---|
| XS7856009-00 | 2-8-08 to 2-8-09 |
| XS7856009-01 | 2-8-09 to 2-8-10 |
| XS7856009-02 | 2-8-10 to 2-8-11 |
| | |
| **NATIONAL CASUALTY COMPANY** | |
| <u>Policy Number</u> | <u>Coverage Date</u> |
| KRO0000000264700 | 2-8-08 to 2-8-09 |
| XKO0000000264800 | 2-8-08 to 2-8-09 |
| KRO0000000264701 | 2-8-09 to 2-8-10 |
| XKO0000000264801 | 2-8-09 to 2-8-10 |
| KRO0000000887100 | 2-8-10 to 2-8-11 |
| XKO0000000887200 | 2-8-10 to 2-8-11 |
| KRO00000001579400 | 2-8-11 to 2-8-12 |
| XKO0000001579600 | 2-8-11 to 2-8-12 |
| XLO0019010 | 2-8-11 to 2-8-12 |
| KRO00000002423400 | 2-8-12 to 2-8-13 |
| XKO0000002423600 | 2-8-12 to 2-8-13 |
| XLO0019647 | 2-8-12 to 2-8-13 |
| KRO00000003302500 | 2-8-13 to 5-1-14 |
| XKO0000003302600 | 2-8-13 to 5-1-14 |
| XLO0019783 | 2-8-13 to 5-1-14 |
| KRO00000004481400 | 5-1-14 to 5-1-15 |
| XKO0000004481500 | 5-1-14 to 5-1-15 |
| XLO0020136 | 5-1-14 to 5-1-15 |
| | |
| **GEMINI INSURANCE COMPANY** | |
| <u>Policy Number</u> | <u>Coverage Date</u> |
| CEX09601478-00 | 5-1-15 to 5-1-16 |
| | |
| **PHILADELPHIA INDEMNITY INSURANCE COMPANY** | |
| <u>Policy Number</u> | <u>Coverage Date</u> |
| PHPK1330247 | 5-1-15 to 5-1-16 |

**USA Gymnastics Plan of Reorganization**
**Exhibit A, Schedule of CGL Insurers and CGL Insurance Policies**

## Karolyi  Insurers

| American Empire | |
| --- | --- |
| Policy Number | Coverage Dates |
| 11CG64058 | 5-18-11 to 5-18-12 |
| 12CG67109 | 5-18-12 to 5-18-13 |
| 13CG0176317 | 5-18-13 to 5-18-14 |
| 14CG0182141 | 5-18-14 to 5-18-15 |
| 15CG0190975 | 5-18-15 to 5-18-16 |
| 16CG0202368 | 5-18-16 to 5-18-17 |

# **EXHIBIT B**

**Schedule of Indemnification Claims**

**USA Gymnastics Plan of Reorganization**
**Exhibit B, Schedule of Indemnification Claims**

| Claim Number[1] | Claimant's Name |
|---|---|
| General Unsecured Claim 7 | Debra Van Horn |
| General Unsecured Claim  143 | All Olympic Gymnastics Center Inc. |
| General Unsecured Claim 147 | Galina Marinova |
| General Unsecured Claim 189 | Artur Akopyan |
| General Unsecured Claim 246 | Mihael Anton |
| General Unsecured Claim 285 | Stephen D. Penny, Jr. |
| General Unsecured Claim 288 | Twistars USA, Inc. |
| General Unsecured Claim 292 | Federal Insurance Company |
| General Unsecured Claim 293 | Executive Risk Indemnity, Inc. |
| General Unsecured Claim 294 | ACE American Insurance Company |
| General Unsecured Claim 295 | ACE Property & Casualty Insurance Company |
| General Unsecured Claim 299 | USOPC |
| General Unsecured Claim 317 | Leslie L. French |
| General Unsecured Claim 319 | BELIEVE LLC |
| General Unsecured Claim 332 | National Gymnastics Foundation |
| General Unsecured Claim 355 | Martha Karolyi |
| General Unsecured Claim 356 | Bela Karolyi |
| General Unsecured Claim 357 | Karolyi Training Camps, LLC |
| General Unsecured Claim 358 | BMK Partners, Ltd. |
| General Unsecured Claim 359 | BMK Training Facilities, Ltd. |

---

[1] The Debtor reserves the right to object to any of the Claims on this Exhibit B and to supplement or amend this Exhibit B.

# <u>EXHIBIT C</u>

**Schedule of Participating Parties**

**USA Gymnastics Plan of Reorganization**
**Exhibit C, Schedule of Participating Parties**

| Participating Parties |
|:---:|
| Twistars |
| USOPC |
| Karolyis |

# EXHIBIT D

**Schedule of Excluded Parties**

**USA Gymnastics Plan of Reorganization**
**Exhibit D, Schedule of Excluded Parties**

| Excluded Parties |
|:---:|
| Don Peters |
| SCATS Gymnastics, including without limitation any predecessor in interest thereto |
| Steve Rybacki |
| Beth Rybacki |
| Charter Oak Gymnastics, including without limitation any predecessor in interest thereto |

**USA Gymnastics Plan of Reorganization**
**Exhibit E, Intentionally Omitted**

# <u>EXHIBIT E</u>

**[Intentionally Omitted]**

# **EXHIBIT F**

**Form of Trust Agreement**

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

## TRUST AGREEMENT

This Trust Agreement is made and entered into between USA Gymnastics ("**USAG**", the "**Debtor**", or the "**Reorganized Debtor**"), William L. Bettinelli (the "**Settlement Trustee**"), and Fred C. Caruso, not individually but as the Future Claims Representative ("**FCR**") pursuant to the terms of the *Modified Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors* (as it may hereafter be amended or modified, the "**Plan**"), filed by the Debtor in its chapter 11 case in the United States Bankruptcy Court for the Southern District of Indiana (the "**Bankruptcy Court**").[1]

## RECITALS

A.      On December 5, 2018, USAG filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor remained in possession of its property and continued to operate and maintain its organization as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.      On December 13, 2021, the Debtor filed the Plan. On [•], 2021, the Bankruptcy Court confirmed the Plan by entering the Confirmation Order. The Debtor will become the Reorganized Debtor upon the Effective Date of the Plan.

C.      Pursuant to the Plan, a Trust is created for the benefit of Abuse Claimants and Future Claimants. All Abuse Claims and Future Claims are channeled to the Trust, along with the USOPC Claim, the Indemnification Claims, all other Claims arising from or related in any way to the Abuse Claims, and any Claims for punitive damages, alter ego liability, or piercing the corporate veil against any Participating Party, Settling Insurer, or Non-Debtor CGL Settling Insurer Covered Person. Distributions to Holders of Allowed Abuse Claims and Holders of Allowed Future Claims shall be made from assets contributed to the Trust by the Settling Insurers and Participating Parties.

D.      The Trust is intended to qualify as a "Designated" or "Qualified" Settlement Fund pursuant to Section 468B of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended (the "**Internal Revenue Code**"), and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.* (the "**Treasury Regulations**").

E.      The Settlement Trustee is duly appointed as a representative of the Debtor and its Estate for the sole purpose of implementing the Plan through the Settlement Trustee's administration of the Trust  and Distribution of the Trust Assets (defined below) pursuant to 11 U.S.C. §1123(a)(5)(B).

---

[1] The definitions set forth in Article I of the Plan apply to capitalized terms used, but not defined, in this Trust Agreement. The rules of construction set forth in Article II of the Plan apply to this Trust Agreement. To the extent that any provision of this Trust Agreement conflicts with any term of the Plan, the terms of the Plan shall control.

F.      The FCR is appointed as the representative of holders of Future Claims. The FCR is a party to this Agreement for purposes of performing the duties necessary with respect to Future Claims.

**NOW, THEREFORE**, pursuant to the Plan and the Confirmation Order and in consideration of the mutual covenants set forth herein, it is agreed as follows:

## ARTICLE I.  AGREEMENT OF TRUST

**1.1    Creation and Name**. The Debtor hereby creates a trust known as "The USA Gymnastics Trust" as the Trust provided under the Plan.

**1.2    Purpose**. The Trust is established for the benefit of the Abuse Claimants and Future Claimants and shall assume all liability for the Channeled Claims. The Trust shall receive and distribute the Trust Assets (defined below) to Abuse Claimants and Future Claimants in accordance with the terms of this Trust Agreement, the Plan, and the Confirmation Order.

**1.3    Irrevocability**. The Trust is irrevocable. The Reorganized Debtor shall not alter, amend, revoke, or terminate the Trust. The Reorganized Debtor shall have no power or authority to direct the Settlement Trustee to return any of the Trust Assets to the Reorganized Debtor. The Settlement Trustee shall nevertheless have the power to amend this Trust Agreement for the purpose of conforming the Trust Agreement to the provisions of the Plan and the Confirmation Order, subject to approval by the Bankruptcy Court.

**1.4    Bound By the Plan**. By executing this Agreement, the Settlement Trustee and the FCR agree to be bound by the terms of the Plan.

## ARTICLE II. CORPUS OF THE TRUST

**2.1    Trust Corpus**. The Trust shall be initially funded with: (a) the Net Settlement Payment; (b) the Twistars Payment; and (c) the assignment of any Insurance Claims.

**2.2    Future Claimant Reserve**. The Trust shall establish a Future Claimant Reserve funded with one percent (1%) of the Net Settlement Payment and Twistars Payment.

**2.2.1    Expiration of Future Claimant Reserve**. Following the fifth (5th) anniversary of the Plan's Effective Date, any funds held in the Future Claimant Reserve shall be released to the Settlement Trustee to administer to Holders of Abuse Claims consistent with the terms of this Trust Agreement, the Plan, and the Confirmation Order. In the event that the remaining funds held, when combined with other Trust assets, total $50,000 or less, the Settlement Trustee shall have the discretion to either (a) administer to Holders of Abuse Claims consistent with the Trust Documents and the terms of the Plan; or (b) distribute to a charitable entity mutually agreed upon by the Settlement Trustee and the Reorganized Debtor; *provided, however*, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the United States Olympic & Paralympic Committee.

**2.3    Transfer of Trust Assets**. Following the occurrence of the conditions to the effectiveness of the Plan, the Reorganized Debtor and the Settling Insurers shall irrevocably and

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

absolutely transfer, grant, assign, convey, set over, and deliver to the Settlement Trustee all of their rights, titles, and interests in and to the Trust Assets to be held in trust. The Settlement Trustee hereby agrees to accept and hold the Trust Assets in trust for the Abuse Claimants and Future Claimants in accordance with the terms of the Plan and the Confirmation Order.

**2.4    Settlement Trustee's Right to and Title and Interest in Trust Assets**. Upon the transfer of the Trust Assets, the Settlement Trustee shall succeed to all of the Debtor's, the Estate's, the Reorganized Debtor's, the Settling Insurers', and the Participating Parties' rights, titles, and interests, if any, in and to the Trust Assets, and the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, and the Participating Parties shall have no further rights, titles, or interests in, or with respect to, the Trust Assets.

**2.5    No Tax on Transfers to Trust**. Pursuant to Section 1146(a) of the Bankruptcy Code, the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Trust Agreement, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by this Trust Agreement, the Plan, and the Confirmation Order and any transfer to the Trust, shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax, or other similar tax.

**2.6    Spendthrift Provision**. To the fullest extent permitted by law, the Trust Assets shall not, in whole or in part, be subject to any legal or equitable Claims of creditors of any Abuse Claimant, Future Claimant, Channeled Claimant, or others, and the Trust Assets shall not be subjected to any legal process or any voluntary or involuntary attempts to transfer, assign, pledge, encumber, or otherwise alienate such Trust Assets, except as may be ordered by the Bankruptcy Court.

## ARTICLE III. POWERS AND DUTIES OF SETTLEMENT TRUSTEE AND FCR

**3.1    Powers and Duties of Settlement Trustee**. The Settlement Trustee shall have, in addition to any other powers and duties conferred on the Settlement Trustee by applicable trust, bankruptcy, or tax law, the following powers and duties:

1.    Receive, deposit, and invest Trust Assets in compliance with Section 345 of the Bankruptcy Code.

2.    Open and maintain bank accounts on behalf of the Trust, deposit funds into such accounts, and draw checks on such accounts.

3.    Establish such reserves as required by this Trust Agreement, the Plan, and the Confirmation Order; *provided, however*, nothing in this provision shall restrict the Settlement Trustee's authority to pool the Trust's accounts for investment purposes or require separate bank accounts for the reserves required by this Trust Agreement, the Plan, and the Confirmation Order.

4.    Allocate and make Distributions to Abuse Claimants and Future Claimants.

5.    Make, sign, execute, acknowledge, deliver, and file, including with any governmental authority, any documents that may be necessary or

appropriate to effectuate the purpose of the Trust or to establish, maintain, or administer the Trust.

6.    Fulfill all reporting obligations to the United States Department of Health and Human Services and other governmental authorities, as contemplated by Section 11.7 of the Plan.

7.    File a motion with the Bankruptcy Court, with notice to parties in interest, for the enforcement of any provision of the Plan or the Confirmation Order pertaining to the Trust, or any provision of this Trust Agreement, as may be appropriate to effectuate the purpose of the Trust.

8.    File a motion with the Bankruptcy Court, with notice to parties in interest, for a modification of the provisions of this Trust Agreement if the Settlement Trustee determines that such modification is necessary to effectuate the purpose of the Trust.

9.    Retain and rely upon the advice of any counsel, consultants, experts, accountants, investment advisors, and such other agents or professionals (each, a "**Professional**") as are necessary and appropriate to effectuate the purpose of, and maintain and administer, the Trust, subject to the Bankruptcy Court's approval of such employment.

10.    Fulfill any and all other obligations imposed on the Trust by this Trust Agreement, the Plan, or the Confirmation Order.

**3.2**    **Limitations on the Settlement Trustee**. The Settlement Trustee is prohibited from taking the following acts:

1.    Making any transfers or Distributions of Trust Assets other than as authorized by this Trust Agreement, the Plan, and the Confirmation Order.

2.    Loaning or encumbering the Trust Assets, or issuing a guaranty with recourse to the Trust Assets.

3.    Conducting any trade or business using or affecting the Trust Assets.

4.    Engaging in any investments or activities inconsistent with the treatment of the Trust as a "Designated" or "Qualified" settlement fund pursuant to the Internal Revenue Code and the Treasury Regulations.

**3.3**    **Powers and Duties of FCR**. The FCR shall have the power and duty to perform those actions required under Article V herein.

## ARTICLE IV.  ALLOCATION METHOD FOR ABUSE CLAIMS

**4.1**    **Trust Assets Available for Abuse Claims**. The Trust shall make Distributions to Holders of Allowed Abuse Claims from the Trust Assets minus the amounts contained in the Future Claimant Reserve (the "**Available Trust Assets**").

**4.2     Allocation Method**. The amount of an Abuse Claimant's Distribution, if any, shall be governed by Section 7.2 of the Plan and the Allocation Protocol attached as <u>Exhibit H</u> to the Plan.

**4.3     Release and Dismissal Of Litigation**. Before the Trust may make any Distribution to any Abuse Claimant, such Abuse Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, and for each of the foregoing, their Related Persons but solely acting in their capacity as such, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within ten (10) days after receiving any payment form the Trust, an Abuse Claimant shall dismiss with prejudice any lawsuit that such Abuse Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall provide copies of such dismissal orders and general releases to any Protected Party that requests a copy.

**4.4     Attorneys' Fees and Costs**. The fees and expenses of attorneys representing Abuse Claimants who receive payment from the Trust will be borne exclusively by such Abuse Claimants based on applicable state law and individual arrangements made between such Abuse Claimants and their respective attorneys. The Trust, the Settlement Trustee, and the other parties listed in Section 11.3 of the Plan shall have no liability for any such fees and expenses, and any Claims for such fees and expenses shall be disallowed.

## ARTICLE V.  ALLOCATION METHOD FOR FUTURE CLAIMS.

**5.1     Submission of Future Claims and Eligibility for Distribution**. A Future Claimant must file a Claim with the Settlement Trustee on or before the fifth (5th) anniversary of the Plan's Effective Date. The Claim shall be entitled to a Distribution exclusively from the Future Claimant Reserve and no other Trust Assets, provided funds remain in the Future Claimant Reserve, only if the Settlement Trustee, in consultation with the FCR, determines that the Holder of such Claim has proven by a preponderance of the evidence that such Holder meets the definition of a Future Claimant and such Holder's Claim meets the definition of a Sexual Abuse Claim.

**5.2     Allocation Method**. If the requirements of Section 5.1 of this Trust Agreement are satisfied, the FCR may allocate a Distribution to a Future Claimant from funds remaining in the Future Claimant Reserve. The amount of a Future Claimant's Distribution, if any, shall be governed by Section 11.6 of the Plan and the Future Claimant Allocation Protocol attached as <u>Exhibit I</u> to the Plan.

**5.3     Release and Dismissal of Litigation**. Before the Trust may make any Distribution to any Future Claimant, such Future Claimant shall execute and deliver to the Trust a full and complete release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

Persons, in form and substance acceptable to the Debtor, the Estate, the Reorganized Debtor, the Participating Parties, and the Settling Insurers, of any and all Claims arising from or relating to Abuse Claims or Future Claims. In addition, within ten (10) days after receiving any payment from the Trust, a Future Claimant shall dismiss with prejudice any lawsuit that such Future Claimant had brought against the Debtor, any Participating Party, and any Non-Debtor CGL Settling Insurer Covered Person, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall provide copies of such dismissal orders to any Protected Party that requests a copy.

     **5.4**    **Attorneys' Fees and Costs**. Pursuant to Section 11.3 of the Plan, the fees and expenses of attorneys representing Future Claimants who receive payment from the Trust will be borne exclusively by such Future Claimants based on applicable state law and individual arrangements made between such Future Claimants and their respective attorneys. The Trust, the Settlement Trustee, and the other parties listed in Section 11.3 of the Plan shall have no liability for any such fees and expenses, and any Claims for such fees and expenses shall be disallowed.

## ARTICLE VI.  TERMINATION OF THE TRUST

     **6.1**    **When Termination Shall Occur**. The Settlement Trustee shall terminate the Trust after the Trust Assets are fully and completely distributed in accordance with this Trust Agreement, the Plan, and the Confirmation Order, and after the Settlement Trustee has fully and completely performed all other duties set forth in this Trust Agreement, the Plan, and the Confirmation Order. The Trust Assets shall be deemed totally distributed when the amount remaining in the Trust is less than $50,000.

     **6.2**    **Termination Distribution**. Upon termination of the Trust, provided that all fees and expenses of the Trust have been paid or provided for in full, the Settlement Trustee shall deliver all funds and other investments remaining in the Trust, if any, including any investment earnings thereon, to a charitable entity mutually agreed upon by the Settlement Trustee and the Reorganized Debtor; *provided, however*, that any such funds shall not revert to the Debtor, the Estate, the Reorganized Debtor, the National Gymnastics Foundation, or the United States Olympic & Paralympic Committee.

     **6.3**    **Termination Procedures**. After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Settlement Trustee shall retain the books, records, documents, and files that were delivered to or created by the Settlement Trustee. The Settlement Trustee, at his discretion, may destroy all such books, records, documents and files at any time following the later of: (a) one year following the final Distribution of the Trust Assets; and (b) the date until which applicable law requires the Settlement Trustee to retain such books, records, documents, and files; *provided, however*, the Settlement Trustee shall not destroy any books, records, documents, or files relating to the Trust without giving the Reorganized Debtor, the Participating Parties, the Settling Insurers, Abuse Claimants, other Channeled Claimants, and the FCR reasonable prior written notice thereof.

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

## ARTICLE VII. IMMUNITY, LIABILITY, AND INDEMNIFICATION OF SETTLEMENT TRUSTEE AND PROFESSIONALS

**7.1 Limitations on Liability**. Neither the Settlement Trustee, the FCR, nor any of their Professionals whose employment is approved by the Bankruptcy Court shall be liable for any good faith act or omission within the scope of their duties under this Trust Agreement, the Plan, and the Confirmation Order, and may only be liable for willful misconduct and fraud. No recourse shall ever be had, directly or indirectly, against the Settlement Trustee or FCR personally or against any of the Settlement Trustee's or FCR's Court-approved Professionals personally, by legal or equitable proceedings of any kind, for any good faith act or omission within the scope of their duties under this Trust Agreement, the Plan, and the Confirmation Order. Any Claims arising out of such acts or omissions shall be enforceable only against, and satisfied only out of, the Trust Assets. The foregoing does not limit the liability of the Settlement Trustee, the FCR or their Court-approved Professionals for their willful misconduct or fraud.

**7.2 Advice of Professionals**. The Settlement Trustee and the FCR may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their respective Court-approved Professionals and shall not be liable for any good faith act or omission in accordance with the advice or opinions provided by such Professionals. Notwithstanding the foregoing, neither the Settlement Trustee nor the FCR shall be under an obligation to consult with their respective Court-approved Professionals, and the determination not to do so shall not result in the imposition of liability on the Settlement Trustee or the FCR, unless such determination is based on the Settlement Trustee's or FCR's willful misconduct or fraud.

**7.3 Indemnification**. The Settlement Trustee, using the Trust Assets (exclusive of the FCR Reserve), shall defend, indemnify, and hold harmless the Settlement Trustee and any of the Settlement Trustee's Court-approved Professionals to the fullest extent that a corporation or trust organized under the laws of the State of Indiana is entitled to defend, indemnify, and hold harmless its agents against any and all costs (including attorneys' fees and expenses), judgments, awards, amounts paid in settlement, liabilities, Claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement, the Plan, and the Confirmation Order; *provided, however*, neither the Settlement Trustee nor any of the Settlement Trustee's agents shall be defended, indemnified, or held harmless in any way for any liability, expense, Claim, damage, or loss arising from their willful misconduct or fraud. The FCR, using the FCR Reserve only, shall defend, indemnify, and hold harmless the FCR and any of the FCR's Court-approved Professionals to the fullest extent that a corporation or trust organized under the laws of the State of Indiana is entitled to defend, indemnify, and hold harmless its agents against any and all costs (including attorneys' fees and expenses), judgments, awards, amounts paid in settlement, liabilities, Claims, damages, or losses incurred by them in the performance of their duties under this Trust Agreement, the Plan, and the Confirmation Order; *provided, however*, neither the FCR nor any of the FCR's agents shall be defended, indemnified, or held harmless in any way for any liability, expense, Claim, damage, or loss arising from their willful misconduct or fraud.

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

## ARTICLE VIII. COMPENSATION AND REIMBURSEMENT OF SETTLEMENT TRUSTEE, FCR, AND PROFESSIONALS

**8.1     Settlement Trustee Compensation**. The Settlement Trustee and the FCR shall be entitled to receive reasonable compensation for services rendered. Such compensation must be approved by the Bankruptcy Court upon application, and will be paid from the Trust Assets.

**8.2     Compensation of Settlement Trustee's or FCR's Agents**. Any Professional retained by the Settlement Trustee or the FCR pursuant to this Trust Agreement, the Plan, and the Confirmation Order, and whose employment is approved by the Bankruptcy Court, shall be entitled to reasonable compensation for services rendered. Such compensation must be approved by the Bankruptcy Court upon application, and will be paid from the Trust Assets.  Compensation to the FCR and the FCR's Agents shall be made from the Future Claimants Reserve.

**8.3     Reimbursement of Expenses**. The Settlement Trustee, the FCR, and any Professional retained by the Settlement Trustee or FCR, whose employment is approved by the Bankruptcy Court, shall be entitled to reimbursement of all reasonable and necessary costs and expenses incurred in the performance of the duties imposed by this Trust Agreement, the Plan, and the Confirmation Order. Such reimbursement must be approved by the Bankruptcy Court upon application, and will be paid from the Trust Assets. Reimbursement of expenses to the FCR and the FCR's Agents shall be made from the Future Claimants Reserve.

## ARTICLE IX. SUCCESSOR SETTLEMENT TRUSTEE OR FCR

**9.1     Vacancy Caused by Settlement Trustee or FCR Resignation**. The Settlement Trustee or FCR may resign upon thirty (30) days written notice filed with the Bankruptcy Court.

**9.2     Vacancy Caused by Settlement Trustee or FCR Removal**. The Bankruptcy Court may remove a Settlement Trustee or the FCR upon finding that the Settlement Trustee or FCR has engaged in a breach of fiduciary duty, willful misconduct, or fraud. The removal will take effect upon the date ordered by the Bankruptcy Court.

**9.3     Appointment of Successor Settlement Trustee or FCR**. If there is a vacancy in the position of Settlement Trustee, the Reorganized Debtor, in consultation with the Participating Parties, Settling Insurers, and the FCR, shall designate a successor Settlement Trustee, subject to the approval of the Bankruptcy Court, after notice and a hearing. If there is a vacancy in the position of FCR, the Reorganized Debtor, in consultation with the Participating Parties, Settling Insurers, and the Settlement Trustee, shall designate a successor FCR, subject to the approval of the Bankruptcy Court, after notice and a hearing. Upon the Bankruptcy Court's approval of any successor Settlement Trustee or FCR, all rights and obligations of the prior Settlement Trustee or prior FCR shall vest in the successor Settlement Trustee or successor FCR, and the successor Settlement Trustee or successor FCR shall be substituted for the prior Settlement Trustee or prior FCR as a matter of law, including in any action or proceeding brought by the prior Settlement Trustee. The Bankruptcy Court may enter such orders as are necessary to effect the appointment of the successor Settlement Trustee  or the successor FCR.

**9.4** **Obligations of Retiring or Removed Settlement Trustees**. In the event of the resignation or removal of the Settlement Trustee, that Settlement Trustee shall, within 30 days of resignation or removal: (a) deliver to the successor Settlement Trustee all of the Trust Assets which were in the possession of the resigning or removed Settlement Trustee along with a complete list of Trust Assets and a complete accounting of all transactions engaged in by the Settlement Trustee while serving as Settlement Trustee; (b) execute and deliver such documents, instruments, records, and other writings as may be reasonably requested by the successor Settlement Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Settlement Trustee to the successor Settlement Trustee; (c) deliver to the successor Settlement Trustee all documents, instruments, records, and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Settlement Trustee; and (d) otherwise assist and cooperate in effecting the assumption of the resigning or removed Settlement Trustee's obligations and functions by the successor Settlement Trustee. In the event of the resignation or removal of the FCR, that FCR shall, within 30 days of resignation or removal: (a) deliver to the successor FCR all documents, instruments, records, and other writings relating to the FCR's performance of his duties as may be in the possession or under the control of the resigning or removed FCR; and (b) otherwise assist and cooperate in effecting the assumption of the resigning or removed FCR's obligations and functions by the successor FCR.

## ARTICLE X.  SETTLEMENT TRUSTEE REPORTING AND DISCHARGE

**10.1** **Annual Accountings**. The Settlement Trustee shall prepare, at least annually, and upon termination of the Trust, a written accounting of the administration of the Trust listing the current assets (with fair market values) and detailing all transactions that occurred during the period covered by such accounting. Each such accounting shall be filed with the Bankruptcy Court.

**10.2** **Approval of Accountings and Discharge of Settlement Trustee**. The Settlement Trustee may file with the Bankruptcy Court a motion for approval of the accounting described in Section 10.1 of this Trust Agreement. Upon the entry of an order of the Bankruptcy Court approving such accounting, the Settlement Trustee shall be discharged from all liability with respect to all assets and transactions listed in such accounting to the Trust, any Claimant, and any other Person who has or may have a Claim against the Trust for acts or omissions in the Settlement Trustee's capacity as the Settlement Trustee.

## ARTICLE XI.  SECTION 468B SETTLEMENT FUND

**11.1** **Trust as Settlement Fund**. In accordance with the Plan and the Confirmation Order, the Settlement Trustee shall take all reasonable steps to ensure that the Trust will qualify as, and remain, a "Designated" or "Qualified" settlement fund within the meaning of Section 468B of the Internal Revenue Code and the Treasury Regulations. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). It is further intended that the transfers to the Trust will satisfy the "all events test" and the "economic performance" requirements of Section 461(h)(1) of the Internal Revenue Code and Treasury Regulation Section 1.461-1(a)(2).

**11.2    Employer Identification Number**. Upon establishment of the Trust, the Settlement Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

**11.3    Relation-Back Election**. If applicable, the Settlement Trustee and the Reorganized Debtor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B- 1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

**11.4    Filing Requirements**. The Settlement Trustee shall cause to be filed, on behalf of the Trust, all required federal, state, and local tax returns in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). The election statement shall be included with the Trust's first timely filed income tax return. The Reorganized Debtor and the Settling Insurers shall supply to the Settlement Trustee and to the Internal Revenue Service the statement described in Treasury Regulation Section 1.468B-3(e)(2) no later than February 15th of the year following each calendar year in which the Reorganized Debtor or the Settling Insurers make any transfers to the Trust.

## ARTICLE XII.  BENEFICIARIES

**12.1    Names and Addresses**. The Settlement Trustee shall at all times keep a register in which the Settlement Trustee maintains a record of the awards made to the Abuse Claimants and Future Claimants pursuant to this Trust Agreement, the Plan, and the Confirmation Order, including their names, contact information, and the amounts of their awards, as well as copies of the required releases they delivered to the Trust; *provided, however*, the Settlement Trustee's management of this register shall be subject to the confidentiality provisions imposed by the Bankruptcy Court's *Order Approving Debtor's Motion For Order Establishing Deadlines For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof* [Dkt. 301]. The Settlement Trustee may rely upon this register for the purposes of delivering Distributions and notices.

**12.2    Rights of Beneficiaries**. Abuse Claimants, Future Claimants, and any other Channeled Claimants shall have no title to, right to, possession of, management of, or control over the Trust Assets, or any right to call for a partition or division of the Trust Assets. Title to all of the Trust Assets shall be vested in the Trust and the Settlement Trustee, and the sole interest of any Claimants in the Trust Assets shall be the rights and benefits given to such Claimants under this Trust Agreement, the Plan, and the Confirmation Order. The rights of a Claimant under this Trust Agreement shall, upon a Claimant's death or incapacity, pass to the legal representative of such Claimant.

**12.3    Tax Identification Numbers**. The Settlement Trustee may require any Claimant to furnish to the Settlement Trustee the Claimant's employer or taxpayer identification number or social security number as assigned by the IRS, and such other records or documents necessary to satisfy the Settlement Trustee's tax reporting obligations (including, but not limited to, certificates of non-foreign status). The Settlement Trustee may condition the payment of any Distribution to any Claimant upon receipt of such number and records or documents.

USA Gymnastics Plan of Reorganization
Exhibit F, Form of Trust Agreement

## ARTICLE XIII.  MISCELLANEOUS PROVISIONS

**13.1    Effective Date**. This Trust Agreement shall only become effective after all of the following conditions are satisfied: (1) the occurrence of the conditions necessary for the effectiveness of the Plan; and (2) the Reorganized Debtor, the Settlement Trustee, and the FCR, execute this Trust Agreement.

**13.2    Incorporation**. The Plan, the Confirmation Order, and any other Plan Documents and Trust Documents are incorporated into this Trust Agreement. The FCR and Settlement Trustee agree to be bound by all of the provisions of the Plan and the Confirmation Order.

**13.3    Notices**. All notices or deliveries required or permitted under this Trust Agreement shall be given to the following:

If to the Trust or Settlement Trustee:

[Settlement Trustee notice party]

If to a Claimant:

The last known address listed for such Claimant with the Bankruptcy Court or with the Claims Agent, or to the last known address of such Claimant's attorney of record.

**13.4    Waiver**. No failure or delay of any party to exercise any right or remedy pursuant to this Trust Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

**13.5    Entirety of Trust Agreement**. This Trust Agreement, along with the Plan, the Confirmation Order, and any other Plan Documents or Trust Documents, constitutes the full and complete understanding of the Parties regarding the Trust Agreement's subject matter and supersedes any prior understanding or agreement, whether oral or in writing.

**13.6    Counterparts**. This Trust Agreement may be executed in two or more counterparts, with the same effect as if all signatures on such counterparts appeared on one document, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**13.7    Captions**. The captions of Articles and Sections are included for convenience only and are to be disregarded in interpreting this Trust Agreement.

**13.8    Independent Legal and Tax Counsel**. All parties to this Trust Agreement have been represented by counsel and advisors of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and neither strictly in favor of or against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the Internal Revenue Service or the taxing authorities of any State or locality of the United States of America.

**USA Gymnastics Plan of Reorganization**
**Exhibit F, Form of Trust Agreement**

**13.9    Applicable Law**. Except to the extent that federal law (including the Bankruptcy Code and the Internal Revenue Code) is applicable, the rights and obligations arising under this Trust Agreement and any other Trust Document shall be governed by and construed and enforced in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of laws.

**IN WITNESS WHEREOF**, the Reorganized Debtor, the Settlement Trustee, and the FCR execute this Trust Agreement as of the last date set forth below.

**USA GYMNASTICS**

By: _____

Its: _____

Dated: _____, 2021

_____

**WILLIAM L. BETTINELLI**, not individually but as Settlement Trustee

Dated: _____, 2021

_____

**FRED C. CARUSO,** not individually but as Future Claims Representative

Dated: _____, 2021

# EXHIBIT G-1

**Form of Buy-Back Agreement (General)**

USA Gymnastics Plan of Reorganization
Exhibit G-1, Form of Buy-Back Agreement (General)

## SETTLEMENT AGREEMENT, RELEASE,
## AND INSURANCE POLICY BUY-BACK
## OF USA GYMNASTICS' INSURANCE POLICIES

This Settlement Agreement, Release, and Policy Buy-Back of USA Gymnastics' Policies issued to USAG (the "**Agreement**") is hereby made between USA Gymnastics, a 501(c)(3) not-for-profit organization incorporated in Texas ("**USAG**"), and [insert name of Debtor CGL Settling Insurer]  (the "**Settling Insurer**" and with USAG, the "**Parties**").

WHEREAS, USAG filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on December 5, 2018, in the United States Bankruptcy Court for the Southern District of Indiana (the "**Chapter 11 Case**"), which Chapter 11 Case is known as Case No. 18-BK-09108-RLM-11.

WHEREAS, prior to the filing of USAG's Chapter 11 Case, the Settling Insurer issued certain insurance policies to or for the benefit of USAG.

WHEREAS, certain disputes have arisen and may arise in the future concerning the Settling Insurer's responsibilities, if any, to provide coverage to USAG and any additional Non-Debtor CGL Settling Insurer Covered Persons for Sexual Abuse Claims and to provide a defense for such Claims (the "**Coverage Disputes**").

WHEREAS, prior to the filing of its Chapter 11 Case, USAG filed a declaratory judgment action against the Settling Insurer and certain other parties in the Marion Superior Court of the State of Indiana, which was subsequently removed to the United States District Court for the Southern District of Indiana, and has since been administratively closed by the Court without prejudice (the "**District Court Declaratory Coverage Action**").

WHEREAS, after USAG filed its Chapter 11 Case, USAG filed the Insurance Coverage Adversary Proceeding against the Settling Insurer and certain other entities on February 1, 2019, in the United States Bankruptcy Court for the Southern District of Indiana, which Insurance Coverage Adversary Proceeding was assigned Case No. 19-AP-50012.

WHEREAS, USAG and the Settling Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish fully and finally to compromise and resolve any and all Coverage Disputes and any and all other disputes between them, whether or not asserted in the District Court Declaratory Coverage Action, the Insurance Coverage Adversary Proceeding, or otherwise.

WHEREAS, through this Agreement and as a material part of the full and final compromise and resolution of all disputes between them, USAG intends to (i) sell the Policies (as defined herein) to the Settling Insurer, with the Settling Insurer buying back all such Policies, and (ii) provide the Settling Insurer with a full and complete general release of the Settling Insurer with respect to any and all coverages under the Policies, including but not limited to defense obligations and coverage.

1

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

WHEREAS, as part of the compromise and resolution of such disputes, USAG and the Settling Insurer wish to effect a sale of the Policies to the Settling Insurer pursuant to Sections 363(b), (f) and (m) and 1123(a)(5) and (b)(6) of the Bankruptcy Code.

WHEREAS, each Party has received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated by the Parties in good faith and at arm's length.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION

1.1    <u>Terms and Meanings</u>. As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used herein but not defined below or otherwise defined in this Agreement shall have the meanings given to them in the Plan or Bankruptcy Code, as applicable.

1.1.1.    "Extra-Contractual Claim" means any known or unknown, asserted or unasserted, Claim against the Settling Insurer, seeking any type of relief, including compensatory, exemplary, or punitive damages, or attorneys' fees, costs, or any other type of relief, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of an unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under a Policy. Extra-Contractual Claims include without limitation: (i) any Claim arising out of or relating to the Settling Insurer's handling of any request for insurance coverage relating to the Policies for any Claim, including, without limitation, any Sexual Abuse Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

1.1.2.    "Insurance Coverage Claim" means any Claim for insurance coverage under the Policies.

1.1.3.    "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief relating to the Policies.

1.1.4.    "Plan" means the Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort Claimants Committee of Sexual Abuse Survivors, as the same may be amended or modified from time to time consistent with this Agreement.

1.1.5.    "Policies" means (i) all insurance policies, issued or allegedly issued, by the Settling Insurer and providing insurance coverage to USAG as the named

insured, as identified on Exhibit 1 to this Agreement, (ii) USAG's Interests in policies that the Settling Insurer issued to USOPC, as identified on Exhibit 1 to this Agreement; and (iii) any and all unknown insurance policies issued or allegedly issued by the Settling Insurer to USAG.

1.2    Rules of Construction. In addition to the rules of construction set forth in the Plan, which are incorporated herein as though fully set forth herein, the following rules of construction shall apply to this Agreement:

1.2.1.    Statutory and Regulatory References. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

1.2.2.    No Construction Against Drafter. The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution. No Party will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which party is an insurer.

## 2.    PAYMENT OF THE SETTLEMENT AMOUNT

2.1    The Settlement Amount. Subject to all of the terms of this Agreement, in full and final settlement of all Claims and responsibilities under, arising out of, or relating to the Policies, and in consideration of the sale of the Policies free and clear of all Interests of any Person, and other benefits afforded to the Settling Insurer under the Plan, and expressly subject to fulfillment of all conditions to payment identified in Section 3 below, the Settling Insurer shall pay to USAG by wire transfer (as provided in the Plan) the Agreed CGL Insurer Payment, which is ($[insert applicable amount from Section 3.2 of the Plan for Debtor CGL Settling Insurer Policies]) (the "**Settlement Amount**"). The Settlement Amount is subject to allocation between the Debtor CGL Insurance Policies and the policies issued to USOPC as set forth in Section 3.2 of the Plan. Unless otherwise agreed by USAG and the Settling Insurer, USAG shall provide the Settling Insurer with notice of the intended Effective Date not less than five days prior to such intended Effective Date. Payment of the Settlement Amount shall occur on the Effective Date of the Plan. In addition, to the extent that any Outstanding Amounts are due as of the Effective Date, the Settling Insurer shall also pay such Outstanding Amount to USAG or the applicable vendor (as provided in Section 3.7 of the Plan) on the Effective Date of the Plan. All invoices for Outstanding Amounts must be submitted to the Debtor CGL Settling Insurers ten days before the Confirmation Hearing. If a Debtor CGL Settling Insurer disputes the Outstanding Amount, it shall notify the Debtor of such dispute within five days of the Confirmation Hearing and the Bankruptcy Court will resolve any such dispute as part of approving the buy-back of the Debtor CGL Settling Insurer's Policies. To the extent that there is a disagreement over Outstanding Amounts due as of the Effective Date, USAG and

the Settling Insurer shall work in good faith to resolve such disagreement as soon as practicable. The Bankruptcy Court shall retain jurisdiction over any unresolved dispute over Outstanding Amounts and the Settling Insurer consents to the entry of an order by the Bankruptcy Court solely with respect to such dispute, without waiving and subject to any appellate rights the Settling Insurer may have; provided, however, nothing herein shall affect any arbitration regarding Outstanding Amounts owed to EPIQ pending as of the Effective Date.

2.2    <u>Settlement Amount Plus Any Additional Outstanding Amounts is the Total Amount</u>. The Parties expressly agree that: (i) that the Settlement Amount plus any Outstanding Amounts is the total amount that the Settling Insurer is obligated to pay on account of any and all Claims of any kind made under or relating to the Policies (including the Abuse Claims and any reimbursement obligations for Conditional Payments under the MSP), with respect to Extra-Contractual Claims relating to the Policies, or as to any Abuse Claims relating to the policies issued by Settling Insurer to the USOPC (except as expressly set forth in the Plan); (ii) that under no circumstance will the Settling Insurer ever be obligated to make any additional payments to anyone in connection with the Policies, including any amounts allegedly owed under the MSP and for Extra Contractual Claims; and (iii) that all limits of liability of the Policies, including all per person, per occurrence, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and coverages referenced in this paragraph.

2.3    <u>Conditional Payments</u>. The Parties agree that the Plan that is confirmed in the Confirmation Order will provide that this Agreement is binding on the Trust and that, before the Settlement Trustee disburses any of the Settlement Amount to any Abuse Claimant or Future Claimant, the Settlement Trustee shall determine whether any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant. If any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant, the Settlement Trustee shall, within the respective time period called for by the MSP, (i) reimburse the appropriate Medicare Trust Fund for the appropriate amount, and (ii) submit the required information for any Abuse Claimant or Future Claimant to the appropriate agency of the United States government.

2.4    <u>Abuse Claimant Release</u>. As a precondition to receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall execute and deliver to the Trust and the Settling Insurer a full and complete general release of the Settling Insurer as provided in Section 11.1.1 of the Plan. In addition, within 10 days after receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall dismiss with prejudice any lawsuit as provided in Section 11.1.1 of the Plan, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall promptly provide copies of such general release and dismissal orders to the Settling Insurer upon the Settling Insurer's request.

USA Gymnastics Plan of Reorganization
Exhibit G-1, Form of Buy-Back Agreement (General)

3.      **CONDITIONS PRECEDENT TO SETTLING INSURER'S PAYMENT**

3.1     <u>Timing of Payment</u>. The Settling Insurer's obligation to pay the Settlement Amount in Section 2.1 above is expressly conditioned on the entry of the Confirmation Order and all conditions to the Effective Date of the Plan having occurred, and receipt of payment instructions (including a completed W-9 form) from the Debtor or the Reorganized Debtor.

3.2     <u>Confirmation Order</u>. The Plan (including any amendments and supplements) and Confirmation Order must be in all respects consistent with this Agreement, and the Confirmation Order must approve this Agreement pursuant to Bankruptcy Code Sections 363, 1123, and 105 and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, and authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement, and must contain no provisions that diminish or impair the benefit of the Plan or this Agreement to the Settling Insurer.

4.      **RELEASES AND SALE FREE AND CLEAR**

4.1     <u>Mutual Releases</u>. Subject to entry of the Confirmation Order as a Final Order, and the payment of the Settlement Amount and any Outstanding Amounts, and without any further action by the Parties, USAG and its Related Persons, on the one hand, and the Settling Insurer and each of its Related Persons, on the other hand, each hereby fully, finally, and completely remises, releases, acquits, and forever discharges, as of the Effective Date, the other, and each of them, from any and all past, present, or future Claims in connection with, relating to or arising out of, in any manner or fashion, the Policies, including Claims that are actual or alleged, known or unknown, accrued or unaccrued, suspected or unsuspected (including Sexual Abuse Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSP, and all Claims relating to, or arising out of, the Chapter 11 Case), whether such Claims seek compensatory damages, punitive damages, exemplary damages, statutorily multiplied damages, attorneys' fees, interest, costs, or any other type of monetary or nonmonetary relief. The Releases provided herein are in addition to, and not in replacement of, the releases provided in the Plan.

4.2     <u>USAG Buy-Back</u>. USAG agrees that, as set forth in the Confirmation Order, the Settling Insurer hereby buys back the Policies, free and clear of all liens, Claims, encumbrances, and other Interests of any Person, including all rights and Interests of USAG, all Participating Parties, all Non-Debtor CGL Settling Insurer Covered Persons, all Persons claiming or who could claim coverage under any of the Policies, and any other Person claiming by, through, or on behalf of USAG, any other insurer, and any Abuse Claimant or Future Claimant. This sale is pursuant to Sections 363(b), 363(f), 1123(a)(5), 1123(b)(6) and 1129 of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Settling Insurer is a good faith purchaser of the Policies within the meaning of Section 363(m) of the Bankruptcy Code and (ii) the consideration exchanged constitutes a fair and reasonable

settlement of the Parties' disputes and of their respective rights and obligations being released hereunder and constitutes reasonably equivalent value. The Parties agree that the releases in this Agreement and the buy-back of the Policies comply with the Bankruptcy Code and applicable non-bankruptcy laws. Further, the Parties agree: (A) (as set forth in the Confirmation Order) that, upon the payment of the Settlement Amount and any Outstanding Amount by the Settling Insurer, the Policies shall be immediately terminated and of no further force and effect; (B) that the Settling Insurer's payment of the Settlement Amount and any Outstanding Amount constitutes the Settling Insurer's full and complete performance of any and all obligations under the Policies and exhausts all limits of liability of the Policies; and (C) the Parties agree that all rights, title, or interests of USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Person, any other Settling Insurer, any Other Insurers, any Person claiming or who could claim coverage under the Policies, any Person claiming or who could assert a claim for reimbursement, contribution, subrogation, or any other payment under the Policies, and each of their respective Related Persons, may have had, may presently have, or in the future may have in the Policies are fully and finally released and extinguished pursuant to the terms of this Agreement.

4.3     Waiver of Surviving Claims. If, contrary to the specific intent of the Parties, any Claims released pursuant to this Agreement, including any Insurance Coverage Claims, are deemed to survive this Agreement, even though they are encompassed by the terms of the releases and buy-backs set forth in Sections 4.1 and 4.2 of this Agreement, the Parties, and the Non-Debtor CGL Settling Insurer Covered Persons, hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims.

4.4     Waiver Does not Affect Reinsurance. The releases set forth in Section 4.1 of this Agreement, as well as all other provisions in this Agreement, are not intended to apply to or have any effect on the Settling Insurer's right to reinsurance recoveries.

4.5     Rights and Obligations Under this Agreement and the Plan. Nothing in this Section 4 is intended to, nor shall be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement. Nothing in this Section 4 is intended, nor shall be construed to, release, waive, relinquish or otherwise affect any obligation of the Trust to the Settling Insurer under the Plan.

4.6     Dismissal With Prejudice of the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding. On or prior to the Effective Date, USAG will dismiss with prejudice the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding as to the Settling Insurer.

5.     **REPRESENTATIONS AND WARRANTIES OF THE PARTIES**

5.1     Representations and Warranties. Each of the Parties separately represents and warrants as follows:

USA Gymnastics Plan of Reorganization
Exhibit G-1, Form of Buy-Back Agreement (General)

5.1.1. Power and Authority. It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court.

5.1.2. Authorized To Execute. Subject to entry of the Confirmation Order as a Final Order, the execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of the Parties and by all other necessary actions of the Parties.

5.1.3. Arm's Length Negotiation. This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and has been executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

5.1.4. Good Faith Search for Existing Policies. Each of the Parties has conducted and completed a thorough and good faith search for any policy of insurance that might exist, or other evidence of any such policy of insurance, under which the Settling Insurer was or might be an insurer of USAG. Other than the Policies listed on Exhibit 1, no other policies of insurance have been located or are known to exist.

## 6.     [INTENTIONALLY OMITTED]

6.1     [INTENTIONALLY OMITTED]

## 7.     MISCELLANEOUS

7.1     Challenge to Agreement. In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding; provided, however, that such cooperation shall not obligate either party to incur professional fees or other expenses for the benefit of the other Party.

7.2     Effectuation. Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement, subject to any necessary Bankruptcy Court approvals, and to preserve its validity and enforceability.

7.3     Cooperation to Obtain Approval. The Parties shall cooperate with each other in connection with obtaining a Confirmation Order approving this Agreement. The Parties agree such cooperation shall include consulting with each other upon request concerning the status of proceedings and providing each other with copies of requested pleadings, notices, proposed orders, and other documents relating to

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and not taking any action to oppose confirmation of a Plan consistent with this Agreement or asking any other Person to oppose confirmation of a Plan consistent with this Agreement; *provided*, *however*, that nothing contained in this Section shall obligate any Party to provide to the other Party any information that is otherwise subject to the attorney-client privilege or work-product doctrine or to take any actions or refrain from taking any actions not consistent with such Party's fiduciary obligations. It is understood and agreed that in addition to the protections set forth in Section 7.6 below, all negotiations leading up to this Agreement, and all prior drafts of this Agreement, are subject to the mediation order entered by the Bankruptcy Court in the Chapter 11 Case, any prior mediation agreements, and the any confidentiality agreement imposed by the mediator.

7.4    <u>Single Integrated Contract</u>. This Agreement, together with the Plan and Confirmation Order, constitute a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided herein, this Agreement, together with the Plan and Confirmation Order, supersede all prior communications, settlements, and understandings between the Parties and their representatives, regarding the matters addressed by this Agreement, the Plan, and Confirmation Order. Except as explicitly set forth in this Agreement, the Plan, and Confirmation Order, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement, the Plan, and Confirmation Order or alter or supplement its terms. Any statements, promises, or inducements, whether made by any party or any agents of any party, that are not contained in this Agreement, the Plan, and Confirmation Order shall not be valid or binding. Any changes to this Agreement, the Plan, and Confirmation Order must be made in writing and with the consent of the Parties.

7.5    <u>No Deemed Waiver</u>. By entering into this Agreement, neither Party has waived or shall be deemed to have waived any rights, obligations, or positions it or they have asserted or may in the future assert in connection with any matter or Person outside the scope of this Agreement. USAG's rights under policies of insurance issued by insurers other than the Settling Insurer shall not be affected by this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding by any Person as evidence of the rights, duties, or obligations of any of the Parties with respect to matters or Persons outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

7.6    <u>Compromise of Disputed Claims</u>. This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability, wrongdoing, or insurance coverage. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be

deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions, as well as all confidentiality provisions entered by the Bankruptcy Court and the mediators in the Chapter 11 Case and/or the Insurance Coverage Adversary Proceeding and the Declaratory Coverage Action. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Party, except in (i) an action or proceeding between the Parties to enforce the terms of this Agreement or (ii) any possible action or proceeding between the Settling Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Settling Insurer's obligations under the Policies, the insurance policies issued to any other Person, or the Claims of any Party against the Settling Insurer.

7.7    <u>No Assignment</u>. Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties, except an assignment that occurs as a matter of law by virtue of a merger of a Party with another corporation or entity. USAG covenants that it has not and will not assign any right, interest or action in or on the Policies to any Person.

7.8    <u>Headings</u>. Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

7.9    <u>Notice</u>. All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by UPS, FedEx, or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to USAG:

> USA Gymnastics
> 1099 N. Meridian St.,
> Suite 800
> Indianapolis, Indiana 46204
> Attn: Li Li Leung

> *With a copy to:*

> Jenner & Block LLP
> 353 North Clark Street
> Chicago, Illinois 60654
> Attn: Catherine Steege and Melissa Root

If to the Settling Insurer:

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

[_____]

*With a copy to:*

7.10    <u>Execution by Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or e-mail, which counterparts shall be deemed to be originals.

7.11    <u>No Admission</u>. The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute (1) an admission by the Settling Insurer that USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Persons, or any other Person was or is entitled to any Insurance Coverage under the Policies or as to the validity of any of the positions that have been or could have been asserted by USAG, (2) an admission by USAG as to the validity of any of the positions or defenses to Insurance Coverage that have been or could have been asserted by the Settling Insurer or any Claims that have been or could have been asserted by USAG against the Settling Insurer, (3) an admission by USAG or the Settling Insurer of any liability whatsoever with respect to any of the Sexual Abuse Claims, or (4) a statement of support by the Settling Insurer for the procedures set forth in the Allocation Protocol or admission that the Allocation Protocol accurately reflects the liability of the Debtor or any other Protected Party with respect to Abuse Claims.

7.12    <u>No-Third Party Beneficiaries</u>. The Parties agree that there are no third-party beneficiaries of this Agreement.

7.13    <u>Jurisdiction</u>. The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Agreement, which shall be construed in accordance with Indiana law.

[Remainder of page left blank intentionally]

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

        IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of USAG

By:_____

Date:_____

Witness:_____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of [＿＿＿＿＿＿＿＿＿＿]

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Date:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

Witness:＿＿＿＿＿＿＿＿＿＿＿＿＿＿

**USA Gymnastics Plan of Reorganization**
**Exhibit G-1, Form of Buy-Back Agreement (General)**

<u>Exhibit 1-Policies</u>

[Insert Policies of Debtor CGL Settling Insurer set forth on Exhibit A to the Plan]

# **EXHIBIT G-2**

**Form of Buy-Back Agreement (National Casualty Company)**

USA Gymnastics Plan of Reorganization
Exhibit G-2, Form of Buy-Back Agreement
(National Casualty Company)

## SETTLEMENT AGREEMENT, RELEASE,
## AND INSURANCE POLICY BUY-BACK
## OF USA GYMNASTICS' INSURANCE POLICIES
## WITH NATIONAL CASUALTY COMPANY

This Settlement Agreement, Release, and Policy Buy-Back of USA Gymnastics' Policies issued to USAG (the "**Agreement**") is hereby made between USA Gymnastics on the one hand, a 501(c)(3) not-for-profit organization incorporated in Texas ("**USAG**"), and National Casualty Company on the other hand  (the "**Settling Insurer**" and with USAG, the "**Parties**").

WHEREAS, USAG filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on December 5, 2018, in the United States Bankruptcy Court for the Southern District of Indiana (the "**Chapter 11 Case**"), which Chapter 11 Case is known as Case No. 18-BK-09108-RLM-11.

WHEREAS, prior to the filing of USAG's Chapter 11 Case, the Settling Insurer issued certain insurance policies to or for the benefit of USAG.

WHEREAS, certain disputes have arisen and may arise in the future concerning the Settling Insurer's responsibilities, if any, to provide coverage to USAG and any additional Non-Debtor CGL Settling Insurer Covered Persons for Sexual Abuse Claims and to provide a defense for such Claims (the "**Coverage Disputes**").

WHEREAS, prior to the filing of its Chapter 11 Case, USAG filed a declaratory judgment action against the Settling Insurer and certain other parties in the Marion Superior Court of the State of Indiana, which was subsequently removed to the United States District Court for the Southern District of Indiana, and has since been administratively closed by the Court without prejudice (the "**District Court Declaratory Coverage Action**").

WHEREAS, after USAG filed its Chapter 11 Case, USAG filed the Insurance Coverage Adversary Proceeding against the Settling Insurer and certain other entities on February 1, 2019, in the United States Bankruptcy Court for the Southern District of Indiana, which Insurance Coverage Adversary Proceeding was assigned Case No. 19-AP-50012.

WHEREAS, USAG and the Settling Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish fully and finally to compromise and resolve any and all Coverage Disputes and any and all other disputes between them, whether or not asserted in the District Court Declaratory Coverage Action, the Insurance Coverage Adversary Proceeding, or otherwise.

WHEREAS, through this Agreement and as a material part of the full and final compromise and resolution of all disputes between them, USAG intends to (i) sell the Policies (as defined herein) to the Settling Insurer, with the Settling Insurer buying back all such Policies, and (ii) provide the Settling Insurer with a full and complete general release of the Settling Insurer with respect to any and all coverages under the Policies, including but not limited to defense obligations and coverage.

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

WHEREAS, as part of the compromise and resolution of such disputes, USAG and the Settling Insurer wish to effect a sale of the Policies to the Settling Insurer pursuant to Sections 363(b), (f) and (m) and 1123(a)(5) and (b)(6) of the Bankruptcy Code.

WHEREAS, each Party has received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated by the Parties in good faith and at arm's length.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION

1.1    <u>Terms and Meanings</u>. As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used herein but not defined below or otherwise defined in this Agreement shall have the meanings given to them in the Plan or Bankruptcy Code, as applicable.

1.1.1.    "Extra-Contractual Claim" means any known or unknown, asserted or unasserted, Claim against the Settling Insurer, seeking any type of relief, including compensatory, exemplary, or punitive damages, or attorneys' fees, costs, or any other type of relief, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of an unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under a Policy. Extra-Contractual Claims include without limitation: (i) any Claim arising out of or relating to the Settling Insurer's handling of any request for insurance coverage relating to the Policies for any Claim, including, without limitation, any Sexual Abuse Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

1.1.2.    "Insurance Coverage Claim" means any Claim for insurance coverage under the Policies.

1.1.3.    "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief relating to the Policies.

1.1.4.    "Plan" means the Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort Claimants Committee of Sexual Abuse Survivors, as the same may be amended or modified from time to time consistent with this Agreement.

1.1.5. "Policies" means (i) all insurance policies, issued or allegedly issued, by the Settling Insurer and providing insurance coverage to USAG as the named insured, as identified on <u>Exhibit 1</u> to this Agreement, (ii) USAG's Interests in policies that the Settling Insurer issued to USOPC, as identified on <u>Exhibit 1</u> to this Agreement; and (iii) any and all unknown insurance policies issued or allegedly issued by the Settling Insurer to USAG.

1.2 <u>Rules of Construction</u>. In addition to the rules of construction set forth in the Plan, which are incorporated herein as though fully set forth herein, the following rules of construction shall apply to this Agreement:

      1.2.3. Statutory and Regulatory References. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

      1.2.4. No Construction Against Drafter. The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution. No Party will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which party is an insurer.

## 2. PAYMENT OF THE SETTLEMENT AMOUNT

2.1 <u>The Settlement Amount</u>. Subject to all of the terms of this Agreement, in full and final settlement of all Claims and responsibilities under, arising out of, or relating to the Policies, and in consideration of the sale of the Policies free and clear of all Interests of any Person, and other benefits afforded to the Settling Insurer under the Plan, and expressly subject to fulfillment of all conditions to payment identified in Section 3 below, the Settling Insurer shall pay to USAG by wire transfer (as provided in the Plan) the Agreed CGL Insurer Payment, which is $158,000,000 (the "**Settlement Amount**"). For purposes of this Agreement, the Settlement Amount is subject to allocation between the Debtor CGL Insurance Policies and the policies issued to USOPC as set forth in Section 3.2 of the Plan. Unless otherwise agreed by USAG and the Settling Insurer, USAG shall provide the Settling Insurer with notice of the intended Effective Date not less than five days prior to such intended Effective Date. Payment of the Settlement Amount shall occur on the Effective Date of the Plan. In addition, to the extent that any Outstanding Amounts are due as of the Effective Date, the Settling Insurer shall also pay such Outstanding Amount to USAG or the applicable vendor (as provided in Section 3.7 of the Plan) on the Effective Date of the Plan. All invoices for Outstanding Amounts must be submitted to the Debtor CGL Settling Insurers ten days before the Confirmation Hearing. If a Debtor CGL Settling Insurer disputes the Outstanding Amount, it shall notify the Debtor of such dispute within five days of the Confirmation Hearing and the Bankruptcy Court will resolve any such dispute as part of approving the buy-

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

back of the Debtor CGL Settling Insurer's Policies. To the extent that there is a disagreement over Outstanding Amounts due as of the Effective Date, USAG and the Settling Insurer shall work in good faith to resolve such disagreement as soon as practicable. The Bankruptcy Court shall retain jurisdiction over any unresolved dispute over Outstanding Amounts and the Settling Insurer consents to the entry of an order by the Bankruptcy Court solely with respect to such dispute, without waiving and subject to any appellate rights the Settling Insurer may have; provided, however, nothing herein shall affect any arbitration regarding Outstanding Amounts owed to EPIQ pending as of the Effective Date.

2.2     <u>Settlement Amount Plus Any Additional Outstanding Amounts is the Total Amount</u>. The Parties expressly agree that: (i) that the Settlement Amount plus any Outstanding Amounts is the total amount that the Settling Insurer is obligated to pay on account of any and all Claims of any kind made under or relating to the Policies (including the Abuse Claims and any reimbursement obligations for Conditional Payments under the MSP), including, but not limited to, Extra-Contractual Claims relating to the Policies (if any), or as to any Abuse Claims relating to the policies issued by Settling Insurer to the USOPC (except as expressly set forth in the Plan); (ii) that under no circumstance will the Settling Insurer ever be obligated to make any additional payments to anyone in connection with the Policies, including any amounts allegedly owed under the MSP and for Extra Contractual Claims; and (iii) that all limits of liability of the Policies, including all per person, per occurrence, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and coverages referenced in this paragraph.

2.3     <u>Conditional Payments</u>. The Parties agree that the Plan that is confirmed in the Confirmation Order will provide that this Agreement is binding on the Trust and that, before the Settlement Trustee disburses any of the Settlement Amount to any Abuse Claimant or Future Claimant, the Settlement Trustee shall determine whether any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant. If any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant, the Settlement Trustee shall, within the respective time period called for by the MSP, (i) reimburse the appropriate Medicare Trust Fund for the appropriate amount, and (ii) submit the required information for any Abuse Claimant or Future Claimant to the appropriate agency of the United States government.

2.4     <u>Abuse Claimant Release</u>. As a precondition to receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall execute and deliver to the Trust and the Settling Insurer a full and complete general release of the Settling Insurer as provided in Section 11.1.1 of the Plan. In addition, within 10 days after receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall dismiss with prejudice any lawsuit as provided in Section 11.1.1 of the Plan, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall promptly provide copies of

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

such general release and dismissal orders to the Settling Insurer upon the Settling Insurer's request.

**3.     CONDITIONS PRECEDENT TO SETTLING INSURER'S PAYMENT**

3.1     <u>Timing of Payment</u>. The Settling Insurer's obligation to pay the Settlement Amount in Section 2.1 above is expressly conditioned on the entry of the Confirmation Order and all conditions to the Effective Date of the Plan having occurred, and receipt of payment instructions (including a completed W-9 form) from the Debtor or the Reorganized Debtor.

3.2     <u>Confirmation Order</u>. The Plan (including any amendments and supplements) and Confirmation Order must be in all respects consistent with this Agreement, and the Confirmation Order, in a form reasonably acceptable to the Settling Insurer, must approve this Agreement pursuant to Bankruptcy Code Sections 363, 1123, and 105 and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, must authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement, and must contain no provisions that diminish or impair the benefit of the Plan or this Agreement to the Settling Insurer.

**4.     RELEASES AND SALE FREE AND CLEAR**

4.1     <u>Mutual Releases</u>. Subject to entry of the Confirmation Order as a Final Order, and the payment of the Settlement Amount and any Outstanding Amounts, and without any further action by the Parties, USAG and its Related Persons, on the one hand, and the Settling Insurer and each of its Related Persons, on the other hand, each hereby fully, finally, and completely remises, releases, acquits, and forever discharges, as of the Effective Date, the other, and each of them, from any and all past, present, or future Claims in connection with, relating to or arising out of, in any manner or fashion, the Policies, including Claims that are actual or alleged, known or unknown, accrued or unaccrued, suspected or unsuspected (including Sexual Abuse Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSP, and all Claims relating to, or arising out of, the Chapter 11 Case), whether such Claims seek compensatory damages, punitive damages, exemplary damages, statutorily multiplied damages, attorneys' fees, interest, costs, or any other type of monetary or nonmonetary relief. The Releases provided herein are in addition to, and not in replacement of, the releases provided in the Plan.

4.2     <u>USAG Buy-Back</u>. USAG agrees that, as set forth in the Confirmation Order, the Settling Insurer hereby buys back the Policies, free and clear of all liens, Claims, encumbrances, and other Interests of any Person, including all rights and Interests of USAG, all Participating Parties, all Non-Debtor CGL Settling Insurer Covered Persons, all Persons claiming or who could claim coverage under any of the Policies, and any other Person claiming by, through, or on behalf of USAG, any other insurer, and any Abuse Claimant or Future Claimant. This sale is pursuant to

Sections 363(b), 363(f), 1123(a)(5), 1123(b)(6) and 1129 of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Settling Insurer is a good faith purchaser of the Policies within the meaning of Section 363(m) of the Bankruptcy Code and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations being released hereunder and constitutes reasonably equivalent value. The Parties agree that the releases in this Agreement and the buy-back of the Policies comply with the Bankruptcy Code and applicable non-bankruptcy laws. Further, the Parties agree: (A) (as set forth in the Confirmation Order) that, upon the payment of the Settlement Amount and any Outstanding Amount by the Settling Insurer, the Policies shall be immediately terminated and of no further force and effect; (B) that the Settling Insurer's payment of the Settlement Amount and any Outstanding Amount constitutes the Settling Insurer's full and complete performance of any and all obligations under the Policies and exhausts all limits of liability of the Policies; and (C) the Parties agree that all rights, title, or interests of USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Person, any other Settling Insurer, any Other Insurers, any Person claiming or who could claim coverage under the Policies, any Person claiming or who could assert a claim for reimbursement, contribution, subrogation, or any other payment under the Policies, and each of their respective Related Persons, may have had, may presently have, or in the future may have in the Policies are fully and finally released and extinguished pursuant to the terms of this Agreement.

4.3     Waiver of Surviving Claims. If, contrary to the specific intent of the Parties, any Claims released pursuant to this Agreement, including any Insurance Coverage Claims, are deemed to survive this Agreement, even though they are encompassed by the terms of the releases and buy-backs set forth in Sections 4.1 and 4.2 of this Agreement, the Parties, and the Non-Debtor CGL Settling Insurer Covered Persons, hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims.

4.4     Waiver Does not Affect Reinsurance. The releases set forth in Section 4.1 of this Agreement, as well as all other provisions in this Agreement, are not intended to apply to or have any effect on the Settling Insurer's right to reinsurance recoveries.

4.5     Rights and Obligations Under this Agreement and the Plan. Nothing in this Section 4 is intended to, nor shall be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement. Nothing in this Section 4 is intended, nor shall be construed to, release, waive, relinquish or otherwise affect any obligation of the Trust to the Settling Insurer under the Plan.

4.6     Dismissal With Prejudice of the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding. On or prior to the Effective Date, USAG will dismiss with prejudice the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding as to the Settling Insurer.

USA Gymnastics Plan of Reorganization
Exhibit G-2, Form of Buy-Back Agreement
(National Casualty Company)

5. **REPRESENTATIONS AND WARRANTIES OF THE PARTIES**

5.1 <u>Representations and Warranties</u>. Each of the Parties separately represents and warrants as follows:

5.1.1. Power and Authority. It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court.

5.1.2. Authorized To Execute. Subject to entry of the Confirmation Order as a Final Order, the execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of the Parties and by all other necessary actions of the Parties.

5.1.3. Arm's Length Negotiation. This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and has been executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

5.1.4. Good Faith Search for Existing Policies. Each of the Parties has conducted and completed a thorough and good faith search for any policy of commercial general liability insurance that might exist, or other evidence of any such policy of insurance, under which the Settling Insurer was or might be an insurer of USAG. Other than the Policies listed on <u>Exhibit 1</u>, no other policies of commercial general liability insurance have been located or are known to exist.

6. **[INTENTIONALLY OMITTED]**

6.1. [INTENTIONALLY OMITTED]

7. **MISCELLANEOUS**

7.1 <u>Challenge to Agreement</u>. In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding; provided, however, that such cooperation shall not obligate either party to incur professional fees or other expenses for the benefit of the other Party.

7.2 <u>Effectuation</u>. Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this

Agreement, subject to any necessary Bankruptcy Court approvals, and to preserve its validity and enforceability.

7.3   <u>Cooperation to Obtain Approval</u>. The Parties shall cooperate with each other in connection with obtaining a Confirmation Order approving this Agreement. The Parties agree such cooperation shall include consulting with each other upon request concerning the status of proceedings and providing each other with copies of requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and not taking any action to oppose confirmation of a Plan consistent with this Agreement or asking any other Person to oppose confirmation of a Plan consistent with this Agreement; *provided*, <u>*however*</u>, that nothing contained in this Section shall obligate any Party to provide to the other Party any information that is otherwise subject to the attorney-client privilege or work-product doctrine or to take any actions or refrain from taking any actions not consistent with such Party's fiduciary obligations. It is understood and agreed that in addition to the protections set forth in Section 7.6 below, all negotiations leading up to this Agreement, and all prior drafts of this Agreement, are subject to the mediation order entered by the Bankruptcy Court in the Chapter 11 Case, any prior mediation agreements, and the any confidentiality agreement imposed by the mediator.

7.4   <u>Single Integrated Contract</u>. This Agreement, together with the Plan and Confirmation Order, constitute a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided herein, this Agreement, together with the Plan and Confirmation Order, supersede all prior communications, settlements, and understandings between the Parties and their representatives, regarding the matters addressed by this Agreement, the Plan, and Confirmation Order. Except as explicitly set forth in this Agreement, the Plan, and Confirmation Order, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement, the Plan, and Confirmation Order or alter or supplement its terms. Any statements, promises, or inducements, whether made by any party or any agents of any party, that are not contained in this Agreement, the Plan, and Confirmation Order shall not be valid or binding. Any changes to this Agreement, the Plan, and Confirmation Order must be made in writing and with the consent of the Parties.

7.5   <u>No Deemed Waiver</u>. By entering into this Agreement, neither Party has waived or shall be deemed to have waived any rights, obligations, or positions it or they have asserted or may in the future assert in connection with any matter or Person outside the scope of this Agreement. USAG's rights under policies of insurance issued by insurers other than the Settling Insurer shall not be affected by this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding by any Person as evidence of the rights, duties, or obligations of any of the Parties with respect to matters or Persons outside the scope of this Agreement. All actions taken and statements made by the Parties

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

7.6 <u>Compromise of Disputed Claims</u>. This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability, wrongdoing, or insurance coverage. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions, as well as all confidentiality provisions entered by the Bankruptcy Court and the mediators in the Chapter 11 Case and/or the Insurance Coverage Adversary Proceeding and the Declaratory Coverage Action. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Party, except in (i) an action or proceeding between the Parties to enforce the terms of this Agreement or (ii) any possible action or proceeding between the Settling Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Settling Insurer's obligations under the Policies, the insurance policies issued to any other Person, or the Claims of any Party against the Settling Insurer.

7.7 <u>No Assignment</u>. Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties, except an assignment that occurs as a matter of law by virtue of a merger of a Party with another corporation or entity. USAG covenants that it has not and will not assign any right, interest or action in or on the Policies to any Person.

7.8 <u>Headings</u>. Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

7.9 <u>Notice</u>. All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by UPS, FedEx, or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to USAG:

        USA Gymnastics
        1099 N. Meridian St.,
        Suite 800
        Indianapolis, Indiana 46204
        Attn: Li Li Leung

*With a copy to:*

Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
Attn: Catherine Steege and Melissa Root

If to the Settling Insurer:

[_____]

*With a copy to:*

7.10   <u>Execution by Counterparts</u>. This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or e-mail, which counterparts shall be deemed to be originals.

7.11   <u>No Admission</u>. The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute (1) an admission by the Settling Insurer that USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Persons, or any other Person was or is entitled to any Insurance Coverage under the Policies or as to the validity of any of the positions that have been or could have been asserted by USAG, (2) an admission by USAG as to the validity of any of the positions or defenses to Insurance Coverage that have been or could have been asserted by the Settling Insurer or any Claims that have been or could have been asserted by USAG against the Settling Insurer, (3) an admission by USAG or the Settling Insurer of any liability whatsoever with respect to any of the Sexual Abuse Claims, or (4) a statement of support by the Settling Insurer for the procedures set forth in the Allocation Protocol or admission that the Allocation Protocol accurately reflects the liability of the Debtor or any other Protected Party with respect to Abuse Claims.

7.12   <u>No-Third Party Beneficiaries</u>. The Parties agree that there are no third-party beneficiaries of this Agreement.

7.13   <u>Jurisdiction</u>. The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Agreement, which shall be construed in accordance with Indiana law.

[Remainder of page left blank intentionally]

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of USAG

By:_____

Date:_____

Witness:_____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of National Casualty Company

By:_____

Date:_____

Witness:_____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-2, Form of Buy-Back Agreement**
**(National Casualty Company)**

<u>Exhibit 1-Policies</u>

| NATIONAL CASUALTY COMPANY | |
|---|---|
| <u>Policy Number</u> | <u>Coverage Date</u> |
| KRO0000000103500 | 8-1-07 to 8-1-08 |
| XKO0000000103600 | 8-1-07 to 8-1-08 |
| KRO0000000103501 | 8-1-08 to 8-1-09 |
| XKO0000000103601 | 8-1-08 to 8-1-09 |
| KRO0000000103502 | 8-1-09 to 8-1-10 |
| XKO0000000103602 | 8-1-09 to 8-1-10 |
| KRO0000001198500 | 8-1-10 to 8-1-11 |
| XKO0000001198600 | 8-1-10 to 8-1-11 |
| KRO0000002032600 | 8-1-11 to 8-1-12 |
| XKO0000002032700 | 8-1-11 to 8-1-12 |
| KRO0000002905000 | 8-1-12 to 8-1-13 |
| XKO0000002905100 | 8-1-12 to 8-1-13 |
| KRO0000003809900 | 8-1-13 to 8-1-14 |
| XKO0000003810100 | 8-1-13 to 8-1-14 |
| KRO0000004695000 | 8-1-14 to 8-1-15 |
| XKO0000004695400 | 8-1-14 to 8-1-15 |
| KRO0000005683700 | 8-1-15 to 8-1-16 |
| XKO0000005690800 | 8-1-15 to 8-1-16 |
| KRO0000006492900 | 8-1-16 to 8-1-17 |
| XKO0000006519400 | 8-1-16 to 8-1-17 |
| KRO0000007069300 | 8-1-17 to 8-1-18 |
| XKO0000007069600 | 8-1-17 to 8-1-18 |
| | |

# **EXHIBIT G-3**

**Form of Buy-Back Agreement
(Great American Assurance Company and
American Empire Surplus Lines Insurance Company)**

USA Gymnastics Plan of Reorganization
Exhibit G-3, Form of Buy-Back Agreement
(Great American Assurance Company and American Empire Surplus Lines Insurance Company)

## SETTLEMENT AGREEMENT, RELEASE,
## AND INSURANCE POLICY BUY-BACK
## OF USA GYMNASTICS' INSURANCE POLICIES
## WITH GREAT AMERICAN ASSURANCE COMPANY AND
## AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY

This Settlement Agreement, Release, and Policy Buy-Back of USA Gymnastics' Policies issued to USAG (the "**Agreement**") is hereby made between USA Gymnastics, a 501(c)(3) not-for-profit organization incorporated in Texas ("**USAG**"), on the one hand, and Great American Assurance Company and American Empire Surplus Lines Insurance Company, on the other hand (together, the "**Settling Insurer**" and with USAG, the "**Parties**").

WHEREAS, USAG filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on December 5, 2018, in the United States Bankruptcy Court for the Southern District of Indiana (the "**Chapter 11 Case**"), which Chapter 11 Case is known as Case No. 18-BK-09108-RLM-11.

WHEREAS, prior to the filing of USAG's Chapter 11 Case, the Settling Insurer issued certain insurance policies to or for the benefit of USAG.

WHEREAS, certain disputes have arisen and may arise in the future concerning the Settling Insurer's responsibilities, if any, to provide coverage to USAG and any additional Non-Debtor CGL Settling Insurer Covered Persons for Sexual Abuse Claims and to provide a defense for such Claims (the "**Coverage Disputes**").

WHEREAS, prior to the filing of its Chapter 11 Case, USAG filed a declaratory judgment action against Great American Assurance Company and certain other parties in the Marion Superior Court of the State of Indiana, which was subsequently removed to the United States District Court for the Southern District of Indiana, and has since been administratively closed by the Court without prejudice (the "**District Court Declaratory Coverage Action**").

WHEREAS, after USAG filed its Chapter 11 Case, USAG filed the Insurance Coverage Adversary Proceeding against Great American Assurance Company and certain other entities on February 1, 2019, in the United States Bankruptcy Court for the Southern District of Indiana, which Insurance Coverage Adversary Proceeding was assigned Case No. 19-AP-50012.

WHEREAS, USAG and the Settling Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish fully and finally to compromise and resolve any and all Coverage Disputes and any and all other disputes between them, whether or not asserted in the District Court Declaratory Coverage Action, the Insurance Coverage Adversary Proceeding, or otherwise.

WHEREAS, through this Agreement and as a material part of the full and final compromise and resolution of all disputes between them, USAG intends to (i) sell the Policies (as defined herein) to the Settling Insurer, with the Settling Insurer buying back all such Policies, and (ii) provide the Settling Insurer with a full and complete general release of the Settling Insurer with

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

respect to any and all coverages under the Policies, including but not limited to defense obligations and coverage.

WHEREAS, as part of the compromise and resolution of such disputes, USAG and the Settling Insurer wish to effect a sale of the Policies to the Settling Insurer pursuant to Sections 363(b), (f) and (m) and 1123(a)(5) and (b)(6) of the Bankruptcy Code.

WHEREAS, each Party has received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated by the Parties in good faith and at arm's length.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION

1.1    <u>Terms and Meanings</u>. As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used herein but not defined below or otherwise defined in this Agreement shall have the meanings given to them in the Plan or Bankruptcy Code, as applicable.

1.1.1.    "Extra-Contractual Claim" means any known or unknown, asserted or unasserted, Claim against the Settling Insurer, seeking any type of relief, including compensatory, exemplary, or punitive damages, or attorneys' fees, costs, or any other type of relief, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of an unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under a Policy. Extra-Contractual Claims include without limitation: (i) any Claim arising out of or relating to the Settling Insurer's handling of any request for insurance coverage relating to the Policies for any Claim, including, without limitation, any Sexual Abuse Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

1.1.2.    "Insurance Coverage Claim" means any Claim for insurance coverage under the Policies.

1.1.3.    "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief relating to the Policies.

1.1.4.    "Plan" means the Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

Claimants Committee of Sexual Abuse Survivors, as may be amended from time to time consistent with this Agreement.

1.1.5. "Policies" means (i) all insurance policies, issued or allegedly issued, by the Settling Insurer and providing insurance coverage to USAG as the named insured, as identified on <u>Exhibit 1</u> to this Agreement, (ii) USAG's Interests in policies that the Settling Insurer issued to USOPC and Karolyis, as identified on <u>Exhibit 1</u> to this Agreement; and (iii) any and all unknown insurance policies issued or allegedly issued by the Settling Insurer to USAG.

1.2 <u>Rules of Construction</u>. In addition to the rules of construction set forth in the Plan, which are incorporated herein as though fully set forth herein, the following rules of construction shall apply to this Agreement:

1.2.5. Statutory and Regulatory References. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

1.2.6. No Construction Against Drafter. The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution. No Party will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which party is an insurer.

## 2. PAYMENT OF THE SETTLEMENT AMOUNT

2.1 <u>The Settlement Amount</u>. Subject to all of the terms of this Agreement, in full and final settlement of all Claims and responsibilities under, arising out of, or relating to the Policies, and in consideration of the sale of the Policies free and clear of all Interests of any Person and other benefits afforded to the Settling Insurer under the Plan, and expressly subject to fulfillment of all conditions to payment identified in Section 3 below, the Settling Insurer shall pay to USAG by wire transfer (as provided in the Plan) the Agreed CGL Insurer Payment, which is $23,679,453 (the "**Settlement Amount**"). For purposes of this Agreement, the Settlement Amount is subject to allocation between the Debtor CGL Insurance Policies, the policies issued to USOPC and the policies issued to Karolyi Training Camps as set forth in Section 3.2 of the Plan. Unless otherwise agreed by USAG and the Settling Insurer, USAG shall provide the Settling Insurer with notice of the intended Effective Date not less than five days prior to such intended Effective Date. Payment of the Settlement Amount shall occur on the Effective Date of the Plan. In addition, to the extent that any Outstanding Amounts are due as of the Effective Date, the Settling Insurer shall also pay such Outstanding Amount to USAG or the applicable vendor (as provided in Section 3.7 of the Plan) on the Effective Date of the Plan.

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

All invoices for Outstanding Amounts must be submitted to the Debtor CGL Settling Insurers ten days before the Confirmation Hearing. If a Debtor CGL Settling Insurer disputes the Outstanding Amount, it shall notify the Debtor of such dispute within five days of the Confirmation Hearing and the Bankruptcy Court will resolve any such dispute as part of approving the buy-back of the Debtor CGL Settling Insurer's Policies. To the extent that there is a disagreement over Outstanding Amounts due as of the Effective Date, USAG and the Settling Insurer shall work in good faith to resolve such disagreement as soon as practicable. The Bankruptcy Court shall retain jurisdiction over any unresolved dispute over Outstanding Amounts and the Settling Insurer consents to the entry of an order by the Bankruptcy Court solely with respect to such dispute, without waiving and subject to any appellate rights the Settling Insurer may have; provided, however, nothing herein shall affect any arbitration regarding Outstanding Amounts owed to EPIQ pending as of the Effective Date.

2.2     Settlement Amount Plus Any Additional Outstanding Amounts is the Total Amount. The Parties expressly agree that: (i) that the Settlement Amount plus any Outstanding Amounts is the total amount that the Settling Insurer is obligated to pay on account of any and all Claims of any kind made under or relating to the Policies (including the Abuse Claims and any reimbursement obligations for Conditional Payments under the MSP), with respect to Extra-Contractual Claims relating to the Policies, or as to any Abuse Claims relating to the policies issued by Settling Insurer to the USOPC or Karolyis (except as expressly set forth in the Plan); (ii) that under no circumstance will the Settling Insurer ever be obligated to make any additional payments to anyone in connection with the Policies, including any amounts allegedly owed under the MSP and for Extra Contractual Claims; and (iii) that all limits of liability of the Policies, including all per person, per occurrence, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and coverages referenced in this paragraph.

2.3     Conditional Payments. The Parties agree that the Plan that is confirmed in the Confirmation Order will provide that this Agreement is binding on the Trust and that, before the Settlement Trustee disburses any of the Settlement Amount to any Abuse Claimant or Future Claimant, the Settlement Trustee shall determine whether any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant. If any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant, the Settlement Trustee shall, within the respective time period called for by the MSP, (i) reimburse the appropriate Medicare Trust Fund for the appropriate amount, and (ii) submit the required information for any Abuse Claimant or Future Claimant to the appropriate agency of the United States government.

2.4     Abuse Claimant Release. As a precondition to receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall execute and deliver to the Trust and the Settling Insurer a full and complete general release of the Settling

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

Insurer as provided in Section 11.1.1 of the Plan. In addition, within 10 days after receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall dismiss with prejudice any lawsuit as provided in Section 11.1.1 of the Plan, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall promptly provide copies of such general release and dismissal orders to the Settling Insurer upon the Settling Insurer's request.

**3.    CONDITIONS PRECEDENT TO SETTLING INSURER'S PAYMENT**

3.1    <u>Timing of Payment</u>. The Settling Insurer's obligation to pay the Settlement Amount in Section 2.1 above is expressly conditioned on the entry of the Confirmation Order and all conditions to the Effective Date of the Plan having occurred, and receipt of payment instructions (including a completed W-9 form) from the Debtor or the Reorganized Debtor.

3.2    <u>Confirmation Order</u>. The Plan (including any amendments and supplements) and Confirmation Order must be in a form reasonably acceptable to the Settling Insurer and shall be in all respects consistent with this Agreement, and the Confirmation Order must approve this Agreement pursuant to Bankruptcy Code Sections 363, 1123, and 105 and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, and authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement, and must contain no provisions that diminish or impair the benefit of the Plan or this Agreement to the Settling Insurer.

**4.    RELEASES AND SALE FREE AND CLEAR**

4.1    <u>Mutual Releases</u>. Subject to entry of the Confirmation Order as a Final Order, and the payment of the Settlement Amount and any Outstanding Amounts, and without any further action by the Parties, USAG and its Related Persons, on the one hand, and the Settling Insurer and each of its Related Persons, on the other hand, each hereby fully, finally, and completely remises, releases, acquits, and forever discharges, as of the Effective Date, the other, and each of them, from any and all past, present, or future Claims in connection with, relating to or arising out of, in any manner or fashion, the Policies, including Claims that are actual or alleged, known or unknown, accrued or unaccrued, suspected or unsuspected (including Sexual Abuse Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSP, and all Claims relating to, or arising out of, the Chapter 11 Case), whether such Claims seek compensatory damages, punitive damages, exemplary damages, statutorily multiplied damages, attorneys' fees, interest, costs, or any other type of monetary or nonmonetary relief. The Releases provided herein are in addition to, and not in replacement of, the releases provided in the Plan.

USA Gymnastics Plan of Reorganization
Exhibit G-3, Form of Buy-Back Agreement
(Great American Assurance Company and American Empire Surplus Lines Insurance Company)

4.2    <u>USAG Buy-Back</u>. USAG agrees that, as set forth in the Confirmation Order, the Settling Insurer hereby buys back the Policies, free and clear of all liens, Claims, encumbrances, and other Interests of any Person, including all rights and Interests of USAG, all Participating Parties, all Non-Debtor CGL Settling Insurer Covered Persons, all Persons claiming or who could claim coverage under any of the Policies, and any other Person claiming by, through, or on behalf of USAG, any other insurer, and any Abuse Claimant or Future Claimant. This sale is pursuant to Sections 363(b), 363(f), 1123(a)(5), 1123(b)(6) and 1129 of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Settling Insurer is a good faith purchaser of the Policies within the meaning of Section 363(m) of the Bankruptcy Code and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations being released hereunder and constitutes reasonably equivalent value. The Parties agree that the releases in this Agreement and the buy-back of the Policies comply with the Bankruptcy Code and applicable non-bankruptcy laws. Further, the Parties agree: (A) (as set forth in the Confirmation Order) that, upon the payment of the Settlement Amount and any Outstanding Amount by the Settling Insurer, the Policies shall be immediately terminated and of no further force and effect; (B) that the Settling Insurer's payment of the Settlement Amount and any Outstanding Amount constitutes the Settling Insurer's full and complete performance of any and all obligations under the Policies and exhausts all limits of liability of the Policies; and (C) the Parties agree that all rights, title, or interests of USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Person, any other Settling Insurer, any Other Insurers, any Person claiming or who could claim coverage under the Policies, any Person claiming or who could assert a claim for reimbursement, contribution, subrogation, or any other payment under the Policies, and each of their respective Related Persons, may have had, may presently have, or in the future may have in the Policies are fully and finally released and extinguished pursuant to the terms of this Agreement.

4.3    <u>Waiver of Surviving Claims</u>. If, contrary to the specific intent of the Parties, any Claims released pursuant to this Agreement, including any Insurance Coverage Claims, are deemed to survive this Agreement, even though they are encompassed by the terms of the releases and buy-backs set forth in Sections 4.1 and 4.2 of this Agreement, the Parties, and the Non-Debtor CGL Settling Insurer Covered Persons, hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims.

4.4    <u>Waiver Does not Affect Reinsurance</u>. The releases set forth in Section 4.1 of this Agreement, as well as all other provisions in this Agreement, are not intended to apply to or have any effect on the Settling Insurer's right to reinsurance recoveries.

4.5    <u>Rights and Obligations Under this Agreement and the Plan</u>. Nothing in this Section 4 is intended to, nor shall be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement. Nothing in this Section 4 is intended, nor shall be construed to, release, waive, relinquish or

otherwise affect any obligation of the Trust to the Settling Insurer arising under the Plan.

4.6 <u>Dismissal With Prejudice of the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding</u>. On or prior to the Effective Date, USAG will dismiss with prejudice the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding as to the Settling Insurer.

## 5. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1 <u>Representations and Warranties</u>. Each of the Parties separately represents and warrants as follows:

5.1.1. Power and Authority. It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court.

5.1.2. Authorized To Execute. Subject to entry of the Confirmation Order as a Final Order, the execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of the Parties and by all other necessary actions of the Parties.

5.1.3. Arm's Length Negotiation. This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and has been executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

5.1.4. Good Faith Search for Existing Policies. Each of the Parties has conducted and completed a thorough and good faith search for any policy of liability insurance that might exist, or other evidence of any such policy of liability insurance, under which the Settling Insurer was or might be an insurer of USAG. Other than the Policies listed on <u>Exhibit 1</u>, no other policies of insurance have been located or are known to exist.

## 6. [INTENTIONALLY OMITTED]

6.1 [INTENTIONALLY OMITTED]

## 7. MISCELLANEOUS

7.1 <u>Challenge to Agreement</u>. In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding; provided, however, that such cooperation shall not obligate either party to incur professional fees or other expenses for the benefit of the other Party.

7.2    <u>Effectuation</u>. Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement, subject to any necessary Bankruptcy Court approvals, and to preserve its validity and enforceability.

7.3    <u>Cooperation to Obtain Approval</u>. The Parties shall cooperate with each other in connection with obtaining a Confirmation Order approving this Agreement. The Parties agree such cooperation shall include consulting with each other upon request concerning the status of proceedings and providing each other with copies of requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and not taking any action to oppose confirmation of a Plan consistent with this Agreement or asking any other Person to oppose confirmation of a Plan consistent with this Agreement; *provided*, *however*, that nothing contained in this Section shall obligate any Party to provide to the other Party any information that is otherwise subject to the attorney-client privilege or work-product doctrine or to take any actions or refrain from taking any actions not consistent with such Party's fiduciary obligations. It is understood and agreed that in addition to the protections set forth in Section 7.6 below, all negotiations leading up to this Agreement, and all prior drafts of this Agreement, are subject to the mediation order entered by the Bankruptcy Court in the Chapter 11 Case, any prior mediation agreements, and the any confidentiality agreement imposed by the mediator.

7.4    <u>Single Integrated Contract</u>. This Agreement, together with the Plan and Confirmation Order, constitute a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided herein, this Agreement, together with the Plan and Confirmation Order, supersede all prior communications, settlements, and understandings between the Parties and their representatives, regarding the matters addressed by this Agreement, the Plan, and Confirmation Order. Except as explicitly set forth in this Agreement, the Plan, and Confirmation Order, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement, the Plan, and Confirmation Order or alter or supplement its terms. Any statements, promises, or inducements, whether made by any party or any agents of any party, that are not contained in this Agreement, the Plan, and Confirmation Order shall not be valid or binding. Any changes to this Agreement, the Plan, and Confirmation Order must be made in writing and with the consent of the Parties.

7.5    <u>No Deemed Waiver</u>. By entering into this Agreement, neither Party has waived or shall be deemed to have waived any rights, obligations, or positions it or they have asserted or may in the future assert in connection with any matter or Person outside the scope of this Agreement. USAG's rights under policies of insurance issued by insurers other than the Settling Insurer shall not be affected by this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding by any Person as evidence of the rights,

duties, or obligations of any of the Parties with respect to matters or Persons outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

7.6    <u>Compromise of Disputed Claims</u>. This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability, wrongdoing, or insurance coverage. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions, as well as all confidentiality provisions entered by the Bankruptcy Court and the mediators in the Chapter 11 Case and/or the Insurance Coverage Adversary Proceeding and the Declaratory Coverage Action. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Party, except in (i) an action or proceeding between the Parties to enforce the terms of this Agreement or (ii) any possible action or proceeding between the Settling Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Settling Insurer's obligations under the Policies, the insurance policies issued to any other Person, or the Claims of any Party against the Settling Insurer.

7.7    <u>No Assignment</u>. Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties, except an assignment that occurs as a matter of law by virtue of a merger of a Party with another corporation or entity. USAG covenants that it has not and will not assign any right, interest or action in or on the Policies to any Person.

7.8    <u>Headings</u>. Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

7.9    <u>Notice</u>. All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by UPS, FedEx, or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to USAG:

   USA Gymnastics
   1099 N. Meridian St.,
   Suite 800

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

Indianapolis, Indiana 46204
Attn: Li Li Leung

*With a copy to:*

Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
Attn: Catherine Steege and Melissa Root

If to the Settling Insurer:

[_____]

*With a copy to:*

7.10    Execution by Counterparts. This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or e-mail, which counterparts shall be deemed to be originals.

7.11    No Admission. The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute (1) an admission by the Settling Insurer that USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Persons, or any other Person was or is entitled to any Insurance Coverage under the Policies or as to the validity of any of the positions that have been or could have been asserted by USAG, (2) an admission by USAG as to the validity of any of the positions or defenses to Insurance Coverage that have been or could have been asserted by the Settling Insurer or any Claims that have been or could have been asserted by USAG against the Settling Insurer, (3) an admission by USAG or the Settling Insurer of any liability whatsoever with respect to any of the Sexual Abuse Claims, or (4) a statement of support by the Settling Insurer for the procedures set forth in the Allocation Protocol or admission that the Allocation Protocol accurately reflects the liability of the Debtor or any other Protected Party with respect to Abuse Claims.

7.12    No-Third Party Beneficiaries. The Parties agree that there are no third-party beneficiaries of this Agreement.

7.13    Jurisdiction. The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Agreement, which shall be construed in accordance with Indiana law.

[Remainder of page left blank intentionally]

10

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of USAG

By:_____

Date:_____

Witness:_____

11

USA Gymnastics Plan of Reorganization
Exhibit G-3, Form of Buy-Back Agreement
(Great American Assurance Company and American Empire Surplus Lines Insurance Company)

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of Great American Assurance Company and American Empire Surplus Lines Insurance Company

By: _____

Date: _____

Witness: _____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-3, Form of Buy-Back Agreement**
**(Great American Assurance Company and American Empire Surplus Lines Insurance Company)**

Exhibit 1-Policies

USAG Policies

| Insurer | Policy Number | Policy Period |
|---|---|---|
| Great American | EXC0000591017800 | 8/1/02 – 8/1/03 |
| Great American | EXC0000591017801 | 8/1/03 – 8/1/04 |
| Great American | PAC0000568846300 | 8/1/04 – 8/1/05 |
| Great American | EXC0000568847900 | 8/1/04 – 8/1/05 |
| Great American | PAC0000568846301 | 8/1/05 – 8/1/06 |
| Great American | EXC0000568847901 | 8/1/05 – 8/1/06 |
| Great American | PAC0000568846302 | 8/1/06 – 8/1/07 |
| Great American | EXC0000568847902 | 8/1/06 – 8/1/07 |

USOPC Policies

| Insurer | Policy Number | Policy Period |
|---|---|---|
| Great American | EXC565946200 | 2/8/03 – 2/8/04 |
| Great American | GLO558255700 | 2/8/04 – 2/8/05 |
| Great American | EXC558255800 | 2/8/04 – 2/8/05 |
| Great American | GLO558255701 | 2/8/05 – 2/8/06 |
| Great American | EXC558255801 | 2/8/05 – 2/8/06 |
| Great American | GLO558255702 | 2/8/06 – 2/8/07 |
| Great American | EXC558255802 | 2/8/06 – 2/8/07 |
| Great American | GLO558255703 | 2/8/07 – 2/8/08 |
| Great American | EXC558255803 | 2/8/07 – 2/8/08 |
| Great American | XS7856009-00 | 2/8/08 – 2/8/09 |
| Great American | XS7856009-01 | 2/8/09 – 2/8/10 |
| Great American | XS7856009-02 | 2/8/10 – 2/8/11 |

Karolyi Policies

| Insurer | Policy Number | Policy Period |
|---|---|---|
| American Empire | 11CG64058 | 5/18/11 – 5/18/12 |
| American Empire | 12CG67109 | 5/18/12 – 5/18/13 |
| American Empire | 13CG0176317 | 5/18/13 – 5/18/14 |
| American Empire | 14CG0182141 | 5/18/14 – 5/18/15 |
| American Empire | 15CG0190975 | 5/18/15 – 5/18/16 |
| American Empire | 16CG0202368 | 5/18/16 – 5/18/17 |

# EXHIBIT G-4

**Form of Buy-Back Agreement
(Virginia Surety Company F/K/A Combined Specialty Insurance Company)**

USA Gymnastics Plan of Reorganization
Exhibit G-4, Form of Buy-Back Agreement
(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)

## SETTLEMENT AGREEMENT, RELEASE, AND INSURANCE POLICY BUY-BACK OF USA GYMNASTICS' INSURANCE POLICIES WITH VIRGINIA SURETY COMPANY F/K/A COMBINED SPECIALTY INSURANCE COMPANY

This Settlement Agreement, Release, and Policy Buy-Back of USA Gymnastics' Policies issued to USAG (the "**Agreement**") is hereby made between USA Gymnastics on the one hand, a 501(c)(3) not-for-profit organization incorporated in Texas ("**USAG**"), and Virginia Surety Company f/k/a Combined Specialty Insurance Company (the "**Settling Insurer**" and with USAG, the "**Parties**").

WHEREAS, USAG filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on December 5, 2018, in the United States Bankruptcy Court for the Southern District of Indiana (the "**Chapter 11 Case**"), which Chapter 11 Case is known as Case No. 18-BK-09108-RLM-11.

WHEREAS, prior to the filing of USAG's Chapter 11 Case, the Settling Insurer issued certain insurance policies to or for the benefit of USAG.

WHEREAS, certain disputes have arisen and may arise in the future concerning the Settling Insurer's responsibilities, if any, to provide coverage to USAG and any additional Non-Debtor CGL Settling Insurer Covered Persons for Sexual Abuse Claims and to provide a defense for such Claims (the "**Coverage Disputes**").

WHEREAS, prior to the filing of its Chapter 11 Case, USAG filed a declaratory judgment action against the Settling Insurer and certain other parties in the Marion Superior Court of the State of Indiana, which was subsequently removed to the United States District Court for the Southern District of Indiana, and has since been administratively closed by the Court without prejudice (the "**District Court Declaratory Coverage Action**").

WHEREAS, after USAG filed its Chapter 11 Case, USAG filed the Insurance Coverage Adversary Proceeding against the Settling Insurer and certain other entities on February 1, 2019, in the United States Bankruptcy Court for the Southern District of Indiana, which Insurance Coverage Adversary Proceeding was assigned Case No. 19-AP-50012.

WHEREAS, USAG and the Settling Insurer, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish fully and finally to compromise and resolve any and all Coverage Disputes and any and all other disputes between them, whether or not asserted in the District Court Declaratory Coverage Action, the Insurance Coverage Adversary Proceeding, or otherwise.

WHEREAS, through this Agreement and as a material part of the full and final compromise and resolution of all disputes between them, USAG intends to (i) sell the Policies (as defined herein) to the Settling Insurer, with the Settling Insurer buying back all such Policies, and (ii) provide the Settling Insurer with a full and complete general release of the Settling Insurer with respect to any and all coverages under the Policies, including but not limited to defense obligations and coverage.

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

WHEREAS, as part of the compromise and resolution of such disputes, USAG and the Settling Insurer wish to effect a sale of the Policies to the Settling Insurer pursuant to Sections 363(b), (f) and (m) and 1123(a)(5) and (b)(6) of the Bankruptcy Code.

WHEREAS, each Party has received the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated by the Parties in good faith and at arm's length.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound, subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION

1.1 <u>Terms and Meanings</u>. As used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used herein but not defined below or otherwise defined in this Agreement shall have the meanings given to them in the Plan or Bankruptcy Code, as applicable.

1.1.1. "Extra-Contractual Claim" means any known or unknown, asserted or unasserted, Claim against the Settling Insurer, seeking any type of relief, including compensatory, exemplary, or punitive damages, or attorneys' fees, costs, or any other type of relief, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of an unfair claims practices act or similar statute, regulation, or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under a Policy. Extra-Contractual Claims include without limitation: (i) any Claim arising out of or relating to the Settling Insurer's handling of any request for insurance coverage relating to the Policies for any Claim, including, without limitation, any Sexual Abuse Claim; and (ii) the conduct of the Parties with respect to the negotiation of this Agreement.

1.1.2. "Insurance Coverage Claim" means any Claim for insurance coverage under the Policies.

1.1.3. "Interests" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief relating to the Policies.

1.1.4. "Plan" means the Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort Claimants Committee of Sexual Abuse Survivors, as the same may be amended or modified from time to time consistent with this Agreement.

       1.1.5. "Policies" means (i) all insurance policies, issued or allegedly issued, by the Settling Insurer and providing insurance coverage to USAG as the named insured, as identified on <u>Exhibit 1</u> to this Agreement, (ii) USAG's Interests in policies that the Settling Insurer issued to USOPC, as identified on <u>Exhibit 1</u> to this Agreement; and (iii) any and all unknown insurance policies issued or allegedly issued by the Settling Insurer to USAG.

1.2    <u>Rules of Construction</u>. In addition to the rules of construction set forth in the Plan, which are incorporated herein as though fully set forth herein, the following rules of construction shall apply to this Agreement:

1.3    Statutory and Regulatory References. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

1.4    No Construction Against Drafter. The wording of this Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunities to propose and negotiate changes prior to its execution. No Party will be entitled to have any wording of this Agreement construed against the other based on any contention as to which of the Parties drafted the language in question or which party is an insurer.

## 2. PAYMENT OF THE SETTLEMENT AMOUNT

2.1    <u>The Settlement Amount</u>. Subject to all of the terms of this Agreement, in full and final settlement of all Claims and responsibilities under, arising out of, or relating to the Policies, and in consideration of the sale of the Policies free and clear of all Interests of any Person, and other benefits afforded to the Settling Insurer under the Plan, and expressly subject to fulfillment of all conditions to payment identified in Section 3 below, the Settling Insurer shall pay to USAG by wire transfer (as provided in the Plan) the Agreed CGL Insurer Payment, which is $23,500,000 (the "**Settlement Amount**"). For purposes of this Agreement, the Settlement Amount is subject to allocation between the Debtor CGL Insurance Policies and the policies issued to USOPC as set forth in Section 3.2 of the Plan. Unless otherwise agreed by USAG and the Settling Insurer, USAG shall provide the Settling Insurer with notice of the intended Effective Date not less than five days prior to such intended Effective Date. Payment of the Settlement Amount shall occur on the Effective Date of the Plan. In addition, to the extent that any Outstanding Amounts are due as of the Effective Date, the Settling Insurer shall also pay such Outstanding Amount to USAG or the applicable vendor (as provided in Section 3.7 of the Plan) on the Effective Date of the Plan. All invoices for Outstanding Amounts must be submitted to the Debtor CGL Settling Insurers ten days before the Confirmation Hearing. If a Debtor CGL Settling Insurer disputes the Outstanding Amount, it shall notify the Debtor of such dispute within five days of the Confirmation Hearing and the Bankruptcy Court will resolve any such dispute as part of approving the buy-

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

back of the Debtor CGL Settling Insurer's Policies. To the extent that there is a disagreement over Outstanding Amounts due as of the Effective Date, USAG and the Settling Insurer shall work in good faith to resolve such disagreement as soon as practicable. The Bankruptcy Court shall retain jurisdiction over any unresolved dispute over Outstanding Amounts and the Settling Insurer consents to the entry of an order by the Bankruptcy Court solely with respect to such dispute, without waiving and subject to any appellate rights the Settling Insurer may have; provided, however, nothing herein shall affect any arbitration regarding Outstanding Amounts owed to EPIQ pending as of the Effective Date.

2.2   <u>Settlement Amount Plus Any Additional Outstanding Amounts is the Total Amount</u>. The Parties expressly agree that: (i) that the Settlement Amount plus any Outstanding Amounts is the total amount that the Settling Insurer is obligated to pay on account of any and all Claims of any kind made under or relating to the Policies (including the Abuse Claims and any reimbursement obligations for Conditional Payments under the MSP), with respect to Extra-Contractual Claims relating to the Policies, or as to any Abuse Claims relating to the policies issued by Settling Insurer to the USOPC (except as expressly set forth in the Plan); (ii) that under no circumstance will the Settling Insurer ever be obligated to make any additional payments to anyone in connection with the Policies, including any amounts allegedly owed under the MSP and for Extra Contractual Claims; and (iii) that all limits of liability of the Policies, including all per person, per occurrence, and aggregate limits, shall be deemed fully and properly exhausted. The Parties further agree that the Settlement Amount is the full purchase price of the Policies and coverages referenced in this paragraph.

2.3   <u>Conditional Payments</u>. The Parties agree that the Plan that is confirmed in the Confirmation Order will provide that this Agreement is binding on the Trust and that, before the Settlement Trustee disburses any of the Settlement Amount to any Abuse Claimant or Future Claimant, the Settlement Trustee shall determine whether any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant. If any Conditional Payment has been made to or on behalf of any Abuse Claimant or Future Claimant, the Settlement Trustee shall, within the respective time period called for by the MSP, (i) reimburse the appropriate Medicare Trust Fund for the appropriate amount, and (ii) submit the required information for any Abuse Claimant or Future Claimant to the appropriate agency of the United States government.

2.4   <u>Abuse Claimant Release</u>. As a precondition to receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall execute and deliver to the Trust and the Settling Insurer a full and complete general release of the Settling Insurer as provided in Section 11.1.1 of the Plan. In addition, within 10 days after receiving any payment from the Trust, each Abuse Claimant and each Future Claimant shall dismiss with prejudice any lawsuit as provided in Section 11.1.1 of the Plan, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee. The Settlement Trustee shall promptly provide copies of

4

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

such general release and dismissal orders to the Settling Insurer upon the Settling Insurer's request.

**3.     CONDITIONS PRECEDENT TO SETTLING INSURER'S PAYMENT**

3.1     <u>Timing of Payment</u>. The Settling Insurer's obligation to pay the Settlement Amount in Section 2.1 above is expressly conditioned on the entry of the Confirmation Order and all conditions to the Effective Date of the Plan having occurred, and receipt of payment instructions (including a completed W-9 form) from the Debtor or the Reorganized Debtor.

3.2     <u>Confirmation Order</u>. The Plan (including any amendments and supplements) and Confirmation Order must be in all respects consistent with this Agreement, and the Confirmation Order, in a form reasonably acceptable to the Settling Insurer, must approve this Agreement pursuant to Bankruptcy Code Sections 363, 1123, and 105 and Bankruptcy Rule 9019 and/or under such other provisions as the Bankruptcy Court may order, must authorize the Parties to undertake the settlement and the transactions contemplated by this Agreement, and must contain no provisions that diminish or impair the benefit of the Plan or this Agreement to the Settling Insurer.

**4.     RELEASES AND SALE FREE AND CLEAR**

4.1     <u>Mutual Releases</u>. Subject to entry of the Confirmation Order as a Final Order, and the payment of the Settlement Amount and any Outstanding Amounts, and without any further action by the Parties, USAG and its Related Persons, on the one hand, and the Settling Insurer and each of its Related Persons, on the other hand, each hereby fully, finally, and completely remises, releases, acquits, and forever discharges, as of the Effective Date, the other, and each of them, from any and all past, present, or future Claims in connection with, relating to or arising out of, in any manner or fashion, the Policies, including Claims that are actual or alleged, known or unknown, accrued or unaccrued, suspected or unsuspected (including Sexual Abuse Claims, Extra-Contractual Claims, reimbursement obligations for Conditional Payments under the MSP, and all Claims relating to, or arising out of, the Chapter 11 Case), whether such Claims seek compensatory damages, punitive damages, exemplary damages, statutorily multiplied damages, attorneys' fees, interest, costs, or any other type of monetary or nonmonetary relief. The Releases provided herein are in addition to, and not in replacement of, the releases provided in the Plan.

4.2     <u>USAG Buy-Back</u>. USAG agrees that, as set forth in the Confirmation Order, the Settling Insurer hereby buys back the Policies, free and clear of all liens, Claims, encumbrances, and other Interests of any Person, including all rights and Interests of USAG, all Participating Parties, all Non-Debtor CGL Settling Insurer Covered Persons, all Persons claiming or who could claim coverage under any of the Policies, and any other Person claiming by, through, or on behalf of USAG, any other insurer, and any Abuse Claimant or Future Claimant. This sale is pursuant to

Sections 363(b), 363(f), 1123(a)(5), 1123(b)(6) and 1129 of the Bankruptcy Code. The Parties acknowledge and agree that (i) the Settling Insurer is a good faith purchaser of the Policies within the meaning of Section 363(m) of the Bankruptcy Code and (ii) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations being released hereunder and constitutes reasonably equivalent value. The Parties agree that the releases in this Agreement and the buy-back of the Policies comply with the Bankruptcy Code and applicable non-bankruptcy laws. Further, the Parties agree: (A) (as set forth in the Confirmation Order) that, upon the payment of the Settlement Amount and any Outstanding Amount by the Settling Insurer, the Policies shall be immediately terminated and of no further force and effect; (B) that the Settling Insurer's payment of the Settlement Amount and any Outstanding Amount constitutes the Settling Insurer's full and complete performance of any and all obligations under the Policies and exhausts all limits of liability of the Policies; and (C) the Parties agree that all rights, title, or interests of USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Person, any other Settling Insurer, any Other Insurers, any Person claiming or who could claim coverage under the Policies, any Person claiming or who could assert a claim for reimbursement, contribution, subrogation, or any other payment under the Policies, and each of their respective Related Persons, may have had, may presently have, or in the future may have in the Policies are fully and finally released and extinguished pursuant to the terms of this Agreement.

4.3   Waiver of Surviving Claims. If, contrary to the specific intent of the Parties, any Claims released pursuant to this Agreement, including any Insurance Coverage Claims, are deemed to survive this Agreement, even though they are encompassed by the terms of the releases and buy-backs set forth in Sections 4.1 and 4.2 of this Agreement, the Parties, and the Non-Debtor CGL Settling Insurer Covered Persons, hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims.

4.4   Waiver Does not Affect Reinsurance. The releases set forth in Section 4.1 of this Agreement, as well as all other provisions in this Agreement, are not intended to apply to or have any effect on the Settling Insurer's right to reinsurance recoveries.

4.5   Rights and Obligations Under this Agreement and the Plan. Nothing in this Section 4 is intended to, nor shall be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Agreement. Nothing in this Section 4 is intended, nor shall be construed to, release, waive, relinquish or otherwise affect any obligation of the Trust to the Settling Insurer under the Plan.

4.6   Dismissal With Prejudice of the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding. On or prior to the Effective Date, USAG will dismiss with prejudice the District Court Declaratory Coverage Action and Insurance Coverage Adversary Proceeding as to the Settling Insurer.

USA Gymnastics Plan of Reorganization
Exhibit G-4, Form of Buy-Back Agreement
(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)

## 5. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1 <u>Representations and Warranties</u>. Each of the Parties separately represents and warrants as follows:

5.1.1. Power and Authority. It has the requisite power and authority to enter into this Agreement and to perform the obligations contemplated by this Agreement, subject only to approval of the Bankruptcy Court.

5.1.2. Authorized To Execute. Subject to entry of the Confirmation Order as a Final Order, the execution and delivery of, and the performance of the obligations contemplated by, this Agreement have been approved by duly authorized representatives of the Parties and by all other necessary actions of the Parties.

5.1.3. Arm's Length Negotiation. This Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and has been executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

5.1.4. Good Faith Search for Existing Policies. Each of the Parties has conducted and completed a thorough and good faith search for any policy of insurance that might exist, or other evidence of any such policy of insurance, under which the Settling Insurer was or might be an insurer of USAG.  Other than the Policies listed on <u>Exhibit 1</u>, no other policies of  insurance have been located or are known to exist.

## 6. [INTENTIONALLY OMITTED]

6.1. [INTENTIONALLY OMITTED]

## 7. MISCELLANEOUS

7.1 <u>Challenge to Agreement</u>. In the event that any proceedings are commenced to invalidate all or any part of this Agreement, the Parties agree to cooperate fully to oppose such proceedings. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Person not a Party to this Agreement to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding; provided, however, that such cooperation shall not obligate either party to incur professional fees or other expenses for the benefit of the other Party.

7.2 <u>Effectuation</u>. Each Party agrees to take such steps and to execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement, subject to any necessary Bankruptcy Court approvals, and to preserve its validity and enforceability.

7.3     <u>Cooperation to Obtain Approval</u>. The Parties shall cooperate with each other in connection with obtaining a Confirmation Order approving this Agreement. The Parties agree such cooperation shall include consulting with each other upon request concerning the status of proceedings and providing each other with copies of requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court and not taking any action to oppose confirmation of a Plan consistent with this Agreement or asking any other Person to oppose confirmation of a Plan consistent with this Agreement; *provided*, <u>*however*</u>, that nothing contained in this Section shall obligate any Party to provide to the other Party any information that is otherwise subject to the attorney-client privilege or work-product doctrine or to take any actions or refrain from taking any actions not consistent with such Party's fiduciary obligations. It is understood and agreed that in addition to the protections set forth in Section 7.6 below, all negotiations leading up to this Agreement, and all prior drafts of this Agreement, are subject to the mediation order entered by the Bankruptcy Court in the Chapter 11 Case, any prior mediation agreements, and the any confidentiality agreement imposed by the mediator.

7.4     <u>Single Integrated Contract</u>. This Agreement, together with the Plan and Confirmation Order, constitute a single integrated written contract that expresses the entire agreement and understanding between the Parties. Except as otherwise expressly provided herein, this Agreement, together with the Plan and Confirmation Order, supersede all prior communications, settlements, and understandings between the Parties and their representatives, regarding the matters addressed by this Agreement, the Plan, and Confirmation Order. Except as explicitly set forth in this Agreement, the Plan, and Confirmation Order, there are no representations, warranties, promises, or inducements, whether oral, written, expressed, or implied, that in any way affect or condition the validity of this Agreement, the Plan, and Confirmation Order or alter or supplement its terms. Any statements, promises, or inducements, whether made by any party or any agents of any party, that are not contained in this Agreement, the Plan, and Confirmation Order shall not be valid or binding. Any changes to this Agreement, the Plan, and Confirmation Order must be made in writing and with the consent of the Parties.

7.5     <u>No Deemed Waiver</u>. By entering into this Agreement, neither Party has waived or shall be deemed to have waived any rights, obligations, or positions it or they have asserted or may in the future assert in connection with any matter or Person outside the scope of this Agreement. USAG's rights under policies of insurance issued by insurers other than the Settling Insurer shall not be affected by this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding by any Person as evidence of the rights, duties, or obligations of any of the Parties with respect to matters or Persons outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

7.6     <u>Compromise of Disputed Claims</u>. This Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession by any Party of liability, culpability, wrongdoing, or insurance coverage. Settlement negotiations leading up to this Agreement and all related discussions and negotiations shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions, as well as all confidentiality provisions entered by the Bankruptcy Court and the mediators in the Chapter 11 Case and/or the Insurance Coverage Adversary Proceeding and the Declaratory Coverage Action. Any evidence of the negotiations or discussions associated with this Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Party, except in (i) an action or proceeding between the Parties to enforce the terms of this Agreement or (ii) any possible action or proceeding between the Settling Insurer and any of its reinsurers. This Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret the Settling Insurer's obligations under the Policies, the insurance policies issued to any other Person, or the Claims of any Party against the Settling Insurer.

7.7     <u>No Assignment</u>. Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties, except an assignment that occurs as a matter of law by virtue of a merger of a Party with another corporation or entity. USAG covenants that it has not and will not assign any right, interest or action in or on the Policies to any Person.

7.8     <u>Headings</u>. Section titles and/or headings contained in this Agreement are included only for ease of reference and shall have no substantive effect.

7.9     <u>Notice</u>. All notices, demands, or other communications to be provided pursuant to this Agreement shall be in writing and sent by UPS, FedEx, or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to USAG:

USA Gymnastics
1099 N. Meridian St.,
Suite 800
Indianapolis, Indiana 46204
Attn: Li Li Leung

*With a copy to:*

9

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

Jenner & Block LLP
353 North Clark Street
Chicago, Illinois 60654
Attn: Catherine Steege and Melissa Root

If to the Settling Insurer:

[_____]

*With a copy to:*

7.10    Execution by Counterparts. This Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile or e-mail, which counterparts shall be deemed to be originals.

7.11    No Admission. The Parties agree that nothing contained in this Agreement shall be deemed or construed to constitute (1) an admission by the Settling Insurer that USAG, any Participating Party, any Non-Debtor CGL Settling Insurer Covered Persons, or any other Person was or is entitled to any Insurance Coverage under the Policies or as to the validity of any of the positions that have been or could have been asserted by USAG, (2) an admission by USAG as to the validity of any of the positions or defenses to Insurance Coverage that have been or could have been asserted by the Settling Insurer or any Claims that have been or could have been asserted by USAG against the Settling Insurer, (3) an admission by USAG or the Settling Insurer of any liability whatsoever with respect to any of the Sexual Abuse Claims, or (4) a statement of support by the Settling Insurer for the procedures set forth in the Allocation Protocol or admission that the Allocation Protocol accurately reflects the liability of the Debtor or any other Protected Party with respect to Abuse Claims.

7.12    No-Third Party Beneficiaries. The Parties agree that there are no third-party beneficiaries of this Agreement.

7.13    Jurisdiction. The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Agreement, which shall be construed in accordance with Indiana law.

[Remainder of page left blank intentionally]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

On behalf of USAG

By:_____

Date:_____

Witness:_____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

      IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the last date indicated below,

On behalf of Virginia Surety Company f/k/a Combined Specialty Insurance Company

By:_____

Date:_____

Witness:_____

**USA Gymnastics Plan of Reorganization**
**Exhibit G-4, Form of Buy-Back Agreement**
**(Virgina Surety Company, f/k/a Combined Specialty Insurance Company)**

Exhibit 1-Policies

| Policy Number | Coverage Dates |
|---|---|
| T7 0000000734000 | 8-1-02 to 8-1-03 |
| T7 0000000734001 | 8-1-03 to 8-1-04 |

# **EXHIBIT H**

**Allocation Protocol**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br>        Debtor. | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

### ALLOCATION PROTOCOL FOR ABUSE CLAIMS

**I.**     **Abuse Claim Reviewer**

The Hon. William Bettinelli (Ret.) shall have the title and responsibility of "Abuse Claims Reviewer" (hereinafter "ACR") under the terms of this Allocation Protocol. The ACR shall conduct a review of each of the abuse claims within the Allocation Protocol and make individual monetary distributions (also known as "allocations") according to the guidelines set forth in Sections IV and V below. The ACR shall have the authority to employ qualified assistants and consultants as he deems appropriate. The ACR's award as to each claimant shall be the final award, subject only to reconsideration as set forth in Section 4.6 below.

**II.**     **Definitions**

    2.1    Capitalized Terms. Capitalized terms used in Allocation Protocol shall have the meanings given them in the Plan, the Settlement Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in Allocation Protocol by reference.

               "Abuse Claimant:" means a claimant who alleges Sexual Abuse by an employee or agent of the Debtor who alleges actionable damage because of the Sexual Abuse by an employee or agent of the Debtor, and who has duly filed a proof of claim in the Bankruptcy as of April 29, 2019, or such a claimant who duly filed a proof of claim thereafter and whose claim was deemed timely by order of the court, or a non-claimant Sexual Abuse victim by an employee or agent of the Debtor, who possesses a filed Sexual Abuse claim against a contributing entity seeking a channeling injunction against such claim through this Plan.[2] For all purposes in this Allocation Protocol,

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 1099 N. Meridian St., Suite 800, Indianapolis, Indiana 46204.

[2] There are three such claimants in this proceeding including Claimants DH and VB, Claim Numbers 544-1 and 545, respectively, and the claim against USOPC, filed in California Federal Court, on behalf of McKayla Maroney.

if represented by counsel, all notices and communications shall be made to the Abuse Claimant's counsel. Abuse Claimant does not mean any Future Abuse Claimants.

"Perpetrator of Debtor:" means a person: (1) who was an employee or other agent of the Debtor at the time such person committed an act of Abuse; or (2) for whom or for whose actions the Debtor was otherwise responsible.

"Plan:" means and refers to the *Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort Claimants' Committee of Sexual Abuse Survivors* as confirmed and as the same may be amended or modified.

"Settlement Fund:" means the fund established by the Plan to pay Abuse Claims, after deduction of the funds to be placed in the Future Claims Fund as outlined in the Plan.

"Sexual Abuse" or "Sexually Abused:" shall have the meaning as outlined in the Plan.

## III.    Purpose

3.1    Purpose: The purpose of Allocation Protocol is to provide for the just, fair and reasonable distribution of settlement funds to Abuse Claimants.

3.2    Sole and Exclusive Method: Allocation Protocol shall be the sole and exclusive method by which an Abuse Claimant may seek payment from the Settlement Fund.

3.3    Interpretation: The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Allocation Protocol.

## IV.    Procedure for Allocation Protocol

4.1    Monetary Distribution: The ACR shall evaluate each Abuse Claim using the Allocation Protocol as set forth below to determine the number of points, if any, that should be allocated to the Abuse Claimant.

4.2    Proof of Abuse: Available documentary information to be presented by the Abuse Claimant shall be provided to the ACR within 30 days of a written request from the ACR (the "Submission Deadline"), provided that the ACR may grant extensions of time for good cause shown.

The ACR's written request for submission of information will set forth the manner, method and form for submission of documentary information and personal statements.

The ACR shall consider all of the facts and evidence presented by the Abuse Claimant. However, it is recognized that many Abuse Claimants may not have such documents as

**USA Gymnastics Plan of Reorganization**
**Exhibit H, Allocation Protocol**

medical or counseling records. The ACR shall not distinguish between documentary evidence and oral testimony in terms of weight or value in making his findings. One is not necessarily more or less valuable than the other. The presence or absence of such documents shall not, alone, advantage or disadvantage the Abuse Claimant if the information presented is otherwise reliable and credible.

Each Abuse Claimant will have the opportunity to submit a written (personal) statement to the ACR or his designated assistant(s), provided that, any Abuse Claimant may opt out of the written statement at any time. The written statement shall be no longer than 5 pages in length, single sided, double spaced with 12-point font, and shall be submitted by the Submission Deadline unless the ACR determines there is good cause for delay. If an Abuse Claimant opts out of a written statement, such refusal shall not be held against the Abuse Claimant or be used as grounds to discount the claim. For those claimants that have previously submitted materials to the ACR in the MSU litigation, they may resubmit those materials as long as they do not exceed the limits described above.

Each Abuse Claimant may interview with the ACR upon written request to the ACR by the Submission Deadline. The interview may be conducted in person, by telephone, by internet teleconferencing or other means reasonably approved by the ACR; however, the interviews will be conducted in person only when the ACR determines, in his or her sole discretion, that an in-person interview is reasonably feasible. The absence of an interview as to a Claimant shall not be grounds for denial or reduction of the Claimant's allocation. The ACR shall maintain an accounting of the costs/expenses incurred by each separate interview request, and the costs/expenses related to such a request shall be borne by the Abuse Claimant making the request, which will be deducted from the Claimant's award.

4.3    <u>Deceased Abuse Claimant</u>: Abuse Claimant shall include the estate of the Deceased Abuse Client, or the personal executor, or personal representative of the estate of a Deceased Abuse Claimant.

4.4    <u>Guidelines for Use of Protocol</u>: The following guidelines will be used by the ACR in evaluating Abuse Claimant's individual claims.

**<u>Pre-Existing Risk and Resiliency Factors:</u>**                **MAXIMUM 20 POINTS**

A.    Risk and resiliency factors are aspects of life known to negatively impact life and to exacerbate the negative impact of experience such as Sexual Abuse:

    i.       Childhood of poverty;

    ii.      Parental divorce;

    iii.     Death of a parent;

    iv.      Exposure to substance abuse;

    v.       Absence of parent(s);

    vi.      Being victim of or witnessing domestic violence; and

    vii.     Prior abuse.

**USA Gymnastics Plan of Reorganization**
**Exhibit H, Allocation Protocol**

<u>**Nature of the Sexual Abuse:**</u>                                        **MAXIMUM 40 POINTS**

      A.     Nature of the Sexual Abuse considers:

              i.     Age at time of the abuse;

              ii.     Date of abuse;

              iii.     Duration;

              iv.     Frequency/number of instances;

              v.     Degree intrusive into victim's body (*e.g.* clothed/unclothed, oral, anal, vaginal);

              vi.     Level of force/violence/coercion/threats;

              vii.     Control of environment (*e.g.* trip under supervision of Perpetrator of Debtors);

              viii.     More than one Perpetrator of Debtor;

              ix.     Physical pain suffered; and

              x.     Grooming.

<u>**Post-Abuse Mental and Physical Functioning:**</u>                    **MAXIMUM 40 POINTS**

      A.     Post-abuse functioning considers:

              i.     School behavior problem;

              ii.     School or academic problems;

              iii.     Loss of faith;

              iv.     Damage to family relationships;

              v.     Mental health symptoms;

              vi.     Depression-PTSD;

              vii.     Suicide attempt or ideation;

              viii.     Anxiety;

              ix.     Substance abuse;

              x.     Sexual dysfunction;

              xi.     Intimacy issues;

              xii.     Runaway;

              xiii.     Flashbacks;

              xiv.     Nightmares;

              xv.     Criminal record;

**USA Gymnastics Plan of Reorganization**
**Exhibit H, Allocation Protocol**

        xvi.    Relationship dysfunction and loss;

        xvii.   Substance abuse;

        xviii.  Lack of access to medical/psychological treatment;

        xix.    Poverty; and

        xx.     Other.

**Legal Considerations:**                  **MAXIMUM +/- 20 POINTS**

      A.      This factor considers:

        i.      Sexual Abuse post 2015;

        ii.     Statute of limitations issues;

        iii.    Notice issues; and

        iv.    Other issues.

**Post-Abuse Employment Issues:**            **MAXIMUM 30 POINTS**

      A.     Post-Abuse Employment Issues include:

        i.      Underemployment/unemployment;

        ii.     Loss of career (athletic or otherwise);

        iii.    Loss of employment opportunities (athletic or otherwise);

        iv.    Loss of sponsorships or scholarships;

        v.     National Team Member; and

        vi.    Olympian.

**Assessment of Global Severity of Impact/Suffering:**   **MAXIMUM 20 POINTS**

      A.     The ACR shall rate the global severity of impact/suffering. That is, compared to other Abuse Claimants in the Allocation Protocol, the ACR will consider how much this individual suffered as a result of the Sexual Abuse:

        i.      Compared to other Abuse Claimants in the Allocation Protocol, the ACR will consider the overall seriousness of the Sexual Abuse; and

        ii.     Compared to other Abuse Claimants in the Allocation Protocol, the ACR will consider the overall negative impact of the Sexual Abuse.

**Additional Factors for Olympians and National Team Members and other Survivors:**                   **MAXIMUM 20 POINTS**

      A.     The ACR shall consider the following additional factors:

        i.     Claimant's level of acclaim in the sport in which she was abused (*e.g.*, publicly-acknowledged accomplishments in national or world events, public figure in the sport, honors from press or sports bodies, etc.); and

        ii.    Claimant's level of participation in public/litigation events related to the Sexual Abuse Claims (*e.g.*, press/media participation, legislative hearing participation).

4.5    <u>Monetary Distribution</u>: The ACR will arrive at a point total for each Abuse Claimant taking into account the factors in Section 4.4, above, and assigning a point total for the Abuse Claimant. The value of the individual "point" will be determined after all Abuse Claimants have been evaluated, by dividing the total amount of dollars by the total number of points for all of the Abuse Claimants. By way of example, if there are 100 Abuse Claimants, who are awarded a total of 5,000 points, with a total net Settlement Fund of $1 million, each point would be valued at $200.

      An Abuse Claimant shall not receive more than one monetary distribution.

4.6    <u>Determinations by the ACR and Requests for Reconsideration and Appeal</u>: The ACR shall notify the Attorneys for the Abuse Claimants in each pot separately in writing (including via email) of the points awarded to the Abuse Claimant they represent and each clients' resulting monetary distribution. The Attorney is then responsible for providing this information to the Abuse Claimant. (Unrepresented Abuse Claimants will be individuals notified by the ACR.) The ACR's determination shall be final unless the Abuse Claimant makes a timely request for the proposed allocation to be reconsidered by the ACR. The Abuse Claimant shall not have a right to any other appeal of the ACR's point award. The Abuse Claimant may request reconsideration of the ACR's point award by having his/her attorney deliver a written request for reconsideration to the ACR within 14 calendar days after the date of the ACR's provision of the award to the Attorney for an Abuse Claimant. The Abuse Claimant, with the request for reconsideration, may submit additional evidence and argument in support of such request provided the Abuse Claimant provides an adequate explanation for the failure to provide the information by prior deadlines. The ACR shall have sole discretion to determine how to proceed with the request for reconsideration and ultimately may increase, decrease, or leave intact the Abuse Claimant's initial monetary distribution determination. The ACR shall maintain an accounting of the costs/expenses incurred for each separate reconsideration request, and the cost/expenses related to such a request shall be borne by the Abuse Claimant making the request, which will be deducted from the Abuse Claimant's Award. The ACR's determination of such request for reconsideration shall be final and not subject to any further appeal.

4.7    <u>Confidentiality</u>: All information that the Settlement Trustee and/or the ACR receives from any source about any Abuse Claimant shall be held strictly confidential and shall not be disclosed, absent an Order of the bankruptcy court.

USA Gymnastics Plan of Reorganization
Exhibit H, Allocation Protocol

## V.      Underline{General Guidelines}

     5.1    <u>Non-Compensatory Damages and Other Theories of Liability</u>: In determining the value of any Abuse Claim, punitive damages and damages that do not compensate the tort claimant, shall not be considered or allowed, even if these damages could have been allowed in a case or at trial.

     5.2    <u>Withdrawal of Claims</u>: An Abuse Claimant can irrevocably withdraw an Abuse Claim at any time upon written notice to the ACR.

     5.3    <u>*Res Judicata* Effect</u>: The ACR's determination with respect to an Abuse Claim shall have no preclusive or *res judicata* effect outside of this Bankruptcy Case as to any third-party. That is, the ACR's determination may not be used against any Abuse Claimant in any other case.

     5.4    <u>Costs of Administration</u>: All costs of administration associated with the matters discussed in the Allocation Protocol, whether incurred by the Plan Trustee or the ACR, shall be an expense of the Plan Trust.

     5.5    <u>Award for Personal Injury</u>. Any award to an Abuse Claimant pursuant to this Allocation Protocol shall be on account of a personal injury to the Abuse Claimant.

# EXHIBIT I

**Future Claimant Allocation Protocol**

USA Gymnastics Plan of Reorganization
Exhibit I, Future Claimant Allocation Protocol

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| In re:<br><br>USA GYMNASTICS,[1]<br><br><div align="center">Debtor.</div> | Chapter 11<br><br>Case No. 18-09108-RLM-11 |

## ALLOCATION PROTOCOL FOR FUTURE CLAIMS

**I.   Abuse Claim Reviewer**

The Future Claimant Representative ("FCR") in consultation with the Honorable (Retired) William L. Bettinelli (the "Settlement Trustee") shall jointly determine if a Claimant meets the definition of a Future Claimant. Once that determination is made, the Settlement Trustee shall have the title, responsibility and authority of "Abuse Claims Reviewer" (hereinafter "ACR") under the terms of this Future Claimant Allocation Protocol (the "Allocation Protocol"). The ACR shall conduct a review of each Future Claim and make individual point allocations according to the guidelines set forth in Sections 5.4 and 5.5 below. The Settlement Trustee shall make individual monetary distributions to Tort Claimants pursuant to the terms of this Allocation Protocol and the Plan based on the ACR's point award. The ACR's point award as to each claimant shall be final, subject only to reconsideration as set forth in Section 5.6 below.

**II.   Source of Payment**

Holders of compensable Future Claims shall be paid from the proceeds of the Future Claimant Reserve on account of such Claims pursuant to the terms of the Plan, Plan Documents, and this Allocation Protocol.

**III.   Definitions**

3.1   Capitalized Terms. Capitalized terms used in this Allocation Protocol shall have the meanings given to them in the Plan, the Trust Agreement or the Bankruptcy Code, unless otherwise defined herein, and such definitions are incorporated in this Allocation Protocol by reference.

"Documentary Information:" means any writing or recorded information regarding a Tort Claim.

---

[1] The last four digits of the Debtor's federal tax identification number are 7871. The location of the Debtor's principal office is 1099 N. Meridian St., Suite 800, Indianapolis, Indiana 46204.

"Future Claim:" has the same meaning as in the Plan.

"Future Claimant:" has the same meaning as in the Plan.

"Perpetrator of Debtor:" means a person: (1) who was an employee or other agent of the Debtor at the time such person committed an act of Abuse; or (2) for whom or for whose actions the Debtor was otherwise responsible.

"Plan:" means and refers to the *Modified Third Amended Joint Chapter 11 Plan of Reorganization Proposed by USA Gymnastics and the Additional Tort Claimants' Committee of Sexual Abuse Survivors* as confirmed and as the same may be amended or modified.

## IV.   Purpose

4.1   Purpose. The purpose of this Allocation Protocol is to provide for the just, fair, and reasonable distribution of settlement funds to Future Claimants.

4.2   Sole and Exclusive Method. This Allocation Protocol shall be the sole and exclusive method by which Future Claimants may receive a distribution on account of their Future Claims.

4.3   Interpretation. The terms of the Plan shall prevail if there is any discrepancy between the terms of the Plan and the terms of this Allocation Protocol.

4.4   Abuse Claims Separately Allocated. Abuse Claims filed in this Case prior to the Bar Date (as defined in Section 1.1.17 of the Plan) shall not be subject to this Allocation Protocol and shall be subject to the Allocation Protocol attached as Exhibit H.

## V.   Procedure for Allocation Protocol

5.1   Filing of Future Claim. A Future Claimant may assert a Future Claim by submitting a claim form to the FCR and Settlement Trustee at: [_____]. Such form shall be substantially similar to the Sexual Abuse Proof of Claim Form submitted by holders of Abuse Claims. For the avoidance of doubt, Future Claimants may submit a copy of the Sexual Abuse Proof of Claim Form to the Settlement Trustee. The Settlement Trustee shall transmit a copy of any claims received to the ACR within a reasonable time after receipt thereof.

5.2   Monetary Distribution on Account of Each Future Claim. The ACR shall evaluate each Future Claim and shall determine the number of points, if any, which should be allocated to each Future Claimant under the guidelines set forth in Section 5.4 below.

5.3   **Guidelines for Use of Protocol:**

a.   Initial-Evaluation.

Before determining a Future Claimant's point award, the ACR shall consider the degree to which each Future Claimant has proven by a preponderance of the evidence that such

**USA Gymnastics Plan of Reorganization**
**Exhibit I, Future Claimant Allocation Protocol**

Future Claimant was abused and that such Future Claimant's Abuse was perpetrated by a Perpetrator of the Debtor. The ACR shall also determine whether the Future Claimant may be designated as a Future Claimant under the terms of the Plan (including the definition of Future Claimant).

The ACR shall have sole discretion to determine that an Future Claimant has proven that such Future Claimant was (a) abused (b) by a Perpetrator of the Debtor. Nothing herein shall prohibit the ACR from requesting information about a particular Future Claimant from the Trustee or the Trustee's counsel.

The ACR should consider the coherence, credibility and consistency of each Future Claimant's accounts of the abuse and should consider any and all evidence that may enhance or diminish the reliability of such claims.

        b.       Nature, Severity, and Impact of the Sexual Abuse.

Each Future Claimant will be evaluated by the ACR and scored according to the system described in Section 5.4 below. If a Future Claimant does not provide additional Documentary Information, then the ACR will allocate points according to the same factors based on the Future Claimant's filed claim to extent the ACR deems such claim is reliable and probative.

        c.       No Award for Adult Claimants.

The ACR shall allocate zero (0) points to a Future Claimant who was over the age of eighteen (18) at the time of the Abuse regardless of the applicability of any other factors, other than a change in the applicable Statute of Limitations.

        d.       No Award for Non-Sexual Abuse.

The ACR shall allocate points only for Future Claims that are based on Abuse. Zero (0) points shall be allocated for any Future Claim based on any act or omission that is not Abuse.

        e.       No Award for Released Tort Claims.

The ACR shall allocate zero (0) points to any Future Claimant who executed a release of the Debtor prior to asserting his or her Future Claim in this Cases.

        f.       No Award for Deceased Future Claimants.

The ACR shall allocate zero (0) points to any Future Claim asserted by an estate of a deceased Future Claimant; provided, however, that any Future Claim submitted by a Future Claimant who dies while the determination of the Claim is pending shall be reviewed and paid to the estate of such Future Claimant pursuant to the terms of the Plan, the Plan Documents and this Allocation Protocol.

**USA Gymnastics Plan of Reorganization**
**Exhibit I, Future Claimant Allocation Protocol**

5.4     Considerations for Allocation.

The ACR shall determine the Future Claimant's point award based on the following factors:

**Pre-Existing Risk and Resiliency Factors:**     **MAXIMUM 20 POINTS**

    A.     Risk and resiliency factors are aspects of life known to negatively impact life and to exacerbate the negative impact of experience such as Sexual Abuse:

        i.     Childhood of poverty;

        ii.     Parental divorce;

        iii.     Death of a parent;

        iv.     Exposure to substance abuse;

        v.     Absence of parent(s);

        vi.     Being victim of or witnessing domestic violence; and

        vii.     Prior abuse.

**Nature of the Sexual Abuse:**     **MAXIMUM 40 POINTS**

    A.     Nature of the Sexual Abuse considers:

        i.     Age at time of the abuse;

        ii.     Date of abuse;

        iii.     Duration;

        iv.     Frequency/number of instances;

        v.     Degree intrusive into victim's body (*e.g.* clothed/unclothed, oral, anal, vaginal);

        vi.     Level of force/violence/coercion/threats;

        vii.     Control of environment (*e.g.* trip under supervision of Perpetrator of Debtors);

        viii.     More than one Perpetrator of Debtor;

        ix.     Physical pain suffered; and

        x.     Grooming.

**Post-Abuse Mental and Physical Functioning:**     **MAXIMUM 40 POINTS**

    A.     Post-abuse functioning considers:

        i.     School behavior problems;

|  |  |
|---|---|
| ii. | School or academic problems; |
| iii. | Loss of faith; |
| iv. | Damage to family relationships; |
| v. | Mental health symptoms; |
| vi. | Depression-PTSD; |
| vii. | Suicide attempt or ideation; |
| viii. | Anxiety; |
| ix. | Substance abuse; |
| x. | Sexual dysfunction; |
| xi. | Intimacy issues; |
| xii. | Runaway; |
| xiii. | Flashbacks; |
| xiv. | Nightmares; |
| xv. | Criminal record; |
| xvi. | Relationship dysfunction and loss; |
| xvii. | Substance abuse; |
| xviii. | Lack of access to medical/psychological treatment; |
| xix. | Poverty; and |
| xx. | Other. |

**Legal Considerations:**                    **MAXIMUM +/- 20 POINTS**

A.  This factor considers:

- i.  Sexual Abuse post 2015;
- ii.  Statute of limitations issues;
- iii.  Notice issues; and
- iv.  Other issues.

**Post-Abuse Employment Issues:**                    **MAXIMUM 30 POINTS**

A.  Post-Abuse Employment Issues include:

- i.  Underemployment/unemployment;
- ii.  Loss of career (athletic or otherwise);
- iii.  Loss of employment opportunities (athletic or otherwise);
- iv.  Loss of sponsorships or scholarships;

5

      v.      National Team Member; and

      vi.     Olympian.

**Assessment of Global Severity of Impact/Suffering:   MAXIMUM 20 POINTS**

    A.    The ACR shall rate the global severity of impact/suffering. That is, compared to other Abuse Claimants in the Allocation Protocol, the ACR will consider how much this individual suffered as a result of the Sexual Abuse:

      i.     Compared to other Abuse Claimants in the Allocation Protocol, the ACR will consider the overall seriousness of the Sexual Abuse; and

      ii.    Compared to other Abuse Claimants in Allocation Protocol, the ACR will consider the overall negative impact of the Sexual Abuse.

**Additional Factors for Olympians and National Team Members and other Survivors:          MAXIMUM 20 POINTS**

    A.    ACR shall consider the following additional factors:

      i.     Claimant's level of acclaim in the sport in which she was abused (*e.g.*, publicly-acknowledged accomplishments in national or world events, public figure in the sport, honors from press or sports bodies, etc.); and

      ii.    Claimant's level of participation in public/litigation events related to the Sexual Abuse Claims (*e.g.*, press/media participation, legislative hearing participation).

5.5    <u>Monetary Distribution</u>. The ACR will arrive at a point total for each Future Claimant taking into account the factors and guidelines in Section 5.4, above, and assigning a point total for each Future Claimant. The value of an individual "point" will be determined after all Future Claims have been evaluated by dividing the total amount of dollars available under the Future Claims Reserve by the total number of points for all of Future Claimants (subject to the Maximum Future Claim Amount (defined below) and the other payment procedures described below). By way of example, if there are 100 Future Claimants awarded a total of 7,500 points and the Future Claims Reserve is $1.0 million, then each point would be valued at $133.33 (subject to the Maximum Future Claim Amount).

      Solely with respect to Future Claims, the point value shall be determined and adjusted from time to time as Future Claims are filed. Such adjustment will occur as claims are filed because each additional claims will increase the points by which the amount to be distributed is divided. By way of example, if there are two (2) Future Claims filed during the first year after

confirmation, with each claim assigned 75 points, and there is $10,000 to distribute, then the value of each point would be $66.67 [10,000/(75*2)]. However, if there is a new Future Claim worth 75 points filed the next year, then the value of each point would be $44.44 [10,000/(75*3)]. As such, as new Future Claims are filed, the value of points may be decreased.

[The Settlement Trustee shall not pay any monetary award to a Future Claimant until such time that such Future Claimant submits a release pursuant to the terms of the Plan.]

5.6     Determinations by the ACR and Requests for Reconsideration and Appeal. The ACR shall notify the Settlement Trustee in writing (including via email) of the points awarded to the each Future Claimant. The Settlement Trustee shall send (via email or First Class Mail) this determination to the Future Claimant or the Future Claimant's attorney. The ACR's determination shall be final unless the Future Claimant makes a timely request for the point award to be reconsidered by the ACR. The Future Claimant shall not have a right to any other appeal of the ACR's point award. The Future may request reconsideration of the ACR's point award by delivering a written request for reconsideration to the ACR within 14 calendar days after the date of mailing of the award point notice. The ACR shall have sole discretion to determine how to proceed with the request for reconsideration and ultimately may increase, decrease or leave intact the Future Claimant's initial point award determination. The ACR's determination of such request for reconsideration shall be final and not subject to any further appeal. The ACR shall maintain an accounting of the costs/expenses incurred for each separate reconsideration request and the costs/expenses related to a specific request shall be borne by the Future Claimant making the request, which may be deducted from his/her Monetary Distribution; provided, however, that if and to the extent any Future Claimant's award is not sufficient to pay for the cost of the ACR's review, then such Future Claimant must advance the costs and expenses for such review at the time such Future Claimant submits his or her request for reconsideration.

5.7     Confidentiality. All information that the Settlement Trustee and/or the ACR receives from any source about any Future Claimant shall be held strictly confidential and shall not be disclosed to any party, including the Debtor, Settling Insurers, Participating Parties, Co-Defendants, or any other Person and/or Entity.

## VI.    **General Guidelines**

6.1     Non-Compensatory Damages and Other Theories of Liability. In determining the value of any Future Claim, punitive damages and damages that do not compensate the Future Claimant, shall not be considered or allowed, even if these damages could have been allowed in a case or at trial.

6.2     Award for Personal Injury. Any award to a Future Claimant pursuant to this Allocation Protocol shall be on account of a personal injury to the Future Claimant.

6.3     Res Judicata Effect. The ACR's determination with respect to an Future Claim shall have no preclusive or res judicata effect outside of this Case as to any third party. That is, the ACR's determination may not be used against any Future Claimant in any other case or proceeding.

**USA Gymnastics Plan of Reorganization**
**Exhibit I, Future Claimant Allocation Protocol**

6.4    <u>Costs of Administration</u>. All costs of administration associated with the matters discussed in this Allocation Protocol shall be deducted from the award paid to the Future Claimant; provided, however, that if the ACR awards a Tort Claimant zero (0) points, then the cost of the ACR's determination shall be paid by the Trust from the Future Claimant Reserve.

6.5    <u>Denial of Claim</u>. If a Future Claim is denied payment pursuant to the Allocation Plan, the holder of such Future Claim will have no further rights against the Debtor, Reorganized Debtor, the Trust, Trustee, or Protected Parties arising out of, relating to, or in connection with such Future Claim.

6.6    <u>Payment of Future Claims</u>.

The Trust shall pay Future Claimants in accordance with the terms of the Plan, Confirmation Order and Trust Documents, as follows:

i.    The Settlement Trustee shall make a Distribution to Future Claimants at least once during every twelve (12) months after the Effective Date if and to the extent any such claims have been filed. The date of any such Distribution is referred to herein as a "Distribution Date."

ii.    The maximum value of a point allocated to Future Claimants pursuant to this Allocation Plan shall be equal to the average value of a point allocated to all Class 6 Abuse Claimants who receive payment under the Allocation Protocol applicable to Class 6 Abuse Claimants (such amount, the "Maximum Future Claim Amount").

iii.    During the first twelve (12) month period (Year 1), the Settlement Trustee shall distribute no more than (a) thirty-seven and one-half percent (37.5%) of the remaining amount available under the Future Claimant Reserve collectively to all Future Claimants who have filed Future Claims entitled to a distribution as of a given Distribution Date and (b) four percent (4%) of the remaining amount available under the Future Claimant Reserve to any single Future Claimant; *provided, however*, that the Settlement Trustee shall not distribute more than the Maximum Future Claim Amount to any Future Claimant, *provided further, however,* that Future Claimants receiving a distribution in Year 1 receive an equal amount (on a per point basis);

iv.    During the second, third, and fourth twelve (12) month periods (Years 2-4), the Settlement Trustee shall distribute no more than (a) twelve and one-half percent (12.5%) of the remaining amount available under the Future Claimant Reserve collectively to all Future Claimants who have filed Future Claims entitled to a distribution as of a given Distribution Date and (b) two percent (2%) of the remaining amount available under the Future Claimant Reserve to any single Future Claimant. provided, however, that the Settlement Trustee shall not distribute more than the Maximum Future Claim Amount to any Future Claimant, provided further, however, that

upon any Distribution, the Settlement Trustee shall (x) first distribute funds to Future Claimants who filed compensable Future Claims after other Future Claimants had already received a Distribution until Holders of such later filed Future Claims receive an amount equal (on a per point basis) to the amount already distributed to Future Claimants who previously received a Distribution and (y) thereafter distribute additional available funds (equal on a per point basis) to all holders of allowed Future Claims as of such Distribution Date; and

v.      During the fifth twelve (12) month period (Year 5), the Settlement Trustee may distribute the remaining amount available under the Future Claimant Reserve to all Future Claimants who have filed Future Claims entitled to a distribution as of a given Distribution Date provided, however, that the Settlement Trustee shall not distribute more than the Maximum Future Claim Amount to any Future Claimant, provided further, however, that upon any Distribution, the Settlement Trustee shall (a) first distribute funds to the Future Claimants who filed compensable Future Claims after other Future Claimants had already received a Distribution until Holders of such later filed Future Claims receive an amount equal (on a per point basis) to the amount already distributed to Future Claimants who previously received a Distribution and (b) thereafter distribute additional available funds (equal on a per point basis) to all holders of allowed Future Claims as of such Distribution Date.

# EXHIBIT J

## Form of General Release

USA Gymnastics Plan of Reorganization
Exhibit J, Form of General Release

## SEXUAL ABUSE CLAIMANT GENERAL RELEASE

This Sexual Abuse Claimant General Release ("**Release**") is executed by [•] (the "**Claimant**") on [•], 202[•] pursuant to, and in accordance with, the terms of the *Modified Third Amended Joint Chapter 11 Plan Of Reorganization Proposed By USA Gymnastics And The Additional Tort Claimants Committee Of Sexual Abuse Survivors* (the "**Plan**").[1]

## RECITALS

A.    On December 5, 2018, USA Gymnastics (the "**Debtor**") filed a voluntary petition under chapter 11 of the United States Bankruptcy Code. The Debtor remained in possession of its property and continued to operate and maintain its organization as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    On December 13, 2021, the Debtor filed the Plan. On [•], 2021, the United States Bankruptcy Court for the Southern District of Indiana confirmed the Plan by entering the Confirmation Order. On [•], 2021, the Effective Date occurred under the Plan and the Debtor became the Reorganized Debtor.

C.    Pursuant to the Plan, a Trust was created for the benefit of Abuse Claimants and Future Claimants. All Abuse Claims and Future Claims are channeled to the Trust for resolution. Distributions to Holders of Allowed Abuse Claims and Holders of Allowed Future Claims shall be made from assets contributed to the Trust by the Settling Insurers and Participating Parties.

D.    The Settlement Trustee has determined, in accordance with the terms of the Plan and the Plan Documents, that the Claimant holds an Allowed [Abuse/Future] Claim (the "**Claimant's Channeled Claim**") and is entitled to a distribution (the "**Distribution**") from the Trust in full, complete, and final satisfaction of the Claimant's Channeled Claim.

E.    The Plan provides that, as a pre-condition to receiving the Distribution from the Trust, the Claimant shall execute and deliver to the Trust a full and complete general release of the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, all Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, and each of the Related Persons of all of the foregoing entities, of any and all Claims arising from or relating to the Debtor, Abuse Claims, Future Claims, or the Settling Insurance Policies.[2]

NOW, THEREFORE, in consideration of the treatment provided for the Claimant's Channeled Claim under the Plan and the Plan Documents, and for good and valuable consideration,

---

[1] The definitions set forth in Article I of the Plan apply to capitalized terms used, but not defined, in this Release. The rules of construction set forth in Article II of the Plan apply to this Release. To the extent that any provision of this Release conflicts with any term of the Plan, the terms of the Plan shall control.

[2] The universe of parties to be released under this Release is disclosed in the Plan. For the avoidance of doubt, such released parties are also listed on Schedule 1, attached hereto.

USA Gymnastics Plan of Reorganization
Exhibit J, Form of General Release

the sufficiency of which is hereby acknowledged, the Claimant agrees to release the Claimant's Channeled Claim on the following terms:

<div align="center">

**RELEASE TERMS**

</div>

      1.    **Claimant's Release**. In exchange for the Distribution, the Claimant, for and on behalf of the Claimant and the Claimant's heirs, intestates, estates, trusts, predecessors, successors, and assigns, and anyone claiming through the Claimant, completely releases, acquits, and forever discharges the Debtor, the Estate, the Reorganized Debtor, the Settling Insurers, the Participating Parties, and all known or unknown parties who may claim coverage under any Insurance Policy issued to the Debtor, including the Non-Debtor CGL Settling Insurer Covered Persons, and all Related Persons of the foregoing but solely in their capacities as Related Persons (the "**Claimant's Released Parties**"), from any and all claims, counterclaims, disputes, liabilities, rights, suits, obligations, judgments, duties, demands, defenses, liens, actions, administrative proceedings, costs, expenses, matters, issues, and causes of action of every kind and nature, whether known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, liquidated or unliquidated, matured or unmatured, accrued or unaccrued, apparent or unapparent, that have been, could have been, or in the future might be asserted in any court, tribunal, or proceeding (including but not limited to any claims arising under federal, state, local, foreign, tribal, or common law), by or on behalf of the Claimant, whether individual, direct, class, representative, derivative, legal, equitable, or any other type or in any other capacity, which the Claimant ever had, now has, or may have had, from the beginning of time to the date of payment of the Distribution, arising from or relating to the Debtor, Abuse Claims, Future Claims, or the Settling Insurance Policies (collectively, the "**Released Claims**"), and the Claimant shall forever be enjoined pursuant to the Plan from prosecuting any such Released Claims against the Claimant's Released Parties.

      2.    **Claimant's Waiver**. The Claimant expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States which is similar, comparable, or equivalent to California Civil Code § 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

In agreeing to the foregoing waiver, the Claimant expressly acknowledges and understands that [she/he] may hereafter discover facts in addition to or different from those which [she/he] now believes to be true with respect to the subject matter of the matters released herein, but expressly agrees that they have taken these possibilities into account in electing to execute this Release, and that the Release given herein shall be and remain in effect as a full and complete general release notwithstanding the discovery or existence of any such additional or different facts, as to which the Claimant expressly assumes the risk.

      3.    **Excluded Parties**. For the avoidance of doubt, the Claimant's Released Parties do not include and specifically exclude any Person who personally committed an act of Sexual Abuse

<div align="center">2</div>

USA Gymnastics Plan of Reorganization
Exhibit J, Form of General Release

that resulted in or would result in a Claim against the Debtor or a Participating Party, including, without limitation, Don Peters, Steve Rybacki, Beth Rybacki, SCATS Gymnastics (including, without limitation, any predecessor in interest thereto), and Charter Oak Gymnastics (including, without limitation, any predecessor in interest thereto).

4.      **Claimant's Representation**. Claimant represents that they have not assigned their Released Claim or any portion thereof and is the owner of such Released Claim and has full authority to execute this Release.

5.      **Dismissal with Prejudice**. Within ten (10) days after receiving the Distribution, the Claimant shall dismiss with prejudice any lawsuit that the Claimant had brought against the Debtor, any Participating Party, any Settling Insurer, and any Non-Debtor CGL Settling Insurer Covered Person, and shall promptly deliver evidence of such dismissal, with prejudice, to the Settlement Trustee.

6.      **Governing Law**. Except to the extent that federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, this Release shall be governed by and construed and enforced in accordance with the laws of the State of Indiana without giving effect to the principles of conflicts of laws.

7.      **Severability**. If any term, covenant, or provision of this Release is held by a court of competent jurisdiction to be invalid or against public policy, the remaining provisions of this Release shall remain in full force and effect and will in no way be affected, impaired, or invalidated.

8.      **Complete Agreement**. The terms of this Release and the Plan, including all of the Plan Documents, supersede all prior negotiations, discussions, or agreements between the Claimant, any of the Claimant's Released Parties, and the Settlement Trustee of any sort whatsoever, whether oral or written, relating to this Release and the Plan.

9.      **Integral to Plan**. This Release is integral and critical to the Plan and the full, complete, and final settlement of the Claimant's Channeled Claim as provided therein. Upon receipt of the Distribution, and thereafter, the Claimant shall not take any action contrary to the terms of the Plan or this Release.

10.      **Right to Consult Counsel**.  Claimant acknowledges that they have reviewed this Release with their legal counsel or had the opportunity to do so prior to signing and elected not to consult legal counsel.

[*Signature page follows*.]

**USA Gymnastics Plan of Reorganization**
**Exhibit J, Form of General Release**

**THE UNDERSIGNED CLAIMANT HAS CAREFULLY READ THE FOREGOING RELEASE AND THE ATTACHED <u>SCHEDULE 1</u>, KNOWS AND FULLY UNDERSTANDS THE CONTENTS THEREOF, AND SIGNS THIS RELEASE AS THE CLAIMANT'S OWN FREE ACT.**

_____

[CLAIMANT]

Dated: _____

USA Gymnastics Plan of Reorganization
Exhibit J, Form of General Release

## SCHEDULE 1
## List of Claimant's Released Parties

- USA Gymnastics

- The Estate created in USA Gymnastics' chapter 11 case pursuant to Section 541 of the Bankruptcy Code

- Reorganized USA Gymnastics

- Settling Insurers

  o ACE American Insurance Company, formerly known as Cigna Insurance Company
  o Great American Assurance Company
  o National Casualty Company
  o National Union Fire Insurance Company of Pittsburgh, P.A.
  o Virginia Surety Company, formerly known as Combined Specialty Insurance Company
  o Lexington Insurance Company
  o Nationwide Mutual Insurance Company
  o New Hampshire Insurance Company
  o Philadelphia Indemnity Insurance Company
  o State Farm Fire and Casualty Company
  o Gemini Insurance Company
  o American Empire Surplus Lines Insurance Company
  o TIG Insurance Company

- Participating Parties

  o Marta Karolyi (aka Martha Karolyi)
  o Bela Karolyi
  o BMK Partners, Ltd.
  o BMK Training Facilities, Ltd
  o Karolyi Training Camps, LLC
  o Karolyi's Elite
  o Karolyi World Gymnastics
  o Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA
  o Geddert's Twistars USA Gymnastics Club, Inc.
  o Twistars USA, Inc.
  o John Geddert
  o Kathryn Geddert
  o United States Olympic and Paralympic Committee

- Non-Debtor CGL Settling Insurer Covered Persons

  o All Olympia Gymnastics Center
  o AOGC All Olympia Gymnastics Center
  o Amy White
  o Artur Akopyan
  o Bob Colarossi

**USA Gymnastics Plan of Reorganization**
**Exhibit J, Form of General Release**

- o Bela Karolyi
- o BMK Partners Ltd
- o BMK Training Facilities Ltd.
- o Debra Van Horn
- o Galina Marinova
- o Geddert's Twistars USA Gymnastics Club, Inc.
- o John Geddert
- o Karolyi Training Camps, LLC
- o Karolyi's Elite
- o Karolyi World Gymnastics
- o Kathryn Geddert
- o Kathy Scanlan
- o Kathy Scanlan, LLC
- o Marta Karolyi (aka Martha Karolyi)
- o National Gymnastics Foundation
- o Paul Parilla
- o Rhonda Faehn
- o Stephen Penny
- o Twistars USA, Inc. d/b/a Geddert's Twistars Gymnastics Club USA
- o Twistars USA, Inc.
- o United States Olympic and Paralympic Committee

- All other known or unknown parties who may claim coverage under any Insurance Policy issued to USA Gymnastics

- All Related Persons of the foregoing but solely in such Person's capacity as a Related Person